**2019-1871, -1873, -1875, -1876, -2224**

# United States Court of Appeals for the Federal Circuit

PFIZER INC.,
*Appellant*,

v.

SANOFI PASTEUR INC., SK CHEMICALS CO., LTD.,
*Appellees*

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,
*Intervenor*.

*Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2017-02131, IPR2017-02132, IPR2017-02136, IPR2017-02138, and IPR2018-00187.*

## BRIEF FOR APPELLANT PFIZER INC.

Henry Huang
WHITE & CASE LLP
3000 El Camino Real
Two Palo Alto Square, Suite 900
Palo Alto, CA 94306
(650) 213-0300 (telephone)
henry.huang@whitecase.com

C. Sebastian Zonte
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071-2433
(213) 620-7798 (telephone)
sebastian.zonte@whitecase.com

John Scheibeler
Dimitrios T. Drivas
Amit Thakore
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200 (telephone)
jscheibeler@whitecase.com
athakore@whitecase.com

*Counsel for Appellant Pfizer Inc.*

## Representative Claims

1. An immunogenic composition comprising a Streptococcus pneumoniae serotype 22F glycoconjugate, wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from S. pneumoniae serotype 22F and a carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.

3. The immunogenic composition of claim 1, wherein the composition further comprises a S. pneumoniae serotype 15B glycoconjugate and a S. pneumoniae serotype 33F glycoconjugate.

4. The immunogenic composition of claim 3, wherein the composition further comprises a S. pneumoniae serotype 12F glycoconjugate, a S. pneumoniae serotype 10A glycoconjugate, a S. pneumoniae serotype 11A glycoconjugate and a S. pneumoniae serotype 8 glycoconjugate.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2019-1871, -1873, -1875, -1876, -2224

**Short Case Caption** Pfizer Inc. v. Sanofi Pasteur Inc.

**Filing Party/Entity** Pfizer Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/18/2022

Signature: /s/John Scheibeler

Name: John Scheibeler

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Pfizer Inc. | Pfizer Inc. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Anita Varma<br>White & Case LLP | Leon Miniovich<br>White & Case LLP (no longer with firm) | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

TABLE OF CONTENTS .......... iv

TABLE OF AUTHORITIES .......... vii

GLOSSARY OF ABBREVIATIONS .......... x

STATEMENT OF RELATED CASES .......... xi

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

ISSUES PRESENTED .......... 4

STATEMENT OF THE CASE .......... 5

I. DEVELOPMENT OF THE CLAIMED VACCINE COMPOSITIONS .......... 5

A. Multivalent Pneumococcal Conjugate Vaccine Development is Empirical in Nature and Unpredictable .......... 5

B. The ’559 Patent Expanded Coverage Beyond Prevnar 13® .......... 8

II. PETITIONERS’ CHALLENGES TO THE ’559 PATENT .......... 10

A. The Merck Proceedings .......... 10

B. The Sanofi Proceeding .......... 11

C. Summary of Pertinent Prior Art in the Petitions .......... 12

1. Merck 2011 / Merck-086 .......... 12

2. GSK 2008 / GSK-711 .......... 15

3. Pfizer 2012 .......... 15

III. PFIZER'S PATENT OWNER RESPONSES AND MOTIONS TO AMEND ....................16

IV. THE FINAL WRITTEN DECISIONS ....................19

A. The Board Found Claims 1-45 Unpatentable ....................19

B. The Board Denied Pfizer's Motion to Amend ....................20

V. PFIZER'S REQUESTS FOR DIRECTOR REVIEW WERE DENIED ....................22

SUMMARY OF ARGUMENT ....................22

ARGUMENT ....................24

I. STANDARD OF REVIEW ....................24

II. THE BOARD ERRED IN FINDING CLAIM 1 OBVIOUS ....................25

A. The Prior Art Does Not Disclose 22F Conjugates With Molecular Weights Overlapping the Claimed Range ....................27

1. The Merck Proceedings ....................27

2. The Sanofi Proceeding ....................30

B. The Record Lacks Substantial Evidence That Conjugate Molecular Weight is a Result-Effective Variable ....................34

C. The Board Failed to Consider the Obviousness of the Claim as a Whole ....................38

III. THE BOARD'S OBVIOUSNESS RULINGS FOR CLAIM 3 AND 4 LACK SUBSTANTIAL EVIDENCE ....................39

IV. THE BOARD'S DENIAL OF PFIZER'S CONTINGENT MOTION TO AMEND WAS AN ABUSE OF DISCRETION ....................45

A. There Was no Reasonable Expectation of Success in Achieving the Claimed 2-Log Increase ....................45

B. There is No Evidence that a 2-Log Increase Could be Achieved by Routine Optimization ....................53

C. There is No Evidence that a 2-Log Increase Was Possible for the Additional Serotypes Recited in Claims 48 and 49 ....................54

V. THE PTO'S DIRECTOR REVIEW PROCEDURE WAS IMPROPER......56

CONCLUSION ....................59

CERTIFICATE OF COMPLIANCE....................61

# TABLE OF AUTHORITIES

## Cases

*Aqua Prods., Inc. v. Matal*,
872 F.3d 1329 (Fed. Cir. 2017)....................57

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
35 F.4th 1328 (Fed. Cir. 2022) .................... 22, 59

*Dickinson v. Zurko*,
527 U.S. 150 (1999)....................24

*E.I. du Pont de Nemours & Co. v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018)....................34

*EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*,
859 F.3d 1341 (Fed. Cir. 2017)....................30

*Ericsson Inc. v. Intellectual Ventures I LLC*,
901 F.3d 1374 (Fed. Cir. 2018)....................25

*Facebook, Inc. v. Windy City Innovations, LLC*,
973 F.3d 1339 (Fed. Cir. 2020)....................57

*Grunenthal GmbH v. Alkem Labs. Ltd.*,
919 F.3d 1333 (Fed. Cir. 2019)....................39

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019)....................35

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012)....................35

*In re Biedermann*,
733 F.3d 329 (Fed. Cir. 2013)....................30

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000)....................25

*In re Magnum Oil Tools*,
829 F.3d 1364 (Fed. Cir. 2016)....................26

*In re Stepan*,
660 F.3d 1341 (Fed. Cir. 2011)....................................................................30

*ModernaTx, Inc. v. Arbutus Biopharma Corp.*,
18 F.4th 1364 (Fed. Cir. 2021) ....................................................................38

*Par Pharm., Inc. v. TWi Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014)....................................................................25

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 747 (Fed. Cir. 2016)......................................................................25

*Pride Mobility Prods. Corp. v. Permobil, Inc.*,
818 F.3d 1307 (Fed. Cir. 2016)....................................................................25

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013)....................................................................25

*Raytheon Techs. Corp. v. Gen. Elec. Co.*,
993 F.3d 1374 (Fed. Cir. 2021)....................................................................43

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015) ..................................................................................25

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ..............................................................................3

35 U.S.C. § 2(b)(2)........................................................................................57

35 U.S.C. § 141 ..............................................................................................3

35 U.S.C. § 314 ..............................................................................................3

35 U.S.C. § 316(a) ........................................................................................57

35 U.S.C. § 318(a) ..........................................................................................3

5 U.S.C. § 553 ...............................................................................................57

5 U.S.C. § 553(b) ................................................................................... 57, 58

5 U.S.C. § 553(c) ....................................................................................57

5 U.S.C. § 706 ........................................................................................24

**Rules**

Federal Circuit Rule 32 ............................................................................61

Federal Circuit Rule 32(b) .........................................................................61

Federal Circuit Rule 47.5 ........................................................................... ix

Federal Rule of Appellate Procedure 32(a)(5)............................................61

Federal Rule of Appellate Procedure 32(a)(6)............................................61

Federal Rule of Appellate Procedure 32(a)(7)(B) ......................................61

Federal Rule of Appellate Procedure 32(f)..................................................61

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ’559 Patent | U.S. Patent No. 9,492,559 (Appx845-934) |
| Pfizer | Appellant Pfizer Inc. |
| Merck | Merck Sharp & Dohme Corp. |
| Sanofi | Sanofi Pasteur Inc. and SK Chemicals Co., Ltd. |
| Board (or PTAB) | Patent Trial and Appeal Board |
| IPR | *inter partes* review |
| Merck Proceedings | IPR2017-02131, IPR2017-02132, IPR2017-02136, and IPR2017-02138 |
| Sanofi Proceeding | IPR2018-00187 |
| Merck 2011 | WO2011/100151, published August 18, 2011 (Appx1732-1768) |
| GSK 2008 | WO2009/00825, published December 31, 2008 (Appx1769-1892) |
| Pfizer 2012 | Brown et al., *Characterization of Complex Prophylactic Vaccines with Protein and Glycoconjugate Components*, 9th CASSS Symposium (Sep. 12, 2012) (Appx1893-1926) |
| GSK-711 | WO2007/071711, published June 28, 2007 (Appx4572-4666) |
| Merck-086 | US2011/0195086, published August 11, 2011 (Appx4667-4683) |
| Hausdorff | US2012/0237542, published September 20, 2012 (Appx4522-4543) |
| POSITA (or skilled artisan) | person of ordinary skill in the art |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellant Pfizer Inc. states:

1. No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court; and

2. The following matters may directly affect or be directly affected by this Court's decision in the pending appeal: None.

## INTRODUCTION

This appeal arises from five IPR proceedings involving Pfizer's '559 patent, which concerns immunogenic vaccine compositions comprising *S. pneumoniae* capsular polysaccharides conjugated to a carrier protein. Petitioners Merck and Sanofi separately challenged all claims of the '559 patent (claims 1-45) as obvious, relying on substantially the same prior art and arguments. The Board found the claims obvious, issuing nearly identical decisions across the five IPR proceedings. The Board also denied Pfizer's contingent motion to amend, which proposed a set of substitute claims reciting additional limitations. The Board's decisions are based on several factual and legal errors that require reversal or, at minimum, vacatur.

Claim 1 recites an immunogenic composition comprising a serotype 22F conjugate having (1) a molecular weight of 1,000-12,500 kDa, and (2) a ratio (w/w) of polysaccharide to carrier protein between 0.4 and 2. The Board found that it would have been obvious to optimize prior art 22F conjugates to the claimed molecular weight range of 1,000-12,500 kDa despite no evidence showing the molecular weight for such conjugates or overlapping ranges of molecular weight, such that a skilled artisan would have known to optimize that parameter. The Board found serotype 22F conjugate molecular weight was a result-effective variable even though no evidence showed this to be the case and neither Merck nor Sanofi asserted the theory. The Board's findings on claim 1 are legally erroneous and unsupported

by the evidence. Because claims 2-45 depend from claim 1, the Court must overturn the Board's decisions as to those claims as well.

Dependent claims 3 and 4 recite additional pneumococcal serotype conjugates in the immunogenic vaccine composition of claim 1. The Board failed to recognize that the additional serotype conjugates renders these claims independently patentable over the cited prior art. Claims 3 and 4 recite up to six additional serotypes for inclusion in the claimed composition. Petitioners did not produce any evidence suggesting that these additional serotypes could be successfully conjugated to a carrier protein and incorporated into an immunogenic vaccine, as required by the claims. The Board nevertheless found the claims obvious, improperly shifting the burden to Pfizer to demonstrate that the claims were "unobvious." The Board's conclusion cannot stand.

The Board also improperly denied Pfizer's contingent motion to amend, which proposed substitute claims with additional limitations nowhere shown or suggested in the prior art. One additional limitation requires that the composition achieve a certain threshold level of immunogenicity (namely, a "2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition"), which was not shown or suggested in the prior art. The Board's denial of Pfizer's motion was an abuse of discretion that must be overturned if the Court affirms the Board's ruling on the original challenged claims.

## STATEMENT OF JURISDICTION

On March 22, 2018, the Board instituted trial in the Merck Proceedings. On June 5, 2018, the Board instituted trial in the Sanofi Proceeding. The Board asserted jurisdiction under 35 U.S.C. §§ 314 and 318(a) for all IPRs.

The Board entered Final Written Decisions on March 12, 2019 for the Merck Proceedings, finding the claims obvious over the cited art and denying Pfizer's motion to amend. Appx1-81, Appx82-160, Appx161-216, Appx217-271. Pfizer appealed on May 13, 2019. ECF No. 1. The Board entered a Final Written Decision on June 3, 2019 for the Sanofi Proceeding, finding the same claims obvious over the cited art, and again denying Pfizer's motion to amend. Appx272-360. Pfizer appealed on August 2, 2019. Appx31827-31922. During these appeals, Merck and Pfizer resolved their disputes. On October 20, 2021, this Court granted Merck's motion to withdraw from the four appeals in which it was a party. ECF Nos. 80, 81.

On November 9, 2021, this Court remanded the appeals so Pfizer could request Director review. ECF No. 82. On February 4, 2022, Commissioner for Patents Andrew Hirshfeld denied Pfizer's requests. Appx31992-31994, Appx32494-32496. On April 8, 2022, Pfizer filed amended notices of appeal. ECF Nos. 89-93. This Court has jurisdiction under 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4)(A).

## ISSUES PRESENTED

1. Whether the Board erroneously found claim 1 of the ’559 patent obvious by applying the law of optimization and “result-effective variables” where the prior art did not disclose (1) the molecular weight for a serotype 22F conjugate or molecular weight ranges for such conjugates that overlap the claimed range, and (2) a relationship between the molecular weight of a conjugate and its immunogenicity.

2. Whether the Board erroneously found dependent claims 3 and 4 of the ’559 patent obvious where the prior art did not teach or suggest the additional immunogenic serotype conjugates recited in those claims.

3. Whether the Board abused its discretion by denying Pfizer’s contingent motion to amend and finding the proposed substitute claims obvious, despite no evidence in the prior art that the claimed “2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition” could be achieved.

4. Whether the PTO’s Director review procedure was implemented without proper rulemaking in violation of the Administrative Procedure Act.

# STATEMENT OF THE CASE

## I. DEVELOPMENT OF THE CLAIMED VACCINE COMPOSITIONS

### A. Multivalent Pneumococcal Conjugate Vaccine Development is Empirical in Nature and Unpredictable

Infections by *Streptococcus pneumoniae* (pneumococcus) are a leading cause of fatal diseases in infants and young children worldwide. Appx5455, Appx863; Appx29436, Appx24194. All pneumococcus bacteria are surrounded by a polysaccharide capsule. Appx5455, Appx863; Appx29436, Appx24194. There are over 91 different pneumococcus serotypes, some of which cause disease, while others do not. Appx5455, Appx863; Appx29436, Appx24194. Each serotype of pneumococcus has a distinct outer polysaccharide capsule. Appx863; Appx29436; Appx24194.

Early vaccines against pneumococcal infections comprised "free" polysaccharides from the polysaccharide capsule of specific pneumococcal serotypes. Appx5455-5456, Appx2582, Appx3137; Appx29436-29437, Appx29375, Appx29381. Because a vaccine effective against one serotype is typically not effective against a different serotype, vaccine developers created "multivalent" compositions containing multiple polysaccharide antigens, each targeting a different serotype. Appx5455; Appx29436. For example, the Pneumovax® vaccine (available since the late 1970s) was a 14-valent vaccine that contained free polysaccharides from 14 different serotypes. Appx2841. Pneumovax

23®, licensed in 1983, expanded coverage to a vaccine that contained free polysaccharides from 23 serotypes. Appx2582, Appx3137; Appx29375, Appx29381.

"Free" polysaccharides have shortcomings in generating immune responses in certain patients. In particular, Pneumovax 23® was found poorly immunogenic for several serotypes in children less than 2 years of age. Appx5455-5456, Appx3137; Appx29436-29437, Appx29381. To increase the immunogenicity of the polysaccharide antigens, vaccine manufacturers sought to develop *conjugate* vaccines wherein the polysaccharides of each serotype are individually conjugated to immunogenic protein carriers to enhance the immune response. Appx5455-5456, Appx3137, Appx29436-29437, Appx29381. Pfizer's 7-valent Prevnar® vaccine, licensed in 2000, comprised polysaccharide conjugates of serotypes 4, 6B, 9V, 14, 18C, 19F, and 23F each conjugated to a carrier protein called $CRM_{197}$. Prevnar® was the first notable success in pneumococcal conjugate vaccine development. Appx2847, Appx2853. A decade later, Pfizer's Prevnar 13® conjugate vaccine expanded coverage to thirteen serotypes, adding serotypes 1, 3, 5, 6A, 7F, and 19A, and was the highest valency pneumococcal conjugate vaccine available as of the invention date for the '559 patent. Appx2911, Appx2917; Appx863.

Conjugate vaccine development is complicated and requires careful control to generate conjugates with the appropriate attributes for inclusion in a vaccine.

Appx5456-5457; Appx29437-29438. This is particularly true for multivalent conjugate vaccines, which are subject to immune suppression or interference. Appx4332; Appx29050. A skilled artisan would have known that no single conjugation chemistry procedure generates conjugates uniformly suitable for inclusion in a vaccine. Appx5456-5457; Appx1946; Appx29437-29438, Appx25226. A skilled artisan would have understood that there was no simple way to determine the appropriate parameters for creating any given conjugate and that the determination was empirical in nature. For example, while researchers were able to produce pneumococcal serotype 3 conjugates at least as early as 1986, (Appx2419), such serotype 3 conjugates exhibited very poor immunogenicity. Appx5456, Appx4305; Appx4308-4309; Appx4316-4317; Appx4329, Appx29437; Appx29033; Appx29036-29037; Appx29044-29045; Appx29057. A vaccine comprising an immunogenic serotype 3 conjugate, Prevnar 13®, was not approved until many years later. Appx2911; Appx4522-4543; Appx28173.

The parameters for creating an immunogenic conjugate of a particular serotype are subject to numerous variables, including: buffer composition, conjugation type, conjugation active ingredients (types and concentrations), pH, polysaccharide and/or protein concentrations used in the conjugation reactions, pre-conjugation and post-conjugation polysaccharide-to-protein ratios, molecular weight of the polysaccharide, and choice of carrier protein. Appx5456-5457;

Appx2513, Appx2515-2516; Appx1946; Appx1821; Appx29437-29438, Appx25122, Appx25124-25125, Appx25053-25054, Appx25226.

Multivalent conjugate vaccine development faces an additional challenge. Appx4322; Appx6778; Appx29050, Appx30692. As the number of serotypes in the formulation increases, the likelihood of interference between the immune responses of one or more of the administered serotypes increases, reducing the immune responses elicited by those serotypes. Appx4322; Appx5590-5591; Appx29050, Appx28903-28904. The increase in carrier protein as valency rises can also increase interference. Appx4323; Appx29051. These concerns remained even after the Prevnar® and Prevnar 13® vaccines were developed. Appx4328; Appx29056.

### B. The '559 Patent Expanded Coverage Beyond Prevnar 13®

Even after Prevnar 13® was introduced, there remained a need for coverage against serotypes not found in Prevnar 13®. Appx5455-5456, Appx864. The '559 patent addressed the need by providing immunogenic 16-valent and 20-valent pneumococcal conjugate vaccine compositions, which expand the coverage of Prevnar 13® while maintaining immunogenicity of the original 13 serotypes in Prevnar 13®. Appx864, Appx923-925.

The claims of the '559 patent cover Pfizer's novel vaccine compositions. Claim 1 recites an immunogenic composition comprising a serotype 22F conjugate. Appx919-921, Appx923-925, Appx933. Claim 3, which depends from claim 1,

adds conjugates of serotypes 33F and 15B. Appx933. Claim 4, which depends from claim 3, further adds conjugates of serotypes 12F, 10A, 11A, and 8. Appx933. The ’559 patent specification provides detailed protocols for preparing and characterizing immunogenic conjugates for all seven of these serotypes (22F, 33F, 15B, 12F, 10A, 11A, and 8) that are not present in Prevnar 13®. Appx5453-5454; Appx12402; Appx910-923.

The ’559 patent also discloses 16-valent and 20-valent pneumococcal vaccine compositions that exhibit more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition in the form of an initial dose and a booster dose. Appx924-924; Appx5587; Appx12534. The 2-log IgG increase across all serotypes is an indicator of an efficacious multivalent vaccine. Appx5587-5588 (citing Appx4540-4541); Appx12534-12535 (same). The vaccines described in the ’559 patent were the first instance of a composition comprising the conjugates of Prevnar13® plus an additional serotype 22F conjugate that exhibited the 2-log IgG increase. Appx5587-5588; Appx12534-12535. The 2-log increase is the subject of the substitute claims in Pfizer’s motion to amend.

## II. PETITIONERS' CHALLENGES TO THE '559 PATENT

### A. The Merck Proceedings

The four Merck Proceedings fall into two groups – (i): IPR2017-02131, -02136; and (ii) IPR2017-02132, -02138 – based on the lead references relied upon.

In the first group, Merck challenged claims 1-10, 16-19, and 38-45 in IPR2017-02131 and claims 11-15 and 20-37 in IPR2017-02136 as obvious over Merck 2011 and GSK 2008, alone or in combination with certain additional references. Appx776-777; Appx14490-14491. Regarding claim 1, Merck alleged that both Merck 2011 and GSK 2008 "disclose immunogenic compositions that include a conjugate of pneumococcal serotype 22F" and that "Merck 2011 demonstrates immunogenicity against serotype 22F by the generation of functional antibody against that serotype." Appx804-805 (citing Appx103; Appx1756). Merck further argued that GSK 2008 discloses pneumococcal conjugates with a molecular weight "between 1,303-9,572 kDa" and that both Merck 2011 and GSK 2008 disclose "the claimed range of conjugate polysaccharide to protein ratios (0.4 to 2), and reflect a POSITA's general understanding that conjugate polysaccharide to protein ratios in the claimed range are typical for immunogenic conjugates." Appx812 (citing Appx1628); Appx14446 (citing Appx16799). As to claims 3 and 4, Merck argued that these claims are obvious based on the disclosure of the recited serotypes in GSK 2008. Appx815-817; Appx7578-7580.

In the second group, Merck challenged claims 1-10, 16-19, and 38-45 in IPR2017-02132 and claims 11-15 and 20-37 in IPR2017-02138 as obvious over Merck 2011 and Pfizer 2012, alone or combination with certain additional references. Merck repeated its arguments regarding Merck 2011, and additionally asserted that Pfizer 2012 discloses "conjugate molecular weights that overlap with the claimed range, *i.e.*, in the range of 1,000 to 5,000 kDa." Appx7522. Merck also alleged that "Pfizer 2012 further discloses that the typical molecular weight for the polysaccharides of a conjugate vaccine is 50-200 kDa." Appx7542. This set of grounds also appears in Merck's challenges to dependent claims 11-15 and 20-37 in IPR2017-02138. Appx19053-19061.

**B. The Sanofi Proceeding**

Sanofi also filed an IPR petition challenging claims 1-45 of the '559 patent. Sanofi asserted that the claims were obvious over GSK-711 and Merck-086, alone or in combination with certain additional references. Appx24101-24102. As explained below, GSK-711 and Merck-086 are substantively the same as GSK 2008 and Merck 2011, respectively, cited in the Merck Proceedings. Sanofi's petition thus raised essentially the same prior art as Merck raised. As with Merck's challenges, the Sanofi petition did not refer to conjugate molecular weight as a "result-effective variable." *E.g.*, Appx24131-24132. Sanofi also argued that claims

3 and 4 are obvious based on the disclosures in Merck-086 and GSK-711, similar to Merck's arguments. Appx24143-24149.

### C. Summary of Pertinent Prior Art in the Petitions

#### 1. Merck 2011 / Merck-086

Merck 2011 (asserted by Merck) and Merck-086 (asserted by Sanofi) are substantively the same reference. Merck 2011 is an international published patent application (Appx1732-1768), while Merck-086 is a corresponding U.S. published application (Appx25098-25114). Both were filed on the same day, claim priority to the same application, and contain substantively identical disclosures. The description below of Merck 2011 also applies to Merck-086. For simplicity, Pfizer refers to Merck 2011 in its discussion of these references, but provides citation to both references.

Merck 2011 discloses a 15-valent pneumococcal conjugate composition (PCV15) that includes the serotypes of Prevnar 13® as well as serotypes 22F and 33F, all conjugated to a $CRM_{197}$ carrier protein. Appx1735; Appx25103. Merck 2011 discloses a "common process flow" for creating the conjugates of PCV15 and provides the pre-conjugation ingredients and amounts for all conjugates of PCV15 combined. Appx1749-1752; Appx25108-25109. Merck 2011 does not describe specific details regarding the conjugation chemistry for any specific serotype, nor any of their final characteristics, including final molecular weight. Appx5458-5460;

Appx29439. Merck 2011 does not disclose the molecular weights of any conjugates present in its composition. Appx4008 (citing Appx5459-5460), Appx4015 (citing Appx5459-5460, and Appx4125); Appx28971-28972 (citing Appx29439). Merck also does not establish any relationship between conjugate molecular weight and immunogenicity.

Relevant to Pfizer's motion to amend and proposed substitute claims, Merck 2011 reports test results for PCV15 in New Zealand White Rabbits, the same test under the same conditions assessed in the '559 patent. The relevant test results are reported in Tables 3-4.

In Table 3, responses for PCV-15 are compared to those of Prevnar® for the seven common serotypes covered by Prevnar® (serotypes 4, 6B, 9V, 14, 18C, 19F, and 23F). Appx4085 (citing Appx1756-1757; Appx5589); Appx28083 (citing Appx25111; Appx28902); *see also* Appx6698 (citing Appx1756-1757; Appx6942). Table 3 shows the post-dose 2 IgG response ratio of PCV-15 vs. Prevnar® in four study arms of eight New Zealand white rabbits. Appx6699 (citing Appx1756-1757; Appx6942). A value of 1.0 for the ratio indicates that the response of that serotype in PCV-15 is the same as in Prevnar®, and any value less than 1.0 indicates an inferior response in PCV-15. Appx6699 (citing Appx6943). The results in Table 3 show that the PCV-15 composition elicited poorer responses (*i.e.*, < 1.0) than Prevnar® to several serotypes across several arms of the study. Appx6699 (citing

Appx6943); *see also* Appx4085 (citing Appx1757; Appx5589-5590); Appx28083 (citing Appx25111; Appx28902). For example, there was a statistically meaningful drop in immune response to serotype 18C in one study arm (NZWR-4) and 23F in two study arms (NZWR-1, -2) versus Prevnar®. Appx6699 (citing Appx1754; *see also* Appx6837-6838; Appx6943). Pfizer's expert, Dr. Paradiso, testified that the data shows that PCV-15 elicited poorer responses than Prevnar® and suffers from immune interference. Appx6943; Appx31027; *see also* Appx6199 ("formulation as a whole raises concern about potential interference").

Table 4 of Merck 2011 shows the fold rise in IgG response (Post-dose 2 : Pre-dose 1) for serotypes 1, 3, 5, 6A, 7F, 19A, 22F and 33F) in the four study arms of New Zealand White Rabbits (NZWR-1, -2, -3, and -4). Appx6700 (citing Appx6944). A value of greater than 100 indicates a greater than 2-log IgG increase. Appx6700 (citing Appx6944); Appx30675 (citing Appx31017-31018). The results show that PCV-15 failed to exhibit a 2-log IgG increase to the aforementioned serotypes. For example, PCV-15 failed to elicit a 2-log IgG increase for serotypes 1, 3, and 33F across all four study arms. Appx6700 (citing Appx6944). In two study arms (NZWR-1 and -2), PCV-15 failed to elicit a 2-log IgG increase for *any* of the serotypes. Appx6700 (citing Appx6944).

### 2. GSK 2008 / GSK-711

GSK 2008 (asserted by Merck) and GSK-711 (asserted by Sanofi) are substantively the same. Both references are related international published patent applications with substantively identical disclosures. For simplicity, Pfizer refers to GSK 2008 throughout this brief with parallel cites to GSK-711.

GSK 2008 discloses 10-, 11-, and 13-valent pneumococcal conjugate compositions that were "made," and a prophetic 14-valent pneumococcal conjugate composition that "may be made." Appx1824; Appx25056-25057. The 13- and 14-valent compositions comprise serotype 22F conjugated to a polyhistidine D protein either directly (PS22F-PhtD) or through an adipic acid dihydrazide linker (PS22F-AH-PhtD), and additional serotypes conjugated to four different carrier proteins (PD, TT, Ply, and DT). *Id.* GSK 2008 does not provide the final molecular weight for either the PS22F-PhtD or PS22F-AH-PhtD conjugate. Appx1823-1824 (listing conjugate size as "not determined"); 187 Ex. 1007 at 54-55 & Tbl. 2 (listing conjugate size as "Not done"). GSK 2008 also does not establish any relationship between conjugate molecular weight and immunogenicity.

### 3. Pfizer 2012

Pfizer 2012 is a slide show presentation that generally describes mass spectrometry and size exclusion chromatography multi-angle light scattering (SEC-MALLS) methods for characterizing several types of vaccines, including conjugates.

Appx1893-1926. Pfizer 2012 discloses that the "[t]ypical mass (kDa)" for conjugate vaccines is "500 to 5000." Appx1898. Pfizer 2012 does not specify which bacteria (*e.g.*, pneumococcal, haemophilus, group B strep) or what serotypes the "typical mass" concerns. Appx1898. Pfizer 2012 provides no information on specific serotypes. Appx5477-5480. While Pfizer 2012 includes figures showing SEC/MALLS, nuclear magnetic resonance, and mass spectrometry data about an unidentified conjugate (Appx1912-1923), it does not disclose the conjugate's individual components, the species source or serotype of the conjugate's polysaccharide (Appx5478-5479).

## III. PFIZER'S PATENT OWNER RESPONSES AND MOTIONS TO AMEND

In its Patent Owner Responses, Pfizer detailed why the references in the asserted grounds did not render obvious the composition of claim 1. *See, e.g.*, Appx4001-4002. Pfizer submitted testimony from its experts to rebut obviousness. In the Merck proceedings, Dr. Geert-Jans Boons explained that the cited art did not disclose the claimed molecular weight ranges, or render them obvious. *See, e.g.*, Appx5467-5484. In the Sanofi proceeding, Dr. Peng Wang detailed why the prior art also failed to teach or render obvious the claimed ranges. Appx29447-29466. Because all other claims of the '559 patent depend from claim 1, Pfizer pointed out that the Petitions failed to show unpatentability for any challenged claim.

Regarding dependent claims 3 and 4, Pfizer argued that neither Merck 2011

nor GSK 2008 exemplifies immunogenic compositions that include a conjugate of pneumococcal serotype 15B, as required by claim 3, or a conjugate of serotypes 12F, 10A, 11A or 8 (as required by claim 4). Appx4052-4053, Appx29015-29016. Pfizer also argued that the claim term "immunogenic" requires a composition that "elicits functional antibody against each serotype in the claimed composition." Appx4011-4015, Appx28977-28979.

In IPR2017-02131, -2132, and 2018-00187, Pfizer timely moved to amend the '559 patent with substitute claims 46-52 in the event the Board found claim 1 unpatentable. Appx4093-4095, Appx11282-11284, Appx28091-28093. Proposed independent claim 46 recites multiple additional limitations (underlined):

> Claim 46 (substitute for original claim 1, if found unpatentable): An immunogenic composition comprising:
>
> a *Streptococcus pneumoniae* serotype 22F glycoconjugate, wherein the 22F glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and a $CRM_{197}$ carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2;
>
> glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F all individually conjugated to $CRM_{197}$;
>
> an aluminum salt adjuvant; and
>
> wherein the composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition in the form of an initial dose and a booster dose.

*See id*. Substitute claims 47-52 all depend from claim 46, and therefore include the

same new limitations. *See id.*

Claim 46 requires not only a 22F conjugate with the specific carrier protein $CRM_{197}$, it recites another 13 serotypes all individually conjugated to $CRM_{197}$. Claim 46 also requires "more than a 2-log increase above baseline in serum IgG levels" in New Zealand White Rabbits across all 14 serotypes. Pfizer argued that the claimed 2-log IgG increase was not shown in the prior art, including Merck 2011. In particular, Pfizer argued that Table 4 of Merck 2011 showed that PCV-15 failed to achieve a 2-log increase in IgG levels for several serotypes in the composition based on four separate study arms of New Zealand White Rabbits. Appx6700-6701, Appx13588-13589, Appx30673. Pfizer also submitted testimony of its expert Dr. Peter Paradiso that the data in Tables 3 and 4 of Merck 2011 indicates that PCV-15 suffered from immune interference and that "[g]iven the poor responses to numerous serotypes across different study arms, a POSA would have no reasonable expectation of making a composition that meets the 2-log IgG increase of the substitute claims based on Hausdorff in view of Merck 2011 and GSK 2008." Appx6944-6945, Appx5590-5591, Appx28903-28904, Appx31026-31027.

Pfizer also presented substitute claims 48 and 49, which depend from claim 46 and recite up to six additional serotypes conjugated to $CRM_{197}$, similar to claims 3 and 4 of the '559 patent, respectively. Appx4093-4095, Appx11282-11284, Appx28091-28093. Claims 48 and 49 thus recite an immunogenic composition

comprising up to 20 *Streptococcus pneumoniae* serotype conjugates, wherein the composition exhibits the claimed 2-log IgG increase across all of the recited serotypes.

## IV. THE FINAL WRITTEN DECISIONS

Across the five proceedings, the Board found all challenged claims obvious over the prior art. The Board denied Pfizer's motions to amend on the ground that the proposed substitute claims were obvious.

### A. The Board Found Claims 1-45 Unpatentable

In each of IPR2017-02131, IPR2017-02132, and IPR2018-00187, the Board found claim 1 of the '559 patent unpatentable because it found that the claimed numerical ranges for molecular weight and polysaccharide-to-carrier protein weight ratio for the 22F conjugate would have been obvious to a skilled artisan. Appx26; Appx108; Appx300. The Board found that "conjugate size is a results[-]effective variable associated with improved stability of conjugates and good immune response," and that it would have been obvious to optimize conjugate molecular weight." Appx26; Appx108; Appx300. In the Sanofi proceeding, the Board accepted Sanofi's calculations about the expected molecular weights of certain conjugates in GSK-711, even though GSK-711 does not disclose such weights. Appx303-305.

The Board also found dependent claims 3 and 4 obvious. Appx48-49;

Appx126-127; Appx318-319. The Board improperly placed the burden on Pfizer to prove that claims 3 and 4 are "unobvious" over the prior art. Appx48; Appx126; Appx318. The Board agreed with Pfizer that the term "immunogenic" requires generation of functional antibodies against each individual claimed serotype. Appx10, Appx48; Appx91, Appx127; Appx281, Appx318. Despite this construction, the Board found claims 3 and 4 obvious because GSK 2008 mentions the claimed serotypes in a long list of serotypes that may be used in a vaccine. Appx48; Appx130; Appx318. The Board acknowledged that "[n]either Merck 2011 nor GSK 2008 exemplifies immunogenic compositions that include a conjugate of pneumococcal serotype 15B" or the remaining serotypes recited in claims 3 and 4. Appx48; Appx127; Appx318. The Board nevertheless found that it would have been obvious to make the claimed multivalent vaccine because the serotypes recited in claims 3 and 4 had previously been included in the free polysaccharide unconjugated vaccine, Pneumovax®. Appx49; Appx127; Appx319.

**B. The Board Denied Pfizer's Motion to Amend**

The Board found proposed substitute claims 46-52 in Pfizer's motion to amend obvious. Appx61; Appx140; Appx340. The Board found that Hausdorff disclosed a 13-valent immunogenic composition comprising serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F each conjugated to the carrier protein $CRM_{197}$ wherein each of the 13 serotypes produced an immune response with more

than a 2-log IgG increase above baseline as recited in the substitute claims. Appx61-63; Appx140-142; Appx348-349. The Board found that it would have been obvious to incorporate a serotype 22F polysaccharide conjugated to $CRM_{197}$, into a pneumococcal vaccine with the 13 serotypes disclosed by Hausdorff with a reasonable expectation of success in obtaining the claimed 2-log IgG increase. Appx74; Appx155; Appx348. The Board acknowledged that Merck 2011 shows that PCV15 "only obtained a 2-log increase in serum IgG levels in serotype 22F conjugates in two of the four study arms" in New Zealand White Rabbits, but nevertheless found that evidence that "all of the Merck 2011 experiments showed a greater than 1-log increase in serum IgG levels and half of the experiments shows a greater than 2-log increase supports the determination that there was a reasonable expectation of success in achieving the claimed combination at a greater than 2-log increase." Appx71; Appx149-150; Appx350-351. The Board focused only on serotype 22F and did not specifically address the data in Tables 3 and 4 of Merck 2011 showing *decreased* IgG levels and *less* than a 2-log increase in IgG levels for several other serotypes in PCV-15. Appx69-70; Appx146-147; Appx348-350.

The Board also denied proposed substitute claims 48 and 49, which depend from claim 46 and recite up to six additional serotypes conjugated to $CRM_{197}$, all of which must achieve a 2-log IgG increase as in claim 46. In the Merck Proceedings, the Board did not address the 2-log increase limitation in its analysis of claims 48

and 49, and yet found the claims obvious based on the mere knowledge of the claimed serotypes in the prior art. Appx76; Appx154-155. In the Sanofi Proceeding, the Board did not address claims 48 and 49 *at all* in its decision. Appx344-355.

## V. PFIZER'S REQUESTS FOR DIRECTOR REVIEW WERE DENIED

After the Supreme Court decided *Arthrex* on June 21, 2021, this Court remanded these proceedings to the PTAB "for the limited purpose of allowing appellant the opportunity to request Director rehearing of the final written decisions." ECF No. 82. Pfizer timely requested Director review of all five decisions. Appx31971-31990, Appx32111-32131, Appx32250-32264, Appx32360-32375, Appx32473-32492. Commissioner Hirshfeld denied all of Pfizer's requests on February 4, 2022, with no analysis of any issues presented for review. Appx31992-31994, Appx32494-32496.

## SUMMARY OF ARGUMENT

I. The Board erred in finding claim 1 obvious by concluding that it would have been obvious to optimize the molecular weight of a serotype 22F conjugate within the claimed range of 1,000-12,500 kDa. The Board sua sponte applied the result-effective variable doctrine (never raised by the Petitioners) despite no disclosure in the prior art of any 22F conjugate molecular weights that overlap the claimed ranges. Moreover, the Board ignored the fact that there was no evidence that molecular weight for a 22F conjugate was known to be a result-effective variable, such that a

skilled artisan would have known to optimize that parameter. The Board also failed to consider the obviousness of the claim as a whole and did not recognize that optimizing the two claimed variables concurrently would be nonobvious. The Board's conclusion that the claimed molecular weight for the 22F conjugate is obvious is not supported by substantial evidence and should be reversed.

II. The Board erred in finding dependent claims 3 and 4 obvious over the cited prior art. Claims 3 and 4 are independently patentable because they recite up to six additional immunogenic conjugates not previously shown in the prior art. The Board improperly relied on the fact that the serotypes recited in claims 3 and 4 had previously been included in a free polysaccharide (*i.e.*, unconjugated) vaccine. However, the prior art did not disclose the generation of a serotype 15B conjugate (as required by claim 3) or a serotype 12F, 10A, 11A, or 8 conjugate (as required by claim 4). The evidence also failed to demonstrate that there would have been a reasonable expectation of success in formulating immunogenic conjugates for the claimed serotypes. The Board's determination that claims 3 and 4 are obvious is not supported by substantial evidence.

III. The Board erred in denying Pfizer's motion to amend and finding proposed substitute claim 46 obvious. There was no reasonable expectation of success in achieving the claimed 2-log increase in serum IgG levels across all fourteen serotypes recited in claim 46. The data in Merck 2011 unequivocally shows that

when Merck attempted to expand coverage beyond the 13-valent conjugate vaccine disclosed in Hausdorff, Merck failed to achieve a 2-log increase in IgG response for several serotypes in the composition. The Board provided no explanation as to how evidence of a 2-log increase for serotype 22F alone in just two out of the four studies in Merck 2011 provides a reasonable expectation of success in achieving such an increase for serotype 22F as well as the remaining thirteen serotypes recited in the claim. Similarly, the Board failed to explain how the claimed 2-log increase would have been obvious in dependent claims 48 and 49, which recite several *additional* serotype conjugates not disclosed in Merck 2011 or elsewhere. The Board provided little to no analysis of substitute claims 48 and 49 in its decisions.

IV. The PTO's Director review procedure violated the Administrative Procedure Act because the PTO failed to conduct notice-and-comment rulemaking. Instead, the PTO relied on a website FAQ, subject to change without notice, to implement Mr. Hirshfeld's reviews. This was improper and warrants remand for Director review under properly promulgated rules.

## ARGUMENT

## I. STANDARD OF REVIEW

The Federal Circuit reviews the Board's decisions under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See, e.g.*, *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999); *Pride Mobility Prods. Corp. v.*

*Permobil, Inc.*, 818 F.3d 1307, 1313 (Fed. Cir. 2016) Both claim construction and obviousness are questions of law, based on underlying questions of fact. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840-42 (2015); *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). The Federal Circuit reviews the Board's legal conclusions on claim construction and obviousness *de novo* and any underlying factual findings for substantial evidence. *See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 751 (Fed. Cir. 2016); *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). "Decisions related to compliance with the Board's procedures are reviewed for an abuse of discretion." *Ericsson Inc. v. Intellectual Ventures I LLC*, 901 F.3d 1374, 1379 (Fed. Cir. 2018).

To establish obviousness, a challenger must demonstrate that "a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1193 (Fed. Cir. 2014) (quotation and citation omitted).

## II. THE BOARD ERRED IN FINDING CLAIM 1 OBVIOUS

The Board invalidated claim 1 and all dependent claims by finding that it would have been obvious to optimize the prior art 22F compositions to the claimed molecular weight range of 1,000-12,500 kDa. The Board spontaneously introduced the result-effective variable standard and applied it to the claimed molecular weight

ranges. *E.g.*, Appx26 ("We find that a preponderance of the evidence of record demonstrates that conjugate size is a results[]effective variable associated with improved stability of conjugates and good immune response . . . ."); Appx300 (same). This legal concept first appeared in the institution decisions, not the Petitions or opening expert declarations. *E.g.*, Appx3900-3901. None of the five petitions refers to "result-effective variable," "variable," or "optimize." *E.g.*, Appx803-804; Appx7557-7558; Appx24131-24132. In fact, Merck and Sanofi ignored this concept throughout expert discovery and oral hearings. Under these circumstances, the Board should not have invoked the result-effective doctrine to find the claimed molecular weight range obvious. *See In re Magnum Oil Tools*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (Board may not "adopt arguments on behalf of petitioners that *could have been, but were not*, raised by the petitioner during an IPR").

The Board also misapplied the law of optimization and result-effective variables. First, the Board improperly applied the result-effective variable doctrine because the prior art did not disclose numerical ranges for molecular weight that overlap the claimed ranges. Second, the Board improperly determined that the molecular weight for the 22F conjugate in claim 1 is a result-effective variable, and that a skilled artisan would have known to optimize that parameter. Appx300; Appx26; Appx108. The Board's conclusion is not supported by substantial

evidence. There is no evidence that final conjugate weight for a 22F conjugate was known to be a result-effective variable for routine optimization, or that the claimed molecular weight and conjugation ratios would result in improved stability or a good immune response. For these reasons, the obviousness rulings are incorrect.

### A. The Prior Art Does Not Disclose 22F Conjugates With Molecular Weights Overlapping the Claimed Range

The result-effective variable doctrine applies to obviousness of claimed numerical ranges under specific circumstances. If the relevant comparison between a disputed claim limitation and the prior art pertains to a range of overlapping values, "a slight overlap in range establishes a prima facie case of obviousness." *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341 (Fed. Cir. 2020) (quoting *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003)). Here, it is undisputed that there is no disclosure of a molecular weight of a 22F pneumococcal conjugate in the prior art of record. On this basis alone, the result-effective variable doctrine should not apply. With no actual overlap in numerical ranges, there is no presumption of obviousness.

#### 1. The Merck Proceedings

In IPR2017-02131, the prior art discloses no molecular weights for *any* 22F conjugate, let alone ranges overlapping with the claimed molecular weight range. For example, Merck 2011 does not disclose conjugate weight ranges that overlap with the challenged claims—which Merck's expert conceded. Appx11314 ("Q. Merck 2011 does not provide the molecular weight of any of the serotype

glycoconjugates described; right? . . . A. That is correct. . . ."). Table 1 of Merck 2011 discloses the amount of the "Pneumococcal polysaccharide antigen" active ingredient for the 15 serotypes in the formulation, but does not disclose the molecular weight for any serotype conjugate, including 22F. Appx8500; Appx5467-5468.

Merck conceded that GSK 2008 does not disclose molecular weights for 22F conjugates. Appx803. GSK 2008 discloses only pre-conjugation molecular weight for serotype 22F, and lists "not determined" for the weights of both 22F conjugates. Appx1823-1824; Appx5472-5474. A skilled artisan would not have understood or expected the serotype 22F conjugates to fall within the molecular weight range of the other conjugates in Table 2. Appx5472-5476.

Likewise, in IPR2017-02132, none of the other cited primary or secondary references discloses the claimed molecular weights. As one example, the Pfizer 2012 slideshow discusses use of SEC/MALLS (size exclusion chromatography – multiple angle laser light scattering) to determine molecular mass of various vaccine types. Appx1899, Appx1913. It does not disclose specific conjugates or their weights. Appx5477-5479, Appx12408. In a chart about characterizing vaccines with mass spectrometry, Pfizer 2012 lists a "Typical Mass (kDa)" of "500 to 5000 for conjugate." Appx1898. However, this statement does not identify any bacteria and certainly not any of the pneumococcal conjugates at issue here. Appx1898. For

these reasons, Pfizer's expert explained that "A POSA would not have interpreted the statement to mean that all glycoconjugates are within the range of 500-5,000 kDa." Appx5479-5480; Appx12418-12419. Nevertheless, the Board found "the 1,000-5,000 kDa molecular weight range disclosed in Pfizer 2012 to be desirable," ignoring the full disclosed range of 500-5,000 kDa and providing no explanation why only a *portion* of this range was "desirable" for any conjugate, let alone 22F. Appx108. The Board cited *Peterson* to support its view, but in that case, the challenged claims recited ranges of rhenium and chromium, and the cited art disclosed overlapping ranges of the *same* two elements. *See* 315 F.3d at 1329. By contrast, Pfizer 2012 does not recite the specific range of *any* pneumococcal conjugates. Pfizer 2012 also refers to general molecular weights ("500" kDa) outside the claimed range in the '559 patent. *E.g.*, Appx1898. Accordingly, Pfizer 2012 would not have guided a skilled artisan how to generate an immunogenic 22F composition within the claimed molecular weight range.

The Board also erred by relying on GSK 2008 to reject claim 1 in IPR2017-02132. Petitioner relied on Merck 2011 and Pfizer 2012 as the primary references in its petition for IPR2017-02132. Merck did not cite GSK 2008 as a prior art reference for claim 1. While Merck mentioned in passing a table from GSK 2008 in its petition, it did not otherwise apply it to claim 1 beyond that single sentence. Appx7563. However, the Board relied on GSK 2008 throughout the Final Written

Decision to support its obviousness analysis. Appx96-97, Appx103-107. The Board's cross-citing of GSK 2008 thus constituted a new ground of rejection in the -2132 IPR. *See EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1348 (Fed. Cir. 2017); *see also In re Stepan*, 660 F.3d 1341, 1345 (Fed. Cir. 2011). The "ultimate criterion of whether a rejection is considered new in a decision by the Board is whether applicants have had fair opportunity to react to the thrust of the rejection." *In re Biedermann*, 733 F.3d 329, 337 (Fed. Cir. 2013) (quotation omitted). Here, Pfizer had insufficient notice that GSK 2008 was part of the grounds for invalidating claim 1 in IPR2017-02132.

### 2. The Sanofi Proceeding

In connection with the Sanofi petition (IPR2018-00187), the Board improperly relied on Sanofi's flawed calculation of minimum conjugate molecular weight for the 22F conjugate disclosed in GSK-711. The Board accepted Sanofi's speculative and incorrect calculations about the expected molecular weights of certain conjugates in GSK-711, even though that reference does not disclose those weights. Appx303-305.

Table 2 in GSK-711 (which is substantively identical to GSK 2008) shows properties for several conjugates, but lists "not done" for molecular weights ("Conj. Size") of the two 22F serotype conjugates. Appx25056. Sanofi contended that a skilled artisan would have understood from Table 2 that GSK-711 renders obvious

the claimed weight range of 1,000-12,500 kDa based on assumptions and calculations about the compositions of the conjugates. Appx24132-24136.

Sanofi and its expert, Dr. Lees, postulated that the 22F conjugates have at least two polysaccharide molecules each: "it can be reasonably assumed that the 'smallest' lattice includes 2 molecules of a 22F polysaccharide." Appx24134. GSK-711 Table 2 indicates the weight of the 22F polysaccharide starting material ("PS size") is "159-167" kDa. Appx25056. Sanofi assumed that the total polysaccharide weight would be 320 kDa (160 kDa x 2 molecules). Appx24134. Sanofi further assumed that the total weight of the carrier protein would be 694.4 kDa because the weight ratio of carrier protein to polysaccharide is 2.17. Appx24134. Putting all of these assumptions together, Sanofi calculated the "minimum" conjugate weight as 1014.4 kDa (320 kDa + 694.4 kDa). Appx24134. Sanofi also argued that because the GSK-711 conjugates were purified with a "size exclusion limit" of 8,000 kDa, the conjugates must fall below the claimed upper range of 12,500 kDa. Appx24135-24136.

Pfizer and its experts explained why Sanofi's chain of assumptions is flawed. As an initial matter, GSK-711 (and GSK 2008) state expressly that the molecular weights of the 22F conjugates were "not done." The authors did not report any weights or attempt to extrapolate those weights based on Sanofi's *ex post* assumptions. Next, Pfizer and Dr. Wang showed that Sanofi's theory was flawed

by applying it to a different protein conjugate in Table 2, PS1-PD. Sanofi's computations would predict a weight range of 1,745-1,986 kDa, but Table 2 shows that the *actual* weight range was 1,499-1,715 kDa—*below* the predicted numbers. Appx29459-29460. This would have informed a skilled artisan to expect that GSK-711's molecular weights for 22F conjugates were *below* 1014.4 kDa. Furthermore, based on GSK-711's activation and conjugation methods, a skilled artisan would have understood that the 22F conjugates had only one polysaccharide molecule. Appx29457-29458; Appx28993. The resulting 22F conjugates would be half the size that Sanofi predicted: only 507.2 kDa, well below the claimed 1,000-12,500 kDa range.

Sanofi also failed to consider the known possibility of polysaccharide fragmentation, which reduces the size of the polysaccharide molecules in the conjugate. Lees-2008 states that "fragmentation can occur" during activation. Appx29458-29459 ("Lees-2008 clearly cautions a POSA of the fragmentation risks associated with CDAP chemistry and its alkaline pH"). When asked whether the alkaline environment used in GSK-711's CDAP conjugation reactions could result in fragmentation, Dr. Lees responded "I can't address that." Appx29257 (146:4-18). All of this evidence refutes Sanofi's molecular weight calculations.

Finally, Sanofi's arguments that the GSK-711 inventors would have been targeting conjugate molecular weights below the 12,500 kDa upper limit in the claim

based on size exclusion limits of a chromatography filter used in the reference are incorrect. Those size limits apply to globular proteins, not conjugates. Appx29453-29454; Appx24136; Appx8397; Appx26809, Appx26811 (Tbls. 1, 2); Appx26830, Appx26855 (Tbls. 4.6, 4.11). GSK-711 itself demonstrates that it is impossible to predict the upper size limit of conjugates from the SEC columns used in its experiments. Appx29454-29455. While Sanofi argues that the Sephacryl S400HR gel filtration column had a size exclusion limit of 8,000 kDa (Pet. at 39-40), GSK-711 taught that one conjugate (PS9V-PD) purified using the Sephacryl S400HR column had a molecular weight of 9,052-9,572 kDa—significantly larger than the column's supposed exclusion limit. Appx29454-29455 (citing Appx25056). Dr. Lees acknowledged during his deposition that the 8,000 kDa exclusion limit for the Sephacryl S400HR column "is not a precise cut off by any means." Appx29232-29233 (121:18-122:10). This is why Pfizer's expert Dr. Wang testified that "the ability to purify a glycoconjugate away from contaminants using an SEC column is unrelated to the ability of a POSA to accurately predict the molecular weight of a glycoconjugate using that same column." Appx29454-29455.

Despite this overwhelming contrary evidence, the Board accepted Sanofi's theory. The panel stated: "[W]e conclude that the molecular weight calculations provide some additional evidence supporting the obviousness of generating a serotype 22F glycoconjugate within the 1,000 to 12,500 kDa range recited by claim

1 of the ’559 patent.” Appx303-305. The Board dismissed any discrepancy in numerical ranges based on Sanofi’s expert’s testimony that they were “kind of the general range you’re targeting,” and because “GSK-711 is not relied upon for anticipation, but rather for obviousness.” Appx305. These conclusions lack substantial evidence or legal support. GSK-711 simply does not disclose the claimed weight range, nor render it obvious through baseless assumptions about polysaccharide ratios and weights. Obviousness here requires an actual overlap in ranges. *See Genentech*, 946 F.3d at 1341. The Board took GSK-711’s *lack* of disclosure of any molecular weight for a 22F conjugate (“not done”) and transformed it into a disclosure of a range close enough to the claimed range based on Sanofi’s erroneous calculations and unsupported assumptions.

### B. The Record Lacks Substantial Evidence That Conjugate Molecular Weight is a Result-Effective Variable

Even when the presumption of obviousness is triggered, this presumption can be rebutted “by showing that a process parameter . . . was not recognized as ‘result-effective’” at the time. *Id.* (citation omitted). “[A] person of ordinary skill would not always be motivated to optimize a parameter ‘if there is no evidence in the record that the prior art recognized that [that] particular parameter affected the result.’” *E.I. du Pont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1008 (Fed. Cir. 2018) (citation omitted). Accordingly, the result-effective variable doctrine applies only when the skilled artisan *actually knew* at the relevant time that a variable affected a

desired result. *See In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) ("The question is whether the dimensions *were known* to be result-effective variables.") (emphasis added).

The Board's conclusion that molecular weight is a result-effective variable is not supported by substantial evidence. The prior art did not disclose a relationship between the molecular weight of a 22F conjugate and its immunogenicity. The conjugate consists of two components, the polysaccharide of a particular serotype and the immunogenic carrier protein—here, 22F and $CRM_{197}$, respectively. No reference taught that conjugate molecular weight correlated with immunogenicity for 22F. While the Board claimed Merck 2011 "disclosed methods to optimize the size of the polysaccharides," that is insufficient as it relates to only *one* component of the polysaccharide-protein conjugate. Appx21; Appx102. And even if a skilled artisan knew to optimize the size of the *polysaccharide* component, that alone does not establish that the skilled artisan knew of any connection between the molecular weight of the combined 22F/$CRM_{197}$ *conjugate* and immunogenicity. The absence of any known correlation precludes application of the result-effective variable doctrine, which undermines the Board's obviousness analysis of claim 1 and all dependent claims. *See HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 703 (Fed. Cir. 2019) ("The district court found that the variables involved in this case, including the components of the inventive formulation, interact in an

unpredictable or unexpected way, such that the results emanating into PENNSAID® 2% were not obvious.").

Furthermore, arriving at the claimed ranges would have been unpredictable, not a matter of routine optimization. There were many differences in conjugation chemistry for different serotypes and for different immunogenic carrier proteins. The '559 patent describes distinct conjugation chemistries for generating each of the immunogenic serotypes 33F, 8, 10A, 12F, 15B, 22F, and 11A conjugates. Appx5471. The cited art showed, and both sides' experts agreed, that each conjugate requires individualized design and testing. *See* Ex. 1007 at 49 ("The activation and coupling conditions are specific for each polysaccharide."); Appx5468-5470 ("The appropriate molecular weight range for any serotype glycoconjugate needs to be determined on a case-by-case basis."); Appx4130-4131 (27:24-28:7) ("If you're asking is it empiric by pilot studies, yes, on an individual serotype basis."). The experts further agreed that determining optimum molecular weight for a conjugate requires case-by-case experimentation. Appx5468; Appx4130-4131 (27:24-28:7). Indeed, the prior art explains that conjugation "must be carefully controlled and optimized." Appx2515-2516. Accordingly, the conditions for creating effective conjugates were unpredictable and required significant experimentation.

The Board improperly dismissed this evidence of unpredictability. Two Pfizer experts testified that vaccine conjugation chemistry and molecular weight

were unpredictable, but the Board disregarded that guidance because there were *some* known techniques to control reactions. Appx24-25; Appx296-297. However, none of the cited testimony shows that "optimization of polysaccharide conjugate size was well known," but rather the opposite: despite known techniques, molecular weight remained unpredictable. Appx5469-5471; Appx29448-29449. For example, Pfizer's experts explained that GSK 2008's use of an alkaline quench at a pH of 9.0 was known to cause fragmentation of polysaccharides, reducing molecular weights. Appx1820 ("The pH was adjusted to the quenching pH (pH 9.0)."); Appx5473-5474 (noting that "alkaline treatment" reduces polysaccharide weight). As noted above, Sanofi's own evidence taught the risks of polysaccharide fragmentation. Appx29458-29459 (explaining "fragmentation risks associated with CDAP chemistry and its alkaline pH"). The Board noted but otherwise ignored these points. Appx19.

Similarly, Pfizer pointed out that Merck's secondary references, "Jones 2005" (Ex. 1026), "Wyeth 2007" (Ex. 1027), and "Lees 2008" (Ex. 1035), did not discuss the 22F serotype, taught different molecular weight ranges, and showed that numerous potential factors affect molecular weight. Appx5482-5484 ("Lees 2008 cautions that 'careful control' over numerous factors (*e.g.*, pH, temperature, ratio of protein and polysaccharide and concentration of each) is 'key to successful conjugation.'"). The Board simply dismissed this evidence, claiming that these

references taught "the known parameters necessary to obtain particular glycoconjugates." Appx27-34. The totality of the record shows that conjugate molecular weight was not subject to routine optimization, and was not recognized as result-effective for immunogenicity.

### C. The Board Failed to Consider the Obviousness of the Claim as a Whole

While claim 1 recites two interrelated numerical ranges—molecular weight of the conjugate and ratio of polysaccharide to carrier protein—the Board considered each range in isolation, focusing on individual disclosures in the art, instead of assessing whether optimizing both variables concurrently as claimed would have been obvious. This Court recently reiterated that concurrent optimization of multiple result-effective variables must be addressed "as a whole." *ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1364, 1376 (Fed. Cir. 2021). Here, the Board concluded that the claimed molecular weight limitation was obvious, and then separately turned its attention to the polysaccharide-to-protein weight ratio limitation of claim 1. Appx26-27; Appx108; Appx300-301. Moreover, despite finding the preamble limiting (Appx10; Appx3887-3888; Appx91; Appx11086; Appx280; Appx27987), the Board's decision does not contain any obviousness analysis of the "immunogenic" requirement of the claim imposed by the Board's own construction. The Board's failure to apply the obviousness analysis required

by law constitutes legal error requiring reversal. *See Grunenthal GmbH v. Alkem Labs. Ltd.*, 919 F.3d 1333, 1344 (Fed. Cir. 2019).

In summary, the Board erred by (1) applying the presumption of obviousness for overlapping ranges despite no disclosure of molecular weight for a 22F conjugate in the prior art, (2) applying the result-effective variable doctrine despite no evidence of a link between conjugate molecular weight and immunogenicity, while disregarding evidence about the unpredictable, case-specific nature of the art, and (3) failing to consider the obviousness of the claim as a whole. This resulted in the Board's erroneous conclusion that claim 1 and all dependent claims of the '559 patent are unpatentable. The Board's decisions should be overturned.

## III. THE BOARD'S OBVIOUSNESS RULINGS FOR CLAIM 3 AND 4 LACK SUBSTANTIAL EVIDENCE

The Board incorrectly found claims 3 and 4 obvious "over the disclosures in Merck 2011, GSK 2008, and the knowledge of the person of ordinary skill in the art." Appx48-49, Appx126-127, Appx318-319. Claims 3 and 4 recite "immunogenic compositions" comprising multiple serotype conjugates that the prior art had not previously created or incorporated into an immunogenic vaccine composition. Claim 3 recites conjugates of serotypes 15B and 33F, while claim 4 further requires inclusion of conjugate serotypes 12F, 10A, 11A, and 8. These claims are independently patentable from claim 1, and the Board's findings on obviousness must be reversed.

The evidence failed to demonstrate that there would have been a reasonable expectation of success in formulating *immunogenic* conjugates for the claimed serotypes. The Board adopted Pfizer's claim construction for "immunogenic" and found that claims 3 and 4 require an immune response for each recited serotype. Appx10, Appx48, Appx91, Appx127, Appx281, Appx318. Even after adopting Pfizer's construction, however, the Board found claims 3 and 4 obvious. The Board relied primarily on GSK 2008 / GSK-711 in both the Merck Proceedings and the Sanofi Proceeding and found that it would have been obvious to incorporate serotypes 15B, 33F, 12F, 10A, 11A, and 8 into a vaccine simply because GSK 2008 mentions the claimed serotypes in a long list of serotypes that may be used in a vaccine which, according to the Board, "also requires induction of an immune response to each serotype." Appx48, Appx127, Appx318.

This reading of GSK 2008 is not supported by any evidence in the record. Petitioners did not submit any evidence showing that GSK 2008 required or demonstrated the induction of an immune response for all recited serotypes. In fact, in the Merck Proceedings, Dr. Kasper's position was that claims 3 and 4 only required that the serotype 22F conjugate be immunogenic, contrary to the Board's construction. Appx4119 (16:6-12, 16-17). Thus, Dr. Kasper's analysis was based on an incorrect interpretation of the claim and cannot be relied upon.

Furthermore, Dr. Kasper did not explain why a skilled artisan would have any expectation that the claimed conjugates would be immunogenic, especially when included in the multivalent compositions of claims 3 and 4. To the contrary, when Dr. Kasper was asked whether he considered it a matter of routine optimization to create a composition that was immunogenic to all three serotypes recited in claim 3, he responded: "I can't predict." Appx4145-4146 (42:7-18, 43:10-15). On the other hand, Pfizer's experts specifically addressed this point and stated: "Neither Merck 2011 nor GSK 2008 exemplifies immunogenic compositions that include a conjugate of pneumococcal serotype 15B, as required by claims 3 and 4." Appx5502, Appx12446, Appx29474. This was acknowledged by Dr. Kasper during deposition. Appx4234-4236, Appx4239-4240 (131:23-133:3, 136:20-137:4).

In the Sanofi Proceeding, the Petitioner and Dr. Lees similarly relied on the appearance of serotypes 15B, 10A, 11A, 12F, and 8 in the unconjugated Pneumovax® vaccine as the basis for obviousness. Appx318-321, Appx24958-24960. However, no prior art reference shows any of the serotypes successfully included in an immunogenic conjugate vaccine, let alone a vaccine composition containing a 22F conjugate. During his deposition, Dr. Lees agreed that the term "immunogenic" required elicitation of functional antibody, and that claims 3-8 required that each of the conjugates recited in those claims be immunogenic. Appx29171-29173 (60:10-62:12). Dr. Lees also stated "I was called here as an

expert in the synthesis of conjugate vaccines, not on immunology. So your question is – involved making a multivalent vaccine. That's immunogenic. I am not in a position to address this at this time." Appx31359-31360 (89:8-90:18). His testimony moments later, where he asserted it would require nothing more than routine experimentation to make an immunogenic conjugate for "each and every" serotype in Pneumovax® (Appx31359-31360, Appx31433-31434 (89:8-90:18, 163:2-164:18)), was unsupported by any analysis or explanation other than an observation that Merck and GSK previously made multivalent conjugate compositions. *Id.*

The Board also failed to apply the correct construction of "immunogenic." Pfizer's construction of "immunogenic," which the Board adopted, requires eliciting antibodies against each of the serotypes or other immunogens within the "immunogenic" composition. Appx8, Appx90, Appx279. However, the Board's discussion of GSK 2008 fails to address whether the compositions it discloses do in fact "elicit functional antibody." Appx48, Appx127, Appx318. At his deposition, Dr. Kasper stated that he could not predict whether a composition containing 22F, 33F, and 15B conjugates would elicit functional antibody. Appx4145-4146 (42:7-43:18).

The prior art also failed to show conjugates of each of the serotypes recited in claims 3 and 4 (let alone immunogenic conjugates). Neither Merck 2011 nor GSK

2008 refers to the generation of a serotype 15B conjugate (as required by claim 3) or a serotype 12F, 10A, 11A, or 8 conjugate (as required by claim 4). Appx5502, Appx12446, Appx29474. In finding that it would have been obvious to make the claimed conjugates and include them in a multivalent vaccine, the Board relied on the fact that the recited serotypes had previously been included in the free polysaccharide unconjugated vaccine, Pneumovax®. Appx49, Appx127, Appx319. Following the Board's flawed approach, the mere knowledge of a serotype in the prior art or the inclusion of a serotype in a vaccine would render obvious a composition comprising an immunogenic *conjugate* of that serotype, even where the prior art contains no disclosure of the conjugate or its immunogenicity. Indeed, Lees 2008 teaches that multivalent pneumococcal conjugate compositions "present additional complexities" due to each serotype being chemically distinct, requiring optimization of each conjugate within the compositions. Appx5502, Appx12446, Appx29474.

The record shows that the prior art fails to teach or suggest the immunogenic compositions in claims 3 and 4. "To render a claim obvious, the prior art, taken as a whole, must enable a skilled artisan to make and use the claimed invention." *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021). "[E]ven though a non-enabling reference can play a role in an obviousness analysis, the evidence of record must still establish that a skilled artisan

could have made the claimed invention." *Id.* at 1381. Here, GSK 2008 and Merck 2011 provided insufficient evidence that the claimed immunogenic conjugates could be obtained. By contrast, the '559 patent provides detailed guidance about how to make and characterize an immunogenic composition comprising all of the additional serotypes recited in the compositions of claims 3 and 4. Appx5502 (citing Ex. 1001 at 121:53-125-34, Tbls. 21, 22). The Board's conclusion on unpatentability of claims 3 and 4 lacks substantial evidence and should be reversed.

Finally, the Board improperly shifted the burden to Pfizer to prove that claims 3 and 4 are "unobvious" over the prior art. Appx48 ("[W]e are not persuaded that claims 3 and 4 are unobvious over the disclosures in Merck 2011, GSK 2008, and the knowledge of the person of ordinary skill in the art."), Appx126, Appx318; *see also* Appx20, Appx101, Appx292 ("We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence"); Appx45, Appx120 ("A preponderance of the evidence does not support Patent Owner's position."). The burden was on the Petitioners to demonstrate by a preponderance of the evidence that claims 3 and 4 would have been obvious in view of the prior art. Pfizer should not have been required to prove that the claims were patentable, and the Board's statements to the contrary constitute reversible legal error.

## IV. THE BOARD'S DENIAL OF PFIZER'S CONTINGENT MOTION TO AMEND WAS AN ABUSE OF DISCRETION

The Board erred in denying Pfizer's motion to amend, which was contingent on a finding of unpatentability of claim 1 of the '559 patent. Pfizer's motion presented independent substitute claim 46, which recites a composition comprising the serotype 22F conjugate of original claim 1 and thirteen additional serotypes conjugated to $CRM_{197}$. The claim further requires that the composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition. The Board found the claim obvious, despite evidence showing that the claimed 2-log increase was *not* achieved by Merck's 15-valent pneumococcal conjugate composition (PCV15) across all serotypes in the composition. The Board also found dependent substitute claims 48 and 49 obvious, which recite up to *six additional* conjugates each capable of producing the claimed 2-log increase. The Board's denial of Pfizer's motion was an abuse of discretion and should be reversed if the Court affirms the Board's ruling that claim 1 of the '559 patent is unpatentable.

### A. There Was no Reasonable Expectation of Success in Achieving the Claimed 2-Log Increase

The Board erred in denying proposed substitute claim 46 requiring that the composition exhibit a 2-log increase in serum IgG levels across all 14 serotypes in

the composition.[1] Merck and Sanofi relied on the disclosure of PCV-15 in Merck 2011 to establish a reasonable expectation of success in achieving the claimed 2-log increase. However, Merck 2011 unequivocally demonstrates that when Merck made a 15-valent conjugate composition, including a 22F conjugate, the composition failed to achieve a 2-log increase across all serotypes in the composition. Appx1757, Appx25111. This evidence directly negated a reasonable expectation of success in achieving the claimed composition and should have been dispositive in Pfizer's favor.

The Board made several errors in its analysis of proposed substitute claim 46 and the prior art. As an initial matter, the Board confused the claimed "2-log" increase with a "2-fold" increase. Specifically, the Board concluded "there would have been a reasonable expectation of success in obtaining a fourteen serotype pneumococcal vaccine composition as required by claim 46 with 2-*fold* increases in IgG responses in New Zealand White Rabbits . . . ." Appx74, Appx152, Appx353. There can be no dispute that a 2-log (100-fold) increase is much greater and certainly not the same as a 2-fold increase. The Board therefore applied the wrong threshold for increased serum IgG level in finding the substitute claims obvious.

---

[1] The fourteen serotypes recited in the claim are the thirteen serotypes present in Prevnar13®, plus serotype 22F.

The Board also erred by focusing only on the immune response to serotype 22F in Merck 2011, notwithstanding the requirement of a 2-log increase across *all 14 serotypes* in the claimed composition. Appx69-71, Appx147-149, Appx348-350. The Board's failure to address the other serotypes is significant because, as discussed below, the data in Merck 2011 revealed that a 2-log increase was not achieved for those other serotypes.

For example, Table 3 of Merck 2011 indicates that Merck's 15-valent composition (PCV-15) elicited poorer immune responses as compared to Pfizer's Prevnar® vaccine for many of the seven common serotypes covered by Prevnar®. In particular, Table 3 shows the IgG response ratio of PCV-15 vs. Prevnar® for serotypes 4, 6B, 9V, 14, 18C, 19F, and 23F following administration of two doses to New Zealand White Rabbits. Appx6942-6943, Appx1757, Appx28902, Appx25111. The data shows that for many of these serotypes, IgG values induced by PCV-15 were less than those induced by Prevnar® (*i.e.*, the ratio was less than 1). In fact, PCV-15 did not achieve a ratio greater than 1 across all seven serotypes in *any* of the four study arms of New Zealand White Rabbits shown in Table 3. *Id*. Pfizer's expert explained that this data indicates PCV-15 suffered from immune interference and that a POSA would have no reasonable expectation of making a composition that meets the 2-log IgG increase claimed in the proposed substitute

claim 46. Appx6943-6946, Appx28903-28904, Appx31020-31023, Appx31026-31027.

The Board failed to address the data in Table 3 of Merck 2011 and simply concluded "we are not persuaded by the Patent Owner's arguments." Appx72, Appx151, Appx352. Instead of focusing on the data within Merck 2011, the Board relied on an entirely different reference ("Skinner 2011," Appx6999-7006) as purportedly showing increased levels of IgG for PCV-15 relative to other pneumococcal vaccine compositions. Appx72-73, Appx151-152. In particular, the Board relied on Figure 3 of Skinner showing immune responses in *infant rhesus monkeys* following *three* doses of PCV-15. *Id*. The Board provided no explanation, and cited no evidence, as to why such tests performed on infant rhesus monkeys following three doses of PCV-15 were "more relevant" than tests performed on New Zealand white rabbits following two doses, as disclosed in Merck 2011 and as required by claim 46. Moreover, to the extent it was appropriate for the Board to rely on infant rhesus monkey data, Pfizer separately argued that *Figure 4* of Skinner 2011 indicates that PCV-15 failed to elicit a 2-log increase in infant rhesus monkeys for several serotypes in the composition. Appx7297, Appx5589, Appx7003. The Board did not address this argument at all in its analysis. Appx72-73, Appx151-152.

Table 4 of Merck 2011 provides even more compelling evidence that the claimed 2-log increase would not have been obvious. Table 4 provides fold-rise data

for PCV-15 following administration of two doses to New Zealand White Rabbits in four separate study arms (NZWR-1, NZWR-2, NZWR-3, and NZWR-4). Appx6944, Appx1757, Appx31021, Appx31023, Appx25111. The table provides data for only seven serotypes (1, 3, 5, 6A, 7F, 19A, and 22F) of the 14 serotypes recited in the claimed composition; it does not provide any data for the remaining seven serotypes in the composition. *Id*. Even as to these seven serotypes, however, the table shows that a 2-log increase was <u>not</u> achieved across all of the serotypes in *any* individual arm of the four study arms evaluated. *Id*. In fact, in two of the study arms ("NZWR-1" and "NZWR-2"), none of the serotypes shown in the table achieved a 2-log increase in IgG response. In the remaining two study arms ("NZWR-3" and "NZWR-4"), a 2-log increase was not achieved for serotypes 1 and 3. *Id*.

Nevertheless, the Board concluded that the claimed 2-log increase would have been obvious based on the fact that Table 4 shows a greater than 2-log increase for *serotype 22F* in two of the four study arms. Appx70, Appx149, Appx350. In particular, the Board concluded that

> [e]vidence that all of the Merck 2011 experiments showed a greater than 1-log increase in serum IgG levels and half of the experiments shows a greater than 2-log increase supports the determination that there was a reasonable expectation of success in achieving the claimed combination at a greater than 2-log increase.

Appx71, Appx149-150, Appx351-352. The Board's statement mischaracterizes the data in Merck 2011 and is based on the Board's own analysis of the prior art, rather than any argument or evidence put forth by the Petitioners. Indeed, no expert testified that a 1-log increase in Merck 2011 provides a reasonable expectation of success for achieving a *greater than 2-log increase* in IgG levels, as required by claim 46. The Board arrived at this conclusion entirely on its own and yet provided no explanation as to how the data in Table 4, which by the Board's own admission did not show a greater than 2-log increase in "half of the experiments" (even for serotype 22F alone), would have provided a skilled artisan with a reasonable expectation of success in achieving the claimed 2-log increase. *Id*. While the Board correctly noted that "absolute predictability of success" is not required for obviousness (Appx71, Appx149, Appx351), Petitioner was still required to demonstrate that a skilled artisan would have reasonably believed that the claimed 2-log increase could be achieved.

Even accepting the Board's analysis regarding serotype 22F, the Board provided no explanation as to how a 2-log increase for serotype 22F alone provides a reasonable expectation of success in achieving such an increase for the *remaining 13 serotypes* recited in the claim. The Board relied on the disclosure of a 13-valent vaccine in Hausdorff and stated that "the issue resolves to whether there would have been a reasonable expectation of success in the inclusion of serotype 22F in

Hausdorff's pneumococcal vaccine composition *while retaining the 2-log increased immune response of the thirteen serotypes* and also allowing a 2-log increase in serotype 22F response." Appx70, Appx148-149, Appx349. However, as noted above, Merck 2011 unequivocally shows that PCV-15 did not produce increased IgG levels compared to Prevnar® across all seven overlapping serotypes (Table 3) and failed to achieve a 2-log increase in IgG levels for the remaining eight serotypes in the composition (Table 4), clear evidence that there was no reasonable expectation of success in achieving a 2-log increase against all 14 serotypes in claim 46. The Board ignored this evidence and instead focused only on serotype 22F. As a result, the Board found claim 46 obvious despite evidence that Merck 2011 actually teaches away from the claimed invention.

The Board's decision on obviousness of the substitute claims relied on its finding that inclusion of an additional serotype 22F-$CRM_{197}$ conjugate into the 13-serotype conjugate of Hausdorff would not have been expected to result in immune interference. Appx74, Appx152-153, Appx353. The Board's determination here was based on legal error. The Board stated that "[w]hile Merck 2011 mentions immune interference in the background section relating to prior art formulations, Patent Owner does not identify a statement in Merck 2011 that immune interference occurred in PCV-15." Appx71, Appx149, Appx350. The absence of an express

"statement" of immune interference in Merck 2011 is irrelevant, and no such statement was required to show immune interference.

The Board's finding that immune interference would not have been expected is also unsupported by the evidence. While the parties disputed whether the data in Paradiso 2009 and Skinner 2011 demonstrated immune interference (*see, e.g.*, Appx72-73, Appx150-151, Appx352-353), there is no dispute that Merck 2011 demonstrated that when Merck actually attempted to expand the vaccine beyond thirteen serotype conjugates, Merck failed to achieve a 2-log increase across all serotypes in the composition. Merck 2011 thus resolved any dispute as to whether the claimed 2-log increase would have been obvious, and the Board's finding that immune interference would not have been expected is not supported by substantial evidence.

The Board relied on Paradiso 2009 as supporting its position that inclusion of 22F into the 13-valent composition of Hausdorff would not have been expected to result in immune interference. Appx71-72, Appx150, Appx352-353. However, Paradiso 2009 does not specifically address whether compositions with 14 or more pneumococcal conjugates as recited in claim 46 would have been successful, and in fact, Pfizer's expert Dr. Paradiso, a coinventor of Paradiso 2009, testified that the statement in Paradiso 2009 that it is "possible to induce good immunity to new serotypes without negatively affecting the components already in the vaccine" would

have been understood to be referring to a 13-valent conjugate vaccine but not necessarily 14 serotypes or higher, as recited by claim 46. Appx6136-6137. Merck 2011 subsequently demonstrated that when a skilled artisan actually attempted to create the claimed composition, the composition failed to meet the required 2-log increase and suffered from immune interference. The Board's reliance on Paradiso 2009 was thus misplaced.

The data in Merck 2011 shows that others in the field were not able to produce a composition having the properties recited in claim 46. This evidence directly negated obviousness. To the extent the Court affirms the Board's decision on the original claims, the Court should reverse the Board's denial of Pfizer's motion to amend.

### B. There is No Evidence that a 2-Log Increase Could be Achieved by Routine Optimization

In IPR2018-00187, Sanofi presented a separate argument not raised by Merck that the claimed 2-log increase from baseline could be achieved by routine optimization of test conditions. Appx29587-29589. The Board agreed and stated that the disclosure of a 2-log increase in Merck-086 for serotype 22F in two of the four studies in New Zealand White Rabbits supported Sanofi's optimization theory. Appx350-352.

The Board's decision in this regard lacks substantial evidence. Sanofi identified no reason why a skilled artisan would have been motivated to "optimize"

conditions so as to achieve the claimed 2-log increase, and its argument that such an effect would have been expected is based on hindsight. As Pfizer noted in its reply to Sanofi's opposition, the data in Merck-086 shows that PCV-15 failed to elicit a 2-log increase for several serotypes across four different groups of animals used in the study. Appx30673-30675, Appx31021, Appx31023, Appx31026. This evidence undermines Sanofi's theory of optimization based on different test conditions and different animals. *See id.* Yet, the Board did not address these arguments in its decision and instead found that the claimed 2-log increase was a "results optimizable variable known in the prior art." Appx351. The Board's conclusion is not supported by the evidence and must be reversed.

### C. There is No Evidence that a 2-Log Increase Was Possible for the Additional Serotypes Recited in Claims 48 and 49

The Board erred in finding Pfizer's proposed substitute claims 48 and 49 obvious. Substitute claims 48 and 49, which correspond to claims 3 and 4 of the '559 patent, depend from claim 46 and recite additional serotypes conjugated with $CRM_{197}$. Claim 48 recites serotypes 15B and 33F $CRM_{197}$ conjugates, while claim 49 further requires inclusion of serotypes 12F, 10A, 11A, and 8 $CRM_{197}$ conjugates. The Board provided little to no analysis regarding these claims in its decisions and yet found the claims obvious over Hausdorff, Merck 2011, and GSK 2008. Appx76, Appx155, Appx344-355. The Board's determination is unsupported by the evidence and should be reversed.

Claims 48 and 49 recite a multivalent immunogenic vaccine composition that includes additional serotypes not previously conjugated to a carrier protein or incorporated into an immunogenic conjugate vaccine composition. Appx5502, Appx31021. As discussed above in connection with claims 3 and 4, it would not have been obvious to formulate immunogenic conjugates for each of these additional serotypes. *See* § III *supra*. For this reason alone, claims 48 and 49 should have been found patentable over the prior art.

Claims 48 and 49, by their dependence on claim 46, also require that the composition achieves a 2-log increase in serum IgG level for each of the conjugates in the composition. As discussed above in connection with claim 46, Merck 2011 showed that PCV15 failed to exhibit a 2-log increase across all 15 serotypes in the composition. Accordingly, claims 48 and 49, which include each of the 14 serotypes recited in claim 46, would not have been obvious for the same reasons as discussed above for claim 46. Moreover, the inclusion of serotypes 15B and 33F (in claim 48) and serotypes 12F, 10A, 11A, and 8 (in claim 49) provides additional, independent bases for patentability. Indeed, there would have been no expectation based on Merck 2011 that a 2-log IgG increase could be achieved for *up to six additional serotypes* as recited in claims 48 and 49, let alone the 14 serotypes recited in claim 46. Appx31021. Notably, the Board did not address the 2-log increase limitation at all in its analysis of claims 48 and 49. Appx76-77, Appx154-155.

In finding claims 48 and 49 obvious, the Board in the Merck Proceedings relied on GSK 2008 and Pneumovax 23 to argue that the additional serotypes recited in the claims were known in the art and obvious to include in a pneumococcal vaccine, just as it did in its analysis of claims 3 and 4. Appx76, Appx155. However, as discussed above, neither of these references would have provided a skilled artisan with a reasonable expectation of success that the claimed serotypes could be successfully conjugated and incorporated into an immunogenic vaccine composition, as required by the claims. *See* § III *supra*. The Board provided no further explanation or analysis as to how the mere knowledge of the recited serotypes would have rendered immunogenic conjugates of the serotypes each producing a 2-log IgG increase over baseline obvious. Appx76, Appx155. The Board's findings on claims 48 and 49 lack substantial evidence and cannot be upheld.

In the Sanofi Proceeding, the Board *did not even address* claims 48 and 49 in its decision. Appx344-355. The Board focused only on claim 46. *Id*. Yet, the Board ultimately found each of Pfizer's proposed substitute claims 46-52 unpatentable. Appx358. The Board's decision cannot stand.

## V. THE PTO'S DIRECTOR REVIEW PROCEDURE WAS IMPROPER

The PTO's Director review procedure violated the Administrative Procedure Act because it was not promulgated through notice-and-comment rulemaking. The PTO is required to enact rules governing IPRs through the notice-and-comment

procedures. *See* 5 U.S.C § 553; 35 U.S.C. § 2(b)(2). The rulemaking process of IPRs is governed by 35 U.S.C. § 316(a): "The Director shall prescribe regulations . . . governing *inter partes* review under this chapter." *Id.* § 316(a)(4); *see Facebook, Inc. v. Windy City Innovations, LLC*, 973 F.3d 1339, 1349-50 (Fed. Cir. 2020) (the Director should "prescribe regulations" to promulgate rules governing the conduct of IPRs); *Aqua Prods., Inc. v. Matal*, 872 F.3d 1329, 1331 (Fed. Cir. 2017) (Moore, J., concurring) ("Congress *only* delegated the Director the authority to do so through *regulations*.").

Here, the PTO has not implemented formal procedures to govern the Director review proceedings, such as pursuant to a notice-and-comment process. The agency must publish in the Federal Register a notice of proposed rulemaking that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or description of the subjects and issues involved." 5 U.S.C § 553(b). After the notice, the agency should "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c). None of these has happened.

Instead, the PTO posted a webpage of Q&A and webinars for rulemaking. The PTO has unpredictably changed the Q&A webpages multiple times since it was

created. *See* https://www.uspto.gov/patents/patent-trial-and-appeal-board/procedures/arthrex-qas (last updated Dec. 4, 2021). A changing website and webinar videos are not proper rulemaking and provide insufficient notice to the public and patent owners. Under the system in place at the time, the PTO can (and has) changed the procedures for Director review simply by updating its webpage without notice. Indeed, Director Vidal's new April 22, 2022 "Interim process for Director review" tacitly acknowledges these deficiencies by indicating an intent to "issue a request for Comments (RFC) . . . to formalize the Director review process." https://www.uspto.gov/patents/patent-trial-and-appeal-board/interim-process-director-review. Moreover, Mr. Hirshfeld's single-page decisions contain no substantive analysis, and are effectively unreviewable. Appx31992-31994, Appx32494-32496. Such an *ad hoc* approach should be invalid or corrected.

Furthermore, the PTO cannot rely on the § 553(b)(B) exception for the notice-and-comment requirements to justify its improper implementation of the rulemaking process. To fall under the exception, § 553(b)(B) requires that the agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C § 553(b). The PTO has never given such a reason or any supporting evidence to invoke that exception.

For these reasons, the Final Written Decisions should be remanded for Director review under appropriate procedures after proper agency rulemaking.[2]

## CONCLUSION

Pfizer respectfully requests that this Court reverse the Board's final written decisions and hold that the original and proposed substitute claims are patentable, or alternatively vacate and remand for further proceedings.

---

[2] In light of this Court's recent decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328 (Fed. Cir. 2022), Pfizer hereby preserves all constitutional and statutory challenges to the Director review process identified in its Amended Notices of Appeal, pending the possibility of *en banc* or Supreme Court review. *E.g.*, ECF No. 89 at 3.

July 18, 2022

Respectfully submitted,

/s/ John Scheibeler
John Scheibeler
Dimitrios T. Drivas
Amit Thakore
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200 (telephone)
jscheibeler@whitecase.com
athakore@whitecase.com

Henry Huang
WHITE & CASE LLP
3000 El Camino Real
Two Palo Alto Square, Suite 900
Palo Alto, CA 94306
(650) 213-0300 (telephone)
henry.huang@whitecase.com

C. Sebastian Zonte
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071-2433
(213) 620-7798 (telephone)
sebastian.zonte@whitecase.com

*Counsel for Appellant Pfizer Inc.*

# Addendum

Trials@uspto.gov
571-272-7822

Paper 59
Entered: March 13, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MERCK SHARP & DOHME CORP.,
Petitioner,

v.

PFIZER INC.,
Patent Owner.

---

Case IPR2017-02131
Patent 9,492,559 B2

---

Before TONI R. SCHEINER, JEFFREY N. FREDMAN, and JACQUELINE T. HARLOW, *Administrative Patent Judges.*

FREDMAN, *Administrative Patent Judge*.

# FINAL WRITTEN DECISION AND RELATED ORDERS

Finding claims 1–10, 16–19, and 38–45 Unpatentable
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Denying Patent Owner's Motion to Amend
*35 U.S.C. § 326(d) and 37 C.F.R. § 42.221*

Denying-in-part and Dismissing-in-part Patent Owner's Motion to Exclude Evidence
*37 C.F.R. § 42.64*

# I. INTRODUCTION

## *A. Background*

Merck Sharp & Dohme Corp. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–10, 16–19, and 38–45 of U.S. Patent No. 9,492,559 B2 (Ex. 1001, "the '559 patent"). Paper 1 ("Pet."). Pfizer Inc. ("Patent Owner") filed a Patent Owner's Preliminary Response. Paper 6 ("Prelim. Resp.").

On March 22, 2018, we instituted an *inter partes* review of all challenged claims. Paper 7 ("Dec. Inst."). On June 18, 2018, Patent Owner filed a Patent Owner's Response to the Petition (Paper 20) ("PO Response") and a Motion to Amend. Paper 22 ("Mot. Amend."). Petitioner filed an Opposition to the Motion to Amend (Paper 31) ("Pet. Opp."), followed by a Reply to the Patent Owner's Response. Paper 33 ("Pet. Reply"). Patent Owner then filed a Reply in Support of the Motion to Amend. Paper 39 ("PO Reply"). Petitioner filed a Sur-Reply to Patent Owner's Motion to Amend. Paper 44 ("Pet. Sur-Reply"). Patent Owner filed a Sur-Reply. Paper 48 ("PO Sur-Reply"). Patent Owner filed a Sur-Sur-Reply in Support of the Motion to Amend. Paper 54 ("PO Sur-Sur-Reply").

Patent Owner filed a Motion to Exclude Evidence. Paper 49. Petitioner filed an Opposition to Motion to Exclude Evidence. Paper 53. Patent Owner filed a Reply in Support of the Motion to Exclude. Paper 54.

On November 13, 2018, the parties presented arguments at an oral hearing. The hearing transcript has been entered in the record. Paper 58 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Having considered the record before us, we

determine that Petitioner has shown by a preponderance of the evidence that claims 1–10, 16–19, and 38–45 of the ’559 patent are unpatentable. See 35 U.S.C. §316(e). Additionally, the Motion to Exclude Evidence by Patent Owner has been decided below in Section IV and the Motion to Amend has been decided below in Section III.

### *B. Related Proceedings*

We have instituted three additional *inter partes* reviews of claims of the ’559 patent in IPR2017-02132, IPR2017-02136, and IPR2017-02138. We also note that IPR2017-00378, IPR2017-00380, and IPR2017-00390 were instituted with respect to U.S. Patent No. 8,562,999, and that several PGR and IPR petitions were also filed with respect to U.S. Patent Nos. 9,399,060 B2 and 8,895,024 B2, which all relate to immunogenic vaccine compositions. Pet. 5.

### *C. The ’559 Patent (Ex. 1001)*

The ’559 patent involves vaccines for “vaccination of human subjects, in particular infants and elderly, against pneumoccocal infections . . . .” Ex. 1001, 1:21–22. “Pneumonia, febrile bacteraemia and meningitis are the most common manifestations of invasive pneumococcal disease, whereas bacterial spread within the respiratory tract may result in middle-ear infection, sinusitis or recurrent bronchitis.” *Id.* at 1:28–32. “Pneumonia is by far the most common cause of pneumococcal death worldwide.” *Id.* at 1:46–48.

The ’559 patent teaches the “etiological agent of pneumococcal diseases, *Streptococcus pneumoniae* (pneumococcus), is a Gram-positive

encapsulated coccus,[1] surrounded by a polysaccharide capsule.[2] Differences in the composition of this capsule permit serological differentiation between about 91 capsular types." *Id.* at 1:49–53. "Pneumococcal conjugate vaccines (PCVs) are pneumococcal vaccines used to protect against disease caused by *S. pneumoniae* (pneumococcus)." *Id.* at 1:59–61. "There are currently three PCV vaccines[3] available on the global market: PREVNAR® (called PREVENAR® in some countries) (heptavalent vaccine), SYNFLORIX® (decavalent vaccine) and PREVNAR 13® (tridecavalent vaccine)." *Id*. at 1:61–65.

The '559 patent teaches "there is a need to address remaining unmet medical need for coverage of pneumococcal disease due to serotypes not found in PREVNAR 13® and potential for serotype replacement over time." *Id*. at 2:3–6.

---

[1] A "coccus" is defined as "a spherical bacterium." *See* https://www.merriam-webster.com/dictionary/coccus.

[2] "Pneumococcus is encapsulated with a chemically linked polysaccharide which confers serotype specificity. There are 90 known serotypes of pneumococci, and the capsule is the principle virulence determinant for pneumococci, as the capsule not only protects the inner surface of the bacteria from complement, but is itself poorly immunogenic." Ex. 1007, 2:10–14.

[3] The valency of a vaccine refers to the number of different serotypes of bacteria to which the vaccine induces immune response (e.g., a tridecavalent vaccine protects against thirteen different bacterial strains).

*D. Illustrative Claims*

All of the challenged claims 1–10, 16–19, and 38–45 depend either directly or indirectly from independent claim 1 of the ’559 patent.[4] Claims 1, 3, and 40 are illustrative of the challenged claims and recite:

> **1.** An immunogenic composition comprising a *Streptococcus pneumoniae* serotype 22F glycoconjugate, wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and a carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.
>
> **3.** The immunogenic composition of claim **1**, wherein the composition further comprises a *S. pneumoniae* serotype 15B glycoconjugate and a *S. pneumoniae* serotype 33F glycoconjugate.
>
> **40.** The immunogenic composition of claim **1**, wherein a ratio of mM acetate per mM polysaccharide in the glycoconjugate to mM acetate per mM isolated polysaccharide is at least 0.6.

Ex. 1001, 141:28–34, 141:38–41, 144:14–17.

*E. The Instituted Grounds of Unpatentability*

We instituted trial based on each challenge to the patentability of the ’559 patent presented in the Petition (Pet. 6–7):

---

[4] Claims 11–15 and 20–37 were not challenged in this proceeding, but were challenged in the related proceedings in IPR2017-02136 and IPR2017-02138.

| Reference | Basis | Claims Challenged |
|---|---|---|
| Merck 2011,[5] GSK 2008[6] | § 103(a) | 1, 3–10, 16–19, 39, 41, 42, 45 |
| Merck 2011, GSK 2008, PVP 2013[7] | § 103(a) | 2, 40, 43 |
| Merck 2011, GSK 2008, Hsieh 2000[8] | § 103(a) | 38, 44 |

Petitioner relies on Declarations of Dennis L. Kasper, M.D. Ex. 1004 and Ex. 1096. Patent Owner relies on Declarations of Geert-Jan Boons, Ph.D. Ex. 2040 and Peter Paradiso, Ph.D., Ex. 2044 and Ex. 2063.

## *II.* ANALYSIS

### *A. Claim Interpretation*

In an *inter partes* review filed before November 13, 2018, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear.[9] 37 C.F.R. § 42.100(b). Under the broadest reasonable interpretation approach, claim

---

[5] Caulfield et al., WO 2011/100151 A1, published Aug. 18, 2011 ("Merck 2011," Ex. 1006).
[6] Biemans et al., WO 2009/000825 A2, published Dec. 31, 2008 ("GSK 2008," Ex. 1007).
[7] *Pneumococcal Vaccine Polyvalent* 1–6 (Mar. 2, 2013) (revision to *Japan's Minimum Requirements for Biological Products* published on the website of Japan's National Institute of Infectious Diseases) ("PVP 2013," Ex. 1009).
[8] C. L. Hsieh, *Characterization of Saccharide-CRM$_{197}$ Conjugate Vaccines*, 103 DEV. BIOL. 93–104 (2000) ("Hsieh 2000," Ex. 1013).
[9] A recent amendment to this rule does not apply here because the Petition was filed before November 13, 2018. *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018).

terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Only terms that are in controversy need to be construed and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

We determine that the following claim term needs to be discussed.

**1.** *"immunogenic"*

Independent claim 1, as well as many of the dependent claims, recites the term "immunogenic" as a modifier of the term "composition." In the Decision on Institution, we construed "immunogenic" to require a composition that "elicits functional antibody." Inst. Dec. 7. We also determined that because claim 1 did not specifically require any additional glycoconjugates besides 22F, the "immunogenic" composition only needed to elicit antibodies against the serotype 22F glycoconjugate recited in claim 1. *Id*.

In its Patent Owner's Response, Patent Owner contends "the context within the claim requires that the *composition* is immunogenic, not merely serotype 22F glycoconjugate in isolation." PO Resp. 12. Patent Owner proposes that "immunogenic" be interpreted as "elicits functional antibody against each serotype in the claimed composition." *Id*. Patent Owner asserts that "[w]hen viewed in the full context of the claims and specification, [Petitioner's] . . . proposed construction yields the illogical result of a pneumococcal conjugate vaccine wherein one conjugate (serotype 22F) elicits functional antibody, but other conjugates . . . need not." *Id.* at 14.

Petitioner agrees with our Decision on Institution that a "POSITA would have understood that the 'immunogenic' limitation of independent claim 1 applies to just the serotype 22F conjugate of claim 1." Pet. Reply 23. Petitioner contends:

> no claim of the '559 Patent recites structural characteristics (*e.g.*, molecular weight and/or polysaccharide to protein ratio) for any conjugate other than the serotype 22F conjugate of claim 1. Ex.1105, ¶12. And there is no disclosure in the '559 Patent specification of molecular weights or polysaccharide to protein ratios for any of the 13 conjugates recited in dependent claims 5–8.

*Id.* at 24.

In performing claim interpretation, we first turn to the language of the claims themselves. While claim 1 recites an immunogenic composition composed solely of the "*Streptococcus pneumoniae* serotype 22F glycoconjugate," claims 3–9 recite the inclusion of glycoconjugates from other *Streptococcus pneumoniae* serotypes and claims 21 and 22 recite inclusion of antigens from other pathogenic bacteria or viruses. While claim 1 does not require the presence of other immunogenic components, claims 3–9, 21, and 22 expressly recite the presence of other immunogenic components. In making a vaccine, there would have been no reason to include these additional antigens other than to induce a protective antibody response for vaccination against the included antigens. Therefore, these dependent claims reasonably support Patent Owner's interpretation that an "immunogenic" composition requires eliciting antibodies against each of the serotypes or other immunogens within the "immunogenic" composition.

Next we turn to the Specification of the '559 patent. When the '559 patent uses the term "immunogenic," the '559 patent identifies "a need for

immunogenic compositions that can be used to induce an immune response against additional *Streptococcus pneumoniae* serotypes." Ex. 1001, 2:10–13. The '559 patent states that multiple serotypes ranging from 7 to 25 may be included in the "immunogenic composition." Ex. 1001, 3:4–6. The '559 patent teaches the "pneumococcal opsonophagocytic assay (OPA), which measures killing of *S. pneumoniae* cells by phagocytic effector cells in the presence of functional antibody and complement, is considered to be an important surrogate for evaluating the effectiveness of pneumococcal vaccines." Ex. 1001, 88:52–56. The '559 patent supports an interpretation of "immunogenic" which requires elicitation of functional antibody for each component in the composition, consistent with the interpretation of Patent Owner.

During prosecution of the '559 patent, the Examiner cited art that disclosed both the 22F conjugate and other conjugates to address the claimed compositions for dependent claims. *See* Ex. 1002, 419–20. The Examiner allowed the claims after amendment to include the ranges for molecular weight and ratio of polysaccharide to carrier protein. *See* Ex. 1002, 451, 467. The Examiner did not address the claim construction issue.

Petitioner's Declarant, Dr. Boons, interprets claim 1 to require that serotype "22F should elicit functional antibodies. But also if other antigens are being included, those should also elicit a functional antibody response." Ex. 1109, 36:7–10. In contrast, Patent Owner's Declarant, Dr. Kasper was asked if

> a composition containing a 22F glycoconjugate, 12F glycoconjugate, 10A glycoconjugate, 11A glycoconjugate, and a serotype 8 glycoconjugate and that composition showed functional antibody with respect to the 22F glycoconjugate but

> not with respect to the other conjugates . . . , is it your view that Claim 4 would be met?

Ex. 2013, 16:6–12. Dr. Kasper answered "I think that interpretation is consistent with Claim 4." *Id.* at 16:16–17.

Accordingly, upon review of the parties' arguments and the evidence before us, including the claims, specification, and prosecution history of the '559 patent, we conclude that the term "immunogenic," as it is used in that patent, is reasonably construed as requiring that functional antibody be elicited against each immunogen contained in the composition. Consequently, for claim 1 of the '559 patent, which recites a single immunogen, serotype 22F, only functional antibodies to serotype 22F are required to meet the claim limitation. However, for claim 3 of the '559 patent that requires serotypes 22F, 15B, and 33F, functional antibodies against all three serotypes are required. Similarly for other claims, the term "immunogenic" requires functional antibodies be elicited against any immunogens specifically recited and required.

### *B. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art;

(3) the level of ordinary skill in the art;[10] and, (4) where in evidence, objective indicia of nonobviousness.[11] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In that regard, an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418. In *KSR*, the Supreme Court also stated that an invention may be found obvious if trying a course of conduct would have been obvious to a person having ordinary skill:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads

---

[10] Petitioner states that the level of skill in the art at the time of the invention

> would have been an individual or team with Ph.D. degrees in the biological and chemical sciences and at least 3 years of work experience, or an M.D. degree and at least 6 years of work experience, developing conjugate vaccines, including specifically growing sufficient quantities of bacteria, extracting, purifying and analyzing bacterial polysaccharides, conjugating polysaccharides to a carrier protein (and analyzing the conjugates), and performing immunologic testing.

Pet. 27–28 (citing Ex. 1004 ¶ 59). Patent Owner "does not dispute . . . the level of skill in the art proposed by Merck." PO Resp. 5. We agree with both parties regarding the level of ordinary skill in the art. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). We also note that the applied prior art reflects the appropriate level of skill at the time of the claimed invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

[11] Neither Petitioner nor Patent Owner presents evidence on the fourth Graham factor.

> to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under §103.

*KSR*, 550 U.S. at 421. "*KSR* affirmed the logical inverse of this statement by stating that § 103 bars patentability unless 'the improvement is more than the predictable use of prior art elements according to their established functions.'" *In re Kubin*, 561 F.3d 1351, 1359–60 (Fed. Cir. 2009) (citing *KSR*, 550 U.S. at 417).

Petitioner bears the burden of proving unpatentability of the challenged claims, and that burden never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must establish the facts supporting its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

We analyze the asserted grounds of unpatentability in accordance with the above-stated principles.

### *C. Obviousness over Merck 2011 and GSK 2008*

Petitioner contends that claims 1, 3–10, 16–19, 39, 41, 42, and 45 are unpatentable under 35 U.S.C. § 103(a) as obvious over Merck 2011, GSK 2008, and the general knowledge of an ordinary artisan. Pet. 33. The thrust of Patent Owner's position is that the cited prior art does not teach or suggest compositions with 22F glycoconjugates that are immunogenic, within the claimed molecular weight ranges, and within the claimed polysaccharide to carrier protein conjugate ratios. PO Resp. 1–2, 15–53. Based on our review of the arguments and the evidence of record, we determine that Petitioner demonstrates, by a preponderance of the evidence,

that the subject matter of claims 1, 3–10, 16–19, 39, 41, 42, and 45 would have been obvious over Merck 2011, GSK 2008, and the general knowledge of an ordinary artisan. After providing a discussion of the prior art and Petitioner's position, we will address Patent Owner's arguments.

**1.** *Merck 2011 (Ex. 1006)*

Merck 2011 teaches "a multivalent immunogenic composition having 15 distinct polysaccharide-protein conjugates. Each conjugate consists of a capsular polysaccharide prepared from a different serotype of *Streptococcus pneumoniae* (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F or 33F) conjugated to a carrier protein, preferably $CRM_{197}$." Ex. 1006, 1:7–11. Merck 2011 teaches "conjugates containing serotypes 22F and 33F provide[] robust antibody responses demonstrat[ing] the feasibility of expanding coverage of pneumococcal serotypes . . . ." Ex. 1006, 4:2–3. Merck 2011 teaches the pneumococcal conjugate vaccine (PCV) with "induced high OPA[12] GMTs to each serotype and a 100% OPA response rate for all 15 serotypes contained in the vaccine." Ex. 1006, 23:3–4.

Merck 2011 teaches "purified polysaccharides are chemically activated to make the saccharides capable of reacting with the carrier protein. . . . Coupling to the protein carrier (e.g., $CRM_{197}$) can be by reductive amination via direct amination to the lysyl groups of the protein." Ex. 1006, 6:11–23. Merck 2011 teaches the "concentrated saccharide was mixed with $CRM_{197}$ carrier protein in a 0.2 – 2 to 1 charge ratio. The blended saccharide-$CRM_{197}$ mixture was filtered through a 0.2 µm filter." Ex. 1006, 17:24–25. Table 1 of Merck 2011 shows a vaccine formulation

[12] Opsonophagocytosis.

comprising 32 µg of total polysaccharide and 32 µg of $CRM_{197}$ carrier protein with the total polysaccharide being composed of 2 µg of 14 serotypes including 22F and 4 µg of serotype 6B. Ex. 1006, 19:5–9.

**2.** *GSK 2008*

GSK 2008 teaches a *Streptococcus pneumoniae* vaccine comprising "capsular saccharide antigens (preferably conjugated), wherein the saccharides are derived from at least ten serotypes of *S. pneumoniae*" that may include an "*S. pneumoniae* saccharide conjugate of 22F." Ex. 1007, 8:5–19. GSK 2008 teaches "*Streptococcus pneumoniae* capsular saccharides . . . may be conjugated to a carrier protein independently selected from the group consisting of . . . CRM197. . . ." Ex. 1007, 10:12–14. GSK 2008 teaches "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" and specifically, conjugates "can also be prepared by direct reductive amination methods. . . ." Ex. 1007, 17:1–28. GSK 2008 teaches "22F-PhtD administered within the 13-valent conjugate vaccine formulation [was] . . . shown immunogenic and induced opsono-phagocytic titers in young OF1 mice." Ex. 1007, 77:21–22.

GSK 2008 teaches: "Preferably the ratio of carrier protein to *S. pneumoniae* saccharide is between 1:5 and 5:1; e.g. between 1:0.5–4:1, 1:1–3.5:1, 1.2:1–3:1, 1.5:1–2.5:1; e.g. between 1:2 and 2.5:1; 1:1 and 2:1 (w/w)." Ex. 1007, 20:24–26. Table 2 of GSK 2008 teaches fourteen different conjugates—the smallest conjugate size was PS4-PD of 1303 kDa and the largest conjugate size was PS9V-PD of 9572 kDa. Ex. 1007, 54–55, Table 2. GSK 2008 discloses a conjugate of serotype 22F, with a carrier/PS ratio of 2.17, but does not determine the conjugate size. Ex. 1007, 55, Table 2.

GSK 2008 claims a conjugate where "the average size (e.g. $M_w$) of the 22F saccharide is between 50 and 800 kDa. . . ." Ex. 1007, 93 (claim 56). GSK 2008 further teaches in claim 61 an "immunogenic composition of any preceding claim wherein the average size (e.g. $M_w$) of the saccharides is above 50 kDa, e.g[.], 50–1600. . . ." Ex. 1007, 94.

GSK 2008 teaches "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 14:18–21. GSK 2008 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 recommends optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter . . . ." Ex. 1007, 14:34.

### **3.** *Analysis*

Petitioner asserts "Merck 2011 and GSK 2011 disclose immunogenic compositions that include a conjugate of pneumococcal serotype 22F" and that "Merck 2011 demonstrates immunogenicity against serotype 22F by the generation of functional antibody against that serotype." Pet. 34–35 (citing Ex. 1004 ¶ 103; Ex. 1006, 23:2–4). Petitioner asserts: "Based on the GSK 2008 disclosure of pneumococcal conjugates between 1,303-9,572 kDa, a POSITA would have been motivated with a reasonable expectation of success to construct the serotype 22F conjugate of Merck 2011/GSK 2008 in that approximate molecular weight range." Pet. 36 (citing Ex. 1004 ¶ 106). Petitioner also asserts "Merck 2011 and GSK 2008 both disclose the claimed

range of conjugate polysaccharide to protein ratios (0.4 to 2), and reflect a POSITA's general understanding that conjugate polysaccharide to protein ratios in the claimed range are typical for immunogenic conjugates." Pet. 42 (citing Ex. 1004 ¶ 114).

Petitioner's Declarant, Dr. Kasper, states that a "POSITA would have considered the disclosure of pre-conjugation polysaccharide to $CRM_{197}$ ratios in the range of 0.2 to 2 indicative of a final conjugate ratio in that range." Ex. 1004 ¶ 115 (citing Ex. 1006, 17:24–25). Dr. Kasper notes "the pre-conjugation ratios of Merck 2011 resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1 (~32 μg of polysaccharide and ~32 μg of protein), squarely in the claimed range." Ex. 1004 ¶ 115 (citing Ex. 1006, 19:3–8). Dr. Kasper also notes "a POSITA's general understanding that conjugate polysaccharide to protein ratios in the claimed range (0.4 to 2) are typical for immunogenic conjugates" and cites a monograph disclosing ratios of saccharide to protein in a pneumococcal $CRM_{197}$ conjugate vaccine with seven serotypes, concluding that each "disclosed ratio overlaps to a large extent with the claimed ratio of 0.4 to 2, consistent with the general understanding in the art as of January 21, 2014 that such ratios are typical for immunogenic conjugates." Ex. 1004 ¶¶ 118–19 (citing Ex. 1085, 20–24).

Dr. Kasper states "GSK 2008 discloses that '[p]referably the ratio of carrier protein to *S. pneumoniae* saccharide is . . . between 1:2 and 2.5:1 . . . (w/w),' which translates to a polysaccharide to protein ratio of 1:2.5 to 2:1, *i.e.*, the claimed polysaccharide to protein ratio of 0.4 to 2." Ex. 1004 ¶ 116 (quoting Ex. 1007, 20:24–26). Dr. Kasper also states "Table 2 of GSK 2008 discloses an immunogenic serotype 22F conjugate (PS22F-PhtD) with a

protein to polysaccharide ratio of 2.17, which translates to a polysaccharide to protein ratio of 1/2.17 or 0.46 - squarely within the claimed range." Ex. 1004 ¶ 116 (citing Ex. 1007, 54:27 to 55:1). Dr. Kasper also relies upon a monograph that "specifies the acceptable range of 'Saccharide content/protein ratio' (which a POSITA would have understood to be a w/w ratio)" and that "[e]ach disclosed ratio overlaps to a large extent with the claimed ratio of 0.4 to 2 . . . ." Ex. 1004 ¶¶ 118–19 (citing Ex. 1085, 20–24).

Dr. Kasper states "the conjugate molecular weights that were determined (for every conjugate of the underlying 10-valent composition) ranged from 1,303-9,572 kDa, squarely within the claimed molecular weight range." Ex. 1004 ¶ 106. Dr. Kasper states "GSK 2008 discloses that the serotype 22F polysaccharide in its immunogenic conjugates can be, *e.g.*, 'between 50 and 800 kDa.'" Ex. 1004 ¶ 107 (quoting Ex. 1007, 93).

Dr. Kasper states the ordinary artisan would "have been motivated to stay roughly within the upper limit of molecular weights disclosed in GSK 2008, because 'excessive modifications to the PS or protein molecules can have an adverse impact on immunogenicity.'" Ex. 1004 ¶ 108 (quoting Ex. 1035, 8). Dr. Kasper also notes that "both Merck 2011 and GSK 2008 disclose a sterile filtration step through a 0.2 μm filter, which sets an upper limit on conjugate molecular weight." Ex. 1004 ¶ 108 (citing Ex. 1006, 16:30–31 and Ex. 1007, 14:13–15).

Dr. Kasper states a "POSITA's motivation and reasonable expectation of success would have been further supported by the fact that Patent Owner disclosed in a scientific meeting in 2012 that the 'Typical Mass (kDa)' for a glycoconjugate is '500-5000,' largely overlapping with the range recited in

GSK 2008 (and claim 1)." Ex. 1004 ¶ 109 (citing Ex. 1008, 6). Dr. Kasper states "Patent Owner even disclosed in a scientific meeting in 2007 that its own pneumococcal conjugates can be as large as ~7,000 to ~12,000 kDa, again overlapping with the range of GSK 2008 (and completely within the claimed range)." Ex. 1004 ¶ 109 (citing Ex. 1027, 21). Dr. Kasper states:

> Because the structure of serotype 22F capsular polysaccharide had been known to the art since 1989 (Ex. 1029), a POSITA would have required only routine experimentation to obtain a conjugate molecular weight within the desirable range disclosed in GSK 2008, *e.g.*, by increasing or decreasing the amount of cross-linking in the conjugate.

Ex. 1004 ¶ 110 (citing Ex. 1030, 4:56–59).

Having reviewed the cited evidence, and the record as a whole, we find that Petitioner has accurately described the above stated teachings of Merck 2011 and GSK 2008. We adopt these stated facts as our own. *See* Pet. 33–55. We focus our remaining analysis on Patent Owner's arguments that the cited combination fails to teach or suggest an immunogenic composition including: (1) a serotype 22F glycoconjugate having a molecular weight of between 1000 kDa and 12,500 kDa; and (2) a polysaccharide to carrier protein ratio (w/w) of between 0.4 and 2.

*a. "wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa"*

Patent Owner asserts:

> Claim 1 and each of the challenged claims that depend therefrom require that the recited serotype 22F glycoconjugate "has a molecular weight of between 1,000 kDa and 12,500 kDa." EX1001 at claim 1. Merck 2011, GSK 2008, and the general knowledge do not alone or in combination teach or suggest this limitation.

PO Resp. 15.

*i. Optimization*

Patent Owner asserts a "POSA would have understood that a number of variables can affect polysaccharide activation, conjugation, and the final molecular weight of a glycoconjugate" and "[d]ue to these variables, a POSA 'couldn't predict what the outcome would be' with regard to the molecular weight of an uncharacterized serotype 7F glycoconjugate." PO Resp. 16 (citing Ex. 2040 ¶ 54).

Patent Owner further asserts that "[d]etermining the appropriate molecular weight for a specific serotype glycoconjugate was not a matter of 'routine optimization' of existing reductive amination procedures as of January 21, 2014." PO Resp. 17 (citing Ex. 2040 ¶ 55). Patent Owner asserts "each serotype glycoconjugate was designed using different protocols, and resulted in serotype glycoconjugates having different properties, thereby demonstrating that each serotype glycoconjugate needed to be evaluated on a case-by-case basis." PO Resp. 18 (citing Ex. 1007, Table 2).

Patent Owner asserts "[t]here is no overlap between the molecular weights in GSK 2008 and the '559 claims." PO Resp. 19. Patent Owner asserts:

> The serotype 22F glycoconjugates of GSK 2008 were treated in an alkaline pH of 9.0 (EX1007 at 51:5-8; 52:18-22), and as a result the molecular weight of the serotype 22F polysaccharide in the final glycoconjugates would be expected to be levels lower than the pre-conjugation weight of 22F (159-167 kDa).

PO Resp. 20. Patent Owner asserts "[t]he polysaccharide size in a final glycoconjugate of GSK 2008 would be unpredictable and as a result, and GSK 2008 cannot render the '559 claims obvious." PO Resp. 20.

Patent Owner asserts that a "POSA would not have determined the molecular weight of serotype 22F glycoconjugates based on GSK 2008 Table 2" because the "table does not provide the molecular weight for the two serotype 22F glycoconjugates" and the "serotype 22F glycoconjugates also differ from the other listed glycoconjugates in that they were associated with dramatically lower antigenicity, and with some of the highest protein to polysaccharide ratios as compared to all of the other serotype glycoconjugates." PO Resp. 23–24.

Patent Owner reiterates these arguments in the Patent Owner's Reply and also asserts "Merck's asserted 'desirable range' is fabricated from the lower and upper molecular weight limits for two non-serotype 22F glycoconjugates (*i.e.*, PS4-PD and PS9V-PD) referenced in Table 2 of GSK-2008." PO Sur-Reply 6.

We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence (*see* Pet. Reply 3–16).

Merck 2011 teaches that "[c]apsular polysaccharides from *Streptococcus pneumoniae* can be prepared by standard techniques known to those skilled in the art. For example, polysaccharides can be isolated from bacteria and may be sized to some degree by known methods (see, e.g., European Patent Nos. EP497524 and EP497525) and preferably by microfluidisation." Ex. 1006, 4:12–15. Merck 2011 teaches "[p]olysaccharides can be sized in order to reduce viscosity in

polysaccharide samples and/or to improve filterability for conjugated products. In the present invention, capsular polysaccharides are prepared from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, **22F**, 23F and 33F of *S. pneumoniae*." Ex. 1006, 4:15–18 (emphasis added). Merck 2011 teaches that:

> The different serotype saccharides are individually conjugated to the purified $CRM_{197}$ carrier protein using a common process flow. In this process the saccharide is dissolved, sized to a target molecular mass, chemically activated and buffer-exchanged by ultrafiltration. The purified $CRM_{197}$ is then conjugated with the activated saccharide and the resulting conjugate is purified by ultrafiltration prior to a final 0.2 µm membrane filtration.

Ex. 1006, 16:27–31.

Thus, Merck 2011 disclosed methods to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide, and taught to couple to known carrier proteins such as $CRM_{197}$, while limiting the upper size range using membrane filtration. Ex. 1006, 4:12–18, 16:27–31. Thus, rather than fabricating desired sizes, Merck 2011 specifically provides methods to constrain polysaccharide sizes within a particular size range. Ex. 1006, 16:27–31.

Table 2 in GSK 2008 shows a range of conjugate sizes where the lowest reported value is 1303 kDa and the highest reported value is 9572 kDa, both values falling within the range of 1000 kDa to 12,500 kDa required by claim 1. Ex. 1007, 54–55. GSK 2008 prefers that "saccharide conjugates of the invention should have an average size of saccharide pre-conjugation of 50-1600" kDa but notes that the "present inventors have found that saccharide conjugate vaccines retaining a larger size of saccharide

can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 teaches that "[f]ull length polysaccharides may be 'sized' i.e. their size may be reduced by various methods such as acid hydrolysis treatment, hydrogen peroxide treatment, sizing by emulsiflex® followed by a hydrogen peroxide treatment to generate oligosaccharide fragments or microfluidization." Ex. 1007, 14:6–10.

GSK 2008 teaches the "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" including "direct reductive amination methods as described in US 4365170 (Jennings) and US 4673574 (Anderson). Other methods are described in EP-0-161-188, EP-208375 and EP-0-477508." Ex. 1007, 17:28–30. GSK 2008 is replete with suggestions to conjugate pneumococcal polysaccharides of various serotypes to $CRM_{197}$. *See, e.g.*, Ex. 1007, 13.

GSK 2008 also provides more specific reasons to optimize the saccharide conjugates for larger sizes by teaching "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 14:18–21. GSK 2008 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 recognizes optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter." Ex. 1007, 14:34.

Thus, GSK 2008 demonstrates that the artisan preferred a range of conjugated polysaccharide sizes overlapping that recited by the ’559 claims, disclosed methods to optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$. Ex. 1007, 13–15, 54–55.

Dr. Kasper, relying on GSK 2008, states “[c]onjugation of each polysaccharide to a carrier protein may be performed ‘by any known coupling technique,’ including conjugation chemistries based on CDAP and/or reductive amination.” Ex. 1004 ¶ 82 (citing Ex. 1007, 17:28–35). Dr. Kasper states “[g]iven that routine conjugation techniques and conditions readily achieved those disclosed molecular weights (as well as polysaccharide to protein ratios falling within the claimed range), a POSITA would have understood such molecular weights to be typical of immunogenic conjugates.” Ex 1004 ¶ 101. Dr. Kasper also stated, in response to the question “[s]o would you agree that developing pneumococcal glycoconjugates is very much a serotype-specific process?” that “I think there is a common process that you follow. This is routine optimization, as far as I’m concerned. There’s nothing unusual about doing that. That’s typical.” Ex. 2013, 29:21–24.

In rebuttal to Dr. Kasper’s position that the molecular weight of the serotype 22F glycoconjugate would have been an optimizable variable, Patent Owner relies on Dr. Boons’s statement that:

> The determination of an appropriate molecular weight for a specific serotype glycoconjugate was not, in my opinion, a matter of “routine optimization” of existing reductive amination procedures. A number of variables affect the postconjugate molecular weight and/or immunogenicity of a specific serotype glycoconjugate. Because numerous variables affect the post-conjugation molecular weight and/or immunogenicity of a

> specific serotype glycoconjugate . . . a POSA would not have inferred that 22F glycoconjugates fall within a particular molecular weight based on the molecular weight of other serotype glycoconjugates (e.g., those serotypes listed in Table 2 of GSK 2008). For example, as noted in Jones 2005 (a document cited by Merck), some glycoconjugates were considerably smaller than the range recited in the ’559 patent.

Ex. 2040 ¶ 55.

Under deposition, Dr. Boons stated that “something that the person skilled in the art would know, is that multiple parameters are important and can be critical for generating an immunogenic glycoconjugate composition, including degree of oxidation, saccharide to protein ratio, and molecular weights.” Ex. 1109, 65:2–8. Dr. Boons stated that “it is well known that glycoconjugate vaccine development is difficult, that multiple parameters need to be optimized, and that success cannot be predicted beforehand.” Ex. 1109, 66:21–24.

However, in response to a question as to whether he could “identify a passage in the ’559 patent where the inventors describe issues that they had constructing a serotype 22F conjugate that elicits functional antibody,” Dr. Boons stated “I can’t identify a specific section mentioning specifically 22F.” Ex. 1109, 69:7–12. In this discussion, Dr. Boons did not identify any specific teaching in the ’559 patent or other prior art that demonstrated that the optimization of the size of the serotype 22F conjugate, known to be desirable by the skilled artisan, would have had any specific issues or concerns. *See* Ex. 1109, 67:2 to 69:25.

Dr. Kasper responded to Dr. Boons’s concerns, noting that “[i]t would have been trivial for a POSITA to construct a conjugate with sufficient cross-linking to produce a serotype 22F conjugate over 1,000 kDa; the

serotype 22F polysaccharides and $CRM_{197}$ carrier proteins each have multiple conjugation points." Ex. 1105 ¶ 46. Dr. Kasper noted that "because the disclosed neoglycoconjugates in Jones 2005 contained on average six saccharides . . ., such neo-glycoconjugates would have been over 1,000 kDa with six serotype 22F polysaccharides (and also within the claimed range), even if the polysaccharides were as small as 167 kDa." Ex. 1105 ¶ 48.

Patent Owner's declarant, Dr. Paradiso, was asked during deposition whether a "person of . . . skill in the art . . . would have understood how to vary the conjugation reaction conditions to achieve those different ten conjugates of Table 16?" Ex. 1104, 103:13–17. Dr. Paradiso answered that a "person of skill in the art would, based on the information given in [columns 15 and 16 and Table 16 of the '559 patent] . . . , probably have a good idea on how to vary these parameters." Ex. 1104, 103:19–22. In a follow-up question, Dr. Paradiso agreed that "there is no disclosure of a particular molecular weight of the serotype 22F conjugate that is used in the 16-valent composition [in the '559 patent] . . . ." Ex. 1104, 106:6–9.

The evidence of record, therefore, shows that optimization of polysaccharide conjugate size was well known to the person of ordinary skill in the art, as even Patent Owner's expert Dr. Boons acknowledged. Ex. 1109, 66:21–24. Dr. Boons further acknowledged that the '559 patent did not rely on any specific disclosure explaining issues in generating a serotype 22F conjugate (Ex. 1109, 69:7–12), thereby supporting the reasonable position of Dr. Paradiso that the ordinary artisan would "probably have a good idea on how to vary these parameters." Ex. 1104, 103:19–22. This evidence supports a determination that routine optimization would have been

obvious, particularly when combined with the teachings of Merck 2011 to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide; with teachings of GSK 2008 of methods to optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$; and with Dr. Kasper's statement that "[t]his is routine optimization, as far as I'm concerned. There's nothing unusual about doing that. That's typical." Ex. 2013 ¶ 82.

We recognize, but find unpersuasive, Patent Owner's assertion that "it is unreasonable to conclude that the molecular weight of a serotype 22F glycoconjugate would necessarily be over 1,000 kDa" (PO Resp. 22), because the issue is the obviousness of routine optimization of conjugate sizes, not inherent anticipation by GSK 2008. Instead, we agree with Petitioner that "a POSITA would have found GSK 2008's molecular weight range (1,303-9,572 kDa) desirable and would have had a reasonable expectation of achieving an immunogenic serotype 22F conjugate in that range." Pet. Reply 12–13.

We find that a preponderance of the evidence of record demonstrates that conjugate size is a resultseffective variable associated with improved stability of conjugates and good immune response, limited only by filter size, thereby rendering "optimization within the grasp of one of ordinary skill in the art." *In re Applied Materials*, 692 F.3d 1289, 1295 (Fed. Cir. 2012). "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955).

We, therefore, conclude that a preponderance of the evidence of record supports Petitioner's position that the 1,000 to 12,500 kDa size range

in claim 1 of the ’559 patent, which overlaps with the 1303 and 9572 kDa in GSK 2008, would have been consistent with the ranges optimized and used to generate multivalent vaccines. Pet. 39; Ex. 1007, 55:2–10. “In cases involving overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a prima facie case of obviousness.” *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003).

*ii. General Knowledge and Other Prior Art*

Patent Owner criticizes Petitioner’s reliance on Pfizer 2012 (Ex. 1008),[13] Jones 2005 (Ex. 1026),[14] Lees 2008 (Ex. 1035),[15] and Wyeth 2007 (Ex. 1027)[16] as evidence that the person of ordinary skill in the art would

---

[13] Pfizer 2012, a slide presentation at a symposium, teaches general kDa mass ranges for glycoconjugates of 50 to 200 for the polysaccharide and 500 to 5,000 for the conjugate. Ex. 1008, 6.

[14] Jones 2005 reviews polysaccharide vaccines including *Streptococcus pneumoniae vaccines*. Ex. 1026, 2. Jones 2005 discusses both glycoconjugate vaccines and a 23-serotype specific pneumococcal polysaccharide vaccine. Ex. 1026, 6. Jones 2005 teaches $CRM_{197}$ as a carrier protein and 5,000 kDa glycoconjugates. Ex. 1026, 7. Jones 2005 also shows a cartoon representation that depicts different structural types of glycoconjugate vaccines. Ex. 1026, 8, Fig. 2.

[15] Lees 2008 reviews conjugation chemistry, and particularly, polysaccharides and carrier proteins used in pneumococcal vaccines. Ex. 1035, 23. Lees 2008 identifies factors including the ratio of protein and polysaccharide as variables that may be controlled during the conjugation process. Ex. 1035, 5. Lees 2008 teaches sizing of the conjugates by purification using size exclusion chromatography or filtering through membranes with particular molecular weight cutoffs. Ex. 1035, 5.

[16] Wyeth 2007, a slide presentation at a colloquium, teaches the process of polysaccharide manufacture for pneumococcus vaccines. Ex. 1027, 4. Wyeth 2007 teaches a method of characterizing polysaccharides in a vaccine by size. Ex. 1027, 10–16. Wyeth 2007 teaches a serotype 7F

have understood that "the claimed ranges of the '559 Patent were known as typical and desirable." PO Resp. 26–31; Pet. Reply 6.

Patent Owner asserts that Petitioner "relies on a mass spectrometry slide in Pfizer 2012 for the statement that a 'typical' mass for a glycoconjugate could be within the range of 500-5,000 kDa," but Patent Owner asserts that a "POSA would not have interpreted the statement to mean that all glycoconjugates are within the range of 500-5,000 kDa. EX2040, ¶69. Pfizer 2012 does not provide any guidance to a POSA on how to generate a *S. pneumoniae* serotype 22F glycoconjugate or what the resulting molecular weight should be." PO Resp. 26. Patent Owner asserts that "Dr. Kasper's testimony illustrates the lack of any guidance, teaching or suggestion on conjugation chemistry or procedures in Pfizer 2012." PO Resp. 27 (citing Ex. 2013, 59:25 to 60:14). Patent Owner asserts that "Pfizer 2012 does not refer to serotype 22F glycoconjugates and only refers to general molecular weights well outside the range in the '559 patent claims." PO Resp. 27.

We find these arguments unpersuasive because we understand the citation to Pfizer 2012 as evidencing that 500 to 5000 kDa was a known size range for glycoconjugates consistent with the disclosure of a range up to 1600 kDA disclosed by GSK 2008. *See* Prelim. Resp. 27–28; Ex. 1008, 6; Ex. 1007, 94 (*cf*. Pet. 19, 39).

Moreover, while we agree with Patent Owner that Pfizer 2012 does detail the procedures used for conjugation, Dr. Kasper stated in his testimony that in Pfizer 2012 "if you look at page 4, they describe two

---

polysaccharide conjugated to $CRM_{197}$ that falls within a range of 9,202 to 11,950 kDa. Ex. 1027, 21.

different technologies for conjugation, one for cross-linking and one for single-end conjugation." Ex. 2013, 60:5–8 (citing Ex. 1008, 4). Dr. Kasper also stated that "[a]s of January 21, 2014, both reductive amination and CDAP had been used to construct immunogenic conjugates, including in licensed pneumococcal vaccines." Ex. 2035 ¶ 35. Dr. Kasper states that "Pfizer 2012 discloses that such conjugates are typically 500-5,000 kDa, with the vast majority of the disclosed range (1,000-5,000 kDa) overlapping the claimed range of 1,000-12,500 kDa." Ex. 2035 ¶ 103. Dr. Kasper asserts that "a POSITA would have been motivated with a reasonable expectation of success to apply Pfizer 2012's disclosed 1,000 to 5,000 kDa range (within the claimed range of 1,000 to 12,500 kDa) to the serotype 22F conjugates of Merck 2011's pneumococcal $CRM_{197}$ conjugate composition." Ex. 2035 ¶ 103.

Patent Owner asserts that: "Jones 2005 does not mention any serotype 22F glycoconjugates, much less how to make these glycoconjugates"; that "Wyeth 2007 does not mention serotype 22F or provide any guidance as to how to make a serotype 22F glycoconjugate"; and that "Lees 2008 does not refer to any serotype 22F glycoconjugates, much less how to make an immunogenic serotype 22F glycoconjugate having the specific molecular weight and ratio parameters recited in the '559 patent claims." PO Resp. 27–30 (citing Ex. 2040 ¶¶ 70, 72, 74).

We are unpersuaded by Patent Owner's general allegations because each of these references provides specific teachings regarding vaccine glycoconjugates that establish the knowledge of the ordinary artisan. As Dr.

Lees[17] stated, "immunogenic 22F glycoconjugates already existed before 2014. Specifically, the 22F glycoconjugates taught in both GSK-711 and Merck-086 were shown to be immunogenic." Ex. 2039 ¶ 124. Dr. Lees noted that "GSK-711 shows that both 22F conjugates (22F-PhtD and 22F-AH-PhtD) are immunogenic measured by both IgG and OPA antibodies." Ex. 2039
¶ 128 (citing Ex. 1007, 93). Petitioner cites Jones 2005, Wyeth 2007, and Lees 2008 in order to demonstrate that the specific conditions used for making glycoconjugate in general were well known.

Patent Owner then makes specific assertions identifying deficiencies in Jones 2005, Wyeth 2007, and Lees 2008. For Jones 2005, Patent Owner asserts that "Jones 2005 refers to a (non-pneumococcal) glycoconjugate having a molecular weight (5,000 kDa) within the recited range of the '559 patent claims, and one that does not (90 kDa)" and asserts a "POSA likely would have initially focused on the smaller neo-glycoconjugate, because it would be expected to be simpler to generate and easier to characterize." PO Resp. 28. For Wyeth 2007, Patent Owner asserts that:

> Wyeth 2007 and GSK 2008 viewed together demonstrate that different conjugation chemistries can result in glycoconjugates with different molecular weights. Wyeth 2007 recites 7F glycoconjugates of 9,202-11,950 kDa, while GSK 2008 recites 7F glycoconjugates of 3907-4452 kDa. *Id.*, ¶73 (citing EX1027 at 21; EX1007 at Table 2). The differences between the molecular weights for 7F glycoconjugates disclosed in Wyeth 2007 and GSK 2008 highlight the need to

[17] Ex. 2039 is a Declaration by Dr. Lees submitted by the Petitioner in IPR 2018-00187 in support of a petitioner asserting the unpatentability of claims 1–45 of the '559 patent. Ex. 2039 ¶ 1.

> determine the appropriate molecular weight of a given serotype glycoconjugate on a case-by-case basis. *Id.*

PO Resp. 29. For Lees 2008, Patent Owner asserts that "Lees 2008 cautions that 'careful control' over numerous factors (e.g., pH, temperature, ratio of protein and polysaccharide and concentration of each) is 'key to successful conjugation.'" PO Resp. 30. Patent Owner further asserts, as to Lees 2008, that a "POSA would have known that more than routine experimentation would be needed to determine the appropriate molecular weight (or polysaccharide to protein ratio) of any given serotype glycoconjugate, and that appropriate conjugation conditions for each serotype glycoconjugate needed to be carefully determined on a case-by-case basis." PO Resp. 31 (citing Ex. 2040 ¶ 74).

We find these specific arguments unpersuasive. Jones 2005 teaches the repeating unit structure of types 1, 2, 3, 4, 5, 6B, 9N, 9V, 12F, 14, 18C, 19F, and 23F of *S. pneumoniae*. *See* Ex. 1026, 5. Jones 2005 does teach structurally variant conjugate vaccines comprising either neoglycoconjugate or crosslinked oligosaccharides with $CRM_{197}$ (*see* Ex. 1026, 8, Fig. 2), but Jones 2005 explains that the "immune responses elicited by these different structural variants are generally similar." Ex. 1026, 7. Jones 2005 teaches, for *Haemophilus influenzae* type b glycoconjugate vaccines, that different methods result in different sizes, with a reductive amination approach resulting in a glycoconjugate that "is approximately 90 kDa in size, is approximately 30% carbohydrate and contains an average of six glycan chains per carrier protein" while cyanogen bromide activation approach results in a conjugate that "is a crosslinked network of polysaccharide and protein with a molecular weight of, on average, $5\times10^6$ Da [(5,000 kDa)]."

Ex. 1026, 7. Jones 2005 teaches "[s]tudies of the crosslinked conjugate vaccines have focused principally on the molecular size" (Ex. 1026, 12) and explains that "[m]olecular sizing of the conjugates is a simple and effective means to ensure consistency of the final conjugate." Ex. 1026, 13–14.

Thus, Jones 2005 demonstrates that the ordinary artisan was aware that different conjugation methods yielded different size glycoconjugates, that size was an important parameter, and that size was controllable using molecular sizing techniques.

Wyeth 2007 provides an example where glycoconjugates of serotype 7F of *S. pneumoniae* with $CRM_{197}$ have a molecular weight between 9,200 kDa and 11,950 kDa. *See* Ex. 1027, 21. While Patent Owner correctly notes that these values differ from those for serotype 7F in GSK 2008 (*see* Ex. 1007, 56), we note that the two vaccines are conjugated to different carriers, $CRM_{197}$ in Wyeth 2007 and *Haemophilus influenzae* protein D in GSK 2008. Ex. 1027, 21; Ex. 1007, 44, 55. Wyeth 2007 emphasizes that size is a central parameter for vaccine production. Ex. 1027, 7. Wyeth 2007 teaches a size assay for size measurement of glycoconjugate vaccines. *See, e.g.*, Ex. 1027, 12, 14.

Thus, Wyeth 2007 also demonstrates that size of glycoconjugates was an important concern for the ordinary artisan, provides a method for determining that size, and demonstrates that a particular glycoconjugate could be generated in the claimed size range using a different carrier protein.

Lees 2008 notably teaches that serotype 22F vaccines are used in formulations, teaching "the currently available licensed 23-valent pneumococcal PS vaccine is formulated with PSs from the 23 most prevalent strains: 1, 2, 3, 4, 5, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C,

19F, 19A, 20, 22F, 23F, and 33F." Ex. 1035, 2. Lees 2008 teaches that "[s]ize fractionation is usually necessary" (Ex. 1035, 4) and that "[c]areful control over the factors relevant to the particular chemistry is key to successful conjugation. These factors include pH, temperature, the ratio of the protein and PS, and the concentration of each." Ex. 1035, 5. Thus, Lees 2008 demonstrates that the factors necessary to obtain particular glycoconjugates are results-optimizable variables, noting "[s]ince each capsular serotype has a different structure, reaction conditions, including concentrations, molar ratios of periodate, oxidation times, and pH, must be optimized." Ex. 1035, 6. Lees 2008 explains that after the reaction has been completed, particular desired sizes of glycoconjugates can be obtained because "purification of the conjugate is usually performed by size exclusion, by using either size exclusion chromatography or membranes with appropriate molecular weight cutoffs." Ex. 1035, 5.

Thus, Lees 2008 demonstrates not only that serotype 22F pneumococcal vaccines are desirable, but provides detailed discussion regarding the known parameters necessary to obtain particular glycoconjugates as well as methods to limit those glycoconjugates to the desired size.

Considered as a whole, we conclude that the disclosures in Jones 2005 of a 5000 kDa glycoconjugate, in Wyeth 2007 of pneumococcal serotype 7F glycoconjugates with sizes between 9202 and 11950 kDa, and in Lees 2008 of a multiple conjugate formation provide evidence that glycoconjugate size was a known optimizable variable. *See* Pet. 37, 39–40; Ex. 1026, 7; Ex. 1027, 21; Ex. 1035, 7. That is, these additional references underline the basic teachings in Merck 2011 and GSK 2008 discussed above and further

demonstrate that at the time of invention, a person of ordinary skill in the art would have recognized how to generate glycoconjugates of varying sizes using known techniques and recognized that size was a known, optimizable variable.

*b. "ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2"*

Patent Owner asserts "Merck 2011, GSK 2008 and the general knowledge would not have motivated a POSA to generate a 22F glycoconjugate with the recited polysaccharide to carrier protein ratio." PO Resp. 31 (citing Ex. 2040 ¶¶ 75–76).

*i. Merck 2011's "charge ratio"*

Patent Owner asserts that "the referenced ratio in Merck 2011 is presented in terms of 'charge', not weight to weight, as required by the '559 patent claims." PO Resp. 32. Patent Owner asserts "[a]t deposition, Dr. Kasper was unable to define what is meant by the term 'charge ratio'" and, therefore, "Merck's basis for the assertion that a general relationship exists between this term and weight-to-weight ratio is unclear." PO Resp. 33 (citing Ex. 2040 ¶ 79). Patent Owner asserts "a POSA would not have had any idea how to determine the appropriate ranges for this undefined parameter." PO Resp. 34. Patent Owner asserts "Merck 2011 also does not teach or suggest that any pre-conjugation polysaccharide to protein ratio (much less a w/w ratio) would be a 'result-effective variable' or have any impact on the resulting properties, *e.g.*, immunogenicity, of its serotype 22F glycoconjugates." PO Resp. 34.

While we agree with Patent Owner that the meaning of the term "charge ratio" is not intrinsically clear from Merck 2011, Patent Owner's

assertion that Dr. Kasper was unable to define the term is incorrect, as Dr. Kasper stated that "[c]harge ratio refers to the preconjugation ratio of your two components." Ex. 2013, 78:20–21. Dr. Kasper supports this interpretation based on "45 years of experience in the field, that's how it's commonly used." Ex. 2013, 79:2–3. Dr. Kasper explains, in response to the question of "[h]ow is charge ratio determined?" that "[t]he common usage would be the ratio of the weight of one that you put into the reaction to the weight of the other, the amount of one -- it's a stoichiometric ratio based on the amount of material that goes in." Ex. 2013, 80:12–17. Dr. Kasper also notes that "Merck 2011 specifically discloses that serotype 22F did not require unusual conjugation conditions. In particular, Merck 2011 discloses common activation and conjugation conditions, as well as any serotypes for which the conditions that deviate from those common conditions. Common conditions are not modified for serotype 22F." Ex. 1105 ¶ 32.

Dr. Boons states that a "POSA in January 2014 would not have been familiar with this term." Ex. 2040 ¶ 78. Dr. Boons responds to Dr. Kasper's statements by noting that Weber 2009 is an example where "the term 'charge ratio' means exactly what one would expect from the words recited in this term, i.e., the ratio of charges (not weights) between two different elements." Ex. 2040 ¶ 78.

Although we agree with Patent Owner that Merck's teaching of a 0.2–2 to 1 charge ratio for polysaccharide and carrier protein does not necessarily equate to the 0.4 to 2 w/w ratio required by claim 1, Merck's teaching nevertheless suggests that the ratio (i.e., proportional relationship) between the amount of polysaccharide to carrier protein represents an optimizable variable. Even Dr. Boons, after disagreeing with the question

"[d]o you agree that based on the Oxford Dictionary of Chemical Engineering for 'charge' the term 'charge ratio' in Merck 2011 refers to the ratio of the quantities of polysaccharide and protein that are fed into the conjugation reaction?" acknowledges that "I look at molar equivalents, not at weight equivalents. Actually I teach my students when you perform reactions weights are far less important than molar equivalents." Ex. 1109, 171:15–20, 173:14–18. Dr. Boons's statements indicate that the relative amount of the components, whether measured in moles or molecular weight, is a known parameter for optimization.

Therefore, even if Dr. Boons's interpretation of "charge ratio" as referring to molar equivalents of the polysaccharide and carrier protein is correct, and even if these ratios represent pre-conjugation amounts rather than post-conjugation amounts, the evidence still supports an understanding of Merck 2011 as suggesting that the relative amounts of these two components are results optimizable for the conjugation reaction and resultant vaccine.

*ii. Merck 2011's pre- and post-conjugate ratios*

Patent Owner asserts the "ratio values in Merck 2011 are pre-conjugation ratios that do not necessarily indicate post-conjugation characteristics of the glycoconjugate." PO Resp. 34 (citing Ex. 2040 ¶ 80). Patent Owner asserts "Tables 1 and 2 of GSK 2008 disclose pre-conjugation ratios that are 28% higher (2.5/1 up to 3.2/1 for serotype 19A) or 50% lower (1/1 down to 0.5/1 for serotype 23F) compared to the final conjugation ratios." PO Resp. 34–35 (citing Ex. 1007, 53–56). Patent Owner asserts that based on these tables in GSK 2008, "a POSA would have understood that one could not reasonably predict a post-conjugation polysaccharide to

protein ratio based on pre-conjugation polysaccharide to protein ratios." PO Resp. 35. Patent Owner asserts that "[i]n Table 2 of GSK 2008, some glycoconjugates comprised up to 11.2% free polysaccharide and up to 4.9% free carrier protein" and that "Merck 2011 considered its first formulation comprised unconjugated polysaccharide at levels high enough to be problematic, and that the levels of these conjugated polysaccharides and carrier protein were allegedly reduced to an unknown level in the second formulation." PO Resp. 36–37 (citing Ex. 1007, Table 2 and Ex. 1006, 24:1–28).

Patent Owner also asserts:

> [t]here is no evidence that the polysaccharides and carrier proteins listed in Merck 2011 Table 1 exist in the composition in a 1:1 ratio for each serotype. EX2040, ¶84. Table 1 lists the total amount of the fifteen different polysaccharides and the total amount of the carrier protein, it does not assess polysaccharide/protein ratio by serotype.

PO Resp. 38.

We are not persuaded by Patent Owner's arguments that Table 1 in Merck 2011 does not suggest a weight/weight ratio of polysaccharide to carrier protein within the range of 0.4 and 2 as required by claim 1 of the '559 patent because Table 1 of Merck 2011 discloses an example that would reasonably have been expected to result in a 1:1 w/w ratio of the 22F polysaccharide to the $CRM_{197}$ carrier protein. Ex. 1006, 19:5–9; Ex. 1087 ¶ 120. This expectation is supported by Dr. Kasper's statement that the ratios "resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1." Ex. 1004 ¶ 115.

Even comparing the pre- and post-conjugation evidence in Tables 1 and 2 of GSK 2008 that relate to serotypes other than serotype 22F,

we note that either a 50% reduction or a 28% increase in the 1:1 starting pre-conjugation ratio for serotype 22F disclosed in Merck 2011 would still result in a final conjugation composition that falls within the 0.4 and 2 w/w ratio range required by claim 1. Therefore, even fully accepting Patent Owner's position, the final conjugated composition of serotype 22F in Merck 2011 would have been expected to render claim 1 obvious. *See, e.g., Ineos USA LLC v. Berry Plastics Corp.*, 783 F.3d 865, 869 (Fed. Cir. 2015) ("When a patent claims a range, as in this case, that range is anticipated by a prior art reference if the reference discloses a point within the range.")

We recognize that Dr. Boons states that "[g]iven the variation between pre- and post-conjugation ratios in Tables 1 and 2 of GSK 2008, a POSA would have understood that pre-conjugation ratios do not indicate post-conjugation ratios and that the appropriate ratio of each serotype glycoconjugate must be determined on a case-by-case basis." Ex. 2040 ¶ 80. However, Dr. Boons has not established that the post-conjugation ratios for any serotype shown in the Merck 2011 Table 2 fall outside the range recited in claim 1, while Dr. Kasper states "[f]or the PS22F-PhtD conjugate, the carrier protein to polysaccharide ratio is 2.17 (which translates to a polysaccharide to carrier protein ratio of 1/2.17 or 0.46), with only 5.8% free (unconjugated) polysaccharide." Ex. 2035 ¶ 89. Thus, the evidence of record in Merck 2011 suggests that the polysaccharide to carrier protein ratio of a serotype 22F conjugate falls within the claimed ratio range of 0.4 to 2.

Moreover, Dr. Lees supports the obviousness of the claimed range, noting that:

> It is desirable to avoid very low or very high polysaccharide-to-carrier protein ratios. Glycoconjugates having a very low polysaccharide-to-carrier protein ratio would

> require administration of large amounts of the conjugates in order to provide an effective amount of the polysaccharide. Ex. 1054 at 13. By contrast, glycoconjugates with a very high polysaccharide-to-carrier protein ratio may interfere with the immunogenic role of the carrier protein.

Ex. 2039 ¶ 57. Dr. Lees further notes that "[a]ccording to the WHO guidelines, the ratio of polysaccharide to carrier protein should be within the range approved . . . . For pneumococcal conjugate vaccines, while the particulars may differ for a specific serotype, the WHO guidelines specifically recommend a ratio 'in the range of 0.3–3.0.'" Ex. 2039 ¶ 58 (internal citation omitted). We note that Dr. Lees appears to be referring to a 2009 statement in *Recommendations to assure the quality, safety and efficacy of pneumococcal conjugate vaccines* published by the Expert Committee on Biological Standardization of the World Health Organization that teaches "[t]ypically for pneumococcal conjugate vaccines the ratio is in the range of 0.3 to 3.0 but varies with the serotype. The ratio can be determined either by independent measurement of the amounts of protein and polysaccharide present, or by methods which give a direct measure of the ratio." Ex. 2060, 17.

Therefore, a preponderance of the evidence of record supports the obviousness of selecting polysaccharide to carrier protein ratio values for the serotype 22F polysaccharides within the 0.4 and 2 range recited in claim 1 of the '559 patent based on the disclosures of Merck 2011, GSK 2008, and the knowledge of the ordinary artisan, including the WHO guidelines.

*iii. GSK teaching about serotype 22F polysaccharide to protein ratio*

Patent Owner asserts "none of the ratio ranges in GSK 2008 are serotype specific and other ratio ranges in this same paragraph cited by Merck have values falling outside of the claimed range." PO Resp. 39. Patent Owner asserts "other portions of GSK 2008 refer to a variety of carrier protein to polysaccharide ratio ranges (*e.g.*, 6:1 to 3:1, and 6:1 to 3.5:1) that, when converted to polysaccharide to protein ratio ranges as in the '559 patent, fall entirely outside of the claimed range (*e.g.*, 0.17 to 0.33 and 0.17 to 0.28)" and, therefore, "a POSA would not have had any motivation to select the specific ratio range cited by Merck over any of the other ratio ranges disclosed in GSK 2008." PO Resp. 39–40.

Patent Owner asserts that based on Figure 6 of GSK 2008, "there is a striking difference (what appears to be a 12-fold difference) between the OPA results from the two different 22F glycoconjugates." PO Resp. 43. Patent Owner asserts that "a POSA trying to make an immunogenic serotype 22F glycoconjugate would have turned to PS22F-AHPhtD rather than PS22F-PhtD" because of "clear and unambiguous statements and data provided in GSK 2008 regarding the superiority of the PS22F-AH-PhtD glycoconjugate." PO Resp. 42.

Patent Owner asserts that:

> Due to the significant inferiority of the PS22F-PhtD glycoconjugate, a POSA would have been "discouraged" from generating this glycoconjugate and "would be led in a direction divergent from the path" adopted by Pfizer, *i.e.*, a POSA would have been directed to prepare a serotype 22F glycoconjugate having a polysaccharide to protein ratio outside the claimed range. EX2040, ¶88.

PO Resp. 45.

Patent Owner compares these facts to *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853 (Fed. Cir. 2015), and asserts, "[s]imilar to the facts of *Insite*, the challenged patent claims recite a combination of features (*e.g.*, polysaccharide to protein ratios and molecular weights), and the cited prior art reference does not disclose one of the recited claim features (*i.e.*, molecular weight) in that combination." PO Resp. 41.

We do not find these arguments persuasive. As already noted, GSK 2008 discloses a range of ratios of polysaccharide to carrier protein that includes and fully overlaps the range claimed. Ex. 1007, 20:24–28. *Peterson*, 315 F.3d at 1329. Dr. Kasper states that the "narrowest range in claim 48 [of GSK 2008] is a protein to polysaccharide ratio of 2:1 to 1:1, which translates to a polysaccharide to protein ratio of 0.5 to 1." Ex. 1105 ¶ 52. Also, we have already discussed Dr. Lees' statement that "[f]or pneumococcal conjugate vaccines, while the particulars may differ for a specific serotype, the WHO guidelines specifically recommend a ratio 'in the range of 0.3–3.0.'" Ex. 2039 ¶ 58 (citing Ex. 2060, 17 ("Typically for pneumococcal conjugate vaccines the ratio is in the range of 0.3 to 3.0 but varies with the serotype.")). Patent Owner also acknowledges that GSK 2008 teaches a final conjugate of serotype 22F that has a polysaccharide to protein ratio of 0.46, within the range required by claim 1. *See* PO Resp. 41.

The exemplary serotype 22F-PhtD conjugate with a 0.46 ratio, along with the overlapping ranges disclosed and claimed by GSK 2008, the overlapping Merck 2011 0.2–2 to 1 charge ratio, and the statement by Dr. Lees that this range substantially overlaps the World Health Organization's recommended ratios for pneumococcal conjugate vaccines, all provide

reasonable motivation for the ordinary artisan to select ratios for the serotype 22F conjugate within the range required by claim 1 of the ’559 patent. Ex. 1004 ¶ 84; Ex. 1105 ¶ 52; Ex. 1006, 19:24–25; Ex. 2039 ¶ 58; Ex. 2060, 17.

We recognize that Figure 6 of GSK 2008 shows what Patent Owner states to be a 12-fold lower level of antibody titer for serotype 22F-PhtD with a 0.46 ratio relative to serotype 22F-AH-PhtD with a 3.66 to 4.34 ratio. *See* Ex. 1007, 108. We also recognize that Dr. Boons states that a “POSA would have avoided the glycoconjugate that was associated with the significantly worse immunogenicity (*i.e.*, PS22F-PhtD), not the glycoconjugate that required a little more effort to make (*i.e.*, PS22F-AH-PhtD).” Ex. 2040 ¶ 88.

However, GSK 2008 teaches that either conjugate may be used, noting a “13 valent vaccine was made by further adding the serotypes 19A and 22F conjugates above (with 22F either directly linked to PhtD, or alternatively through an ADH linker).” Ex. 1007, 55:5–7. Thus, the plain text of GSK 2008 teaches that either conjugate may be used. Therefore, even if the GSK 2008 teaching were interpreted as a preference for the higher polysaccharide to protein ratio rather than simply a preference for the ADH linker, it is well settled that disclosed examples, and even preferred embodiments do not constitute a teaching away from a broader disclosure or non-preferred embodiments. *In re Susi*, 440 F.2d 442, 446 n.3 (CCPA 1971). “[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine.” *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). *See also In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (“The prior art’s mere disclosure of more than one alternative does not constitute a teaching

away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the [claimed] solution.”).

We also note that GSK 2008 shows the immunogenicity for the two serotype 22F conjugates as either 37% or 28–31%, demonstrating similar results for both conjugates. Patent Owner points to no teaching in GSK 2008 that criticizes, discredits, or discourages the use of a ratio within the range required by claim 1.

Patent Owner points to *Insite* as indicating that one of ordinary skill in the art would not have been motivated to select the claimed conjugate because the claims require “a combination of features (*e.g.*, polysaccharide to protein ratios and molecular weights), and the cited prior art reference does not disclose one of the recited claim features (*i.e.*, molecular weight).” PO Resp. 41 (*citing Insite*, 783 F.3d at 861).

In *Insite*, the Federal Circuit relied on District Court findings that “it would not have been obvious to a person of ordinary skill in the art to formulate a topical azithromycin formulation for ophthalmic treatment of any infection” because “there were ‘innumerable’ options for ophthalmic treatments” and concerns that azithromycin “might not penetrate ocular tissue based on its high molecular weight, charge and insolubility in water.” *Insite*, 783 F.3d at 861.

In contrast, here, both of the cited prior art references, Merck 2011 and GSK 2008, specifically direct the ordinary artisan to incorporate serotype 22F conjugates into pneumococcal vaccines. *See* Ex. 1006, 6:1–4 (“[T]he addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by

existing pneumococcal vaccines.”). *See also* Ex. 1007, 5:32 to 6:1 (“The present invention provides an immunogenic composition . . . [that] comprises a 22F saccharide conjugate.”).

Moreover, as discussed above, the Merck 2011 and GSK 2008 references together suggest molecular weights and polysaccharide to carrier protein ratios that overlap and fall within the ranges recited in claim 1 of the ’559 patent. *See, e.g.*, Ex. 1007, 55–56; Ex. 1004 ¶ 84; Ex. 1105 ¶ 52; Ex. 1006, 19:24–25. In addition, the ordinary artisan was aware of desirable ranges of polysaccharide to carrier protein. *See* Ex. 2039 ¶ 58; Ex. 2060, 17.

Therefore, unlike *Insite*, we conclude that the evidence of record directly suggests incorporation of a serotype 22F glycoconjugate into a pneumococcal vaccine and suggests selection of molecular weight and polysaccharide to carrier protein ratio from a limited series of optimizable ranges disclosed in the prior art.

We also conclude that the prior art provides a reasonable expectation of success in doing so, particularly in light of the disclosure in the prior art of functional glycoconjugates. Specifically, GSK 2008 demonstrates an immunogenic serotype 22F glycoconjugate with an overlapping polysaccharide to carrier protein ratio and Merck 2011 demonstrates an immunogenic serotype 22F glycoconjugate in a 1:1 polysaccharide to carrier protein ratio. Ex. 1007, 55–56; Ex. 1006, 21. Patent Owner provides no evidence showing that any serotype 22F glycoconjugate fails to result in an immunogenic response.

*iv. Optimization of 1:1 polysaccharide to protein ratio*

Patent Owner asserts a "POSA would disagree with Dr. Kasper's assertion that one would be 'shooting for' a polysaccharide to protein ratio of 1:1. . . . GSK 2008, in fact, teaches the opposite. For example, Table 1 of GSK 2008 provides pre-conjugation protein/polysaccharide ratios ranging from 1:1 to 3:1." PO Resp. 46 (citing Ex. 1008, Table 1). Patent Owner asserts that Example 2 of GSK 2008 "targets a ratio well below 1:1 and outside the claimed ranges" where the "conjugate had a final protein to polysaccharide ratio of 4.1 (w/w), which translates to a polysaccharide to protein ratio of 1:4.1, or 0.24." PO Resp. 47 (citing Ex. 1007, 52:38).

We are not persuaded that the range recited in claim 1 of polysaccharide to the carrier protein, between 0.4 and 2, is unobvious. We note that while Dr. Kasper responded to a question about a 1:1 saccharide to protein ratio as "[t]hat's what you're shooting for most often," Dr. Kasper continued to state regarding the ratio that "[b]ut they fall within a range. And the Pfizer patent and the GSK patent define a range of .4 to 2." Ex. 2013, 77:7–23. Thus, Dr. Kasper states that the range recited in claim 1 would have been obvious based on the ranges disclosed in the prior art.

We recognize Patent Owner's reliance on Dr. Boons' statement that "[p]rior to generating a glycoconjugate, a POSA would not have assumed that any particular post-conjugation polysaccharide to protein ratio would necessarily be appropriate for generating that given glycoconjugate." Ex. 2040 ¶ 90 (citing Ex. 1026, 13).

A preponderance of the evidence does not support Patent Owner's position. As already noted, GSK 2008 specifically suggests a range of carrier protein that overlaps the range recited in claim 1 of the '559 patent,

and GSK 2008 specifically teaches "the majority of the conjugates, for example 6, 7, 8, 9 or more of the conjugates have a ratio of carrier protein to saccharide that is greater than 1:1, for example 1.1:1." Ex. 1007, 20:24–28. Of equal significance, Merck 2011 teaches conjugations in which equal amounts of polysaccharide and carrier protein are present, including equal amounts of serotype 22F, suggesting a 1:1 ratio of these components. Ex. 1006, Table 1. Dr. Lees also supports the obviousness of the claimed range, stating that "[f]or pneumococcal conjugate vaccines, while the particulars may differ for a specific serotype, the WHO guidelines specifically recommend a ratio 'in the range of 0.3–3.0.'" Ex. 2039 ¶ 58 (citing Ex. 2060, 17 ("Typically for pneumococcal conjugate vaccines the ratio is in the range of 0.3 to 3.0 but varies with the serotype.")). Dr. Lees further notes that the "desired ratios of polysaccharide to carrier protein can be achieved typically by varying the relative amounts of starting polysaccharide materials and carrier proteins in the reaction mixture, optimizing the reaction conditions and monitoring the conjugation chemistry." Ex. 2039 ¶ 60.

*v. JNIDD and polysaccharide to protein ratio*

Patent Owner asserts that "the English portion of JNIID does not refer to any serotype 22F glycoconjugates, much less a polysaccharide to protein ratio range for a serotype 22F glycoconjugate." PO Resp. 48 (citing Ex. 2013, 103:14–23). Patent Owner asserts "a POSA understood that appropriate parameters for each serotype glycoconjugate needed to be determined on a case-by-case basis, and a POSA would not have assumed that a polysaccharide to protein ratio for one serotype glycoconjugate would be appropriate for a different polysaccharide to protein glycoconjugate." PO Resp. 48 (citing Ex. 2040 ¶ 92). Patent Owner also asserts:

> This understanding is also made clear in another document cited by Merck, Jones 2005 (EX1026). Jones 2005 states that: "[t]he optimal [polysaccharide-protein] ratio has to be determined by experiment in preclinical studies or clinical trials." *Id.* (quoting EX1026 at 13). Lees 2008 further notes that "[t]he unique structures of each serotype mean that the precise activation and conjugation conditions ***must be carefully controlled and optimized***. . . ." EX1035 at 7-8.

PO Resp. 48–49.

We agree with Patent Owner that the prior art recognized that conjugate size and polysaccharide to protein ratio were known results optimizable variables, and we agree that JNIID does not specifically discuss serotype 22F. However, JNIID does identify saccharide to protein ratios for seven serotypes, serotypes 4, 6B, 9V, 14, 18C, 19F, and 23F, that range from a low of 0.3 to a high of 2.6, with the vast majority falling within the range of 0.4 and 2 recited by claim 1 of the '559 patent. Ex. 1085, 23. Thus, we agree with Dr. Kasper's statement that "[e]ach disclosed ratio [in JNIID] overlaps to a large extent with the claimed ratio of 0.4 to 2, consistent with the general understanding in the art as of January 21, 2014 that such ratios are typical for immunogenic conjugates." Ex. 2035 ¶ 113.

*c. serotype 15B in claim 3 and 10A and 11A in claim 4*

Patent Owner asserts a "POSA reading claims 3 or 4 (or claims 5–8) would understand that <u>all</u> of the serotype glycoconjugates recited in these claims would be required to be immunogenic, not just serotype 22F glycoconjugates." PO Resp. 51. Patent Owner asserts that "[n]either Merck 2011 nor GSK 2008 exemplifies immunogenic compositions that include a conjugate of pneumococcal serotype 15B, as required by claims 3 and 4." PO Resp. 52. Patent Owner asserts Lees 2008 "teaches that multivalent

pneumococcal glycoconjugate compositions 'present additional complexities' due to each serotype being chemically distinct, requiring optimization of each glycoconjugate within the compositions." PO Resp. 52 (internal citation omitted).

While we agree, as noted above, that Patent Owner correctly construes the claims to require the term "immunogenic" to apply to all of the serotypes present in the composition, we are not persuaded that claims 3 and 4 are unobvious over the disclosures in Merck 2011, GSK 2008, and the knowledge of the person of ordinary skill in the art.

GSK 2008 teaches a "multivalent pneumococcal vaccine of the invention will be selected from the following serotypes 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15, 17F, 18C, 19A, 19F, 20, 22F, 23F and 33F." Ex. 1007, 8:29–31. Thus, GSK 2008 expressly suggests a vaccine containing serotypes 10A, 11A, and 15. Just as we agreed with Patent Owner that the construction of the word "immunogenic" in claim 1 reasonably requires each serotype contained in a vaccine to induce an immune response, we also find that the disclosure of a vaccine by GSK 2008 containing multiple serotypes also requires induction of an immune response to each serotype. Otherwise there would be no need to include a serotype unable to induce such a response. And indeed, GSK 2008 uses the same term, immunogenic, to describe the pneumococcal vaccine composition. *See* Ex. 1007, 5:27.

We recognize that Dr. Boons correctly notes that "[n]either Merck 2011 nor GSK 2008 exemplifies immunogenic compositions that include a conjugate of pneumococcal serotype 15B." Ex. 2040 ¶ 96. However, "[a]ll the disclosures in a reference must be evaluated . . . and a reference is not

limited to the disclosure of specific working examples." *In re Mills*, 470 F.2d 649, 651 (CCPA 1972).

We note that Dr. Kasper stated that at the time of invention, the ordinary artisan was aware of serotype 15B, that PVP 2013 discloses inclusion of serotype 15B in a pneumococcal vaccine, and that "[b]ased on GSK 2008, a POSITA would have been motivated with a reasonable expectation of success to additionally include a serotype 15B conjugate." Ex. 1004 ¶¶ 44, 88, 120 (citing Ex. 1009, 1). Dr. Kasper also noted that "serotypes 15B and 33F had already been included in the Pneumovax® 23 polysaccharide vaccine." Ex. 1096 ¶ 60 (citing Ex. 1054, 4). Dr. Kasper stated for serotypes 22F, 33F, and 15B that "each one had to be optimized structurally, and then they could be combined. And they would induce an immune response." Ex. 2013, 43:10–13.

This is consistent with Dr. Lees statement that "[c]laims 3–8 [of the '559 patent] collectively recite 20 additional serotypes. However, . . . all 20 of the recited serotypes were already included in multivalent pneumococcal vaccines on the market in 2014" and, therefore, "[o]ne would also have reasonably expected success because, as shown in GSK-711 and Merck-086, 22F and other new serotypes were successfully included in multivalent PCV compositions while maintaining the immunogenicity to all serotypes in the compositions." Ex. 2039 ¶¶ 158–59.

We, therefore, conclude that incorporation of known immunogenic serotypes such as 10A, 11A, 15B, and 33F into the vaccine suggested by Merck 2011, GSK 2008, and the knowledge of the ordinary artisan would have been obvious in order to increase the coverage of serotypes of pneumococcal vaccines.

*D. Obviousness over Merck 2011, GSK 2008, and PVP 2013*

Petitioner asserts that "PVP 2013 specifies that, for a pneumococcal polysaccharide vaccine, serotype 22F capsular polysaccharide must contain an 'O-acetyl/polysaccharide unit molar ratio' of '0.5 - 1.5'; that entire specified range meets the claimed ratio of 'at least 0.1.'" Pet. 57, citing Ex. 1009, 4. Petitioner asserts that "[b]ecause the immunogenicity of a conjugate depends in large part on the immunogenicity of the included polysaccharide, a POSITA would have considered the teachings of PVP 2013 when designing the pneumococcal conjugate compositions of Merck 2011/GSK 2008." Pet. 56. Petitioner asserts:

> [g]iven that the O-acetyl content of native 22F capsular polysaccharide was known to be approximately 0.8 (Ex. 1029 at 1), it would have been obvious to a POSITA that the "ratio of mM acetate per mM polysaccharide in the glycoconjugate to mM acetate per mM polysaccharide in the activated polysaccharide" would have been at least 0.625-1.875; that entire specified range meets the claim limitation of "at least 0.6."

Pet. 61–62, citing Ex. 1004 ¶ 150.

Patent Owner asserts "Merck 2011 and GSK 2008 do not refer to the minimum acetate levels required by claims 2, 40, and 43" and asserts that Petitioner "relies on PVP 2013 (EX1009) to allege that the acetate contents specified in these claims would have been obvious." PO Resp. 54. Patent Owner asserts the "23-valent free unconjugated polysaccharide vaccine referred to in PVP 2013, is not the same as the glycoconjugate compositions that are claimed in the '559 patent" because "the polysaccharides in a free polysaccharide-based vaccine composition are not conjugated to any carrier protein." PO Resp. 54 (citing Ex. 2013, 109:8–23 and Ex. 1071, 5). Patent

Owner asserts "[b]ecause carrier proteins or glycoconjugates are not mentioned in PVP 2013, this document would not have taught a POSA how to arrive at the specific polysaccharide to protein ratio (w/w) recited in the '559 patent claims." PO Resp. 54.

1. *PVP 2013 (Exhibit 1009)*

PVP 2013 is titled "Pneumococcal Vaccine Polyvalent" and was published on the website of Japan's National Institute of Infectious Diseases (*see* Pet., v). PVP 2013 discusses starting materials used to make vaccines including serotypes 1, 2, 3, 4, 5, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C, 19A, 19F, 20, 22F, 23F, and 33F. *See* Ex. 1009, 1. PVP 2013 teaches various tests used to analyze polysaccharides used in the vaccines including, among others, an *O*-acetate content test. Ex. 1009, 3, 4. PVP 2013 provides a range of *O*-acetate for a variety of serotypes including a range of 0.5 – 1.5 for serotype 22F. Ex. 1009, 4.

2. *Analysis*

We find these arguments unpersuasive. Claim 2 requires "at least 0.1 mM acetate per mM polysaccharide" and claims 40 and 43 require a mM ratio that "is at least 0.6." Ex. 1001, 141:35–37, 144:15–18, 27–30. Dr. Kasper stated "PVP 2013 specifies that, for a pneumococcal polysaccharide vaccine, serotype 22F capsular polysaccharide must contain an 'O-acetyl/ polysaccharide unit molar ratio' of '0.5 - 1.5'; that entire specified range meets the claimed ratio of 'at least 0.1.'" Ex. 1004 ¶ 142 (citing Ex. 1009, 4). Consistent with Dr. Kasper's statement, PVP 2013 states the "*O*-acetate content (*O*-acetyl/polysaccharide unit molar ratio) shall be within the range

of the following specification" where the range for serotype 22F is given as "0.5–1.5." Ex. 1009, 3, 4.

Dr. Kasper explained that Rajam 2007[18] evidences "that O-acetyl groups can contribute to the immunogenicity of pneumococcal polysaccharides." Ex. 1004 ¶ 143 (citing Ex. 1086). Rajam 2007 states "the primary functional epitope of 15B-Ps is linked to the O acetylation of the monosaccharide residues. Removal of this O-acetyl group results in loss of the functional antibody activity." Ex. 1086, 4. This teaching, in combination with the teaching of PVP 2013 to incorporate acetate into serotype 22F in particular, demonstrates that the evidence of record better supports Petitioner's position that use of acetate in the molar ratios suggested by PVP 2013 would have been expected to improve vaccine activity.

Consequently, PVP 2013 and the knowledge of the ordinary artisan reasonably suggest to utilize a molar ratio of acetate to polysaccharide for serotype 22F that falls within the requirements of claims 2, 40, and 43.

As to Patent Owner's assertions regarding polysaccharide to protein ratios and molecular weight ranges, we have already found the ratio of polysaccharide to protein and molecular weight ranges obvious for claim 1 as discussed above and claims 2, 40, and 43 are drawn to further ratios of acetate to polysaccharide suggested by PVP 2013.

---

[18]Gowrisankar Rajam et al., *Functional Antibodies to the O-Acetylated Pneumococcal Serotype 15B Capsular Polysaccharide Have Low Cross-Reactivities with Serotype 15C*, 14 CLINICAL & VAC. IMMUNOL. 1223–27 (2007) ("Rajam 2007," Ex. 1086).

We therefore conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by Merck 2011, GSK 2008, and the knowledge of the ordinary artisan with the acetate ratios suggested by PVP 2013 in order to retain immunogenic activity as disclosed by PVP 2013.

### *E. Obviousness over Merck 2011, GSK 2008, and Hsieh 2000*

Petitioner asserts that Hsieh 2000 "discloses methods for characterizing $CRM_{197}$ conjugate vaccines, including multivalent pneumococcal conjugate vaccines prepared by reductive amination." Pet. 62. Petitioner asserts that "[b]ased on Hsieh 2000, a POSITA would have been motivated with a reasonable expectation of success to obtain at least 30% of the conjugates of claim 1 with a $K_d$ below or equal to 0.3 in a CL-4B column." Pet. 62, citing Ex. 1004 ¶ 152.

Patent Owner asserts "[n]either Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, GSK 2008, Hsieh 2000 and the 'general knowledge.' Therefore, Merck has likewise not met its burden in showing that claims 38 and 44 are obvious." PO Resp. 55. Patent Owner asserts "Hsieh 2000 does not refer to serotype 22F glycoconjugates. Hsieh 2000 also does not contain any guidance about targeting any particular molecular weight or polysaccharide to protein ratio for a serotype 22F glycoconjugate." PO Resp. 56 (citing Ex. 2040 ¶ 102).

#### 1. *Hsieh 2000 (Exhibit 1013)*

Hsieh 2000 discusses the characterization of vaccines composed of polysaccharides conjugated to $CRM_{197}$, including a 7-valent pneumococcal saccharide-$CRM_{197}$ conjugate vaccine. Ex. 1013, 1. Hsieh 2000 teaches that "$CRM_{197}$ is a mutant of diphtheria toxin" and "lists the methods that have

been used to characterize $CRM_{197}$" including "High Performance Size-exclusion Liquid Chromatography . . . [that] is adequate to control the consistency and purity of the product." Ex. 1013, 2. Hsieh 2000 teaches that important parameters for conjugate vaccines include molecular size and polysaccharide to protein ratio among others. *See* Ex. 1013, 6. Hsieh explains that "[i]t is essential to demonstrate the covalent linkage of the saccharide to the carrier protein." Ex. 1013, 8

2. *Analysis*

We agree with Petitioner that "Hsieh 2000 discloses that '[s]ize exclusion chromatography (SEC) with either CL-2B or CL-4B sepharose is used' to assess molecular size" and Hsieh 2000 "discloses the typical extent of conjugation for $CRM_{197}$ conjugates, and how to measure it." Pet. 26–27. Claim 38 requires the glycoconjugates to "have a $K_d$ below or equal to 0.3 in a CL-4B column." Ex 1001, 144:7–9. Dr. Kasper stated "Hsieh 2000 discloses that pneumococcal conjugates should generally have a $K_d$ below or equal to 0.3 in a CL-4B column." Ex. 1004 ¶ 152 (citing Ex. 1013, 6). Hsieh 2000 analyzed saccharide-$CRM_{197}$ conjugates and stated:

> For pneumococcal conjugate, the molecular structure is more complicated than Hib or meningococcal conjugates. The molecular weight distribution can spread over a much wider range in the CL-4B profile, as shown in Figure 3. Therefore, a single value of 50% $K_d$ or similar expression may not be indicative of the complex nature of the conjugate. As a qualitative measurement, a percent value of less than 0.3 $K_d$ can be used to indicate the quantity of high molecular fraction in the conjugate.

Ex. 1013, 6. Thus, Hsieh 2000 directly suggests that for pneumococcal saccharide-$CRM_{197}$ conjugates a 0.3 value $K_d$ value obtained from a CL-4B column is desirable. Ex. 1013, 6. Patent Owner provides no evidence that

there would be any difficulty or unpredictability in performing Hsieh's assay on the conjugates suggested by Merck 2011 and GSK 2008. *See In re Pearson*, 494 F.2d 1399, 1405 (CCPA 1974) ("Attorney's argument in a brief cannot take the place of evidence.").

Claim 44 requires the "degree of conjugation of said glycoconjugate is between 2 and 15." Ex. 1001, 144:32–34. Dr. Kasper stated "[b]ased on Hsieh 2000, a POSITA would have been motivated with a reasonable expectation of success to construct the conjugate of claim 1 with a 'degree of conjugation' between 2 and 15." Ex. 1004 ¶ 153 (citing Ex. 1013, 8). Hsieh 2000 teaches "[f]or saccharide-$CRM_{197}$ conjugates, there is a limited number of exposed lysines on surface $CRM_{197}$, which can participate in the conjugation reaction. The loss of lysine has been relatively consistent in the range of 6-9." Ex. 1013, 8. Thus, the only evidence of record, Hsieh 2000, teaches a degree of conjugation between 6 and 9. Ex. 1013, 8. Patent Owner raises general concerns about variation in glycoconjugates, without providing specific evidence of unpredictability for 22F, but the requirement is not an absolute expectation of success, but rather a reasonable expectation of success based on the teachings of the prior art. "Obviousness does not require absolute predictability of success . . . *all that is required is a reasonable expectation of success*." *Kubin*, 561 F.3d at 1360 (internal quotation marks and citation omitted).

We, therefore, conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by Merck 2011, GSK 2008, and the knowledge of the ordinary artisan with purification and conjugation techniques of Hsieh 2000 to obtain quality conjugates.

## III. PATENT OWNER'S MOTION TO AMEND

Patent Owner's motion to amend is contingent on a finding of unpatentability of claims 1, 2, 3, 4, 9, 41, and 42 by the Board. Mot. Amend 1. Because we conclude that Petitioner has demonstrated that these claims are unpatentable (among other claims), we proceed to consider Patent Owner's motion to substitute claims 46–52 for claims 1, 2, 3, 4, 9, 41, and 42. For the reasons discussed below, Patent Owner's motion to amend is denied.

### *A. Threshold Requirements*

In an *inter partes* review, claims may be added as part of a proposed motion to amend. 35 U.S.C. § 316(d).

The Board must assess the patentability of the proposed substitute claims "without placing the burden of persuasion on the patent owner." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1328 (Fed. Cir. 2017) (en banc). Patent Owner's proposed substitute claims, however, must still meet the statutory requirements of 35 U.S.C. § 316(d) and the procedural requirements of 37 C.F.R. § 42.121 as a threshold matter. *See* USPTO's Memorandum, GUIDANCE ON MOTIONS TO AMEND IN VIEW OF AQUA PRODUCTS (Nov. 2017), available at https://www.uspto.gov/sites/default/files/documents/guidance_on_motions_to_amend_11_2017.pdf. Accordingly, Patent Owner must demonstrate: (1) the amendment proposes a reasonable number of substitute claims; (2) the amendment does not seek to enlarge the scope of the claims of the patent or introduce new subject matter; (3) the amendment responds to a ground of unpatentability involved in the trial; and (4) the original disclosure sets forth written description support for each proposed claim. *See* 35 U.S.C.

§ 316(d)(1)(B),(3); 37 C.F.R. § 42.121; *Hospira, Inc. v. Genentech, Inc*., Case IPR2017-00737, slip op. at 47 (PTAB Oct. 3, 2018) (Paper 108).

*B. Proposed Substitute Claims*

Proposed substitute claims 46 and 47 are reproduced below with markings showing proposed changes from claims 1 and 2, respectively. Deletions are shown in brackets and additions are underlined.

> Claim 46 (substitute for original claim 1): An immunogenic composition comprising:
>
> a *Streptococcus pneumoniae* serotype 22F glycoconjugate, wherein the 22F glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and a $CRM_{197}$ carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2;
>
> glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F all individually conjugated to $CRM_{197}$;
>
> an aluminum salt adjuvant; and
>
> wherein the composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition in the form of an initial dose and a booster dose.
>
> Claim 47 (Substitute for original claim 2): The immunogenic composition of claim ~~1~~ 46, wherein the glycoconjugate comprises at least ~~0.1~~ 0.8 mM acetate per mM polysaccharide.

Mot. Amend App'x i, ii; Ex. 2044 ¶¶ 16–37.

*C. Broadening, Definiteness, and Written Description*

We construe only those terms that are in controversy, and only to the extent necessary to resolve the controversy. *See Vivid Techs.*, 200 F.3d at 803. None of the newly added claim terms are in controversy, so no claim construction is required.

In particular, we determine that the substitute claims do not broaden the invention and that substitute claim 47 is definite and has adequate written description support.

*1. Claims do not improperly broaden the term "immunogenic"*

Petitioner asserts "Patent Owner's proposed claims should be rejected because they impermissibly incorporate a broadened 'immunogenic' term." Pet. Opp. 24. Petitioner asserts that "Patent Owner's proposed claims would cover compositions that would not have infringed the original claims, *i.e.*, compositions that elicit the recited 2-log increase in serum IgG levels **without eliciting functional antibody against serotype 22F**." Pet. Opp. 25.

Patent Owner asserts:

> The substitute claim was not meant to broaden the scope beyond the original claims. Should the Board deem it necessary to construe the term "immunogenic" in the context of the substitute claims, Pfizer's position is that the term should be construed consistently with the manner in which the parties construed the term in the context of the original claims.

PO Reply 10.

We agree with Patent Owner that the term "immunogenic" does not impermissibly broaden the claims. As discussed in our claim interpretation section above, we agree with Patent Owner that the term "immunogenic" requires functional antibody be elicited against each immunogen contained

in the composition. Because every original claim and every newly proposed claim requires an immunogenic composition that comprises serotype 22F, the newly added claims require functional antibody against serotype 22F. Therefore, the inclusion of other serotypes serves to narrow the claims, because the claims must include an "immunogenic" serotype 22F glycoconjugate, along with additional "immunogenic" glycoconjugates of other serotypes.

*2. Claim 47 is not indefinite*

Petitioner asserts that "[p]roposed claim 47 should also be rejected as indefinite under 35 U.S.C. § 112(b) because the meaning of the claim term 'the glycoconjugate' is unclear." Pet. Opp. 22. Petitioner asserts that "proposed claim 46 recites 14 distinct 'glycoconjugates' - and there is no indication which one is 'the glycoconjugate' of proposed claim 47. Ex.1096, ¶¶82-84." Pet. Opp. 22.

Patent Owner asserts "claim 47 is readily interpreted as directed to the 22F conjugate as it is a proposed substitute to claim 2 and is supported by disclosures relating to a 22F conjugate." PO Reply 10–11.

We agree with Patent Owner that the reasonable reading of "the glycoconjugate" in claim 47 refers to the serotype 22F glycoconjugate referenced in independent claim 46. However, even if we agreed with Petitioner's interpretation and "the glycoconjugate" would then refer to all of the glycoconjugates in claim 46, this interpretation would simply further narrow claim 47 to require all of the glycoconjugates to satisfy the 0.8 mM acetate per mM polysaccharide limitation.

*3. Claim 47 has written description support*

Petitioner asserts a "POSITA would have understood that this paragraph does not disclose that the amount of acetate relative to polysaccharide in the serotype 22F conjugate can be 'at least 0.8 mM acetate per mM polysaccharide.'" Pet. Opp. 23 (internal citation omitted).

Patent Owner asserts "[c]laim 47 is directly supported by the disclosure: 'at least . . . about 0.8 mM acetate per mM serotype 22F polysaccharide' in both the application issuing as the '559 patent and the provisional to which it claims priority." PO Reply 12.

We agree with Patent Owner. The '559 patent states "the serotype 22F glycoconjugate of the invention comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6 or 0.7 or about 0.8 mM acetate per mM serotype 22F polysaccharide." Ex. 1001, 26:1–4. We determine that the ordinary artisan, confronted with the phrase "at least . . . or about 0.8 mM acetate" would understand this to encompass "at least about" 0.8 mM acetate, thus, allowing for either "at least" or "about" that amount of acetate.

*D. Unpatentability*

Petitioner assets that proposed substitute claims 46–52 are unpatentable as obvious over the combination of Hausdorff, Merck 2011, GSK 2008, and the knowledge of the ordinary artisan. Pet. Opp. 2–18; *see also* Pet. Sur-Reply 3–8. To support its Opposition, Petitioner proffers the declaration of Dr. Kasper and the deposition of Dr. Paradiso. Ex. 1096; Ex. 1104. Patent Owner disagrees. PO Reply 1–9; *see also* PO Sur-Sur-Reply 1–5. To

support its Motion Reply, Patent Owner proffers the declarations of Dr. Paradiso (Ex. 2044; Ex. 2063).

We determine that claims 46 and 48–52 would have been obvious over the combination of Merck 2011, GSK 2008, Hausdorff, and the knowledge of the skilled artisan. We determine that claim 47 would have been obvious with the further addition of PVP 2013.

*1. Claims 46–52 are obvious over Hausdorff, Merck 2011, GSK 2008, and the knowledge of the ordinary artisan*

*a. Hausdorff (Ex. 2027)*

Hausdorff teaches "a multivalent immunogenic composition, wherein the capsular polysaccharides are from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9v, 14, 18C, 19A, 19F and 23F of Streptococcus pneumoniae, the carrier protein is $CRM_{197}$, and the adjuvant is an aluminum-based adjuvant." Ex. 2027 ¶ 8. Hausdorff teaches a starting "saccharide/protein ratio of 2:1." Ex. 2027 ¶ 89. Hausdorff teaches that "[s]ize exclusion chromatography media (CL-4B) was used to profile the relative molecular size distribution of the conjugate." (Hausdorff ¶ 92).

Hausdorff "examined the ability of the 13vPnC vaccine with $AlPO_4$ adjuvant to elicit vaccine serotype-specific immune responses. The pneumococcal serotypes represented in the 13vPnC vaccine include types 1, 3, 4, 5, 6A, 68, 7F, 9V, 14, 18C, 19A, 19F and 23F." Ex. 2027 ¶ 230. Hausdorff teaches:

> New Zealand White rabbits were immunized intramuscularly at week 0 and week 2 with the planned human clinical dose of each polysaccharide (2 µg of each PS, except 4 µg of 68) formulated with or without $AlPO_4$ (100 µg/dose). Sera were collected at various time points. Serotype specific IgG was

> measured by ELISA and functional activity was assessed by OPA.

Ex. 2027 ¶ 230.

Table 3 of Hausdorff, reproduced below, shows that each of the thirteen tested serotypes produced an immune response with more than a 2-log increase above baseline serum IgG levels in New Zealand White Rabbits after administration of the two equal doses.

TABLE 3

Rabbit IgG Immune Responses (GMTs) Following Immunization with Two Doses of 13-valent Pneumococcal Glycoconjugate

| | Diluent with $ALPO_4$[a] | | | 13vPnC[a] | | | 13vPnC + $ALPO_4$[a] | | |
|---|---|---|---|---|---|---|---|---|---|
| Serotype | Week 0 | Week 4 | Ratio Wk4:Wk0 | Week 0 | Week 4 (95% CI) | Ratio Wk4:Wk0 | Week 0 | Week 4 (95% CI) | Ratio Wk4:Wk0 |
| 1 | <100 | <100 | 1.0 | 50 | 5,926 (2,758-12,733) | 119 | 50 | 11,091 (5,327-23,093) | 222 |
| 3 | <100 | <100 | 1.0 | 50 | 6,647 (2,773-15,932) | 133 | 58 | 16,443 (7,096-38,106) | 284 |
| 4 | <100 | <100 | 1.0 | 50 | 13,554 (8,031-22,875) | 271 | 50 | 29,183 (15,342-55,508) | 584 |
| 5 | 134 | <100 | 0.4 | 50 | 5,859 (2,450-14,009) | 117 | 50 | 16,714 (6,959-40,140) | 334 |
| 6A | 141 | <100 | 0.4 | 74 | 22,415 (11,987-41,914) | 303 | 83 | 63,734 (21,141-192,146) | 768 |
| 6B | <100 | <100 | 1.0 | 57 | 8,108 (3,564-18,444) | 142 | 54 | 23,505 (11,286-48,955) | 435 |
| 7F | 3,859 | 579 | 0.2 | 171 | 43,591 (26,931-70,557) | 444 | 143 | 84,888 (46,445-155,151) | 496 |
| 9V | 289 | 995 | 3.4 | 205 | 15,780 (7,193-34,616) | 125 | 208 | 43,331[b] (23,256-71,510) | 217 |
| 14 | 437 | 177 | 0.4 | 61 | 6,906 (3,416-13,962) | 113 | 70 | 16,076 (9,649-26,785) | 322 |
| 18C | <100 | <100 | 1.0 | 50 | 21,283 (15,770-28,725) | 426 | 50 | 35,040 (24,708-49,692) | 701 |
| 19A | <100 | <100 | 1.0 | 121 | 113,599 (54,518-236,707) | 939 | 144 | 280,976 (119,587-660,167) | 1,951 |
| 19F | <100 | <100 | 1.0 | 50 | 14,365 (7,346-28,090) | 287 | 50 | 24,912 (9,243-67,141) | 498 |
| 23F | <100 | <100 | 1.0 | 50 | 5,323 (1,894-14,962) | 106 | 50 | 15,041 (4,711-48,018) | 301 |

[a]GMTs of pooled sera consisted of equal volumes of serum from each individual rabbit within a group
[b]Statistically different ($p = 0.022$) from treatment group without $ALPO_4$

Table 3 shows the geometric mean titer "achieved in pooled serum samples, following two doses of the 13vPnC vaccine." Ex. 2027 ¶ 231.

The data of Table 3 show that the ratio of week 4 to week 0, both with and without aluminum phosphate, was higher than a 2-log increase of 100 for every single serotype tested. Ex. 2027 ¶ 231, Table 3.

*b. Merck 2011 (Ex. 1006)*

As discussed above in Section II.C.1, Merck 2011 teaches an immunogenic composition composed of serotypes "of *Streptococcus pneumoniae* (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F or 33F) conjugated to a carrier protein, preferably $CRM_{197}$." Ex. 1006, 1:9–11. Table 1 of Merck 2011 shows a vaccine formulation with a 1:1 ratio for 14 serotypes including serotype 22F and a 2:1 ratio for serotype 6B, specifically showing the formulation comprises 32 µg of total polysaccharide and 32 µg of $CRM_{197}$ carrier protein with the total polysaccharide being composed of 2 µg of 14 serotypes including 22F and 4 µg of serotype 6B. Ex. 1006, 19:5–9.

Merck 2011 teaches formulations containing 15 serotypes of the pneumococcal conjugate vaccine (PCV-15) "were evaluated in 4 studies in adult New Zealand White Rabbits (NZWRs) using a compressed immunization regimen in which rabbits received a full human dose of vaccine at day 0 and day 14." Ex. 1006, 23:15–17.

Table 4

Fold-rise (Post-dose 2:Pre-dose 1) in IgG Responses to Non-Prevnar™ Serotypes of PCV-15 Lead Formulations Tested in NZWR

| Serotype | NZWR-1 | NZWR-2 | NZWR-3 | NZWR-4 |
|---|---|---|---|---|
| 1 | 14.9 | 30.5 | 55.1 | 59.9 |
| 3 | 33.6 | 16.2 | 61.5 | 28.5 |
| 5 | 12.8 | 70.2 | 112.0 | 134.0 |
| 6A | 21.3 | 77.8 | 143.0 | 123.0 |
| 7F | 42.0 | 83.8 | 194.0 | 108.0 |
| 19A | 40.5 | 79.1 | 450.0 | 314.0 |
| 22F | 45.7 | 87.8 | 243.0 | 135.0 |
| 33F | 21.7 | 47.9 | 98.8 | 69.4 |

Merck 2011 Table 4.

In Table 4, Merck 2011 teaches the "fold-rise in antibody levels to the non-Prevnar® serotypes from Day 0 to Day 28 (Post-dose 2, PD-2)." Ex. 1006, 24:14–15.

In the NZWR-3 and NZWR-4 studies in Table 4 of Merck 2011, serotype 22F exhibits a greater than 2-log increase above baseline in New Zealand White Rabbits with values of 243.0 and 135.0, while in the NZWR-1 and NZWR-2 studies in Table 4, serotype 22F exhibits less than 2-log increases of 45.7 and 87.8. *See* Ex. 1006, Table 4.

*c. GSK 2008 (Ex. 1007)*

As discussed above in Section II.C.2, GSK 2008 teaches "the multivalent pneumococcal vaccine of the invention will be selected from the following serotypes 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15, 17F, 18C, 19A, 19F, 20, 22F, 23F and 33F." Ex. 1007, 8:29–31. GSK 2008 teaches conjugation of polysaccharides to the carrier protein $CRM_{197}$ (*see* Ex. 1007, 10:12–14) and teaches "[p]referably the ratio of carrier

protein to *S. pneumoniae* saccharide is between 1:5 and 5:1." Ex. 1007, 20:24–26. GSK 2008 further teaches in claim 61 an "immunogenic composition of any preceding claim wherein the average size (e.g. $M_w$) of the saccharides is above 50 kDa, e.g[.], 50-1600. . . ." Ex. 1007, 94.

*d. Analysis*

*i. Claim 46*

Petitioner asserts a "POSITA as of January 21, 2014 would have been motivated with a reasonable expectation of success to add the immunogenic serotype 22F conjugate of Merck 2011 to the immunogenic 13-valent composition of Hausdorff." Pet. Opp. 4 (citing Ex. 1096 ¶ 23). Petitioner asserts "serotype 22F was well-known as an emerging and clinically relevant pneumococcal serotype not in Prevnar 13®. *See, e.g.,* Ex.1096, ¶26; Ex.1098, 1; Ex.1099, 7; Ex.1100, 1." Pet. Opp. 4. Petitioner asserts that the ordinary artisan would have had reason to use $CRM_{197}$ as the protein conjugate and an aluminum salt as the adjuvant. Pet. Opp. 5 (citing Ex. 1096 ¶¶ 29–30; Ex. 2027 ¶ 59; Ex. 1006, 11:31–33).

Petitioner asserts that a "POSITA would have had a reasonable expectation that combining such conjugates would yield a 14-valent composition with the claimed 2-log increase in serum IgG levels." Pet. Opp. 8. Petitioner asserts that Hausdorff "reports that the 13-valent composition, with or without adjuvant, exhibits the claimed 2-log increase in serum IgG levels." Pet. Opp. 6 (citing Ex. 2027 ¶ 231). Petitioner also asserts that "for serotype 22F, Merck 2011 discloses more than a 2-log increase in IgG levels (*i.e.*, 243.0- and 135.0-fold increases) above baseline in 2 studies." Pet. Opp. 8 (citing Ex.1006, 24:17–25:1 (Table 4)).

Petitioner asserts that a "POSITA would not have been concerned that adding one more conjugate to the 13-valent composition of Hausdorff would negatively impact immunogenicity of the composition." Pet. Opp. 8 (citing Ex. 1096 ¶ 43). Petitioner asserts that

> Patent Owner's expert in a related proceeding, Dr. Fattom, confirmed that immune interference "is not something that will prevent you from developing any vaccine with any valency. It's a risk management and risk evaluation." Ex.1102, 77:25-78:21. It was well-known that Patent Owner had successfully added 6 more $CRM_{197}$ conjugates to its 7-valent pneumococcal $CRM_{197}$ conjugate vaccine.

Pet. Opp. 8 (citing Ex. 1096 ¶ 43). Petitioner also asserts that Dr. Paradiso held the position in a published paper that "'[w]ith conjugates on $CRM_{197}$ it has been possible to induce good immunity to new serotypes **without negatively affecting the components already in the vaccine**.'" Pet. Opp. 9 (citing Ex. 1091, 3 (emphasis added in Pet. Opp.)). Petitioner asserts that Dr. Paradiso "testified that a POSITA would not have been concerned about immune interference with a 21-valent composition 'based on the data with the 16- and the 20-valent vaccine, which achieved the two-log increase.'" Pet. Opp. 9 (citing Ex.1104, 110:22–111:10).

Petitioner asserts that "Merck 2011 describes its 15-valent composition as 'highly immunogenic' (in both infant rhesus monkeys ('IRMs') and NZWRs) against all 15 serotypes in the composition, and 'comparable to' Prevnar® with respect to the 7 overlapping serotypes." Pet. Opp. 10 (citing Ex. 1006, 30:3–14 and Ex. 1096 ¶¶ 45, 51). Petitioner asserts that "Patent Owner's expert, Dr. Paradiso, conceded that Merck 2011 discloses data in Figure 1 (IRM assay) establishing that 'after three doses the

responses for the 15-valent composition of Merck 2011 and that of Prevnar[®] were comparable.'" Pet. Opp. 10 (citing Ex. 1104, 138:4–9).

Patent Owner acknowledges that "Merck 2011 discloses a fifteen-valent composition ('PCV-15') that includes thirteen conjugates of the same serotypes and carrier disclosed in Hausdorff and two additional conjugates, one of which is a 22F-$CRM_{197}$ conjugate." PO Reply 1 (citing Ex. 2063 ¶ 6). Patent Owner asserts, however, that "the data in Merck 2011 show that such a combination would not have achieved the 2-log IgG Increase required by substitute claim 46." PO Reply 1 (citing Ex. 2063 ¶ 5).

Patent Owner asserts "[i]n Merck 2011 Table 3, responses for PCV-15 are compared to those of Prevnar® for the 7 common serotypes covered by Prevnar®." PO Reply 1 (citing Ex. 1006, 25:15– 26:15; Ex. 2063 ¶ 7). Patent Owner asserts the "results in Table 3 show that the PCV-15 composition elicited poorer responses (i.e., < 1.0) than Prevnar® to several serotypes and in several arms of the study." PO Reply 2 (citing Ex. 2063 ¶ 9). Patent Owner relies on Dr. Paradiso to assert that "[f]ar from showing that PCV-15 is 'comparable' to Prevnar® (*see* Opp. at 12), these results show that PCV-15 elicited poorer responses than Prevnar® and suffers from immune interference." PO Reply 2–3 (citing Ex. 1104, 147:13–25).

Patent Owner asserts the results of Table 4 of Merck 2011 "show that PCV-15 failed to exhibit the 2-log IgG Increase to all serotypes as required by the substitute claim." PO Reply 3 (citing Ex. 2063 ¶ 13). Patent Owner asserts that "[g]iven the poor responses to numerous serotypes of the Merck 2011 formulations containing the undefined 22F conjugate, a POSA would have no reasonable expectation of making a composition that meets the 2-log IgG Increase of the substitute claims based on Hausdorff in view of

Merck 2011 and GSK 2008." PO Reply 4 (citing Ex. 2063 ¶ 14). Patent Owner asserts "Merck's argument that a POSA would dismiss the poor responses shown by Table 3 as variances generally associated with the rabbit immunogenicity test (*see* Opp. 11) rings hollow since Merck 2011 and Dr. Kasper relied on rabbit immunogenicity tests." PO Reply 5 (citing Ex. 1006, 25:15–26:1; Ex. 2062, 15:24–16:5).

Patent Owner asserts that Petitioner "argues that a POSA would not have been concerned with the immune interference demonstrated by Tables 3 and 4 because 13-valent conjugate vaccines had avoided immune interference in the past." PO Reply 6. Patent Owner asserts that "Merck 2011 itself reflected such concerns: '[o]ther PCVs have covered 7, 10, 11, or 13 of the serotypes contained in PCV-15, but immune interference has been observed for some serotypes.'" PO Reply 6 (citing Ex. 1006, 4:13–15). Patent Owner asserts that Petitioner's

> argument is also contradicted by its own statement to the USPTO in prosecuting U.S. Application 13/020,402, related to Merck 2011, that it was well known as of the priority date of Merck 2011 that "carrier induced epitopic suppression (CIES) was a problem when increasing the number of polysaccharides in pneumococcal conjugate vaccines."

PO Reply 6 (citing Ex. 2061, 4).

Patent Owner also asserts "Merck's assertion that serotype 22F was a known emerging serotype merely identifies a problem, not a motivation to combine particular references." PO Reply 7. Patent Owner also asserts that Petitioner's "opposition ignores the critical limitations that the claimed 'immunogenic composition compris[es]' a '22F glycoconjugate [that] has a molecular weight of between 1000 kDa and 12,500 kDa,' 'wherein a ratio

(w/w) of the [22F] polysaccharide to the [$CRM_{197}$] carrier protein is between 0.4 and 2.'" PO Reply 8 (internal citation omitted).

Viewing the evidence as a whole, we determine that a preponderance of the evidence demonstrates that it would have been obvious to incorporate a serotype 22F polysaccharide—conjugated to $CRM_{197}$, with molecular weights and saccharide to protein ratios falling in the claimed ranges as rendered obvious by Merck 2011 and GSK 2008—into a pneumococcal vaccine with the 13 serotypes and aluminum salt adjuvant disclosed by Hausdorff with a reasonable expectation of success in obtaining a 2-log increase above baseline in serum IgG levels as required by claim 46.

As to reasons to include serotype 22F into such a composition, Merck 2011 states "the addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses [and] demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing pneumococcal vaccines." Ex. 1006, 4:1–4. GSK 2008 states:

> the presence of 22F in a childhood pneumococcal vaccine will be advantageous in inducing herd immunity in the population such that the onset of serious elderly disease caused by this serotype (such as pneumonia and/or invasive pneumococcal disease (IPD) and/or exacerbations of chronic obstructive pulmonary disease (COPD)) may be prevented or reduced in severity.

Ex. 1007, 5:5–9. Thus, both Merck 2011 and GSK 2008 provide specific reasons to incorporate serotype 22F into a pneumococcal vaccine to provide robust antibody responses that will provide herd immunity and reduce disease in human populations. As discussed extensively regarding claim 1

above, these two references also render the specific molecular weight and saccharide to protein ratios obvious and we incorporate that reasoning here.

As to the issue of immune interference and a reasonable expectation of success in obtaining a 2-log increase, Table 3 of Hausdorff shows that a composition with thirteen of the fourteen serotypes that were required by claim 46, conjugated with $CRM_{197}$, produced an immune response with more than a 2-log increase above baseline serum IgG levels in New Zealand White Rabbits after administration of the two equal doses with or without the aluminum salt adjuvant. Ex. 2027 ¶ 231, Table 3.

Thus, the issue resolves to whether there would have been a reasonable expectation of success in the inclusion of serotype 22F in Hausdorff's pneumococcal vaccine composition while retaining the 2-log increased immune response of the thirteen serotypes and also allowing a 2-log increase in serotype 22F response.

Dr. Kasper states that

> Because the increases in serum IgG levels reported in Hausdorff were all well-above the 2-log threshold, as was also the case for the serotype 22F conjugate of Merck 2011, a POSITA would have had a reasonable expectation that the addition of the serotype 22F conjugate of Merck 2011 to the 13-valent composition of Hausdorff would yield the claimed 14-valent composition with the recited 2-log increase in serum IgG levels.

Ex. 1096 ¶ 34. This position is supported by Merck 2011, which shows that PCV-15, a composition comprising all of Hausdorff's thirteen serotypes and further including serotypes 22F and 33F, resulted in a 2-log increase for serotype 22F in two of four studies in New Zealand White Rabbits, and less than a 2-log increase in the other two studies. *See* Ex. 1006, 2:24–30, Ex.

1006, 24, Table 4. While Merck 2011 mentions immune interference in the background section relating to prior art formulations, Patent Owner does not identify a statement in Merck 2011 that immune interference occurred in PCV-15. Ex. 1006, 4:13–15.

We recognize Patent Owner correctly notes that Merck 2011 only obtained a 2-log increase of serum IgG levels in serotype 22F conjugates in two of the four arms, and annotates Figures 3 and 4 in Merck 2011 to identify particular experimental results that did not satisfy the 2-log increase. PO Reply 3–4. However, "'[o]bviousness does not require absolute predictability of success . . . *all that is required is a reasonable expectation of success*.'" *Kubin*, 561 F.3d at 1360 (*quoting In re O'Farrell,* 853 F.2d 894, 903–04 (Fed. Cir. 1988)). Evidence that all of the Merck 2011 experiments showed a greater than 1-log increase in serum IgG levels and half of the experiments shows a greater than 2-log increase supports the determination that there was a reasonable expectation of success in achieving the claimed combination at a greater than 2-log increase. *See* Ex. 1006, 2:24–30, 24, Table 4.

Dr. Kasper cites Paradiso 2009 to support his position that immune interference would not have been expected with the addition of a serotype 22F-$CRM_{197}$ conjugate to the thirteen serotype composition of Hausdorff because Paradiso 2009 states "[w]ith conjugates on $CRM_{197}$ it has been possible to induce good immunity to new serotypes without negatively affecting the components already in the vaccine." Ex. 1091, 3; Ex. 1096, 43. Dr. Paradiso, Patent Owner's expert, stated in deposition that "I would agree that what I said was that up to a 13-valent pneumococcal conjugate vaccine that it's been possible to induce good immunity to new serotypes without

negatively affecting the components already in the vaccine." Ex. 1104, 85:16–20. Dr. Paradiso also stated "I didn't" in response to a question of whether he made "any qualifications in the statement where the 13-valent composition was the upper threshold." Ex. 1104, 86:9–13.

We recognize Patent Owner's argument that the Merck 2011 "results show that PCV-15 elicited poorer responses than Prevnar® and suffers from immune interference" based on a statement by Dr. Paradiso that the Merck 2011 "formulation as a whole raises concern about potential interference" PO Reply 2–3; Ex. 1104, 147:24–25. Patent Owner also asserts:

> Table 2 of Skinner[19] (and Table 2 of Merck 2011), shows that PCV-15 elicited a variety of poorer responses when compared to Prevnar®. *See* EX1113 at 24:3-23; EX1110 at 6. Based on this data, a POSA would have understood that PCV-15 exhibited immune interference and would not have had a reasonable expectation that Merck's asserted combination would achieve the 2-log IgG Increase across all serotypes as required by every substitute claim. *See* EX2044 at ¶ 72.

PO Sur-Sur-Reply 2.

We are not persuaded by Patent Owner's arguments because Skinner 2011 shows IgG levels in Figure 3, while showing serotype-specific opsonophagocytic killing activity in Table 2. Ex. 1110, 6. Because claim 46 recites the 2-fold increase in IgG levels, not in opsonophagocytic killing

[19] Skinner 2011 is a prior art reference that teaches evaluation of a 15-valent pneumococcal $CRM_{197}$ conjugate vaccine in a monkey model. Ex. 1110, 1. Skinner 2011 teaches increasing amounts of serotype specific antibodies after each immunization with the vaccine in monkeys for each of the 15 serotypes in the vaccine. Ex. 1110, 5, Figure 4. Skinner 2011 teaches that there was no serotype interference as the number of serotypes used was increased. Ex. 1110, 6.

activity, Figure 3 of Skinner 2011 is more relevant to the claim. Moreover, in a Reply Deposition, Dr. Paradiso was asked about results in Figure 3 of Skinner 2011 showing that "the IgG responses for PCV-15 were comparable to or higher than that for PCV-13 for all of the serotypes" and answered "So I agree that in this figure that is true, yes." Ex. 1113, 26:3–8 (referring to Ex. 1110, 4, Fig. 3). We note that Skinner 2011 teaches that "IRMs [(infant rhesus monkeys)] immunized with PCV-15 did not appear to demonstrate serotype interference as the antibody responses to the seven Prevnar® serotypes were not diminished by inclusion of additional polysaccharide conjugates as the vaccine was expanded to include either 13 or 15 types." Ex. 1110, 6. Indeed, Figure 3 of Skinner shows increased levels of IgG for every serotype in PCV-15 relative to all other pneumococcal vaccine compositions. Ex. 1110, Fig. 3.

Patent Owner also addresses deficiencies in Petitioner's reliance on Exhibit 1111, Exhibit 1112, and Exhibit 1114. PO Sur-Sur-Reply 4–5. We do not rely upon these Exhibits to demonstrate a reasonable expectation of success nor does our review of them find any evidence persuasively rebutting a reasonable expectation of success in generating a pneumococcal vaccine with serotype 22F with a 2-fold increase in IgG responses in New Zealand White Rabbits.

We note that "this is not the case where the prior art teaches merely to pursue a "'general approach that seemed to be a promising field of experimentation'" or "'gave only general guidance as to the particular form of the claimed invention or how to achieve it.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007) (*quoting O'Farrell*, 853 F.2d at 903; *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1167 (Fed. Cir. 2006)).

Here, both Merck 2011 and GSK 2008 specifically suggested incorporation of a serotype 22F conjugate linked to $CRM_{197}$ into a pneumococcal vaccine that was already composed of other known serotypes, including all of the thirteen serotypes disclosed by Hausdorff. Ex. 1006, 1:9–11; Ex. 1007, 8:29–31; Ex. 2027 ¶ 230.

Thus, we find that a preponderance of the evidence supports a determination that there would have been a reasonable expectation of success in obtaining a fourteen serotype pneumococcal vaccine composition as required by claim 46 with 2-fold increases in IgG responses in New Zealand White Rabbits because Merck 2011 itself exemplifies 2-fold increases in IgG responses in New Zealand White Rabbits for serotype 22F conjugates and because both Paradiso 2009 and Skinner 2011 support the position that inclusion of an additional serotype 22F-$CRM_{197}$ conjugate into the thirteen serotype composition of Hausdorff would not have been expected to result in immune interference. Ex. 1006, 24.

We conclude that claim 46 would have been obvious over Hausdorff, Merck 2011, GSK 2008, and the knowledge of the ordinary artisan.

*ii. Claim 47*

Petitioner asserts that "PVP 2013 specifies that, for a pneumococcal polysaccharide vaccine, serotype 22F capsular polysaccharide must contain an 'O-acetyl/polysaccharide unit molar ratio' of '0.5 - 1.5'; that specified range overlaps largely with the claimed ratio of 'at least 0.8.'" Pet. Opp. 14, (citing Ex. 1009, 3–4). Petitioner asserts that "[b]ecause immunogenicity of a conjugate depends in large part on immunogenicity of the included polysaccharide, a POSITA would have considered the teachings of PVP 2013 for the composition of claim 47; that composition incorporates many of

the same polysaccharides as PVP 2013, including serotype 22F." Pet. Opp. 13 (citing Ex. 1096 ¶ 53). Petitioner asserts that a "POSITA would have understood that O-acetyl groups can contribute to the immunogenicity of pneumococcal polysaccharides." Pet. Opp. 14 (citing Ex. 1096 ¶ 55). Petitioner asserts that a "POSITA as of January 21, 2014 would have been motivated to maintain at least 0.8 mM acetate per mM polysaccharide, *i.e.*, approximately native levels of acetate in the serotype 22F polysaccharide." Pet. Opp. 13–14 (citing Ex. 1096 ¶ 54, Ex. 1001, 15:67 to 16:2).

Patent Owner does not separately argue that Petitioner failed to meet its burden for dependent claim 47.

Dr. Kasper stated "PVP 2013 specifies that, for a pneumococcal polysaccharide vaccine, serotype 22F capsular polysaccharide must contain an 'O-acetyl/ polysaccharide unit molar ratio' of '0.5 - 1.5'; that entire specified range meets the claimed ratio of 'at least 0.1.'" Ex. 1004 ¶ 142 (citing Ex. 1009, 4). Consistent with Dr. Kasper's statement, PVP 2013 states the "*O*-acetate content (*O*-acetyl/polysaccharide unit molar ratio) shall be within the range of the following specification" where the range for serotype 22F is given as "0.5–1.5." Ex. 1009, 3, 4.

Viewing the evidence as a whole, we determine that a preponderance of the evidence demonstrates that it would have been obvious that use of acetate in the molar ratios suggested by PVP 2013 would have been expected to improve vaccine activity.

*iii. Claims 48 and 49*

Petitioner asserts "[b]ased on GSK 2008, a POSITA would have been motivated with a reasonable expectation of success to include $CRM_{197}$ conjugates of those 6 additional serotypes - well-known as emerging and

clinically relevant pneumococcal serotypes." Pet. Opp. 15 (citing Ex. 1096 ¶¶ 59–60). Petitioner asserts "the fact that Pneumovax® 23 polysaccharide vaccine featured serotypes 15B, 33F, 12F, 10A, 11A and 8 underscores that they were well-known to be prevalent." Pet. Opp. 16 (citing Ex. 1096 ¶¶ 60, 67; Ex. 1054, 4).

Patent Owner asserts:

> Merck fails to show that claims 48 and 49, which require additional conjugates, are not patentable. Merck fails to show any disclosure of serotype 15B in the art, and identifies no motivation for a POSA to conjugate serotypes 15B, 12F, 10A, 11A, and 8 to CRM197 or for those conjugates to be immunogenic or achieve the 2-log IgG Increase.

PO Reply 9.

Viewing the evidence as a whole, we determine that a preponderance of the evidence demonstrates that it would have been obvious to incorporate additional known *S. pneumoniae* serotypes into a pneumococcal vaccine. Claims 48 and 49 recite the additional inclusion of serotypes 15B, 33F, 12F, 10A, 11A, and 8, all conjugated to $CRM_{197}$. GSK 2008 specifically suggests inclusion of serotypes 33F, 12F, 10A, 11A, 8, along with serotype 15. *See* Ex. 1007, 8:29–31. Dr. Kasper states that a "POSITA would have understood that there is no individual 'serotype 15' and that 'serotype 15' in GSK 2008 includes all serotypes within serogroup 15, including serotype 15B as claimed." Ex. 1096 ¶ 60. Patent Owner provides no evidence that the ordinary artisan would not have understood the term "serotype 15" to include serotype 15B. We also note that the 1990 Physicians' Desk Reference disclosed that Pneumovax 23 contained serotype 15B, establishing that the prior art recognized this serotype as desirable in a pneumococcal vaccine. Ex. 1054, 4.

We conclude that claims 48 and 49 would have been obvious over Hausdorff, Merck 2011, GSK 2008, and the knowledge of the ordinary artisan.

## IV. PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner moves to exclude the following Exhibits, or portions thereof: Exhibit 1004 ¶ 21, Exhibit 1090, Exhibit 1094, Exhibit 1095, Exhibit 1101, Exhibit 1103, Exhibit 1110, Exhibit 1111, Exhibit 1112, and Exhibit 1114. Paper 49 ("Patent Owner Mot. to Exclude").

As to Exhibit 1004 ¶ 21, 1090, 1094, 1095, 1101, 1103, 1111, 1112, and 1114, we do not rely on any of that evidence in making our ultimate determination on the patentability of the challenged claims. Accordingly, we need not decide Patent Owner's motion as to those exhibits and paragraphs, and we dismiss that portion of Patent Owner's motion as moot.

Patent Owner asserts that we should exclude Exhibit 1110 because "Merck is offering Exhibit 1110 to prove the truth of the matter asserted in the document, the exhibit is hearsay under Fed. R. Evid. 801. Since Exhibit 1110 does not fall within an exception to the rule against hearsay, Exhibit 1110 should be excluded under Fed. R. Evid. 802." Paper 49, 9.

Patent Owner also asserts that "Exhibit 1110 should be excluded as legally irrelevant under Fed. R. Evid. 401 and 402." Paper 49, 9. Patent Owner asserts "Merck also fails to identify how information on testing in infant rhesus monkeys is relevant to addressing deficiencies in its burden to prove unpatentability of the substitute claims." Paper 49, 10.

Petitioner asserts that "Exs.1110–1112 are admissible scientific papers published in the timeframe between Merck 2011's (Ex.1006) priority date (February 9, 2010) and January 21, 2014, and represent the state of the art

during that period." Paper 53, 10. Petitioner asserts that these papers "directly contradict Patent Owner's contention with respect to its Motion to Amend: that a POSITA would have interpreted the data of Merck 2011 as demonstrating immune interference for Merck's PCV-15 (pneumococcal $CRM_{197}$ conjugate vaccine)." Paper 53, 10.

Petitioner asserts that "Skinner 2011 [(Ex. 1110)][is] . . . not being relied upon for the truth of the matters asserted therein," but rather that "Skinner 2011 [is] . . . cited for what [it] . . . indisputably disclosed to a POSITA as of January 21, 2014." Paper 53, 13. Petitioner also asserts regarding the relevance of Exhibit 1110 that "Patent Owner's argument is a red herring. The entire premise of the Motion to Amend is that '[t]he response to the vaccine in claim 46 suggests efficacy levels comparable to the original Prevnar® for which efficacy [*i.e.*, in humans] was demonstrated.' Ex.2044, ¶59." Paper 53, 12.

With few exceptions, the Federal Rules of Evidence apply to *inter partes* proceedings. 37 C.F.R. § 42.62. The moving party has the burden of proof to establish that it is entitled to the requested relief. 37 C.F.R. §§ 42.20(c), 42.62(a).

As to hearsay, Exhibit 1110 is a scientific journal article submitted as rebuttal evidence regarding the knowledge of an ordinary artisan regarding immune interference. *See* Pet. Reply, 1. Exhibit 1110 was offered simply as evidence of what it described, not for proving the truth of the matters addressed in the document, and, thus, is not hearsay. *EMC Corp. v. Personal Web Techns., LLC*, Case IPR2013-00085, slip op. at 66 (PTAB May 15, 2014) (Paper 73); *see also* Fed. R. Evid. § 801(c) (1997 Adv. Comm. Note) ("If the significance of an offered statement lies solely in the

fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.”).

As to relevance, evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* Fed. R. Evid. § 401. The Federal Circuit recognizes that there is a “low threshold for relevancy.” *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1407 (Fed. Cir. 1997). The issue of immune interference is relevant to the issue of reasonable expectation of success for Hausdorff, Merck 2011, and GSK 2008 in rendering obvious the compositions claimed in Patent Owner’s Motion to Amend. *See, e.g.*, PO Reply 2, Pet. Opp. 9. Exhibit 1110 provides an exemplary model system where immune interference did not occur based on the inclusion of additional *S. pneumoniae* serotype glycoconjugates. Ex. 1110, 6. We determine that Exhibit 1110 is relevant and are not persuaded by Patent Owner’s argument, which goes to the weight of the evidence rather than its admissibility.

We deny Patent Owner’s request to exclude Exhibit 1110.

## V. CONCLUSION

We conclude that Petitioner has shown by a preponderance of the evidence that (1) claims 1, 3–10, 16–19, 39, 41, 42, and 45 of the ’559 patent are unpatentable over the combination of Merck 2011 and GSK 2008, (2) claims 2, 40, and 43 of the ’559 patent are unpatentable over the combination of Merck 2011, GSK 2008, and PVP 2013; and (3) that claims 38 and 44 of the ’559 patent are unpatentable over the combination of Merck 2011, GSK 2008, and Hsieh 2000.

We deny Patent Owner's Contingent Motion to Amend to replace claims 1–4, 9, 41, and 42 with substitute claims 46–52, as those claims are unpatentable over the cited art.

We dismiss Patent Owner's Motion to exclude Exhibits 1004 ¶ 21, 1090, 1094, 1095, 1101, 1103, 1111, 1112, and 1114 as moot.

We deny Patent Owner's Motion to exclude Exhibit 1110.

## VI. ORDER

For the reasons given, it is

ORDERED, based on a preponderance of the evidence, that claims 1–10, 16–19, and 38–45 are unpatentable;

FURTHER ORDERED, Patent Owner's Motion to Amend is denied as to replacing claims 1–4, 9, 41, and 42 with substitute claims 46–52;

FURTHER ORDERED, Patent Owner's Motion to Exclude Exhibits 1004 ¶ 21, 1090, 1094, 1095, 1101, 1103, 1111, 1112, and 1114 is dismissed as moot;

FURTHER ORDERED, Patent Owner's Motion to Exclude Exhibit 1110 is denied;

FURTHER ORDERED, because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Arlene L. Chow
Ernest Yakob
HOGAN LOVELLS US LLP
arlene.chow@hoganlovells.com
ernest.yakob@hoganlovells.com

Anthony M. Isogna
Nikolaos C. George
JONES DAY
aminsogna@jonesday.com
ncgeorge@jonesday.com

PATENT OWNER:

John Scheibeler
Dimitrios T. Drivas
Anita Varma
Brendan Gavin
Eric A. Krause
WHITE & CASE LLP
jscheibeler@whitecase.com
ddrivas@whitecase.com
anita.varma@whitecase.com
brendan.gavin@whitecase.com
eric.krause@whitecase.com

Trials@uspto.gov
571-272-7822

Paper 59
Entered: March 13, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MERCK SHARP & DOHME CORP.,
Petitioner,

v.

PFIZER INC.,
Patent Owner.

---

Case IPR2017-02132
Patent 9,492,559 B2

---

Before TONI R. SCHEINER, JEFFREY N. FREDMAN, and JACQUELINE T. HARLOW, *Administrative Patent Judges.*

FREDMAN, *Administrative Patent Judge*.

# FINAL WRITTEN DECISION AND RELATED ORDERS

Finding claims 1–10, 16–19, and 38–45 Unpatentable
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Denying Patent Owner's Motion to Amend
*35 U.S.C. § 326(d) and 37 C.F.R. § 42.221*

Denying-in-part and Dismissing-in-part Patent Owner's
Motion to Exclude Evidence
*37 C.F.R. § 42.64*

# I. INTRODUCTION

## *A. Background*

Merck Sharp & Dohme Corp. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–10, 16–19, and 38–45 of U.S. Patent No. 9,492,559 B2 (Ex. 1001, "the '559 patent"). Paper 1 ("Pet."). Pfizer Inc. ("Patent Owner") filed a Patent Owner's Preliminary Response. Paper 6 ("Prelim. Resp.").

On March 22, 2018, we instituted an *inter partes* review of all challenged claims. Paper 7 ("Dec. Inst."). Patent Owner filed a Patent Owner Response to the Petition (Paper 19) ("PO Response") and a Motion to Amend. Paper 21 ("Mot. Amend."). Petitioner filed an Opposition to the Motion to Amend (Paper 31) ("Pet. Opp."), followed by a Reply to the Patent Owner Response. Paper 33 ("Pet. Reply"). Patent Owner then filed a Reply in Support of the Motion to Amend. Paper 39 ("PO Reply"). Petitioner filed a Sur-Reply to Patent Owner's Motion to Amend. Paper 44 ("Pet. Sur-Reply"). Patent Owner filed a Sur-Reply. Paper 48 ("PO Sur-Reply"). Patent Owner filed a Sur-Sur-Reply in Support of the Motion to Amend. Paper 54 ("PO Sur-Sur-Reply").

Patent Owner filed a Motion to Exclude Evidence. Paper 50. Petitioner filed an Opposition to Motion to Exclude Evidence. Paper 53. Patent Owner filed a Reply in Support of the Motion to Exclude. Paper 55.

On November 13, 2018, the parties presented arguments at an oral hearing. The hearing transcript has been entered in the record. Paper 58 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Having considered the record before us, we

determine that Petitioner has shown by a preponderance of the evidence that claims 1–10, 16–19, and 38–45 of the ’559 patent are unpatentable. *See* 35 U.S.C. §316(e). Additionally, the Motion to Exclude Evidence by Patent Owner has been addressed below in Section IV and the Motion to Amend has been addressed below in Section III.

### *B. Related Proceedings*

We have instituted three additional *inter partes* reviews of claims of the ’559 patent in IPR2017-02131, IPR2017-02136, and IPR2017-02138. We also note that IPR2017-00378, IPR2017-00380, and IPR2017-00390 were instituted with respect to U.S. Patent No. 8,562,999, and that several PGR and IPR petitions were also filed with respect to U.S. Patent Nos. 9,399,060 B2 and 8,895,024 B2. Pet. 4.

### *C. The ’559 Patent (Ex. 1001)*

The ’559 patent involves vaccines for “vaccination of human subjects, in particular infants and elderly, against pneumoccocal infections . . . .” Ex. 1001, 1:21–22. “Pneumonia, febrile bacteraemia and meningitis are the most common manifestations of invasive pneumococcal disease, whereas bacterial spread within the respiratory tract may result in middle-ear infection, sinusitis or recurrent bronchitis.” *Id.* at 1:28–32. “Pneumonia is by far the most common cause of pneumococcal death worldwide.” *Id.* at 1:46–48.

The ’559 patent teaches the “etiological agent of pneumococcal diseases, *Streptococcus pneumoniae* (pneumococcus), is a Gram-positive

encapsulated coccus,[1] surrounded by a polysaccharide capsule.[2] Differences in the composition of this capsule permit serological differentiation between about 91 capsular types." *Id.* at 1:49–53. "Pneumococcal conjugate vaccines (PCVs) are pneumococcal vaccines used to protect against disease caused by *S. pneumoniae* (pneumococcus)." *Id.* at 1:59–61. "There are currently three PCV vaccines[3] available on the global market: PREVNAR® (called PREVENAR® in some countries) (heptavalent vaccine), SYNFLORIX® (a decavalent vaccine) and PREVNAR 13® (tridecavalent vaccine)." *Id*. at 1:59–65.

The '559 patent teaches "there is a need to address remaining unmet medical need for coverage of pneumococcal disease due to serotypes not found in PREVNAR 13® and potential for serotype replacement over time." *Id*. at 2:3–6.

---

[1] A "coccus" is defined as "a spherical bacterium." *See* https://www.merriam-webster.com/dictionary/coccus.

[2] "Pneumococcus is encapsulated with a chemically linked polysaccharide which confers serotype specificity. There are 90 known serotypes of pneumococci, and the capsule is the principle virulence determinant for pneumococci, as the capsule not only protects the inner surface of the bacteria from complement, but is itself poorly immunogenic." Ex. 1007, 2:10–14.

[3] The valency of a vaccine refers to the number of different serotypes of bacteria to which the vaccine induces immune response (e.g., a tridecavalent vaccine protects against thirteen different bacterial strains).

*D. Illustrative Claims*

All of the challenged claims 1–10, 16–19, and 38–45 depend either directly or indirectly from independent claim 1 of the ’559 patent.[4] Claims 1, 3, and 40 are illustrative of the challenged claims and recite:

> 1. An immunogenic composition comprising a *Streptococcus pneumoniae* serotype 22F glycoconjugate, wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and a carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.
>
> 3**.** The immunogenic composition of claim **1**, wherein the composition further comprises a *S. pneumoniae* serotype 15B glycoconjugate and a *S. pneumoniae* serotype 33F glycoconjugate.
>
> 40. The immunogenic composition of claim 1, wherein a ratio of mM acetate per mM polysaccharide in the glycoconjugate to mM acetate per mM isolated polysaccharide is at least 0.6.

Ex. 1001, 141:28–34, 141:38–41, 144:14–17.

*E. The Instituted Grounds of Unpatentability*

We instituted trial based on each challenge to the patentability of the ’559 patent presented in the Petition (Pet. 6–7):

---

[4] Claims 11–15 and 20–37 were not challenged in this proceeding, but were challenged in the related proceedings in IPR2017-02136 and IPR2017-02138.

| Reference | Basis | Claims Challenged |
|---|---|---|
| Merck 2011,[5] Pfizer 2012[6] | § 103(a) | 1, 5–10, 16–19, 39, 41, 42, 45 |
| Merck 2011, Pfizer 2012, PVP 2013 [7] | § 103(a) | 2, 40, 43 |
| Merck 2011, Pfizer 2012, GSK 2008[8] | § 103(a) | 3, 4, 39, 45 |
| Merck 2011, Pfizer 2012, Hsieh 2000[9] | § 103(a) | 38, 44 |

Petitioner relies on Declarations of Dennis L. Kasper, M.D. Ex. 1005 and Ex. 1097. Patent Owner relies on Declarations of Geert-Jan Boons, Ph.D. Ex. 2041 and Peter Paradiso, Ph.D., Ex. 2045 and Ex. 2064.

## *II.* ANALYSIS

### *A. Claim Interpretation*

In an *inter partes* review filed before November 13, 2018, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear.[10] 37 C.F.R.

---

[5] Caulfield et al., WO 2011/100151 A1, published Aug. 18, 2011 ("Merck 2011," Ex. 1006).
[6] Brown et al., *Characterization of Complex Prophylactic Vaccines with Protein and Glycoconjugate Components*, 9th CASSS Symposium (Sept. 12, 2012) ("Pfizer 2012," Ex. 1008).
[7] "Pneumococcal Vaccine Polyvalent" revision to Japan's "Minimum Requirements for Biological Products" published on the website of Japan's National Institute of Infectious Diseases (as of March 2, 2013) ("PVP 2013," Ex. 1009).
[8] Biemans et al., WO 2009/000825 A2, published Dec. 31, 2008 ("GSK 2008," Ex. 1007).
[9] Hsieh, *Characterization of Saccharide-CRM$_{197}$ Conjugate Vaccines*, 103 DEV. BIOL. 93–104 (2000) ("Hsieh 2000," Ex. 1013).
[10] A recent amendment to this rule does not apply here because the Petition was filed before November 13, 2018. See Changes to the Claim

§ 42.100(b). Under the broadest reasonable interpretation approach, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Only terms which are in controversy need to be construed and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

We determine that the following claim term needs to be discussed.

1. *"immunogenic"*

Independent claim 1, as well as many of the dependent claims, recites the term "immunogenic" as a modifier of the term "composition." In the Decision on Institution, we construed "immunogenic" to require a composition that "elicits functional antibody." Inst. Dec. 6–7. We also determined that because claim 1 did not specifically require any additional glycoconjugates besides 22F, the "immunogenic" composition only needed to elicit antibodies against the serotype 22F glycoconjugate recited in claim 1. *Id*.

In its Patent Owner's Response, Patent Owner contends "the context within the claim requires that the *composition* is immunogenic, not merely serotype 22F glycoconjugate in isolation." PO Resp. 13. Patent Owner proposes that "immunogenic" be interpreted as "elicits functional antibody against each serotype in the claimed composition." *Id*. Patent Owner asserts that "[w]hen viewed in the full context of the claims and specification,

---

Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018).

[Petitioner's] proposed construction yields the illogical result of a pneumococcal conjugate vaccine wherein one conjugate (serotype 22F) elicits functional antibody, but other conjugates . . . need not." *Id.* at 14.

Petitioner agrees with our Decision on Institution that a "POSITA would have understood that the 'immunogenic' limitation of independent claim 1 applies to just the serotype 22F conjugate of claim 1." Pet. Reply 23. Petitioner contends:

> no claim of the '559 Patent recites structural characteristics (*e.g.*, molecular weight and/or polysaccharide to protein ratio) for any conjugate other than the serotype 22F conjugate of claim 1. Ex.1106, ¶12. And there is no disclosure in the '559 Patent specification of molecular weights or polysaccharide to protein ratios for any of the 13 conjugates recited in dependent claims 5–8.

*Id.* at 24.

In performing claim interpretation, we first turn to the language of the claims themselves. While claim 1 recites an immunogenic composition composed solely of the "*Streptococcus pneumoniae* serotype 22F glycoconjugate," claims 3–9 recite the inclusion of glycoconjugates from other *Streptococcus pneumoniae* serotypes and claims 21 and 22 recite inclusion of antigens from other pathogenic bacteria or viruses. While claim 1 does not require the presence of other immunogenic components, claims 3–9, 21, and 22 expressly recite the presence of other immunogenic components. In making a vaccine, there would have been no reason to include these additional antigens other than to induce a protective antibody response for vaccination against the included antigens. Therefore, these dependent claims reasonably support Patent Owner's interpretation that an

"immunogenic" composition requires eliciting antibodies against each of the serotypes or other immunogens within the "immunogenic" composition.

Next we turn to the Specification of the '559 patent. When the '559 patent uses the term "immunogenic," the '559 patent identifies "a need for immunogenic compositions that can be used to induce an immune response against additional *Streptococcus pneumoniae* serotypes." Ex. 1001, 2:10–13. The '559 patent states that multiple serotypes ranging from 7 to 25 may be included in the "immunogenic composition." Ex. 1001, 3:4–6. The '559 patent teaches the "pneumococcal opsonophagocytic assay (OPA), which measures killing of *S. pneumoniae* cells by phagocytic effector cells in the presence of functional antibody and complement, is considered to be an important surrogate for evaluating the effectiveness of pneumococcal vaccines." Ex. 1001, 88:52–56. The '559 patent supports an interpretation of "immunogenic" which requires elicitation of functional antibody for each component in the composition, consistent with the interpretation of Patent Owner.

During prosecution of the '559 patent, the Examiner cited art that disclosed both the 22F conjugate and other conjugates to address the claimed compositions for dependent claims. *See* Ex. 1002, 419–20. The Examiner allowed the claims after amendment to include the ranges for molecular weight and ratio of polysaccharide to carrier protein. *See* Ex. 1002, 451, 467. The Examiner did not address the claim construction issue.

Petitioner's Declarant, Dr. Boons, interprets claim 1 to require that serotype "22F should elicit functional antibodies. But also if other antigens are being included, those should also elicit a functional antibody response."

Ex. 1109, 36:7–10. In contrast, Patent Owner's Declarant, Dr. Kasper, was asked if

> a composition containing a 22F glycoconjugate, 12F glycoconjugate, 10A glycoconjugate, 11A glycoconjugate, and a serotype 8 glycoconjugate and that composition showed functional antibody with respect to the 22F glycoconjugate but not with respect to the other conjugates . . . , is it your view that Claim 4 would be met?

Ex. 2013, 16:6–14. Dr. Kasper answered "I think that interpretation is consistent with Claim 4." *Id.* at 16:16–17.

Accordingly, upon review of the parties' arguments and the evidence before us, including the claims, specification, and prosecution history of the '559 patent, we conclude that the term "immunogenic," as it is used in that patent, is reasonably construed as requiring that functional antibody be elicited against each immunogen contained in the composition. Consequently, for claim 1 of the '559 patent, which recites a single immunogen, serotype 22F, only functional antibodies to serotype 22F are required to meet the claim limitation. However, for claim 3 of the '559 patent that requires serotypes 22F, 15B, and 33F, functional antibodies against all three serotypes are required. Similarly for other claims, the term "immunogenic" requires functional antibodies be elicited against any immunogens specifically recited and required.

### *B. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art;[11] and, (4) where in evidence, objective indicia of nonobviousness.[12] *Graham v. John Deere Co.,* 383 U.S. 1, 17–18 (1966).

In that regard, an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418. In *KSR*, the Supreme Court also stated that an invention may be found obvious if trying a

---

[11] Petitioner states that the level of skill in the art at the time of the invention

> would have been an individual or team with Ph.D. degrees in the biological and chemical sciences and at least 3 years of work experience, or an M.D. degree and at least 6 years of work experience, developing conjugate vaccines, including specifically growing sufficient quantities of bacteria, extracting, purifying and analyzing bacterial polysaccharides, conjugating polysaccharides to a carrier protein (and analyzing the conjugates), and performing immunologic testing.

Pet. 33 (citing Ex. 1005 ¶ 60). Patent Owner "does not dispute . . . the level of skill in the art proposed by Merck." PO Resp. 5. We agree with both parties regarding the level of ordinary skill in the art. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). We also note that the applied prior art reflects the appropriate level of skill at the time of the claimed invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

[12] Neither Petitioner nor Patent Owner presents evidence on the fourth Graham factor.

course of conduct would have been obvious to a person having ordinary skill:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under §103.

*KSR*, 550 U.S. at 421. "*KSR* affirmed the logical inverse of this statement by stating that § 103 bars patentability unless 'the improvement is more than the predictable use of prior art elements according to their established functions.'" *In re Kubin*, 561 F.3d 1351, 1359–60 (Fed. Cir. 2009) (citing *KSR*, 550 U.S. at 417).

Petitioner bears the burden of proving unpatentability of the challenged claims, and that burden never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must establish the facts supporting its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

We analyze the asserted grounds of unpatentability in accordance with the above-stated principles.

### *C. Obviousness over Merck 2011 and Pfizer 2012*

Petitioner contends that claims 1, 5–10, 16–19, 39, 41, 42, and 45 are unpatentable under 35 U.S.C. § 103(a) as obvious over Merck 2011, Pfizer 2012, and the general knowledge of an ordinary artisan. Pet. 38–54. The thrust of Patent Owner's position with respect to all the claims challenged on

this ground is that the cited prior art does not teach or suggest compositions with 22F glycoconjugates that are immunogenic, within the claimed molecular weight ranges, and within the claimed polysaccharide to carrier protein conjugate ratios. PO Resp. 1–2, 15–42. Based on our review of the arguments and the evidence of record, we determine that Petitioner demonstrates, by a preponderance of the evidence, that the subject matter of claims 1, 5–10, 16–19, 39, 41, 42, and 45 would have been obvious over Merck 2011, Pfizer 2012, and the general knowledge of an ordinary artisan. After providing a discussion of the prior art and Petitioner's position, we will address Patent Owner's arguments.

1. *Merck 2011 (Ex. 1006)*

Merck 2011 teaches a pneumococcal conjugate vaccine (PCV) comprising "a multivalent immunogenic composition having 15 distinct polysaccharide-protein conjugates. Each conjugate consists of a capsular polysaccharide prepared from a different serotype of *Streptococcus pneumoniae* (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F or 33F) conjugated to a carrier protein, preferably $CRM_{197}$." Ex. 1006, 1:7–11. Merck 2011 teaches "conjugates containing serotypes 22F and 33F provide[] robust antibody responses demonstrat[ing] the feasibility of expanding coverage of pneumococcal serotypes . . . ." Ex. 1006, 4:2–3. Merck 2011 teaches the 15–valent pneumococcal conjugate vaccine (PCV–15) "induced high OPA[13] GMTs to each serotype and a 100% OPA response rate for all 15 serotypes contained in the vaccine." Ex. 1006, 23:3–4.

[13] Opsonophagocytosis.

Merck 2011 teaches "purified polysaccharides are chemically activated to make the saccharides capable of reacting with the carrier protein. . . . Coupling to the protein carrier (e.g., $CRM_{197}$) can be by reductive amination via direct amination to the lysyl groups of the protein." Ex. 1006, 6:11–23. Merck 2011 teaches the "concentrated saccharide was mixed with $CRM_{197}$ carrier protein in a 0.2 – 2 to 1 charge ratio. The blended saccharide-$CRM_{197}$ mixture was filtered through a 0.2 µm filter." Ex. 1006, 17:24–25. Table 1 of Merck 2011 shows a vaccine formulation comprising 32 µg of total polysaccharide and 32 µg of $CRM_{197}$ carrier protein with the total polysaccharide being composed of 2 µg of 14 serotypes including 22F and 4 µg of serotype 6B. Ex. 1006, 19:5–9.

2. *Pfizer 2012*

Pfizer 2012 depicts examples of glycoconjugate vaccines as reproduced below:



The glycoconjugate vaccine image reproduced above depicts chains of carrier proteins represented by the solid lines conjugated to polysaccharide antigens represented by the connected cylinders. Ex. 1008, 4.
Pfizer 2012 teaches glycoconjugate vaccines with a typical mass range of 500 to 5000 kDa. Ex. 1008, 6. Pfizer 2012 teaches conjugation of polysaccharide to proteins such as $CRM_{197}$. Ex. 1008, 20. Pfizer 2012

teaches measurement of the size (i.e. mass) of the polysaccharide and conjugate using techniques such as SEC/MALLS. Ex. 1008, 6–7, 21.

3. *GSK 2008*

GSK 2008 teaches a *Streptococcus pneumoniae* vaccine comprising "capsular saccharide antigens (preferably conjugated), wherein the saccharides are derived from at least ten serotypes of *S. pneumoniae*" that may include an "*S. pneumoniae* saccharide conjugate of 22F." Ex. 1007, 8:5–19. GSK 2008 teaches "*Streptococcus pneumoniae* capsular saccharides . . . may be conjugated to a carrier protein independently selected from the group consisting of . . . CRM197. . . ." Ex. 1007, 10:12–14. GSK 2008 teaches "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" and specifically, conjugates "can also be prepared by direct reductive amination methods. . . ." Ex. 1007, 17:1–28. GSK 2008 teaches "22F-PhtD administered within the 13-valent conjugate vaccine formulation [was] . . . shown immunogenic and induced opsono-phagocytic titers in young OF1 mice." Ex. 1007, 77:21–22.

GSK 2008 teaches: "Preferably the ratio of carrier protein to *S. pneumoniae* saccharide is between 1:5 and 5:1; e.g. between 1:0.5–4:1, 1:1–3.5:1, 1.2:1–3:1, 1.5:1–2.5:1; e.g. between 1:2 and 2.5:1; 1:1 and 2:1 (w/w)." Ex. 1007, 20:24–26. Table 2 of GSK 2008 teaches fourteen different conjugates—the smallest conjugate size was PS4-PD of 1303 kDa and the largest conjugate size was PS9V-PD of 9572 kDa. Ex. 1007, 54–55, Table 2. GSK 2008 discloses a conjugate of serotype 22F, with a carrier/PS ratio of 2.17, but does not determine the conjugate size. Ex. 1007, 55, Table 2.

GSK 2008 claims a conjugate where "the average size (e.g. $M_w$) of the 22F saccharide is between 50 and 800 kDa. . . ." Ex. 1007, 93 (claim 56). GSK 2008 further teaches in claim 61 an "immunogenic composition of any preceding claim wherein the average size (e.g. $M_w$) of the saccharides is above 50 kDa, e.g.[.], 50–1600. . . ." Ex. 1007, 94.

GSK 2008 teaches "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 14:18–21. GSK 2008 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 recommends optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter . . . ." Ex. 1007, 14:34.

4. *Analysis*

Petitioner asserts "Merck 2011 is directed to immunogenic multivalent pneumococcal conjugate compositions that include a serotype 22F conjugate" and that "Merck 2011 demonstrates immunogenicity against serotype 22F by the generation of functional antibody against that serotype." Pet. 40 (citing Ex. 1005 ¶ 105, Ex. 1006, 23:2–4). Petitioner asserts: "Based on Pfizer 2012's disclosure of conjugates between 1,000-5,000 kDa, a POSITA would have been motivated with a reasonable expectation of success to construct a serotype 22F $CRM_{197}$ conjugate in that molecular weight range. . . ." Pet. 40 (citing Ex. 1005 ¶ 106). Petitioner also asserts "Merck 2011 discloses pre-conjugation ratios between 0.2 and 2, which a

POSITA would have considered indicative of a final conjugate ratio in that same range." Pet. 44 (citing Ex. 1006, 17:24–25). Petitioner points out "the pre-conjugation ratios of Merck 2011 resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1 (~32 μg of polysaccharide and ~32 μg of protein), squarely in the claimed range." Pet 44–45 (citing Ex. 1006, 19:3–8).

Petitioner's Declarant, Dr. Kasper, states that a "POSITA would have considered the disclosure of pre-conjugation polysaccharide to $CRM_{197}$ ratios in the range of 0.2 to 2 indicative of a final conjugate ratio in that range." Ex. 1005 ¶ 111 (citing Ex. 1006, 17:24–25). Dr. Kasper notes "the pre-conjugation ratios of Merck 2011 resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1 (~32 μg of polysaccharide and ~32 μg of protein), squarely in the claimed range." Ex. 1005 ¶ 111 (citing Ex. 1006, 19:3–8). Dr. Kasper also notes "a POSITA's general understanding that conjugate polysaccharide to protein ratios in the claimed range (0.4 to 2) are typical for immunogenic conjugates" and cites a monograph disclosing ratios of saccharide to protein in a pneumococcal $CRM_{197}$ conjugate vaccine with seven serotypes, concluding that each "disclosed ratio overlaps to a large extent with the claimed ratio of 0.4 to 2, consistent with the general understanding in the art as of January 21, 2014 that such ratios are typical for immunogenic conjugates." Ex. 1005 ¶¶ 112–113 (citing Ex., 1085, 20–24).

Dr. Kasper states a "POSITA easily could have constructed a cross-linked serotype 22F $CRM_{197}$ conjugate in Pfizer 2012's molecular weight range, using the well-known reductive amination or CDAP conjugation chemistries disclosed in Merck 2011." Ex. 1005 ¶ 107, citing Ex. 1006

6:15–7:6. Dr. Kasper states "cross-linked conjugates of 5,000 kDa were well-known" as were pneumococcal conjugate molecular weights of 1,303-9,572 kDa. Ex. 1005 ¶ 107 (citing Ex. 1026, 7, Ex. 1007, 54:27–55:1). Dr. Kasper states:

> Because the structure of serotype 22F capsular polysaccharide had been known to the art since 1989 . . . (Ex. 1029), a POSITA would have required only routine experimentation to obtain a conjugate molecular weight within the desirable range disclosed in Pfizer 2012, *e.g.*, by increasing or decreasing the amount of cross-linking in the conjugate.

Ex. 1005 ¶ 108 (citing Ex. 1030, 4:56–59).

Having reviewed the cited evidence, and the record as a whole, we find that Petitioner has accurately described the above stated teachings of Merck 2011 and Pfizer 2012. We adopt these stated facts as our own. *See* Pet. 19–54. We focus our remaining analysis on Patent Owner's arguments that the cited combination fails to teach or suggest an immunogenic composition including: (1) a serotype 22F glycoconjugate having a molecular weight of between 1000 kDa and 12,500 kDa; and (2) a polysaccharide to carrier protein ratio (w/w) of between 0.4 and 2.

*a. "wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa"*

Patent Owner asserts:

> Claim 1 and each of the challenged claims that depend therefrom require that the recited serotype 22F glycoconjugate "has a molecular weight of between 1,000 kDa and 12,500 kDa." EX1001 at claim 1. Merck 2011, Pfizer 2012, and the general knowledge do not alone or in combination teach or suggest this limitation.

PO Resp. 15.

*i. Optimization*

Patent Owner asserts a "POSA would have understood that a number of variables can affect polysaccharide activation, conjugation, and the final molecular weight of a glycoconjugate" and "[d]ue to these variables, a POSA 'couldn't predict what the outcome would be' with regard to the molecular weight of an uncharacterized serotype 7F glycoconjugate." PO Resp. 20 (citing Ex. 2041 ¶ 61).

Patent Owner further asserts that "[d]etermining the appropriate molecular weight for a specific serotype glycoconjugate was not a matter of 'routine optimization' of existing reductive amination procedures as of January 21, 2014." PO Resp. 21 (citing Ex. 2041 ¶ 62). Patent Owner asserts "each serotype glycoconjugate was designed using different protocols, and resulted in serotype glycoconjugates having different properties, thereby demonstrating that each serotype glycoconjugate needed to be evaluated on a case-by-case basis." PO Resp. 22 (citing Ex. 1007, Table 2).

Patent Owner asserts:

> Pfizer 2012 does not refer to serotype 22F glycoconjugates and only refers to general molecular weights well outside the range in the '559 patent claims, Pfizer 2012 would not have provided a POSA with any meaningful guidance or suggestion to generate an immunogenic serotype 22F glycoconjugate within the claimed molecular weight.

PO Reply 18.

Patent Owner asserts "[t]here is no overlap between the molecular weights in GSK 2008 and the '559 claims." PO Resp. 23. Patent Owner asserts:

> The serotype 22F glycoconjugates of GSK 2008 were treated in an alkaline pH of 9.0 (EX1007 at 51:5-8; 52:18-22), and as a result the molecular weight of the serotype 22F polysaccharide in the final glycoconjugates would be expected to be levels lower than the pre-conjugation weight of 22F (159-167 kDa).

PO Resp. 24. Patent Owner asserts "[t]he polysaccharide size in a final glycoconjugate of GSK 2008 would be unpredictable and as a result, and GSK 2008 cannot render the '559 claims obvious." PO Resp. 24.

Patent Owner asserts that a "POSA would not have determined the molecular weight of serotype 22F glycoconjugates based on GSK 2008 Table 2" because the "table does not provide the molecular weight for the two serotype 22F glycoconjugates" and the "serotype 22F glycoconjugates also differ from the other listed glycoconjugates in that they were associated with dramatically lower antigenicity, and with some of the highest protein to polysaccharide ratios as compared to all of the other serotype glycoconjugates." PO Resp. 27.

Patent Owner reiterates these arguments in the Patent Owner's Reply and also asserts Petitioner's "asserted 'desirable range' is fabricated from the lower and upper molecular weight limits for two non-serotype 22F glycoconjugates (*i.e.*, PS4-PD and PS9V-PD) referenced in Table 2 of GSK-2008." PO Sur-Reply 8.

We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence (*see* Pet. Reply 3–16).

Merck 2011 teaches that "[c]apsular polysaccharides from *Streptococcus pneumoniae* can be prepared by standard techniques known to those skilled in the art. For example, polysaccharides can be isolated from

bacteria and may be sized to some degree by known methods (see, e.g., European Patent Nos. EP497524 and EP497525) and preferably by microfluidisation." Ex. 1006, 4:12–15. Merck 2011 teaches "[p]olysaccharides can be sized in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products. In the present invention, capsular polysaccharides are prepared from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, **22F**, 23F and 33F of *S. pneumoniae*." Ex. 1006, 4:15–18 (emphasis added). Merck 2011 teaches that:

> The different serotype saccharides are individually conjugated to the purified $CRM_{197}$ carrier protein using a common process flow. In this process the saccharide is dissolved, sized to a target molecular mass, chemically activated and buffer-exchanged by ultrafiltration. The purified $CRM_{197}$ is then conjugated with the activated saccharide and the resulting conjugate is purified by ultrafiltration prior to a final 0.2 µm membrane filtration.

Ex. 1006, 16:27–31.

Thus, Merck 2011 disclosed methods to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide, and taught to couple to known carrier proteins such as $CRM_{197}$, while limiting the upper size range using membrane filtration. Ex. 1006, 4:12–18, 16:27–31. Thus, rather than fabricating desired sizes, Merck 2011 specifically provides methods to constrain polysaccharide sizes within a particular size range. Ex. 1006, 16:27–31.

Pfizer 2012, in the context of characterizing vaccines, expressly discloses that the "[t]ypical mass (kDa)" for glycoconjugate vaccines is "500 to 5000." Ex. 1008, 6. As Dr. Kasper notes:

> The disclosed molecular weight range in Pfizer 2012 largely overlaps the claimed range of 1,000-12,500 kDa, and therefore expressly teaches conjugates of 1,000-5,000 kDa that fall within the claimed range. It would have been obvious to a POSITA to apply the teachings of Pfizer 2012 to the pneumococcal $CRM_{197}$ conjugate vaccine of Merck 2011; a POSITA would have been aware of Patent Owner's licensed Prevnar® pneumococcal $CRM_{197}$ conjugate vaccines.

Ex. 1005 ¶ 106.

While GSK 2008 was not expressly relied upon in the statement of the rejection, GSK 2008 evidences typical conjugation methods, polysaccharide sizes, and conjugate sizes of which the ordinary artisan would have been aware. *See, e.g.*, Pet. 30–31.

Table 2 in GSK 2008 shows a range of conjugate sizes where the lowest reported value is 1303 kDa and the highest reported value is 9572 kDa, both values falling within the range of 1000 kDa to 12,500 kDa required by claim 1. Ex. 1007, 54–55. GSK 2008 prefers that "saccharide conjugates of the invention should have an average size of saccharide pre-conjugation of 50-1600" kDa but notes that the "present inventors have found that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 teaches that "[f]ull length polysaccharides may be 'sized' i.e. their size may be reduced by various methods such as acid hydrolysis treatment, hydrogen peroxide treatment, sizing by emulsiflex® followed by a hydrogen peroxide treatment to generate oligosaccharide fragments or microfluidization." Ex. 1007, 14:6–10.

GSK 2008 teaches the "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known

coupling technique" including "direct reductive amination methods as described in US 4365170 (Jennings) and US 4673574 (Anderson). Other methods are described in EP-0-161-188, EP-208375 and EP-0-477508." Ex. 1007, 17:28–30. GSK 2008 is replete with suggestions to conjugate pneumococcal polysaccharides of various serotypes to $CRM_{197}$. *See, e.g.*, Ex. 1007, 13.

GSK 2008 also provides more specific reasons to optimize the saccharide conjugates for larger sizes by teaching "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 14:18–21. GSK 2008 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 recognizes optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter." Ex. 1007, 14:34.

Thus, GSK 2008 demonstrates that the artisan recognized a range of conjugated polysaccharide sizes overlapping those recited by the '559 claims, disclosed methods to optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$. Ex. 1007, 13–15, 54–55.

Dr. Kasper, relying on GSK 2008, states "[c]onjugation of each polysaccharide to a carrier protein may be performed 'by any known coupling technique,' including conjugation chemistries based on CDAP and/or reductive amination." Ex. 1005 ¶ 87 (citing Ex. 1007, 17:28–35). Dr. Kasper states "a POSITA would have required only routine

experimentation to obtain a conjugate molecular weight within the desirable range disclosed in Pfizer 2012, *e.g.*, by increasing or decreasing the amount of cross-linking in the conjugate." Ex 1005 ¶ 108 (citing Ex. 1030, 4:56–59). Dr. Kasper also stated, in response to the question "[s]o would you agree that developing pneumococcal glycoconjugates is very much a serotype-specific process?" that "I think there is a common process that you follow. This is routine optimization, as far as I'm concerned. There's nothing unusual about doing that. That's typical." Ex. 2013, 29:21–24.

In rebuttal to Dr. Kasper's position that the molecular weight of the serotype 22F glycoconjugate would have been an optimizable variable, Patent Owner relies on Dr. Boons' statement that:

> The determination of an appropriate molecular weight for a specific serotype glycoconjugate was not, in my opinion, a matter of "routine optimization" of existing reductive amination procedures. A number of variables affect the postconjugation molecular weight and/or immunogenicity of a specific serotype glycoconjugate. Because numerous variables affect the post-conjugation molecular weight and/or immunogenicity of a specific serotype glycoconjugate . . . a POSA would not have inferred that 22F glycoconjugates fall within a particular molecular weight based on the molecular weight of other serotype glycoconjugates (*e.g.*, those serotypes listed in Table 2 of GSK 2008). For example, as noted in Jones 2005 (a document cited by Merck), some glycoconjugates were considerably smaller than the range recited in the '559 patent.

Ex. 2041 ¶ 62.

Under deposition, Dr. Boons stated that "something that the person skilled in the art would know, is that multiple parameters are important and can be critical for generating an immunogenic glycoconjugate composition, including degree of oxidation, saccharide to protein ratio, and molecular

weights." Ex. 1109, 65:2–8. Dr. Boons stated that "it is well known that glycoconjugate vaccine development is difficult, that multiple parameters need to be optimized, and that success cannot be predicted beforehand." Ex. 1109, 66:21–24.

However, in response to a question as to whether he could "identify a passage in the '559 patent where the inventors describe issues that they had constructing a serotype 22F conjugate that elicits functional antibody," Dr. Boons stated "I can't identify a specific section mentioning specifically 22F." Ex. 1109, 69:7–12. In this discussion, Dr. Boons did not identify any specific teaching in the '559 patent or other prior art that demonstrated that the optimization of the size of the serotype 22F conjugate, known to be desirable by the skilled artisan, would have had any specific issues or concerns. *See* Ex. 1109, 67:2 to 69:25.

Dr. Kasper responded to Dr. Boons' concerns, noting that "[i]t would have been trivial for a POSITA to construct a conjugate with sufficient cross-linking to produce a serotype 22F conjugate over 1,000 kDa; the serotype 22F polysaccharides and $CRM_{197}$ carrier proteins each have multiple conjugation points." Ex. 1106 ¶ 46. Dr. Kasper noted that "because the disclosed neoglycoconjugates in Jones 2005 contained on average six saccharides . . ., such neo-glycoconjugates would have been over 1,000 kDa with six serotype 22F polysaccharides (and also within the claimed range), even if the polysaccharides were as small as 167 kDa." Ex. 1106 ¶ 48.

Patent Owner's declarant, Dr. Paradiso, was asked during deposition whether a "person of . . . skill in the art . . . would have understood how to vary the conjugation reaction conditions to achieve those different ten

conjugates of Table 16?" Ex. 1104, 103:13–17. Dr. Paradiso answered that a "person of skill in the art would, based on the information given in [columns 15 and 16 and Table 16 of the '559 patent] . . . , probably have a good idea on how to vary these parameters." Ex. 1104, 103:19–22. In a follow-up question, Dr. Paradiso agreed that "there is no disclosure of a particular molecular weight of the serotype 22F conjugate that is used in the 16-valent composition [in the '559 patent] . . . ." Ex. 1104, 106:6–9.

The evidence of record, therefore, shows that optimization of polysaccharide conjugate size was well known to the person of ordinary skill in the art, as even Patent Owner's expert Dr. Boons acknowledged. Ex. 1109, 66:21–24. Dr. Boons further acknowledged that the '559 patent did not rely on any specific disclosure explaining issues in generating a serotype 22F conjugate (Ex. 1109, 69:7–12), thereby supporting the reasonable position of Dr. Paradiso that the ordinary artisan would "probably have a good idea on how to vary these parameters." Ex. 1104, 103:19–22. This evidence supports a determination that routine optimization would have been obvious, particularly when combined with the teachings of Merck 2011 to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide; with teachings of Pfizer 2012 of a particular size range for glycoconjugate vaccines, and with the teachings of GSK 2008 of methods to optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$; and with Dr. Kasper's statement that "[t]his is routine optimization, as far as I'm concerned. There's nothing unusual about doing that. That's typical." Ex. 2013 29:22–24.

We recognize, but find unpersuasive, Patent Owner's assertion that "it is unreasonable to conclude that the molecular weight of a serotype 22F glycoconjugate would necessarily be over 1,000 kDa" (PO Resp. 26), because the issue is the obviousness of routine optimization of conjugate sizes, not inherent anticipation by Pfizer 2012 or GSK 2008. Instead, we agree with Petitioner that "a POSITA would have found the 1,000-5,000 kDa molecular weight range disclosed in Pfizer 2012 to be desirable and would have had a reasonable expectation of achieving an immunogenic serotype 22F conjugate in that range." Pet. Reply 12–13.

We find that a preponderance of the evidence of record demonstrates that conjugate size is a results-effective variable associated with improved stability of conjugates and good immune response, limited only by filter size, thereby rendering "optimization within the grasp of one of ordinary skill in the art." *In re Applied Materials*, 692 F.3d 1289, 1295 (Fed. Cir. 2012). "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955).

We therefore conclude that a preponderance of the evidence of record supports Petitioner's position that the 1,000 to 12,500 kDa size range in claim 1 of the '559 patent, which overlaps with the 1,000 to 5,000 kDa range of Pfizer 2012, would have been consistent with the ranges optimized and used to generate multivalent vaccines. Pet. 39; Ex. 1008, 6. "In cases involving overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a *prima facie* case of obviousness." *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003).

*ii. General Knowledge and Other Prior Art*

Patent Owner criticizes Petitioner's reliance on Jones 2005 (Ex. 1026)[14] and Lees 2008 (Ex. 1035)[15] as evidence that the person of ordinary skill in the art would have understood that "the claimed ranges of the '559 Patent were known as typical and desirable." PO Resp. 28–30; Pet. Reply 15.

Patent Owner asserts that: "Jones 2005 does not mention any serotype 22F glycoconjugates, much less how to make these glycoconjugates" and that "Lees 2008 does not refer to any serotype 22F glycoconjugates, much less how to make an immunogenic serotype 22F glycoconjugate having the specific molecular weight and ratio parameters recited in the '559 patent claims." PO Resp. 28–30 (citing Ex. 2041 ¶¶ 73, 75).

We are unpersuaded by Patent Owner's general allegations because each of these references provides specific teachings regarding vaccine glycoconjugates that establish the knowledge of the ordinary artisan. As Dr.

---

[14] Jones 2005 reviews polysaccharide vaccines including *Streptococcus pneumoniae vaccines*. Ex. 1026, 2. Jones 2005 discusses both glycoconjugate vaccines and a 23-serotype specific pneumococcal polysaccharide vaccine. Ex. 1026, 6. Jones 2005 teaches $CRM_{197}$ as a carrier protein and 5,000 kDa glycoconjugates. Ex. 1026, 7. Jones 2005 also shows a cartoon representation that depicts different structural types of glycoconjugate vaccines. Ex. 1026, 8, Fig. 2.

[15] Lees 2008 reviews conjugation chemistry, and particularly, polysaccharides and carrier proteins used in pneumococcal vaccines. Ex. 1035, 23. Lees 2008 identifies factors including the ratio of protein and polysaccharide as variables that may be controlled during the conjugation process. Ex. 1035, 5. Lees 2008 teaches sizing of the conjugates by purification using size exclusion chromatography or filtering through membranes with particular molecular weight cutoffs. Ex. 1035, 5.

Lees[16] stated, "immunogenic 22F glycoconjugates already existed before 2014. Specifically, the 22F glycoconjugates taught in both GSK-711 and Merck-086 were shown to be immunogenic." Ex. 2039 ¶ 124. Dr. Lees noted that "GSK-711 shows that both 22F conjugates (22F-PhtD and 22F-AH-PhtD) are immunogenic measured by both IgG and OPA antibodies." Ex. 2039 ¶ 128 (citing Ex. 1007, 93). Petitioner cites Jones 2005 and Lees 2008 in order to demonstrate that the specific conditions used for making glycoconjugate in general were well known.

Patent Owner then makes specific assertions identifying deficiencies in Jones 2005 and Lees 2008. For Jones 2005, Patent Owner asserts that "Jones 2005 refers to a (non-pneumococcal) glycoconjugate having a molecular weight (5,000 kDa) within the recited range of the '559 patent claims, and one that does not (90 kDa)" and asserts a "POSA likely would have initially focused on the smaller neo-glycoconjugate, because it would be expected to be simpler to generate and easier to characterize." PO Resp. 29.

For Lees 2008, Patent Owner asserts that "Lees 2008 cautions that 'careful control' over numerous factors (e.g., pH, temperature, ratio of protein and polysaccharide and concentration of each) is 'key to successful conjugation.'" PO Resp. 29–30. Patent Owner further asserts, as to Lees 2008, that a "POSA would have known that more than routine experimentation would be needed to determine the appropriate molecular weight (or polysaccharide to protein ratio) of any given serotype

[16] Ex. 2039 is a Declaration by Dr. Lees submitted by the Petitioner in IPR 2018-00187 in support of a petitioner asserting the unpatentability of claims 1–45 of the '559 patent. Ex. 2039 ¶ 1.

glycoconjugate, and that appropriate conjugation conditions for each serotype glycoconjugate needed to be carefully determined on a case-by-case basis." PO Resp. 30 (citing Ex. 2041 ¶ 75).

We find these specific arguments unpersuasive. Jones 2005 teaches the repeating unit structure of types 1, 2, 3, 4, 5, 6B, 9N, 9V, 12F, 14, 18C, 19F, and 23F of *S. pneumoniae*. *See* Ex. 1026, 5. Jones 2005 does teach structurally variant conjugate vaccines comprising either neoglycoconjugate or crosslinked oligosaccharides with $CRM_{197}$ (*see* Ex. 1026, 8, Fig. 2), but Jones 2005 explains that the "immune responses elicited by these different structural variants are generally similar." Ex. 1026, 7. Jones 2005 teaches, for *Haemophilus influenzae* type b glycoconjugate vaccines, that different methods result in different sizes, with a reductive amination approach resulting in a glycoconjugate that "is approximately 90 kDa in size, is approximately 30% carbohydrate and contains an average of six glycan chains per carrier protein" while cyanogen bromide activation approach results in a conjugate that "is a crosslinked network of polysaccharide and protein with a molecular weight of, on average, $5\times10^6$ Da [(5,000 kDa)]." Ex. 1026, 7. Jones 2005 teaches "[s]tudies of the crosslinked conjugate vaccines have focused principally on the molecular size" (Ex. 1026, 12) and explains that "[m]olecular sizing of the conjugates is a simple and effective means to ensure consistency of the final conjugate." Ex. 1026, 13–14.

Thus, Jones 2005 demonstrates that the ordinary artisan was aware that different conjugation methods yielded different size glycoconjugates, that size was an important parameter, and that size was controllable using molecular sizing techniques.

Lees 2008 teaches that serotype 22F vaccines are used in formulations, teaching "the currently available licensed 23-valent pneumococcal PS vaccine is formulated with PSs from the 23 most prevalent strains: 1, 2, 3, 4, 5, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C, 19F, 19A, 20, 22F, 23F, and 33F." Ex. 1035, 2. Lees 2008 teaches that "[s]ize fractionation is usually necessary" (Ex. 1035, 4) and that "[c]areful control over the factors relevant to the particular chemistry is key to successful conjugation. These factors include pH, temperature, the ratio of the protein and PS, and the concentration of each." Ex. 1035, 5. Thus, Lees 2008 demonstrates that the factors necessary to obtain particular glycoconjugates are results-optimizable variables, noting "[s]ince each capsular serotype has a different structure, reaction conditions, including concentrations, molar ratios of periodate, oxidation times, and pH, must be optimized." Ex. 1035, 6. Lees 2008 explains that after the reaction has been completed, particular desired sizes of glycoconjugates can be obtained because "purification of the conjugate is usually performed by size exclusion, by using either size exclusion chromatography or membranes with appropriate molecular weight cutoffs." Ex. 1035, 5.

Thus, Lees 2008 demonstrates not only that serotype 22F pneumococcal vaccines are desirable, but provides detailed discussion regarding the known parameters necessary to obtain particular glycoconjugates as well as methods to limit those glycoconjugates to the desired size.

Considered as a whole, we conclude that the disclosures in Jones 2005 of a 5000 kDa glycoconjugate and in Lees 2008 of a multiple conjugate formation provide evidence that glycoconjugate size was a known

optimizable variable. *See* Pet. 42; Ex. 1026, 7; Ex. 1035, 7. That is, these additional references underline the basic teachings in Merck 2011 and GSK 2008 discussed above and further demonstrate that at the time of invention, a person of ordinary skill in the art would have recognized how to generate glycoconjugates of varying sizes using known techniques and recognized that size was a known, optimizable variable.

*b. "ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2"*

Patent Owner asserts "Merck 2011, GSK 2008 and the general knowledge would not have motivated a POSA to generate a 22F glycoconjugate with the recited polysaccharide to carrier protein ratio." PO Resp. 31 (citing Ex. 2041 ¶ 76). Patent Owner further asserts "Pfizer 2012 does not refer to any polysaccharide to protein ratios for any serotype glycoconjugates." PO Resp. 31.

*i. Merck 2011's "charge ratio"*

Patent Owner asserts that "the referenced ratio in Merck 2011 is presented in terms of 'charge', not weight to weight, as required by the '559 patent claims." PO Resp. 31–32. Patent Owner asserts "[a]t deposition, Dr. Kasper was unable to define what is meant by the term 'charge ratio'" and, therefore, "Merck's basis for the assertion that a general relationship exists between this term and weight-to-weight ratio is unclear." PO Resp. 33 (citing Ex. 2041 ¶ 80). Patent Owner asserts "a POSA would not have had any idea how to determine the appropriate ranges for this undefined parameter." PO Resp. 33. Patent Owner asserts "Merck 2011 also does not teach or suggest that any pre-conjugation polysaccharide to protein ratio (much less a w/w ratio) would be a 'result-effective variable' or have any

impact on the resulting properties, *e.g.*, immunogenicity, of its serotype 22F glycoconjugates." PO Resp. 33–34.

While we agree with Patent Owner that the meaning of the term "charge ratio" is not intrinsically clear from Merck 2011, Patent Owner's assertion that Dr. Kasper was unable to define the term is incorrect, as Dr. Kasper stated that "[c]harge ratio refers to the preconjugation ratio of your two components." Ex. 2013, 78:20–21. Dr. Kasper supports this interpretation based on "45 years of experience in the field, that's how it's commonly used." Ex. 2013, 79:2–3. Dr. Kasper explains, in response to the question of "[h]ow is charge ratio determined?" that "[t]he common usage would be the ratio of the weight of one that you put into the reaction to the weight of the other, the amount of one -- it's a stoichiometric ratio based on the amount of material that goes in." Ex. 2013, 80:12–17. Dr. Kasper also notes that "Merck 2011 specifically discloses that serotype 22F did not require unusual conjugation conditions. In particular, Merck 2011 discloses common activation and conjugation conditions, as well as any serotypes for which the conditions that deviate from those common conditions. Common conditions are not modified for serotype 22F." Ex. 1106 ¶ 32.

Dr. Boons states that a "POSA in January 2014 would not have been familiar with this term." Ex. 2041 ¶ 79. Dr. Boons responds to Dr. Kasper's statements by noting that Weber 2009 is an example where "the term 'charge ratio' means exactly what one would expect from the words recited in this term, *i.e.*, the ratio of charges (not weights) between two different elements." Ex. 2041 ¶ 79.

Although we agree with Patent Owner that Merck's teaching of a 0.2–2 to 1 charge ratio for polysaccharide and carrier protein does not

necessarily equate to the 0.4 to 2 w/w ratio required by claim 1, Merck's teaching nevertheless suggests that the ratio (i.e., proportional relationship) between the amount of polysaccharide to carrier protein represents an optimizable variable. Even Dr. Boons, after disagreeing with the question "[d]o you agree that based on the Oxford Dictionary of Chemical Engineering for 'charge' the term 'charge ratio' in Merck 2011 refers to the ratio of the quantities of polysaccharide and protein that are fed into the conjugation reaction?" acknowledges that "I look at molar equivalents, not at weight equivalents. Actually I teach my students when you perform reactions weights are far less important than molar equivalents." Ex. 1109, 171:15–20, 173:14–18. Dr. Boons' statements indicate that the relative amount of the components, whether measured in moles or molecular weight, is a known parameter for optimization.

Therefore, even if Dr. Boons' interpretation of "charge ratio" as referring to molar equivalents of the polysaccharide and carrier protein is correct, and even if these ratios represent pre-conjugation amounts rather than post-conjugation amounts, the evidence still supports an understanding of Merck 2011 as suggesting that the relative amounts of these two components are results optimizable for the conjugation reaction and resultant vaccine.

*ii. Merck 2011's pre- and post-conjugate ratios*

Patent Owner asserts the "ratio values in Merck 2011 are pre-conjugation ratios that do not necessarily indicate post-conjugation characteristics of the glycoconjugate." PO Resp. 34 (citing Ex. 2041 ¶ 81). Patent Owner asserts "Tables 1 and 2 of GSK 2008 disclose pre-conjugation ratios that are 28% higher (2.5/1 up to 3.2/1 for serotype 19A) or 50% lower

(1/1 down to 0.5/1 for serotype 23F) compared to the final conjugation ratios." PO Resp. 34 (citing Ex. 1007, 53–56). Patent Owner asserts that based on these tables in GSK 2008, "a POSA would have understood that one could not reasonably predict a post-conjugation polysaccharide to protein ratio based on pre-conjugation polysaccharide to protein ratios." PO Resp. 35. Patent Owner asserts that "[i]n Table 2 of GSK 2008, some glycoconjugates comprised up to 11.2% free polysaccharide and up to 4.9% free carrier protein" and that "Merck 2011 considered its first formulation comprised unconjugated polysaccharide at levels high enough to be problematic, and that the levels of these conjugated polysaccharides and carrier protein were allegedly reduced to an unknown level in the second formulation." PO Resp. 36–37 (citing Ex. 1007, Table 2 and Ex. 1006, 24:1–28).

Patent Owner also asserts:

> [t]here is no evidence that the polysaccharides and carrier proteins listed in Merck 2011 Table 1 exist in the composition in a 1:1 ratio for each serotype. EX2041, ¶85. Table 1 lists the total amount of the fifteen different polysaccharides and the total amount of the carrier protein, it does not assess polysaccharide/protein ratio by serotype.

PO Resp. 37–38.

We are not persuaded by Patent Owner's arguments that Table 1 in Merck 2011 does not suggest a weight/weight ratio of polysaccharide to carrier protein within the range of 0.4 and 2 as required by claim 1 of the '559 patent because Table 1 of Merck 2011 discloses an example that would reasonably have been expected to result in a 1:1 w/w ratio of the 22F polysaccharide to the $CRM_{197}$ carrier protein. Ex. 1006, 19:5–9; Ex. 1005 ¶ 111. This expectation is supported by Dr. Kasper's statement that the

ratios "resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1." Ex. 1005 ¶ 111.

Even comparing the pre- and post-conjugation evidence in Tables 1 and 2 of GSK 2008 that relate to serotypes other than serotype 22F, we note that either a 50% reduction or a 28% increase in the 1:1 starting pre-conjugation ratio for serotype 22F disclosed in Merck 2011 would still result in a final conjugation composition that falls within the 0.4 and 2 w/w ratio range required by claim 1. Therefore, even fully accepting Patent Owner's position, the final conjugated composition of serotype 22F in Merck 2011 would have been expected to render claim 1 obvious. *See, e.g.*, *Ineos USA LLC v. Berry Plastics Corp*., 783 F.3d 865, 869 (Fed. Cir. 2015) ("When a patent claims a range, as in this case, that range is anticipated by a prior art reference if the reference discloses a point within the range.")

We recognize that Dr. Boons states that "[g]iven the variation between pre- and post-conjugation ratios in Tables 1 and 2 of GSK 2008, a POSA would have understood that pre-conjugation ratios do not indicate post-conjugation ratios and that the appropriate ratio of each serotype glycoconjugate must be determined on a case-by-case basis." Ex. 2041 ¶ 81. However, Dr. Boons has not established that the post-conjugation ratios for any serotype shown in the Merck 2011 Table 2 fall outside the range recited in claim 1, while Dr. Kasper states "[f]or the PS22F-PhtD conjugate, the carrier protein to polysaccharide ratio is 2.17 (which translates to a polysaccharide to carrier protein ratio of 1/2.17 or 0.46), with only 5.8% free (unconjugated) polysaccharide." Ex. 2037 ¶ 84. Thus, the evidence of record in Merck 2011 suggests that the polysaccharide to carrier protein ratio of a serotype 22F conjugate falls within the claimed ratio range of 0.4 to 2.

Moreover, Dr. Lees supports the obviousness of the claimed range, noting that:

> It is desirable to avoid very low or very high polysaccharide-to-carrier protein ratios. Glycoconjugates having a very low polysaccharide-to-carrier protein ratio would require administration of large amounts of the conjugates in order to provide an effective amount of the polysaccharide. Ex. 1054 at 13. By contrast, glycoconjugates with a very high polysaccharide-to-carrier protein ratio may interfere with the immunogenic role of the carrier protein.

Ex. 2039 ¶ 57. Dr. Lees further notes that "[a]ccording to the WHO guidelines, the ratio of polysaccharide to carrier protein should be within the range approved . . . . For pneumococcal conjugate vaccines, while the particulars may differ for a specific serotype, the WHO guidelines specifically recommend a ratio 'in the range of 0.3–3.0.'" Ex. 2039 ¶ 58 (internal citation omitted). We note that Dr. Lees appears to be referring to a 2009 statement in *Recommendations to assure the quality, safety and efficacy of pneumococcal conjugate vaccines* published by the Expert Committee on Biological Standardization of the World Health Organization that teaches "[t]ypically for pneumococcal conjugate vaccines the ratio is in the range of 0.3 to 3.0 but varies with the serotype. The ratio can be determined either by independent measurement of the amounts of protein and polysaccharide present, or by methods which give a direct measure of the ratio." Ex. 2060, 17.

Therefore, a preponderance of the evidence of record supports the obviousness of selecting polysaccharide to carrier protein ratio values for the serotype 22F polysaccharides within the 0.4 and 2 range recited in claim 1 of

the ’559 patent based on the disclosures of Merck 2011, GSK 2008, and the knowledge of the ordinary artisan, including the WHO guidelines.

*iii. Optimization of 1:1 polysaccharide to protein ratio*

Patent Owner asserts a “POSA would disagree with Dr. Kasper’s assertion that one would be shooting for a polysaccharide to protein ratio of 1:1. . . . GSK 2008 (cited by Merck in Ground 3), in fact, teaches the opposite. For example, Table 1 of GSK 2008 provides pre-conjugation protein/polysaccharide ratios ranging from 1:1 to 3:1.” PO Resp. 38 (citing Ex. 1008, Table 1). Patent Owner asserts that Example 2 of GSK 2008 “targets a ratio well below 1:1 and outside the claimed ranges” where the “conjugate had a final protein to polysaccharide ratio of 4.1 (w/w), which translates to a polysaccharide to protein ratio of 1:4.1, or 0.24.” PO Resp. 39–40 (citing Ex. 1007, 52:38).

We are not persuaded that the range recited in claim 1 of polysaccharide to the carrier protein, between 0.4 and 2, is unobvious. We note that while Dr. Kasper responded to a question about a 1:1 saccharide to protein ratio as “[t]hat’s what you’re shooting for most often,” Dr. Kasper continued to state regarding the ratio that “[b]ut they fall within a range. And the Pfizer patent and the GSK patent define a range of .4 to 2.” Ex. 2013, 77:7–20. Thus, Dr. Kasper states that the range recited in claim 1 would have been obvious based on the ranges disclosed in the prior art.

We recognize Patent Owner’s reliance on Dr. Boons’ statement that “[p]rior to generating a glycoconjugate, a POSA would not have assumed that any particular post-conjugation polysaccharide to protein ratio would necessarily be appropriate for generating that given glycoconjugate.” Ex. 2041 ¶ 86 (citing Ex. 1026, 13).

A preponderance of the evidence does not support Patent Owner's position. GSK 2008 specifically suggests a range of carrier protein that overlaps the range recited in claim 1 of the '559 patent, and GSK 2008 specifically teaches "the majority of the conjugates, for example 6, 7, 8, 9 or more of the conjugates have a ratio of carrier protein to saccharide that is greater than 1:1, for example 1.1:1." Ex. 1007, 20:26–28. Of equal significance, Merck 2011 teaches conjugations in which equal amounts of polysaccharide and carrier protein are present, including equal amounts of serotype 22F, suggesting a 1:1 ratio of these components. Ex. 1006, Table 1. Dr. Lees also supports the obviousness of the claimed range, stating that "[f]or pneumococcal conjugate vaccines, while the particulars may differ for a specific serotype, the WHO guidelines specifically recommend a ratio 'in the range of 0.3–3.0.'" Ex. 2039 ¶ 58 (citing Ex. 2060, 17[17] ("Typically for pneumococcal conjugate vaccines the ratio is in the range of 0.3 to 3.0 but varies with the serotype.")). Dr. Lees further notes that the "desired ratios of polysaccharide to carrier protein can be achieved typically by varying the relative amounts of starting polysaccharide materials and carrier proteins in the reaction mixture, optimizing the reaction conditions and monitoring the conjugation chemistry." Ex. 2039 ¶ 60.

*iv. JNIDD and polysaccharide to protein ratio*

Patent Owner asserts that "the English portion of JNIID does not refer to any serotype 22F glycoconjugates, much less a polysaccharide to protein ratio range for a serotype 22F glycoconjugate." PO Resp. 40 (citing Ex.

---

[17] We note that Ex. 2039 ¶ 58 inadvertently cites the WHO guidelines with an "*Id.*" referring to Ex. 1019, rather than the correct citation to Ex. 2060, 17.

2013, 103:14–23). Patent Owner asserts "a POSA understood that appropriate parameters for each serotype glycoconjugate needed to be determined on a case-by-case basis, and a POSA would not have assumed that a polysaccharide to protein ratio for one serotype glycoconjugate would be appropriate for a different polysaccharide to protein glycoconjugate." PO Resp. 40–41 (citing Ex. 2041 ¶ 88). Patent Owner also asserts:

> This understanding is also made clear in another document cited by Merck, Jones 2005 (EX1026). Jones 2005 states that: "[t]he optimal [polysaccharide-protein] ratio has to be determined by experiment in preclinical studies or clinical trials." *Id.* (quoting EX1026 at 13). Lees 2008 further notes that "[t]he unique structures of each serotype mean that the precise activation and conjugation conditions ***must be carefully controlled and optimized***. . . ." EX1035 at 7-8.

PO Resp. 41.

We agree with Patent Owner that the prior art recognized that conjugate size and polysaccharide to protein ratio were known results optimizable variables, and we agree that JNIID does not specifically discuss serotype 22F. However, JNIID does identify saccharide to protein ratios for seven serotypes, serotypes 4, 6B, 9V, 14, 18C, 19F, and 23F, that range from a low of 0.3 to a high of 2.6, with the vast majority falling within the range of 0.4 and 2 recited by claim 1 of the '559 patent. Ex. 1085, 23. Thus, we agree with Dr. Kasper's statement that "[e]ach disclosed ratio [in JNIID] overlaps to a large extent with the claimed ratio of 0.4 to 2, consistent with the general understanding in the art as of January 21, 2014 that such ratios are typical for immunogenic conjugates." Ex. 2037 ¶ 119.

We therefore conclude that with respect to all the claims challenged on this ground that the cited prior art does suggests compositions with 22F

glycoconjugates that are immunogenic, within the claimed molecular weight ranges, and within the claimed polysaccharide to carrier protein conjugate ratios.

### *D. Obviousness over Merck 2011, Pfizer 2012, and PVP 2013*

Petitioner asserts that "PVP 2013 specifies that, for a pneumococcal polysaccharide vaccine, serotype 22F capsular polysaccharide must contain an 'O-acetyl/polysaccharide unit molar ratio' of '0.5 - 1.5'; that entire specified range meets the claimed ratio of 'at least 0.1.'" Pet. 55, citing Ex. 1009, 4. Petitioner asserts that "[b]ecause the immunogenicity of a conjugate depends in large part on the immunogenicity of the included polysaccharide, a POSITA would have considered the teachings of PVP 2013 when designing the pneumococcal conjugate compositions of Merck 2011/Pfizer 2012." Pet. 54–55. Petitioner asserts

> [g]iven that the O-acetyl content of native 22F capsular polysaccharide was known to be approximately 0.8 (Ex. 1029 at 1), it would have been obvious to a POSITA that the "ratio of mM acetate per mM polysaccharide in the glycoconjugate to mM acetate per mM isolated polysaccharide" would have been at least 0.625-1.875; that entire specified range meets the claim limitation of "at least 0.6."

Pet. 58–59, citing Ex. 1005 ¶ 138.

Patent Owner asserts "Merck 2011 and Pfizer 2012 do not refer to the minimum acetate levels required by claims 2, 40, and 43" and asserts that Petitioner "relies on PVP 2013 (EX1009) to allege that the acetate contents specified in these claims would have been obvious." PO Resp. 43. Patent Owner asserts the "23-valent free unconjugated polysaccharide vaccine referred to in PVP 2013, is not the same as the glycoconjugate compositions that are claimed in the '559 patent" because "the polysaccharides in a free

polysaccharide-based vaccine composition are not conjugated to any carrier protein." PO Resp. 43–44 (citing Ex. 2013, 109:8–23 and Ex. 1071, 5). Patent Owner asserts "[b]ecause carrier proteins or glycoconjugates are not mentioned in PVP 2013, this document would not have taught a POSA how to arrive at the specific polysaccharide to protein ratio (w/w) recited in the '559 patent claims." PO Resp. 44.

1. *PVP 2013 (Exhibit 1009)*

PVP 2013 is titled "Pneumococcal Vaccine Polyvalent" and was published on the website of Japan's National Institute of Infectious Diseases (*see* Pet., vi). PVP 2013 discusses starting materials used to make vaccines including serotypes 1, 2, 3, 4, 5, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C, 19A, 19F, 20, 22F, 23F, and 33F. *See* Ex. 1009, 1. PVP 2013 teaches various tests used to analyze polysaccharides used in the vaccines including, among others, an *O*-acetate content test. Ex. 1009, 3–4. PVP 2013 provides a range of *O*-acetate for a variety of serotypes including a range of 0.5 – 1.5 for serotype 22F. Ex. 1009, 4.

2. *Analysis*

We find these arguments unpersuasive. Claim 2 requires "at least 0.1 mM acetate per mM polysaccharide" and claims 40 and 43 require a mM ratio that "is at least 0.6." Ex. 1001, 141:35–37, 144:15–18, 27–30. Dr. Kasper stated "PVP 2013 specifies that, for a pneumococcal polysaccharide vaccine, serotype 22F capsular polysaccharide must contain an 'O-acetyl/ polysaccharide unit molar ratio' of '0.5 - 1.5'; that entire specified range meets the claimed ratio of 'at least 0.1.'" Ex. 1005 ¶ 132 (citing Ex. 1009, 4). Consistent with Dr. Kasper's statement, PVP 2013 states the "*O*-acetate content (*O*-acetyl/polysaccharide unit molar ratio) shall be within the range

of the following specification" where the range for serotype 22F is given as "0.5–1.5." Ex. 1009, 3–4.

Dr. Kasper explained that Rajam 2007[18] evidences "that O-acetyl groups can contribute to the immunogenicity of pneumococcal polysaccharides." Ex. 1005 ¶ 133 (citing Ex. 1086). Rajam 2007 states "the primary functional epitope of 15B-Ps is linked to the O acetylation of the monosaccharide residues. Removal of this O-acetyl group results in loss of the functional antibody activity." Ex. 1086, 4. This teaching, in combination with the teaching of PVP 2013 to incorporate acetate into serotype 22F in particular, demonstrates that the evidence of record better supports Petitioner's position that use of acetate in the molar ratios suggested by PVP 2013 would have been expected to improve vaccine activity.

Consequently, PVP 2013 and the knowledge of the ordinary artisan reasonably suggest to utilize a molar ratio of acetate to polysaccharide for serotype 22F that falls within the requirements of claims 2, 40, and 43.

As to Patent Owner's assertions regarding polysaccharide to protein ratios and molecular weight ranges, we have already found the ratio of polysaccharide to protein and molecular weight ranges obvious for claim 1 as discussed above and claims 2, 40, and 43 are drawn to further ratios of acetate to polysaccharide suggested by PVP 2013.

---

[18]Gowrisankar Rajam et al., *Functional Antibodies to the O-Acetylated Pneumococcal Serotype 15B Capsular Polysaccharide Have Low Cross-Reactivities with Serotype 15C*, 14 CLINICAL & VAC. IMMUNOL. 1223–27 (2007) ("Rajam 2007," Ex. 1086).

We therefore conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan with the acetate ratios suggested by PVP 2013 in order to retain immunogenic activity as disclosed by PVP 2013.

### *E. Obviousness over Merck 2011, Pfizer 2012, and GSK 2008*

Petitioner asserts that "GSK 2008 discloses compositions with conjugates of serotypes 22F, 15B and 33F." Pet. 61. Petitioner asserts that a "POSITA would have understood that 'serotype 15' in GSK 2008 includes all serotypes within serogroup 15, including serotype 15B as claimed." Pet. 61 (citing Ex. 1005 ¶ 143). Petitioner further asserts that "GSK 2008 discloses compositions with conjugates of serotypes 22F, 15B, 33F, 12F, 10A, 11A and 8." Pet. 62. Petitioner asserts that "the claimed serotypes were well-known to be prevalent and had already been included in the Pneumovax® 23 polysaccharide vaccine." Pet. 62 (citing Ex. 1031, 2; Ex. 1054, 4).

Patent Owner asserts a "POSA reading claims 3 or 4 would understand that all of the serotype glycoconjugates recited in these claims would be required to be immunogenic, not just serotype 22F glycoconjugates." PO Resp. 45. Patent Owner asserts that "[n]one of Merck 2011, Pfizer 2012 or GSK 2008 exemplifies immunogenic compositions that include a conjugate of pneumococcal serotype 15B, as required by claims 3 and 4." PO Resp. 47. Patent Owner asserts Lees 2008 "teaches that multivalent pneumococcal glycoconjugate compositions 'present additional complexities' due to each serotype being chemically distinct, requiring

optimization of each glycoconjugate within the compositions." PO Resp. 47 (citing Ex. 2041 ¶ 95 and Ex. 1035, 1–2).

1. *GSK 2008 (Exhibit 1007)*

GSK 2008 was already discussed substantively above. GSK 2008 teaches the "multivalent pneumococcal vaccine of the invention will be selected from the following serotypes 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, <u>**10A**</u>, <u>**11A**</u>, 12F, 14, <u>**15**</u>, 17F, 18C, 19A, 19F, 20, <u>**22F**</u>, 23F and 33F." Ex. 1007, 8:29–31 (emphases added).

GSK 2008 teaches: "Preferably the ratio of carrier protein to *S. pneumoniae* saccharide is between 1:5 and 5:1 . . . (w/w)." Ex. 1007, 20:24–26. GSK 2008 claims a conjugate where "the average size (e.g. Mw) of the 22F saccharide is between 50 and 800 kDa. . . ." Ex. 1007, 93 (claim 56).

2. *Analysis*

*i. Reasons to include serotypes of claims 3 and 4*

While we agree, as noted above, that Patent Owner correctly construes the claims to require the term "immunogenic" to apply to all of the serotypes present in the composition, we are not persuaded that claims 3 and 4 are unobvious over the disclosures in Merck 2011, Pfizer 2012, GSK 2008, and the knowledge of the person of ordinary skill in the art.

GSK 2008 teaches a "multivalent pneumococcal vaccine of the invention will be selected from the following serotypes 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15, 17F, 18C, 19A, 19F, 20, 22F, 23F and 33F." Ex. 1007, 8:29–31. Thus, GSK 2008 expressly suggests a vaccine containing serotypes 10A, 11A, and 15. Just as we agreed with Patent Owner that the construction of the word "immunogenic" in claim 1 reasonably requires each serotype contained in a vaccine to induce an

immune response, we also find that the disclosure of a vaccine by GSK 2008 containing multiple serotypes also requires induction of an immune response to each serotype. Otherwise, there would be no need to include a serotype unable to induce such a response. And indeed, GSK 2008 uses the same term, immunogenic, to describe the pneumococcal vaccine composition. *See* Ex. 1007, 5:27.

We recognize that Dr. Boons correctly notes that "[n]one of Merck 2011, Pfizer 2012, or GSK 2008 exemplifies immunogenic compositions that include a conjugate of pneumococcal serotype 15B." Ex. 2041 ¶ 95. However, "[a]ll the disclosures in a reference must be evaluated . . . and a reference is not limited to the disclosure of specific working examples." *In re Mills*, 470 F.2d 649, 651 (CCPA 1972).

We note that Dr. Kasper stated that at the time of invention, the ordinary artisan was aware of serotype 15B, that PVP 2013 discloses inclusion of serotype 15B in a pneumococcal vaccine, and that "[b]ased on GSK 2008, it would have been obvious to a POSITA to additionally include a serotype 15B conjugate." Ex. 1005 ¶ 142. Dr. Kasper also noted that "serotypes 15B and 33F had already been included in the Pneumovax® 23 polysaccharide vaccine." Ex. 1096 ¶ 60 (citing Ex. 1054, 4). Dr. Kasper stated for serotypes 22F, 33F, and 15B that "each one had to be optimized structurally, and then they could be combined. And they would induce an immune response." Ex. 2013, 43:10–13.

This is consistent with Dr. Lee's statement that "[c]laims 3–8 [of the '559 patent] collectively recite 20 additional serotypes. However, . . . all 20 of the recited serotypes were already included in multivalent pneumococcal vaccines on the market in 2014" and, therefore, "[o]ne would also have

reasonably expected success because, as shown in GSK-711 and Merck-086, 22F and other new serotypes were successfully included in multivalent PCV compositions while maintaining the immunogenicity to all serotypes in the compositions." Ex. 2039 ¶¶ 158–59.

ii. *GSK 2008 teaching about serotype 22F polysaccharide to protein ratio*

Patent Owner asserts that "Table 2 of GSK 2008 refers to a 22F conjugate (referred to as 'PS22F-PhtD') having a protein to polysaccharide ratio of 2.17, which [Petitioner] translates to a polysaccharide to protein ratio of 1/2.17, or 0.46." PO Resp. 48 (citing Ex. 1005 ¶ 89). Patent Owner asserts that "[t]able 2 also provides data for a second glycoconjugate referred to as 'PS22F-AHPhtD'" that "has a protein to polysaccharide ratio of 3.66-4.34." PO Resp. 48 (citing Ex. 1007, Table 2).

Patent Owner asserts that based on Figure 6 of GSK 2008, "there is a striking difference (what appears to be a 12-fold difference) between the OPA results from the two different 22F glycoconjugates." PO Resp. 50 (citing Ex. 1007, 108). Patent Owner asserts that "Figure 6 clearly teaches that the PS22F-AH-PhtD glycoconjugate was functionally superior to the PS22F-PhtD glycoconjugate." PO Resp. 50.

Patent Owner asserts that:

> Due to the significant inferiority of the PS22F-PhtD glycoconjugate, a POSA would have been "discouraged" from generating this glycoconjugate and "would be led in a direction divergent from the path" adopted by Pfizer, i.e., a POSA would have been directed to prepare a serotype 22F glycoconjugate having a polysaccharide to protein ratio outside the claimed range. EX2041, ¶99.

PO Resp. 52.

We do not find these arguments persuasive. As already noted, GSK 2008 discloses a range of ratios of polysaccharide to carrier protein that includes and fully overlaps the range claimed. Ex. 1007, 20:24–28. Peterson, 315 F.3d at 1329. Dr. Kasper states that the "narrowest range in claim 48 [of GSK 2008] is a protein to polysaccharide ratio of 2:1 to 1:1, which translates to a polysaccharide to protein ratio of 0.5 to 1." Ex. 1106 ¶ 52. Dr. Lees' stated that "[f]or pneumococcal conjugate vaccines, while the particulars may differ for a specific serotype, the WHO guidelines specifically recommend a ratio 'in the range of 0.3–3.0.'" Ex. 2039 ¶ 58 (citing Ex. 2060, 17 ("Typically for pneumococcal conjugate vaccines the ratio is in the range of 0.3 to 3.0 but varies with the serotype.")). Patent Owner also acknowledges that GSK 2008 teaches a final conjugate of serotype 22F that has a polysaccharide to protein ratio of 0.46, within the range required by claim 1. See PO Resp. 10, 48.

The exemplary serotype 22F-PhtD conjugate with a 0.46 ratio, along with the overlapping ranges disclosed and claimed by GSK 2008, the overlapping Merck 2011 0.2–2 to 1 charge ratio, and the statement by Dr. Lees that this range substantially overlaps the World Health Organization's recommended ratios for pneumococcal conjugate vaccines, all provide reasonable motivation for the ordinary artisan to select ratios for the serotype 22F conjugate within the range required by claim 1 of the '559 patent. Ex. 1005 ¶ 89; Ex. 1106 ¶ 52; Ex. 1006, 19:24–25; Ex. 2039 ¶ 58; Ex. 2060, 17.

We recognize that Figure 6 of GSK 2008 shows what Patent Owner states to be a 12 fold lower level of antibody titer for serotype 22F-PhtD with a 0.46 ratio relative to serotype 22F-AH-PhtD with a 3.66 to 4.34 ratio. See Ex. 1007, 108. We also recognize that Dr. Boons states that a "POSA

would have avoided the glycoconjugate that was associated with the significantly worse immunogenicity (*i.e.*, PS22F-PhtD), not the glycoconjugate that required a little more effort to make (*i.e.*, PS22F-AH-PhtD)." Ex. 2041 ¶ 99.

However, GSK 2008 teaches that either conjugate may be used, noting a "13 valent vaccine was made by further adding the serotypes 19A and 22F conjugates above (with 22F either directly linked to PhtD, or alternatively through an ADH linker)." Ex. 1007, 55:5–7. Thus, the plain text of GSK 2008 teaches that either conjugate may be used. Therefore, even if the GSK 2008 teaching were interpreted as a preference for the higher polysaccharide to protein ratio rather than simply a preference for the ADH linker, it is well settled that disclosed examples, and even preferred embodiments do not constitute a teaching away from a broader disclosure or non-preferred embodiments. *In re Susi*, 440 F.2d 442, 446 n.3 (CCPA 1971). "[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). *See also In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) ("The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the [claimed] solution.").

We also note that GSK 2008 shows the immunogenicity for the two serotype 22F conjugates as either 37% or 28–31%, demonstrating similar results for both conjugates. Ex. 1007, table 2. Patent Owner points to no teaching in GSK 2008 that criticizes, discredits, or discourages the use of a ratio within the range required by claim 1.

In addition, two of the cited prior art references, Merck 2011 and GSK 2008, specifically direct the ordinary artisan to incorporate serotype 22F conjugates into pneumococcal vaccines. See Ex. 1006, 6:1–4 ("[T]he addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing pneumococcal vaccines."). See also Ex. 1007, 5:32 to 6:1 ("The present invention provides an immunogenic composition . . . [that] comprises a 22F saccharide conjugate.").

Moreover, Merck 2011 and GSK 2008 both suggest molecular weights and polysaccharide to carrier protein ratios that overlap and fall within the ranges recited in claim 1 of the '559 patent. *See, e.g.*, Ex. 1007, 55–56; Ex. 1004 ¶ 84; Ex. 1105 ¶ 52; Ex. 1006, 19:24–25. In addition, the ordinary artisan was aware of desirable ranges of polysaccharide to carrier protein. *See* Ex. 2039 ¶ 58; Ex. 2060, 17.

Therefore, the prior art provides a reasonable expectation of success in light of the disclosure in the prior art of functional glycoconjugates. Specifically, GSK 2008 demonstrates an immunogenic serotype 22F glycoconjugate with an overlapping polysaccharide to carrier protein ratio and Merck 2011 demonstrates an immunogenic serotype 22F glycoconjugate in a 1:1 polysaccharide to carrier protein ratio. Ex. 1007, 55–56; Ex. 1006, 21. Patent Owner provides no evidence showing that any serotype 22F glycoconjugate fails to result in an immunogenic response.

We therefore conclude that incorporation of known immunogenic serotypes such as 10A, 11A, 15B, and 33F into the vaccine suggested by Merck 2011, Pfizer 2012, GSK 2008, and the knowledge of the ordinary

artisan would have been obvious in order to increase the coverage of serotypes of pneumococcal vaccines.

### *F. Obviousness over Merck 2011, Pfizer 2012, and Hsieh 2000*

Petitioner asserts that Hsieh 2000 "discloses methods for characterizing $CRM_{197}$ conjugate vaccines, including multivalent pneumococcal conjugate vaccines prepared by reductive amination." Pet. 64. Petitioner asserts that "[b]ased on Hsieh 2000, a POSITA would have been motivated with a reasonable expectation of success to obtain at least 30% of the conjugates of claim 1 with a $K_d$ below or equal to 0.3 in a CL-4B column." Pet. 64, citing Ex. 1005 ¶ 148.

Patent Owner asserts "[n]either Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, GSK 2008, Hsieh 2000 and the 'general knowledge.' Therefore, Merck has likewise not met its burden in showing that claims 38 and 44 are obvious." PO Resp. 53. Patent Owner also asserts "Hsieh 2000 does not refer to serotype 22F glycoconjugates. Hsieh 2000 also does not contain any guidance about targeting any particular molecular weight or polysaccharide to protein ratio for a serotype 22F glycoconjugate." PO Resp. 53.

#### 1. *Hsieh 2000 (Exhibit 1013)*

Hsieh 2000 discusses the characterization of vaccines composed of polysaccharides conjugated to $CRM_{197}$, including a 7-valent pneumococcal saccharide-$CRM_{197}$ conjugate vaccine. Ex. 1013, 1. Hsieh 2000 teaches that "$CRM_{197}$ is a mutant of diphtheria toxin" and "lists the methods that have been used to characterize $CRM_{197}$" including "High Performance Size-exclusion Liquid Chromatography . . . [that] is adequate to control the consistency and purity of the product." Ex. 1013, 2. Hsieh 2000 teaches

that important parameters for conjugate vaccines include molecular size and polysaccharide to protein ratio among others. *See* Ex. 1013, 6. Hsieh explains that "[i]t is essential to demonstrate the covalent linkage of the saccharide to the carrier protein." Ex. 1013, 8.

2. *Analysis*

We agree with Petitioner that "Hsieh 2000 discloses that '[s]ize exclusion chromatography (SEC) with either CL-2B or CL-4B sepharose is used' to assess molecular size" and Hsieh 2000 "discloses the typical extent of conjugation for $CRM_{197}$ conjugates, and how to measure it." Pet. 32–33. Claim 38 requires the glycoconjugates to "have a $K_d$ below or equal to 0.3 in a CL-4B column." Ex 1001, 144:7–9. Dr. Kasper stated "Hsieh 2000 discloses that pneumococcal conjugates should generally have a $K_d$ below or equal to 0.3 in a CL-4B column." Ex. 1005 ¶ 148 (citing Ex. 1013, 6). Hsieh 2000 analyzed saccharide-$CRM_{197}$ conjugates and stated:

> For pneumococcal conjugate, the molecular structure is more complicated than Hib or meningococcal conjugates. The molecular weight distribution can spread over a much wider range in the CL-4B profile, as shown in Figure 3. Therefore, a single value of 50% $K_d$ or similar expression may not be indicative of the complex nature of the conjugate. As a qualitative measurement, a percent value of less than 0.3 $K_d$ can be used to indicate the quantity of high molecular fraction in the conjugate.

Ex. 1013, 6. Thus, Hsieh 2000 directly suggests that for pneumococcal saccharide-$CRM_{197}$ conjugates a 0.3 value $K_d$ value obtained from a CL-4B column is desirable. Ex. 1013, 6. Patent Owner provides no evidence that there would be any difficulty or unpredictability in performing Hsieh's assay on the conjugates suggested by Merck 2011 and Pfizer 2012. *See In re*

*Pearson*, 494 F.2d 1399, 1405 (CCPA 1974) ("Attorney's argument in a brief cannot take the place of evidence.").

Claim 44 requires the "degree of conjugation of said glycoconjugate is between 2 and 15." Ex. 1001, 144:32–34. Dr. Kasper stated "[b]ased on Hsieh 2000, a POSITA would have been motivated with a reasonable expectation of success to construct the conjugate of claim 1 with a 'degree of conjugation' between 2 and 15." Ex. 1005 ¶ 149. Hsieh 2000 teaches "[f]or saccharide-$CRM_{197}$ conjugates, there is a limited number of exposed lysines on surface $CRM_{197}$, which can participate in the conjugation reaction. The loss of lysine has been relatively consistent in the range of 6-9." Ex. 1013, 8. Thus, the only evidence of record, Hsieh 2000, teaches a degree of conjugation between 6 and 9. Ex. 1013, 8. "Obviousness does not require absolute predictability of success . . . *all that is required is a reasonable expectation of success*." *Kubin*, 561 F.3d at 1360 (internal quotation marks and citation omitted).

We therefore conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan with purification and conjugation techniques of Hsieh 2000 to obtain quality conjugates.

## III. PATENT OWNER'S MOTION TO AMEND

Patent Owner's motion to amend is contingent on a finding of unpatentability of claims 1, 2, 3, 4, 9, 41, and 42 by the Board. Mot. Amend 1. Because we conclude that Petitioner has demonstrated that these claims are unpatentable (among other claims), we proceed to consider Patent Owner's motion to substitute claims 46–52 for claims 1, 2, 3, 4, 9, 41, and

42. For the reasons discussed below, Patent Owner's motion to amend is denied.

*A. Threshold Requirements*

In an *inter partes* review, claims may be added as part of a proposed motion to amend. 35 U.S.C. § 316(d).

The Board must assess the patentability of the proposed substitute claims "without placing the burden of persuasion on the patent owner." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1328 (Fed. Cir. 2017) (en banc). Patent Owner's proposed substitute claims, however, must still meet the statutory requirements of 35 U.S.C. § 316(d) and the procedural requirements of 37 C.F.R. § 42.121 as a threshold matter. *See* USPTO's Memorandum, GUIDANCE ON MOTIONS TO AMEND IN VIEW OF AQUA PRODUCTS (Nov. 2017), available at https://www.uspto.gov/sites/default/files/documents/guidance_on_motions_to_amend_11_2017.pdf. Accordingly, Patent Owner must demonstrate: (1) the amendment proposes a reasonable number of substitute claims; (2) the amendment does not seek to enlarge the scope of the claims of the patent or introduce new subject matter; (3) the amendment responds to a ground of unpatentability involved in the trial; and (4) the original disclosure sets forth written description support for each proposed claim. *See* 35 U.S.C. § 316(d)(1)(B),(3); 37 C.F.R. § 42.121; *Hospira, Inc. v. Genentech, Inc.*, Case IPR2017-00737, slip op. at 47 (PTAB Oct. 3, 2018) (Paper 108). *See also Lectrosonics, Inc. v. Zaxcom, Inc.*, Case IPR 2018-01129, slip op. 4–7 (PTAB Feb. 25, 2019)(Paper 15) (Clarifying motion to amend requirements, including clarification of requirements regarding scope of proposed substitute claims.)

*B. Proposed Substitute Claims*

Proposed substitute claims 46 and 47 are reproduced below with markings showing proposed changes from claims 1 and 2, respectively. Deletions are shown in brackets or strikethrough and additions are underlined.

> Claim 46 (substitute for original claim 1, if found unpatentable): An immunogenic composition comprising:
>
> a *Streptococcus pneumoniae* serotype 22F glycoconjugate, wherein the 22F glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and a $CRM_{197}$ carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2;
>
> glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F all individually conjugated to $CRM_{197}$;
>
> an aluminum salt adjuvant; and
>
> wherein the composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition in the form of an initial dose and a booster dose.
>
> Claim 47 (Substitute for original claim 2): The immunogenic composition of claim ~~1~~ 46, wherein the glycoconjugate comprises at least ~~0.1~~ 0.8 mM acetate per mM polysaccharide.

Mot. Amend App'x i, ii; Ex. 2045 ¶¶ 16–38.

*C. Broadening, Definiteness, and Written Description*

We construe only those terms that are in controversy, and only to the extent necessary to resolve the controversy. *See Vivid Techs.*, 200 F.3d at 803. None of the newly added claim terms are in controversy, so no claim construction is required.

In particular, we determine that the substitute claims do not broaden the invention and that substitute claim 47 is definite and has adequate written description support.

*1. Claims do not improperly broaden the term "immunogenic"*

Petitioner asserts "Patent Owner's proposed claims should be rejected because they impermissibly incorporate a broadened 'immunogenic' term." Pet. Opp. 24. Petitioner asserts that "Patent Owner's proposed claims would cover compositions that would not have infringed the original claims, *i.e.*, compositions that elicit the recited 2-log increase in serum IgG levels **without eliciting functional antibody against serotype 22F**." Pet. Opp. 25.

Patent Owner asserts:

> The substitute claim was not meant to broaden the scope beyond the original claims. Should the Board deem it necessary to construe the term "immunogenic" in the context of the substitute claims, Pfizer's position is that the term should be construed consistently with the manner in which the parties construed the term in the context of the original claims.

PO Reply 10.

We agree with Patent Owner that the term "immunogenic" does not impermissibly broaden the claims. As discussed in our claim interpretation section above, we agree with Patent Owner that the term "immunogenic" requires functional antibody be elicited against each immunogen contained

in the composition. Because every original claim and every newly proposed claim requires an immunogenic composition that comprises serotype 22F, the newly added claims require functional antibody against serotype 22F. Therefore, the inclusion of other serotypes serves to narrow the claims, because the claims must include an "immunogenic" serotype 22F glycoconjugate, along with additional "immunogenic" glycoconjugates of other serotypes.

*2. Claim 47 is not indefinite*

Petitioner asserts that "[p]roposed claim 47 should also be rejected as indefinite under 35 U.S.C. § 112(b) because the meaning of the claim term 'the glycoconjugate' is unclear." Pet. Opp. 22. Petitioner asserts that "proposed claim 46 recites 14 distinct 'glycoconjugates' - and there is no indication which one is 'the glycoconjugate' of proposed claim 47. Ex.1097, ¶¶82-84." Pet. Opp. 22.

Patent Owner asserts "claim 47 is readily interpreted as directed to the 22F conjugate as it is a proposed substitute to claim 2 and is supported by disclosures relating to a 22F conjugate." PO Reply 10–11.

We agree with Patent Owner that the reasonable reading of "the glycoconjugate" in claim 47 refers to the serotype 22F glycoconjugate referenced in independent claim 46. However, even if we agreed with Petitioner's interpretation and "the glycoconjugate" would then refer to all of the glycoconjugates in claim 46, this interpretation would simply further narrow claim 47 to require all of the glycoconjugates to satisfy the 0.8 mM acetate per mM polysaccharide limitation.

*3. Claim 47 has written description support*

Petitioner asserts a "POSITA would have understood that this paragraph does **not** disclose that the amount of acetate relative to polysaccharide in the serotype 22F conjugate can be 'at least 0.8 mM acetate per mM polysaccharide.'" Pet. Opp. 23 (internal citation omitted).

Patent Owner asserts "[c]laim 47 is directly supported by the disclosure: 'at least . . . about 0.8 mM acetate per mM serotype 22F polysaccharide' in both the application issuing as the '559 patent and the provisional to which it claims priority." PO Reply 12.

We agree with Patent Owner. The '559 patent states "the serotype 22F glycoconjugate of the invention comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6 or 0.7 or about 0.8 mM acetate per mM serotype 22F polysaccharide." Ex. 1001, 26:1–4. We determine that the ordinary artisan, confronted with the phrase "at least . . . or about 0.8 mM acetate" would understand this to encompass "at least about" 0.8 mM acetate, thus, allowing for either "at least" or "about" that amount of acetate.

*D. Unpatentability*

Petitioner asserts that proposed substitute claims 46–52 are unpatentable as obvious over the combination of Hausdorff, Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan. Pet. Opp. 2–19; *see also* Pet. Sur-Reply 3–8. To support its Opposition, Petitioner proffers the declaration of Dr. Kasper and the deposition of Dr. Paradiso. Ex. 1097; Ex. 1104. Patent Owner disagrees. PO Reply 1–9; *see also* PO Sur-Sur-Reply 1–5. To

support its Motion Reply, Patent Owner proffers the declarations of Dr. Paradiso (Ex. 2045; Ex. 2064).

We determine that claims 46 and 48–52 would have been obvious over the combination of Merck 2011, Pfizer 2012, Hausdorff, and the knowledge of the skilled artisan. We also determine that claim 47 would have been obvious with the further addition of PVP 2013.

*1. Claims 46–52 are obvious over Hausdorff, Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan*

*a. Hausdorff (Ex. 2027)*

Hausdorff teaches "a multivalent immunogenic composition, wherein the capsular polysaccharides are from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9v, 14, 18C, 19A, 19F and 23F of Streptococcus pneumoniae, the carrier protein is $CRM_{197}$, and the adjuvant is an aluminum-based adjuvant." Ex. 2027 ¶ 8. Hausdorff teaches a starting "saccharide/protein ratio of 2:1." Ex. 2027 ¶ 89. Hausdorff teaches that "[s]ize exclusion chromatography media (CL-4B) was used to profile the relative molecular size distribution of the conjugate." (Hausdorff ¶ 92).

Hausdorff "examined the ability of the 13vPnC vaccine with $AlPO_4$ adjuvant to elicit vaccine serotype-specific immune responses. The pneumococcal serotypes represented in the 13vPnC vaccine include types 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F." Ex. 2027 ¶ 230. Hausdorff teaches:

> New Zealand White rabbits were immunized intramuscularly at week 0 and week 2 with the planned human clinical dose of each polysaccharide (2 µg of each PS, except 4 µg of 6B) formulated with or without $AlPO_4$ (100 µg/dose). Sera were collected at various time points. Serotype specific IgG was

> measured by ELISA and functional activity was assessed by OPA.

Ex. 2027 ¶ 230.

Table 3 of Hausdorff, reproduced below, shows that each of the thirteen tested serotypes produced an immune response with more than a 2-log increase above baseline serum IgG levels in New Zealand White Rabbits after administration of the two equal doses.

TABLE 3

Rabbit IgG Immune Responses (GMTs) Following Immunization with Two Doses of 13-valent Pneumococcal Glycoconjugate

| | Diluent with $ALPO_4$[a] | | | 13vPnC[a] | | | 13vPnC + $ALPO_4$[a] | | |
|---|---|---|---|---|---|---|---|---|---|
| Serotype | Week 0 | Week 4 | Ratio Wk4:Wk0 | Week 0 | Week 4 (95% CI) | Ratio Wk4:Wk0 | Week 0 | Week 4 (95% CI) | Ratio Wk4:Wk0 |
| 1 | <100 | <100 | 1.0 | 50 | 5,926 (2,758-12,733) | 119 | 50 | 11,091 (5,327-23,093) | 222 |
| 3 | <100 | <100 | 1.0 | 50 | 6,647 (2,773-15,932) | 133 | 58 | 16,443 (7,096-38,106) | 284 |
| 4 | <100 | <100 | 1.0 | 50 | 13,554 (8,031-22,875) | 271 | 50 | 29,183 (15,342-55,508) | 584 |
| 5 | 134 | <100 | 0.4 | 50 | 5,859 (2,450-14,009) | 117 | 50 | 16,714 (6,959-40,140) | 334 |
| 6A | 141 | <100 | 0.4 | 74 | 22,415 (11,987-41,914) | 303 | 83 | 63,734 (21,141-192,146) | 768 |
| 6B | <100 | <100 | 1.0 | 57 | 8,108 (3,564-18,444) | 142 | 54 | 23,505 (11,286-48,955) | 435 |
| 7F | 3,859 | 579 | 0.2 | 171 | 43,591 (26,931-70,557) | 444 | 143 | 84,888 (46,445-155,151) | 496 |
| 9V | 289 | 995 | 3.4 | 205 | 15,780 (7,193-34,616) | 125 | 208 | 43,331[b] (23,256-71,510) | 217 |
| 14 | 437 | 177 | 0.4 | 61 | 6,906 (3,416-13,962) | 113 | 70 | 16,076 (9,649-26,785) | 322 |
| 18C | <100 | <100 | 1.0 | 50 | 21,283 (15,770-28,725) | 426 | 50 | 35,040 (24,708-49,692) | 701 |
| 19A | <100 | <100 | 1.0 | 121 | 113,599 (54,518-236,707) | 939 | 144 | 280,976 (119,587-660,167) | 1,951 |
| 19F | <100 | <100 | 1.0 | 50 | 14,365 (7,346-28,090) | 287 | 50 | 24,912 (9,243-67,141) | 498 |
| 23F | <100 | <100 | 1.0 | 50 | 5,323 (1,894-14,962) | 106 | 50 | 15,041 (4,711-48,018) | 301 |

[a]GMTs of pooled sera consisted of equal volumes of serum from each individual rabbit within a group
[b]Statistically different ($p = 0.022$) from treatment group without $ALPO_4$

Table 3 shows the geometric mean titer "achieved in pooled serum samples, following two doses of the 13vPnC vaccine." Ex. 2027 ¶ 231.

The data of Table 3 show that the ratio of week 4 to week 0, both with and without aluminum phosphate, was higher than a 2-log increase of 100 for every single serotype tested. Ex. 2027 ¶ 231, Table 3.

*b. Merck 2011 (Ex. 1006)*

As discussed above in Section II.C.1, Merck 2011 teaches an immunogenic composition composed of serotypes "of *Streptococcus pneumoniae* (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F or 33F) conjugated to a carrier protein, preferably $CRM_{197}$." Ex. 1006, 1:9–11. Table 1 of Merck 2011 shows a vaccine formulation with a 1:1 ratio for 14 serotypes including serotype 22F and a 2:1 ratio for serotype 6B, specifically showing the formulation comprises 32 µg of total polysaccharide and 32 µg of $CRM_{197}$ carrier protein with the total polysaccharide being composed of 2 µg of 14 serotypes including 22F and 4 µg of serotype 6B. Ex. 1006, 19:5–9.

Merck 2011 teaches formulations containing 15 serotypes of the pneumococcal conjugate vaccine (PCV-15) "were evaluated in 4 studies in adult New Zealand White Rabbits (NZWRs) using a compressed immunization regimen in which rabbits received a full human dose of vaccine at day 0 and day 14." Ex. 1006, 23:15–17.

Table 4

Fold-rise (Post-dose 2:Pre-dose 1) in IgG Responses to Non-Prevnar™ Serotypes of PCV-15 Lead Formulations Tested in NZWR

| Serotype | NZWR-1 | NZWR-2 | NZWR-3 | NZWR-4 |
|---|---|---|---|---|
| 1 | 14.9 | 30.5 | 55.1 | 59.9 |
| 3 | 33.6 | 16.2 | 61.5 | 28.5 |
| 5 | 12.8 | 70.2 | 112.0 | 134.0 |
| 6A | 21.3 | 77.8 | 143.0 | 123.0 |
| 7F | 42.0 | 83.8 | 194.0 | 108.0 |
| 19A | 40.5 | 79.1 | 450.0 | 314.0 |
| 22F | 45.7 | 87.8 | 243.0 | 135.0 |
| 33F | 21.7 | 47.9 | 98.8 | 69.4 |

Merck 2011 Table 4.

In Table 4, Merck 2011 teaches the "fold-rise in antibody levels to the non-Prevnar® serotypes from Day 0 to Day 28 (Post-dose 2, PD-2)." Ex. 1006, 24:14–15.

In the NZWR-3 and NZWR-4 studies in Table 4 of Merck 2011, serotype 22F exhibits a greater than 2-log increase above baseline in New Zealand White Rabbits with values of 243.0 and 135.0, while in the NZWR-1 and NZWR-2 studies in Table 4, serotype 22F exhibits less than 2-log increases of 45.7 and 87.8. *See* Ex. 1006, Table 4.

*c. Pfizer 2012 (Ex. 1008)*

As discussed above in Section II.C.2, Pfizer 2012 teaches glycoconjugate vaccines with a typical mass range of 500 to 5000 kDa. Ex. 1008, 6. Pfizer 2012 additionally teaches conjugation of polysaccharide to proteins such as $CRM_{197}$.

*d. Analysis*

*i. Claim 46*

Petitioner asserts a "POSITA as of January 21, 2014 would have been motivated with a reasonable expectation of success to add the immunogenic serotype 22F conjugate of Merck 2011 to the immunogenic 13-valent composition of Hausdorff." Pet. Opp. 4 (citing Ex. 1097 ¶ 23). Petitioner asserts "serotype 22F was well-known as an emerging and clinically relevant pneumococcal serotype not in Prevnar 13®. *See, e.g.*, Ex.1097, ¶26; Ex.1098, 1; Ex.1099, 7; Ex.1100, 1." Pet. Opp. 4. Petitioner asserts that the ordinary artisan would have had reason to use $CRM_{197}$ as the protein conjugate and an aluminum salt as the adjuvant. Pet. Opp. 5 (citing Ex. 1097 ¶¶ 29–31; Ex. 2027 ¶ 59; Ex. 1006, 11:31–33).

Petitioner asserts that a "POSITA would have had a reasonable expectation that combining such conjugates would yield a 14-valent composition with the claimed 2-log increase in serum IgG levels." Pet. Opp. 8. Petitioner asserts that Hausdorff "reports that the 13-valent composition, with or without adjuvant, exhibits the claimed 2-log increase in serum IgG levels." Pet. Opp. 6 (citing Ex. 2027 ¶ 231). Petitioner also asserts that "for serotype 22F, Merck 2011 discloses more than a 2-log increase in IgG levels (*i.e.*, 243.0- and 135.0-fold increases) above baseline in 2 studies." Pet. Opp. 8 (citing Ex.1006, 24:17–25:1 (Table 4)).

Petitioner asserts that a "POSITA would not have been concerned that adding one more conjugate to the 13-valent composition of Hausdorff would negatively impact immunogenicity of the composition." Pet. Opp. 8 (citing Ex. 1097 ¶ 43). Petitioner asserts that

> Patent Owner's expert in a related proceeding, Dr. Fattom, confirmed that immune interference "is not something that will prevent you from developing any vaccine with any valency. It's a risk management and risk evaluation." Ex.1102, 77:25-78:21. It was well-known that Patent Owner had successfully added 6 more $CRM_{197}$ conjugates to its 7-valent pneumococcal $CRM_{197}$ conjugate vaccine.

Pet. Opp. 8 (citing Ex. 1097 ¶ 43). Petitioner also asserts that Dr. Paradiso held the position in a published paper that "'[w]ith conjugates on $CRM_{197}$ it has been possible to induce good immunity to new serotypes **without negatively affecting the components already in the vaccine**.'" Pet. Opp. 9 (citing Ex. 1091, 3 (emphasis added in Pet. Opp.)). Petitioner asserts that Dr. Paradiso "testified that a POSITA would not have been concerned about immune interference with a 21-valent composition 'based on the data with the 16- and the 20-valent vaccine, which achieved the two-log increase.'" Pet. Opp. 9 (citing Ex.1104, 110:22–111:10).

Petitioner asserts that "Merck 2011 describes its 15-valent composition as 'highly immunogenic' (in both infant rhesus monkeys ('IRMs') and NZWRs) against all 15 serotypes in the composition, and 'comparable to' Prevnar® with respect to the 7 overlapping serotypes." Pet. Opp. 10 (citing Ex. 1006, 30:3–14 and Ex. 1097 ¶¶ 45, 51). Petitioner asserts that "Patent Owner's expert, Dr. Paradiso, conceded that Merck 2011 discloses data in Figure 1 (IRM assay) establishing that 'after three doses the responses for the 15-valent composition of Merck 2011 and that of Prevnar[®] were comparable.'" Pet. Opp. 10 (citing Ex. 1104, 138:4–9).

Patent Owner acknowledges that "Merck 2011 discloses a fifteen-valent composition ('PCV-15') that includes thirteen conjugates of the same

serotypes and carrier disclosed in Hausdorff and two additional conjugates, one of which is a 22F-$CRM_{197}$ conjugate." PO Reply 1 (citing Ex. 2064 ¶ 6). Patent Owner asserts, however, that "the data in Merck 2011 show that such a combination would not have achieved the 2-log IgG Increase required by substitute claim 46." PO Reply 1 (citing Ex. 2064 ¶ 5).

Patent Owner asserts "[i]n Merck 2011 Table 3, responses for PCV-15 are compared to those of Prevnar® for the 7 common serotypes covered by Prevnar®." PO Reply 1 (citing Ex. 1006, 25:15– 26:15; Ex. 2064 ¶ 7). Patent Owner asserts the "results in Table 3 show that the PCV-15 composition elicited poorer responses (i.e., < 1.0) than Prevnar® to several serotypes and in several arms of the study." PO Reply 2 (citing Ex. 2064 ¶ 9). Patent Owner relies on Dr. Paradiso to assert that "[f]ar from showing that PCV-15 is 'comparable' to Prevnar® (*see* Opp. at 12), these results show that PCV-15 elicited poorer responses than Prevnar® and suffers from immune interference." PO Reply 2 (citing Ex. 1104, 147:13–25).

Patent Owner asserts the results of Table 4 of Merck 2011 "show that PCV-15 failed to exhibit the 2-log IgG Increase to all serotypes as required by the substitute claim." PO Reply 3 (citing Ex. 2064 ¶ 13). Patent Owner asserts that "[g]iven the poor responses to numerous serotypes of the Merck 2011 formulations containing the undefined 22F conjugate, a POSA would have no reasonable expectation of making a composition that meets the 2-log IgG Increase of the substitute claims based on Hausdorff in view of Merck 2011 and Pfizer 2012." PO Reply 4 (citing Ex. 2064 ¶ 14). Patent Owner asserts Petitioner's "argument that a POSA would dismiss the poor responses shown by Table 3 as variances generally associated with the rabbit immunogenicity test (*see* Opp. 11) rings hollow since Merck 2011 and Dr.

Kasper relied on rabbit immunogenicity tests." PO Reply 5 (citing Ex. 1006, 25:15–26:1; Ex. 2062, 15:24–16:5).

Patent Owner asserts that Petitioner "argues that a POSA would not have been concerned with the immune interference demonstrated by Tables 3 and 4 because 13-valent conjugate vaccines had avoided immune interference in the past." PO Reply 6. Patent Owner asserts that "Merck 2011 itself reflected such concerns: '[o]ther PCVs have covered 7, 10, 11, or 13 of the serotypes contained in PCV-15, but immune interference has been observed for some serotypes.'" PO Reply 6 (citing Ex. 1006, 4:13–15). Patent Owner asserts that Petitioner's

> argument is also contradicted by its own statement to the USPTO in prosecuting U.S. Application 13/020,402, related to Merck 2011, that it was well known as of the priority date of Merck 2011 that "carrier induced epitopic suppression (CIES) was a problem when increasing the number of polysaccharides in pneumococcal conjugate vaccines."

PO Reply 6 (citing Ex. 2061, 4).

Patent Owner also asserts Petitioner's "assertion that serotype 22F was a known emerging serotype merely identifies a problem, not a motivation to combine particular references." PO Reply 7. Patent Owner also asserts that Petitioner's "opposition ignores the critical limitations that the claimed 'immunogenic composition compris[es]' a '22F glycoconjugate [that] has a molecular weight of between 1000 kDa and 12,500 kDa,' 'wherein a ratio (w/w) of the [22F] polysaccharide to the [$CRM_{197}$] carrier protein is between 0.4 and 2.'" PO Reply 7–8 (internal citation omitted).

Viewing the evidence as a whole, we determine that a preponderance of the evidence demonstrates that it would have been obvious to incorporate a serotype 22F polysaccharide—conjugated to $CRM_{197}$, with molecular

weights and saccharide to protein ratios falling in the claimed ranges as rendered obvious by Merck 2011 and Pfizer 2012—into a pneumococcal vaccine with the 13 serotypes and aluminum salt adjuvant disclosed by Hausdorff with a reasonable expectation of success in obtaining a 2-log increase above baseline in serum IgG levels as required by claim 46.

As to reasons to include serotype 22F into such a composition, Merck 2011 states "the addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses [and] demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing pneumococcal vaccines." Ex. 1006, 4:1–4. Thus, Merck 2011 provides specific reasons to incorporate serotype 22F into a pneumococcal vaccine to provide robust antibody responses that will provide immunity and reduce disease in human populations. As discussed extensively regarding claim 1 above, Merck 2011 and Pfizer 2012 also render the specific molecular weight and saccharide to protein ratios obvious and we incorporate that reasoning here.

As to the issue of immune interference and a reasonable expectation of success in obtaining a 2-log increase, Table 3 of Hausdorff shows that a composition with thirteen of the fourteen serotypes that were required by claim 46, conjugated with $CRM_{197}$, produced an immune response with more than a 2-log increase above baseline serum IgG levels in New Zealand White Rabbits after administration of the two equal doses with or without the aluminum salt adjuvant. Ex. 2027 ¶ 231, Table 3.

Thus, the issue resolves to whether there would have been a reasonable expectation of success in the inclusion of serotype 22F in Hausdorff's pneumococcal vaccine composition while retaining the 2-log

increased immune response of the thirteen serotypes and also allowing a 2-log increase in serotype 22F response.

Dr. Kasper states that

> Because the increases in serum IgG levels reported in Hausdorff were all well-above the 2-log threshold, as was also the case for the serotype 22F conjugate of Merck 2011, a POSITA would have had a reasonable expectation that the addition of the serotype 22F conjugate of Merck 2011 to the 13-valent composition of Hausdorff would yield the claimed 14-valent composition with the recited 2-log increase in serum IgG levels.

Ex. 1097 ¶ 34. This position is supported by Merck 2011, which shows that PCV-15, a composition comprising all of Hausdorff's thirteen serotypes and further including serotypes 22F and 33F, resulted in a 2-log increase for serotype 22F in two of four studies in New Zealand White Rabbits, and less than a 2-log increase in the other two studies. *See* Ex. 1006, 2:24–30, Ex. 1006, 24, Table 4. While Merck 2011 mentions immune interference in the background section relating to prior art formulations, Patent Owner does not identify a statement in Merck 2011 that immune interference occurred in PCV-15. Ex. 1006, 4:13–15.

We recognize Patent Owner correctly notes that Merck 2011 only obtained a 2-log increase of serum IgG levels in serotype 22F conjugates in two of the four arms, and annotates Figures 3 and 4 in Merck 2011 to identify particular experimental results that did not satisfy the 2-log increase. PO Reply 3–4. However, "'[o]bviousness does not require absolute predictability of success . . . *all that is required is a reasonable expectation of success*.'" *Kubin*, 561 F.3d at 1360 (*quoting In re O'Farrell*, 853 F.2d 894, 903–04 (Fed. Cir. 1988)). Evidence that all of the Merck 2011

experiments showed a greater than 1-log increase in serum IgG levels and half of the experiments shows a greater than 2-log increase supports the determination that there was a reasonable expectation of success in achieving the claimed combination at a greater than 2-log increase. *See* Ex. 1006, 2:24–30, 24, Table 4.

Dr. Kasper cites Paradiso 2009 to support his position that immune interference would not have been expected with the addition of a serotype 22F-$CRM_{197}$ conjugate to the thirteen serotype composition of Hausdorff because Paradiso 2009 states "[w]ith conjugates on $CRM_{197}$ it has been possible to induce good immunity to new serotypes without negatively affecting the components already in the vaccine." Ex. 1091, 3; Ex. 1097 ¶ 43. Dr. Paradiso, Patent Owner's expert, stated in deposition that "I would agree that what I said was that up to a 13-valent pneumococcal conjugate vaccine that it's been possible to induce good immunity to new serotypes without negatively affecting the components already in the vaccine." Ex. 1104, 85:16–20. Dr. Paradiso also stated "I didn't" in response to a question of whether he made "any qualifications in the statement where the 13-valent composition was the upper threshold." Ex. 1104, 86:9–13.

We recognize Patent Owner's argument that the Merck 2011 "results show that PCV-15 elicited poorer responses than Prevnar® and suffers from immune interference" is based on a statement by Dr. Paradiso that the Merck 2011 "formulation as a whole raises concern about potential interference" PO Reply 2–3; Ex. 1104, 147:24–25. Patent Owner also asserts:

> Table 2 of Skinner[19] (and Table 2 of Merck 2011), shows that PCV-15 elicited a variety of poorer responses when compared to Prevnar®. *See* EX1113 at 24:3-23; EX1110 at 6. Based on this data, a POSA would have understood that PCV-15 exhibited immune interference and would not have had a reasonable expectation that Merck's asserted combination would achieve the 2-log IgG Increase across all serotypes as required by every substitute claim. *See* EX2045 at ¶ 72.

PO Sur-Sur-Reply 2.

We are not persuaded by Patent Owner's arguments because Skinner 2011 shows IgG levels in Figure 3, while showing serotype-specific opsonophagocytic killing activity in Table 2. Ex. 1110, 4–6. Because claim 46 recites the 2-fold increase in IgG levels, not in opsonophagocytic killing activity, Figure 3 of Skinner 2011 is more relevant to the claim. Moreover, in a Reply Deposition, Dr. Paradiso was asked about results in Figure 3 of Skinner 2011 showing that "the IgG responses for PCV-15 were comparable to or higher than that for PCV-13 for all of the serotypes" and answered "So I agree that in this figure that is true, yes." Ex. 1113, 26:3–8 (referring to Ex. 1110, 4, Fig. 3). We note that Skinner 2011 teaches that "IRMs [(infant rhesus monkeys)] immunized with PCV-15 did not appear to demonstrate serotype interference as the antibody responses to the seven Prevnar® serotypes were not diminished by inclusion of additional polysaccharide

---

[19] Skinner 2011 is a prior art reference that teaches evaluation of a 15-valent pneumococcal $CRM_{197}$ conjugate vaccine in a monkey model. Ex. 1110, 1. Skinner 2011 teaches increasing amounts of serotype specific antibodies after each immunization with the vaccine in monkeys for each of the 15 serotypes in the vaccine. Ex. 1110, 5, Figure 4. Skinner 2011 teaches that there was no serotype interference as the number of serotypes used was increased. Ex. 1110, 6.

conjugates as the vaccine was expanded to include either 13 or 15 types." Ex. 1110, 6. Indeed, Figure 3 of Skinner shows increased levels of IgG for every serotype in PCV-15 relative to all other pneumococcal vaccine compositions. Ex. 1110, Fig. 3.

Patent Owner also addresses deficiencies in Petitioner's reliance on Exhibit 1111, Exhibit 1112, and Exhibit 1114. PO Sur-Sur-Reply 4–5. We do not rely upon these Exhibits to demonstrate a reasonable expectation of success nor does our review of them find any evidence persuasively rebutting a reasonable expectation of success in generating a pneumococcal vaccine with serotype 22F with a 2-fold increase in IgG responses in New Zealand White Rabbits.

We note that "this is not the case where the prior art teaches merely to pursue a "'general approach that seemed to be a promising field of experimentation'" or "'gave only general guidance as to the particular form of the claimed invention or how to achieve it.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007) (*quoting O'Farrell*, 853 F.2d at 903; *Medichem,* 437 F.3d at 1167. Here, Merck 2011 specifically suggested incorporation of a serotype 22F conjugate linked to $CRM_{197}$ into a pneumococcal vaccine that was already composed of other known serotypes, including all of the thirteen serotypes disclosed by Hausdorff. Ex. 1006, 1:9–11; Ex. 2027 ¶ 230.

Thus, we find that a preponderance of the evidence supports a determination that there would have been a reasonable expectation of success in obtaining a fourteen serotype pneumococcal vaccine composition as required by claim 46 with 2-fold increases in IgG responses in New Zealand White Rabbits, because Merck 2011 itself exemplifies 2-fold

increases in IgG responses in New Zealand White Rabbits for serotype 22F conjugates. Moreover, both Paradiso 2009 and Skinner 2011 support the position that inclusion of an additional serotype 22F-$CRM_{197}$ conjugate into the thirteen serotype composition of Hausdorff would not have been expected to result in immune interference. Ex. 1006, 24.

We conclude that claim 46 would have been obvious over Hausdorff, Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan.

*ii. Claim 47*

Petitioner asserts that "PVP 2013 specifies that, for a pneumococcal polysaccharide vaccine, serotype 22F capsular polysaccharide must contain an 'O-acetyl/polysaccharide unit molar ratio' of '0.5 - 1.5'; that specified range overlaps largely with the claimed ratio of 'at least 0.8.'" Pet. Opp. 14, (citing Ex. 1009, 3–4). Petitioner asserts that "[b]ecause immunogenicity of a conjugate depends in large part on immunogenicity of the included polysaccharide, a POSITA would have considered the teachings of PVP 2013 for the composition of claim 47; that composition incorporates many of the same polysaccharides as PVP 2013, including serotype 22F." Pet. Opp. 13 (citing Ex. 1097 ¶ 53). Petitioner asserts that a "POSITA would have understood that O-acetyl groups can contribute to the immunogenicity of pneumococcal polysaccharides." Pet. Opp. 14 (citing Ex. 1097 ¶ 55). Petitioner asserts that a "POSITA as of January 21, 2014 would have been motivated to maintain at least 0.8 mM acetate per mM polysaccharide, *i.e.*,

approximately native levels of acetate in the serotype 22F polysaccharide." Pet. Opp. 13–14 (citing Ex. 1097 ¶ 54, Ex. 1001, 15:67 to 16:2).

Patent Owner does not separately argue that Petitioner failed to meet its burden for dependent claim 47.

Dr. Kasper stated "PVP 2013 specifies that, for a pneumococcal polysaccharide vaccine, serotype 22F capsular polysaccharide must contain an 'O-acetyl/ polysaccharide unit molar ratio' of '0.5 - 1.5'; that entire specified range meets the claimed ratio of 'at least 0.1.'" Ex. 1005 ¶ 132 (citing Ex. 1009, 4). Consistent with Dr. Kasper's statement, PVP 2013 states the "*O*-acetate content (*O*-acetyl/polysaccharide unit molar ratio) shall be within the range of the following specification" where the range for serotype 22F is given as "0.5–1.5." Ex. 1009, 3, 4.

Viewing the evidence as a whole, we determine that a preponderance of the evidence demonstrates that it would have been obvious that use of acetate in the molar ratios suggested by PVP 2013 would have been expected to improve vaccine activity.

*iii. Claims 48 and 49*

Petitioner asserts in "further view of GSK 2008, a POSITA would have been motivated with a reasonable expectation of success to include $CRM_{197}$ conjugates of those 6 additional serotypes - well-known as emerging and clinically relevant pneumococcal serotypes." Pet. Opp. 15 (citing Ex. 1097 ¶¶ 59–60). Petitioner asserts "the fact that Pneumovax® 23 polysaccharide vaccine featured serotypes 15B, 33F, 12F, 10A, 11A and 8 underscores that they were well-known to be prevalent." Pet. Opp. 16 (citing Ex. 1097 ¶¶ 60, 67; Ex. 1054, 4).

Patent Owner asserts:

> Merck fails to show that claims 48 and 49, which require additional conjugates, are not patentable. Merck fails to show any disclosure of serotype 15B in the art, and identifies no motivation for a POSA to conjugate serotypes 15B, 12F, 10A, 11A, and 8 to $CRM_{197}$ or for those conjugates to be immunogenic or achieve the 2-log IgG Increase.

PO Reply 9.

Viewing the evidence as a whole, we determine that a preponderance of the evidence demonstrates that it would have been obvious to incorporate additional known *S. pneumoniae* serotypes into a pneumococcal vaccine. Claims 48 and 49 recite the additional inclusion of serotypes 15B, 33F, 12F, 10A, 11A, and 8, all conjugated to $CRM_{197}$. GSK 2008 specifically suggests inclusion of serotypes 33F, 12F, 10A, 11A, 8, along with serotype 15. *See* Ex. 1007, 8:29–31. Dr. Kasper states that a "POSITA would have understood that there is no individual 'serotype 15' and that 'serotype 15' in GSK 2008 includes all serotypes within serogroup 15, including serotype 15B as claimed." Ex. 1097 ¶ 60. Patent Owner provides no evidence that the ordinary artisan would not have understood the term "serotype 15" to include serotype 15B. We also note that the 1990 Physicians' Desk Reference disclosed that Pneumovax 23 contained serotype 15B, establishing that the prior art recognized this serotype as desirable in a pneumococcal vaccine. Ex. 1054, 4.

We conclude that claims 48 and 49 would have been obvious over Hausdorff, Merck 2011, Pfizer 2012, GSK 2008, and the knowledge of the ordinary artisan.

## IV. PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner moves to exclude the following Exhibits, or portions thereof: Exhibit 1005 ¶ 22, Exhibit 1090, Exhibit 1094, Exhibit 1095, Exhibit 1101, Exhibit 1103, Exhibit 1110, Exhibit 1111, Exhibit 1112, and Exhibit 1114. Paper 50 ("Patent Owner Mot. to Exclude").

As to Exhibit 1005 ¶ 22, 1090, 1094, 1095, 1101, 1103, 1111, 1112, and 1114, we do not rely on any of that evidence in making our ultimate determination on the patentability of the challenged claims. Accordingly, we need not decide Patent Owner's motion as to those exhibits and paragraphs, and we dismiss that portion of Patent Owner's motion as moot.

Patent Owner asserts that we should exclude Exhibit 1110 because Petitioner "is offering Exhibit 1110 to prove the truth of the matter asserted in the document, the exhibit is hearsay under Fed. R. Evid. 801. Since Exhibit 1110 does not fall within an exception to the rule against hearsay, Exhibit 1110 should be excluded under Fed. R. Evid. 802." Paper 50, 9.

Patent Owner also asserts that "Exhibit 1110 should be excluded as legally irrelevant under Fed. R. Evid. 401 and 402." Paper 50, 9. Patent Owner asserts Petitioner "also fails to identify how information on testing in infant rhesus monkeys is relevant to addressing deficiencies in its burden to prove unpatentability of the substitute claims." Paper 50, 10.

Petitioner asserts that "Exs.1110–1112 are admissible scientific papers published in the timeframe between Merck 2011's (Ex.1006) priority date (February 9, 2010) and January 21, 2014, and represent the state of the art during that period." Paper 53, 10. Petitioner asserts that these papers "directly contradict Patent Owner's contention with respect to its Motion to Amend: that a POSITA would have interpreted the data of Merck 2011 as

demonstrating immune interference for Merck's PCV-15 (pneumococcal $CRM_{197}$ conjugate vaccine)." Paper 53, 10.

Petitioner asserts that "Skinner 2011 [(Ex. 1110)][is] . . . not being relied upon for the truth of the matters asserted therein," but rather that "Skinner 2011 [is] . . . cited for what [it] . . . indisputably disclosed to a POSITA as of January 21, 2014." Paper 53, 13. Petitioner also asserts regarding the relevance of Exhibit 1110 that "Patent Owner's argument is a red herring. The entire premise of the Motion to Amend is that '[t]he response to the vaccine in claim 46 suggests efficacy levels comparable to the original Prevnar® for which efficacy [*i.e.*, in humans] was demonstrated.' Ex.2045, ¶59." Paper 53, 12.

With few exceptions, the Federal Rules of Evidence apply to *inter partes* proceedings. 37 C.F.R. § 42.62. The moving party has the burden of proof to establish that it is entitled to the requested relief. 37 C.F.R. §§ 42.20(c), 42.62(a).

As to hearsay, Exhibit 1110 is a scientific journal article submitted as rebuttal evidence regarding the knowledge of an ordinary artisan regarding immune interference. *See* Paper 53, 10. Exhibit 1110 was offered simply as evidence of what it described, not for proving the truth of the matters addressed in the document, and, thus, is not hearsay. *EMC Corp. v. Personal Web Techns., LLC*, Case IPR2013-00085, slip op. at 66 (PTAB May 15, 2014) (Paper 73); *see also* Fed. R. Evid. § 801(c) (1997 Adv. Comm. Note) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

As to relevance, evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* Fed. R. Evid. § 401. The Federal Circuit recognizes that there is a "low threshold for relevancy." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1407 (Fed. Cir. 1997). The issue of immune interference is relevant to the issue of reasonable expectation of success for Hausdorff, Merck 2011, Pfizer 2012 and GSK 2008 in rendering obvious the compositions claimed in Patent Owner's Motion to Amend. *See, e.g.*, PO Reply 2, Pet. Opp. 9. Exhibit 1110 provides an exemplary model system where immune interference did not occur based on the inclusion of additional *S. pneumoniae* serotype glycoconjugates. Ex. 1110, 6. We determine that Exhibit 1110 is relevant and are not persuaded by Patent Owner's argument, which goes to the weight of the evidence rather than its admissibility.

We deny Patent Owner's request to exclude Exhibit 1110.

## V. CONCLUSION

We conclude that Petitioner has shown by a preponderance of the evidence that (1) claims 1, 5–10, 16–19, 39, 41, 42, 45 of the '559 patent are unpatentable over the combination of Merck 2011 and Pfizer 2012; (2) claims 2, 40, and 43 of the '559 patent are unpatentable over the combination of Merck 2011, Pfizer 2012, and PVP 2013; (3) that claims 3, 4, 39, and 45 of the '559 patent are unpatentable over the combination of Merck 2011, Pfizer 2012, and GSK 2008; and (4) that claims 38 and 44 are unpatentable over the combination of Merck 2011, Pfizer 2012, and Hsieh 2000.

We deny Patent Owner's Contingent Motion to Amend to replace claims 1–4, 9, 41, and 42 with substitute claims 46–52, as those claims are unpatentable over the cited art.

We dismiss Patent Owner's Motion to exclude Exhibits 1005 ¶ 22, 1090, 1094, 1095, 1101, 1103, 1111, 1112, and 1114 as moot.

We deny Patent Owner's Motion to exclude Exhibit 1110.

## VI. ORDER

For the reasons given, it is

ORDERED, based on a preponderance of the evidence, that claims 1–10, 16–19, and 38–45 are unpatentable;

FURTHER ORDERED, Patent Owner's Motion to Amend is denied as to replacing claims 1–4, 9, 41, and 42 with substitute claims 46–52;

FURTHER ORDERED, Patent Owner's Motion to Exclude Exhibits 1005 ¶ 22, 1090, 1094, 1095, 1101, 1103, 1111, 1112, and 1114 is dismissed as moot;

FURTHER ORDERED, Patent Owner's Motion to Exclude Exhibit 1110 is denied;

FURTHER ORDERED, because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Arlene L. Chow
Ernest Yakob
HOGAN LOVELLS US LLP
arlene.chow@hoganlovells.com
ernest.yakob@hoganlovells.com

Anthony M. Isogna
Nikolaos C. George
JONES DAY
aminsogna@jonesday.com
ncgeorge@jonesday.com

PATENT OWNER:

John Scheibeler
Dimitrios T. Drivas
Anita Varma
Brendan Gavin
Eric A. Krause
WHITE & CASE LLP
jscheibeler@whitecase.com
ddrivas@whitecase.com
anita.varma@whitecase.com
brendan.gavin@whitecase.com
eric.krause@whitecase.com

Trials@uspto.gov
571-272.-822

Paper 43
Entered: March 13, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MERCK SHARP & DOHME CORP.,
Petitioner,

v.

PFIZER INC.,
Patent Owner.

---

Case IPR2017-02136
Patent 9,492,559 B2

---

Before TONI R. SCHEINER, JEFFREY N. FREDMAN, and JACQUELINE T. HARLOW, *Administrative Patent Judges.*

FREDMAN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION AND RELATED ORDERS

Finding claims 11–15 and 20–37 Unpatentable
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Dismissing Patent Owner's Motion to Exclude Evidence
*37 C.F.R. § 42.64*

# I. INTRODUCTION

## *A. Background*

Merck Sharp & Dohme Corp. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 11–15 and 20–37 of U.S. Patent No. 9,492,559 B2 (Ex. 1001, "the '559 patent"). Paper 1 ("Pet."). Pfizer Inc. ("Patent Owner") filed a Patent Owner Preliminary Response. Paper 6 ("Prelim. Resp.").

On March 22, 2018, we instituted an *inter partes* review of all challenged claims. Paper 7 ("Dec. Inst."). Patent Owner filed a Patent Owner Response to the Petition (Paper 19) ("PO Response"). Petitioner filed a Reply to the Patent Owner Response. Paper 26 ("Pet. Reply"). Patent Owner filed a Sur-Reply. Paper 33 ("PO Sur-Reply"). Patent Owner filed a Motion to Exclude Evidence. Paper 35. Petitioner filed an Opposition to Motion to Exclude Evidence. Paper 38. Patent Owner filed a Reply in Support of the Motion to Exclude. Paper 39.

On November 13, 2018, the parties presented arguments at an oral hearing. The hearing transcript has been entered in the record. Paper 42 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Having considered the record before us, we determine that Petitioner has shown by a preponderance of the evidence that claims 11–15 and 20–37 of the '559 patent are unpatentable. See 35 U.S.C. § 316(e). Additionally, the Motion to Exclude Evidence by Patent Owner has been addressed below in Section III.

*B. Related Proceedings*

We have instituted three additional *inter partes* reviews of claims of the ’559 patent in IPR2017-02132, IPR2017-02136, and IPR2017-02138. We also note that IPR2017-00378, IPR2017-00380, and IPR2017-00390 were instituted with respect to U.S. Patent No. 8,562,999, and that several PGR and IPR petitions were also filed with respect to U.S. Patent Nos. 9,399,060 B2 and 8,895,024 B2, which all relate to immunogenic vaccine compositions. Pet. 5.

*C. The ’559 Patent (Ex. 1001)*

The ’559 patent involves vaccines for “vaccination of human subjects, in particular infants and elderly, against pneumoccocal infections . . . .” Ex. 1001, 1:21–22. “Pneumonia, febrile bacteraemia and meningitis are the most common manifestations of invasive pneumococcal disease, whereas bacterial spread within the respiratory tract may result in middle-ear infection, sinusitis or recurrent bronchitis.” *Id.* at 1:28–32. “Pneumonia is by far the most common cause of pneumococcal death worldwide.” *Id.* at 1:46–48.

The ’559 patent teaches the “etiological agent of pneumococcal diseases, *Streptococcus pneumoniae* (pneumococcus), is a Gram-positive encapsulated coccus,[1] surrounded by a polysaccharide capsule.[2]

---

[1] A “coccus” is defined as “a spherical bacterium.” *See* https://www.merriam-webster.com/dictionary/coccus.

[2] “Pneumococcus is encapsulated with a chemically linked polysaccharide which confers serotype specificity. There are 90 known serotypes of pneumococci, and the capsule is the principle virulence determinant for pneumococci, as the capsule not only protects the inner surface of the bacteria from complement, but is itself poorly immunogenic.” Ex. 1007, 2:10–14.

Differences in the composition of this capsule permit serological differentiation between about 91 capsular types." *Id.* at 1:49–53. "Pneumococcal conjugate vaccines (PCVs) are pneumococcal vaccines used to protect against disease caused by *S. pneumoniae* (pneumococcus)." *Id.* at 1:59–61. "There are currently three PCV vaccines[3] available on the global market: PREVNAR® (called PREVENAR® in some countries) (heptavalent vaccine), SYNFLORIX® (a decavalent vaccine) and PREVNAR 13® (tridecavalent vaccine)." *Id*. at 1:61–65.

The '559 patent teaches "there is a need to address remaining unmet medical need for coverage of pneumococcal disease due to serotypes not found in PREVNAR 13® and potential for serotype replacement over time." *Id*. at 2:3–6.

*D. Illustrative Claims*

All of the challenged claims 11–15 and 20–37 depend either directly or indirectly from independent claim 1 of the '559 patent.[4] Claims 1, 11, and 31 are illustrative of the challenged claims and recite:

> 1. An immunogenic composition comprising a *Streptococcus pneumoniae* serotype 22F glycoconjugate, wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumo*niae serotype 22F and a carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.

---

[3] The valency of a vaccine refers to the number of different serotypes of bacteria to which the vaccine induces immune response (e.g., a tridecavalent vaccine protects against thirteen different bacterial strains).

[4] Claims 1–10, 16–19, and 38–45 were not challenged in this proceeding, but were challenged in the related proceedings in IPR 2017-02131 and 2017-02132.

11. The immunogenic composition of claim 1, wherein said immunogenic composition further comprises a buffer, a salt, a divalent cation, a non-ionic detergent, a cryoprotectant, an anti-oxidant, or a combination thereof.

31. A method of preventing an infection caused by *S. pneumoniae* in a subject comprising administering to the subject an effective amount of the immunogenic composition of claim 1.

Ex. 1001, 141:27–33, 142:26–29, 143:27–30.

### *E. The Instituted Grounds of Unpatentability*

We instituted trial based on each challenge to the patentability of the ’559 patent presented in the Petition (Pet. 6–7):

| Reference | Basis | Claims Challenged |
|---|---|---|
| Merck 2011,[5] GSK 2008[6] | § 103(a) | 11–14, 23–33, 35–37 |
| Merck 2011, GSK 2008, ’787 Patent[7] | § 103(a) | 15 |
| Merck 2011, GSK 2008, Obaro 2002[8] | § 103(a) | 20, 21 |
| Merck 2011, GSK 2008, Sigurdardottir 2008[9] | § 103(a) | 22 |

[5] Caulfield et al., WO 2011/100151 A1, published Aug. 18, 2011 (“Merck 2011,” Ex. 1006).
[6] Biemans et al., WO 2009/000825 A2, published Dec. 31, 2008 (“GSK 2008,” Ex. 1007).
[7] Khandke et al., US 7,935,787 B2, issued May 3, 2011 (“’787 Patent,” Ex. 1010).
[8] Obaro et al., *Safety and immunogenicity of pneumococcal conjugate vaccine in combination with diphtheria, tetanus toxoid, pertussis and Haemophilus influenzae type b conjugate vaccine*, 21 PEDIATRIC INFECTIOUS DISEASE J. 940–6 (2002) (“Obaro 2002,” Ex. 1040).
[9] Sigurdardottir et al., *Safety and immunogenicity of CRM197-conjugated pneumococcal–meningococcal C combination vaccine (9vPnC–MnCC)*

| | | |
|---|---|---|
| Merck 2011, GSK 2008, MMWR 2012[10] | § 103(a) | 34 |

Petitioner relies on the Declaration of Dennis L. Kasper, M.D. Ex. 1087. Patent Owner relies on the Declaration of Dr. Geert-Jan Boons, Ph.D. Ex. 2042.

## II. ANALYSIS

### *A. Claim Interpretation*

In an *inter partes* review filed before November 13, 2018, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear.[11] 37 C.F.R. § 42.100(b) (2017). Under the broadest reasonable interpretation approach, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Only terms that are in controversy need to be construed and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

---

*whether given in two or three primary doses*, 26 VACCINE 4178–86 (2008) ("Sigurdardottir 2008," Ex. 1011).

[10] Bennett et al., *Use of 13-Valent Pneumococcal Conjugate Vaccine and 23-Valent Pneumococcal Polysaccharide Vaccine for Adults with Immunocompromising Conditions: Recommendations of the Advisory Committee on Immunization Practices (ACIP)*, 61 MMWR 816–9 (2012) ("MMWR 2012," Ex. 1012).

[11] A recent amendment to this rule does not apply here because the Petition was filed before November 13, 2018. See Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018).

We determine that the following claim term need to be discussed.

1. *"immunogenic"*

Independent claim 1, as well as many of the dependent claims, recites the term "immunogenic" as a modifier of the term "composition." In the Decision on Institution, we construed "immunogenic" to require a composition that "elicits functional antibody." Inst. Dec. 7. We also determined that because claim 1 did not specifically require any additional glycoconjugates besides 22F, the "immunogenic" composition only needed to elicit antibodies against the serotype 22F glycoconjugate recited in claim 1. *Id*.

In its Patent Owner Response, Patent Owner contends "the context within the claim requires that the *composition* is immunogenic, not merely serotype 22F glycoconjugate in isolation." PO Resp. 14. Patent Owner proposes that "immunogenic" be interpreted as "elicits functional antibody against each serotype in the claimed composition." *Id*. Patent Owner asserts that "[w]hen viewed in the full context of the claims and specification, [Petitioner's] . . . proposed construction yields the illogical result of a pneumococcal conjugate vaccine wherein one conjugate (serotype 22F) elicits functional antibody, but other conjugates . . . need not." *Id.* at 15.

Petitioner agrees with our Decision on Institution that a "POSITA would have understood that the 'immunogenic' limitation of independent claim 1 applies to just the serotype 22F conjugate of claim 1." Pet. Reply 23. Petitioner contends:

> no claim of the '559 Patent recites structural characteristics (*e.g.*, molecular weight and/or polysaccharide to protein ratio) for any conjugate other than the serotype 22F conjugate of claim 1. Ex.1107, ¶12. And there is no disclosure in the '559

> Patent specification of molecular weights or polysaccharide to protein ratios for any of the 13 conjugates recited in dependent claims 5–8.

*Id.* at 24.

In performing claim interpretation, we first turn to the language of the claims themselves. While claim 1 recites an immunogenic composition composed solely of the "*Streptococcus pneumoniae* serotype 22F glycoconjugate," claims 3–9 recite the inclusion of glycoconjugates from other *Streptococcus pneumoniae* serotypes and claims 21 and 22 recite inclusion of antigens from other pathogenic bacteria or viruses. While claim 1 does not require the presence of other immunogenic components, claims 3–9, 21, and 22 expressly recite the presence of other immunogenic components. In making a vaccine, there would have been no reason to include these additional antigens other than to induce a protective antibody response for vaccination against the included antigens. Therefore, these dependent claims reasonably support Patent Owner's interpretation that an "immunogenic" composition requires eliciting antibodies against each of the serotypes or other immunogens within the "immunogenic" composition.

Next we turn to the Specification of the '559 patent. When the '559 patent uses the term "immunogenic," the '559 patent identifies "a need for immunogenic compositions that can be used to induce an immune response against additional *Streptococcus pneumoniae* serotypes." Ex. 1001, 2:10–13. The '559 patent states that multiple serotypes ranging from 7 to 25 may be included in the "immunogenic composition." Ex. 1001, 3:4–6. The '559 patent teaches the "pneumococcal opsonophagocytic assay (OPA), which measures killing of *S. pneumoniae* cells by phagocytic effector cells in the presence of functional antibody and complement, is considered to be

an important surrogate for evaluating the effectiveness of pneumococcal vaccines." Ex. 1001, 88:52–56. The '559 patent supports an interpretation of "immunogenic" which requires elicitation of functional antibody for each component in the composition, consistent with the interpretation of Patent Owner.

During prosecution of the '559 patent, the Examiner cited art that disclosed both the 22F conjugate and other conjugates to address the claimed compositions for dependent claims. *See* Ex. 1002, 419–20. The Examiner allowed the claims after amendment to include the ranges for molecular weight and ratio of polysaccharide to carrier protein. *See* Ex. 1002, 451, 467. The Examiner did not address the claim construction issue.

Petitioner's Declarant, Dr. Boons, interprets claim 1 to require that serotype "22F should elicit functional antibodies. But also if other antigens are being included, those should also elicit a functional antibody response." Ex. 1109, 36:7–10. In contrast, Patent Owner's Declarant, Dr. Kasper was asked if

> a composition containing a 22F glycoconjugate, 12F glycoconjugate, 10A glycoconjugate, 11A glycoconjugate, and a serotype 8 glycoconjugate and that composition showed functional antibody with respect to the 22F glycoconjugate but not with respect to the other conjugates . . . , is it your view that Claim 4 would be met?

Ex. 2013, 16:6–14. Dr. Kasper answered, "I think that interpretation is consistent with Claim 4." *Id.* at 16:16–17.

Accordingly, upon review of the parties' arguments and the evidence before us, including the claims, specification, and prosecution history of the '559 patent, we conclude that the term "immunogenic," as it is used in that patent, is reasonably construed as requiring that functional antibody be

elicited against each immunogen contained in the composition. Consequently, for claim 1 of the ’559 patent, which recites a single immunogen, serotype 22F, only functional antibodies to serotype 22F are required to meet the claim limitation. However, for claim 3 of the ’559 patent that requires serotypes 22F, 15B, and 33F, functional antibodies against all three serotypes are required. Similarly for other claims, the term “immunogenic” requires functional antibodies be elicited against any immunogens specifically recited and required.

### *B. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art;[12] and, (4) where in evidence,

---

[12] Petitioner states that the level of skill in the art at the time of the invention

> would have been an individual or team with Ph.D. degrees in the biological and chemical sciences and at least 3 years of work experience, or an M.D. degree and at least 6 years of work experience, developing conjugate vaccines, including specifically growing sufficient quantities of bacteria, extracting, purifying and analyzing bacterial polysaccharides, conjugating polysaccharides to a carrier protein (and analyzing the conjugates), and performing immunologic testing.

objective indicia of nonobviousness.[13] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In that regard, an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418. In *KSR*, the Supreme Court also stated that an invention may be found obvious if trying a course of conduct would have been obvious to a person having ordinary skill:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under §103.

*KSR*, 550 U.S. at 421. "*KSR* affirmed the logical inverse of this statement by stating that § 103 bars patentability unless 'the improvement is more than the predictable use of prior art elements according to their established functions.'" *In re Kubin*, 561 F.3d 1351, 1359–60 (Fed. Cir. 2009) (citing *KSR*, 550 U.S. at 417).

---

Pet. 29 (citing Ex. 1087 ¶ 62). Patent Owner "does not dispute . . . the level of skill in the art proposed by Merck." PO Resp. 5. We agree with both parties regarding the level of ordinary skill in the art. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). We also note that the applied prior art reflects the appropriate level of skill at the time of the claimed invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

[13] Neither Petitioner nor Patent Owner presents evidence on the fourth Graham factor.

Petitioner bears the burden of proving unpatentability of the challenged claims, and that burden never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must establish the facts supporting its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

We analyze the asserted grounds of unpatentability in accordance with the above-stated principles.

### C. *Obviousness over Merck 2011 and GSK 2008*

Petitioner contends that claims 11–14, 23–33, and 35–37 are unpatentable under 35 U.S.C. § 103(a) as obvious over Merck 2011, GSK 2008, and the general knowledge of an ordinary artisan. Pet. 34. The thrust of Patent Owner's position with respect to all the claims challenged on this ground is that the cited prior art does not teach or suggest compositions with 22F glycoconjugates that are immunogenic, within the claimed molecular weight ranges, and within the claimed polysaccharide to carrier protein conjugate ratios. PO Resp. 1–2, 16–57. Based on our review of the arguments and the evidence of record, we determine that Petitioner demonstrates, by a preponderance of the evidence, that the subject matter of claims 11–14, 23–33, and 35–37 would have been obvious over Merck 2011, GSK 2008, and the general knowledge of an ordinary artisan. After providing a discussion of the prior art and Petitioner's position, we will address Patent Owner's arguments.

#### 1. *Merck 2011 (Ex. 1006)*

Merck 2011 teaches a pneumococcal conjugate vaccine (PCV) comprising "a multivalent immunogenic composition having 15 distinct

polysaccharide-protein conjugates. Each conjugate consists of a capsular polysaccharide prepared from a different serotype of *Streptococcus pneumoniae* (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F or 33F) conjugated to a carrier protein, preferably $CRM_{197}$." Ex. 1006, 1:7–11. Merck 2011 teaches "conjugates containing serotypes 22F and 33F provide[] robust antibody responses demonstrat[ing] the feasibility of expanding coverage of pneumococcal serotypes . . . ." Ex. 1006, 4:2–3. Merck 2011 teaches the 15-valent pneumococcal conjugate vaccine (PCV-15) "induced high OPA[14] GMTs to each serotype and a 100% OPA response rate for all 15 serotypes contained in the vaccine." Ex. 1006, 23:3–4.

Merck 2011 teaches "purified polysaccharides are chemically activated to make the saccharides capable of reacting with the carrier protein. . . . Coupling to the protein carrier (e.g., $CRM_{197}$) can be by reductive amination via direct amination to the lysyl groups of the protein." Ex. 1006, 6:11–23. Merck 2011 teaches the "concentrated saccharide was mixed with $CRM_{197}$ carrier protein in a 0.2 – 2 to 1 charge ratio. The blended saccharide-$CRM_{197}$ mixture was filtered through a 0.2 µm filter." Ex. 1006, 17:24–25. Table 1 of Merck 2011 shows a vaccine formulation comprising 32 µg of total polysaccharide and 32 µg of $CRM_{197}$ carrier protein with the total polysaccharide being composed of 2 µg of 14 serotypes including 22F and 4 µg of serotype 6B. Ex. 1006, 19:5–9.

2. *GSK 2008*

GSK 2008 teaches a *Streptococcus pneumoniae* vaccine comprising "capsular saccharide antigens (preferably conjugated), wherein the

---

[14] Opsonophagocytosis.

saccharides are derived from at least ten serotypes of *S. pneumoniae*" that may include an "*S. pneumoniae* saccharide conjugate of 22F." Ex. 1007, 8:5–19. GSK 2008 teaches "*Streptococcus pneumoniae* capsular saccharides . . . may be conjugated to a carrier protein independently selected from the group consisting of . . . CRM197. . . ." Ex. 1007, 10:12–14. GSK 2008 teaches "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" and specifically, conjugates "can also be prepared by direct reductive amination methods. . . ." Ex. 1007, 17:1–28. GSK 2008 teaches "22F-PhtD administered within the 13-valent conjugate vaccine formulation [was] . . . shown immunogenic and induced opsono-phagocytic titers in young OF1 mice." Ex. 1007, 77:21–22.

GSK 2008 teaches: "Preferably the ratio of carrier protein to *S. pneumoniae* saccharide is between 1:5 and 5:1; e.g. between 1:0.5–4:1, 1:1–3.5:1, 1.2:1–3:1, 1.5:1–2.5:1; e.g. between 1:2 and 2.5:1; 1:1 and 2:1 (w/w)." Ex. 1007, 20:24–26. Table 2 of GSK 2008 teaches fourteen different conjugates—the smallest conjugate size was PS4-PD of 1303 kDa and the largest conjugate size was PS9V-PD of 9572 kDa. Ex. 1007, 54–55, Table 2. GSK 2008 discloses a conjugate of serotype 22F, with a carrier/PS ratio of 2.17, but does not determine the conjugate size. Ex. 1007, 55, Table 2.

GSK 2008 claims a conjugate where "the average size (e.g. $M_w$) of the 22F saccharide is between 50 and 800 kDa. . . ." Ex. 1007, 93 (claim 56). GSK 2008 further teaches in claim 61 an "immunogenic composition of any preceding claim wherein the average size (e.g. $M_w$) of the saccharides is above 50 kDa, e.g[.], 50–1600. . . ." Ex. 1007, 94 (claim 61).

GSK 2008 teaches "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 14:18–21. GSK 2008 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 recommends optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter . . . ." Ex. 1007, 14:34.

3. *Analysis*

Petitioner asserts "Merck 2011 and GSK 2011 disclose immunogenic compositions that include a conjugate of pneumococcal serotype 22F" and that "Merck 2011 demonstrates immunogenicity against serotype 22F by the generation of functional antibody against that serotype." Pet. 36 (citing Ex. 1087 ¶ 108; Ex. 1006 23:2–4). Petitioner asserts: "Based on the GSK 2008 disclosure of pneumococcal conjugates between 1,303-9,572 kDa, a POSITA would have been motivated with a reasonable expectation of success to construct the serotype 22F conjugate of Merck 2011/GSK 2008 in that approximate molecular weight range." Pet. 37 (citing Ex. 1087 ¶ 111). Petitioner also asserts "Merck 2011 and GSK 2008 both disclose the claimed range of conjugate polysaccharide to protein ratios (0.4 to 2), and reflect a POSITA's general understanding that conjugate polysaccharide to protein ratios in the claimed range are typical for immunogenic conjugates." Pet. 43 (citing Ex. 1087 ¶ 119).

Petitioner's Declarant, Dr. Kasper, states that a "POSITA would have considered the disclosure of pre-conjugation polysaccharide to $CRM_{197}$ ratios in the range of 0.2 to 2 indicative of a final conjugate ratio in that range." Ex. 1087 ¶ 120 (citing Ex. 1006, 17:24–25). Dr. Kasper notes "the pre-conjugation ratios of Merck 2011 resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1 (~32 μg of polysaccharide and ~32 μg of protein), squarely in the claimed range." Ex. 1087 ¶ 120 (citing Ex. 1006, 19:3–8). Dr. Kasper also notes "a POSITA's general understanding that conjugate polysaccharide to protein ratios in the claimed range (0.4 to 2) are typical for immunogenic conjugates" and cites a monograph disclosing ratios of saccharide to protein in a pneumococcal $CRM_{197}$ conjugate vaccine with seven serotypes, concluding that each "disclosed ratio overlaps to a large extent with the claimed ratio of 0.4 to 2, consistent with the general understanding in the art as of January 21, 2014 that such ratios are typical for immunogenic conjugates." Ex. 1087 ¶¶ 123–124 (citing Ex. 1085, 20–24).

Dr. Kasper states "GSK 2008 discloses that '[p]referably the ratio of carrier protein to *S. pneumoniae* saccharide is . . . between 1:2 and 2.5:1 . . . (w/w),' which translates to a polysaccharide to protein ratio of 1:2.5 to 2:1, *i.e.*, the claimed polysaccharide to protein ratio of 0.4 to 2." Ex. 1087 ¶ 121, (citing Ex. 1007, 20:24–26). Dr. Kasper also states "Table 2 of GSK 2008 discloses an immunogenic serotype 22F conjugate (PS22F-PhtD) with a protein to polysaccharide ratio of 2.17, which translates to a polysaccharide to protein ratio of 1/2.17 or 0.46 - squarely within the claimed range." Ex. 1087 ¶ 121 (citing Ex. 1007, 54:27 to 55:1). Dr. Kasper also relies upon a monograph that "specifies the acceptable range of 'Saccharide

content/protein ratio' (which a POSITA would have understood to be a w/w ratio)" and that "[e]ach disclosed ratio overlaps to a large extent with the claimed ratio of 0.4 to 2. . . ." Ex. 1087 ¶¶ 123–124 (citing Ex. 1085, 20–24).

Dr. Kasper states "the conjugate molecular weights that were determined (for every conjugate of the underlying 10-valent composition) ranged from 1,303-9,572 kDa, squarely within the claimed molecular weight range." Ex. 1087 ¶ 111. Dr. Kasper states "GSK 2008 discloses that the serotype 22F polysaccharide in its immunogenic conjugates can be, e.g., 'between 50 and 800 kDa.'" Ex. 1087 ¶ 112 (citing Ex. 1007, 93).

Dr. Kasper states the ordinary artisan would "have been motivated to stay roughly within the upper limit of molecular weights disclosed in GSK 2008, because 'excessive modifications to the PS or protein molecules can have an adverse impact on immunogenicity.'" Ex. 1087 ¶ 113 (citing Ex. 1035, 8). Dr. Kasper also notes that "both Merck 2011 and GSK 2008 disclose a sterile filtration step through a 0.2 μm filter, which sets an upper limit on conjugate molecular weight." Ex. 1087 ¶ 113 (citing Ex. 1006 16:30–31, Ex. 1007 14:13–15).

Dr. Kasper states a "POSITA's motivation and reasonable expectation of success would have been further supported by the fact that Patent Owner disclosed in a scientific meeting in 2012 that the 'Typical Mass (kDa)' for a glycoconjugate is '500-5000,' largely overlapping with the range recited in GSK 2008 (and claim 1)." Ex. 1087 ¶ 114 (citing Ex. 1008, 6). Dr. Kasper states "Patent Owner even disclosed in a scientific meeting in 2007 that its own pneumococcal conjugates can be as large as ~7,000 to ~12,000 kDa,

again overlapping with the range of GSK 2008 (and completely within the claimed range)." Ex. 1087 ¶ 114 (citing Ex. 1027, 21). Dr. Kasper states:

> Because the structure of serotype 22F capsular polysaccharide had been known to the art since 1989 (Ex. 1029), a POSITA would have required only routine experimentation to obtain a conjugate molecular weight within the desirable range disclosed in GSK 2008, e.g., by increasing or decreasing the amount of cross-linking in the conjugate.

Ex. 1087 ¶ 115 (citing Ex. 1030, 4:56–59).

Having reviewed the cited evidence, and the record as a whole, we find that Petitioner has accurately described the above stated teachings of Merck 2011 and GSK 2008. We adopt these stated facts as our own. *See* Pet. 34–55. We focus our remaining analysis on Patent Owner's arguments that the cited combination fails to teach or suggest an immunogenic composition including: (1) a serotype 22F glycoconjugate having a molecular weight of between 1000 kDa and 12,500 kDa; and (2) a polysaccharide to carrier protein ratio (w/w) of between 0.4 and 2.

*a. "wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa"*

Patent Owner asserts:

> Claim 1 and each of the challenged claims that depend therefrom require that the recited serotype 22F glycoconjugate "has a molecular weight of between 1,000 kDa and 12,500 kDa." EX1001 at claim 1, 11-14, 23-33, 35-37. Merck 2011, GSK 2008, and the general knowledge do not alone or in combination teach or suggest this limitation.

PO Resp. 16.

*i. Optimization*

Patent Owner asserts a "POSA would have understood that a number of variables can affect polysaccharide activation, conjugation, and the final molecular weight of a glycoconjugate" and "[d]ue to these variables, a POSA 'couldn't predict what the outcome would be' with regard to the molecular weight of an uncharacterized serotype 7F glycoconjugate." PO Resp. 17–18 (citing Ex. 2042 ¶ 54).

Patent Owner further asserts that "[d]etermining the appropriate molecular weight for a specific serotype glycoconjugate was not a matter of 'routine optimization' of existing reductive amination procedures as of January 21, 2014." PO Resp. 18 (citing Ex. 2042 ¶ 55). Patent Owner asserts "each serotype glycoconjugate was designed using different protocols, and resulted in serotype glycoconjugates having different properties, thereby demonstrating that each serotype glycoconjugate needed to be evaluated on a case-by-case basis." PO Resp. 19 (citing Ex. 1007, Table 2).

Patent Owner asserts "[t]here is no overlap between the molecular weights in GSK 2008 and the '559 claims." PO Resp. 21. Patent Owner asserts:

> The serotype 22F glycoconjugates of GSK 2008 were treated in an alkaline pH of 9.0 (EX1007 at 51:5-8; 52:18-22), and as a result the molecular weight of the serotype 22F polysaccharide in the final glycoconjugates would be expected to be levels lower than the pre-conjugation weight of 22F (159-167 kDa).

PO Resp. 21–22. Patent Owner asserts "[t]he polysaccharide size in a final glycoconjugate of GSK 2008 would be unpredictable and as a result, and GSK 2008 cannot render the '559 claims obvious." PO Resp. 22.

Patent Owner asserts that a "POSA would not have determined the molecular weight of serotype 22F glycoconjugates based on GSK 2008 Table 2" because the "table does not provide the molecular weight for the two serotype 22F glycoconjugates" and the "serotype 22F glycoconjugates also differ from the other listed glycoconjugates in that they were associated with dramatically lower antigenicity, and with some of the highest protein to polysaccharide ratios as compared to all of the other serotype glycoconjugates." PO Resp. 25.

Patent Owner reiterates these arguments in the Patent Owner's Reply and also asserts "Merck's asserted 'desirable range' is fabricated from the lower and upper molecular weight limits for two non-serotype 22F glycoconjugates (*i.e.*, PS4-PD and PS9V-PD) referenced in Table 2 of GSK-2008." PO Sur-Reply 6.

We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence (*see* Pet. Reply 3–16).

Merck 2011 teaches that "[c]apsular polysaccharides from *Streptococcus pneumoniae* can be prepared by standard techniques known to those skilled in the art. For example, polysaccharides can be isolated from bacteria and may be sized to some degree by known methods (see, e.g., European Patent Nos. EP497524 and EP497525) and preferably by microfluidisation." Ex. 1006, 4:12–15. Merck 2011 teaches "[p]olysaccharides can be sized in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products. In the present invention, capsular polysaccharides are prepared from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, **<u>22F</u>**, 23F and

33F of *S. pneumoniae*." Ex. 1006, 4:15–18 (emphasis added). Merck 2011 teaches that:

> The different serotype saccharides are individually conjugated to the purified $CRM_{197}$ carrier protein using a common process flow. In this process the saccharide is dissolved, sized to a target molecular mass, chemically activated and buffer-exchanged by ultrafiltration. The purified $CRM_{197}$ is then conjugated with the activated saccharide and the resulting conjugate is purified by ultrafiltration prior to a final 0.2 µm membrane filtration.

Ex. 1006, 16:27–31.

Thus, Merck 2011 disclosed methods to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide, and taught to couple to known carrier proteins such as $CRM_{197}$, while limiting the upper size range using membrane filtration. Ex. 1006, 4:12–18, 16:27–31. Thus, rather than fabricating desired sizes, Merck 2011 specifically provides methods to constrain polysaccharide sizes within a particular size range. Ex. 1006, 16:27–31.

Table 2 in GSK 2008 shows a range of conjugate sizes where the lowest reported value is 1303 kDa and the highest reported value is 9572 kDa, both values falling within the range of 1000 kDa to 12,500 kDa required by claim 1. Ex. 1007, 54–55. GSK 2008 prefers that "saccharide conjugates of the invention should have an average size of saccharide pre-conjugation of 50-1600" kDa but notes that the "present inventors have found that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 teaches that "[f]ull length polysaccharides may be 'sized' i.e. their size may be reduced by various methods such as acid

hydrolysis treatment, hydrogen peroxide treatment, sizing by emulsiflex® followed by a hydrogen peroxide treatment to generate oligosaccharide fragments or microfluidization." Ex. 1007, 14:6–10.

GSK 2008 teaches the "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" including "direct reductive amination methods as described in US 4365170 (Jennings) and US 4673574 (Anderson). Other methods are described in EP-0-161-188, EP-208375 and EP-0-477508." Ex. 1007, 17:28–30. GSK 2008 is replete with suggestions to conjugate pneumococcal polysaccharides of various serotypes to $CRM_{197}$. *See, e.g.*, Ex. 1007, 13.

GSK 2008 also provides more specific reasons to optimize the saccharide conjugates for larger sizes by teaching "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 14:18–21. GSK 2008 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 recognizes optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter." Ex. 1007, 14:34.

Thus, GSK 2008 demonstrates that the artisan preferred a range of conjugated polysaccharide sizes overlapping that recited by the '559 claims, disclosed methods to optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$. Ex. 1007, 13–15, 54–55.

Dr. Kasper, relying on GSK 2008, states "[c]onjugation of each polysaccharide to a carrier protein may be performed 'by any known coupling technique,' including conjugation chemistries based on CDAP and/or reductive amination." Ex. 1087 ¶ 85 (citing Ex. 1007, 17:1–30). Dr. Kasper states "[g]iven that routine conjugation techniques and conditions readily achieved those disclosed molecular weights (as well as polysaccharide to protein ratios falling within the claimed range), a POSITA would have understood such molecular weights to be typical of immunogenic conjugates." Ex 1087 ¶ 106. Dr. Kasper also stated, in response to the question "[s]o would you agree that developing pneumococcal glycoconjugates is very much a serotype-specific process?" that "I think there is a common process that you follow. This is routine optimization, as far as I'm concerned. There's nothing unusual about doing that. That's typical." Ex. 2013, 29:12–14, 21–24.

In rebuttal to Dr. Kasper's position that the molecular weight of the serotype 22F glycoconjugate would have been an optimizable variable, Patent Owner relies on Dr. Boons's statement that:

> The determination of an appropriate molecular weight for a specific serotype glycoconjugate was not, in my opinion, a matter of "routine optimization" of existing reductive amination procedures. A number of variables affect the postconjugation molecular weight and/or immunogenicity of a specific serotype glycoconjugate. Because numerous variables affect the post-conjugation molecular weight and/or immunogenicity of a specific serotype glycoconjugate . . . a POSA would not have inferred that 22F glycoconjugates fall within a particular molecular weight based on the molecular weight of other serotype glycoconjugates (e.g., those serotypes listed in Table 2 of GSK 2008). For example, as noted in Jones 2005 (a

> document cited by Merck), some glycoconjugates were considerably smaller than the range recited in the ’559 patent.

Ex. 2042 ¶ 55.

Under deposition, Dr. Boons stated that “something that the person skilled in the art would know, is that multiple parameters are important and can be critical for generating an immunogenic glycoconjugate composition, including degree of oxidation, saccharide to protein ratio, and molecular weights.” Ex. 1109, 65:2–8. Dr. Boons stated that “it is well known that glycoconjugate vaccine development is difficult, that multiple parameters need to be optimized, and that success cannot be predicted beforehand.” Ex. 1109, 66:21–24.

However, in response to a question as to whether he could “identify a passage in the ’559 patent where the inventors describe issues that they had constructing a serotype 22F conjugate that elicits functional antibody,” Dr. Boons stated “I can’t identify a specific section mentioning specifically 22F.” Ex. 1109, 69:7–12. In this discussion, Dr. Boons did not identify any specific teaching in the ’559 patent or other prior art that demonstrated that the optimization of the size of the serotype 22F conjugate, known to be desirable by the skilled artisan, would have had any specific issues or concerns. *See* Ex. 1109, 67:2 to 69:25.

Dr. Kasper responded to Dr. Boons’s concerns, noting that “[i]t would have been trivial for a POSITA to construct a conjugate with sufficient cross-linking to produce a serotype 22F conjugate over 1,000 kDa; the serotype 22F polysaccharides and $CRM_{197}$ carrier proteins each have multiple conjugation points.” Ex. 1107 ¶ 46. Dr. Kasper noted that “because the disclosed neoglycoconjugates in Jones 2005 contained on

average six saccharides . . . , such neo-glycoconjugates would have been over 1,000 kDa with six serotype 22F polysaccharides (and also within the claimed range), even if the polysaccharides were as small as 167 kDa." Ex. 1107 ¶ 48.

Patent Owner's declarant, Dr. Paradiso, was asked during deposition whether a "person of ordinary skill in the art . . . would have understood how to vary the conjugation reaction conditions to achieve those different ten conjugates of Table 16?" Ex. 1104, 103:13–17. Dr. Paradiso answered that a "person of skill in the art would, based on the information given in [columns 15 and 16 and Table 16 of the '559 patent] . . . , probably have a good idea on how to vary these parameters." Ex. 1104, 103:19–22. In a follow-up question, Dr. Paradiso agreed that "there is no disclosure of a particular molecular weight of the serotype 22F conjugate that is used in the 16-valent composition [in the '559 patent] . . . ." Ex. 1104, 106:6–9.

The evidence of record, therefore, shows that optimization of polysaccharide conjugate size was well known to the person of ordinary skill in the art, as even Patent Owner's expert Dr. Boons acknowledged. Ex. 1109, 66:21–24. Dr. Boons further acknowledged that the '559 patent did not rely on any specific disclosure explaining issues in generating a serotype 22F conjugate (Ex. 1109, 69:7–12), thereby supporting the reasonable position of Dr. Paradiso that the ordinary artisan would "probably have a good idea on how to vary these parameters." Ex. 1104, 103:19–22. This evidence supports a determination that routine optimization would have been obvious, particularly when combined with the teachings of Merck 2011 to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide; with teachings of GSK 2008 of methods to

optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$; and with Dr. Kasper's statement that "[t]his is routine optimization, as far as I'm concerned. There's nothing unusual about doing that. That's typical." Ex. 2013, 29:21–24.

We recognize, but find unpersuasive, Patent Owner's assertion that "it is unreasonable to conclude that the molecular weight of a serotype 22F glycoconjugate would necessarily be over 1,000 kDa" (PO Resp. 24), because the issue is the obviousness of routine optimization of conjugate sizes, not inherent anticipation by GSK 2008. Instead, we agree with Petitioner that "a POSITA would have found GSK 2008's molecular weight range (1,303-9,572 kDa) desirable and would have had a reasonable expectation of achieving an immunogenic serotype 22F conjugate in that range." Pet. Reply 12–13 (emphasis omitted).

We find that a preponderance of the evidence of record demonstrates that conjugate size is a results-effective variable associated with improved stability of conjugates and good immune response, limited only by filter size, thereby rendering "optimization within the grasp of one of ordinary skill in the art." *In re Applied Materials*, 692 F.3d 1289, 1295 (Fed. Cir. 2012). "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955).

We, therefore, conclude that a preponderance of the evidence of record supports Petitioner's position that the 1,000 to 12,500 kDa size range in claim 1 of the '559 patent, which overlaps with the 1303 and 9572 kDa in GSK 2008, would have been consistent with the ranges optimized and used to generate multivalent vaccines. Pet. 41; Ex. 1007, 55:2–10. "In cases

involving overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a prima facie case of obviousness." *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003).

*ii. General Knowledge and Other Prior Art*

Patent Owner criticizes Petitioner's reliance on Pfizer 2012 (Ex. 1008),[15] Jones 2005 (Ex. 1026),[16] Lees 2008 (Ex. 1035),[17] and Wyeth 2007 (Ex. 1027)[18] as evidence that the person of ordinary skill in the art would have understood that "the claimed ranges of the '559 Patent were known as typical and desirable." PO Resp. 26–32; Pet. Reply 6.

---

[15] Pfizer 2012, a slide presentation at a symposium, teaches general kDa mass ranges for glycoconjugates of 50 to 200 for the polysaccharide and 500 to 5,000 for the conjugate. Ex. 1008, 6.

[16] Jones 2005 reviews polysaccharide vaccines including *Streptococcus pneumoniae vaccines*. Ex. 1026, 2. Jones 2005 discusses both glycoconjugate vaccines and a 23-serotype specific pneumococcal polysaccharide vaccine. Ex. 1026, 6. Jones 2005 teaches $CRM_{197}$ as a carrier protein and 5,000 kDa glycoconjugates. Ex. 1026, 7. Jones 2005 also shows a cartoon representation that depicts different structural types of glycoconjugate vaccines. Ex. 1026, 8, Fig. 2.

[17] Lees 2008 reviews conjugation chemistry, and particularly, polysaccharides and carrier proteins used in pneumococcal vaccines. Ex. 1035, 23. Lees 2008 identifies factors including the ratio of protein and polysaccharide as variables that may be controlled during the conjugation process. Ex. 1035, 5. Lees 2008 teaches sizing of the conjugates by purification using size exclusion chromatography or filtering through membranes with particular molecular weight cutoffs. Ex. 1035, 5.

[18] Wyeth 2007, a slide presentation at a colloquium, teaches the process of polysaccharide manufacture for pneumococcus vaccines. Ex. 1027, 4. Wyeth 2007 teaches a method of characterizing polysaccharides in a vaccine by size. Ex. 1027, 10–16. Wyeth 2007 teaches a serotype 7F polysaccharide conjugated to $CRM_{197}$ that falls within a range of 9,202 to 11,950 kDa. Ex. 1027, 21.

Patent Owner asserts that Petitioner "relies on a statement in Pfizer 2012 for the statement that a 'typical' mass for a glycoconjugate could be within the range of 500-5,000 kDa," but Patent Owner asserts that a "POSA would not have interpreted the statement to mean that all glycoconjugates are within the range of 500-5,000 kDa. EX2042, ¶69. Pfizer 2012 does not provide any guidance to a POSA on how to generate a *S. pneumoniae* serotype 22F glycoconjugate or what the resulting molecular weight should be." PO Resp. 27–28. Patent Owner asserts that "Dr. Kasper's testimony illustrates the lack of any guidance, teaching or suggestion on conjugation chemistry or procedures in Pfizer 2012." PO Resp. 28 (citing Ex. 2013, 59:25 to 60:14). Patent Owner asserts that "Pfizer 2012 does not refer to serotype 22F glycoconjugates and only refers to general molecular weights well outside the range in the '559 patent claims." PO Resp. 28.

We find these arguments unpersuasive because we understand the citation to Pfizer 2012 as evidencing that 500 to 5000 kDa was a known size range for glycoconjugates consistent with the disclosure of a range up to 1600 kDA disclosed by GSK 2008. *See* Prelim. Resp. 28–29; Ex. 1008, 6; Ex. 1007, 94 (*cf*. Pet. 19, 39).

Moreover, while we agree with Patent Owner that Pfizer 2012 does not detail the procedures used for conjugation, Dr. Kasper stated in his testimony that in Pfizer 2012 "if you look at page 4, they describe two different technologies for conjugation, one for cross-linking and one for single-end conjugation." Ex. 2013, 60:5–8 (citing Ex. 1008, 4). Dr. Kasper also stated that "[a]s of January 21, 2014, both reductive amination and CDAP had been used to construct immunogenic conjugates, including in licensed pneumococcal vaccines." Ex. 1107 ¶ 36. Dr. Kasper states, in

response to a question, that Pfizer 2012 "shows a typical mass for glycoconjugate of 500-5,000 kDa" that the "teaching includes pneumococcus. And, in fact, the example [Pfizer 2012] give[s] on page 7 is a pneumococcal polysaccharide." Ex. 2013, 59:2–12.

Patent Owner asserts that: "Jones 2005 does not mention any serotype 22F glycoconjugates, much less how to make these glycoconjugates"; that "Wyeth 2007 does not mention serotype 22F or provide any guidance as to how to make a serotype 22F glycoconjugate"; and that "Lees 2008 does not refer to any serotype 22F glycoconjugates, much less how to make an immunogenic serotype 22F glycoconjugate having the specific molecular weight and ratio parameters recited in the '559 patent claims." PO Resp. 29–31 (citing Ex. 2042 ¶¶ 70, 72, 74).

We are unpersuaded by Patent Owner's general allegations because each of these references provides specific teachings regarding vaccine glycoconjugates that establish the knowledge of the ordinary artisan. As Dr. Kasper stated, prior art including GSK 2008 exemplified "[p]reparation of multivalent pneumococcal vaccines containing serotype 22F conjugates." Ex. 1087 ¶ 86. Dr. Kasper noted that GSK 2008 disclosed that "22F-PhtD administered within the 13-valent conjugate vaccine formulation were shown immunogenic and induced opsonophagocytic titers in young Balb/c mice." Ex. 1087 ¶ 88 (citing Ex. 1007, 75). Petitioner cites Jones 2005, Wyeth 2007, and Lees 2008 in order to demonstrate that the specific conditions used for making glycoconjugate in general were well known.

Patent Owner then makes specific assertions identifying deficiencies in Jones 2005, Wyeth 2007, and Lees 2008. For Jones 2005, Patent Owner asserts that "Jones 2005 refers to a (non-pneumococcal) glycoconjugate

having a molecular weight (5,000 kDa) within the recited range of the ’559 patent claims, and one that does not (90 kDa)” and asserts a “POSA likely would have initially focused on the smaller neo-glycoconjugate, because it would be expected to be simpler to generate and easier to characterize.” PO Resp. 29–30. For Wyeth 2007, Patent Owner asserts that:

> Wyeth 2007 and GSK 2008 viewed together demonstrate that different conjugation chemistries can result in glycoconjugates with different molecular weights. Wyeth 2007 recites 7F glycoconjugates of 9,202-11,950 kDa, while GSK 2008 recites 7F glycoconjugates of 3907-4452 kDa. EX2042, ¶73 (citing EX1027 at 21; EX1007 at Table 2). The differences between the molecular weights for 7F glycoconjugates disclosed in Wyeth 2007 and GSK 2008 highlight the need to determine the appropriate molecular weight of a given serotype glycoconjugate on a case-by-case basis. *Id.*

PO Resp. 30–31. For Lees 2008, Patent Owner asserts that “Lees 2008 cautions that ‘careful control’ over numerous factors (e.g., pH, temperature, ratio of protein and polysaccharide and concentration of each) is ‘key to successful conjugation.’” PO Resp. 31–32. Patent Owner further asserts, as to Lees 2008, that a “POSA would have known that more than routine experimentation would be needed to determine the appropriate molecular weight (or polysaccharide to protein ratio) of any given serotype glycoconjugate, and that appropriate conjugation conditions for each serotype glycoconjugate needed to be carefully determined on a case-by-case basis.” PO Resp. 32 (citing Ex. 2042 ¶ 74).

We find these specific arguments unpersuasive. Jones 2005 teaches the repeating unit structure of types 1, 2, 3, 4, 5, 6B, 9N, 9V, 12F, 14, 18C, 19F, and 23F of *S. pneumoniae*. *See* Ex. 1026, 5. Jones 2005 does teach structurally variant conjugate vaccines comprising either neoglycoconjugate

or crosslinked oligosaccharides with $CRM_{197}$ (*see* Ex. 1026, 8, Fig. 2), but Jones 2005 explains that the "immune responses elicited by these different structural variants are generally similar." Ex. 1026, 7. Jones 2005 teaches, for *Haemophilus influenzae* type b glycoconjugate vaccines, that different methods result in different sizes, with a reductive amination approach resulting in a glycoconjugate that "is approximately 90 kDa in size, is approximately 30% carbohydrate and contains an average of six glycan chains per carrier protein" while cyanogen bromide activation approach results in a conjugate that "is a crosslinked network of polysaccharide and protein with a molecular weight of, on average, $5\times10^6$ Da [(5,000 kDa)]." Ex. 1026, 7. Jones 2005 teaches "[s]tudies of the crosslinked conjugate vaccines have focused principally on the molecular size" (Ex. 1026, 12) and explains that "[m]olecular sizing of the conjugates is a simple and effective means to ensure consistency of the final conjugate." Ex. 1026, 13–14.

Thus, Jones 2005 demonstrates that the ordinary artisan was aware that different conjugation methods yielded different size glycoconjugates, that size was an important parameter, and that size was controllable using molecular sizing techniques.

Wyeth 2007 provides an example where glycoconjugates of serotype 7F of *S. pneumoniae* with $CRM_{197}$ have a molecular weight between 9,200 kDa and 11,950 kDa. *See* Ex. 1027, 21. While Patent Owner correctly notes that these values differ from those for serotype 7F in GSK 2008 (*see* Ex. 1007, 56), we note that the two vaccines are conjugated to different carriers, $CRM_{197}$ in Wyeth 2007 and *Haemophilus influenzae* protein D in GSK 2008. Ex. 1027, 21; Ex. 1007, 44, 55. Wyeth 2007 emphasizes that size is a central parameter for vaccine production. Ex. 1027, 7. Wyeth 2007 teaches

a size assay for size measurement of glycoconjugate vaccines. *See, e.g.*, Ex. 1027, 12, 14.

Thus, Wyeth 2007 also demonstrates that size of glycoconjugates was an important concern for the ordinary artisan, provides a method for determining that size, and demonstrates that a particular glycoconjugate could be generated in the claimed size range using a different carrier protein.

Lees 2008 notably teaches that serotype 22F vaccines are used in formulations, teaching "the currently available licensed 23-valent pneumococcal PS vaccine is formulated with PSs from the 23 most prevalent strains: 1, 2, 3, 4, 5, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C, 19F, 19A, 20, 22F, 23F, and 33F." Ex. 1035, 2. Lees 2008 teaches that "[s]ize fractionation is usually necessary" (Ex. 1035, 4) and that "[c]areful control over the factors relevant to the particular chemistry is key to successful conjugation. These factors include pH, temperature, the ratio of the protein and PS, and the concentration of each." Ex. 1035, 5. Thus, Lees 2008 demonstrates that the factors necessary to obtain particular glycoconjugates are results-optimizable variables, noting "[s]ince each capsular serotype has a different structure, reaction conditions, including concentrations, molar ratios of periodate, oxidation times, and pH, must be optimized." Ex. 1035, 6. Lees 2008 explains that after the reaction has been completed, particular desired sizes of glycoconjugates can be obtained because "purification of the conjugate is usually performed by size exclusion, by using either size exclusion chromatography or membranes with appropriate molecular weight cutoffs." Ex. 1035, 5.

Thus, Lees 2008 demonstrates not only that serotype 22F pneumococcal vaccines are desirable, but provides detailed discussion

regarding the known parameters necessary to obtain particular glycoconjugates as well as methods to limit those glycoconjugates to the desired size.

Considered as a whole, we conclude that the disclosures in Jones 2005 of a 5000 kDa glycoconjugate, in Wyeth 2007 of pneumococcal serotype 7F glycoconjugates with sizes between 9202 and 11950 kDa, and in Lees 2008 of a multiple conjugate formation provide evidence that glycoconjugate size was a known optimizable variable. *See* Pet. 37, 39–41; Ex. 1026, 7; Ex. 1027, 21; Ex. 1035, 7. That is, these additional references underline the basic teachings in Merck 2011 and GSK 2008 discussed above and further demonstrate that at the time of invention, a person of ordinary skill in the art would have recognized how to generate glycoconjugates of varying sizes using known techniques and recognized that size was a known, optimizable variable.

*b. "ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2"*

Patent Owner asserts "Merck 2011, GSK 2008 and the general knowledge would not have motivated a POSA to generate a 22F glycoconjugate with the recited polysaccharide to carrier protein ratio." PO Resp. 33 (citing Ex. 2042 ¶¶ 75–76).

*i. Merck 2011's "charge ratio"*

Patent Owner asserts that "the referenced ratio in Merck 2011 is presented in terms of 'charge', not weight to weight, as required by the '559 patent claims." PO Resp. 34. Patent Owner asserts "[a]t deposition, Dr. Kasper was unable to define what is meant by the term 'charge ratio'" and, therefore, "Merck's basis for the assertion that a general relationship exists

between this term and weight-to-weight ratio is unclear." PO Resp. 35 (citing Ex. 2042 ¶ 79). Patent Owner asserts "a POSA would not have had any idea how to determine the appropriate ranges for this undefined parameter." PO Resp. 35. Patent Owner asserts "Merck 2011 also does not teach or suggest that any pre-conjugation polysaccharide to protein ratio (much less a w/w ratio) would be a 'result-effective variable' or have any impact on the resulting properties, *e.g.*, immunogenicity, of its serotype 22F glycoconjugates." PO Resp. 35–36.

While we agree with Patent Owner that the meaning of the term "charge ratio" is not intrinsically clear from Merck 2011, Patent Owner's assertion that Dr. Kasper was unable to define the term is incorrect, as Dr. Kasper stated that "[c]harge ratio refers to the preconjugation ratio of your two components." Ex. 2013, 78:20–21. Dr. Kasper supports this interpretation based on "45 years of experience in the field, that's how it's commonly used." Ex. 2013, 79:2–3. Dr. Kasper explains, in response to the question of "[h]ow is charge ratio determined?" that "[t]he common usage would be the ratio of the weight of one that you put into the reaction to the weight of the other, the amount of one -- it's a stoichiometric ratio based on the amount of material that goes in." Ex. 2013, 80:12–17. Dr. Kasper also notes that "Merck 2011 specifically discloses that serotype 22F did not require unusual conjugation conditions. In particular, Merck 2011 discloses common activation and conjugation conditions, as well as any serotypes for which the conditions that deviate from those common conditions. Common conditions are not modified for serotype 22F." Ex. 1107 ¶ 32.

Dr. Boons states that a "POSA in January 2014 would not have been familiar with this term." Ex. 2042 ¶ 78. Dr. Boons responds to Dr. Kasper's

statements by noting that Weber 2009 is an example where "the term 'charge ratio' means exactly what one would expect from the words recited in this term, i.e., the ratio of charges (not weights) between two different elements." Ex. 2042 ¶ 78.

Although we agree with Patent Owner that Merck's teaching of a 0.2–2 to 1 charge ratio for polysaccharide and carrier protein does not necessarily equate to the 0.4 to 2 w/w ratio required by claim 1, Merck's teaching nevertheless suggests that the ratio (i.e., proportional relationship) between the amount of polysaccharide to carrier protein represents an optimizable variable. Even Dr. Boons, after disagreeing with the question "[d]o you agree that based on the Oxford Dictionary of Chemical Engineering for 'charge' the term 'charge ratio' in Merck 2011 refers to the ratio of the quantities of polysaccharide and protein that are fed into the conjugation reaction?" acknowledges that "I look at molar equivalents, not at weight equivalents. Actually I teach my students when you perform reactions weights are far less important than molar equivalents." Ex. 1109, 171:15–20, 173:14–18. Dr. Boons's statements indicate that the relative amount of the components, whether measured in moles or molecular weight, is a known parameter for optimization.

Therefore, even if Dr. Boons's interpretation of "charge ratio" as referring to molar equivalents of the polysaccharide and carrier protein is correct, and even if these ratios represent pre-conjugation amounts rather than post-conjugation amounts, the evidence still supports an understanding of Merck 2011 as suggesting that the relative amounts of these two components are results optimizable for the conjugation reaction and resultant vaccine.

*ii. Merck 2011's pre- and post-conjugation ratios*

Patent Owner asserts the "ratio values in Merck 2011 are pre-conjugation ratios that do not necessarily indicate post-conjugation characteristics of the glycoconjugate." PO Resp. 36 (citing Ex. 2042 ¶ 80). Patent Owner asserts "Tables 1 and 2 of GSK 2008 disclose pre-conjugation ratios that are 28% higher (2.5/1 up to 3.2/1 for serotype 19A) or 50% lower (1/1 down to 0.5/1 for serotype 23F) compared to the final conjugation ratios." PO Resp. 36 (citing Ex. 1007, 53–56). Patent Owner asserts that based on these tables in GSK 2008, "a POSA would have understood that one could not reasonably predict a post-conjugation polysaccharide to protein ratio based on pre-conjugation polysaccharide to protein ratios." PO Resp. 37. Patent Owner asserts that "[i]n Table 2 of GSK 2008, some glycoconjugates comprised up to 11.2% free polysaccharide and up to 4.9% free carrier protein" and that "Merck 2011 considered its first formulation comprised unconjugated polysaccharide at levels high enough to be problematic, and that the levels of these conjugated polysaccharides and carrier protein were allegedly reduced to an unknown level in the second formulation." PO Resp. 38–39 (citing Ex. 1007, Table 2 and Ex. 1006, 24:1–28).

Patent Owner also asserts:

> [t]here is no evidence that the polysaccharides and carrier proteins listed in Merck 2011 Table 1 exist in the composition in a 1:1 ratio for each serotype. EX2042, ¶84. Table 1 lists the total amount of the fifteen different polysaccharides and the total amount of the carrier protein, it does not assess polysaccharide/protein ratio by serotype.

PO Resp. 39–40.

We are not persuaded by Patent Owner's arguments that Table 1 in Merck 2011 does not suggest a weight/weight ratio of polysaccharide to carrier protein within the range of 0.4 and 2 as required by claim 1 of the '559 patent. Rather, Table 1 of Merck 2011 discloses an example that would reasonably have been expected to result in a 1:1 w/w ratio of the 22F polysaccharide to the $CRM_{197}$ carrier protein. Ex. 1006, 19:5–9; Ex. 1087 ¶ 120. This expectation is supported by Dr. Kasper's statement that the ratios "resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1." Ex. 1087 ¶ 120.

Even comparing the pre- and post-conjugation evidence in Tables 1 and 2 of GSK 2008 that relate to serotypes other than serotype 22F, we note that either a 50% reduction or a 28% increase in the 1:1 starting pre-conjugation ratio for serotype 22F disclosed in Merck 2011 would still result in a final conjugation composition that falls within the 0.4 and 2 w/w ratio range required by claim 1. Therefore, even fully accepting Patent Owner's position, the final conjugated composition of serotype 22F in Merck 2011 would have been expected to render claim 1 obvious. *See, e.g.*, *Ineos USA LLC v. Berry Plastics Corp.*, 783 F.3d 865, 869 (Fed. Cir. 2015) ("When a patent claims a range, as in this case, that range is anticipated by a prior art reference if the reference discloses a point within the range.")

We recognize that Dr. Boons states that "[g]iven the variation between pre- and post-conjugation ratios in Tables 1 and 2 of GSK 2008, a POSA would have understood that pre-conjugation ratios do not indicate post-conjugation ratios and that the appropriate ratio of each serotype glycoconjugate must be determined on a case-by-case basis." Ex. 2042 ¶ 80. However, Dr. Boons has not established that the post-conjugation ratios for

any serotype shown in the Merck 2011 Table 2 fall outside the range recited in claim 1, while Dr. Kasper states "[f]or the PS22F-PhtD conjugate, the carrier protein to polysaccharide ratio is 2.17 (which translates to a polysaccharide to carrier protein ratio of 1/2.17 or 0.46), with only 5.8% free (unconjugated) polysaccharide." Ex. 1087 ¶ 87. Thus, the evidence of record in Merck 2011 suggests that the polysaccharide to carrier protein ratio of a serotype 22F conjugate falls within the claimed ratio range of 0.4 to 2.

Moreover, Lees 2008 supports the obviousness of optimizing the claimed range, noting that "[r]egulatory authorities have considered the potency assay for conjugate vaccines to be a combination of the determination of the PS-to-protein ratio and the estimation of the amount of residual free saccharide. Ex. 1035, 9.

Therefore, a preponderance of the evidence of record supports the obviousness of selecting polysaccharide to carrier protein ratio values for the serotype 22F polysaccharides within the 0.4 and 2 range recited in claim 1 of the '559 patent based on the disclosures of Merck 2011, GSK 2008, and the knowledge of the ordinary artisan.

*iii. GSK teaching about serotype 22F polysaccharide to protein ratio*

Patent Owner asserts "none of the ratio ranges in GSK 2008 are serotype specific and other ratio ranges in this same paragraph cited by Merck have values falling outside of the claimed range." PO Resp. 40. Patent Owner asserts "other portions of GSK 2008 refer to a variety of carrier protein to polysaccharide ratio ranges (*e.g.*, 6:1 to 3:1, and 6:1 to 3.5:1) that, when converted to polysaccharide to protein ratio ranges as in the '559 patent, fall entirely outside of the claimed range (*e.g.*, 0.17 to 0.33

and 0.17 to 0.28)" and, therefore, "a POSA would not have had any motivation to select the specific ratio range cited by Merck over any of the other ratio ranges disclosed in GSK 2008." PO Resp. 40–41.

Patent Owner asserts that based on Figure 6 of GSK 2008, "there is a striking difference (what appears to be a 12-fold difference) between the OPA results from the two different 22F glycoconjugates." PO Resp. 44. Patent Owner asserts that "a POSA trying to make an immunogenic serotype 22F glycoconjugate would have turned to PS22F-AHPhtD rather than PS22F-PhtD" because of "clear and unambiguous statements and data provided in GSK 2008 regarding the superiority of the PS22F-AH-PhtD glycoconjugate." PO Resp. 43–44.

Patent Owner asserts that:

> Due to the significant inferiority of the PS22F-PhtD glycoconjugate, a POSA would have been "discouraged" from generating this glycoconjugate and "would be led in a direction divergent from the path" adopted by Pfizer, *i.e.*, a POSA would have been directed to prepare a serotype 22F glycoconjugate having a polysaccharide to protein ratio outside the claimed range. EX2042, ¶89.

PO Resp. 46–47.

Patent Owner compares these facts to *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853 (Fed. Cir. 2015), and asserts, "[s]imilar to the facts of *Insite*, the challenged patent claims recite a combination of features (*e.g.*, polysaccharide to protein ratios and molecular weights), and the cited prior art reference does not disclose one of the recited claim features (*i.e.*, molecular weight) in that combination." PO Resp. 42.

We do not find these arguments persuasive. As already noted, GSK 2008 discloses a range of ratios of polysaccharide to carrier protein that

includes and fully overlaps the range claimed. Ex. 1007, 20:24–28. *Peterson*, 315 F.3d at 1329. Dr. Kasper states that the "narrowest range in claim 48 [of GSK 2008] is a protein to polysaccharide ratio of 2:1 to 1:1, which translates to a polysaccharide to protein ratio of 0.5 to 1." Ex. 1107 ¶ 52. Patent Owner also acknowledges that GSK 2008 teaches a final conjugate of serotype 22F that has a polysaccharide to protein ratio of 0.46, within the range required by claim 1. *See* PO Resp. 42.

The exemplary serotype 22F-PhtD conjugate with a 0.46 ratio, along with the overlapping ranges disclosed and claimed by GSK 2008, the overlapping Merck 2011 0.2–2 to 1 charge ratio, provides reasonable motivation for the ordinary artisan to select ratios for the serotype 22F conjugate within the range required by claim 1 of the '559 patent. Ex. 1004 ¶ 84; Ex. 1107 ¶ 52; Ex. 1006, 19:24–25.

We recognize that Figure 6 of GSK 2008 shows what Patent Owner states to be a 12-fold lower level of antibody titer for serotype 22F-PhtD with a 0.46 ratio relative to serotype 22F-AH-PhtD with a 3.66 to 4.34 ratio. *See* Ex. 1007, 108. We also recognize that Dr. Boons states that a "POSA would have avoided the glycoconjugate that was associated with the significantly worse immunogenicity (*i.e.*, PS22F-PhtD), not the glycoconjugate that required a little more effort to make (*i.e.*, PS22F-AH-PhtD)." Ex. 2042 ¶ 88.

However, GSK 2008 teaches that either conjugate may be used, noting a "13 valent vaccine was made by further adding the serotypes 19A and 22F conjugates above (with 22F either directly linked to PhtD, or alternatively through an ADH linker)." Ex. 1007, 55:5–7. Thus, the plain text of GSK 2008 teaches that either conjugate may be used. Therefore,

even if the GSK 2008 teaching were interpreted as a preference for the higher polysaccharide to protein ratio rather than simply a preference for the ADH linker, it is well settled that disclosed examples, and even preferred embodiments do not constitute a teaching away from a broader disclosure or non-preferred embodiments. *In re Susi*, 440 F.2d 442, 446 n.3 (CCPA 1971). "[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). *See also In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) ("The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the [claimed] solution.").

We also note that GSK 2008 shows the immunogenicity for the two serotype 22F conjugates as either 37% or 28–31%, demonstrating similar results for both conjugates. Patent Owner points to no teaching in GSK 2008 that criticizes, discredits, or discourages the use of a ratio within the range required by claim 1.

Patent Owner points to *Insite* as indicating that one of ordinary skill in the art would not have been motivated to select the claimed conjugate because the claims require "a combination of features (*e.g.*, polysaccharide to protein ratios and molecular weights), and the cited prior art reference does not disclose one of the recited claim features (*i.e.*, molecular weight)." PO Resp. 42 (*citing Insite*, 783 F.3d at 861).

In *Insite*, the Federal Circuit relied on District Court findings that "it would not have been obvious to a person of ordinary skill in the art to formulate a topical azithromycin formulation for ophthalmic treatment of

any infection" because "there were 'innumerable' options for ophthalmic treatments" and concerns that azithromycin "might not penetrate ocular tissue based on its high molecular weight, charge and insolubility in water." *Insite*, 783 F.3d at 861.

In contrast, here, both of the cited prior art references, Merck 2011 and GSK 2008, specifically direct the ordinary artisan to incorporate serotype 22F conjugates into pneumococcal vaccines. *See* Ex. 1006, 6:1–4 ("[T]he addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses [and] demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing pneumococcal vaccines."). *See also* Ex. 1007, 5:32 to 6:1 ("The present invention provides an immunogenic composition . . . [that] comprises a 22F saccharide conjugate.").

Moreover, as discussed above, the Merck 2011 and GSK 2008 references together suggest molecular weights and polysaccharide to carrier protein ratios that overlap and fall within the ranges recited in claim 1 of the '559 patent. *See, e.g.*, Ex. 1007, 55–56; Ex. 1004 ¶ 84; Ex. 1107 ¶ 52; Ex. 1006, 19:24–25. In addition, the ordinary artisan was aware of desirable ranges of polysaccharide to carrier protein. *See* Ex. 1107 ¶ 18, 52.

Therefore, unlike *Insite*, we conclude that the evidence of record directly suggests incorporation of a serotype 22F glycoconjugate into a pneumococcal vaccine and suggests selection of molecular weight and polysaccharide to carrier protein ratio from a limited series of optimizable ranges disclosed in the prior art.

We also conclude that the prior art provides a reasonable expectation of success in doing so, particularly in light of the disclosure in the prior art

of functional glycoconjugates. Specifically, GSK 2008 demonstrates an immunogenic serotype 22F glycoconjugate with an overlapping polysaccharide to carrier protein ratio and Merck 2011 demonstrates an immunogenic serotype 22F glycoconjugate in a 1:1 polysaccharide to carrier protein ratio. Ex. 1007, 55–56; Ex. 1006, 21. Patent Owner provides no evidence showing that any serotype 22F glycoconjugate fails to result in an immunogenic response.

*iv. Optimization of 1:1 polysaccharide to protein ratio*

Patent Owner asserts a "POSA would disagree with Dr. Kasper's assertion that one would be 'shooting for' a polysaccharide to protein ratio of 1:1. . . . GSK 2008, in fact, teaches the opposite. For example, Table 1 of GSK 2008 provides pre-conjugation protein/polysaccharide ratios ranging from 1:1 to 3:1." PO Resp. 47 (citing Ex. 1008, Table 1). Patent Owner asserts that Example 2 of GSK 2008 "targets a ratio well below 1:1 and outside the claimed ranges" where the "conjugate had a final protein to polysaccharide ratio of 4.1 (w/w), which translates to a polysaccharide to protein ratio of 1:4.1, or 0.24." PO Resp. 48 (citing Ex. 1007, 52:38).

We are not persuaded that the range recited in claim 1 of polysaccharide to the carrier protein, between 0.4 and 2, is unobvious. We note that while Dr. Kasper responded to a question about a 1:1 saccharide to protein ratio as "[t]hat's what you're shooting for most often," Dr. Kasper continued to state regarding the ratio "[b]ut they fall within a range. And the Pfizer patent and the GSK patent define a range of .4 to 2." Ex. 2013, 77:7–23. Thus, Dr. Kasper states that the range recited in claim 1 would have been obvious based on the ranges disclosed in the prior art.

We recognize Patent Owner's reliance on Dr. Boons' statement that "[p]rior to generating a glycoconjugate, a POSA would not have assumed that any particular post-conjugation polysaccharide to protein ratio would necessarily be appropriate for generating that given glycoconjugate." Ex. 2042 ¶ 90 (citing Ex. 1026, 13).

A preponderance of the evidence does not support Patent Owner's position. As already noted, GSK 2008 specifically suggests a range of carrier protein that overlaps the range recited in claim 1 of the '559 patent, and GSK specifically teaches "the majority of the conjugates, for example 6, 7, 8, 9 or more of the conjugates have a ratio of carrier protein to saccharide that is greater than 1:1, for example 1.1:1." Ex. 1007, 20:24–28. Of equal significance, Merck 2011 teaches conjugations in which equal amounts of polysaccharide and carrier protein are present, including equal amounts of serotype 22F, suggesting a 1:1 ratio of these components. Ex. 1006, Table 1.

*v. JNIDD and polysaccharide to protein ratio*

Patent Owner asserts that "the English portion of JNIID does not refer to any serotype 22F glycoconjugates, much less a polysaccharide to protein ratio range for a serotype 22F glycoconjugate." PO Resp. 49 (citing Ex. 2013, 103:14–23). Patent Owner asserts "a POSA understood that appropriate parameters for each serotype glycoconjugate needed to be determined on a case-by-case basis, and a POSA would not have assumed that a polysaccharide to protein ratio for one serotype glycoconjugate would be appropriate for a different polysaccharide to protein glycoconjugate." PO Resp. 49–50 (citing Ex. 2042 ¶ 92). Patent Owner also asserts:

> This understanding is also made clear in another document cited by Merck, Jones 2005 (EX1026). Jones 2005 states that: "[t]he optimal [polysaccharide-protein] ratio has to be determined by experiment in preclinical studies or clinical trials." *Id.* (quoting EX1026 at 13). Lees 2008 further notes that "[t]he unique structures of each serotype mean that the precise activation and conjugation conditions ***must be carefully controlled and optimized***. . . ." EX1035 at 7-8.

PO Resp. 50.

We agree with Patent Owner that the prior art recognized that conjugate size and polysaccharide to protein ratio were known results optimizable variables, and we agree that JNIID does not specifically discuss serotype 22F. However, JNIID does identify saccharide to protein ratios for seven serotypes, serotypes 4, 6B, 9V, 14, 18C, 19F, and 23F, that range from a low of 0.3 to a high of 2.6, with the vast majority falling within the range of 0.4 and 2 recited by claim 1 of the '559 patent. Ex. 1085, 23. Thus, we agree with Dr. Kasper's statement that "as of January 21, 2014 [JNIID] demonstrates that the claimed molecular weight and polysaccharide to protein ratio ranges of the '559 Patent were known to be typical and desirable." Ex. 1107 ¶ 18 (citing Ex. 1085, 23).

We therefore conclude that with respect to all the claims challenged on this ground that the cited prior art does suggests compositions with 22F glycoconjugates that are immunogenic, within the claimed molecular weight ranges, and within the claimed polysaccharide to carrier protein conjugate ratios.

*D. Obviousness over Merck 2011, GSK 2008, and '787 patent*

Petitioner asserts that based on the "'787 Patent (Ex. 1010), a POSITA would have been motivated with a reasonable expectation of

success to include the immunogenic composition of claim 1 in a syringe that is siliconized and/or made of glass." Pet. 56 (citing Ex. 1087 ¶ 143). Petitioner asserts that "'787 Patent discloses pneumococcal polysaccharide-protein conjugate formulations in siliconized containers, including glass syringes; the formulations inhibit protein aggregation caused by the silicone oil." Pet. 56 (citing Ex. 1010 13:34 to 14:23).

Patent Owner asserts

> Neither Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, GSK 2008, the '787 patent, and the "general knowledge," because Merck has not identified any reasons as to why the '787 patent remedies the deficiencies of Merck 2011 or GSK 2008. Merck has not met its burden in showing that claim 15 is obvious.

PO Resp. 52.

1. *'787 patent (Exhibit 1010)*

The '787 patent discusses "an ongoing need in the art to improve the stability of immunogenic compositions such as polysaccharide-protein conjugates." Ex. 1010, 9:57–59. The '787 patent discusses "the polysaccharide-protein conjugate formulation is a 13-valent pneumococcal conjugate (13vPnC) formulation comprising a *S. pneumoniae* serotype . . . polysaccharide conjugated to a $CRM_{197}$ polypeptide." Ex. 1010, 6:39–43. The '787 patent explains the "formulations of the present invention are particularly useful in stabilizing the immunogen (i.e., a polysaccharide-protein conjugate . . . in the presence silicon oil found on container means such syringes, glass vials, rubbers stoppers and the like." Ex. 1010, 14:12–21.

2. *Analysis*

We have already concluded that a preponderance of evidence supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that an ordinary artisan would have found it obvious to modify the multivalent pneumococcal vaccine containing the 22F serotype rendered obvious by Merck 2011 and GSK 2008 with a siliconized syringe as disclosed by the ’787 patent for use with a 13 valent pneumococcal conjugate vaccine because these formulations function to stabilize the antigen.

We therefore conclude that a preponderance of the evidence supports the obviousness of modifying the conjugate vaccine suggested by Merck 2011, GSK 2008, and the knowledge of the ordinary artisan with the siliconized and glass syringes disclosed by the ’787 patent in order to stabilize the vaccine as disclosed by the ’787 patent.

*E. Obviousness over Merck 2011, GSK 2008, and Obaro 2002*

Petitioner asserts that based on Obaro 2002, “a POSITA would have been motivated with a reasonable expectation of success to include an antigen from a pathogen other than pneumococcus in the immunogenic composition of claim 1.” Pet. 57 (citing Ex. 1087 ¶ 146). Petitioner asserts that “Obaro 2002 reports the safety and immunogenicity of Patent Owner's 9-valent pneumococcal CRM197-conjugate vaccine (‘PnCV’) when given in combination with a vaccine (‘TETRAMUNE’) containing diphtheria toxoid, tetanus toxoid, whole cell pertussis, and $CRM_{197}$-conjugated *Haemophilus influenzae* type B oligosaccharide.” Pet. 57 (citing Ex. 1040, 2). Petitioner asserts “a POSITA would have understood that combining distinct individual vaccines (e.g., pneumococcal and non-pneumococcal

vaccinations) into a single composition is desirable, to enhance protection against disease and minimize the number of injections to a patient, particularly for infants." Pet. 57 (citing Ex. 1087 ¶ 146).

Patent Owner asserts "[n]either Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, GSK 2008, Obaro 2002, and the 'general knowledge.' Therefore, Merck has likewise not met its burden in showing that claims 20 and 21 are obvious." PO Resp. 53. Patent Owner asserts:

> Obaro 2002 does not disclose the molecular weight or polysaccharide to protein ratio for any of its glycoconjugates. As such, a POSA would not have had any motivation from Obaro 2002 to generate an immunogenic composition comprising a serotype 22F glycoconjugate having a molecular weight or polysaccharide to protein ratio falling within the specific ranges recited in any of the '559 patent claims (including claims 20 and 21).

PO Resp. 53–54 (citing Ex. 2042 ¶ 94).

1. *Obaro 2002 (Exhibit 1040)*

Obaro 2002 states "we evaluated the safety and immunogenicity of a 9-valent pneumococcal conjugate vaccine given in combination with TETRAMUNE [*Haemophilus influenzae* type b vaccine] administered simultaneously at different sites or mixed and administered as a single injection." Ex. 1040, 2. Obaro 2002 teaches the pneumococcal vaccine "was prepared in a lyophilized form and contained 2 µg of types 1, 4, 5, 9V, 14, 19F and 23F pneumococcal polysaccharides; 2 µg of type 18C oligosaccharide; and 4 µg of type 6B polysaccharide. Each polysaccharide or oligosaccharide was coupled independently to $CRM_{197}$, a nontoxic mutant of diphtheria toxoid, to give 20 µg of $CRM_{197}$ per dose." Ex. 1040, 2.

Obaro 2002 states the “combination of TETRAMUNE and PnCV is safe and immunogenic.” Ex. 1040, 1; emphasis omitted. Obaro 2002 teaches “[c]ombination of vaccines should make administration easier, less expensive and more acceptable to parents.” Ex. 1040, 2.

2. *Analysis*

We have already concluded that a preponderance of evidence supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that an ordinary artisan would have found it obvious to combine the pneumococcal vaccine including the 22F serotype with other vaccines including a *Haemophilus influenzae* type b vaccine because Obaro 2002 explains that combination of these vaccines makes administration easier and less expensive. While Patent Owner is correct that Obaro 2002 is silent on the molecular weights for the pneumococcus conjugate vaccine, both Merck 2011 and GSK 2008 disclose reasons to select the molecular weights required by claim 1 as discussed above. As to the polysaccharide to protein ratios, these are also disclosed in Merck 2011 and GSK 2008 as already discussed. In addition, Obaro 2002 teaches a 1:1 ratio for serotypes 1, 4, 5, 6B, 9V, 14, 18C, 19F, and 23F because Obaro 2002 teaches 2 µg of polysaccharide for 8 serotypes and 4 µg for serotype 6B combined with 20 µg of $CRM_{197}$. Ex. 1040, 2.

We, therefore, conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by Merck 2011, GSK 2008, and the knowledge of the ordinary artisan by combining it with the *Haemophilus influenzae* type b vaccine of Obaro 2002 to simplify and reduce the expense of vaccine administration.

### *F. Obviousness over Merck 2011, GSK 2008, and Sigurdardottir 2008*

Petitioner asserts that based on Sigurdardottir 2008, "a POSITA would have been motivated with a reasonable expectation of success to include a meningococcal serogroup C conjugate in the immunogenic composition of claim 1." Pet. 60 (citing Ex. 1087 ¶ 148). Petitioner asserts that "Sigurdardottir 2008 'evaluated safety and immunogenicity of a combined 9-valent pneumococcal and meningococcal C conjugate vaccine ['9vPnC-MnCC']" and Sigurdardottir 2008 concludes "9vPnC-MnCC is safe and immunogenic" Pet. 60 (citing Ex. 1011, 2, 8). Petitioner asserts "that combining distinct individual vaccines (e.g., pneumococcal and non-pneumococcal vaccinations) into a single composition is desirable, to enhance protection against disease and minimize the number of injections to a patient." Pet. 57 (citing Ex. 1087 ¶ 146).

Patent Owner asserts "[n]either Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, GSK 2008, Sigurdardottir 2008, and the 'general knowledge.' Therefore, Merck has likewise not met its burden in showing that claim 22 is obvious." PO Resp. 54. Patent Owner asserts:

> The pneumococcal glycoconjugates of Sigurdardottir 2008 comprise nine different serotype glycoconjugates (i.e., serotypes 1, 4, 5, 6B, 9V, 14, 18C, 19F, and 23F), none of which is serotype 22F. EX1011 at 2. Sigurdardottir 2008 also does not refer to the molecular weight or polysaccharide to protein ratio for any of the glycoconjugates present in its vaccine.

PO Resp. 54–55 (citing Ex. 2042 ¶ 96). Patent Owner acknowledges that "Sigurdardottir 2008 does refer to serotype 22F." PO Resp. 55. Patent

Owner asserts, however, that a "POSA would not have had any motivation from Sigurdardottir 2008 to generate an immunogenic composition comprising a serotype 22F glycoconjugate having a molecular weight or polysaccharide to protein ratio falling within the specific ranges recited in any of the '559 patent claims." PO Resp. 55 (citing Ex. 2042 ¶ 97).

1. *Sigurdardottir (Exhibit 1011)*

Sigurdardottir states "we investigated the safety and immunogenicity of a 9-valent CRM197-conjugated pneumococcal-polysaccharide vaccine combined with a CRM197-conjugated *Meningococcus C* polysaccharide." Ex. 1011, 2. Sigurdardottir teaches the

> trial vaccine contained nine pneumococcal serotype polysaccharides, 2 µg of saccharide per pneumococcal serotypes 1, 4, 5, 9V, 14, 18C, 19F and 23F, 4 µg of pneumococcal serotype 6B and 10 µg of meningococcal group C oligosaccharide (same concentration as in monovalent Meningococcus C CRM197 conjugate, Meningitec®) coupled to 18.5 µg of CRM197 carrier protein.

Ex. 1011, 2. Sigurdardottir states a booster comprising the 23-valent pneumococcal-polysaccharide vaccine containing serotype 22F was used. Ex. 1011, 2. Sigurdardottir teaches "decreas[ing] the number of infant vaccinations by combining pneumococcal and Meningococcus C CRM197 conjugates." Ex. 1011, 7.

2. *Analysis*

We have already concluded that a preponderance of evidence supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that an ordinary artisan would have found it obvious to combine the pneumococcal vaccine including the 22F serotype with other vaccines including a Meningococcus C vaccine because Sigurdardottir explains that

combination of these vaccines permits a decreased number of vaccinations. While Patent Owner is correct that Sigurdardottir is silent on the molecular weights for the pneumococcus conjugate vaccine, both Merck 2011 and GSK 2008 disclose reasons to select the molecular weights required by claim 1 as discussed above. Sigurdardottir also recognizes that serotype 22F is a vaccine target. Ex. 1011, 2. As to the polysaccharide to protein ratios, these are also disclosed in Merck 2011 and GSK 2008 as already discussed. In addition, Sigurdardottir teaches an approximately 1:1 ratio for serotypes 1, 4, 5, 6B, 9V, 14, 18C, 19F, and 23F because Sigurdardottir teaches 2 µg of polysaccharide for 8 serotypes and 4 µg for serotype 6B combined with 18.5 µg of $CRM_{197}$. Ex. 1011, 2.

We, therefore, conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by Merck 2011, GSK 2008, and the knowledge of the ordinary artisan by combining it with the Meningococcus C vaccine of Sigurdardottir to simplify and reduce the expense of vaccine administration.

### *G. Obviousness over Merck 2011, GSK 2008, and MMWR 2012*

Petitioner asserts that based on MMWR 2012, "a POSITA would have been motivated with a reasonable expectation of success to practice the method of claim 30 (taught by the combination of Merck 2011 and GSK 2008) in an immunocompromised human." Pet. 61 (citing Ex. 1087 ¶ 149). Petitioner asserts that "MMWR 2012 discloses the 'recommended routine use of 13-valent pneumococcal conjugate vaccine (PCV13; Prevnar 13, Wyeth Pharmaceuticals, Inc., a subsidiary of Pfizer, Inc.) for adults aged ≥19 years with immunocompromising conditions." Pet. 61 (citing Ex. 1012, 12).

Patent Owner asserts "[n]either Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, GSK 2008, MMWR 2012, and the 'general knowledge.' Therefore, Merck has likewise not met its burden in showing that claim 34 is obvious." PO Resp. 56. Patent Owner asserts "Prevnar13® does not include a serotype 22F glycoconjugate, and MMWR 2012 also does not disclose the molecular weight or polysaccharide to protein ratio for any of the glycoconjugates present in Prevnar13®." PO Resp. 56 (citing Ex. 2042 ¶ 99). Patent Owner asserts "a POSA would not have had any motivation from MMWR 2012 to generate and utilize an immunogenic composition comprising a serotype 22F glycoconjugate having a molecular weight or polysaccharide to protein ratio falling within the specific ranges recited in any of the '559 patent claims." PO Resp. 56–57.

1. *MMWR 2012 (Exhibit 1012)*

MMWR 2012 states

> the Advisory Committee on Immunization Practices (ACIP) recommended routine use of 13-valent pneumococcal conjugate vaccine (PCV13; Prevnar 13, Wyeth Pharmaceuticals, Inc., a subsidiary of Pfizer, Inc.) for adults aged ≥19 years with immunocompromising conditions, functional or anatomic asplenia, cerebrospinal fluid (CSF) leaks, or cochlear implants (Table). PCV13 should be administered to eligible adults in addition to the 23-valent pneumococcal polysaccharide vaccine (PPSV23; Pneumovax 23, Merck & Co. Inc.), the vaccine currently recommended for these groups of adults.

Ex. 1012, 12. MMWR 2012 teaches "[a]dults with specified immunocompromising conditions who are eligible for pneumococcal vaccine should be vaccinated with PCV13 during their next pneumococcal

vaccination opportunity." Ex. 1012, 14.

2. *Analysis*

We have already concluded that a preponderance of evidence supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that an ordinary artisan would have found it obvious to vaccinate immunocompromised individuals with the pneumococcal vaccine including the 22F serotype with other vaccines including a *Haemophilus influenzae* type b vaccine because MMWR 2012 suggests that such individuals should be vaccinated with pneumococcal vaccines, including the 23-valent vaccine that includes the 22F serotype. Ex. 1012, 12; Ex. 1087 ¶ 41. While Patent Owner is correct that MMWR 2012 is silent on the molecular weights for the pneumococcus conjugate vaccine, both Merck 2011 and GSK 2008 disclose reasons to select the molecular weights required by claim 1 as discussed above. As to the polysaccharide to protein ratios, these are also disclosed in Merck 2011 and GSK 2008 as already discussed.

We, therefore, conclude that a preponderance of the evidence supports the obviousness of treating immunocompromised patients with the vaccine suggested by Merck 2011, GSK 2008, and the knowledge of the ordinary artisan because MMWR 2012 suggests the desirability of treating this patient population with a pneumococcal vaccine. Ex. 1012, 12, 14.

## III. PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner moves to exclude the following Exhibits, or portions thereof: Exhibit 1087 ¶ 23, Exhibit 1094, and Exhibit 1095, Paper 35 ("Patent Owner Mot. to Exclude").

We do not rely on any of this evidence in making our ultimate determination on the patentability of the challenged claims. Accordingly,

we need not decide Patent Owner's motion and we therefore dismiss Patent Owner's motion as moot.

## V. CONCLUSION

We conclude that Petitioner has shown by a preponderance of the evidence that (1) claims 11–14, 23–33, and 35–37 of the '559 patent are unpatentable over the combination of Merck 2011 and GSK 2008, (2) claim 15 of the '559 patent is unpatentable over the combination of Merck 2011, GSK 2008, and '787 patent; (3) claims 20 and 21 of the '559 patent are unpatentable over Merck 2011, GSK 2008, and Obaro 2002; (4) claim 22 of the '559 patent is unpatentable over Merck 2011, GSK 2008, and Sigurdardottir 2008; and (5) claim 34 of the '559 patent is unpatentable over the combination of Merck 2011, GSK 2008, and MMWR 2012.

We dismiss Patent Owner's Motion to exclude Exhibit 1087 ¶ 23, Exhibit 1094, and Exhibit 1095 as moot.

## VI. ORDER

For the reasons given, it is

ORDERED, based on a preponderance of the evidence, that claims 11–15 and 20–37 are unpatentable;

FURTHER ORDERED, Patent Owner's Motion to Exclude Exhibit 1087 ¶ 23, Exhibit 1094, and Exhibit 1095 is dismissed as moot;

FURTHER ORDERED, because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Arlene L. Chow
Ernest Yakob
HOGAN LOVELLS US LLP
arlene.chow@hoganlovells.com
ernest.yakob@hoganlovells.com

Anthony M. Isogna
Nikolaos C. George
JONES DAY
aminsogna@jonesday.com
ncgeorge@jonesday.com

PATENT OWNER:

John Scheibeler
Dimitrios T. Drivas
Anita Varma
Brendan Gavin
Eric A. Krause
WHITE & CASE LLP
jscheibeler@whitecase.com
ddrivas@whitecase.com
anita.varma@whitecase.com
brendan.gavin@whitecase.com
eric.krause@whitecase.com

Trials@uspto.gov
571-272-7822

Paper 45
Entered: March 13, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MERCK SHARP & DOHME CORP.,
Petitioner,

v.

PFIZER INC.,
Patent Owner.

---

Case IPR2017-02138
Patent 9,492,559 B2

---

Before TONI R. SCHEINER, JEFFREY N. FREDMAN, and JACQUELINE T. HARLOW, *Administrative Patent Judges.*

FREDMAN, *Administrative Patent Judge*.

# FINAL WRITTEN DECISION AND RELATED ORDERS

Finding claims 11–15 and 20–37 Unpatentable
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Dismissing Patent Owner's Motion to Exclude Evidence
*37 C.F.R. § 42.64*

# I. INTRODUCTION

## *A. Background*

Merck Sharp & Dohme Corp. (“Petitioner”) filed a Petition to institute an *inter partes* review of claims 11–15 and 20–37 of U.S. Patent No. 9,492,559 B2 (Ex. 1001, “the ’559 patent”). Paper 1 (“Pet.”). Pfizer Inc. (“Patent Owner”) filed a Patent Owner Preliminary Response. Paper 6 (“Prelim. Resp.”).

On March 22, 2018, we instituted an *inter partes* review of all challenged claims. Paper 7 (“Dec. Inst.”). Patent Owner filed a Request for Rehearing (Paper 11) that was denied (Paper 16). Patent Owner then filed Patent Owner Response to the Petition. Paper 22 (“PO Resp.”). Petitioner filed a Reply to the Patent Owner Response. Paper 28 (“Pet. Reply”). Patent Owner filed a Sur-Reply. Paper 35 (“PO Sur-Reply”).

Patent Owner filed a Motion to Exclude Evidence. Paper 37. Petitioner filed an Opposition to Motion to Exclude Evidence. Paper 40. Patent Owner filed a Reply in Support of the Motion to Exclude. Paper 41.

On November 13, 2018, the parties presented arguments at an oral hearing. The hearing transcript has been entered in the record. Paper 44 (“Tr.”).

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Having considered the record before us, we determine that Petitioner has shown by a preponderance of the evidence that claims 11–15 and 20–37 of the ’559 patent are unpatentable. *See* 35 U.S.C. §316(e). Additionally, the Motion to Exclude Evidence by Patent Owner has been addressed below in Section III.

*B. Related Proceedings*

We have instituted three additional *inter partes* reviews of claims of the ’559 patent in IPR2017-02131, IPR2017-02132, and IPR2017-02136. We also note that IPR2017-00378, IPR2017-00380, and IPR2017-00390 were instituted with respect to U.S. 8,562,999, and that several PGR and IPR petitions were also filed with respect to U.S. 9,399,060 B2 and 8,895,024 B2. Pet. 4.

*C. The ’559 Patent (Ex. 1001)*

The ’559 patent involves vaccines for “vaccination of human subjects, in particular infants and elderly, against pneumoccocal infections.” Ex. 1001, 1:21–22. “Pneumonia, febrile bacteraemia and meningitis are the most common manifestations of invasive pneumococcal disease, whereas bacterial spread within the respiratory tract may result in middle-ear infection, sinusitis or recurrent bronchitis.” *Id.* at 1:28–32. “Pneumonia is by far the most common cause of pneumococcal death worldwide.” *Id.* at 1:46–48.

The ’559 patent teaches the “etiological agent of pneumococcal diseases, *Streptococcus pneumoniae* (pneumococcus), is a Gram-positive encapsulated coccus,[1] surrounded by a polysaccharide capsule.[2] Differences in the composition of this capsule permit serological

---

[1] A “coccus” is defined as “a spherical bacterium.” *See* https://www.merriam-webster.com/dictionary/coccus.

[2] “Pneumococcus is encapsulated with a chemically linked polysaccharide which confers serotype specificity. There are 90 known serotypes of pneumococci, and the capsule is the principle virulence determinant for pneumococci, as the capsule not only protects the inner surface of the bacteria from complement, but is itself poorly immunogenic.” Ex. 1007, 2:10–14.

differentiation between about 91 capsular types." *Id.* at 1:49–53. "Pneumococcal conjugate vaccines (PCVs) are pneumococcal vaccines used to protect against disease caused by *S. pneumoniae* (pneumococcus)." *Id.* at 1:59–61. "There are currently three PCV vaccines[3] available on the global market: PREVNAR® (called PREVENAR® in some countries) (heptavalent vaccine), SYNFLORIX® (decavalent vaccine) and PREVNAR 13® (tridecavalent vaccine)." *Id.* at 1:61–65.

The '559 patent teaches "there is a need to address remaining unmet medical need for coverage of pneumococcal disease due to serotypes not found in PREVNAR 13® and potential for serotype replacement over time." *Id.* at 2:3–6.

*D. Illustrative Claims*

All of the challenged claims 11–15 and 20–37 depend either directly or indirectly from independent claim 1 of the '559 patent.[4] Claims 1, 11, and 31 are illustrative of the challenged claims and recite:

> 1. An immunogenic composition comprising a *Streptococcus pneumoniae* serotype 22F glycoconjugate, wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and a carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.

---

[3] The valency of a vaccine refers to the number of different serotypes of bacteria to which the vaccine induces immune response (e.g., a tridecavalent vaccine protects against thirteen different bacterial strains).

[4] Claims 11–15 and 20–37 were not challenged in this proceeding, but were challenged in the related proceedings in IPR2017-02136 and IPR2017-02138.

11. The immunogenic composition of claim 1, wherein said immunogenic composition further comprises a buffer, a salt, a divalent cation, a non-ionic detergent, a cryoprotectant, an anti-oxidant, or a combination thereof.

31. A method of preventing an infection caused by *S. pneumoniae* in a subject comprising administering to the subject an effective amount of the immunogenic composition of claim 1.

Ex. 1001, 141:28–34, 142:26–29, and 143:27–30.

### *E. The Instituted Grounds of Unpatentability*

We instituted trial based on each challenge to the patentability of the ’559 patent presented in the Petition (Pet. 6–7):

| Reference | Basis | Claims Challenged |
|---|---|---|
| Merck 2011,[5] Pfizer 2012[6] | § 103(a) | 11–14, 23–27, 29–33, 35–37 |
| Merck 2011, Pfizer 2012, GSK 2008[7] | § 103(a) | 28 |
| Merck 2011, Pfizer 2012, ’787 Patent[8] | § 103(a) | 15 |
| Merck 2011, Pfizer 2012, Obaro 2002[9] | § 103(a) | 20, 21 |

[5] Caulfield et al., WO 2011/100151 A1, published Aug. 18, 2011 (“Merck 2011,” Ex. 1006).
[6] Brown et al., *Characterization of Complex Prophylactic Vaccines with Protein and Glycoconjugate Components*, 9th CASSS Symposium (Sept. 12, 2012) (“Pfizer 2012,” Ex. 1008).
[7] Biemans et al., WO 2009/000825 A2, published Dec. 31, 2008 (“GSK 2008,” Ex. 1007).
[8] Khandke et al., US 7,935,787 B2, issued May 3, 2011 (“’787 Patent,” Ex. 1010).
[9] Obaro et al., *Safety and immunogenicity of pneumococcal conjugate vaccine in combination with diphtheria, tetanus toxoid, pertussis and*

| | | |
|---|---|---|
| Merck 2011, Pfizer 2012, Sigurdardottir 2008[10] | § 103(a) | 22 |
| Merck 2011, Pfizer 2012, MMWR 2012[11] | § 103(a) | 34 |

Petitioner relies on Declarations of Dennis L. Kasper, M.D. Ex. 1088 and Ex. 1108. Patent Owner relies on a Declaration of Geert-Jan Boons, Ph.D. Ex. 2043.

## *II.* ANALYSIS

### *A. Claim Interpretation*

In an *inter partes* review filed before November 13, 2018, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear.[12] 37 C.F.R. § 42.100(b). Under the broadest reasonable interpretation approach, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire

*Haemophilus influenzae type b conjugate vaccine*, 21 PEDIATRIC INFECTIOUS DISEASE J. 940–6 (2002) ("Obaro 2002," Ex. 1040).

[10] Sigurdardottir et al., *Safety and immunogenicity of CRM$_{197}$-conjugated pneumococcal–meningococcal C combination vaccine (9vPnC–MnCC) whether given in two or three primary doses*, 26 VACCINE 4178–86 (2008) ("Sigurdardottir 2008," Ex. 1011).

[11] Bennett et al., *Use of 13-Valent Pneumococcal Conjugate Vaccine and 23-Valent Pneumococcal Polysaccharide Vaccine for Adults with Immunocompromising Conditions: Recommendations of the Advisory Committee on Immunization Practices (ACIP)*, 61 MMWR 816–9 (2012) ("MMWR 2012," Ex. 1012).

[12] A recent amendment to this rule does not apply here because the Petition was filed before November 13, 2018. *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018).

disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Only terms which are in controversy need to be construed and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

We determine that the following claim term needs to be discussed.

1. *"immunogenic"*

Independent claim 1, as well as many of the dependent claims, recites the term "immunogenic" as a modifier of the term "composition." In the Decision on Institution, we construed "immunogenic" to require a composition that "elicits functional antibody." Dec. Inst. 6–7. We also determined that because claim 1 did not specifically require any additional glycoconjugates besides 22F, the "immunogenic" composition only needed to elicit antibodies against the serotype 22F glycoconjugate recited in claim 1. *Id*.

In its Patent Owner's Response, Patent Owner contends "the context within the claim requires that the *composition* is immunogenic, not merely serotype 22F glycoconjugate in isolation." PO Resp. 14. Patent Owner proposes that "immunogenic" be interpreted as "elicits functional antibody against each serotype in the claimed composition." *Id*. Patent Owner asserts that "[w]hen viewed in the full context of the claims and [S]pecification, [Petitioner's] proposed construction yields the illogical result of a pneumococcal conjugate vaccine wherein one conjugate (serotype 22F) elicits functional antibody, but other conjugates . . . need not." *Id.* at 16.

Petitioner agrees with our Decision on Institution that a "POSITA would have understood that the 'immunogenic' limitation of independent

claim 1 applies to just the serotype 22F conjugate of claim 1." Pet. Reply 23. Petitioner contends:

> no claim of the '559 Patent recites structural characteristics (*e.g.*, molecular weight and/or polysaccharide to protein ratio) for any conjugate other than the serotype 22F conjugate of claim 1. Ex.1108, ¶12. And there is no disclosure in the '559 Patent specification of molecular weights or polysaccharide to protein ratios for any of the 13 conjugates recited in dependent claims 5–8.

*Id.* at 24.

In performing claim interpretation, we first turn to the language of the claims themselves. While claim 1 recites an immunogenic composition composed solely of the "*Streptococcus pneumoniae* serotype 22F glycoconjugate," claims 3–9 recite the inclusion of glycoconjugates from other *Streptococcus pneumoniae* serotypes and claims 21 and 22 recite inclusion of antigens from other pathogenic bacteria or viruses. While claim 1 does not require the presence of other immunogenic components, claims 3–9, 21, and 22 expressly recite the presence of other immunogenic components. In making a vaccine, there would have been no reason to include these additional antigens other than to induce a protective antibody response for vaccination against the included antigens. Therefore, these dependent claims reasonably support Patent Owner's interpretation that an "immunogenic" composition requires eliciting antibodies against each of the serotypes or other immunogens within the "immunogenic" composition.

Next we turn to the Specification of the '559 patent. When the '559 patent uses the term "immunogenic," the '559 patent identifies "a need for immunogenic compositions that can be used to induce an immune response against additional *Streptococcus pneumoniae* serotypes." Ex. 1001, 2:10–

13. The ’559 patent states that multiple serotypes ranging from 7 to 25 may be included in the “immunogenic composition.” Ex. 1001, 3:4–6. The ’559 patent teaches the “pneumococcal opsonophagocytic assay (OPA), which measures killing of *S. pneumoniae* cells by phagocytic effector cells in the presence of functional antibody and complement, is considered to be an important surrogate for evaluating the effectiveness of pneumococcal vaccines.” Ex. 1001, 88:52–56. The ’559 patent supports an interpretation of “immunogenic” which requires elicitation of functional antibody for each component in the composition, consistent with the interpretation of Patent Owner.

During prosecution of the ’559 patent, the Examiner cited art that disclosed both the 22F conjugate and other conjugates to address the claimed compositions for dependent claims. *See* Ex. 1002, 419–20. The Examiner allowed the claims after amendment to include the ranges for molecular weight and ratio of polysaccharide to carrier protein. *See* Ex. 1002, 451, 467. The Examiner did not address the claim construction issue.

Petitioner’s Declarant, Dr. Boons, interprets claim 1 to require that serotype “22F should elicit functional antibodies. But also if other antigens are being included, those should also elicit a functional antibody response.” Ex. 1109, 36:7–10. In contrast, Patent Owner’s Declarant, Dr. Kasper was asked if

> a composition containing a 22F glycoconjugate, 12F glycoconjugate, 10A glycoconjugate, 11A glycoconjugate, and a serotype 8 glycoconjugate and that composition showed functional antibody with respect to the 22F glycoconjugate but not with respect to the other conjugates[], is it your view that Claim 4 would be met?

Ex. 2013, 16:6–12. Dr. Kasper answered "I think that interpretation is consistent with Claim 4." *Id.* at 16:16–17.

Accordingly, upon review of the parties' arguments and the evidence before us, including the claims, specification, and prosecution history of the '559 patent, we conclude that the term "immunogenic," as it is used in that patent, is reasonably construed as requiring that functional antibody be elicited against each immunogen contained in the composition. Consequently, for claim 1 of the '559 patent, which recites a single immunogen, serotype 22F, only functional antibodies to serotype 22F are required to meet the claim limitation. However, for claim 3 of the '559 patent that requires serotypes 22F, 15B, and 33F, functional antibodies against all three serotypes are required. Similarly for other claims, the term "immunogenic" requires functional antibodies be elicited against any immunogens specifically recited and required.

### *B. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art;[13] and, (4) where in evidence,

---

[13] Petitioner states that the level of skill in the art at the time of the invention

objective indicia of nonobviousness.[14] *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

In that regard, an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418. In *KSR*, the Supreme Court also stated that an invention may be found obvious if trying a course of conduct would have been obvious to a person having ordinary skill:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that

---

> would have been an individual or team with Ph.D. degrees in the biological and chemical sciences and at least 3 years of work experience, or an M.D. degree and at least 6 years of work experience, developing conjugate vaccines, including specifically growing sufficient quantities of bacteria, extracting, purifying and analyzing bacterial polysaccharides, conjugating polysaccharides to a carrier protein (and analyzing the conjugates), and performing immunologic testing.

Pet. 33 (citing Ex. 1005 ¶ 60). Patent Owner "does not dispute . . . the level of skill in the art proposed by Merck." PO Resp. 5. We agree with both parties regarding the level of ordinary skill in the art. *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). We also note that the applied prior art reflects the appropriate level of skill at the time of the claimed invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

[14] Neither Petitioner nor Patent Owner presents evidence on the fourth Graham factor.

> instance the fact that a combination was obvious to try might show that it was obvious under [35 U.S.C.] §103.

*KSR*, 550 U.S. at 421. "*KSR* affirmed the logical inverse of this statement by stating that [35 U.S.C.] § 103 bars patentability unless 'the improvement is more than the predictable use of prior art elements according to their established functions.'" *In re Kubin*, 561 F.3d 1351, 1359–60 (Fed. Cir. 2009) (citing *KSR*, 550 U.S. at 417).

Petitioner bears the burden of proving unpatentability of the challenged claims, and that burden never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must establish the facts supporting its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

We analyze the asserted grounds of unpatentability in accordance with the above-stated principles.

### *C. Obviousness over Merck 2011 and Pfizer 2012*

Petitioner contends that claims 11–14, 23–27, 29–33, and 35–37 are unpatentable under 35 U.S.C. § 103(a) as obvious over Merck 2011, Pfizer 2012, and the general knowledge of an ordinary artisan. Pet. 39–62. The thrust of Patent Owner's position with respect to all the claims challenged on this ground is that the cited prior art does not teach or suggest compositions with 22F glycoconjugates that are immunogenic, within the claimed molecular weight ranges, and within the claimed polysaccharide to carrier protein conjugate ratios. PO Resp. 1–2, 17–52. Based on our review of the arguments and the evidence of record, we determine that Petitioner demonstrates, by a preponderance of the evidence, that the subject matter of

claims 11–14, 23–27, 29–33, and 35–37 would have been obvious over Merck 2011, Pfizer 2012, and the general knowledge of an ordinary artisan. After providing a discussion of the prior art and Petitioner's position, we will address Patent Owner's arguments.

1. *Merck 2011 (Ex. 1006)*

Merck 2011 teaches a pneumococcal conjugate vaccine (PCV) comprising "a multivalent immunogenic composition having 15 distinct polysaccharide-protein conjugates. Each conjugate consists of a capsular polysaccharide prepared from a different serotype of *Streptococcus pneumoniae* (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F or 33F) conjugated to a carrier protein, preferably $CRM_{197}$." Ex. 1006, 1:7–11. Merck 2011 teaches "conjugates containing serotypes 22F and 33F provide[] robust antibody responses demonstrat[ing] the feasibility of expanding coverage of pneumococcal serotypes." Ex. 1006, 4:2–3. Merck 2011 teaches the 15-valent pneumococcal conjugate vaccine (PCV-15) "induced high OPA[15] GMTs to each serotype and a 100% OPA response rate for all 15 serotypes contained in the vaccine." Ex. 1006, 23:3–4.

Merck 2011 teaches "purified polysaccharides are chemically activated to make the saccharides capable of reacting with the carrier protein. . . . Coupling to the protein carrier (e.g., $CRM_{197}$) can be by reductive amination via direct amination to the lysyl groups of the protein." Ex. 1006, 6:11–23. Merck 2011 teaches the "concentrated saccharide was mixed with $CRM_{197}$ carrier protein in a 0.2 – 2 to 1 charge ratio. The blended saccharide-$CRM_{197}$ mixture was filtered through a 0.2 µm filter."

[15] Opsonophagocytosis.

Ex. 1006, 17:24–25. Table 1 of Merck 2011 shows a vaccine formulation comprising 32 µg of total polysaccharide and 32 µg of $CRM_{197}$ carrier protein with the total polysaccharide being composed of 2 µg of 14 serotypes including 22F and 4 µg of serotype 6B. Ex. 1006, 19:5–9.

2. *Pfizer 2012*

Pfizer 2012 depicts examples of glycoconjugate vaccines as reproduced below:



The glycoconjugate vaccine image reproduced above depicts chains of carrier proteins represented by the solid lines conjugated to polysaccharide antigens represented by the connected cylinders. Ex. 1008, 4.
Pfizer 2012 teaches glycoconjugate vaccines with a typical mass range of 500 to 5000 kDa. Ex. 1008, 6. Pfizer 2012 teaches conjugation of polysaccharide to proteins such as $CRM_{197}$. Ex. 1008, 20. Pfizer 2012 teaches measurement of the size (i.e. mass) of the polysaccharide and conjugate using techniques such as SEC/MALLS. Ex. 1008, 6–7, and 21.

3. *GSK 2008*

GSK 2008 teaches a *Streptococcus pneumoniae* vaccine comprising "capsular saccharide antigens (preferably conjugated), wherein the saccharides are derived from at least ten serotypes of *S. pneumoniae*" that

may include an "*S. pneumoniae* saccharide conjugate of 22F." Ex. 1007, 8:5–19. GSK 2008 teaches "*Streptococcus pneumoniae* capsular saccharides . . . may be conjugated to a carrier protein independently selected from the group consisting of . . . CRM197." Ex. 1007, 10:12–14. GSK 2008 teaches "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" and specifically, conjugates "can also be prepared by direct reductive amination methods." Ex. 1007, 17:1–28. GSK 2008 teaches "22F-PhtD administered within the 13-valent conjugate vaccine formulation [was] shown immunogenic and induced opsono-phagocytic titers in young OF1 mice." Ex. 1007, 77:21–22.

GSK 2008 teaches: "Preferably the ratio of carrier protein to *S. pneumoniae* saccharide is between 1:5 and 5:1; e.g. between 1:0.5–4:1, 1:1–3.5:1, 1.2:1–3:1, 1.5:1–2.5:1; e.g. between 1:2 and 2.5:1; 1:1 and 2:1 (w/w)." Ex. 1007, 20:24–26. Table 2 of GSK 2008 teaches fourteen different conjugates—the smallest conjugate size was PS4-PD of 1303 kDa and the largest conjugate size was PS9V-PD of 9572 kDa. Ex. 1007, 54–55, Table 2. GSK 2008 discloses a conjugate of serotype 22F, with a carrier/PS ratio of 2.17, but does not determine the conjugate size. Ex. 1007, 55, Table 2.

GSK 2008 claims a conjugate where "the average size (e.g. $M_w$) of the 22F saccharide is between 50 and 800 kDa." Ex. 1007, 93 (claim 56). GSK 2008 further teaches in claim 61 an "immunogenic composition of any preceding claim wherein the average size (e.g. $M_w$) of the saccharides is above 50 kDa, e.g[.], 50–1600." Ex. 1007, 94.

GSK 2008 teaches "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of

larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 14:18–21. GSK 2008 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 recommends optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter." Ex. 1007, 14:34.

4. *Analysis*

Petitioner asserts "Merck 2011 is directed to immunogenic multivalent pneumococcal conjugate compositions that include a serotype 22F conjugate" and that "Merck 2011 demonstrates immunogenicity against serotype 22F by the generation of functional antibody against that serotype." Pet. 41 (citing Ex. 1088 ¶ 110, Ex. 1006, 23:2–4). Petitioner asserts: "Based on Pfizer 2012's disclosure of conjugates between 1,000-5,000 kDa, a POSITA would have been motivated with a reasonable expectation of success to construct the serotype 22F $CRM_{197}$ conjugate of Merck 2011 in that molecular weight range." Pet. 41 (citing Ex. 1088 ¶ 111, Ex.1008, 6). Petitioner also asserts "Merck 2011 discloses pre-conjugation ratios between 0.2 and 2, which a POSITA would have considered indicative of a final conjugate ratio in that same range." Pet. 45 (citing Ex. 1006, 17:24–25). Petitioner points out "the pre-conjugation ratios of Merck 2011 resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1 (~32 μg of polysaccharide and ~32 μg of protein), squarely in the claimed range." Pet 45–46 (citing Ex. 1006, 19:3–8).

Petitioner's Declarant, Dr. Kasper, states that a "POSITA would have considered the disclosure of pre-conjugation polysaccharide to $CRM_{197}$ ratios in the range of 0.2 to 2 indicative of a final conjugate ratio in that range." Ex. 1088 ¶ 116 (citing Ex. 1006, 17:24–25). Dr. Kasper notes "the pre-conjugation ratios of Merck 2011 resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1 (~32 μg of polysaccharide and ~32 μg of protein), squarely in the claimed range." Ex. 1088 ¶ 116 (citing Ex. 1006, 19:3–8). Dr. Kasper also notes "a POSITA's general understanding that conjugate polysaccharide to protein ratios in the claimed range (0.4 to 2) are typical for immunogenic conjugates" and cites a monograph disclosing ratios of saccharide to protein in a pneumococcal $CRM_{197}$ conjugate vaccine with seven serotypes, concluding that each "disclosed ratio overlaps to a large extent with the claimed ratio of 0.4 to 2, consistent with the general understanding in the art as of January 21, 2014 that such ratios are typical for immunogenic conjugates." Ex. 1088 ¶¶ 117–118 (citing Ex. 1085, 20–24).

Dr. Kasper states a "POSITA easily could have constructed a cross-linked serotype 22F $CRM_{197}$ conjugate in Pfizer 2012's molecular weight range, using the well-known reductive amination or CDAP conjugation chemistries disclosed in Merck 2011." Ex. 1088 ¶ 112 (citing Ex. 1006, 6:15–7:6). Dr. Kasper states "cross-linked conjugates of 5,000 kDa were well-known" as were "pneumococcal conjugate molecular weights of 1,303-9,572 kDa." Ex. 1088 ¶ 112 (citing Ex. 1026, 7; Ex. 1007, 54:27–55:1). Dr. Kasper states:

> Because the structure of serotype 22F capsular polysaccharide had been known to the art since 1989 . . . (Ex. 1029), a POSITA would have required only routine experimentation to obtain a

> conjugate molecular weight within the desirable range disclosed in Pfiser 2012, *e.g.*, by increasing or decreasing the amount of cross-linking in the conjugate.

Ex. 1088 ¶ 113, (citing Ex. 1030, 4:56–59).

Having reviewed the cited evidence, and the record as a whole, we find that Petitioner has accurately described the above stated teachings of Merck 2011 and Pfizer 2012. We adopt these stated facts as our own. *See* Pet. 19–54. We focus our remaining analysis on Patent Owner's arguments that the cited combination fails to teach or suggest an immunogenic composition including: (1) a serotype 22F glycoconjugate having a molecular weight of between 1000 kDa and 12,500 kDa; and (2) a polysaccharide to carrier protein ratio (w/w) of between 0.4 and 2.

*a. "wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa"*

Patent Owner asserts:

> Claim 1 and each of the challenged claims that depend therefrom require that the recited serotype 22F glycoconjugate "has a molecular weight of between 1,000 kDa and 12,500 kDa." [Ex.]1001 at claim 1, 11-14, 23-27, 29-33, and 35-37. Merck 2011, Pfizer 2012, and the general knowledge do not alone or in combination teach or suggest this limitation.

PO Resp. 17.

*i. Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan suggest the claimed molecular weight*

Patent Owner asserts a "POSA would have given little or no weight to Pfizer 2012 when designing a pneumococcal glycoconjugate, much less a serotype 22F glycoconjugate." PO Resp. 17. Patent Owner asserts "Pfizer 2012 does not provide any information about how to make any of these

diverse types of vaccines." PO Resp. 18. Patent Owner asserts "Pfizer 2012 does not provide any guidance to a POSA on how to generate a *S. pneumoniae* serotype 22F glycoconjugate or what the resulting molecular weight should be." PO Resp. 19.

We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence (*see* Pet. Reply 3–7).

We find that Patent Owner has not persuasively demonstrated that the teachings of Merck 2011 regarding polysaccharide sizing and conjugation would require undue experimentation to obtain serotype 22F polysaccharide conjugates within the range suggested by Pfizer 2012. Merck 2011 teaches "polysaccharides can be isolated from bacteria and may be sized to some degree by known methods;" "sized in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products;" and "prepared from serotypes . . . 22F . . . of *S. pneumoniae*." Ex. 1006, 4:14–18. Merck 2011 teaches the "polysaccharide conjugates may be prepared by known coupling techniques." Ex. 1006, 6:13–14.

Pfizer 2012 teaches the range of 500 to 5000 for glycoconjugates (Ex. 1008, 6), and GSK 2008 also evidences that "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" and specifically, conjugates "can also be prepared by direct reductive amination methods." Ex. 1007, 17:1–28.

Thus, a preponderance of the evidence of record suggests that the ordinary artisan would have recognized the desirable range for glycoconjugates disclosed by Pfizer 2012 and would have been able to generate serotype 22F glycoconjugates within that range as evidenced by

Merck 2011 and GSK 2008.

*ii. Optimization*

Patent Owner asserts a "POSA would have understood that a number of variables can affect polysaccharide activation, conjugation, and the final molecular weight of a glycoconjugate" and "[d]ue to these variables, a POSA 'couldn't predict what the outcome would be' with regard to the molecular weight of an uncharacterized serotype 7F glycoconjugate." PO Resp. 21 (citing Ex. 2043 ¶ 61; Ex. 1035 7–8).

Patent Owner further asserts that "[d]etermining the appropriate molecular weight for a specific serotype glycoconjugate was not a matter of 'routine optimization' of existing reductive amination procedures as of January 21, 2014." PO Resp. 22 (citing Ex. 2043 ¶ 62). Patent Owner asserts "each serotype glycoconjugate was designed using different protocols, and resulted in serotype glycoconjugates having different properties, thereby demonstrating that each serotype glycoconjugate needed to be evaluated on a case-by-case basis." PO Resp. 23 (citing Ex. 1007, Table 2).

As already noted, Patent Owner asserts:

> Pfizer 2012 does not refer to serotype 22F glycoconjugates and only refers to general molecular weights well outside the range in the '559 patent claims, Pfizer 2012 would not have provided a POSA with any meaningful guidance or suggestion to generate an immunogenic serotype 22F glycoconjugate within the claimed molecular weight.

PO Reply 18.

Patent Owner asserts "[t]here is no overlap between the molecular weights in GSK 2008 and the '559 claims." PO Resp. 25. Patent Owner asserts:

> The serotype 22F glycoconjugates of GSK 2008 were treated in an alkaline pH of 9.0 (EX1007 at 51:5-8; 52:18-22), and as a result the molecular weight of the serotype 22F polysaccharide in the final glycoconjugates would be expected to be levels lower than the pre-conjugation weight of 22F (159-167 kDa).

PO Resp. 25–26. Patent Owner asserts "[t]he polysaccharide size in a final glycoconjugate of GSK 2008 would be unpredictable and as a result, and GSK 2008 cannot render the '559 claims obvious." PO Resp. 26.

Patent Owner asserts that a "POSA would not have determined the molecular weight of serotype 22F glycoconjugates based on GSK 2008 Table 2" because the "table does not provide the molecular weight for the two serotype 22F glycoconjugates" and the "serotype 22F glycoconjugates also differ from the other listed glycoconjugates in that they were associated with dramatically lower antigenicity, and with some of the highest protein to polysaccharide ratios as compared to all of the other serotype glycoconjugates." PO Resp. 28.

Patent Owner reiterates these arguments in the Patent Owner's Reply and also asserts Petitioner's "asserted 'desirable range' is fabricated from the lower and upper molecular weight limits for two non-serotype 22F glycoconjugates (*i.e.*, PS4-PD and PS9V-PD) referenced in Table 2 of GSK-2008." PO Sur-Reply 7.

We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence. *See* Pet. Reply 7–15.

Merck 2011 teaches that "[c]apsular polysaccharides from *Streptococcus pneumoniae* can be prepared by standard techniques known to those skilled in the art. For example, polysaccharides can be isolated from bacteria and may be sized to some degree by known methods (see, e.g., European Patent Nos. EP497524 and EP497525) and preferably by microfluidisation." Ex. 1006, 4:12–15. Merck 2011 teaches "[p]olysaccharides can be sized in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products. In the present invention, capsular polysaccharides are prepared from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, **22F**, 23F and 33F of *S. pneumoniae*." Ex. 1006, 4:15–18 (emphasis added). Merck 2011 teaches that:

> The different serotype saccharides are individually conjugated to the purified $CRM_{197}$ carrier protein using a common process flow. In this process the saccharide is dissolved, sized to a target molecular mass, chemically activated and buffer-exchanged by ultrafiltration. The purified $CRM_{197}$ is then conjugated with the activated saccharide and the resulting conjugate is purified by ultrafiltration prior to a final 0.2 µm membrane filtration.

Ex. 1006, 16:27–31.

Thus, Merck 2011 disclosed methods to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide, and taught to couple to known carrier proteins such as $CRM_{197}$, while limiting the upper size range using membrane filtration. Ex. 1006, 4:12–18, 16:27–31. Thus, rather than fabricating desired sizes, Merck 2011 specifically provides methods to constrain polysaccharide sizes within a particular size range. Ex. 1006, 16:27–31.

Pfizer 2012, in the context of characterizing vaccines, expressly discloses that the "[t]ypical mass (kDa)" for glycoconjugate vaccines is "500 to 5000." Ex. 1008, 6. As Dr. Kasper notes:

> The disclosed molecular weight range in Pfizer 2012 largely overlaps the claimed range of 1,000-12,500 kDa, and therefore expressly teaches conjugates of 1,000-5,000 kDa that fall within the claimed range. It would have been obvious to a POSITA to apply the teachings of Pfizer 2012 to the pneumococcal $CRM_{197}$ conjugate vaccine of Merck 2011; a POSITA would have been aware of Patent Owner's licensed Prevnar® pneumococcal $CRM_{197}$ conjugate vaccines.

Ex. 1005 ¶ 106.

While GSK 2008 was not expressly relied upon in the statement of the rejection, GSK 2008 evidences typical conjugation methods, polysaccharide sizes, and conjugate sizes of which the ordinary artisan would have been aware. *See, e.g.*, Pet. 29–30.

Table 2 in GSK 2008 shows a range of conjugate sizes where the lowest reported value is 1303 kDa and the highest reported value is 9572 kDa, both values falling within the range of 1000 kDa to 12,500 kDa required by claim 1. Ex. 1007, 54–55. GSK 2008 prefers that "saccharide conjugates of the invention should have an average size of saccharide pre-conjugation of 50-1600" kDa but notes that the "present inventors have found that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 teaches that "[f]ull length polysaccharides may be 'sized' i.e. their size may be reduced by various methods such as acid hydrolysis treatment, hydrogen peroxide treatment, sizing by emulsiflex®

followed by a hydrogen peroxide treatment to generate oligosaccharide fragments or microfluidization." Ex. 1007, 14:6–10.

GSK 2008 teaches the "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" including "direct reductive amination methods as described in US 4365170 (Jennings) and US 4673574 (Anderson). Other methods are described in EP-0-161-188, EP-208375 and EP-0-477508." Ex. 1007, 17:28–30. GSK 2008 is replete with suggestions to conjugate pneumococcal polysaccharides of various serotypes to $CRM_{197}$. *See, e.g.*, Ex. 1007, 13.

GSK 2008 also provides more specific reasons to optimize the saccharide conjugates for larger sizes by teaching "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 14:18–21. GSK 2008 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 14:23–25. GSK 2008 recognizes optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter." Ex. 1007, 14:34.

Thus, GSK 2008 demonstrates that the artisan recognized a range of conjugated polysaccharide sizes overlapping that recited by the '559 claims, disclosed methods to optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$. Ex. 1007, 13–15, and 54–55.

Dr. Kasper, relying on GSK 2008, states "[c]onjugation of each polysaccharide to a carrier protein may be performed 'by any known coupling technique,' including conjugation chemistries based on CDAP and/or reductive amination." Ex. 1088 ¶ 88 (citing Ex. 1007, 17:1–30). Dr. Kasper states "a POSITA would have required only routine experimentation to obtain a conjugate molecular weight within the desirable range disclosed in Pfizer 2012, *e.g.*, by increasing or decreasing the amount of cross-linking in the conjugate." Ex 1088 ¶ 113 (citing Ex. 1030, 4:56–59). Dr. Kasper also stated, in response to the question "[s]o would you agree that developing pneumococcal glycoconjugates is very much a serotype-specific process?" that "I think there is a common process that you follow. This is routine optimization, as far as I'm concerned. There's nothing unusual about doing that. That's typical." Ex. 2013, 29:21–24.

In rebuttal to Dr. Kasper's position that the molecular weight of the serotype 22F glycoconjugate would have been an optimizable variable, Patent Owner relies on Dr. Boons' statement that:

> The determination of an appropriate molecular weight for a specific serotype glycoconjugate was not, in my opinion, a matter of "routine optimization" of existing reductive amination procedures. A number of variables affect the postconjugate molecular weight and/or immunogenicity of a specific serotype glycoconjugate. Because numerous variables affect the post-conjugation molecular weight and/or immunogenicity of a specific serotype glycoconjugate . . . a POSA would not have inferred that 22F glycoconjugates fall within a particular molecular weight based on the molecular weight of other serotype glycoconjugates (*e.g.*, those serotypes listed in Table 2 of GSK 2008). For example, as noted in Jones 2005 (a document cited by Merck), some glycoconjugates were considerably smaller than the range recited in the '559 patent.

Ex. 2043 ¶ 62.

Under deposition, Dr. Boons stated that “something that the person skilled in the art would know, is that multiple parameters are important and can be critical for generating an immunogenic glycoconjugate composition, including degree of oxidation, saccharide to protein ratio, and molecular weights.” Ex. 1109, 65:2–8. Dr. Boons stated that “it is well known that glycoconjugate vaccine development is difficult, that multiple parameters need to be optimized, and that success cannot be predicted beforehand.” Ex. 1109, 66:21–24.

However, in response to a question as to whether he could “identify a passage in the ’559 patent where the inventors describe issues that they had constructing a serotype 22F conjugate that elicits functional antibody,” Dr. Boons stated “I can’t identify a specific section mentioning specifically 22F.” Ex. 1109, 69:7–12. In this discussion, Dr. Boons did not identify any specific teaching in the ’559 patent or other prior art that demonstrated that the optimization of the size of the serotype 22F conjugate, known to be desirable by the skilled artisan, would have had any specific issues or concerns. *See* Ex. 1109, 67:2 to 69:25.

Dr. Kasper responded to Dr. Boons’ concerns, noting that “[i]t would have been trivial for a POSITA to construct a conjugate with sufficient cross-linking to produce a serotype 22F conjugate over 1,000 kDa; the serotype 22F polysaccharides and $CRM_{197}$ carrier proteins each have multiple conjugation points.” Ex. 1108 ¶ 46. Dr. Kasper noted that “because the disclosed neoglycoconjugates in Jones 2005 contained on average six saccharides[], such neo-glycoconjugates would have been over 1,000 kDa with six serotype 22F polysaccharides (and also within the

claimed range), even if the polysaccharides were as small as 167 kDa." Ex. 1108 ¶ 48.

Patent Owner's declarant, Dr. Paradiso, was asked during deposition whether a "person of . . . skill in the art . . . would have understood how to vary the conjugation reaction conditions to achieve those different ten conjugates of Table 16?" Ex. 1104, 103:13–17. Dr. Paradiso answered that a "person of skill in the art would, based on the information given in [columns 15 and 16 and Table 16 of the '559 patent], probably have a good idea on how to vary these parameters." Ex. 1104, 103:19–22. In a follow-up question, Dr. Paradiso agreed that "there is no disclosure of a particular molecular weight of the serotype 22F conjugate that is used in the 16-valent composition [in the '559 patent]." Ex. 1104, 106:6–9.

The evidence of record, therefore, shows that optimization of polysaccharide conjugate size was well known to the person of ordinary skill in the art, as even Patent Owner's expert Dr. Boons acknowledged. Ex. 1109, 66:21–24. Dr. Boons further acknowledged that the '559 patent did not rely on any specific disclosure explaining issues in generating a serotype 22F conjugate (Ex. 1109, 69:7–12), thereby supporting the reasonable position of Dr. Paradiso that the ordinary artisan would "probably have a good idea on how to vary these parameters." Ex. 1104, 103:19–22. This evidence supports a determination that routine optimization would have been obvious, particularly when combined with the teachings of Merck 2011 to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide; with teachings of Pfizer 2012 of a particular size range for glycoconjugate vaccines, and with the teachings of GSK 2008 of methods to optimize the size of the polysaccharides as well as

to couple to known conjugates such as $CRM_{197}$; and with Dr. Kasper's statement that "[t]his is routine optimization, as far as I'm concerned. There's nothing unusual about doing that. That's typical." *See* Ex. 2013 ¶ 82.

We recognize, but find unpersuasive, Patent Owner's assertion that "it is unreasonable to conclude that the molecular weight of a serotype 22F glycoconjugate would necessarily be over 1,000 kDa" (PO Resp. 27), because the issue is the obviousness of routine optimization of conjugate sizes, not inherent anticipation by Pfizer 2012 or GSK 2008. Instead, we agree with Petitioner that "a POSITA would have found the 1,000-5,000 kDa molecular weight range disclosed in Pfizer 2012 to be desirable and would have had a reasonable expectation of achieving an immunogenic serotype 22F conjugate in that range." Pet. Reply 12–13.

We find that a preponderance of the evidence of record demonstrates that conjugate size is a results-effective variable associated with improved stability of conjugates and good immune response, limited only by filter size, thereby rendering "optimization within the grasp of one of ordinary skill in the art." *In re Applied Materials*, 692 F.3d 1289, 1295 (Fed. Cir. 2012). "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955).

We, therefore, conclude that a preponderance of the evidence of record supports Petitioner's position that the 1,000 to 12,500 kDa size range in claim 1 of the '559 patent, which overlaps with the 1,000 to 5,000 kDa range of Pfizer 2012, would have been consistent with the ranges optimized and used to generate multivalent vaccines. Pet. 39; Ex. 1008, 6. "In cases

involving overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a prima facie case of obviousness." *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003).

*iii. General Knowledge and Other Prior Art*

Patent Owner criticizes Petitioner's reliance on Jones 2005 (Ex. 1026)[16] and Lees 2008 (Ex. 1035)[17] as evidence that the person of ordinary skill in the art would have understood that "the claimed ranges of the '559 Patent were known as typical and desirable." *See* PO Resp. 29–31; Pet. Reply 15–16.

Patent Owner asserts that: "Jones 2005 does not mention any serotype 22F glycoconjugates, much less how to make these glycoconjugates" and that "Lees 2008 does not refer to any serotype 22F glycoconjugates, much less how to make an immunogenic serotype 22F glycoconjugate having the specific molecular weight and ratio parameters

---

[16] Jones 2005 reviews polysaccharide vaccines including *Streptococcus pneumoniae vaccines*. Ex. 1026, 2. Jones 2005 discusses both glycoconjugate vaccines and a 23-serotype specific pneumococcal polysaccharide vaccine. Ex. 1026, 6. Jones 2005 teaches $CRM_{197}$ as a carrier protein and 5,000 kDa glycoconjugates. Ex. 1026, 7. Jones 2005 also shows a cartoon representation that depicts different structural types of glycoconjugate vaccines. Ex. 1026, 8, Fig. 2.

[17] Lees 2008 reviews conjugation chemistry, and particularly, polysaccharides and carrier proteins used in pneumococcal vaccines. Ex. 1035, 23. Lees 2008 identifies factors including the ratio of protein and polysaccharide as variables that may be controlled during the conjugation process. Ex. 1035, 5. Lees 2008 teaches sizing of the conjugates by purification using size exclusion chromatography or filtering through membranes with particular molecular weight cutoffs. Ex. 1035, 5.

recited in the ’559 patent claims.” PO Resp. 30–31 (citing Ex. 2043 ¶¶ 73, 75).

Patent Owner then makes specific assertions identifying deficiencies in Jones 2005 and Lees 2008. For Jones 2005, Patent Owner asserts that “Jones 2005 refers to a (non-pneumococcal) glycoconjugate having a molecular weight (5,000 kDa) within the recited range of the ’559 patent claims, and one that does not (90 kDa)” and asserts a “POSA likely would have initially focused on the smaller neo-glycoconjugate, because it would be expected to be simpler to generate and easier to characterize.” PO Resp. 30.

For Lees 2008, Patent Owner asserts that “Lees 2008 cautions that ‘careful control’ over numerous factors (e.g., pH, temperature, ratio of protein and polysaccharide and concentration of each) is ‘key to successful conjugation.’” PO Resp. 31. Patent Owner further asserts, as to Lees 2008, that a “POSA would have known that more than routine experimentation would be needed to determine the appropriate molecular weight (or polysaccharide to protein ratio) of any given serotype glycoconjugate, and that appropriate conjugation conditions for each serotype glycoconjugate needed to be carefully determined on a case-by-case basis.” PO Resp. 32 (citing Ex. 2043 ¶ 75).

We are unpersuaded by Patent Owner’s general allegations because each of these references provides specific teachings regarding vaccine glycoconjugates that establish the knowledge of the ordinary artisan. Petitioner cites Jones 2005 and Lees 2008 in order to demonstrate that the specific conditions used for making glycoconjugate in general were well known. Pet. 43 (citing Ex. 1026, 7; Ex. 1035, 6–8).

Jones 2005 teaches the repeating unit structure of types 1, 2, 3, 4, 5, 6B, 9N, 9V, 12F, 14, 18C, 19F, and 23F of *S. pneumoniae*. *See* Ex. 1026, 5. Jones 2005 does teach structurally variant conjugate vaccines comprising either neoglycoconjugate or crosslinked oligosaccharides with $CRM_{197}$ (*see* Ex. 1026, 8, Fig. 2), but Jones 2005 explains that the "immune responses elicited by these different structural variants are generally similar." Ex. 1026, 7. Jones 2005 teaches, for *Haemophilus influenzae* type b glycoconjugate vaccines, that different methods result in different sizes, with a reductive amination approach resulting in a glycoconjugate that "is approximately 90 kDa in size, is approximately 30% carbohydrate and contains an average of six glycan chains per carrier protein" while cyanogen bromide activation approach results in a conjugate that "is a crosslinked network of polysaccharide and protein with a molecular weight of, on average, $5\times10^6$ Da [(5,000 kDa)]." Ex. 1026, 7. Jones 2005 teaches "[s]tudies of the crosslinked conjugate vaccines have focused principally on the molecular size" (Ex. 1026, 12) and explains that "[m]olecular sizing of the conjugates is a simple and effective means to ensure consistency of the final conjugate." Ex. 1026, 13–14.

Thus, Jones 2005 demonstrates that the ordinary artisan was aware that different conjugation methods yielded different size glycoconjugates, that size was an important parameter, and that size was controllable using molecular sizing techniques.

Lees 2008 teaches that serotype 22F vaccines are used in formulations, teaching "the currently available licensed 23-valent pneumococcal PS vaccine is formulated with PSs from the 23 most prevalent strains: 1, 2, 3, 4, 5, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C,

19F, 19A, 20, 22F, 23F, and 33F." Ex. 1035, 2. Lees 2008 teaches that "[s]ize fractionation is usually necessary" (Ex. 1035, 4) and that "[c]areful control over the factors relevant to the particular chemistry is key to successful conjugation. These factors include pH, temperature, the ratio of the protein and PS, and the concentration of each." Ex. 1035, 5. Thus, Lees 2008 demonstrates that the factors necessary to obtain particular glycoconjugates are results-optimizable variables, noting "[s]ince each capsular serotype has a different structure, reaction conditions, including concentrations, molar ratios of periodate, oxidation times, and pH, must be optimized." Ex. 1035, 6. Lees 2008 explains that after the reaction has been completed, particular desired sizes of glycoconjugates can be obtained because "purification of the conjugate is usually performed by size exclusion, by using either size exclusion chromatography or membranes with appropriate molecular weight cutoffs." Ex. 1035, 5.

Thus, Lees 2008 demonstrates not only that serotype 22F pneumococcal vaccines are desirable, but provides detailed discussion regarding the known parameters necessary to obtain particular glycoconjugates as well as methods to limit those glycoconjugates to the desired size.

Considered as a whole, we conclude that the disclosures in Jones 2005 of a 5000 kDa glycoconjugate and in Lees 2008 of a multiple conjugate formulation provide evidence that glycoconjugate size was a known optimizable variable. *See* Pet. 42; Ex. 1026, 7; and Ex. 1035, 7. That is, these additional references underline the basic teachings in Merck 2011 and GSK 2008 discussed above and further demonstrate that at the time of invention, a person of ordinary skill in the art would have recognized how to

generate glycoconjugates of varying sizes using known techniques and recognized that size was a known, optimizable variable.

*b. "ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2"*

Patent Owner asserts "Merck 2011, GSK 2008 and the general knowledge would not have motivated a POSA to generate a 22F glycoconjugate with the recited polysaccharide to carrier protein ratio." PO Resp. 32 (citing Ex. 2043 ¶ 76). Patent Owner further asserts "Pfizer 2012 does not refer to any polysaccharide to protein ratios for any serotype glycoconjugates." PO Resp. 33.

*i. Merck 2011's "charge ratio"*

Patent Owner asserts that "the referenced ratio in Merck 2011 is presented in terms of 'charge', not weight to weight, as required by the '559 patent claims." PO Resp. 33 (citing Ex. 2043 ¶ 78; Ex. 1006, 19:24–25). Patent Owner asserts "[a]t deposition, Dr. Kasper was unable to define what is meant by the term 'charge ratio'" and, therefore, "Merck's basis for the assertion that a general relationship exists between this term and weight-to-weight ratio is unclear." PO Resp. 34 (citing Ex. 2043 ¶ 80). Patent Owner asserts "a POSA would not have had any idea how to determine the appropriate ranges for this undefined parameter." PO Resp. 35. Patent Owner asserts "Merck 2011 also does not teach or suggest that any pre-conjugation polysaccharide to protein ratio (much less a w/w ratio) would be a 'result-effective variable' or have any impact on the resulting properties, *e.g.*, immunogenicity, of its serotype 22F glycoconjugates." PO Resp. 35 (citing Ex. 2043 ¶ 77; *In re Antonie*, 559 F.2d 618, 620 (CCPA 1977)).

While we agree with Patent Owner that the meaning of the term "charge ratio" is not intrinsically clear from Merck 2011, Patent Owner's assertion that Dr. Kasper was unable to define the term is incorrect, as Dr. Kasper stated that "[c]harge ratio refers to the preconjugation ratio of your two components." Ex. 2013, 78:20–21. Dr. Kasper supports this interpretation based on "45 years of experience in the field, that's how it's commonly used." Ex. 2013, 79:2–3. Dr. Kasper explains, in response to the question of "[h]ow is charge ratio determined?" that "[t]he common usage would be the ratio of the weight of one that you put into the reaction to the weight of the other, the amount of one — it's a stoichiometric ratio based on the amount of material that goes in." Ex. 2013, 80:12–17. Dr. Kasper also notes that "Merck 2011 specifically discloses that serotype 22F did not require unusual conjugation conditions. In particular, Merck 2011 discloses common activation and conjugation conditions, as well as any serotypes for which the conditions that deviate from those common conditions. Common conditions are not modified for serotype 22F." Ex. 1108 ¶ 32.

Dr. Boons states that a "POSA in January 2014 would not have been familiar with this term." Ex. 2043 ¶ 79. Dr. Boons responds to Dr. Kasper's statements by noting that Weber 2009 is an example where "the term 'charge ratio' means exactly what one would expect from the words recited in this term, *i.e.*, the ratio of charges (not weights) between two different elements." Ex. 2043 ¶ 79.

Although we agree with Patent Owner that Merck's teaching of a 0.2–2 to 1 charge ratio for polysaccharide and carrier protein does not necessarily equate to the 0.4 to 2 w/w ratio required by claim 1, Merck's teaching nevertheless suggests that the ratio (i.e., proportional relationship)

between the amount of polysaccharide to carrier protein represents an optimizable variable. Even Dr. Boons, after disagreeing with the question "[d]o you agree that based on the Oxford Dictionary of Chemical Engineering for 'charge' the term 'charge ratio' in Merck 2011 refers to the ratio of the quantities of polysaccharide and protein that are fed into the conjugation reaction?" Acknowledged this by stating: "I look at molar equivalents, not at weight equivalents. Actually I teach my students when you perform reactions weights are far less important than molar equivalents." Ex. 1109, 171:15–20, 173:14–18. Dr. Boons' statements indicate that the relative amount of the components, whether measured in moles or molecular weight, is a known parameter for optimization.

Therefore, even if Dr. Boons' interpretation of "charge ratio" as referring to molar equivalents of the polysaccharide and carrier protein is correct, and even if these ratios represent pre-conjugation amounts rather than post-conjugation amounts, the evidence still supports an understanding of Merck 2011 as suggesting that the relative amounts of these two components are results optimizable for the conjugation reaction and resultant vaccine.

*ii. Merck 2011's pre- and post-conjugate ratios*

Patent Owner asserts the "ratio values in Merck 2011 are pre-conjugation ratios that do not necessarily indicate post-conjugation characteristics of the glycoconjugate." PO Resp. 35 (citing Ex. 2043 ¶ 81). Patent Owner asserts "Tables 1 and 2 of GSK 2008 disclose pre-conjugation ratios that are 28% higher (2.5/1 up to 3.2/1 for serotype 19A) or 50% lower (1/1 down to 0.5/1 for serotype 23F) compared to the final conjugation ratios." PO Resp. 35 (citing Ex. 1007, 53–56, Tables 1–2). Patent Owner

asserts that based on these tables in GSK 2008, "a POSA would have understood that one could not reasonably predict a post-conjugation polysaccharide to protein ratio based on pre-conjugation polysaccharide to protein ratios." PO Resp. 36. Patent Owner asserts that "[i]n Table 2 of GSK 2008, some glycoconjugates comprised up to 11.2% free polysaccharide and up to 4.9% free carrier protein" and that "Merck 2011 considered its first formulation comprised unconjugated polysaccharide at levels high enough to be problematic, and that the levels of these conjugated polysaccharides and carrier protein were allegedly reduced to an unknown level in the second formulation." PO Resp. 37–38 (citing Ex. 1007, Table 2 and Ex. 1006, 24:1–28).

Patent Owner also asserts:

> [t]here is no evidence that the polysaccharides and carrier proteins listed in Merck 2011 Table 1 exist in the composition in a 1:1 ratio for each serotype. EX2043, ¶85. Table 1 lists the total amount of the fifteen different polysaccharides and the total amount of the carrier protein, it does not assess polysaccharide/protein ratio by serotype.

PO Resp. 39.

We are not persuaded by Patent Owner's arguments that Table 1 in Merck 2011 does not suggest a weight/weight ratio of polysaccharide to carrier protein within the range of 0.4 and 2 as required by claim 1 of the '559 patent because Table 1 of Merck 2011 discloses an example that would reasonably have been expected to result in a 1:1 w/w ratio of the 22F polysaccharide to the $CRM_{197}$ carrier protein. Ex. 1006, 19:5–9. This expectation is supported by Dr. Kasper's statement that the ratios "resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1." Ex. 1088 ¶ 116.

Even comparing the pre- and post-conjugation evidence in Tables 1 and 2 of GSK 2008 that relate to serotypes other than serotype 22F, we note that either a 50% reduction or a 28% increase in the 1:1 starting pre-conjugation ratio for serotype 22F disclosed in Merck 2011 would still result in a final conjugation composition that falls within the 0.4 and 2 w/w ratio range required by claim 1. Therefore, even fully accepting Patent Owner's position, the final conjugated composition of serotype 22F in Merck 2011 would have been expected to render claim 1 obvious. *See, e.g.*, *Ineos USA LLC v. Berry Plastics Corp*., 783 F.3d 865, 869 (Fed. Cir. 2015) ("When a patent claims a range, as in this case, that range is anticipated by a prior art reference if the reference discloses a point within the range.")

We recognize that Dr. Boons states that "[g]iven the variation between pre- and post-conjugation ratios in Tables 1 and 2 of GSK 2008, a POSA would have understood that pre-conjugation ratios do not indicate post-conjugation ratios and that the appropriate ratio of each serotype glycoconjugate must be determined on a case-by-case basis." Ex. 2043 ¶ 81. However, Dr. Boons has not established that the post-conjugation ratios for any serotype shown in the Merck 2011 Table 2 fall outside the range recited in claim 1, while Dr. Kasper states "[f]or the PS22F-PhtD conjugate, the carrier protein to polysaccharide ratio is 2.17 (which translates to a polysaccharide to carrier protein ratio of 1/2.17 or 0.46), with only 5.8% free (unconjugated) polysaccharide." Ex. 1088 ¶ 90. Thus, the evidence of record in Merck 2011 suggests that the polysaccharide to carrier protein ratio of a serotype 22F conjugate falls within the claimed ratio range of 0.4 to 2.

Moreover, Lees 2008 supports the obviousness of optimizing the claimed range, noting that "[r]egulatory authorities have considered the

potency assay for conjugate vaccines to be a combination of the determination of the PS-to-protein ratio and the estimation of the amount of residual free saccharide. Ex. 1035, 9.

Additionally, JNIID identifies saccharide to protein ratios for seven serotypes, serotypes 4, 6B, 9V, 14, 18C, 19F, and 23F, that range from a low of 0.3 to a high of 2.6, with the vast majority falling within the range of 0.4 and 2 recited by claim 1 of the ’559 patent. Ex. 1085, 23. Thus, we agree with Dr. Kasper’s statement that “[e]ach disclosed ratio [in JNIID] overlaps to a large extent with the claimed ratio of 0.4 to 2, consistent with the general understanding in the art as of January 21, 2014 that such ratios are typical for immunogenic conjugates.” Ex. 1088 ¶ 118.

Therefore, a preponderance of the evidence of record supports the obviousness of selecting polysaccharide to carrier protein ratio values for the serotype 22F polysaccharides within the 0.4 and 2 range recited in claim 1 of the ’559 patent based on the disclosures of Merck 2011, GSK 2008, and the knowledge of the ordinary artisan, including the WHO guidelines.

*iii. Optimization of 1:1 polysaccharide to protein ratio*

Patent Owner asserts a “POSA would disagree with Dr. Kasper’s assertion that one would be ‘shooting for’ a polysaccharide to protein ratio of 1:1. . . . GSK 2008 (cited by Merck in Ground 3), in fact, teaches the opposite. For example, Table 1 of GSK 2008 provides pre-conjugation protein/polysaccharide ratios ranging from 1:1 to 3:1.” PO Resp. 39–40 (citing Ex. 2019, 71:16–72:6, 44:7–16; Ex. 1008, Table 1). Patent Owner asserts that Example 2 of GSK 2008 “targets a ratio well below 1:1 and outside the claimed ranges” where the “conjugate had a final protein to

polysaccharide ratio of 4.1 (w/w), which translates to a polysaccharide to protein ratio of 1:4.1, or 0.24." PO Resp. 40–41 (citing Ex. 1007, 52:38).

We are not persuaded that the range recited in claim 1 of polysaccharide to the carrier protein, between 0.4 and 2, is unobvious. We note that while Dr. Kasper responded to a question about a 1:1 saccharide to protein ratio as "[t]hat's what you're shooting for most often," Dr. Kasper continued to state regarding the ratio that "[b]ut they fall within a range. And the Pfizer patent and the GSK patent define a range of .4 to 2." Ex. 2013, 77:7–23. Thus, Dr. Kasper states that the range recited in claim 1 would have been obvious based on the ranges disclosed in the prior art.

We recognize Patent Owner's reliance on Dr. Boons' statement that "[p]rior to generating a glycoconjugate, a POSA would not have assumed that any particular post-conjugation polysaccharide to protein ratio would necessarily be appropriate for generating that given glycoconjugate." Ex. 2043 ¶ 86 (citing Ex. 1026, 13).

A preponderance of the evidence does not support Patent Owner's position. GSK 2008 specifically suggests a range of carrier protein that overlaps the range recited in claim 1 of the '559 patent, and GSK 2008 specifically teaches "the majority of the conjugates, for example 6, 7, 8, 9 or more of the conjugates have a ratio of carrier protein to saccharide that is greater than 1:1, for example 1.1:1." Ex. 1007, 20:24–28. Of equal significance, Merck 2011 teaches conjugations in which equal amounts of polysaccharide and carrier protein are present, including equal amounts of serotype 22F, suggesting a 1:1 ratio of these components. Ex. 1006, Table 1.

*D. Obviousness over Merck 2011, Pfizer 2012, and GSK 2008*

Petitioner asserts "[b]ased on GSK 2008 and the general knowledge of a POSITA, a POSITA would have been motivated with a reasonable expectation of success to formulate the immunogenic composition of claim 1 in lyophilized form to improve stability." Pet. 56 (citing Ex. 1088 ¶ 136).

Patent Owner asserts "GSK 2008 does not teach or suggest the molecular weights recited in the '559 patent claims and teaches away from the polysaccharide to protein ratio recited in the '559 patent claims." PO Resp. 43 (citing Ex. 2043 ¶ 88).

Patent Owner asserts that Petitioner focuses on one of the two serotype 22F glycoconjugates disclosed in GSK 2008, PS22F-PhtD, that Petitioner "translates to a polysaccharide to protein ratio of 1/2.17, or 0.46." PO Resp. 43 (citing Ex. 1005 ¶ 90; Ex. 1007, 55–56, Table 2). Patent Owner asserts "Table 2 also provides data for a second glycoconjugate referred to as 'PS22F-AHPhtD'" that has a "polysaccharide to protein ratio of 1:4.34-1:3.66, or 0.23-0.27" that "clearly falls outside of the '559 patent claimed range." PO Resp. 43–44 (citing Ex. 1007, 55–56, Table 2).

Patent Owner asserts that "PS22F-AH-PhtD (i.e., the glycoconjugate having the ratio outside the claimed range), 'was shown [to be] much more immunogenic' than PS22F-PhtD (the glycoconjugate allegedly having a ratio within the claimed range) in terms of both IgG levels and opsonophagocytic (OPA) titre." PO Resp. 44 (citing Ex. 1007, 85:14–15). Patent Owner asserts that based on Figure 6 of GSK 2008, "there is a striking difference (what appears to be a 12-fold difference) between the OPA results from the two different 22F glycoconjugates." PO Resp. 45 (citing Ex. 2043 ¶ 90). Patent Owner asserts that "a POSA would have

avoided making a serotype 22F glycoconjugate similar to the disclosed PS22F-PhtD and instead opted for the PS22F-AH-PhtD glycoconjugate." PO Resp. 45 (citing Ex. 2043 ¶ 91).

Patent Owner asserts that:

> Due to the significant inferiority of the PS22F-PhtD glycoconjugate, a POSA would have been "discouraged" from generating this glycoconjugate and "would be led in a direction divergent from the path" adopted by Pfizer, *i.e.*, a POSA would have been directed to prepare a serotype 22F glycoconjugate having a polysaccharide to protein ratio outside the claimed range. EX2043, ¶ 91.

PO Resp. 47.

We do not find these arguments persuasive. As already noted, GSK 2008 discloses a range of ratios of polysaccharide to carrier protein that includes and fully overlaps the range claimed. Ex. 1007, 20:24–28. *Peterson*, 315 F.3d at 1329. Dr. Kasper states that the "narrowest range in claim 48 [of GSK 2008] is a protein to polysaccharide ratio of 2:1 to 1:1, which translates to a polysaccharide to protein ratio of 0.5 to 1." Ex. 1108 ¶ 52. Patent Owner also acknowledges that GSK 2008 teaches a final conjugate of serotype 22F that has a polysaccharide to protein ratio of 0.46, within the range required by claim 1. *See* PO Resp. 43.

The exemplary serotype 22F-PhtD conjugate with a 0.46 ratio, along with the overlapping ranges disclosed and claimed by GSK 2008, the overlapping Merck 2011 0.2–2 to 1 charge ratio, provides reasonable motivation for the ordinary artisan to select ratios for the serotype 22F conjugate within the range required by claim 1 of the '559 patent. Ex. 1088 ¶ 90; Ex. 1108 ¶ 52; and Ex. 1006, 19:24–25.

We recognize that Figure 6 of GSK 2008 shows what Patent Owner states to be a 12-fold lower level of antibody titer for serotype 22F-PhtD with a 0.46 ratio relative to serotype 22F-AH-PhtD with a 3.66 to 4.34 ratio. *See* Ex. 1007, 108. We also recognize that Dr. Boons states that a "POSA would have avoided the glycoconjugate that was associated with the significantly worse immunogenicity (*i.e.*, PS22F-PhtD), not the glycoconjugate that required a little more effort to make (*i.e.*, PS22F-AH-PhtD)." Ex. 2043 ¶ 91.

However, GSK 2008 teaches that either conjugate may be used, noting a "13 valent vaccine was made by further adding the serotypes 19A and 22F conjugates above (with 22F either directly linked to PhtD, or alternatively through an ADH linker)." Ex. 1007, 55:5–7. Thus, the plain text of GSK 2008 teaches that either conjugate may be used. Therefore, even if the GSK 2008 teaching were interpreted as a preference for the higher polysaccharide to protein ratio rather than simply a preference for the ADH linker, it is well settled that disclosed examples, and even preferred embodiments do not constitute a teaching away from a broader disclosure or non-preferred embodiments. *In re Susi*, 440 F.2d 442, 446 n.3 (CCPA 1971). "[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). *See also In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) ("The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the [claimed] solution.").

We also note that GSK 2008 shows the immunogenicity for the two serotype 22F conjugates as either 37% or 28–31%, demonstrating similar results for both conjugates. Patent Owner points to no teaching in GSK 2008 that criticizes, discredits, or discourages the use of a ratio within the range required by claim 1.

Two of the cited prior art references, Merck 2011 and GSK 2008, specifically direct the ordinary artisan to incorporate serotype 22F conjugates into pneumococcal vaccines. *See* Ex. 1006, 4:1–4 ("[T]he addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing pneumococcal vaccines."). *See also* Ex. 1007, 4:32 to 5:1 ("The present invention provides an immunogenic composition [that] comprises a 22F saccharide conjugate.").

As discussed above, the Merck 2011 and GSK 2008 references together suggest molecular weights and polysaccharide to carrier protein ratios that overlap and fall within the ranges recited in claim 1 of the '559 patent. *See, e.g.*, Ex. 1007, 55–56; Ex. 1088 ¶ 90; Ex. 1108 ¶ 52; and Ex. 1006, 19:24–25. In addition, the ordinary artisan was aware of desirable ranges of polysaccharide to carrier protein. *See* Ex. 1108 ¶¶ 18, 52.

We also conclude that the prior art provides a reasonable expectation of success in doing so, particularly in light of the disclosure in the prior art of functional glycoconjugates. Specifically, GSK 2008 demonstrates an immunogenic serotype 22F glycoconjugate with an overlapping polysaccharide to carrier protein ratio and Merck 2011 demonstrates an immunogenic serotype 22F glycoconjugate in a 1:1 polysaccharide to carrier

protein ratio. Ex. 1007, 55–56; Ex. 1006, 21. Patent Owner provides no evidence showing that any serotype 22F glycoconjugate fails to result in an immunogenic response.

### *E. Obviousness over Merck 2011, Pfizer 2012, and ’787 patent*

Petitioner asserts that based on the "’787 Patent, a POSITA would have been motivated with a reasonable expectation of success to include the immunogenic composition of claim 1 in a syringe that is siliconized and/or made of glass." Pet. 56 (citing Ex. 1088 ¶ 137). Petitioner asserts that "’787 Patent discloses pneumococcal polysaccharide-protein conjugate formulations in siliconized containers, including glass syringes; the formulations inhibit protein aggregation caused by the silicone oil." Pet. 57 (citing Ex. 1010 13:34–4:23).

Patent Owner asserts

> Neither Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, Pfizer 2012, the ’787 patent, and the "general knowledge," because Merck has not identified any reasons as to why the ’787 patent remedies the deficiencies of Merck 2011 or Pfizer 2012. Merck has not met its burden in showing that claim 15 is obvious.

PO Resp. 48.

#### 1. *’787 patent (Exhibit 1010)*

The ’787 patent discusses "an ongoing need in the art to improve the stability of immunogenic compositions such as polysaccharide-protein conjugates." Ex. 1010, 9:57–59. The ’787 patent discusses "the polysaccharide-protein conjugate formulation is a 13-valent pneumococcal conjugate (13vPnC) formulation comprising a *S. pneumoniae* serotype . . . polysaccharide conjugated to a $CRM_{197}$ polypeptide." Ex. 1010, 6:39–43.

The ’787 patent explains the “formulations of the present invention are particularly useful in stabilizing the immunogen (i.e., a polysaccharide-protein conjugate . . . in the presence silicon oil found on container means such syringes, glass vials, rubbers stoppers and the like.” Ex. 1010, 14:12–21.

2. *Analysis*

We have already concluded that a preponderance of evidence supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that an ordinary artisan would have found it obvious to modify the multivalent pneumococcal vaccine containing the 22F serotype rendered obvious by Merck 2011 and Pfizer 2012 with a siliconized syringe as disclosed by the ’787 patent for use with a 13 valent pneumococcal conjugate vaccine because these formulations function to stabilize the antigen.

We therefore conclude that a preponderance of the evidence supports the obviousness of modifying the conjugate vaccine suggested by Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan with the siliconized and glass syringes disclosed by the ’787 patent in order to stabilize the vaccine as disclosed by the ’787 patent.

*F. Obviousness over Merck 2011, Pfizer 2012, and Obaro 2002*

Petitioner asserts that based on Obaro 2002, “a POSITA would have been motivated with a reasonable expectation of success to include an antigen from a pathogen other than pneumococcus in the immunogenic composition of claim 1.” Pet. 58 (citing Ex. 1088 ¶ 140). Petitioner asserts that “Obaro 2002 reports the safety and immunogenicity of Patent Owner’s 9-valent pneumococcal $CRM_{197}$-conjugate vaccine (‘PnCV’) when given in

combination with a vaccine ('TETRAMUNE') containing diphtheria toxoid, tetanus toxoid, whole cell pertussis, and $CRM_{197}$-conjugated *Haemophilus influenzae* type B oligosaccharide." Pet. 58 (citing Ex. 1040, 2). Petitioner asserts "a POSITA would have understood that combining distinct individual vaccines (e.g., pneumococcal and non-pneumococcal vaccinations) into a single composition is desirable, to enhance protection against disease and minimize the number of injections to a patient, particularly for infants." Pet. 58 (citing Ex. 1088 ¶ 140).

Patent Owner asserts "[n]either Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, Pfizer 2012, Obaro 2002, and the 'general knowledge.' Therefore, Merck has likewise not met its burden in showing that claims 20 and 21 are obvious." PO Resp. 48–49. Patent Owner asserts:

> Obaro 2002 does not disclose the molecular weight or polysaccharide to protein ratio for any of its glycoconjugates. As such, a POSA would not have had any motivation from Obaro 2002 to generate an immunogenic composition comprising a serotype 22F glycoconjugate having a molecular weight or polysaccharide to protein ratio falling within the specific ranges recited in any of the '559 patent claims (including claims 20 and 21).

PO Resp. 49 (citing Ex. 2043 ¶ 94; Ex. 1040, 2).

1. *Obaro 2002 (Exhibit 1040)*

Obaro 2002 states "we evaluated the safety and immunogenicity of a 9-valent pneumococcal conjugate vaccine given in combination with TETRAMUNE [*Haemophilus influenzae* type b vaccine] administered simultaneously at different sites or mixed and administered as a single injection." Ex. 1040, 2. Obaro 2002 teaches the pneumococcal vaccine

"was prepared in a lyophilized form and contained 2 µg of types 1, 4, 5, 9V, 14, 19F and 23F pneumococcal polysaccharides; 2 µg of type 18C oligosaccharide; and 4 µg of type 6B polysaccharide. Each polysaccharide or oligosaccharide was coupled independently to $CRM_{197}$, a nontoxic mutant of diphtheria toxoid, to give 20 µg of $CRM_{197}$ per dose." Ex. 1040, 2. Obaro 2002 states the "combination of TETRAMUNE and PnCV is safe and immunogenic." Ex. 1040, 1 (emphasis omitted). Obaro 2002 teaches "[c]ombination of vaccines should make administration easier, less expensive and more acceptable to parents." Ex. 1040, 2.

2. *Analysis*

We have already concluded that a preponderance of evidence supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that an ordinary artisan would have found it obvious to combine the pneumococcal vaccine including the 22F serotype with other vaccines including a *Haemophilus influenzae* type b vaccine because Obaro 2002 explains that combination of these vaccines makes administration easier and less expensive. While Patent Owner is correct that Obaro 2002 is silent on the molecular weights for the pneumococcus conjugate vaccine, both Merck 2011 and Pfizer 2012 disclose reasons to select the molecular weights required by claim 1 as discussed above. As to the polysaccharide to protein ratios, these are also disclosed in Merck 2011 and Pfizer 2012 as already discussed. In addition, Obaro 2002 teaches a 1:1 ratio for serotypes 1, 4, 5, 6B, 9V, 14, 18C, 19F, and 23F because Obaro 2002 teaches 2 µg of polysaccharide for 8 serotypes and 4 µg for serotype 6B combined with 20

µg of $CRM_{197}$. Ex. 1040, 2.

We, therefore, conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan by combining it with the *Haemophilus influenzae* type b vaccine of Obaro 2002 to simplify and reduce the expense of vaccine administration.

### *G. Obviousness over Merck 2011, Pfizer 2012, and Sigurdardottir 2008*

Petitioner asserts that based on Sigurdardottir 2008, "a POSITA would have been motivated with a reasonable expectation of success to include a meningococcal serogroup C conjugate in the immunogenic composition of claim 1." Pet. 60 (citing Ex. 1088 ¶ 142). Petitioner asserts that "Sigurdardottir 2008 'evaluated safety and immunogenicity of a combined 9-valent pneumococcal and meningococcal C conjugate vaccine ['9vPnC-MnCC']"' and Sigurdardottir 2008 concludes "9vPnC-MnCC is safe and immunogenic." Pet. 61 (citing Ex. 1011, 2, 8). Petitioner asserts "that combining distinct individual vaccines (*e.g.*, pneumococcal and non-pneumococcal vaccinations) into a single composition is desirable, to enhance protection against disease and minimize the number of injections to a patient." Pet. 60–61 (citing Ex. 1007, 43:1–11).

Patent Owner asserts "[n]either Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, Pfizer 2012, Sigurdardottir 2008, and the 'general knowledge.' Therefore, Merck has likewise not met its burden in showing that claim 22 is obvious." PO Resp. 50. Patent Owner asserts:

> The pneumococcal glycoconjugates of Sigurdardottir 2008 comprise nine different serotype glycoconjugates (*i.e.*,

> serotypes 1, 4, 5, 6B, 9V, 14, 18C, 19F, and 23F), none of which is serotype 22F. EX1011 at 2. Sigurdardottir 2008 also does not refer to the molecular weight or polysaccharide to protein ratio for any of the glycoconjugates present in its vaccine.

PO Resp. 50 (citing Ex. 2043 ¶ 96). Patent Owner acknowledges that "Sigurdardottir 2008 does refer to serotype 22F." PO Resp. 50. Patent Owner asserts, however, that a "POSA would not have had any motivation from Sigurdardottir 2008 to generate an immunogenic composition comprising a serotype 22F glycoconjugate having a molecular weight or polysaccharide to protein ratio falling within the specific ranges recited in any of the '559 patent claims." PO Resp. 51 (citing Ex. 2043 ¶ 97).

1. *Sigurdardottir (Exhibit 1011)*

Sigurdardottir states "we investigated the safety and immunogenicity of a 9-valent CRM197-conjugated pneumococcal-polysaccharide vaccine combined with a CRM197-conjugated *Meningococcus C* polysaccharide." Ex. 1011, 2. Sigurdardottir teaches the

> trial vaccine contained nine pneumococcal serotype polysaccharides, 2 µg of saccharide per pneumococcal serotypes 1, 4, 5, 9V, 14, 18C, 19F and 23F, 4 µg of pneumococcal serotype 6B and 10 g of meningococcal group C oligosaccharide (same concentration as in monovalent Meningococcus C CRM197 conjugate, Meningitec®) coupled to 18.5 µg of CRM197 carrier protein.

Ex. 1011, 2. Sigurdardottir states a booster comprising the 23-valent pneumococcal-polysaccharide vaccine containing serotype 22F was used. Ex. 1011, 2. Sigurdardottir teaches "to decrease number of infant

vaccinations by combining pneumococcal and Meningococcus C CRM197 conjugates." Ex. 1011, 7.

2. *Analysis*

We have already concluded that a preponderance of evidence supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that an ordinary artisan would have found it obvious to combine the pneumococcal vaccine including the 22F serotype with other vaccines including a Meningococcus C vaccine because Sigurdardottir explains that combination of these vaccines permits a decreased number of vaccinations. Ex. 1011, 7. While Patent Owner is correct that Sigurdardottir is silent on the molecular weights for the pneumococcus conjugate vaccine, both Merck 2011 and Pfizer 2012 disclose reasons to select the molecular weights required by claim 1 as discussed above. Sigurdardottir also recognizes that serotype 22F is a vaccine target. Ex. 1011, 2. As to the polysaccharide to protein ratios, these are also disclosed in Merck 2011 and Pfizer 2012 as already discussed. In addition, Sigurdardottir teaches an approximately 1:1 ratio for serotypes 1, 4, 5, 6B, 9V, 14, 18C, 19F, and 23F because Sigurdardottir teaches 2 µg of polysaccharide for 8 serotypes and 4 µg for serotype 6B combined with 18.5 µg of $CRM_{197}$. Ex. 1011, 2.

We, therefore, conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan by combining it with the Meningococcus C vaccine of Sigurdardottir to simplify and reduce the expense of vaccine administration.

*H. Obviousness over Merck 2011, Pfizer 2012, and MMWR 2012*

Petitioner asserts that based on MMWR 2012, "a POSITA would have been motivated with a reasonable expectation of success to practice the method of claim 30 (taught by the combination of Merck 2011 and Pfizer 2012) in an immunocompromised human." Pet. 61–62 (citing Ex. 1088 ¶ 143). Petitioner asserts that "MMWR 2012 discloses the 'recommended routine use of 13-valent pneumococcal conjugate vaccine (PCV13; Prevnar 13, Wyeth Pharmaceuticals, Inc., a subsidiary of Pfizer, Inc.) for adults aged ≥19 years with immunocompromising conditions." Pet. 62 (citing Ex. 1012, 12).

Patent Owner asserts "[n]either Merck nor its expert, Dr. Kasper, has demonstrated that claim 1 is obvious over Merck 2011, Pfizer 2012, MMWR 2012, and the 'general knowledge.' Therefore, Merck has likewise not met its burden in showing that claim 34 is obvious." PO Resp. 51. Patent Owner asserts "Prevnar13® does not include a serotype 22F glycoconjugate, and MMWR 2012 also does not disclose the molecular weight or polysaccharide to protein ratio for any of the glycoconjugates present in Prevnar13®." PO Resp. 52 (citing Ex. 2043 ¶ 99). Patent Owner asserts "a POSA would not have had any motivation from MMWR 2012 to generate and utilize an immunogenic composition comprising a serotype 22F glycoconjugate having a molecular weight or polysaccharide to protein ratio falling within the specific ranges recited in any of the '559 patent claims." PO Resp. 52 (citing Ex. 2043 ¶ 100).

1. *MMWR 2012 (Exhibit 1012)*

MMWR 2012 states

> the Advisory Committee on Immunization Practices (ACIP) recommended routine use of 13-valent pneumococcal conjugate

> vaccine (PCV13; Prevnar 13, Wyeth Pharmaceuticals, Inc., a subsidiary of Pfizer, Inc.) for adults aged ≥19 years with immunocompromising conditions, functional or anatomic asplenia, cerebrospinal fluid (CSF) leaks, or cochlear implants (Table). PCV13 should be administered to eligible adults in addition to the 23-valent pneumococcal polysaccharide vaccine (PPSV23; Pneumovax 23, Merck & Co. Inc.), the vaccine currently recommended for these groups of adults.

Ex. 1012, 12. MMWR 2012 teaches "[a]dults with specified immunocompromising conditions who are eligible for pneumococcal vaccine should be vaccinated with PCV13 during their next pneumococcal vaccination opportunity." Ex. 1012, 14.

2. *Analysis*

We have already concluded that a preponderance of evidence supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that an ordinary artisan would have found it obvious to vaccinate immunocompromised individuals with the pneumococcal vaccine including the 22F serotype with other vaccines including a *Haemophilus influenzae* type b vaccine because MMWR 2012 suggests that such individuals should be vaccinated with pneumococcal vaccines, including the 23-valent vaccine that includes the 22F serotype. Ex. 1012, 12; Ex. 1087 ¶ 41. While Patent Owner is correct that MMWR 2012 is silent on the molecular weights for the pneumococcus conjugate vaccine, both Merck 2011 and Pfizer 2012 disclose reasons to select the molecular weights required by claim 1 as discussed above. As to the polysaccharide to protein ratios, these are also disclosed in Merck 2011 and Pfizer 2012 as already discussed.

We, therefore, conclude that a preponderance of the evidence supports the obviousness of treating immunocompromised patients with the vaccine

suggested by Merck 2011, Pfizer 2012, and the knowledge of the ordinary artisan because MMWR 2012 suggests the desirability of treating this patient population with a pneumococcal vaccine. Ex. 1012, 12, and 14.

## III. PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner moves to exclude the following Exhibits, or portions thereof: Exhibit 1088 ¶ 24, Exhibit 1094, and 1095. Paper 37 ("Patent Owner Mot. to Exclude").

We do not rely on any of this evidence in making our ultimate determination on the patentability of the challenged claims. Accordingly, we need not decide Patent Owner's motion and we therefore dismiss Patent Owner's motion as moot.

## V. CONCLUSION

We conclude that Petitioner has shown by a preponderance of the evidence that: (1) claims 11–14, 23–27, 29–33, and 35–37 of the '559 patent are unpatentable over the combination of Merck 2011 and GSK 2008; (2) claim 28 of the '559 patent is unpatentable over the combination of Merck 2011, Pfizer 2012, and GSK 2008; (3) claim 15 of the '559 patent is unpatentable over the combination of Merck 2011, Pfizer 2012, and '787 patent; (4) claims 20 and 21 of the '559 patent are unpatentable over Merck 2011, Pfizer 2012, and Obaro 2002; (5) claim 22 of the '559 patent is unpatentable over Merck 2011, Pfizer 2012, and Sigurdardottir 2008; and (6) claim 34 of the '559 patent is unpatentable over the combination of Merck 2011, Pfizer 2012, and MMWR 2012.

We dismiss Patent Owner's Motion to exclude Exhibit 1088 ¶ 24, Exhibit 1094, and Exhibit 1095 as moot.

## VI. ORDER

For the reasons given, it is

ORDERED, based on a preponderance of the evidence, that claims 11–15 and 20–37 are unpatentable;

FURTHER ORDERED, Patent Owner's Motion to Exclude Exhibit 1088 ¶ 24, Exhibit 1094, and Exhibit 1095 is dismissed as moot;

FURTHER ORDERED, because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Arlene L. Chow
Ernest Yakob
HOGAN LOVELLS US LLP
arlene.chow@hoganlovells.com
ernest.yakob@hoganlovells.com

Anthony M. Isogna
Nikolaos C. George
JONES DAY
aminsogna@jonesday.com
ncgeorge@jonesday.com

PATENT OWNER:

John Scheibeler
Dimitrios T. Drivas
Anita Varma
Brendan Gavin
Eric A. Krause
WHITE & CASE LLP
jscheibeler@whitecase.com
ddrivas@whitecase.com
anita.varma@whitecase.com
brendan.gavin@whitecase.com
eric.krause@whitecase.com

Trials@uspto.gov
571.272.7822

Paper No.: 61
Entered: June 3, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SANOFI PASTEUR INC. AND SK CHEMICALS CO., LTD.,
Petitioner,

v.

PFIZER INC.,
Patent Owner.

---

Case IPR2018-00187
Patent 9,492,559 B2

---

Before TONI R. SCHEINER, JEFFREY N. FREDMAN, and JACQUELINE T. HARLOW, *Administrative Patent Judges.*

FREDMAN, *Administrative Patent Judge.*

# FINAL WRITTEN DECISION AND RELATED ORDERS

Finding claims 1–45 Unpatentable
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Denying Patent Owner's Motion to Amend
*35 U.S.C. § 326(d) and 37 C.F.R. § 42.221*

Denying-in-part and Dismissing-in-part Patent Owner's
Motion to Exclude Evidence
*37 C.F.R. § 42.64*

Denying-in-part and Dismissing-in-part Petitioner's
Motion to Exclude Evidence
*37 C.F.R. § 42.64*

# I. INTRODUCTION

## *A. Background*

Sanofi Pasteur Inc. and SK Chemicals Co., Ltd. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1–45 of U.S. Patent No. 9,492,559 B2 (Ex. 1001, "the '559 patent"). Paper 3 ("Pet."). Pfizer Inc. ("Patent Owner") filed a Patent Owner's Preliminary Response. Paper 8 ("Prelim. Resp.").

On June 5, 2018, we instituted an *inter partes* review of all challenged claims. Paper 10 ("Dec. Inst."). Patent Owner filed a Motion to Amend. Paper 15 ("Mot. Amend."). Patent Owner then filed a Patent Owner Response to the Petition. Paper 21 ("PO Response"). Petitioner filed an Opposition to the Motion to Amend (Paper 28) ("Pet. Opp."), followed by a Reply to the Patent Owner's Response. Paper 31 ("Pet. Reply"). Patent Owner then filed a Reply in Support of the Motion to Amend. Paper 36 ("PO Reply"). Petitioner filed a Sur-Reply to Patent Owner Motion to Amend. Paper 55 ("Pet. Sur-Reply"). Patent Owner filed a Sur-Reply. Paper 46 ("PO Sur-Reply").

Petitioner and Patent Owner both filed Motions to Exclude Evidence. Papers 44 and 45. Patent Owner and Petitioner both filed respective Oppositions to Motion to Exclude Evidence. Papers 48 and 49. Petitioner and Patent Owner both filed Replies in Support of the Motion to Exclude. Paper 53 and 54.

On February 12, 2019, the parties presented arguments at an oral hearing. The hearing transcript has been entered in the record. Paper 58 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Having considered the record before us, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–45 of the ’559 patent are unpatentable. *See* 35 U.S.C. §316(e). Additionally, the Motions to Exclude Evidence by Petitioner and Patent Owner have been decided below in Sections IV and V and the Motion to Amend has been decided below in Section III.

*B. Related Proceedings*

A concurrent Petition for *inter partes* review of the ’559 patent, IPR 2018-00188, was denied institution on June 5, 2018. Four *inter partes* reviews of the ’559 patent were filed by a different petitioner, IPR2017-02131, IPR2017-02132, IPR2017-02136, and IPR2017-02138. Pet. 2. Decisions determining that the challenged claims of the ’559 patent are unpatentable have issued in each of those proceedings. IPR2017-02131, Paper 59; IPR2017-02132, Paper 59; IPR2017-02136, Paper 43; IPR2017-02138, Paper 45.

*C. The ’559 Patent (Ex. 1001)*

The ’559 patent involves vaccines for “vaccination of human subjects, in particular infants and elderly, against pneumoccocal infections . . . .” Ex. 1001, 1:21–22. “Pneumonia, febrile bacteraemia and meningitis are the most common manifestations of invasive pneumococcal disease, whereas bacterial spread within the respiratory tract may result in middle-ear infection, sinusitis or recurrent bronchitis.” *Id.* at 1:28–32. “Pneumonia is by far the most common cause of pneumococcal death worldwide.” *Id.* at 1:46–48.

The ’559 patent teaches the “etiological agent of pneumococcal diseases, *Streptococcus pneumoniae* (pneumococcus), is a Gram-positive encapsulated coccus,[1] surrounded by a polysaccharide capsule.[2] Differences in the composition of this capsule permit serological differentiation between about 91 capsular types.” *Id.* at 1:49–53. “Pneumococcal conjugate vaccines (PCVs) are pneumococcal vaccines used to protect against disease caused by *S. pneumoniae* (pneumococcus).” *Id.* at 1:59–61. “There are currently three PCV vaccines[3] available on the global market: PREVNAR® (called PREVENAR® in some countries) (heptavalent vaccine), SYNFLORIX® (decavalent vaccine) and PREVNAR 13® (tridecavalent vaccine).” *Id.* at 1:61–65.

The ’559 patent teaches “there is a need to address remaining unmet medical need for coverage of pneumococcal disease due to serotypes not found in PREVNAR 13® and potential for serotype replacement over time.” *Id.* at 2:3–6.

---

[1] A “coccus” is defined as “a spherical bacterium.” *See* https://www.merriam-webster.com/dictionary/coccus.

[2] “Pneumococcus is encapsulated with a chemically linked polysaccharide which confers serotype specificity. There are 90 known serotypes of pneumococci, and the capsule is the principle virulence determinant for pneumococci, as the capsule not only protects the inner surface of the bacteria from complement, but is itself poorly immunogenic.” Ex. 1007, 2:10–14.

[3] The valency of a vaccine refers to the number of different serotypes of bacteria to which the vaccine induces immune response (e.g., a tridecavalent vaccine protects against thirteen different bacterial strains).

*D. Illustrative Claims*

All of the challenged claims 1–45 depend either directly or indirectly from independent claim 1 of the ’559 patent. Claim 1 is illustrative of the challenged claims and recites:

> 1. An immunogenic composition comprising a *Streptococcus pneumoniae* serotype 22F glycoconjugate, wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and a carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.

Ex. 1001, 141:28–34.

*E. The Instituted Grounds of Unpatentability*

We instituted trial based on each challenge to the patentability of the ’559 patent presented in the Petition (Pet. 4, 15, 17):

| Reference | Basis | Claims Challenged |
|---|---|---|
| GSK-711,[4] Merck-086[5] | § 103 | 1, 3–19, 23–37, 41, 42, 45 |
| GSK-711, Merck-086, Lees-2008,[6] PVP 2013,[7] Pfizer- | § 103 | 2, 40, 43 |

[4] Biemans et al., WO 2007/071711 A2, published June 28, 2007 (“GSK-711,” Ex. 1007).
[5] Caulfield et al., US 2011/0195086 A1, published Aug. 11, 2011 (“Merck-086,” Ex. 1008).
[6] Lees et al., “*Chapter 11. Conjugation Chemistry*,” In: Pneumococcal Vaccines: *The Impact of Conjugate Vaccine* (Ed. George R. Siber et al.); pp. 163–174 (2008) (“Lees-2008,” Ex. 1011).
[7] “*Pneumococcal Vaccine Polyvalent*” revision to Japan’s “*Minimum Requirements for Biological Products*” published on the website of Japan’s National Institute of Infectious Diseases (as of March 2, 2013) (“PVP 2013,” Ex. 1012).

| Reference | Basis | Claims Challenged |
|---|---|---|
| 605[8] | | |
| GSK-711, Merck-086, GSK-531[9] | § 103 | 20–22 |
| GSK-711, Merck-086, Pfizer-605 | § 103 | 38, 39 |
| GSK-711, Merck-086, Hsieh 2000[10] | § 103 | 44 |

Petitioner relies on the Declaration of Andrew Lees, Ph.D. Ex. 1005. Petitioner also relies on the Declaration of Dr. Loek Van Alphen, Ph.D. Ex. 1101. Patent Owner relies on the Declaration of Dr. Peng Wang, Ph.D. Ex. 2058. Patent Owner also relies on the Declaration of Dr. Peter Paradiso, Ph.D. Ex. 2051.

ANALYSIS

*A. Claim Interpretation*

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear.[11] 37 C.F.R. § 42.100(b). Under the broadest

---

[8] Prasad, A.K., US 7,955,605 B2, issued June 7, 2011 ("Pfizer-605," Ex. 1013).

[9] Biemans et al., WO 2011/110531 A2, published Sept. 15, 2011 ("GSK-531," Ex. 1014).

[10] Hsieh, *Characterization of Saccharide-$CRM_{197}$ Conjugate Vaccines*, In: *Physico-Chemical Procedures for the Characterization of Vaccines* (Eds. Brown F., Corbel M., and Griffths E.); Vol. 103, pp. 93–104; Basel; Karger, 2000 ("Hsieh 2000," Ex. 1015).

[11] A recent amendment to this rule does not apply here because the Petition was filed before November 13, 2018. *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018).

reasonable interpretation approach, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Only terms that are in controversy need to be construed and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

We determine that the following claim term needs to be discussed.

1. *"immunogenic"*

Independent claim 1, as well as many of the dependent claims, recites the term "immunogenic" as a modifier of the term "composition." In the Decision on Institution, we construed "immunogenic" to require a composition that "elicits functional antibody against each serotype in the claimed composition." Inst. Dec. 7. We also determined that because claim 1 did not specifically require any additional glycoconjugates besides 22F, the "immunogenic" composition only needed to elicit antibodies against the serotype 22F glycoconjugate recited in claim 1. *Id.*

In its Patent Owner's Response, Patent Owner disagrees with Petitioner's assertion that "the term 'immunogenic' means 'capable of producing an immune response as determined by an immunogenic assay known in the art by a POSA including an OPA assay.'" PO Resp. 16 (citing Pet. 27–28). Instead, Patent Owner points to the Specification, prosecution history, and statements by Dr. Lees to support its position that the "proper construction of 'immunogenic' is 'elicits functional antibody against each

serotype in the claimed composition.'" PO Resp. 16 (citing Ex. 2054, 62:2–12, Ex. 1004, 23–24, and Ex. 1001, 116:50–52).

Petitioner does not address Patent Owner's claim interpretation in its Reply.

In performing claim interpretation, we first turn to the language of the claims themselves. While claim 1 recites an immunogenic composition composed solely of the "*Streptococcus pneumoniae* serotype 22F glycoconjugate," claims 3–9 recite the inclusion of glycoconjugates from other *Streptococcus pneumoniae* serotypes and claims 21 and 22 recite inclusion of antigens from other pathogenic bacteria or viruses. While claim 1 does not require the presence of other immunogenic components, claims 3–9, 21, and 22 expressly recite the presence of other immunogenic components. There would have been no reason to include these additional antigens other than to induce a protective antibody response for vaccination against the included antigens. Therefore, these dependent claims reasonably support Patent Owner's interpretation that an "immunogenic" composition requires eliciting antibodies against each of the serotypes or other immunogens within the "immunogenic" composition.

Next we turn to the Specification of the '559 patent. When the '559 patent uses the term "immunogenic," the '559 patent identifies "a need for immunogenic compositions that can be used to induce an immune response against additional *Streptococcus pneumoniae* serotypes." Ex. 1001, 2:10–13. The '559 patent states that multiple serotypes ranging from 7 to 25 may be included in the "immunogenic composition." Ex. 1001, 3:4–6. The '559 patent teaches the "pneumococcal opsonophagocytic assay (OPA), which measures killing of *S. pneumoniae* cells by phagocytic effector cells

in the presence of functional antibody and complement, is considered to be an important surrogate for evaluating the effectiveness of pneumococcal vaccines." Ex. 1001, 88:52–56. The '559 patent supports an interpretation of "immunogenic" which requires elicitation of functional antibody for each component in the composition, consistent with the interpretation of Patent Owner.

During prosecution of the '559 patent, the Examiner cited art that disclosed both the 22F conjugate and other conjugates to address the claimed compositions for dependent claims. *See* Ex. 1004, 33–34. The Examiner allowed the claims after amendment to include the ranges for molecular weight and ratio of polysaccharide to carrier protein. *See* Ex. 1004, 11. The Examiner did not address the claim construction issue.

Accordingly, upon review of the parties' arguments and the evidence before us, including the claims, specification, and prosecution history of the '559 patent, we conclude that the term "immunogenic," as it is used in that patent, is reasonably construed as requiring that functional antibody be elicited against each immunogen contained in the composition. Consequently, to meet the limitations of claim 1 of the '559 patent, which recites a single immunogen, serotype 22F, only functional antibodies to serotype 22F would be required. However, for claim 3 of the '559 patent that requires serotypes 22F, 15B, and 33F, functional antibodies against all three serotypes would be required. Similarly for other claims, the term "immunogenic" requires functional antibodies be elicited against any immunogens specifically recited and required.

### *B. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art;[12] and (4) where in evidence, objective indicia of nonobviousness.[13] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

In that regard, an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of

---

[12] Petitioner states that a person with the level of skill in the art at the time of the invention "would have had a Ph.D. or equivalent degree in chemistry, immunology, or other biological sciences or an MD and at least 2 years of experience in glycoconjugate vaccine research and development, or would have an M.S. degree and at least 4 years of relevant experience." Pet. 26, citing Ex. 1005 ¶ 77. Patent Owner "does not dispute Sanofi's proposed level of skill for the person having ordinary skill in the art." PO Resp 8. We agree with both parties regarding the level of ordinary skill in the art. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). We also note that the applied prior art reflects the appropriate level of skill at the time of the claimed invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

[13] Neither Petitioner nor Patent Owner presents evidence on the fourth Graham factor.

ordinary skill in the art would employ." *KSR*, 550 U.S. at 418. In *KSR*, the Supreme Court also stated that an invention may be found obvious if trying a course of conduct would have been obvious to a person having ordinary skill:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under §103.

*KSR*, 550 U.S. at 421. "*KSR* affirmed the logical inverse of this statement by stating that § 103 bars patentability unless 'the improvement is more than the predictable use of prior art elements according to their established functions.'" *In re Kubin*, 561 F.3d 1351, 1359–60 (Fed. Cir. 2009) (citing *KSR*, 550 U.S. at 417).

Petitioner bears the burden of proving unpatentability of the challenged claims, and that burden never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must establish the facts supporting its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

We analyze the asserted grounds of unpatentability in accordance with the above-stated principles.

### *C. Obviousness over GSK-711 and Merck-086*

Petitioner contends that claims 1, 3–19, 23–37, 41, 42, and 45 are unpatentable under 35 U.S.C. § 103 as obvious over GSK-711, Merck-086,

and the general knowledge of an ordinary artisan. Pet. 30–66. The thrust of Patent Owner's position is that the cited prior art does not teach or suggest compositions with 22F glycoconjugates that are immunogenic, within the claimed molecular weight ranges, and within the claimed polysaccharide to carrier protein conjugate ratios. PO Resp. 1–5, 18–55. Based on our review of the arguments and the evidence of record, we determine that Petitioner demonstrates, by a preponderance of the evidence, that the subject matter of claims 1, 3–19, 23–37, 41, 42, and 45 would have been obvious over GSK-711, Merck-086, and the general knowledge of an ordinary artisan. After providing a discussion of the prior art and Petitioner's position, we will address Patent Owner's arguments.

1. *GSK-711 (Ex. 1007)*

GSK-711 teaches a *Streptococcus pneumoniae* vaccine comprising "capsular saccharide antigens (preferably conjugated), wherein the saccharides are derived from at least ten serotypes of *S. pneumoniae*" that may include an "*S. pneumoniae* saccharide conjugate of 22F." Ex. 1007, 6:4, 24–26.[14] GSK-711 teaches "*Streptococcus pneumoniae* capsular saccharides . . . may be conjugated to a carrier protein independently selected from the group consisting of . . . CRM197. . . ." Ex. 1007, 8:18–20. GSK-711 teaches "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" and specifically, conjugates "can also be prepared by direct reductive amination methods. . . ." Ex. 1007, 15:9–10; 16:1. GSK-711 teaches "22F-PhtD administered within the 13-valent conjugate vaccine

[14] We refer to the original page numbers in Ex. 1007.

formulation [was] shown immunogenic in old C57BI mice." Ex. 1007, 67:36–37.

GSK-711 teaches: "Preferably the ratio of carrier protein to *S. pneumoniae* saccharide is between 1:5 and 5:1; e.g. between 1:0.5–4:1, 1:1–3.5:1, 1.2:1–3:1, 1.5:1–2.5:1; e.g. between 1:2 and 2.5:1; 1:1 and 2:1 (w/w)." Ex. 1007, 19:1–3. Table 2 of GSK-711 teaches fourteen different conjugates—the smallest conjugate size was PS4-PD of 1303 kDa and the largest conjugate size was PS9V-PD of 9572 kDa. Ex. 1007, 53, Table 2. GSK-711 discloses a conjugate of serotype 22F, with a carrier/PS ratio of 2.17, but does not determine the conjugate size. Ex. 1007, 53, Table 2.

GSK-711 claims a conjugate where "the average size (e.g. $M_w$) of the 22F saccharide is between 50 and 800 kDa. . . ." Ex. 1007, 81, claim 56. GSK-711 further teaches in claim 61 an "immunogenic composition of any preceding claim wherein the average size (e.g. $M_w$) of the saccharides is above 50 kDa, e.g., 50–1600. . . ." Ex. 1007, 82.

GSK-711 teaches "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 12:31–34. GSK-711 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 13:1–3. GSK-711 recommends optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter. . . ." Ex. 1007, 13:12.

2. *Merck-086 (Ex. 1008)*

Merck-086 teaches "a multivalent immunogenic composition having 15 distinct polysaccharide-protein conjugates. Each conjugate consists of a capsular polysaccharide prepared from a different serotype of *Streptococcus pneumoniae* (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F or 33F) conjugated to a carrier protein, preferably $CRM_{197}$." Ex. 1008 ¶ 2. Merck-086 teaches "conjugates containing serotypes 22F and 33F provide[] robust antibody responses demonstrat[ing] the feasibility of expanding coverage of pneumococcal serotypes. . . ." Ex. 1008 ¶ 15. Merck-086 teaches the pneumococcal conjugate vaccine (PCV) with "induced high OPA[15] GMTs to each serotype and a 100% OPA response rate for all 15 serotypes contained in the vaccine." Ex. 1008 ¶ 114.

Merck-086 teaches "purified polysaccharides are chemically activated to make the saccharides capable of reacting with the carrier protein. . . . Coupling to the protein carrier (*e.g.*, $CRM_{197}$) can be by reductive amination via direct amination to the lysyl groups of the protein." Ex. 1008 ¶¶ 23, 25. Merck-086 teaches the "concentrated saccharide was mixed with $CRM_{197}$ carrier protein in a 0.2 – 2 to 1 charge ratio. The blended saccharide-$CRM_{197}$ mixture was filtered through a 0.2 μm filter." Ex. 1008 ¶ 94. Table 1 of Merck-086 shows a vaccine formulation comprising 32 μg of total polysaccharide and 32 μg of $CRM_{197}$ carrier protein with the total polysaccharide being composed of 2 μg of 14 serotypes including 22F and 4 μg of serotype 6B. Ex. 1008 ¶ 104.

[15] Opsonophagocytosis.

3. *Analysis*

Petitioner asserts that GSK-711 and Merck-086 suggest immunogenic compositions of S. pneumoniae serotype 22F conjugated to carrier that have molecular weights and polysaccharide/carrier protein ratios within the ranges recited by claim 1 of the ’559 patent. *See* Pet. 1–2, 17–21, 34–36.

Petitioner asserts “GSK-711 demonstrate[s] that a 13-valent vaccine formulation containing the 22F-PhtD glycoconjugate induced anti-22F immune response in old mice, young mice, and guinea pigs, respectively. . . .” Pet. 31 (citing Ex. 1005 ¶¶ 125–128; Ex. 1007, 68–73). Petitioner also asserts “Merck-086 discloses a PCV15 composition containing a 22F-$CRM_{197}$ glycoconjugate that induced 22F specific immune response in animal models. . . .” Pet. 32–33 (citing Ex. 1005 ¶¶ 129–131; Ex. 1008, Tables 2–6).

Petitioner asserts “GSK-711 teaches that isolated polysaccharides from *S. pneumoniae* including 22F may be conjugated to a carrier protein independently selected from $CRM_{197}$.” Pet. 34 (citing Ex. 1005 ¶ 134; Ex. 1007, 9:18–22, 11:4–27). Petitioner asserts the “22F-PhtD conjugate disclosed in Table 2 has the ratio of carrier protein to polysaccharide of 2.17. Lees [Ex. 1005] ¶137; Ex. 1007, Table 2. When converted to a polysaccharide to carrier protein ratio, this equals 0.46, which falls within the range claimed in claim 1.” Pet. 34. Petitioner asserts:

> a POSA in view of the teachings in GSK-711 would (i) reasonably have expected that the 22F glycoconjugates disclosed in Table 2 would have molecular weights that also fall within the claimed range; or (ii) would have been motivated to make 22F glycoconjugates that fall within the claimed range with a reasonable expectation of success.

Pet. 36 (citing Ex. 1005 ¶ 140).

To support its obviousness position, Petitioner relies upon the Declaration of Dr. Lees, who states "there is nothing inventive to claims 1–45 of the '559 patent. As stated above, 22F polysaccharide-carrier protein conjugates had already been made before the earliest filing date of the '559 patent as part of multivalent PCV products developed by Merck and GSK and were shown to be immunogenic." Ex. 1005 ¶ 117.

Dr. Lees, addressing the limitation in claim 1 for a ratio of polysaccharide to carrier protein that is between 0.4 and 2, states "GSK-711 teaches, among preferred ratios, a carrier protein to polysaccharide ratio of 'between 1:2 and 2.5:1' (w/w). . . . When converted to a polysaccharide to carrier protein ratio, this equals to the ratio of 'between 0.4 and 2' required by claim 1." Ex. 1005 ¶ 136 (citing Ex. 1007, 20:1–6). Dr. Lees notes "the example PS22F-PhtD glycoconjugate described in Table 2 has a specific carrier:polysaccharide ratio of 2.17 . . . which equals to a polysaccharide:protein ratio of 0.46, falling within the range of 0.4–2.0." Ex. 1005 ¶ 137 (citing Ex. 1007, 54).

Dr. Lees, addressing the limitation in claim 1 for a glycoconjugate molecular weight between 1000 kDa and 12,500 kDa, acknowledges "molecular weights are not explicitly provided for the two 22F glycoconjugates (PS22F-PhtD and PS22F-AHPhtD) shown in Table 2" but states "Table 2 discloses the conjugate sizes for ten (10) different pneumococcal glycoconjugates with different serotype and carrier protein combinations, all of which fall within and span most of the range of 'between 1000 kDa and 12,500 kDa' recited in claim 1." Ex. 1005 ¶¶ 138–139 (citing Ex. 1007, 54). Dr. Lees states "one would have reasonably expected that the sizes of the two 22F conjugates disclosed in Table 2, if

measured, would also fall within the range between 1,000 KDa and 12,500 KDa." Ex. 1005 ¶ 141. Dr. Lees states regarding the lower end of the range that because

> GSK-711 Table 2 discloses that the carrier protein to polysaccharide ratio is 2.17, the total weight of the carrier protein PhtD in this "smallest" lattice would be 694.4 kDa (about 7 molecules of PhtD11). As a result, the molecular weight of this "smallest" 22F-PhtD conjugate lattice would be at least 1014.4 kDa (320 kDa +694.4 kDa).

Ex. 1005 ¶ 143. Dr. Lees states with regard to the higher end of the range that "a POSA would have understood that the GSK inventors would have been targeting at 22F glycoconjugates with a molecular weight well below 12,500 kDa by using a Sephacryl S400HR column (exclusion limit below 8,000 kDa) to purify the conjugates. . . ." Ex. 1005 ¶ 144.

Dr. Lees, next addressing the obviousness of the glycoconjugate molecular weight range, states "[t]his range (1000–12,500 kDa) is desirable also for the following reasons: On one hand, if conjugates are too small (with molecular weights below 1000 kDa), they are difficult to separate from unconjugated free polysaccharides. As discussed above, unconjugated polysaccharides are less immunogenic in infants, elderly and immunocompromised patients." Ex. 1005 ¶ 148 (citing Ex. 1019, 103). Dr. Lees further notes: "On the other hand, large glycoconjugates (with molecular weights above 12,500 kDa) are difficult to purify and difficult to analyze . . . Overconjugation may also result in the reduction or elimination of T-cell epitopes required for eliciting an immune response." Ex. 1005 ¶ 149 (Citing Ex. 1011, 11–12).

Dr. Lees, addressing the issue of a reasonable expectation of success in forming a 22F conjugate within the claimed molecular weight range,

states "CDAP or reductive amination chemistry naturally results in glycoconjugates with highly crosslinked lattice structures with multiple saccharide molecules linked to multiple carrier protein molecules in each lattice." Ex. 1005 ¶ 151. Dr. Lees states the "fact that GSK-711 discloses 10 different pneumococcal glycoconjugates with molecular weights all falling within the claimed range of 1,000 kDa and 12,500 kDa confirms a reasonable expectation of success." Ex. 1005 ¶ 152 (citing Ex. 1007, 54).

Having reviewed the cited evidence, and the record as a whole, we find that Petitioner has accurately described the above stated teachings of GSK-711 and Merck-086, which we adopt as our own. *See* Pet. 30–50. We focus our remaining analysis on Patent Owner's arguments that the cited combination fails to teach or suggest an immunogenic composition including: (1) a serotype 22F glycoconjugate having a molecular weight of between 1000 kDa and 12,500 kDa; and (2) a polysaccharide to carrier protein ratio (w/w) of between 0.4 and 2.

*a. "wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa"*

Patent Owner asserts: "Claim 1 and each of the challenged dependent claims require that the recited serotype 22F glycoconjugate 'has a molecular weight of between 1,000 kDa and 12,500 kDa. . . .' GSK-711, Merck-086 and the general knowledge do not alone or in combination teach or suggest this limitation." PO Resp. 19 (internal citation omitted).

*i. Optimization of molecular weight*

Patent Owner asserts "GSK-711 does not provide the molecular weight for either of its serotype 22F glycoconjugates. Merck-086 does not

provide the molecular weight for any of its glycoconjugates." PO Reply 19 (citing Ex. 2058 ¶¶ 50, 51) (internal citations omitted).

Patent Owner asserts a "POSA would have understood that the determination of an appropriate molecular weight for a specific serotype glycoconjugate was not a matter of routine optimization of existing conjugation procedures." PO Reply 21 (citing Ex. 2058 ¶ 52). Patent Owner asserts that a "number of variables affect the post-conjugate molecular weight and/or immunogenicity of a specific serotype glycoconjugate." PO Reply 21 (citing Ex. 2058 ¶ 52).

Patent Owner asserts:

> As illustrated in Table 1 of GSK-711, the conjugation chemistries used to make the different serotype glycoconjugates differed in terms of polysaccharide concentration, solvent for polysaccharide dilution, carrier protein concentration, type of carrier protein (four different carrier proteins were utilized), initial carrier protein to polysaccharide ratio, CDAP concentration, and reaction pH condition.

PO Resp. 22 (citing Ex. 2058 ¶ 53, Ex. 1007, Table 1). Patent Owner points to Dr. Lees' statement that "the choice of carrier protein is quite complex." PO Reply 23 (citing Ex. 2054, 71:8–72:16).

Patent Owner asserts "[t]able 2 of GSK-711 provides data for six different parameters tested for thirteen distinct serotype conjugates" and that "this table does not provide any molecular weight data for the two referenced serotype 22F glycoconjugates, 'PS22F-AH-PhtD' and 'PS22F-PhtD.'" PO Reply 23–24 (citing Ex. 1007, Table 2). Patent Owner asserts that "[b]ecause the serotype 19A and 22F glycoconjugates differed from the other listed glycoconjugates with regard to four of the six parameters provided in Table 2 of GSK-711, a POSA would have concluded that the

serotype 19A and 22F glycoconjugates were distinct from the other glycoconjugates." PO Reply 24–25 (citing Ex. 2058 ¶ 55).

Patent Owner asserts "Lees-2008 cautions that 'careful control' over numerous factors (*e.g.*, pH, temperature, ratio of protein and polysaccharide and concentration of each) is 'key to successful conjugation.'" PO Reply 25 (citing Ex. 1011, 8). Patent Owner concludes that the "teachings of Lees-2008 show that more than routine experimentation would be needed to determine the appropriate molecular weight (or polysaccharide to protein ratio) of any given serotype glycoconjugate. . . ." PO Reply 26.

Patent Owner acknowledges Petitioner's argument that "using the size exclusion chromatography columns described in GSK-711 (*i.e.*, Sephacryl S400HR and TSK5000-PWXL), a POSA would have been targeting serotype 22F glycoconjugates well below the 12,500 kDa limit recited in the '559 patent claims." PO Reply 26 (citing Pet. 40, Ex. 1005 ¶ 144). Patent Owner asserts that "[h]owever, the size limits for each of the columns cited by Sanofi are for globular proteins, not for glycoconjugates." PO Reply 26 (citing Ex. 2058 ¶ 57, Ex. 1060, 2, Ex.1061, 15). Patent Owner asserts a "POSA would have further understood that unless the correct mobile phase of SEC was selected for purifying a glycoconjugate, it was possible that the glycoconjugate analyte could elute earlier or later than expected." PO Reply 27 (citing Ex. 2058 ¶ 57).

Patent Owner asserts that "GSK-711 itself demonstrates that it is not possible to predict the upper limit of the glycoconjugates by simply looking at the SEC columns used in its experiments" because "GSK-711 teaches that one of its glycoconjugates (PS9VPD) purified using the Sephacryl S400HR column had a molecular weight of 9,052-9,572 kDa, *i.e., larger* than the

supposed exclusion limit for the Sephacryl S400HR column." PO Reply 27 (citing Ex. 2058 ¶ 58).

We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence of record (*see* Pet. Reply 3–5, 13–16).

Merck-086 teaches that "[c]apsular polysaccharides from *Streptococcus pneumoniae* can be prepared by standard techniques known to those skilled in the art. For example, polysaccharides can be isolated from bacteria and may be sized to some degree by known methods (see, e.g., European Patent Nos. EP497524 and EP497525) and preferably by microfluidisation." Ex. 1008 ¶ 17. Merck-086 teaches "[p]olysaccharides can be sized in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products. In the present invention, capsular polysaccharides are prepared from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, **22F**, 23F and 33F of *S. pneumoniae*." Ex. 1008 ¶ 17 (emphasis added). Merck-086 teaches that:

> The different serotype saccharides are individually conjugated to the purified $CRM_{197}$ carrier protein using a common process flow. In this process the saccharide is dissolved, sized to a target molecular mass, chemically activated and buffer-exchanged by ultrafiltration. The purified $CRM_{197}$ is then conjugated with the activated saccharide and the resulting conjugate is purified by ultrafiltration prior to a final 0.2 µm membrane filtration.

Ex. 1008 ¶ 86.

Thus, Merck-086 disclosed methods to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide, and taught to couple to known carrier proteins such as

$CRM_{197}$, while limiting the upper size range using membrane filtration. Ex. 1008 ¶¶ 17, 86. Thus, rather than fabricating desired sizes, Merck 2011 specifically provides methods to constrain polysaccharide sizes within a particular size range. Ex. 1006 ¶ 86.

GSK-711 teaches "[p]olysaccharides are isolated from bacteria and may be sized to some degree by known methods. . . . in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products." Ex. 1007, 12:5–8. GSK-711 teaches "the *S. pneumoniae* saccharides are sized by mechanical cleavage, for instance by microfluidisation or sonication." Ex. 1007, 14:20–21.

GSK-711 teaches the "saccharide conjugates present in the immunogenic compositions of the invention may be prepared by any known coupling technique" including "direct reductive amination methods as described in US 4365170 (Jennings) and US 4673574 (Anderson). Other methods are described in EP-0-161-188, EP-208375 and EP-0-477508." Ex. 1007, 15:9–16:3. GSK-711 is replete with suggestions to conjugate pneumococcal polysaccharides of various serotypes to $CRM_{197}$. *See, e.g.*, Ex. 1007, 6.

GSK-711 teaches an "immunogenic composition of the invention may thus comprise one or more saccharide conjugates wherein the average size (e.g. weight-average molecular weight; Mw) of each saccharide before conjugation is above . . . 1000kDa." Ex. 1007, 13:5–8. GSK-711 exemplifies a range of conjugate sizes where the lowest reported value is 1303 kDa and the highest reported value is 9572 kDa, both values falling within the range of 1000 kDa to 12,500 kDa required by claim 1. Ex. 1007, 53 (Table 2).

GSK-711 notes that the "present inventors have found that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 13:1–3. GSK-711 also provides more specific reasons to optimize the saccharide conjugates for larger sizes by teaching "immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate." Ex. 1007, 12:31–34. GSK-711 teaches "that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease." Ex. 1007, 13:1–3. GSK-711 recognizes optimization for larger size saccharide-protein conjugates, limited only by a requirement to be "filterable through a 0.2 micron filter." Ex. 1007, 13:12.

Thus, GSK-711 demonstrates that the artisan preferred a range of conjugated polysaccharide sizes overlapping that recited by the '559 claims, disclosed methods to optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$. Ex. 1007, 13–15, 54–55.

Dr. Lees states that the 22F size in GSK-711 would have been expected to fall within the claimed molecular weight range. Dr. Lees states that "a 22F-PhtD conjugate synthesized using the CDAP chemistry would naturally result in highly crosslinked lattices, each of which contains multiple saccharide molecules and multiple carrier protein molecules." Ex. 1005 ¶ 142. Dr. Lees continues:

> a "smallest" lattice structure includes 2 molecules of a 22F polysaccharide. . . . Because GSK-711 Table 2 discloses that the carrier protein to polysaccharide ratio is 2.17, the total

> weight of the carrier protein PhtD in this "smallest" lattice would be 694.4 kDa . . . . As a result, the molecular weight of this "smallest" 22F-PhtD conjugate lattice would be at least 1014.4 kDa (320 kDa +694.4 kDa).

Ex. 1005 ¶ 143. Dr. Lees further states "the glycoconjugates described in Table 2, including 22F glycoconjugates, were purified using Sephacryl S400HR gel filtration, which has a size exclusion limitation under 8,000 kDa." Ex. 1005 ¶ 144. Dr. Lees concludes, based on the teachings of GSK-711 and Merck-086, that:

> It would therefore only require routine optimization of the conjugation conditions, such as varying the relative amounts of starting polysaccharides and carrier proteins in the reaction mixture and monitoring the conjugation chemistry, to achieve 22F glycoconjugates with molecular sizes above 1000 kDa. A POSA can also quench the conjugation reaction at a desired time before the molecular sizes reach 12,500 kDa to facilitate purification, characterization and to avoid precipitation or forming a gel.

Ex. 1005 ¶ 151.

Dr. Lees' position is supported by Dr. Kasper's[16] statement that "[g]iven that routine conjugation techniques and conditions readily achieved those disclosed molecular weights (as well as polysaccharide to protein ratios falling within the claimed range), a POSITA would have understood such molecular weights to be typical of immunogenic conjugates." Ex. 2037 ¶ 101.

---

[16] Ex. 2037 is a Declaration by Dr. Kasper submitted by the Petitioner in IPR2017-02131 in support of a petitioner asserting the unpatentability of claims of the '559 patent. Ex. 2037 ¶ 2.

In rebuttal to the position of Dr. Lees and Dr. Kasper that the molecular weight of the serotype 22F glycoconjugate would have been an optimizable variable, Patent Owner relies on Dr. Wang's statement that a

> POSA would have understood that, simply because several specific serotype glycoconjugates had a molecular weight falling within a particular range does not necessarily mean that any other serotype glycoconjugate (*e.g.*, serotype 22F glycoconjugate) would also have a molecular weight falling within that same range. Numerous variables can impact the molecular weight, polysaccharide to protein ratio, and/or immunogenicity of a specific serotype glycoconjugate.

Ex. 2058 ¶ 52. Dr. Wang points to Lees-2008 as teaching that "numerous factors should be regarded before determining the appropriate molecular weight of any glycoconjugate." Ex. 2058 ¶ 56.

However, under deposition, Dr. Wang acknowledged that "[c]hemists have all kind of tricks to control, at least I've tried to do as much as they can, to come up with the desired product. That's why the conjugation chemistry and the vaccine industry is a special field." Ex. 1106, 156:11–16. Dr. Wang stated that "in order to better control your conjugation, you want the reaction a little slow and with certain time so you can really control that." Ex. 1106, 157:2–5.

Also, in response to a question as to whether Dr. Wang identified "any claims in the '559 patent that in [Dr. Wang's] opinion are directed to the particular conjugation chemistry or conditions of the conjugation chemistry that you would use in order to make the 22F glycoconjugate," Dr. Wang stated "No." Ex. 1106, 160:16–24. In this discussion, Dr. Wang did not identify any specific teaching in the '559 patent that demonstrated that the

optimization of the size of the serotype 22F conjugate would have had any specific issues or concerns. *See* Ex. 1106, 162:21 to 164:8.

Dr. Kasper made statements that address Dr. Wang's concerns regarding glycoconjugation factors (*see* Ex. 2058 ¶¶ 52, 56), noting that "a POSITA would have required only routine experimentation to obtain a conjugate molecular weight within the desirable range." Ex. 2035 ¶ 110.

Petitioner's declarant, Dr. Lees, stated during deposition that glycoconjugate size "is part of their routine optimization that I described before. The ability to control the extent of the reaction is one of the elements can be in that reaction time." Ex. 2054, 82:14–18. Dr. Lees further stated regarding conjugation for each seryotype that

> it is a routine matter. To determine the reaction time, you just simply take an aliquot, describe how to quench and stop the reaction, and that gives them plenty of time to then run those samples because there would be no further reaction changes. So it is a very routine type of thing to monitor it, and then you decide, okay, for the serotype, that is a good length of time.

Ex. 2054, 83:4–13. Dr. Lees explains that at the time of invention, ordinary artisans used a "statistical approach called design of experiment, and we can work out many of these conditions in this way, and you will come up -- this polysaccharide, this works" and that the "fact that these are all variable is a pretty routine type of experimentation." Ex. 2054, 88:10–22.

The evidence of record, therefore, shows that optimization of polysaccharide conjugate size was well known to the person of ordinary skill in the art, as even Patent Owner's expert Dr. Wang acknowledged that with regard to conjugation conditions, that "you can really control [them]." Ex. 1106, 157:2–5. This is also supported by Dr. Lees' statements and testimony that optimization of conjugate sizes was routine. Ex. 1005 ¶ 151,

Ex. 2054, 88:11–22. This evidence supports a determination that routine optimization of conjugate size would have been obvious within the size range of Table 2 of GSK-711 (Ex. 1007, 54) and the express 50–1600 kilodalton range of GSK-711. Ex. 1007, 82. This routine optimization would have been particularly obvious when combined with the teachings of Merck-086 to optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide; with teachings of GSK-711 of methods to optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$; and with Dr. Kasper's statement that "routine conjugation techniques and conditions readily achieved those disclosed molecular weights." Ex. 2037 ¶ 101.

We recognize, but find unpersuasive, Patent Owner's assertion that "teachings of Lees-2008 show that more than routine experimentation would be needed to determine the appropriate molecular weight (or polysaccharide to protein ratio) of any given serotype glycoconjugate." PO. Response 26.

Lees-2008 notably teaches that serotype 22F vaccines are used in formulations, teaching "the currently available licensed 23-valent pneumococcal PS vaccine is formulated with PSs from the 23 most prevalent strains: 1, 2, 3, 4, 5, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C, 19F, 19A, 20, 22F, 23F, and 33F." Ex. 1011, 5. Lees-2008 teaches that "[s]ize fractionation is usually necessary" (Ex. 1011, 7) and that "[c]areful control over the factors relevant to the particular chemistry is key to successful conjugation. These factors include pH, temperature, the ratio of the protein and PS, and the concentration of each." Ex. 1011, 8. Thus, Lees-2008 demonstrates that the factors necessary to obtain particular glycoconjugates are results optimizable variables, noting "[s]ince each

capsular serotype has a different structure, reaction conditions, including concentrations, molar ratios of periodate, oxidation times, and pH, must be optimized. . . .” Ex. 1011, 9. Lees-2008 explains that after the reaction has been completed, particular desired sizes of glycoconjugates can be obtained because “purification of the conjugate is usually performed by size exclusion, by using either size exclusion chromatography or membranes with appropriate molecular weight cutoffs.” Ex. 1011, 8.

Thus, Lees-2008 demonstrates not only that serotype 22F pneumococcal vaccines are desirable, but provides detailed discussion regarding the known parameters necessary to optimize the size of these glycoconjugates.

We recognize, but find unpersuasive, Patent Owner’s assertion that “a POSA would not have turned to the size exclusion limits of the SEC columns used in GSK-711 to make any conclusions about the final sizes of the serotype 22F glycoconjugates described in Table 2.” PO Response 28. As Dr. Lees notes, GSK-711’s use of particular size exclusion columns designed for sizes overlapping the 1,000 to 12,500 kDa range of claim 1 “would certainly suggest to someone that, yeah, you could purify these conjugates on there.” Ex. 2054, 120:20–22.

We recognize that Dr. Wang stated a “POSA would have understood at the priority date of the ’559 patent that size exclusion chromatography (‘SEC’) for glycoconjugates was not the same as that for proteins, and that SEC of glycoconjugates ‘presents special difficulties’ and was associated with ‘pitfalls.’” Ex. 2058 ¶ 57. However, as Dr. Lees stated:

> a POSA would have reasonably expected that the size of GSK-711’s 22F glycoconjugate, *if measured*, would also fall within the claimed range given that the same conjugation chemistry

> and SEC columns were used to generate, purify and analyze the 22F glycoconjugate as those other glycoconjugates. At the very least, a POSA would have been motivated to make 22F glycoconjugates that fall within the claimed molecular weight range and would have had a reasonable expectation that a 22F glycoconjugate with such a molecular weight could be successfully made using routine methods available well before 2014.

Ex. 1005 ¶ 118. Therefore, while the actual sizes of the particular 22F glycoconjugates disclosed in GSK-711 may or may not themselves fall within the claimed range, we agree with Petitioner that GSK-711's use of these size exclusion columns suggests the desirability and optimizability of glycoconjugates falling within the ranges analyzed by these columns. Pet. 44, Ex. 1005 ¶ 118.

We find that a preponderance of the evidence of record demonstrates that conjugate size is a results effective variable associated with improved stability of conjugates and good immune response, limited only by filter size, thereby rendering "optimization within the grasp of one of ordinary skill in the art." *In re Applied Materials*, 692 F.3d 1289, 1295 (Fed. Cir. 2012). "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955).

We, therefore, conclude that a preponderance of the evidence of record supports Petitioner's position that the 1,000 to 12,500 kDa size range in claim 1 of the '559 patent, which overlaps with the 1303 and 9572 kDa in GSK-711, would have been consistent with the ranges optimized and used to generate multivalent vaccines. Pet. 40–44; Ex. 1007, 55:2–10. "In cases involving overlapping ranges, we and our predecessor court have

consistently held that even a slight overlap in range establishes a *prima facie* case of obviousness." *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003). *See also E.I. DuPont de Nemours & Company v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018) (reaffirming this obviousness doctrine).

*ii. CDAP conjugation and serotype 22F glycoconjugate molecular weight*

Patent Owner asserts that Petitioner contends "the CDAP chemistry used to generate the glycoconjugates described in Table 2 of GSK-711 would be 'likely to produce a 22F-PhtD conjugate with an average molecular weight above 1000 kDa.'" PO Response 28 (citing Pet. 37).

Patent Owner asserts Petitioner "oversimplified the conjugation process" because Petitioner "has not shown how many of (or even a rough approximation of) the hydroxyl groups or lysine residues referenced by [Petitioner] would actually be available for conjugation reactions." PO Response 29 (citing Ex. 2058 ¶¶ 59–60). Patent Owner acknowledges that "a POSA would have understood that the actual number of activated hydroxyl groups would need to be carefully controlled during a conjugation reaction" but asserts Dr. Lees "has failed to explain how a POSA should control the serotype 22F activation step such that only the appropriate number of activated hydroxyl groups would be made available to react with those two lysine groups." PO Response 29–30 (citing Ex. 2058 ¶ 60, Ex. 2054, 132:1–8).

Patent Owner concludes that Petitioner "does not explain why the specific reaction parameters described in Example 2 and Table 1 of GSK-

711 would be likely to result in a serotype 22F glycoconjugate having the claimed molecular weight parameters." PO Response 31.

We agree with Petitioner that these arguments are not persuasive because they conflate anticipation with obviousness and are not supported by a preponderance of the evidence of record (*see* Pet. Reply 10–13).

As already noted, GSK-711 produced fourteen conjugates as disclosed in Table 2, ten of which had conjugate sizes within the range required by claim 1 of the '559 patent, and four whose conjugate size was not measured including a 22F-PhtD conjugate. Ex. 1007, 53. Dr. Lees persuasively explained that even assuming minimal conjugation for the 22F-PhtD glycoconjugate, the "molecular weight of this 'smallest' 22F-PhtD conjugate lattice would be at least 1014.4 kDa" and that "a POSA would reasonably expect that the average molecular weight of all lattices in the 22F-PhtD conjugate should be well above 1000 kDa." Ex. 1005 ¶ 143.

In rebuttal, Dr. Wang states "it is possible that the referenced serotype 22F glycoconjugates could each have only one polysaccharide" and therefore "the resulting serotype 22F glycoconjugates would be half the size" of the lower limit recited by claim 1 of the '559 patent. Ex. 2058 ¶ 62.

However, when deposed, Dr. Wang stated regarding the CDAP conjugation process that "it's hard to control, it's a – it's react very fast." Ex. 1106, 108:24–25. When Dr. Wang was then asked whether this fast conjugation process made it "unlikely that you would see very, very small glycoconjugates," Dr. Wang answered "You may still achieve some linkage. It's all depend [sic] on the -- you know, the procedure, the operation." Ex. 1106, 109:6–14. Thus, Dr. Wang acknowledges that the ordinary artisan would expect CDAP activation to result in larger, rather than smaller,

glycoconjugates consistent with Dr. Lees' position, and that the size of these glycoconjugates may be controlled if the artisan is very careful to do the operation. Ex. 1106, 109:18–19.

This understanding is reinforced by Dr. Lees, who stated under deposition that CDAP "is a controllable reaction." Ex. 2081, 61:24. Dr. Lees further states that "[i]n my experience working with CDAP conjugation in particular, pretty much routine conditions. I've worked with a very large number of polysaccharides using CDAP chemistry, and we make conjugates that are immunogenic by the standards." Ex. 2081, 83:2–7.

We recognize, but find unpersuasive, Patent Owner's assertion that Petitioner "does not explain why the specific reaction parameters described in Example 2 and Table 1 of GSK-711 would be likely to result in a serotype 22F glycoconjugate having the claimed molecular weight parameters" (PO Resp. 31), because the issue is the obviousness of routine optimization of conjugate sizes, not inherent anticipation by GSK-711. Instead, we agree with Petitioner that "a POSA would still have reasonably expected lattice sizes well above 1,000 kDa because the conjugation conditions can be readily optimized to increase cross-linking." Pet. Reply 18.

*iii. GSK-711 table 2 molecular weight calculations*

Patent Owner asserts that Petitioner

> relies upon an oversimplified calculation that does not work in practice. EX2058, ¶62. As Dr. Wang points out, it is unclear why Sanofi concludes that the smallest serotype 22F glycoconjugate would be a lattice including at least two polysaccharides. *Id*. After considering the activation and conjugation methods described in GSK-711, a POSA would have understood that the referenced serotype 22F glycoconjugates could each have had only one polysaccharide. *Id*. In such a situation, the resulting serotype 22F

> glycoconjugates would be half the size concluded by Sanofi, *i.e.*, 507.2 kDa.

PO Reply 32. Patent Owner further asserts that in Table 2 of GSK-711 "the listed size for the 22F polysaccharide is *prior* to the activation and conjugation reactions" and the "activation and conjugation reactions could process a polysaccharide so that it is smaller when incorporated into the final glycoconjugate." PO Reply 33 (citing Ex. 2058 ¶ 63).

Patent Owner asserts that an example in Table 2 of GSK-711 supports this reasoning because "the 'smallest' possible glycoconjugate determined using Sanofi's calculation *exceeded* the actual PS1-PD glycoconjugate sizes as provided in Table 2." PO Reply 35 (citing Ex. 2058 ¶ 64). Patent Owner asserts that "even if these values are close, this does not change the fact that Sanofi's calculation and conclusions are unreliable." PO Reply 36 (citing Ex. 2058 ¶ 65). Patent Owner concludes that "there is no reason why the actual serotype 22F glycoconjugate of GSK-711 could not be similarly below Sanofi's calculated value and below the lower limit specified in the challenged claims." PO Reply 35.

We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence (*see* Pet. Reply 16–20).

Dr. Lees states "[e]xcept for PS1-PD, all other conjugates in Table 2 with measured MWs are above the 'smallest' hypothetical lattice size, and therefore conform to my calculations. The size of the PS1-PD conjugates is among the smallest of all the conjugates in Table 2 and appears to be the only outlier in this respect." Ex. 1108 ¶ 30. Table 2 of GSK-711 shows that several serotypes with polysaccharide sizes smaller than the 159–167 kDa

size of serotype 22F, including serotypes 4 (93–100 kDa), 18C (89–97 kDA), and 19F (133–143 kDa), all after conjugation result in final glycoconjugates within the 1,000 to 12,500 kDa range recited in claim 1 of the ’559 patent. Ex. 1007, 53. Under deposition Dr. Lees states “[a]ll of the numbers, whether it’s 1,499 or 1,745, they are all within the claims that -- of the seven -- of the ’599 patent. For the reason, this is kind of the general range you're targeting, is greater than 1,000” kDa. Ex. 2081, 147:5–10.

Dr. Kasper confirms that a “POSITA would have understood that, given the molecular weights of the polysaccharides and carrier proteins (all of which had a combined weight several-fold smaller than the corresponding conjugate molecular weights), the conjugates had been crosslinked into high molecular weight lattice structures containing multiple polysaccharide and carrier proteins.” Ex. 2037 ¶ 84.

As we have already noted, GSK-711 is not relied upon for anticipation, but rather for obviousness. Consequently, even if the smallest possible size conjugate was slightly below the claimed range as argued by Patent Owner, it is not necessary for obviousness for the ordinary artisan to predict conjugation conditions that will result in the desired range prior to performance of actual experimentation to routinely optimize glycoconjugate size. Instead, there must be a reason to optimize to the desired range, and in addition to Table 2 of GSK-711 teaching a number of examples within the range recited by claim 1 of the ’559 patent, GSK-711 suggests that larger conjugates are better because “saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease” with an upper size limit constrained by a

requirement for the glycoconjugate to be "filterable through a 0.2 micron filter." Ex. 1007, 13:1–3, 12.

Therefore, we agree with Petitioner that "a POSA would still have reasonably expected lattice sizes well above 1,000 kDa because the conjugation conditions can be readily optimized to increase cross-linking." Pet. Reply 18 (citing Ex. 1108 ¶ 29). We conclude that the molecular weight calculations provide some additional evidence supporting the obviousness of generating a serotype 22F glycoconjugate within the 1,000 to 12,500 kDa range recited by claim 1 of the '559 patent.

*iv. Serotype 22F glycoconjugate size relative to polysaccharide*

Patent Owner asserts "there is no support in GSK-711 or anywhere else in the art for the general rule that a glycoconjugate should be at least 3-5 fold larger than its respective polysaccharide." PO Resp. 37 (citing Ex. 2058 ¶ 67). Patent Owner asserts "Dr. Lees did not provide any specific basis for the arbitrary selection of this '3-5 fold' range." PO Resp. 37 (citing Ex. 2054, 150:3–12).

Patent Owner asserts that "if the serotype 22F glycoconjugate were 3-5 fold larger than its preconjugation polysaccharide . . . then the resulting serotype 22F glycoconjugate would only be 477-835 kDa, well below the 1,000-12,500 kDa range recited in the '559 patent." PO Resp. 37–38 (citing Ex. 2058 ¶ 69).

Patent Owner asserts that:

> In *Applied Materials*, the claims recited dimensions that overlapped with those disclosed in a prior art. [*In re Applied Materials, Inc*., 692 F.3d 1289, 1295 (Fed. Cir. 2012]. There is no overlap between the molecular weights in GSK-711 and the challenged claims. The challenged claims recite the molecular

> weight of the 22F glycoconjugate and not the unconjugated polysaccharide. GSK-711 does not disclose molecular weights of either serotype 22F glycoconjugate. At best, GSK-711 discloses generic molecular weight ranges of one component, *i.e.*, the pre-conjugation size of the 22F polysaccharide. The pre-conjugation size of 22F does not indicate the polysaccharide size in the final product or the molecular weight of the glycoconjugate. EX2058, ¶71.

PO Resp. 38–39. Patent Owner asserts "[t]here is no reason why a POSA would have selected a polysaccharide having a molecular weight on the upper end (800 kDa) of the range recited in GSK-711, as opposed to the lower end (50 kDa) to prepare glycoconjugates." PO Resp. 40 (citing Ex. 2058 ¶ 71). Patent Owner asserts that based on the size of the serotype 22F polysaccharide in Table 2 and "on the small sizes of the specific carrier proteins referenced by [Petitioner], it is not reasonable to assume that the molecular weight of a serotype 22F glycoconjugate would have a molecular weight over 1,000 kDa." PO Resp. 41 (citing Ex. 2058 ¶ 74).

We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence of record. *See* Pet. Reply 13–16, 22–24.

To the extent that Dr. Lees discusses a purported rule that "to effectively separate conjugates from unconjugated polysaccharides using an SEC column . . . the size of the conjugates preferably needs to be at least 3–5 fold larger than the unconjugated polysaccharides" (Ex. 1005 ¶ 148), we agree that the rule reflects a parameter that would be considered by the ordinary artisan in optimizing glycoconjugate sizes. *See, e.g.,* Pet. Reply 23.

We appreciate Patent Owner's argument that the sole basis of the 3–5 fold rule is found in Dr. Lees' Declaration, but under deposition Dr. Lees

explained that the underlying reasoning for this rule is that to separate materials in sizing columns "you need to have a physical size difference between the two in order to be able to separate them." Ex. 2054, 150:10–12. Dr. Lees is simply pointing out that the greater the size difference between two molecular components, the more effectively they can be distinguished and separated using a sizing column, as acknowledged by Dr. Wang that "[i]n order to separate well, the difference, the larger the better, of course." Ex. 1006, 124:5–6. Additionally, the Cross Flow Filtration Method Handbook explains that "[a]n ultrafiltration filter with a nominal molecular weight cut-off (NMWC) that is 3× to 5× less than the molecular weight of the target molecule is generally recommended." Ex. 1110, 19. Thus, the ordinary artisan would have had reason to maximize these size differences to improve the efficacy of separation.

As to Patent Owner's arguments regarding optimization, we have already extensively addressed the evidence supporting optimization of glycoconjugate sizes above, but we will reiterate some of the key evidence below. GSK-711 teaches a range for the saccharide glycoconjugates that overlaps the 1,000 to 12,500 kDa range recited in claim 1 of the '559 patent, specifically teaching "saccharide conjugates of the invention should have an average size of saccharide pre-conjugation of 50-1600" kDa. Ex. 1007, 13:8–10. Table 2 of GSK-711 teaches ten different serotypes of *S. pneumoniae* with final glycoconjugate sizes ranging from 1,499 to 9,572 kDa. Ex. 1007, 53.

More directly, GSK-711 provides reasons to optimize the size of the glycoconjugates and in particular, larger saccharides because "saccharide conjugate vaccines retaining a larger size of saccharide can provide a good

immune response against pneumococcal disease." Ex. 1007, 13:1–3. GSK-711 teaches "[p]olysaccharides can be sized in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products." Ex. 1007, 12:7–8.

GSK-711 teaches sizes may be measured by MALLS (see Ex. 1007, 15:10–15) and teaches "conjugates were purified by gel filtration using a Sephacryl S400HR gel filtration column equilibrated with 0.15M NaCl (S500HR for 18C) to remove small molecules (including DMAP) and unconjugated PS and protein." Ex. 1007, 50:16–18.

Under deposition, Dr. Lees stated that glycoconjugates "take on a characteristic that are intermediate between the two components. So it's not running like a polysaccharide. It's not running like a globular protein. It will run at something in between" polysaccharides and globular proteins. Ex. 2081, 46:18–22. Patent Owner, in the Lees' deposition, asks whether for a Sephacryl S400HR gel filtration column, "the size limit for dextrans is 2000 kilodaltons . . . And the size limit for globular proteins for the S400 HR column is 8,000 kilodaltons." Ex. 2081, 45:7–13 (citing Ex. 1060, table 1). Dr. Lees answered "That's correct." Ex. 2081, 45:14. Thus, there is no dispute that the Sephacryl S400 column used by GSK-711 for purification of glycoconjugates have useful purification range of "2 x $10^4$–8 x $10^6$" kDa for globular proteins and "1 x $10^4$–2 x $10^6$" for the carbohydrate, dextran. Ex. 1060, Table 1. As Dr. Lees noted under deposition "somebody reviewing the literature at that time in 2014 would be well aware that you could use an S-400 column." Ex. 2054, 123:2–4.

These teachings regarding the purification range of a Sephacryl S400 column, in combination with Dr. Lees' statement that polysaccharide

conjugates will fall somewhere between the globular protein and dextran ranges, evidences that the ordinary artisan would have understood the minimum size of glycoconjugates being purified by GSK-711 would have been no lower than 1 x $10^4$ kDa, or 1,000 kDa, equivalent to the lower end of the range recited in claim 1 of the ’559 patent. Thus, the ordinary artisan would have known to optimize the lower size range of the glycoconjugates to a size around 1,000 kDa.

*v. Merck-086 and molecular weight*

Patent Owner asserts that “[n]either Merck-086 nor the two specific documents cited in Merck-086 teaches or suggests a molecular weight of a serotype 22F polysaccharide.” PO Resp. 42 (citing Ex. 2058 ¶ 75).

We agree with Patent Owner that Merck-086 has very limited disclosure regarding the size of glycoconjugates, only teaching that polysaccharides such as 22F can be conjugated to carrier proteins such as $CRM_{197}$. Ex. 1008, ¶¶ 17–18. However, the obviousness analysis is based on the combination of the disclosures of Merck-086 with GSK-711, not Merck-086 alone. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (“The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.”)

*b. “ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2”*

Patent Owner asserts “[c]laim 1 and its dependent claims require that the ‘ratio (w/w) of the polysaccharide to the carrier protein is between 0.4

and 2' for the recited 22F glycoconjugate. EX1001 at claims 1, 3-19, 23-37, 41-42, 45. GSK-711 teaches away from the claimed ratio. EX2058, ¶76." PO Resp. 43.

*i. GSK-711 does not teach away from the claimed polysaccharide to protein ratio*

Patent Owner asserts that while one of the two different serotypes exemplified by GSK-711, PS22F-PhtD, "translates to a polysaccharide to protein w/w ratio of 1/2.17, or 0.46" that is within the polysaccharide to protein ratio range of the '559 claims (PO Resp. 43), the other serotype, PS22F-AHPhtD, "translates to a pre-conjugation polysaccharide to protein ratio of 1:3, or 0.33, which is outside the ratio range of the '559 patent claims." PO Resp. 44 (citing Ex. 2058 ¶ 78). Patent Owner asserts that, based on pre-conjugation ratios for both exemplified serotypes, a "POSA would have understood that it was an objective of the inventors of GSK-711 to generate a serotype 22F glycoconjugate having a polysaccharide to protein ratio below the ratio range recited in the '559 patent claims." PO Resp. 44.

Patent Owner asserts that because of the significant "immunogenic superiority of the PS22F-AH-PhtD over the PS22F-PhtD glycoconjugate," "a POSA trying to make an immunogenic serotype 22F glycoconjugate would have turned to PS22F-AHPhtD rather than PS22F-PhtD." PO Resp. 45 (citing Ex. 2058 ¶ 79). Patent Owner asserts that because the "serotype 22F glycoconjugate was one of only two glycoconjugates described in GSK-711 that was made using a linker . . . a POSA likely would have believed that the ADH linker chemistry was adopted for the serotype 22F

glycoconjugate because the data show insufficient immunogenicity for the direct conjugate." PO Resp. 48 (citing Ex. 2058 ¶ 82).

Patent Owner also asserts that "consistency between the starting and final ratios indicates a very efficient conjugation for the PS22F-AH-PhtD" while the "drop in protein to polysaccharide ratios from starting to final material for the PS22F-PhtD glycoconjugate clearly suggests a less efficient conjugation." PO Resp. 49 (citing Ex. 2058 ¶ 83). Patent Owner asserts that a "POSA would desire a conjugation chemistry that was more efficient because it would provide more predictability and ease in purification." PO Resp. 49. Patent Owner concludes "[d]ue to the highly significant inferiority of the PS22F-PhtD glycoconjugate, a POSA would have been discouraged from generating this glycoconjugate." PO Resp. 47.

We agree with Petitioner that these arguments are not persuasive because they are not supported by a preponderance of the evidence of record. *See* Pet. Reply 6–10.

GSK-711 discloses a range of ratios of polysaccharide to carrier protein that includes and fully overlaps the range claimed. Ex. 1007, 19:1–6. *Peterson*, 315 F.3d at 1329. GSK-711 teaches "the majority of the conjugates, for example 6, 7, 8, 9 or more of the conjugates have a ratio of carrier protein to saccharide that is greater than 1:1, for example 1.1:1." Ex. 1007, 19:1–6. Dr. Lees further explains that "[f]or pneumococcal conjugate vaccines, while the particulars may differ for a specific serotype, the WHO guidelines specifically recommend a ratio 'in the range of 0.3–3.0.'" Ex. 1005 ¶ 58 (citing Ex. 1019, 119 ("For pneumococcal conjugate vaccines the ratio is typically in the range 0.3–3.0 but varies with the serotype.")). Patent Owner also acknowledges that GSK-711 teaches an example of a final

conjugate of serotype 22F that has a polysaccharide to protein ratio of 0.46, within the range required by claim 1. *See* PO Resp. 43. Dr. Lees supports the obviousness of the claimed range, noting that:

> It is desirable to avoid very low or very high polysaccharide-to-carrier protein ratios. Glycoconjugates having a very low polysaccharide-to-carrier protein ratio would require administration of large amounts of the conjugates in order to provide an effective amount of the polysaccharide. Ex. 1054 at 13. By contrast, glycoconjugates with a very high polysaccharide-to-carrier protein ratio may interfere with the immunogenic role of the carrier protein.

Ex. 1005 ¶ 57.

The exemplary serotype 22F-PhtD conjugate with a 0.46 ratio, along with the overlapping ranges disclosed and claimed by GSK-711, the overlapping Merck-086 0.2–2 to 1 charge ratio, and the statement by Dr. Lees that this range substantially overlaps the World Health Organization's recommended ratios for pneumococcal conjugate vaccines, all provide reasonable motivation for the ordinary artisan to have selected ratios for the serotype 22F conjugate within the range required by claim 1 of the '559 patent. Ex. 1007, 19:1–6; Ex. 1008, 11 ¶ 94; Ex. 1005 ¶ 58; Ex. 1019, 119.

We recognize that Figure 6 of GSK-711 shows what Patent Owner states to be a 12 fold lower level of antibody titer for serotype 22F-PhtD with a 0.46 ratio relative to serotype 22F-AH-PhtD with a 3.66 to 4.34 ratio. *See* PO Resp. 46 (citing Ex. 1007, 93). We also recognize that Dr. Wang states that "a POSA would have focused on the glycoconjugate having the significantly superior immunogenicity, *i.e.*, PS22FPhtD." Ex. 2058 ¶ 81.

However, GSK-711 expressly teaches that either conjugate may be used, noting a "13 valent vaccine was made by further adding the serotypes

19A and 22F conjugates above (with 22F either directly linked to PhtD, or alternatively through an ADH linker)." Ex. 1007, 54:12–14. Thus, the plain text of GSK-711 teaches that either conjugate may be used. Therefore, even if the GSK-711 teaching were interpreted as a preference for the higher polysaccharide to protein ratio rather than simply a preference for the ADH linker, it is well settled that disclosed examples, and even preferred embodiments do not constitute a teaching away from a broader disclosure or non-preferred embodiments. *In re Susi*, 440 F.2d 442, 446 n.3 (CCPA 1971). "[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). *See also In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) ("The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the [claimed] solution.").

Also, GSK-711 shows the immunogenicity for the two serotype 22F conjugates as either 37% or 28–31%, demonstrating similar results for both conjugates. Ex. 1007, 53, Table 2. Patent Owner points to no teaching in GSK-711 that criticizes, discredits, or discourages the use of a ratio within the range required by claim 1. Indeed, in response to the question of whether GSK-711 stated "if you want to make an immunogenic 22F glycoconjugate, do not use the glycoconjugate that does not have a linker," Patent Owner's expert Dr. Wang answered "the patent did not say specifically that." Ex. 1006, 127:10–17.

Moreover, the other reference relied upon in the obviousness analysis, Merck-086, also suggests conjugation of polysaccharide to protein in

overlapping amounts to those recited in the claims of the ’559 patent. Table 1 of Merck 2011 discloses an example that would reasonably have been expected to result in a 1:1 w/w ratio of the 22F polysaccharide to the $CRM_{197}$ carrier protein. Ex. 1008, ¶ 104. This expectation is supported by Dr. Kasper’s statement that the ratios “resulted in an average polysaccharide to protein ratio in the conjugates of approximately 1.” Ex. 2037 ¶ 115.

*ii. GSK-711 suggests overlapping polysaccharide to protein ratios*

Patent Owner asserts GSK-711 discloses “ratio range[s] between 0.4 to 2; 0.4 and 0.67; and 0.5 and 1” but Petitioner “has failed to explain why a POSA would have adopted the specific polysaccharide range of 0.4 to 2 from this generic list.” PO Resp. 50. Patent Owner points out that GSK-711 includes “polysaccharide to protein ratio ranges that fall entirely *outside* of the claimed range.” PO Resp. 50 (citing Ex. 2058 ¶ 84).

Patent Owner compares these facts to *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853 (Fed. Cir. 2015), and asserts, “[s]imilar to the facts of *Insite*, the challenged patent claims recite a combination of features (*e.g.*, polysaccharide to protein ratios and molecular weights), and the cited prior art reference does not disclose one of the recited claim features (i.e., molecular weight) in that combination.” PO Resp. 52 (citing Ex. 1054, 13 “[t]he optimal [polysaccharide-protein] ratio has to be determined by experiment in pre-clinical studies or clinical trials.”)

We do not find these arguments persuasive. In *Insite*, the Federal Circuit relied on District Court findings that “it would not have been obvious to a person of ordinary skill in the art to formulate a topical azithromycin formulation for ophthalmic treatment of any infection” because “there were

'innumerable' options for ophthalmic treatments" and concerns that azithromycin "might not penetrate ocular tissue based on its high molecular weight, charge and insolubility in water." *Insite*, 783 F.3d at 861.

In contrast, here, both of the cited prior art references, GSK-711 and Merck-086, specifically direct the ordinary artisan to incorporate serotype 22F conjugates into pneumococcal vaccines. *See* Ex. 1008, ¶15 ("[T]he addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing pneumococcal vaccines."). *See* also Ex. 1007, 4:12–15 ("The present invention provides an immunogenic composition . . . [that] comprises a 22F saccharide conjugate.").

Moreover, as discussed above, the GSK-711 and Merck-086 together suggest molecular weights and polysaccharide to carrier protein ratios that overlap and fall within the ranges recited in claim 1 of the '559 patent. *See*, e.g., Ex. 1007, 19:1–6; Ex. 1008, 11–12; Ex. 1005 ¶ 58. In addition, the ordinary artisan was aware of desirable ranges of polysaccharide to carrier protein. Ex. 1019, 119. As Dr. Kasper noted "the acceptable range of 'Saccharide content/protein ratio' . . . for each of the seven disclosed conjugates," though not including 22F, "overlaps to a large extent with the claimed ratio of 0.4 to 2, consistent with the general understanding in the art as of January 21, 2014 that such ratios are typical for immunogenic conjugates." Ex. 2035 ¶¶ 112–113.

Therefore, unlike *Insite*, we conclude that the evidence of record directly suggests incorporation of a serotype 22F glycoconjugate into a pneumococcal vaccine and suggests selection of molecular weight and

polysaccharide to carrier protein ratio from a limited series of optimizable ranges disclosed in the prior art. We also conclude that the prior art provides a reasonable expectation of success in doing so, particularly in light of the disclosure in the prior art of functional glycoconjugates. Specifically, GSK-711 demonstrates an immunogenic serotype 22F glycoconjugate with an overlapping polysaccharide to carrier protein ratio and Merck-086 demonstrates an immunogenic serotype 22F glycoconjugate in a 1:1 polysaccharide to carrier protein ratio. Ex. 1007, 19:1–6; Ex. 1008, 11–12, Table 1. Patent Owner provides no evidence showing that any serotype 22F glycoconjugate fails to result in an immunogenic response.

Therefore, a preponderance of the evidence of record supports the obviousness of selecting polysaccharide to carrier protein ratio values for the serotype 22F polysaccharides within the 0.4 and 2 range recited in claim 1 of the ’559 patent based on the disclosures of GSK-711, Merck-086, and the knowledge of the ordinary artisan, including the WHO guidelines.

*c. serotype 15B in claim 3 and 10A and 11A in claim 4*

Patent Owner asserts a “POSA reading claims 3 or 4 (or claims 5–8) would understand that all of the serotype glycoconjugates recited in these claims would be required to be immunogenic, not just serotype 22F glycoconjugates.” PO Resp. 53–54 (citing Ex. 2058 ¶ 88). Patent Owner asserts that “[n]either GSK-711 nor Merck-086 exemplifies the generation of a serotype 15B glycoconjugate (as required by claim 3) or a serotype 12F, 10A, 11A or 8 glycoconjugate (as required by claim 4).” PO Resp. 55 (citing Ex. 2058 ¶ 89). Patent Owner asserts Lees-2008 teaches that “multivalent pneumococcal glycoconjugate compositions ‘present additional complexities’ due to each serotype being chemically distinct, requiring

optimization of each glycoconjugate within the compositions." PO Resp. 55 (citing Ex. 2058 ¶ 89).

While we agree, as noted above, that Patent Owner correctly construes the claims to require the term "immunogenic" to apply to all of the serotypes present in the composition, we are not persuaded that claims 3 and 4 are unobvious over the disclosures in GSK-711, Merck-086, and the knowledge of the person of ordinary skill in the art.

GSK-711 teaches a "multivalent pneumococcal vaccine of the invention will be selected from the following serotypes 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C, 19A, 19F, 20, 22F, 23F and 33F." Ex. 1007, 7:1–3. Thus, GSK-711 expressly suggests a vaccine containing serotypes 10A, 11A, and 15. Just as we agreed with Patent Owner that the construction of the word "immunogenic" in claim 1 reasonably requires each serotype contained in a vaccine to induce an immune response, we also find that the disclosure of a vaccine by GSK-711 containing multiple serotypes also requires induction of an immune response, otherwise there would be no need to include a serotype unable to induce such a response. And indeed, GSK-711 uses the same term, immunogenic, to describe the pneumococcal vaccine composition. *See* Ex. 1007, 4:12.

We recognize that Dr. Wang correctly notes that "[n]either GSK-711 nor Merck-086 exemplifies the generation of a serotype 15B glycoconjugate (as required by claim 3) or a serotype 12F, 10A, 11A or 8 glycoconjugate (as required by claim 4)." Ex. 2058 ¶ 89. However, "[a]ll the disclosures in a reference must be evaluated . . . and a reference is not limited to the

disclosure of specific working examples." *In re Mills*, 470 F.2d 649, 651 (CCPA 1972).

We note that Dr. Kasper stated that at the time of invention, the ordinary artisan was aware of serotype 15B, that PVP 2013 discloses inclusion of serotype 15B in a pneumococcal vaccine, and that based on the prior art disclosures "a POSITA would have been motivated with a reasonable expectation of success to additionally include a serotype 15B conjugate." Ex. 2037 ¶¶ 44, 88, 120. Dr. Kasper also noted that the "claimed serotypes were well-known to be prevalent and had already been included in the Pneumovax® 23 polysaccharide vaccine." Ex. 2037 ¶ 122.

This is consistent with Dr. Lees' statement that "[c]laims 3–8 [of the '559 patent] collectively recite 20 additional serotypes. However, . . . all 20 of the recited serotypes were already included in multivalent pneumococcal vaccines on the market in 2014" and, therefore, "[o]ne would also have reasonably expected success because, as shown in GSK-711 and Merck-086, 22F and other new serotypes were successfully included in multivalent PCV compositions while maintaining the immunogenicity to all serotypes in the compositions." Ex. 1005 ¶¶ 158–59.

We, therefore, conclude that incorporation of known immunogenic serotypes such as 10A, 11A, 15B, and 33F into the vaccine suggested by GSK-711, Merck-086, and the knowledge of the ordinary artisan would have been obvious in order to increase the coverage of serotypes of pneumococcal vaccines.

### *D. Obviousness over GSK-711, Merck-086, Lees-2008, PVP-2013, and Pfizer-605*

Petitioner asserts that "Lees-2008 establishes that O-acetyl groups on polysaccharides were considered desired epitopes" because "O-acetyl groups could be important for protective immunogenicity." Pet. 67 (citing Ex. 1011, 5, 7). Petitioner asserts that "it was known that the O-acetylation level on native 22F polysaccharide is 0.8 mM acetate per mM of polysaccharide repeating unit." Pet. 67 (citing Ex. 1026, 9).

Petitioner asserts PVP-2013 states "that for 22F polysaccharides, the permitted O-acetylation level by NIID is '0.5–1.5' mM acetate per mM polysaccharide unit." Pet. 68 (citing Ex. 1012, 3, 4). Petitioner asserts that "Lees-2008 and/or PVP-2013 clearly establish a motivation to meet the threshold recited in claim 2." Pet. 68. Petitioner asserts "Pfizer had already used such an approach (*i.e.*, reductive amination in DMSO) in its earlier Pfizer-605 patent to prepare glycoconjugates and preserve O-acetyl groups on the native polysaccharide." Pet. 69 (citing Ex. 1013, Ex 1005 ¶ 232).

Patent Owner asserts "GSK-711 and Merck-086, and the 'general knowledge' do not teach or suggest the minimum acetate levels required by claims 2, 40 and 43" and "Lees-2008, PVP 2013, and Pfizer-605 do not remedy the deficiencies." PO Resp. 56. Patent Owner asserts "Lees-2008 is silent with regard to serotype 22F glycoconjugate" and "emphasizes the uncertainty in the field regarding the role of *O*-acetylation in glycoconjugates." PO Resp. 57 (citing Ex. 1011, 5, Ex. 2058 ¶ 92).

Patent Owner asserts "23-valent free unconjugated polysaccharide vaccine referred to in PVP2013 is not the same as the glycoconjugate compositions that are claimed" because "[t]here is no carrier protein in the PVP-2013 free polysaccharide compositions." PO Resp. 58. Patent Owner

asserts "[b]ecause carrier proteins or glycoconjugates are not mentioned in PVP-2013, this document would not have taught a POSA how to arrive at the specific polysaccharide to protein ratio (w/w) recited in the '559 patent claims." PO Resp. 58. Patent Owner asserts "Pfizer-605 does not refer to any serotype 22F glycoconjugates, and, therefore, does not teach an appropriate molecular weight or polysaccharide to protein ratio for a serotype 22F glycoconjugate." PO Resp. 59.

1. *Lees-2008 (Exhibit 1011)*

Lees-2008 is titled "Conjugation Chemistry" and is included in a volume on Pneumococcal Vaccines. Ex. 1011, 2, 4. Lees-2008 identifies a number of pneumococcal serotypes including 22F. Ex. 1011, 5. Lees-2008 states that for some polysaccharides "O acetylation is necessary in order for the conjugates to induce protective antibodies" but that "O-acetyl groups in serotype 9V and 18C PSs [polysaccharides] may not be required for the PS to induce functional antibodies." Ex. 1011, 5).

2. *PVP-2013 (Exhibit 1012)*

PVP-2013 is titled "Pneumococcal Vaccine Polyvalent" and was published on the website of Japan's National Institute of Infectious Diseases (*see* Pet. 68). PVP-2013 discusses starting materials used to make vaccines including serotypes 1, 2, 3, 4, 5, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C, 19A, 19F, 20, 22F, 23F, and 33F. *See* Ex. 1012, 1. PVP-2013 teaches various tests used to analyze polysaccharides used in the vaccines including, among others, an *O*-acetate content test. Ex. 1012, 3, 4. PVP-2013 provides a range of *O*-acetate for a variety of serotypes including a range of 0.5 – 1.5 for serotype 22F. Ex. 1012, 4.

3. *Pfizer-605 (Exhibit 1013)*

Pfizer-605 is a patent drawn to a "multivalent immunogenic composition comprising 13 distinct polysaccharide-protein conjugates" of *Streptococcus pneumoniae*. Ex. 1013, 2:8–9. Pfizer-605 teaches the "conjugation step is performed in DMSO via a reductive amination mechanism in the presence of sodium cyanoborohydride." Ex. 1013, 12:32–34. Pfizer-605 teaches the "ratio of O-acetyl concentration to total saccharide concentration gave µmoles of O-acetyl per mg of saccharide." Ex. 1013, 16:34–36.

4. *Analysis*

We find Patent Owner's arguments unpersuasive. Claim 2 requires "at least 0.1 mM acetate per mM polysaccharide" and claims 40 and 43 require a mM ratio that "is at least 0.6." Ex. 1001, 141:35–37, 144:15–18, 27–30. Dr. Kasper stated "PVP 2013 specifies that, for a pneumococcal polysaccharide vaccine, serotype 22F capsular polysaccharide must contain an 'O-acetyl/ polysaccharide unit molar ratio' of '0.5 - 1.5'; that entire specified range meets the claimed ratio of 'at least 0.1.'" Ex. 2037 ¶ 142 (citing Ex. 1009, 4). Consistent with Dr. Kasper's statement, PVP 2013 states the "*O*-acetate content (*O*-acetyl/polysaccharide unit molar ratio) shall be within the range of the following specification" where the range for serotype 22F is given as "0.5–1.5." Ex. 1012, 3, 4. Dr. Lees further performs a calculation on the PVP-2013 analysis, finding that "the permitted minimum ratio of O-acetylation level . . . is at least 0.625." Ex. 1005 ¶ 229.

We recognize Dr. Wang's statement that "the PVP-2013 compositions include free polysaccharides that are not conjugated to any carrier protein" (Ex. 2058, 94) but find this argument unpersuasive because Dr. Wang

provides no reasoning as to why the O-acetyl levels necessary for free polysaccharides to function as immunogens would differ when the polysaccharides were conjugated.

Indeed, Dr. Kasper explained that the prior art evidences "that O-acetyl groups can contribute to the immunogenicity of pneumococcal polysaccharides." Ex. 2037 ¶ 143. This teaching evidencing that O-acetyl groups are associated with immunogenicity, in combination with the teaching of PVP-2013 to incorporate acetate into serotype 22F in particular at levels within the scope of the claims of the '559 patent, demonstrates that the evidence of record better supports Petitioner's position that use of acetate in the molar ratios suggested by PVP 2013 would have been expected to improve vaccine activity.

Consequently, PVP-2013 and the knowledge of the ordinary artisan reasonably suggest to utilize a molar ratio of acetate to polysaccharide for serotype 22F that falls within the requirements of claims 2, 40, and 43.

As to Patent Owner's assertions regarding polysaccharide to protein ratios and molecular weight ranges, we have already found the ratio of polysaccharide to protein and molecular weight ranges obvious for claim 1 as discussed above and claims 2, 40, and 43 are drawn to further ratios of acetate to polysaccharide suggested by PVP-2013.

We therefore conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by GSK-711, Merck-086, and the knowledge of the ordinary artisan with the acetate ratios suggested by PVP-2013 in order to retain immunogenic activity as disclosed by PVP-2013 and Lees-2008 using known methods such as those of Pfizer-605.

*E. Obviousness of GSK-711, Merck-086, and GSK-531*

Petitioner asserts that "Claims 20–22 are directed to combination vaccines" and require "the claimed immunogenic composition further includes an antigen from other pathogens." Pet. 70. Petitioner asserts "GSK-531 specifically teaches that its disclosed pneumococcal glycoconjugates (including a 22F glycoconjugate) can be mixed with other antigens, including those specifically recited in claim 21." Pet. 71 (citing Ex. 1014, 20:25–31). Petitioner asserts "[c]ombination vaccines are desirable because they provide broad coverage and reduce the number of vaccine injections that need to be administered to infants, among other benefits. . . . Therefore, a POSA would have been motivated to include an antigen from other pathogens in the claimed composition." Pet. 71 (citing Lees ¶ 235) (internal citations omitted).

Patent Owner asserts Petitioner "has not demonstrated that claim 1 is obvious over GSK-711, Merck-086, GSK-531 and the "general knowledge." Therefore, [Petitioner] has likewise not met its burden in showing that claims 20-22 are obvious." PO Resp. 58–59. Patent Owner asserts "GSK-531 does not teach or suggest any methods of preparing a pneumococcal serotype 22F glycoconjugate, much less a serotype 22F glycoconjugate having the molecular weight and polysaccharide to protein ratio limitations recited in the '559 patent claims." PO Resp. 60 (citing Ex. 2058 ¶ 98).

1. *GSK-531 (Exhibit 1014)*

GSK-531 discusses forming a vaccine through conjugation of bacterial capsular saccharides, including *Streptococcus pneumoniae* serotype 22F, by reductive amination to proteins including $CRM_{197}$. Ex. 1014, 2:35–3:17, 7:34, 9:21. GSK-531 teaches including additional antigens in the

vaccine including "Diphtheria toxoid (DT), tetanus toxoid (TT), and pertussis components" as well as a "capsular saccharide from *N. meningitides*." Ex. 1014, 20:25–21:3.

2. *Analysis*

We have already concluded that a preponderance of the evidence of record supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that an ordinary artisan would have found it obvious to combine the pneumococcal vaccine including the 22F serotype with other known vaccines because Dr. Lees explains that "combination vaccines were known to be desirable because they provide broad coverage and reduce the number of vaccine injections that need to be administered to infants, among other benefits." Ex. 1005 ¶ 235. While Patent Owner is correct that GSK-531 is not relied upon by Petitioner for either the molecular weight or ratio requirements, GSK-711 and Merck-086 render these limitations of claim 1 obvious for the reasons discussed above.

We, therefore, conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by GSK-711, Merck-086, and the knowledge of the ordinary artisan by combining it with the combination vaccine of GSK-531.

*F. Obviousness of GSK-711, Merck-086, and Pfizer-605*

Petitioner asserts "Pfizer-605 describes the use of size exclusion chromatography with a CL-4B column to profile the relative molecular size distribution of the pneumococcal conjugates." Pet. 73 (citing Ex. 1005 ¶ 243; Ex. 1013, 36–37). Petitioner asserts that Pfizer-605 teaches "that a preferred value for conjugate molecular sizes is about 70% 0.3 $K_d$ in a CL-4B column, which is well above the recited limitation of 'at least 30%' in

claim 38." Pet. 73 (citing Ex. 1005 ¶ 243; Ex. 1013, 36–37). Petitioner asserts "a POSA would have had the motivation to optimize the glycoconjugation process of GSK-711 according to what's taught in Pfizer-605 to achieve the threshold recited in Claim 38." Pet. 74.

Patent Owner asserts Petitioner "has not demonstrated that claim 1 is obvious over GSK-711, Merck-086, Pfizer-605 and the 'general knowledge.' Therefore, Sanofi has likewise not met its burden in showing that claims 38 and 39 are obvious." PO Resp. 61. Patent Owner asserts "Pfizer-605 does not refer to any serotype 22F glycoconjugates, and, therefore, does not provide guidance as to what would be an appropriate molecular weight range and polysaccharide to protein ratio range for a serotype 22F glycoconjugate." PO Resp. 61 (citing Ex. 2058 ¶ 100).

1. *Pfizer-605 (Exhibit 1013)*

Pfizer-605 discusses "a multivalent immunogenic composition, wherein the capsular polysaccharides are from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9v, 14, 18C, 19A, 19F and 23E of *Streptococcus pneumoniae*, the carrier protein is $CRM_{197}$, and the adjuvant is an aluminum-based adjuvant." Ex. 1013, 2:24–28. Pfizer-605 teaches "[c]haracterization of the conjugate . . . include[ed] use of size exclusion chromatography media (CL-4B) to profile the relative molecular size distribution of the conjugate." Ex. 1013, 36:50–53. Pfizer-605 teaches "a preferred value for conjugate molecular size is about 70% 0.3 Kd, with a preferred free saccharide level below about 20–25%." Ex. 1013, 24.

2. *Analysis*

We have already concluded that a preponderance of the evidence of record supports the obviousness of claim 1 for the reasons discussed. We

further agree with Petitioner that claims 38 and 39 would have been obvious because Pfizer-605 discloses that size exclusion chromatography (SEC) with CL-4B sepharose is used to assess molecular size and Pfizer-605 teaches preferred values for conjugate size and free saccharide levels that overlap those of claims 38 and 39. "In cases involving overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a *prima facie* case of obviousness." *In re Peterson*, 315 F.3d 1325, 1329, 1330 (Fed. Cir. 2003).

Dr. Lees stated that, based on Pfizer-605,

> a POSA would have had motivation to prepare a 22Fglycoconjugate that meets the minimum percentage value "at least 30%" as measured by a $K_d$ value below or equal to 0.3 in a CL-4B column as recited in claim 39 and would also have had a reasonable expectation of success that such a minimum threshold may be achieved by routine optimization of the conjugation process available in 2014.

Ex. 1005 ¶ 244.

We, therefore, conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by GSK-711, Merck-086, and the knowledge of the ordinary artisan with the sizing and purification techniques of Pfizer-605 to obtain quality conjugates.

*G. Obviousness over GSK-711, Merck-086, and Hsieh-2000*

Petitioner asserts that "the degree of conjugation recited in claim 44 had already been achieved in many glycoconjugates before the earliest possible priority date." Pet. 76 (citing Lees ¶ 250). Petitioner asserts that Hsieh-2000

> characterized saccharide-$CRM_{197}$ conjugates included in *Hib*, pneumococcal and meningococcal vaccines successfully

> developed by Wyeth and observed that the formulation of the covalent bonds between lysines and polysaccharides had been "consistent in the range of 6–9," (Ex. 1015, 8), which falls entirely within the range of 2–15 as claimed in claim 44.

Pet. 76. Petitioner asserts that "it would have been obvious for a POSA to optimize the conjugation process of GSK-711 in view of Hsieh-2000 to prepare a 22F glycoconjugate with the degree of conjugation between 2–15 as recited in claim 44." Pet. 76.

Patent Owner asserts Petitioner "has not demonstrated that claim 1 is obvious over GSK-711, Merck-086, GSK-531 and the 'general knowledge.' Therefore, Sanofi has likewise not met its burden in showing that claim 44 is obvious." PO Resp. 62. Patent Owner asserts "Hsieh 2000 does not refer to serotype 22F glycoconjugates. Ex. 2058, ¶102. Hsieh 2000 also does not contain any guidance about targeting any particular molecular weight or polysaccharide to protein ratio for a serotype 22F glycoconjugate." PO Resp. 56 (citing Ex. 2040 ¶ 102).

1. *Hsieh-2000 (Exhibit 1015)*

Hsieh-2000 discusses the characterization of vaccines composed of polysaccharides conjugated to $CRM_{197}$, including a 7-valent pneumococcal saccharide-$CRM_{197}$ conjugate vaccine. Ex. 1015, 1. Hsieh-2000 teaches that "$CRM_{197}$ is a mutant of diphtheria toxin" and "lists the methods that have been used to characterize $CRM_{197}$" including "High Performance Size-exclusion Liquid Chromatography . . . [that] is adequate to control the consistency and purity of the product." Ex. 1015, 2. Hsieh 2000 teaches that important parameters for conjugate vaccines include molecular size and polysaccharide to protein ratio among others. *See* Ex. 1015, 6. Hsieh

explains that "[i]t is essential to demonstrate the covalent linkage of the saccharide to the carrier protein." Ex. 1015, 8.

2. *Analysis*

We have already concluded that a preponderance of evidence supports the obviousness of claim 1 for the reasons discussed. We further agree with Petitioner that claim 44 would have been obvious because Hsieh-2000 discloses that size exclusion chromatography (SEC) with either CL-2B or CL-4B sepharose is used to assess molecular size and Hsieh-2000 discloses the typical extent of conjugation for $CRM_{197}$ conjugates, and how to measure it. Ex. 2035 ¶¶ 94–96. Claim 44 requires the "degree of conjugation of said glycoconjugate is between 2 and 15." Ex. 1001, 144:32–34.

Dr. Kasper stated "[b]ased on Hsieh 2000, a POSITA would have been motivated with a reasonable expectation of success to construct the conjugate of claim 1 with a 'degree of conjugation' between 2 and 15." Ex. 2035 ¶ 153. Dr. Lees similarly states that "Hsieh-2000 teaches that a typical degree of conjugation of a successful polysaccharide-$CRM_{197}$ conjugate is 6–9, entirely within the claimed range of 'between 2 and 15' in claim 44." Ex. 1005 ¶ 252. Hsieh-2000 teaches "[f]or saccharide-$CRM_{197}$ conjugates, there is a limited number of exposed lysines on surface $CRM_{197}$, which can participate in the conjugation reaction. The loss of lysine has been relatively consistent in the range of 6-9." Ex. 1015, 8. Thus, the only evidence of record, Hsieh 2000, teaches a degree of conjugation between 6 and 9. Ex. 1015, 8.

We recognize that Dr. Wang raises general concerns about variation in glycoconjugates, without providing specific evidence of unpredictability for 22F. Ex. 2058 ¶ 102. However, Dr. Wang's concerns, balanced against

the statements of Dr. Kasper and Dr. Lees and the specific teachings of Hsieh-2000 do not persuade us that the specific conjugation degree of claim 44 would have been unobvious because the requirement is not an absolute expectation of success, but rather a reasonable expectation of success based on the teachings of the prior art. "Obviousness does not require absolute predictability of success . . . *all that is required is a reasonable expectation of success*." *Kubin*, 561 F.3d at 1360 (internal quotation marks and citation omitted).

We, therefore, conclude that a preponderance of the evidence supports the obviousness of modifying the vaccine suggested by GSK-711, Merck-086, and the knowledge of the ordinary artisan with purification and conjugation techniques of Hsieh 2000 to obtain quality conjugates.

## III. PATENT OWNER'S MOTION TO AMEND

Patent Owner's motion to amend is contingent on a finding of unpatentability of claims 1, 2, 3, 4, 9, 41, and 42 by the Board. Mot. Amend 1. Because we conclude that Petitioner has demonstrated that these claims are unpatentable (among other claims), we proceed to consider Patent Owner's motion to substitute claims 46–52 for claims 1, 2, 3, 4, 9, 41, and 42. For the reasons discussed below, Patent Owner's motion to amend is denied.

### *A. Threshold Requirements*

In an *inter partes* review, claims may be added as part of a proposed motion to amend. 35 U.S.C. § 316(d).

The Board must assess the patentability of the proposed substitute claims "without placing the burden of persuasion on the patent owner." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1328 (Fed. Cir. 2017) (en banc).

Patent Owner's proposed substitute claims, however, must still meet the statutory requirements of 35 U.S.C. § 316(d) and the procedural requirements of 37 C.F.R. § 42.121 as a threshold matter. *See* USPTO's Memorandum, GUIDANCE ON MOTIONS TO AMEND IN VIEW OF AQUA PRODUCTS (Nov. 2017), available at https://www.uspto.gov/sites/default/files/documents/guidance_on_motions_to_amend_11_2017.pdf. Accordingly, Patent Owner must demonstrate: (1) the amendment proposes a reasonable number of substitute claims; (2) the amendment does not seek to enlarge the scope of the claims of the patent or introduce new subject matter; (3) the amendment responds to a ground of unpatentability involved in the trial; and (4) the original disclosure sets forth written description support for each proposed claim. *See* 35 U.S.C. § 316(d)(1)(B),(3); 37 C.F.R. § 42.121; *Hospira, Inc. v. Genentech, Inc.*, Case IPR2017-00737, slip op. at 47 (PTAB Oct. 3, 2018) (Paper 108).

*B. Proposed Substitute Claims*

Proposed substitute claims 46 and 47 are reproduced below with markings showing proposed changes from claims 1 and 2, respectively. Deletions are shown in brackets and additions are underlined.

> Claim 46 (substitute for original claim 1): An immunogenic composition comprising:
>
> a *Streptococcus pneumoniae* serotype <u>22F</u> glycoconjugate, wherein the 22F glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and a <u>$CRM_{197}$</u> carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2;

glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F all individually conjugated to $CRM_{197}$;

an aluminum salt adjuvant; and

wherein the composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition in the form of an initial dose and a booster dose.

Claim 47 (Substitute for original claim 2): The immunogenic composition of claim ~~1~~ 46, wherein the glycoconjugate comprises at least ~~0.1~~ 0.8 mM acetate per mM polysaccharide.

Mot. Amend App'x i, ii; Ex. 2044 ¶¶ 16–37.

### *C. Definiteness, Written Description, and Enablement*

We construe only those terms that are in controversy, and only to the extent necessary to resolve the controversy. *See Vivid Techs.*, 200 F.3d at 803. None of the newly added claim terms are in controversy, so no claim construction is required.

In particular, we determine that the substitute claims are definite and have adequate written description support.

#### 1. *Claims 46–52 are not indefinite*

##### *i. Claim 46 and 48–52*

Petitioner asserts that "the '559 patent fails to provide a definition or other disclosure with respect to how or under what conditions the '2-Log IgG Increase' required by the claims should be measured." Pet. Opp. 3. Petitioner asserts that "[d]ifferent doses can elicit different IgG responses"; "that IgG concentrations can be measured using different assays"; and that

"[i]ndividual animals can have very different baselines for a given serotype." Pet. Opp. 4–5. Petitioner asserts that "a POSA would not be able to determine whether a given immunogenic composition would meet the 2-Log IgG Increase limitation encompassed by the claims." Pet. Opp. 6–7.

Patent Owner asserts Petitioner "offers no evidence to suggest that a variation in any of the parameters of dose, type of assay, or measurement of baseline could affect the comparative analysis across all serotypes of the multivalent vaccine as required by the proposed substitute claims." PO Reply 2.

We agree with Patent Owner that the phrase "2-log IgG increase above baseline" in claim 46 is definite because the dose, assay, and baselines "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 911 (2014).

As to dose, EMA teaches that there is a maximal dose because EMA observes a "dose-dependent increase in IgG level that significantly levelled off with increasing dose increment was demonstrated for most serotypes." Ex. 1102, 14. Merck-086 also states "there did not appear to be a significant benefit in increasing the amount of polysaccharide-conjugate in the vaccine." Ex. 1008 ¶ 118. Dr. Paradiso supports this understanding of doses in pneumococcal vaccines, stating a "POSA would have understood well-known techniques for determining and optimizing dosage, and would also have been aware of studies showing that IgG levels taper off with increased dosage in pneumococcal conjugate vaccines." Ex. 2074 ¶ 6.

We recognize Petitioner's argument that the "fact that Merck and EMA investigated the dose effect shows a general concern that dose could

impact IgG response" (Sur-Reply 4) but find it unpersuasive because the results of the investigation of Merck-086 and EMA demonstrate that as doses increase, the IgG levels stop rising and therefore resolve the concern about dose and IgG response. Moreover, we are also persuaded by Dr. Paradiso that optimizing dosages was well known at the time of invention, and the ordinary artisan would have been known how to optimize doses to obtain a 2-log IgG increase above baseline as required by claim 46.

As to assays and baselines, the World Health Organization (WHO) guidelines state that "[i]mmune responses to pneumococcal conjugate vaccines can be assessed by . . . Determination of serotype-specific IgG antibody geometric mean concentrations (GMCs) based on measurement of binding to polysaccharides (e.g. using an ELISA method). Appendix 1 provides a detailed consideration of the development and standardization of ELISA methods. . . ." Ex. 1019, 126–127. Goldblatt[17] explains that different assays may be standardized to the WHO guidelines using known bridging techniques, specifically stating:

> Subsequent international efforts were therefore focused on establishing guidelines for the performance of a pneumococcal enzyme-linked immunosorbent assay (ELISA) that could match the data obtained by the Wyeth ELISA. The importance of matching the data obtained with the Wyeth assay was underlined with the publication of correlates of protection derived from three efficacy studies, each of which had antibodies measured by the Wyeth assay. These correlates were incorporated into guidelines for licensing new vaccines that rely on assessment of the proportions of samples achieving antibody

---

[17] Goldblatt et al., *Comparison of a New Multiplex Binding Assay versus the Enzyme- Linked Immunosorbent Assay for Measurement of Serotype-Specific Pneumococcal Capsular Polysaccharide IgG*, 18 Clinical and Vaccine Immunology 1744–51 (2011) (Ex. 2069).

> concentrations above the protective threshold of 0.35 μg/ml by the World Health Organization (WHO) reference ELISA. The guidelines also state that it may be acceptable for manufacturers to employ an alternative threshold value when using a specific in-house assay, provided it can be demonstrated by a well-conducted bridging study to correspond to an IgG concentration of 0.35 μg/ml in the WHO reference ELISA. Therefore, it is critical to use assays that are bridged and are comparable to the original Wyeth assays.

Ex. 2069, 1 (internal citations omitted). Based on these disclosures, Dr. Paradiso concludes a "POSA would have been very familiar with how to measure IgG increases (including fold increases) in NZWR and would have had no uncertainty regarding assay conditions in the context of the proposed substitute claims." Ex. 2074 ¶ 7.

We recognize Petitioner's argument that "IgG concentrations can be measured using different assays" and that "[d]ifferent IgG assays can output different values in different units that could affect the ratio calculation against the baseline." Pet. Opp. 4. We also recognize Petitioner's argument that "without defining what specific assay and assay conditions should be used to measure the serum IgG concentrations, a POSA would not be able to determine if a given immunogenic composition is able to achieve the 2-Log IgG Increase limitation intended by the claims." PO Opp. 5 (citing Ex. 1101 ¶ 33). We find these arguments unpersuasive, however, because the evidence of record, including the WHO guidelines, supports Patent Owner's position that "calculation of the claimed IgG response is explained by the claim and well understood in the art." PO Reply 4. To the extent that the claim broadly encompasses any assay result with a two-log increase from baseline as required by the claim, even "undue breadth is not indefiniteness." *In re Johnson*, 558 F.2d 1008, 1016 n. 17 (CCPA 1977).

*ii. Claim 47*

Petitioner asserts "claim 47 is indefinite because claim 46 recites 14 different glycoconjugates and it is unclear which glycoconjugate is referred to in claim 47." Pet. Opp. 21

Patent Owner asserts "[t]hat "the glycoconjugate" recited by claim 47 refers to the 22F conjugate of claim 46 is apparent from the context of claim 47 itself. Moreover, "claim 47 narrows the acetate limitation from original claim 2" and is supported by disclosures relating to a 22F conjugate." PO Reply 6.

We agree with Patent Owner that the reasonable reading of "the glycoconjugate" in claim 47 refers to the serotype 22F glycoconjugate referenced in independent claim 46. However, even if we agreed with Petitioner's interpretation and "the glycoconjugate" would then refer to all of the glycoconjugates in claim 46, this interpretation would simply further narrow claim 47 to require all of the glycoconjugates to satisfy the 0.8 mM acetate per mM polysaccharide limitation.

We, therefore, conclude that a preponderance of the evidence supports the definiteness of proposed amended claims 46–52.

2. *Claim 46–52 have written description support*

*i. Claims 46 and 48–52*

Petitioner asserts that

> the 2-Log IgG Increase may be impacted by various factors such as the dose amounts administered, the IgG assays used to measure the IgG levels, and the baselines of the NZWRs. Therefore, the '559 patent does not provide sufficient examples to show that any "2-Log IgG Increase" from any "baseline" measured using any assay under any conditions or any dose amounts is an indicator of immunogenicity or efficacy.

Pet. Opp. 7. Petitioner asserts "the '559 patent does not describe any structural difference that correlates with the ability to achieve the 2-Log IgG Increase" and therefore "the substitute claims fail to satisfy the written description requirement because the '559 patent fails to disclose a correlation between structure and function." Pet. Opp. 9–10.

Patent Owner responds that Petitoner "itself admits that this correlation was well known to a POSA, stating: 'IgG levels are one of the indicators of immunogenicity' and a POSA was motivated to achieve the 2-log IgG Increase." PO Reply 1.

We agree with Patent Owner. The '559 patent provides express descriptive support for the phrase "more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits" in claim 46, teaching "[s]erum IgG levels increased more than 2-logs above baseline" in an experiment performed in in New Zealand White Rabbits. Ex. 1001, 123:35–36.

> A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language. That is because the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before. Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue experimentation.

*Falkner v. Inglis*, 448 F.3d 1357, 1366 (Fed. Cir. 2006) (*quoting LizardTech, Inc. v. Earth Resource Mapping, PTY, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005).

As discussed above regarding definiteness, and as will be discussed below regarding obviousness, the Specification demonstrates possession of the 2-log increase limitation. The person of skill in the art would have been familiar with dosing, serum IgG assays, and baselines from the prior art and would have found obtaining a 2-log increase in IgG levels a matter of simple routine optimization based on the detailed knowledge in the art. Ex. 2069, 1; Ex. 2027 ¶ 231, Table 3.

*ii. Claim 47*

Petitioner asserts that "nothing supports 'at least 0.8 mM acetate per mM polysaccharide' recited in claim 47." Pet. Opp. 21.

Patent Owner asserts "'claim 47 narrows the acetate limitation from original claim 2' and is supported by disclosures relating to a 22F conjugate." PO Reply 6.

We agree with Patent Owner. The '559 patent states "the serotype 22F glycoconjugate of the invention comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6 or 0.7 or about 0.8 mM acetate per mM serotype 22F polysaccharide." Ex. 1001, 26:1–4. We determine that the ordinary artisan, confronted with the phrase "at least . . . or about 0.8 mM acetate" would understand this to encompass "at least about" 0.8 mM acetate, thus, allowing for either "at least" or "about" that amount of acetate.

We, therefore, conclude that a preponderance of the evidence demonstrated descriptive support in the '559 patent for proposed amended claims 46–52.

3. *Claim 46–52 are enabled*

Petitioner asserts "[i]f Pfizer asserts that a POSA would not have had a reasonable expectation that additional serotypes could be successfully

added to Prevnar13® due to immune interference, then claim 46 is not enabled for the full scope of the claim." Pet. Opp. 21.

Patent Owner asserts the "'559 patent provides detailed guidance on how the conjugates were created, formulation of the immunogenic composition, and the tests for the measurement of the 2-log IgG Increase. Sanofi identifies no lack of guidance in the '559 patent nor experimentation that is undue." PO Reply 5.

We agree with Patent Owner that there is no evidence of record to support a finding that claims 46–52 are not enabled for their full scope. By contrast, prior art including Hausdorff, Merck-086, and GSK-711, demonstrate the immunogenicity of pneumococcal vaccines, along with the disclosure of the '559 patent itself. Ex. 2027 ¶ 231, Table 3; Ex. 1008 ¶ 114; Ex. 1007, 67:36–37; Ex. 1001, 123:35–36. Petitioner provides no evidence of unpredictability or lack of teaching by the '559 patent. Some experimentation, even a considerable amount, is not "undue" if, e.g., it is merely routine, or if the specification provides a reasonable amount of guidance as to the direction in which the experimentation should proceed. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

We, therefore, conclude that a preponderance of the evidence supports enablement of the '559 patent for proposed amended claims 46–52.

*D. Unpatentability*

Petitioner asserts that proposed substitute claims 46–52 are unpatentable as obvious over the combination of Hausdorff, Merck-086, GSK-711, and the knowledge of the ordinary artisan. Pet. Opp. 10–21; *see also* Pet. Sur-Reply 6–12. To support its Opposition, Petitioner proffers the declaration of Dr. Van Alphen and the deposition of Dr. Paradiso. Ex. 1101; Ex. 1105.

Patent Owner disagrees. PO Reply 6–12. To support its Reply, Patent Owner proffers the declarations of Dr. Paradiso (Ex. 2051; Ex. 2074).

We determine that claims 46 and 48–52 would have been obvious over the combination of Hausdorff, Merck-086, GSK-711, and the knowledge of the skilled artisan. We determine that claim 47 would have been obvious with the further addition of PVP-2013 and Lees-2008.

*1. Claims 46 and 48–52 are obvious over Hausdorff, Merck-086, GSK-711, and the knowledge of the ordinary artisan*

*a. Hausdorff (Ex. 2027)*

Hausdorff teaches "a multivalent immunogenic composition, wherein the capsular polysaccharides are from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9v, 14, 18C, 19A, 19F and 23F of Streptococcus pneumoniae, the carrier protein is $CRM_{197}$, and the adjuvant is an aluminum-based adjuvant." Ex. 2027 ¶ 8. Hausdorff teaches a starting "saccharide/protein ratio of 2:1." Ex. 2027 ¶ 89. Hausdorff teaches that "[s]ize exclusion chromatography media (CL-4B) was used to profile the relative molecular size distribution of the conjugate." (Hausdorff ¶ 92).

Hausdorff "examined the ability of the 13vPnC vaccine with $AlPO_4$ adjuvant to elicit vaccine serotype-specific immune responses. The pneumococcal serotypes represented in the 13vPnC vaccine include types 1, 3, 4, 5, 6A, 68, 7F, 9V, 14, 18C, 19A, 19F and 23F." Ex. 2027 ¶ 230. Hausdorff teaches:

> New Zealand White rabbits were immunized intramuscularly at week 0 and week 2 with the planned human clinical dose of each polysaccharide (2 μg of each PS, except 4 μg of 6B) formulated with or without $AlPO_4$ (100 μg/dose). Sera were collected at various time points. Serotype specific IgG was

> measured by ELISA and functional activity was assessed by OPA.

Ex. 2027 ¶ 230.

Table 3 of Hausdorff shows that each of the thirteen tested serotypes produced an immune response with more than a 2-log increase above baseline serum IgG levels in New Zealand White Rabbits after administration of the two equal doses as reproduced below.

TABLE 3

Rabbit IgG Immune Responses (GMTs) Following Immunization with Two Doses of 13-valent Pneumococcal Glycoconjugate

| | Diluent with $ALPO_4$[a] | | | 13vPnC[a] | | | 13vPnC + $ALPO_4$[a] | | |
|---|---|---|---|---|---|---|---|---|---|
| Serotype | Week 0 | Week 4 | Ratio Wk4:Wk0 | Week 0 | Week 4 (95% CI) | Ratio Wk4:Wk0 | Week 0 | Week 4 (95% CI) | Ratio Wk4:Wk0 |
| 1 | <100 | <100 | 1.0 | 50 | 5,926 (2,758-12,733) | 119 | 50 | 11,091 (5,327-23,093) | 222 |
| 3 | <100 | <100 | 1.0 | 50 | 6,647 (2,773-15,932) | 133 | 58 | 16,443 (7,096-38,106) | 284 |
| 4 | <100 | <100 | 1.0 | 50 | 13,554 (8,031-22,875) | 271 | 50 | 29,183 (15,342-55,508) | 584 |
| 5 | 134 | <100 | 0.4 | 50 | 5,859 (2,450-14,009) | 117 | 50 | 16,714 (6,959-40,140) | 334 |
| 6A | 141 | <100 | 0.4 | 74 | 22,415 (11,987-41,914) | 303 | 83 | 63,734 (21,141-192,146) | 768 |
| 6B | <100 | <100 | 1.0 | 57 | 8,108 (3,564-18,444) | 142 | 54 | 23,505 (11,286-48,955) | 435 |
| 7F | 3,859 | 579 | 0.2 | 171 | 43,591 (26,931-70,557) | 444 | 143 | 84,888 (46,445-155,151) | 496 |
| 9V | 289 | 995 | 3.4 | 205 | 15,780 (7,193-34,616) | 125 | 208 | 43,331[b] (23,256-71,510) | 217 |
| 14 | 437 | 177 | 0.4 | 61 | 6,906 (3,416-13,962) | 113 | 70 | 16,076 (9,649-26,785) | 322 |
| 18C | <100 | <100 | 1.0 | 50 | 21,283 (15,770-28,725) | 426 | 50 | 35,040 (24,708-49,692) | 701 |
| 19A | <100 | <100 | 1.0 | 121 | 113,599 (54,518-236,707) | 939 | 144 | 280,976 (119,587-660,167) | 1,951 |
| 19F | <100 | <100 | 1.0 | 50 | 14,365 (7,346-28,090) | 287 | 50 | 24,912 (9,243-67,141) | 498 |
| 23F | <100 | <100 | 1.0 | 50 | 5,323 (1,894-14,962) | 106 | 50 | 15,041 (4,711-48,018) | 301 |

[a]GMTs of pooled sera consisted of equal volumes of serum from each individual rabbit within a group

[b]Statistically different ($p = 0.022$) from treatment group without $ALPO_4$

Table 3, reproduced above, shows that the ratio of week 4 to week 0, both with and without aluminum phosphate, was higher than a 2-log increase of 100 for every single serotype tested. Ex. 2027 ¶ 231, Table 3.

*b. Merck-086 (Ex. 1008)*

As discussed above in Section II.C.1, Merck-086 teaches an immunogenic composition composed of serotypes "of *Streptococcus pneumoniae* (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F or 33F) conjugated to a carrier protein, preferably $CRM_{197}$." Ex. 1008 ¶ 2. Table 1 of Merck-086 shows a vaccine formulation with a 1:1 ratio for 14 serotypes including serotype 22F and a 2:1 ratio for serotype 6B, specifically showing the formulation comprises 32 µg of total polysaccharide and 32 µg of $CRM_{197}$ carrier protein with the total polysaccharide being composed of 2 µg of 14 serotypes including 22F and 4 µg of serotype 6B. Ex. 1008 ¶ 104.

Merck-086 teaches formulations containing 15 serotypes of the pneumococcal conjugate vaccine (PCV-15) "were evaluated in 4 studies in adult New Zealand White Rabbits (NZWRs) using a compressed immunization regimen in which rabbits received a full human dose of vaccine at day 0 and day 14." Ex. 1008 ¶ 115.

Table 4

Fold-rise (Post-dose 2:Pre-dose 1) in IgG Responses to Non-Prevnar™ Serotypes of PCV-15 Lead Formulations Tested in NZWR

| Serotype | NZWR-1 | NZWR-2 | NZWR-3 | NZWR-4 |
|---|---|---|---|---|
| 1 | 14.9 | 30.5 | 55.1 | 59.9 |
| 3 | 33.6 | 16.2 | 61.5 | 28.5 |
| 5 | 12.8 | 70.2 | 112.0 | 134.0 |
| 6A | 21.3 | 77.8 | 143.0 | 123.0 |
| 7F | 42.0 | 83.8 | 194.0 | 108.0 |
| 19A | 40.5 | 79.1 | 450.0 | 314.0 |
| 22F | 45.7 | 87.8 | 243.0 | 135.0 |
| 33F | 21.7 | 47.9 | 98.8 | 69.4 |

Merck 2011 Table 4.

Merck-086 teaches the "fold-rise in antibody levels to the non-Prevnar® serotypes from Day 0 to Day 28 (Post-dose 2, PD-2) are summarized in Table 4." Ex. 1008 ¶ 117.

In the NZWR-3 and NZWR-4 studies in Table 4 of Merck-086, serotype 22F exhibits a greater than 2-log increase above baseline in New Zealand White Rabbits with values of 243.0 and 135.0, while in the NZWR-1 and NZWR-2 studies in Table 4, serotype 22F exhibits less than 2-log increases of 45.7 and 87.8. *See* Ex. 1008 ¶ 117.

*c. GSK-711 (Ex. 1007)*

As discussed above in Section II.C.2, GSK-711 teaches "the multivalent pneumococcal vaccine of the invention will be selected from the following serotypes 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15, 17F, 18C, 19A, 19F, 20, 22F, 23F and 33F." Ex. 1007, 7:1–3. GSK 2008 teaches conjugation of polysaccharides to the carrier protein $CRM_{197}$ (*see* Ex. 1007, 10:4–6) and teaches "[p]referably the ratio of carrier protein

to *S. pneumoniae* saccharide is between 1:5 and 5:1." Ex. 1007, 19:1. GSK-711 further teaches in claim 61 an "immunogenic composition of any preceding claim wherein the average size (e.g. $M_w$) of the saccharides is above 50 kDa, e.g[.], 50-1600. . . ." Ex. 1007, 82.

*d. Analysis*

*i. Claim 46*

Petitioner asserts "proposed substitute claim 46 is obvious over the prior art." Pet. Opp. 10. Petitioner asserts "Merck-086 discloses an immunogenic PCV15 composition including pneumococcal serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F and 33F, all individually conjugated to CRM197." Pet. Opp. 10 (citing Ex. 1008 ¶¶ 2, 86, 102, 103). Petitioner asserts that "PCV15 also contained an aluminum phosphate adjuvant (APA), which is an aluminum salt adjuvant." Pet. Opp. 10 (citing Ex. 1008 ¶¶ 41, 42). Petitioner points out that consistent with our decision on the original claims above, Patent Owner "cannot rely on the molecular weight and ratio ranges for patentability of claim 46 because these features have already been determined to be obvious." Pet. Opp. 11. Petitioner concludes that "[t]herefore, Merck-086 discloses all relevant structural features recited in substitute claim 46." Pet. Opp. 10–11.

Petitioner asserts, regarding the functional requirement of a 2-log IgG increase, that "Merck-086 demonstrates that its PCV15 composition is highly immunogenic in infant rhesus monkeys and NZWRs." Pet. Opp. 11 (citing Ex. 1008 ¶ 122). Petitioner asserts that "Merck-086 discloses that some, but not all, serotypes in PCV15 achieved the recited 2-Log IgG Increase in NZWRs." Pet. 11 (citing Ex. 1008, Table 4).

Petitioner asserts that "Hausdorff showed that 13vPnPC (Prevnar13®) achieved a 2-Log IgG Increase or higher across all serotypes (at least in one study)." Pet. Opp. 13 (citing Ex. 2027, Table 3). Petitioner asserts that "[b]ecause Prevnar13® has become one of the most successful multivalent PCVs since its approval in 2009, a POSA seeking to add serotype 22F to Prevnar13® in January 2014 would have been motivated to achieve the same." Pet. Opp. 13 (citing Ex. 1101 ¶¶ 59–64).

Petitioner asserts that Hausdorf's "data demonstrated that for a reasonably immunogenic multivalent PCV composition, a 2-Log IgG Increase across all serotypes can be achieved by optimizing the baseline, and/or the dose or adjuvant amounts." Pet. Opp. 14 (citing Ex. 1101 ¶ 61). Petitioner asserts that "[i]n Hausdorff, routine optimization of the baseline, the dose and the adjuvant amount resulted in approximately a **3-fold** difference in IgG fold increase from baseline for serotype 1 in 13vPnPC, i.e., from **76.5-fold** in Study #HT01-0036 (Table 5) to **222-fold** in Study #HT01-0021 (Table 3)." Pet. Opp. 14 (citing Ex. 1101 ¶ 63).

Petitioner asserts that "Merck-086 recognized the variability issue associated with NZWRs and other animals, especially when a small number of animals is used in studies." Pet. Opp. 17 (citing Ex. 1101 ¶ 70). Petitioner asserts that because Merck-086 found "'2.5 fold was regarded as a meaningful response threshold'" then "serotype-specific IgG responses were not meaningfully different if the difference was within 2.5-fold." Pet. Opp. 17 (citing Ex. 1101 ¶70).

Petitioner also asserts that Dr. Paradiso held the position in a published paper that "$CRM_{197}$-based conjugates made it possible to induce good immunity to new '***without negatively affecting the components***

***already in the vaccine***.'" Pet. Opp. 18 (citing Ex. 1107, 3 (emphasis added in Pet. Opp.)). Petitioner asserts that Dr. Paradiso testified "that immune interference only means that there is a reduced immune response and that the existence of immune interference *per se* would not preclude one from developing an efficacious vaccine.'" Pet. Opp. 19 (citing Ex.1105, 81:13–84:8–17).

Patent Owner asserts Petitioner "has not directed the PTAB to prior art of record that teaches the claimed limitations of "molecular weight" and "ratio (w/w) of the [22F] polysaccharide to the [$CRM_{197}$] carrier protein" required by every proposed substitute claim." PO Reply 6.

Patent Owner asserts "[e]ven if a POSA could have tripled the IgG-fold increases of the PCV-15 in Merck-086 through routine optimization, as Sanofi asserts (*see* Opp. at 14-15), a POSA would have no basis to believe that the tripled unknown values would meet the claimed 2-log IgG Increase across all serotypes" PO Reply 7 (citing Ex. 2074 ¶ 14). Patent Owner asserts "Table 4 of Merck-086 shows that serotypes 1 and 3 (required by all proposed substitute claims) and 33F (required by proposed substitute claim 48) of PCV-15 of Merck-086 never achieved a 2-log IgG Increase across four separate groups of NZWR." PO Reply 7 (citing Ex. 2074 ¶ 16). Patent Owner asserts "Figure 2 of Merck-086 shows that after two doses, the vaccine failed to elicit a 2-log IgG Increase in serum IgG levels in IRM for at least serotypes 1, 3, 5, 6A, 7F, 19A, and 22F." PO Reply 8 (citing Ex. 2051 ¶ 67). Patent Owner asserts "[l]acking any supporting disclosure in the art, Sanofi instead alleges that a POSA would have been motivated to 'optimize' the PCV-15 described by Merck-086 to achieve the 2-log

increase, but Dr. Van Alphen admits that this is based on hindsight." PO Reply 7–8 (citing Ex. 2073, 115:17–116:23).

Patent Owner asserts a "POSA would have had no reasonable expectation of success that Merck-086's vaccine could achieve the 2-log IgG Increase for all serotypes, which is required for a showing of obviousness." PO Reply 8. Patent Owner asserts "Hausdorff does not describe the Table 3 results as optimizing Table 5. EX2074 at ¶18. Rather, the studies reflected in Tables 3 and 5 were different experiments aimed at entirely different comparisons." PO Reply 8–9 (citing Ex. 2074 ¶ 18). Patent Owner asserts "a POSA would not have been able to optimize the baseline because it is not feasible to procure NZWR with a specific baseline or exclude certain NZWR from experiments." PO Reply 9 (citing Ex. 2073, 68:15–69:14; 75:2–24).

Patent Owner asserts "Merck-086 is silent on the baseline values corresponding to the experiments of Tables 3 and 4, and does not report observing anomalous data that would suggest that IgG ratios below 100 (i.e., 2-log) might be due to presence of abnormally high baseline values." PO Reply 9 (citing Ex. 2074 ¶ 21). Patent Owner asserts that in Merck-086 "responses could not be further optimized by adjustment of dose because 'there did not appear to be a significant benefit in increasing the amount of polysaccharideconjugate in the vaccine.'" PO Reply 10 (citing Ex. 1008 ¶ 118; Ex. 2074 ¶ 22). Patent Owner asserts regarding optimization of assay conditions that a "POSA would not have had any such expectation." PO Reply 10 (citing Ex. 2074 ¶ 24). Patent Owner asserts that "[g]iven that Merck-086 shows that its formulations were unable to meet the required 2-log IgG Increase even after optimization attempts, a POSA would not have expected they could be routinely optimized further." PO Reply 11 (citing

Ex. 2074 ¶ 27). Patent Owner asserts "a POSA would have concluded that PCV-15 of Merck-086 likely suffered from immune interference." PO Reply 11 (citing Ex. 2074 ¶ 28).

Patent Owner also asserts "[l]ong felt need for the immunogenic compositions of the proposed substitute claims and the failure of others to formulate a composition eliciting the efficacy associated with the 2-log IgG Increase further demonstrate that the proposed substitute claims are not obvious.'" PO Reply 11–12. Patent Owner asserts "Pfizer's 16- and 20-valent pneumococcal conjugate vaccines, embodiments of the proposed substitute claims, meet the long felt need for coverage of serotypes 22F (claim 46), 33F, and 15B (claim 48) with a 2-log IgG Increase maintained for all serotypes in the vaccine." PO Reply 12 (citing Ex. 2074 ¶ 30). Patent Owner asserts "[t]o date, there are no licensed vaccines that cover the serotypes required by claim 46 and its dependent claims." PO Reply 12 (citing Ex. 2074 ¶ 31).

Viewing the evidence as a whole, we determine that a preponderance of the evidence demonstrates that it would have been obvious to incorporate a serotype 22F polysaccharide—conjugated to $CRM_{197}$, with molecular weights and saccharide to protein ratios falling in the claimed ranges as rendered obvious by Merck-086 and GSK-711—into a pneumococcal vaccine with the 13 serotypes and aluminum salt adjuvant disclosed by Hausdorff with a reasonable expectation of success in obtaining a 2-log increase above baseline in serum IgG levels as required by claim 46.

As to reasons to include serotype 22F into such a composition, Merck-086 states "the addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses [and]

demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing pneumococcal vaccines." Ex. 1008 ¶ 15. GSK-711 states:

> the presence of 22F in a childhood pneumococcal vaccine will be advantageous in inducing herd immunity in the population such that the onset of serious elderly disease caused by this serotype (such as pneumonia and/or invasive pneumococcal disease (IPD) and/or exacerbations of chronic obstructive pulmonary disease (COPD)) may be prevented or reduced in severity.

Ex. 1007, 5:18–22. Thus, both Merck-086 and GSK-711 provide specific reasons to incorporate serotype 22F into a pneumococcal vaccine to provide robust antibody responses that will provide herd immunity and reduce disease in human populations. As discussed extensively regarding claim 1 above, these two references also render the specific molecular weight and saccharide to protein ratios obvious and we incorporate that reasoning here.

As to the issue of immune interference and a reasonable expectation of success in obtaining a 2-log increase, Table 3 of Hausdorff shows that a composition with thirteen of the fourteen serotypes that were required by claim 46, conjugated with $CRM_{197}$, produced an immune response with more than a 2-log increase above baseline serum IgG levels in New Zealand White Rabbits after administration of the two equal doses with or without the aluminum salt adjuvant. Ex. 2027 ¶ 231, Table 3.

Thus, the issue resolves to whether there would have been a reasonable expectation of success in the inclusion of serotype 22F in Hausdorff's pneumococcal vaccine composition while retaining the 2-log increased immune response of the thirteen serotypes and also allowing a 2-log increase in serotype 22F response.

Dr. Van Alphen states that

> Hausdorff showed that its 13-valent PCV composition (13vPnPC) achieved a 2-Log IgG Increase or higher across all serotypes (at least in one study). . . . Hausdorff also demonstrated that its 13vPnPC composition successfully achieved the 2-Log IgG Increase across all serotypes by routine optimization. Specifically, Hausdorff reported several studies examining the immune response to the 13vPnPC composition in NZWRs.

Ex. 1101 ¶ 59–60. Dr. Van Alphen states that the data in Hausdorf "demonstrated that for a reasonably immunogenic multivalent PCV composition, a 2-Log IgG Increase from baseline across all the serotypes can be achieved by routine optimization of test conditions, for example, the baseline (using different animals), the dose or adjuvant amounts, and others." Ex. 1101 ¶ 61.

The optimization reasoning is supported by Merck-086, which shows that PCV-15, a composition comprising all of Hausdorff's thirteen serotypes and further including serotypes 22F and 33F, resulted in a 2-log increase for serotype 22F in two of four studies in New Zealand White Rabbits, and less than a 2-log increase in the other two studies. *See* Ex. 1008 ¶¶ 7, 117, Table 4. While Merck-086 mentions immune interference in the background section relating to prior art formulations, Patent Owner does not identify a statement in Merck-086 that immune interference occurred in PCV-15. Ex. 1008 ¶ 6.

We are also unpersuaded by Patent Owner's assertion that "a POSA would not have been able to optimize the baseline because it is not feasible to procure NZWR with a specific baseline or exclude certain NZWR from experiments." PO Reply 9. Dr. Van Alphen stated "[t]here was a clear

motivation to further increase the IgG levels above the baseline for all serotypes as serum IgG levels are one of the indicators of immunogenicity of vaccine." Ex. 1101 ¶ 51 (citing Ex. 1053, 100–101). Dr. Van Alphen further stated with regard to Hausdorf that "for a reasonably immunogenic multivalent PCV composition, a 2-Log IgG Increase from baseline across all the serotypes can be achieved by routine optimization of test conditions, for example, the baseline (using different animals)." Ex. 1101 ¶ 61.

Dr. Van Alphen's optimization reasoning is supported by Dr. Paradiso's response to the question "what are some of the factors that would impact the level of the baseline," where Dr. Paradiso stated "previous exposure to the bacteria or previous immunization, two that come to mind." Ex. 1105, 104:11–18. Thus, the baseline could be routinely reduced by selecting germ-free animals that were never immunized or increased by selecting exposed animals already subjected to immunization, rendering this a results optimizable variable known in the prior art. Ex. 1101 ¶ 61; Ex. 1105, 104:11–18.

We recognize Patent Owner correctly notes that Merck-086 only obtained a 2-log increase of serum IgG levels in serotype 22F conjugates in two of the four arms, and annotates Figures 3 and 4 in Merck 2011 to identify particular experimental results that did not satisfy the 2-log increase. PO Reply 7–8. However, "'[o]bviousness does not require absolute predictability of success . . . *all that is required is a reasonable expectation of success*.'" *Kubin*, 561 F.3d at 1360 (*quoting In re O'Farrell*, 853 F.2d 894, 903–04 (Fed. Cir. 1988)). Evidence that all of the Merck-086 experiments showed a greater than 1-log increase in serum IgG levels and half of the experiments shows a greater than 2-log increase supports the

determination that there was a reasonable expectation of success. *See* Ex. 1008 ¶¶ 7, 117, Table 4.

We note that "this is not the case where the prior art teaches merely to pursue a 'general approach that seemed to be a promising field of experimentation' or 'gave only general guidance as to the particular form of the claimed invention or how to achieve it.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007) (*quoting O'Farrell*, 853 F.2d at 903; *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1167 (Fed. Cir. 2006)). Here, both Merck-086 and GSK-711 specifically suggested incorporation of a serotype 22F conjugate linked to $CRM_{197}$ into a pneumococcal vaccine that was already composed of other known serotypes, including all of the thirteen serotypes disclosed by Hausdorff. Ex. 1008 ¶ 15; Ex. 1007, 5:18–22; Ex. 2027 ¶ 231, Table 3.

We recognize, but find unpersuasive, Patent Owner's assertion that "a POSA would have concluded that PCV-15 of Merck-086 likely suffered from immune interference." PO Reply 11 (citing Ex. 2074 ¶ 28).

Paradiso 2009 supports the position that immune interference would not necessarily have been expected with the addition of a serotype 22F-$CRM_{197}$ conjugate to the thirteen serotype composition of Hausdorff because Paradiso 2009 states "[w]ith conjugates on $CRM_{197}$ it has been possible to induce good immunity to new serotypes without negatively affecting the components already in the vaccine." Ex. 1107, 3.

We also conclude that even if some degree of immune interference resulted from the addition of the serotype 22F conjugate, Dr. Van Alphen states "the overall benefit of the new multivalent conjugate vaccine composition based on both epidemiology consideration and regulatory

consideration could outweigh the reduced immune response to a particular serotype and the new multivalent conjugate vaccine could still be efficacious and approved." Ex. 1101 ¶ 80. This is consistent with Patent Owner's expert, Dr. Paradiso's opinion, who answered "Correct" in response to a question asking "one of the trade-offs that you would consider is whether a reduced immune response with respect to an individual serotype in the multivalent immunogenic composition made it worth – still worthwhile or not worthwhile to develop the vaccine, correct?" Ex. 1105, 82:20–83:2.

Thus, we find that a preponderance of the evidence supports a determination that there would have been a reasonable expectation of success in obtaining a fourteen serotype pneumococcal vaccine composition as required by claim 46 with 2-fold increases in IgG responses in New Zealand White Rabbits because Merck-086 itself exemplifies 2-fold increases in IgG responses in New Zealand White Rabbits for serotype 22F conjugates, and because Paradiso-2009 supports the position that inclusion of an additional serotype 22F-$CRM_{197}$ conjugate into the thirteen serotype composition of Hausdorff would not have been expected to result in immune interference. Ex. 1008 ¶ 15; Ex. 1107, 3.

We are not persuaded by Patent Owner's assertion of long-felt need because, as Petitioner points out, Patent Owner "fails to produce any objective evidence that the need for the immunogenic compositions of the substitute claims, specifically eliciting the 2-log IgG Increase is an art-recognized problem." Pet. Sur-Reply 10. Indeed, Patent Owner provides no objective evidence establishing any of the three elements necessary for long felt need: (i) the need must have been a persistent one that was recognized by ordinarily skilled artisans (ii) the long-felt need must not have been

satisfied by another before Appellants' invention; and (iii) the invention must, in fact, satisfy the long-felt need. *In re Gershon*, 372 F.2d 535, 538 (CCPA 1967); *Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988); *In re Cavanagh*, 436 F.2d 491, 496 (CCPA 1971).

We also agree with Petitioner that there is no evidence that the PCV-15 vaccine disclosed in Merck-086 "failed at any specific effort to formulate a composition eliciting the 2-log IgG Increase." Pet. Sur-Reply 11. Patent Owner's citation to post-filing date evidence in Ex. 2072 (PO Reply 12) is also unavailing because Ex. 2072 teaches that "PCV15 is likely to provide additional protection against diseases caused by 22F and 33F." Ex. 2072, 8. While we recognize that Ex. 2072 also teaches reduced immunogenicity of certain strains in PCV15, Patent Owner provides no objective evidence that these reductions resulted in levels below the 2-log increase required by claim 46. *See* Ex. 2072, 5–6. Thus, there is no objective evidence that the PCV-15 vaccine did not satisfy the long-felt need recited by claim 46.

Lastly, Patent Owner does not provide objective evidence that the claimed invention satisfies the need because Patent Owner acknowledges that "[t]o date, there are no licensed vaccines that cover the serotypes required by claim 46 and its dependent claims." PO Reply 12. To the extent that Patent Owner asserts that the only way to satisfy the long-felt need is by a licensed vaccine, rather than a disclosed composition such as PCV-15, Patent Owner has not established with objective evidence that the composition of claim 46 is a licensed vaccine. We do not, however, take such a narrow view of satisfying the long-felt need, but instead find that PCV-15 itself can reasonably be identified as satisfying the long-felt need consistent with Dr. Paradiso's statement that PCV-15 and Prevnar 13 would

show "[c]omparability using the WHO standard." Ex. 1116, 43:10. Thus, even if we credit the claimed composition as also satisfying the long-felt need, there is no evidence that it was not previously satisfied by PCV-15.

We conclude that claim 46 would have been obvious over Hausdorff, Merck-086, GSK-711, and the knowledge of the ordinary artisan.

## IV. PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner moves to exclude Exhibit 1101. Paper 45 ("Patent Owner Mot. to Exclude").

Patent Owner asserts that we should exclude Exhibit 1101 because Dr. Van Alphen "analyzed the proposed amended claims by considering only select limitations and disregarding entirely the limitations reciting molecular weight" and "ratio (w/w) of the [22F] polysaccharide to the [$CRM_{197}$] carrier protein" required by every proposed substitute claim." Paper 45, 2. Patent Owner asserts that Dr. Van Alphen "failed to apply reliable principles and methods to the facts of the case in contravention of Fed. R. Evid. 702." Paper 45, 3.

Petitioner asserts that "Dr. Van Alphen carefully considered and addressed each and every limitation recited in the proposed substitute claims, and reliably applied the obviousness legal standard to the facts of this case." Paper 49, 2. Petitioner asserted that Dr. Van Alphen "specifically explained that he based his opinion also on the *lack of any evidence* provided by Pfizer suggesting that combining a 22F-$CRM_{197}$ conjugate with the recited 'MW' and 'PS-to-protein' ratio ranges with the 13 serotypes from Prevnar13® individually conjugated to $CRM_{197}$ is inventive." Paper 49, 4.

With few exceptions, the Federal Rules of Evidence apply to *inter partes* proceedings. 37 C.F.R. § 42.62. The moving party has the burden of proof to establish that it is entitled to the requested relief. 37 C.F.R. §§ 42.20(c), 42.62(a).

Pursuant to FRE 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of opinion. Patent Owner does not dispute that Dr. Van Alphen is an expert, only that he relied upon Petitioner's prior evidence that the molecular weight and serotype 22F polysaccharide to carrier protein ratio would have been obvious. This argument goes more towards the weight we should afford the Declaration of Dr. Van Alphen, rather than its admissibility. It is within our discretion to assign the appropriate weight to the testimony offered by Dr. Van Alphen. *See, e.g., Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010) (holding the Board has discretion to give more weight to one item of evidence over another "unless no reasonable trier of fact could have done so"); *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1368 (Fed. Cir. 2004) ("[T]he Board is entitled to weigh the declarations and conclude that the lack of factual corroboration warrants discounting the opinions expressed in the declarations.").

We deny Patent Owner's request to exclude Exhibit 1101.

## V. PETITIONER'S MOTION TO EXCLUDE

Petitioner moves to exclude the following Exhibits, or portions thereof: Exhibits 2016–2019, Exhibit 2051 in part, Exhibit 2058, and Exhibit 2074 in part. Paper 44 ("Petitioner Mot. to Exclude").

As to Exhibits 2016–2019 and Exhibit 2051, we do not rely on any of these Exhibits in making our ultimate determination on the patentability of

the challenged claims. Accordingly, we need not decide Petitioner's motion as to those exhibits and paragraphs, and we dismiss that portion of Petitioner's motion as moot.

Petitioner asserts, regarding Exhibit 2058, that "Dr. Wang failed to reliably apply the correct legal standard for obviousness to the facts of this case. Therefore, Dr. Wang's opinions are unreliable and should be excluded under FRE 702." Paper 44, 10. Petitioner asserts, regarding Exhibit 2074, that "Dr. Paradiso's opinions . . . are unreliable because Dr. Paradiso failed to provide sufficient underlying data such that a POSA would have a reasonable basis to believe that his conclusion is correct." Paper 44, 13. Petitioner similarly asserts that other portions of Dr. Paradiso's testimony lack sufficient underlying data. Paper 44, 14.

Patent Owner asserts, regarding Exhibit 2058, that Petitioner's "argument goes to the sufficiency of the evidence and is not a proper basis to exclude all of Dr. Wang's testimony." Paper 48, 10. Patent Owner asserts, regarding Exhibit 2074, that Petitioner's "challenge is directed to the sufficiency, rather than admissibility of the evidence and is improper." Paper 48, 6, 9.

As already noted, FRE 702 authorizes a witness who is qualified as an expert by knowledge, skill, experience, training, or education to testify in the form of opinion. Petitioner does not dispute that either Dr. Wang or Dr. Paradiso are experts, only that they either relied upon an incorrect legal standard in formulating their opinions or lacked sufficient underlying data. These arguments go more towards the weight we should afford the Declarations of Dr. Wang and Dr. Paradiso, rather than their admissibility. It is within our discretion to assign the appropriate weight to the testimony

offered by Dr. Wang and Dr. Paradiso. *Yorkey,* 601 F.3d at 1284; *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d at 1368.

We deny Petitioner's request to exclude Exhibit 2058 and Exhibit 2074.

## V. CONCLUSION

We conclude that Petitioner has shown by a preponderance of the evidence that (1) claims 1, 3–19, 23–37, 41, 42, and 45 of the '559 patent are unpatentable as obvious over the combination of GSK-711, Merck-086, (2) claims 2, 40, and 43 of the '559 patent are unpatentable as obvious over the combination of GSK-711, Merck-086, Lees-2008, PVP 2013, Pfizer-605; (3) that claims 20–22 of the '559 patent are unpatentable as obvious over the combination of GSK-711, Merck-086, GSK-531; (4) that claims 38 and 39 of the '559 patent are unpatentable as obvious over the combination of GSK-711, Merck-086, Pfizer-605; and (5) that claim 44 is unpatentable as obvious over the combination of GSK-711, Merck-086, Hsieh 2000.

We deny Patent Owner's Contingent Motion to Amend to replace claims 1–4, 9, 41, and 42 with substitute claims 46–52.

We deny Patent Owner's Motion to exclude Exhibit 1101.

We dismiss Petitioner's Motion to exclude Exhibit 2016–2019 and Exhibit 2051 as moot.

We deny Petitioner's Motion to exclude Exhibits 2058 and 2074.

## VI. ORDER

For the reasons given, it is

ORDERED, based on a preponderance of the evidence, that claims 1–45 are unpatentable;

FURTHER ORDERED, Patent Owner's Motion to Amend is denied as to replacing claims 1–4, 9, 41, and 42 with substitute claims 46–52;

FURTHER ORDERED, Patent Owner's Motion to Exclude Exhibit 1101 is denied;

FURTHER ORDERED, Petitioner's Motion to Exclude Exhibits 2016–2019 and 2051 is dismissed as moot;

FURTHER ORDERED, Patent Owner's Motion to Exclude Exhibits 2058 and 2074 is denied;

FURTHER ORDERED, because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Fangli Chen
Siegmund Gutman
Andrej Barbic
Gerald Worth
PROSKAUER ROSE LLP
fchenptabmatters@proskauser.com
sgutmanptabmatters@procskauer.com
abarbic@proskauer.com
gworth@proskauer.com

PATENT OWNER:

John Scheibeler
Dimitrios T. Drivas
Anita Varma
Brendan Gabin
WHITE & CASE LLP
jscheibeler@whitecase.com
ddrivas@whitecase.com
anitavarma@whitecase.com
Brendan.gavin@whitecase.com

US009492559B2

(12) **United States Patent**
**Emini et al.**

(10) **Patent No.: US 9,492,559 B2**
(45) **Date of Patent: Nov. 15, 2016**

(54) **IMMUNOGENIC COMPOSITIONS COMPRISING CONJUGATED CAPSULAR SACCHARIDE ANTIGENS AND USES THEREOF**

(71) Applicant: **Pfizer Inc.**, New York, NY (US)

(72) Inventors: **Emilio Anthony Emini**, Dresher, PA (US); **Wendy Jo Watson**, Blue Bell, PA (US); **Avvari Krishna Prasad**, Chapel Hill, NC (US); **Mingming Han**, Nazareth, PA (US); **Jin-Hwan Kim**, Suffern, NY (US); **Jianxin Gu**, Paramus, NJ (US); **Yu-ying Yang**, Stamford, CT (US); **Rajesh Kumar Kainthan**, Tappan, NY (US); **David Cooper**, Monroe, NY (US); **Michael William Pride**, Staten Island, NY (US); **Kathrin Ute Jansen**, New York, NY (US)

(73) Assignee: **Pfizer Inc.**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/597,488**

(22) Filed: **Jan. 15, 2015**

(65) **Prior Publication Data**

US 2015/0202309 A1 Jul. 23, 2015

**Related U.S. Application Data**

(60) Provisional application No. 61/929,547, filed on Jan. 21, 2014.

(51) **Int. Cl.**

| | |
|---|---|
| ***A61K 39/00*** | (2006.01) |
| ***A61K 39/02*** | (2006.01) |
| ***A61K 39/09*** | (2006.01) |
| ***A61K 39/385*** | (2006.01) |
| ***A61K 47/48*** | (2006.01) |

(52) **U.S. Cl.**
CPC ......... ***A61K 47/4833*** (2013.01); ***A61K 39/092*** (2013.01); *A61K 2039/6037* (2013.01); *A61K 2039/70* (2013.01)

(58) **Field of Classification Search**
CPC .................................................. A61K 47/4833
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,709,017 A | 11/1987 | Collier et al. | |
| 4,950,740 A | 8/1990 | Greenfield et al. | |
| 5,614,382 A | 3/1997 | Metcalf | |
| 5,843,711 A | 12/1998 | Collier et al. | |
| 5,917,017 A | 6/1999 | Collier et al. | |
| 6,194,388 B1 | 2/2001 | Krieg et al. | |
| 6,207,646 B1 | 3/2001 | Krieg et al. | |
| 6,214,806 B1 | 4/2001 | Krieg et al. | |
| 6,218,371 B1 | 4/2001 | Krieg et al. | |
| 6,239,116 B1 | 5/2001 | Krieg et al. | |
| 6,339,068 B1 | 1/2002 | Krieg et al. | |
| 6,455,673 B1 | 9/2002 | Collier | |
| 2004/0202668 A1* | 10/2004 | Boutriau .............. | A61K 39/095 424/184.1 |
| 2006/0228380 A1 | 10/2006 | Hausdorff et al. | |
| 2006/0228381 A1 | 10/2006 | Bahler et al. | |
| 2007/0184071 A1 | 8/2007 | Hausdorff et al. | |
| 2007/0184072 A1 | 8/2007 | Hausdorff et al. | |
| 2007/0231340 A1 | 10/2007 | Hausdorff et al. | |
| 2008/0102498 A1 | 5/2008 | Bahler et al. | |
| 2008/0286838 A1 | 11/2008 | Yuan et al. | |
| 2012/0052088 A1* | 3/2012 | Davis ................... | A61K 39/092 424/197.11 |
| 2012/0237542 A1† | 9/2012 | Hausdorff | |
| 2013/0266609 A1† | 10/2013 | Boutriau | |
| 2013/0273098 A1† | 10/2013 | Blue | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2004810 | 12/1989 |
| CN | 103495161 A | 1/2014 |
| EP | 0378881 A1 | 7/1990 |
| EP | 0427347 A1 | 5/1991 |
| EP | 0471177 A2 | 2/1992 |
| EP | 0761231 A1 | 3/1997 |
| GB | 2220211 A | 1/1990 |
| WO | 90/03184 A1 | 4/1990 |
| WO | 91/01146 A1 | 2/1991 |
| WO | 91/18926 A1 | 12/1991 |
| WO | 93/15760 A1 | 8/1993 |
| WO | 93/17712 A2 | 9/1993 |
| WO | 94/03208 A1 | 2/1994 |
| WO | 94/21292 A1 | 9/1994 |
| WO | 95/08348 A1 | 3/1995 |
| WO | 95/17210 A1 | 6/1995 |

(Continued)

OTHER PUBLICATIONS

Oosterhuis-Kafeja, F., et al., "Immunogenicity, efficacy, safety and effectiveness of pneumococcal conjugate vaccines (1998-2006)", Vaccine, 25(12):2194-2212 (2007).

Ma, Z., et al., "TEMP-mediated glycoconjugation: a scheme fort he controlled synthesis of polysaccharide conjugates" Carbohydrate Research, 346(2):343-346 (2011).

(Continued)

*Primary Examiner* — Albert Navarro

(74) *Attorney, Agent, or Firm* — Victoria S. Molenda

(57) **ABSTRACT**

The present invention relates to new immunogenic compositions comprising conjugated *Streptococcus pneumoniae* capsular saccharide antigens (glycoconjugates) and uses thereof. Immunogenic compositions of the present invention will typically comprise at least one glycoconjugate from a *S. pneumoniae* serotype not found in PREVNAR®, SYNFLORIX® and/or PREVNAR 13®. The invention also relates to vaccination of human subjects, in particular infants and elderly, against pneumoccocal infections using said novel immunogenic compositions.

**45 Claims, 16 Drawing Sheets**

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 96/02555 | A1 | 2/1996 |
| WO | 96/11711 | A1 | 4/1996 |
| WO | 96/29094 | A1 | 9/1996 |
| WO | 97/01640 | A2 | 1/1997 |
| WO | 98/18810 | A1 | 5/1998 |
| WO | 98/36772 | A1 | 8/1998 |
| WO | 98/42721 | A1 | 10/1998 |
| WO | 98/57659 | A1 | 12/1998 |
| WO | 98/58668 | A2 | 12/1998 |
| WO | 99/11241 | A1 | 3/1999 |
| WO | 99/44636 | A2 | 9/1999 |
| WO | 99/52549 | A1 | 10/1999 |
| WO | 00/07621 | A2 | 2/2000 |
| WO | 00/23105 | A2 | 4/2000 |
| WO | 00/37105 | A2 | 6/2000 |
| WO | 00/39299 | A2 | 7/2000 |
| WO | 00/41720 | A1 | 7/2000 |
| WO | 00/48630 | A1 | 8/2000 |
| WO | 00/56357 | A2 | 9/2000 |
| WO | 00/56358 | A2 | 9/2000 |
| WO | 00/61761 | A2 | 10/2000 |
| WO | 00/62800 | A2 | 10/2000 |
| WO | 01/21152 | A1 | 3/2001 |
| WO | 01/21207 | A2 | 3/2001 |
| WO | 01/72337 | A1 | 10/2001 |
| WO | 01/98334 | A2 | 12/2001 |
| WO | 02/091998 | A2 | 11/2002 |
| WO | 03/024480 | A2 | 3/2003 |
| WO | 03/054007 | A2 | 7/2003 |
| WO | 2004/081515 | A2 | 9/2004 |
| WO | 2004/083251 | A2 | 9/2004 |
| WO | 2005/033148 | A1 | 4/2005 |
| WO | 2006/032499 | A1 | 3/2006 |
| WO | 2006/110352 | A2 | 10/2006 |
| WO | 2006/110381 | A1 | 10/2006 |
| WO | 2006/134423 | A2 | 12/2006 |
| WO | 2007/026190 | A2 | 3/2007 |
| WO | 2008/079653 | A1 | 7/2008 |
| WO | 2008/118752 | A2 | 10/2008 |
| WO | 2008/143709 | A2 | 11/2008 |
| WO | 2008/157590 | A1 | 12/2008 |
| WO | 2009/000826 | A2 | 12/2008 |
| WO | 2010/125480 | A1 | 11/2010 |
| WO | 2014/027302 | A1 | 2/2014 |
| WO | 2014/097099 | A2 | 6/2014 |
| WO | 2014/118201 | A1 | 8/2014 |

OTHER PUBLICATIONS

Baraldo, K., et al., "N19 Polyepitope as a Carrier for Enhanced Immunogenicity and Protective Efficacy of Meningococcal Conjugate Vaccines", Infection and Immunity, 72(8):4884-4887 (2004).

Bethell, G.S., et al., "A Novel Method of Activation of Cross-linked Agaroses with 1,1'-Carbonyldiimidazole Which Gives a Matrix for Affinity Chromatography Devoid of Additional Charged Groups", The Journal of Biological Chemistry, 254(8):2572-2574 (1979).

Calix, J.J. et al., "Elucidation of Structural and Antigenic Properties of Pneumococcal Serotype 11A, 11B, 11C, and 11F Polysaccharide Capsules", Journal of Bacteriology, 193(19)15271-5278 (2011).

Crooke, S. T., et al., "Progress in Antisense Oligonucleotide Therapeutics", Annu. Rev. Pharmacol. Toxicol., 36:107-129 (1996).

Falugi, F., et al., "Rationally designed strings of promiscuous CD4+ T cell epitopes provide help to Haemophilus influenzae type b oligosaccharide: a model for new conjugate vaccines", Eur. J. Immunol., 31(12):3816-3824 (2001).

Hearn; M,T.W., et al., "Application of 1,1'-Carbonyldiimidazole-Activitated Matrices for the Purification of Proteins, III. The Use of 1,1'-Carbonyldiimidazole-Activated Agaroses in the Biospecific Affinity Chromatographic Isolation of Serum Antibodies", Journal of Chromatography. 218:509-518 (1981).

Hestrin, S., "The Reaction of Acetylcholine and Other Carboxylic Acid Derivatives with Hydroxyiamine, and Its Analytical Application", The Journal of Biological Chemistry, 180(1):249-261 (1949).

Hu, B.T., et al., "Approach to Validating an Opsonophagoeytic Assay for *Streptococcus pneumoniae*", Clinical and Diagnostic Laboratory Immunology, 12(2):287-295 (2005).

Hunziker, J., et al., "Nucleic Acid Analogues: Synthesis and Properties", Mod. Synth. Methods, 7:331-417 (1995).

Jones, J.K.N., et al., "The Structure of the Type VIII Pneumococcus, Specific Polysaccharide", The Journal of the American Chemical Society, 79(11):2787-2793 (1957).

Jones, C., "Full assignment of the NMR spectrum of the capsular polysaccharide from *Streptococcus pneumoniae* serotype 10A", Carbohydrate Research, 269:175-181 (1995).

Jones, C., et al., "Use and validation of NMR assays for the identity and O-acetyl content of capsular polysaccharides from Neisseria meningitidis used in vaccine manufacture", Journal of Pharmaceutical and Biomedical Analysis, 30 (4):1233-1247 (2002).

Jones, C., et al., "Full NMR assignment and revised structure for the capsular polysaccharide from *Streptococcus pneumoniae* type 15B", Carbohydrate Research, 340:403-409 (2005).

Kuo, J., et al., "Characterization of a Recombinant Pneumolysin and Its Use as a Protein Carrier or Pneumococcal Type 180 Conjugate Vaccines", Infection and Immunity, 63(7):2706-2713 (1995).

Lemercinier, X., et al., "Full 1H NMR assignment and detailed O-acetylation patterns of capsular polysaccharides from Neisseria meningitidis used in vaccine production", Carbohydrate Research, 296:83-98 (1996).

Lemercinier, X., et al., "Full assignment of the 1H and 13C spectra and revision of the O-acetylation site of the capsular polysaccharide of *Streptococcus pneumoniae* Type 33F, a component of the current pneumococcal polysaccharide vaccine", Carbohydrate Research, 341:68-74 (2006).

Leontein, K. et al., "Structural Studies of the Capsular Polysaccharide from *Streptococcus pneumoniae* Type 12A", Carbohydrate Research, 114:257-266 (1983).

Richards, J.C., et al., "Elucidation and Comparison of the Chemical Structures of the Specific Capsular Polysaccharides of *Streptococcus pneumoniae* Groups 11, (11F, 11B, 11C, and 11A)", Adv. Exp. Med. Biol., 228:595-596 (1988) (Abstract).

Richards, J.C., et al., "Structural analysis of the specific capsular polysaccharide of *Streptococcus pneumoniae* type 22F", Canadian Journal of Chemistry, 67(6):1038-1050 (1989).

Robbins, J.B., et al., "Considerations for Formulating the Second-Generation Pneumococcal Capsular Polysaccharide Vaccine with Emphasis on the Cross-Reactive Types Within Groups" The Journal of Infectious Diseases, 148(6):1136-1159 (1983).

Sjolander, A., et al., "ISCOMs: an adjuvant with multiple functions", Journal of Leukocyte Biology, 64:713-723 (1998).

Uchida, T., et al., "Mutation in the Structural Gene for Diphtheria Toxin carried by Temperate Phage β", Nature New Biology, 233:8-11 (1971).

Uchida, T., et al., "Diphtheria Toxin and Related Proteins", The Journal of Biological Chemistry, 248(11):3838-3844 (1973).

Uhlmann, E., et al., "Antisense Oligonucleotides: A New Therapeutic Principle", Chemical Reviews, 90(4):543-584 (1990).

Douglas, C.M., et al., "Exotoxin A of Pseudomonas aeruginosa: Substitution of Glutamic Acid 553 with Aspartic Acid Drastically Reduces Toxicity and Enzymatic Activity", Journal of Bacteriology 169(11):4967-4971 (1987).

* cited by examiner
† cited by third party

# FIGURE 1




→4)-β-D-Glc$p$A-(1→4)-β-D-Glc$p$-(1→4)-α-D-Glc$p$-(1→4)-α-D-Gal$p$-(1→

MW $(H^+)$ = 662.553 $C_{24}H_{38}O_{21}$
MW $(Na^+)$ = 684.534 $C_{24}H_{37}O_{21}Na_1$

FIGURE 2


NHAc
$CH_2OH$
β-D-Galf
β-D-Galp
5)-β-D-Galf-(1→3)-β-D-Galp-(1→4)-β-D-GalpNAc-(1→3)-α-D-Galp-(1→2)-D-Ribitol-(5-$PO_4$)
n

FIGURE 3


1 eq
0.9 eq
0.5 eq
Mw (Na) = 950.7
Ac (100%) Ac (50%)
Ac (60%) Ac (50%)
OPO3- -1-D-glycerol

FIGURE 4



FIGURE 5


NHAc
(HOH2C)2HC—O
R = Ac (C6 = 55%, C4 = 12%, C3 = 12%, C2 = 6%)
→6)-D-GlcpNAc-β-(1→3)-D-Galp-β-(1→4)-D-Glcp-β-(1→
D-Galp-α-(1→2)-D-Galp(3-OPO3-R1)-β-(1→4
R1 = CH(CH2OH)2
C37H61NNaO31P, MW=1069.8
Ac= Acetyl

FIGURE 6



## FIGURE 7

Pn 33F



# FIGURE 8


(A)
Serotype Pn-33F Polysaccharide
- compound with 1,2,4-triazole
- lyophilize
Lyophilized Pn-33F Polysaccharide
- reconstitute in anhydrous DMSO
- react with 1,1'-carbonyldi-1,2,4-triazole (CDT)
- incubate for 1 hr, 23 ± 2°C
- quench with 100 mM sodium tetraborate, pH 9.0
- incubate for 1 hr, 23 ± 2°C
- add cystamine dihydrochloride
- incubate for 20 ± 2 hr, 23 ± 2°C
- Reduction with TCEP
- Incubate for 3 hrs, 23 ± 2°C
- 100K MWCO diafiltration vs.10mM Sod Phos, pH 4.3
Thiolated Pn-33F Polysaccharide
(B)
Thiolated Pn-33F Polysaccharide
- Add to bromoacetylated $CRM_{197}$
- Incubate for 20 ± 2 hrs, 5 ± 3°C, pH 8.0 – 9.0
- Capping with *N*-acetyl-L-cysteine
- incubate for 3 hrs, 5 ± 3 °C
- Capping with Iodoacetamide
- incubate for 20 ± 2 hr, 5 ± 3°C
- 0.45 or 5µm filtration
- 300K MWCO diafiltration
vs. 5 mM succinate- 0.9% saline, pH6.0,
- 0.2 µm filtration
Pn-33F Conjugate (Final Bulk)

# FIGURE 9


DO vs Meq NCS
Degree of oxidation (DO)
MEq NCS
0
5
10
15
20
25
30
35
40
0
0,5
1
1,5
2
2,5
3

FIGURE 10


Stability: Conjugates from Periodate Oxidation vs Tempo Chem (25°C)
Type 12F (Periodate Oxidation)
Type 12F (TEMPO)
% Free Saccharide
50
45
40
35
30
25
20
15
10
5
0
Time (Days)
0
14
30
60
90
120
150

FIGURE 11


OPA Titers
100000
10000
1000
100
10
1
98.3
98.3 %
100%
93.2
9V
9A
9L
9N
GMT
9162
2631
5334
2729

FIGURE 12


OPA Titers
1,E+06
1,E+05
1,E+04
1,E+03
1,E+02
1,E+01
1,E+00
84%
100
66%
95%
82%
95%
86%
98%
Pre
Post
Pre
Post
Pre
Post
Pre
Post
9V
9A
9L
9N
GMT
221
1323
41
308
165
706
322
693

FIGURE 13


RCDC Curves of OPA Titers
9V pre
9V post
% Subjects
100%
90%
80%
70%
60%
50%
40%
30%
20%
10%
0%
1
10
100
1000
10000
100000
OPA Titers

FIGURE 14


RCDC Curves of OPA Titers
9A pre
9A post
% Subjects
100%
90%
80%
70%
60%
50%
40%
30%
20%
10%
0%
1
10
100
1000
10000
100000
OPA Titers

FIGURE 15


RCDC Curves of OPA Titers
9L pre
9L post
% Subjects
100%
90%
80%
70%
60%
50%
40%
30%
20%
10%
0%
1
10
100
1000
10000
100000
OPA Titers

Case: 19-1871 Document: 99 Page: 452 Filed: 07/18/2022



# FIGURE 16



# IMMUNOGENIC COMPOSITIONS COMPRISING CONJUGATED CAPSULAR SACCHARIDE ANTIGENS AND USES THEREOF

## CROSS REFERENCE TO RELATED APPLICATION

This application claims the priority benefit of U.S. Provisional Application No. 61/929,547, filed Jan. 21, 2014, the entirety of which is hereby incorporated by reference herein.

## FIELD OF THE INVENTION

The present invention relates to new immunogenic compositions comprising conjugated capsular saccharide antigens (glycoconjugates) and uses thereof. Immunogenic compositions of the present invention will typically comprise glycoconjugates, wherein the saccharides are derived from serotypes of *Streptococcus pneumoniae*. The invention also relates to vaccination of human subjects, in particular infants and elderly, against pneumoccocal infections using said novel immunogenic compositions.

## BACKGROUND OF THE INVENTION

Infections caused by pneumococci are a major cause of morbidity and mortality all over the world. Pneumonia, febrile bacteraemia and meningitis are the most common manifestations of invasive pneumococcal disease, whereas bacterial spread within the respiratory tract may result in middle-ear infection, sinusitis or recurrent bronchitis. Compared with invasive disease, the non-invasive manifestations are usually less severe, but considerably more common.

In Europe and the United States, pneumococcal pneumonia is the most common community-acquired bacterial pneumonia, estimated to affect approximately 100 per 100,000 adults each year. The corresponding figures for febrile bacteraemia and meningitis are 15-19 per 100 000 and 1-2 per 100,000, respectively. The risk for one or more of these manifestations is much higher in infants and elderly people, as well as immune compromised persons of any age. Even in economically developed regions, invasive pneumococcal disease carries high mortality; for adults with pneumococcal pneumonia the mortality rate averages 10%-20%, whilst it may exceed 50% in the high-risk groups. Pneumonia is by far the most common cause of pneumococcal death worldwide.

The etiological agent of pneumococcal diseases, *Streptococcus pneumoniae* (pneumococcus), is a Gram-positive encapsulated coccus, surrounded by a polysaccharide capsule. Differences in the composition of this capsule permit serological differentiation between about 91 capsular types, some of which are frequently associated with pneumococcal disease, others rarely. Invasive pneumococcal infections include pneumonia, meningitis and febrile bacteremia; among the common non-invasive manifestations are otitis media, sinusitis and bronchitis.

Pneumococcal conjugate vaccines (PCVs) are pneumococcal vaccines used to protect against disease caused by *S. pneumoniae* (pneumococcus). There are currently three PCV vaccines available on the global market: PREVNAR® (called PREVENAR® in some countries) (heptavalent vaccine), SYNFLORIX® (a decavalent vaccine) and PREVNAR 13® (tridecavalent vaccine).

The recent development of widespread microbial resistance to essential antibiotics and the increasing number of



immunocompromised persons underline the need for pneumococcal vaccines with even broader protection.

In particular, there is a need to address remaining unmet medical need for coverage of pneumococcal disease due to serotypes not found in PREVNAR 13® and potential for serotype replacement over time. The specific serotypes causing disease beyond the 13 in PREVNAR 13® vary by region, population, and may change over time due to acquisition of antibiotic resistance, pneumococcal vaccine introduction and secular trends of unknown origin. There is a need for immunogenic compositions that can be used to induce an immune response against additional *Streptococcus pneumoniae* serotypes in humans and in particular in children less than 2 years old.

An object of the new immunogenic compositions of the present invention is to provide for appropriate protection against *S. pneumoniae* serotypes not found in PREVNAR 13®. In one aspect, an object of the immunogenic compositions of the present invention is to provide for appropriate protection against *S. pneumoniae* serotypes not found in PREVNAR® (heptavalent vaccine), SYNFLORIX® and/or PREVNAR 13® while maintaining an immune response against serotypes currently covered by said vaccines.

## SUMMARY OF THE INVENTION

The present invention relates to an immunogenic composition comprising at least one glycoconjugate selected from the group consisting of a glycoconjugate from *S. pneumoniae* serotype 15B, a glycoconjugate from *S. pneumoniae* serotype 22F, a glycoconjugate from *S. pneumoniae* serotype 33F, a glycoconjugate from *S. pneumoniae* serotype 12F, a glycoconjugate from *S. pneumoniae* serotype 10A, a glycoconjugate from *S. pneumoniae* serotype 11A and a glycoconjugate from *S. pneumoniae* serotype 8.

In one aspect, the invention provides an immunogenic composition comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B, at least one glycoconjugate from *S. pneumoniae* serotype 22F and at least one glycoconjugate from *S. pneumoniae* serotype 33F.

In another aspect the invention provides an immunogenic composition comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B, at least one glycoconjugate from *S. pneumoniae* serotype 22F, at least one glycoconjugate from *S. pneumoniae* serotype 33F, at least one glycoconjugate from *S. pneumoniae* serotype 12F, at least one glycoconjugate from *S. pneumoniae* serotype 10A, at least one glycoconjugate from *S. pneumoniae* serotype 11A and at least one glycoconjugate from *S. pneumoniae* serotype 8.

In an aspect the above immunogenic composition further comprises glycoconjugates from *S. pneumoniae* serotypes 4, 6B, 9V, 14, 18C, 19F and 23F.

In another aspect the above immunogenic composition further comprises glycoconjugates from *S. pneumoniae* serotypes 1, 5 and 7F.

In another aspect the above immunogenic composition further comprises glycoconjugates from *S. pneumoniae* serotypes 6A and 19A.

In another aspect the above immunogenic composition further comprises glycoconjugates from *S. pneumoniae* serotype 3.

In another aspect the above immunogenic composition further comprises glycoconjugates from *S. pneumoniae* serotype 2, 9N, 17F, 20 and/or 15C.

In an aspect the above immunogenic composition does not comprise capsular saccharide from *S. pneumoniae* serotype 9N, 9A and/or 9L.

In an aspect the above immunogenic composition is a 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 or 20-valent pneumococcal conjugate composition. In an aspect the above immunogenic composition is a 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25-valent pneumococcal conjugate composition.

In an aspect the glycoconjugates are individually conjugated to a carrier protein selected form the group consisting of DT (Diphtheria toxin), TT (tetanus toxoid), $CRM_{197}$, other DT mutants, PD (*Haemophilus influenzae* protein D), or immunologically functional equivalents thereof.

In one aspect, the invention provides a container filled with any of the immunogenic composition defined in the present document.

In one aspect, the invention provides any of the immunogenic composition defined in the present document for use as a medicament, in particular for use as a vaccine.

In one aspect, the invention provides a method of preventing, treating or ameliorating an infection, disease or condition associated with *S. pneumoniae* in a subject, comprising administering to the subject an immunologically effective amount of any of the immunogenic composition defined in the present document.

## FIGURES

FIG. **1** shows a repeating polysaccharide structure of *S. pneumoniae* serotype 8 (Pn-8) capsular polysaccharide.

FIG. **2** shows a repeating polysaccharide structure of *S. pneumoniae* serotype 10A (Pn-10A) capsular polysaccharide.

FIG. **3** shows a repeating polysaccharide structure of *S. pneumoniae* serotype 11A (Pn-11A) capsular polysaccharide.

FIG. **4** shows a repeating polysaccharide structure of *S. pneumoniae* serotype 12F (Pn-12F) capsular polysaccharide.

FIG. **5** shows a repeating polysaccharide structure of *S. pneumoniae* serotype 15B (Pn-15B) capsular polysaccharide.

FIG. **6** shows a repeating polysaccharide structure of *S. pneumoniae* serotype 22F (Pn-22F) capsular polysaccharide.

FIG. **7** shows a repeating polysaccharide structure of *S. pneumoniae* serotype 33F (Pn-33F) capsular polysaccharide.

FIG. **8** shows a representative process flow diagram for the activation (A) and conjugation (B) processes which can be used in the preparation of Pn-33F glycoconjugate.

FIG. **9** shows the effect on DO by varying amount of NCS in the TEMPO/NCS oxidation reaction.

FIG. **10** shows evaluation of Pn-12F glycoconjugates stability.

FIG. **11** Cross-Functional OPA Responses. A subset of 59 sera from adults vaccinated with a 13 valent Pneumococcal Conjugate Vaccine (US Study 6115A1-004; ClinicalTrials.gov Identifier: NCT00427895) was assessed in OPAs for the presence of functional antibodies against serotypes 9V, 9A, 9L, and 9N. The percent of samples with OPA positive titer (i.e., ≥1:8) is indicated above each group. Geometric mean titers (GMT) are listed in the x axis below each group.

FIG. **12** Cross-Functional OPA Responses of Sixty-six Matched pre/post Sera. A subset of 66 matched pre- and post-vaccinated serum panel from adults vaccinated with a 13 valent Pneumococcal Conjugate Vaccine (study 6115A1-3005; ClinicalTrials.gov Identifier: NCT00546572) were assessed in OPAs for the presence of functional antibodies against serotypes 9V, 9A, 9L, and 9N. The percent of samples with OPA positive titer (i.e., ≥1:8) is indicated above each group. Geometric mean titers (GMT) are listed in the x axis below each group.

FIG. **13** Reverse cumulative distribution curves (RCDC) of pre and post Immunization—pneumococcal serotype 9V (Pn9V).

Reverse cumulative distribution curves of OPA titers to serotype 9V from a matched pre- and post-vaccination serum panel (N=66) vaccinated with a 13 valent Pneumococcal Conjugate Vaccine (study 6115A1-3005; ClinicalTrials.gov Identifier: NCT00546572). The plots represent the percent of sera with OPA positive titer (i.e., ≥1:8).

FIG. **14** Reverse cumulative distribution curves (RCDC) of pre and post Immunization—pneumococcal serotype 9A (Pn9A).

Reverse cumulative distribution curves of OPA titers to serotype 9A from a matched pre- and post-vaccination serum panel (N=66) vaccinated with a 13 valent Pneumococcal Conjugate Vaccine (study 6115A1-3005; ClinicalTrials.gov Identifier: NCT00546572). The plots represent the percent of sera with OPA positive titer (i.e., ≥1:8).

FIG. **15** Reverse cumulative distribution curves (RCDC) of pre and post Immunization—pneumococcal serotype 9L (Pn9L).

Reverse cumulative distribution curves of OPA titers to serotype 9L from a matched pre- and post-vaccination serum panel (N=66) vaccinated with a 13 valent Pneumococcal Conjugate Vaccine (study 6115A1-3005; ClinicalTrials.gov Identifier: NCT00546572). The plots represent the percent of sera with OPA positive titer (i.e., ≥1:8).

FIG. **16** Reverse cumulative distribution curves (RCDC) of pre and post Immunization—pneumococcal serotype 9N (Pn9N).

Reverse cumulative distribution curves of OPA titers to serotype 9N from a matched pre- and post-vaccination serum panel (N=66) vaccinated with a 13 valent Pneumococcal Conjugate Vaccine (study 6115A1-3005; ClinicalTrials.gov Identifier: NCT00546572). The plots represent the percent of sera with OPA positive titer (i.e., ≥1:8).

## 1 IMMUNOGENIC COMPOSITIONS OF THE INVENTION

Immunogenic compositions of the present invention will typically comprise conjugated capsular saccharide antigens (also named glycoconjugates), wherein the saccharides are derived from serotypes of *S. pneumoniae.*

Preferably, the number of *S. pneumoniae* capsular saccharides can range from 8 different serotypes (or "v", valences) to 20 different serotypes (20v). In one embodiment there are 8 different serotypes. In one embodiment there are 9 different serotypes. In one embodiment there are 10 different serotypes. In one embodiment there are 11 different serotypes. In one embodiment there are 12 different serotypes. In one embodiment there are 13 different serotypes. In one embodiment there are 14 different serotypes. In one embodiment there are 15 different serotypes. In one embodiment there are 16 different serotypes. In an embodiment there are 17 different serotypes. In an embodiment there are 18 different serotypes. In an embodiment there are 19 different serotypes. In an embodiment there are 20 different serotypes. The capsular saccharides are conjugated to a carrier protein to form glycoconjugates as described here below.

If the protein carrier is the same for 2 or more saccharides in the composition, the saccharides could be conjugated to

the same molecule of the protein carrier (carrier molecules having 2 or more different saccharides conjugated to it) [see for instance WO2004/083251].

In a preferred embodiment though, the saccharides are each individually conjugated to different molecules of the protein carrier (each molecule of protein carrier only having one type of saccharide conjugated to it). In said embodiment, the capsular saccharides are said to be individually conjugated to the carrier protein.

For the purposes of the invention the term 'glycoconjugate' indicates a capsular saccharide linked covalently to a carrier protein. In one embodiment a capsular saccharide is linked directly to a carrier protein. In a second embodiment a bacterial saccharide is linked to a protein through a spacer/linker.

1.1 Carrier Protein of the Invention

A component of the glycoconjugate of the invention is a carrier protein to which the saccharide is conjugated. The terms "protein carrier" or "carrier protein" or "carrier" may be used interchangeably herein. Carrier proteins should be amenable to standard conjugation procedures.

In a preferred embodiment, the carrier protein of the glycoconjugates is selected in the group consisting of: DT (Diphtheria toxin), TT (tetanus toxoid) or fragment C of TT, $CRM_{197}$ (a nontoxic but antigenically identical variant of diphtheria toxin), other DT mutants (such as CRM176, CRM228, CRM45 (Uchida et al. (1973) J. Biol. Chem. 218:3838-3844), CRM9, CRM102, CRM103 or CRM107; and other mutations described by Nicholls and Youle in Genetically Engineered Toxins, Ed: Frankel, Marcel Dekker Inc. (1992); deletion or mutation of Glu-148 to Asp, Gln or Ser and/or Ala 158 to Gly and other mutations disclosed in U.S. Pat. Nos. 4,709,017 and 4,950,740; mutation of at least one or more residues Lys 516, Lys 526, Phe 530 and/or Lys 534 and other mutations disclosed in U.S. Pat. Nos. 5,917,017 and 6,455,673; or fragment disclosed in U.S. Pat. No. 5,843,711, pneumococcal pneumolysin (ply) (Kuo et al. (1995) Infect Immun 63:2706-2713) including ply detoxified in some fashion, for example dPLY-GMBS (WO 2004/081515, WO 2006/032499) or dPLY-formol, PhtX, including PhtA, PhtB, PhtD, PhtE (sequences of PhtA, PhtB, PhtD or PhtE are disclosed in WO 00/37105 and WO 00/39299) and fusions of Pht proteins, for example PhtDE fusions, PhtBE fusions, Pht A-E (WO 01/98334, WO 03/054007, WO 2009/000826), OMPC (meningococcal outer membrane protein), which is usually extracted from *Neisseria meningitidis* serogroup B (EP0372501), PorB (from *N. meningitidis*), PD (*Haemophilus influenzae* protein D; see, e.g., EP0594610 B), or immunologically functional equivalents thereof, synthetic peptides (EP0378881, EP0427347), heat shock proteins (WO 93/17712, WO 94/03208), pertussis proteins (WO 98/58668, EP0471177), cytokines, lymphokines, growth factors or hormones (WO 91/01146), artificial proteins comprising multiple human CD4+ T cell epitopes from various pathogen derived antigens (Falugi et al. (2001) Eur J Immunol 31:3816-3824) such as N19 protein (Baraldoi et al. (2004) Infect Immun 72:4884-4887) pneumococcal surface protein PspA (WO 02/091998), iron uptake proteins (WO 01/72337), toxin A or B of *Clostridium difficile* (WO 00/61761), transferrin binding proteins, pneumococcal adhesion protein (PsaA), recombinant *Pseudomonas aeruginosa* exotoxin A (in particular non-toxic mutants thereof (such as exotoxin A bearing a substitution at glutamic acid 553 (Douglas et al. (1987) J. Bacteriol. 169(11): 4967-4971)). Other proteins, such as ovalbumin, keyhole limpet hemocyanin (KLH), bovine serum albumin (BSA) or purified protein derivative of tuberculin (PPD) also can be used as carrier proteins. Other suitable carrier proteins include inactivated bacterial toxins such as cholera toxoid (e.g., as described in WO 2004/083251), *Escherichia coli* LT, *E. coli* ST, and exotoxin A from *P. aeruginosa*.

In a preferred embodiment, the carrier protein of the glycoconjugates is independently selected from the group consisting of TT, DT, DT mutants (such as $CRM_{197}$), *H. influenzae* protein D, PhtX, PhtD, PhtDE fusions (particularly those described in WO 01/98334 and WO 03/054007), detoxified pneumolysin, PorB, N19 protein, PspA, OMPC, toxin A or B of *C. difficile* and PsaA.

In an embodiment, the carrier protein of the glycoconjugates of the invention is DT (Diphtheria toxoid). In another embodiment, the carrier protein of the glycoconjugates of the invention is TT (tetanus toxoid).

In another embodiment, the carrier protein of the glycoconjugates of the invention is PD (*H. influenzae* protein D; see, e.g., EP0594610 B).

In a preferred embodiment, the capsular saccharides of the invention are conjugated to $CRM_{197}$ protein. The $CRM_{197}$ protein is a nontoxic form of diphtheria toxin but is immunologically indistinguishable from the diphtheria toxin. $CRM_{197}$ is produced by *Corynebacterium diphtheriae* infected by the nontoxigenic phage $\beta 197^{tox-}$ created by nitrosoguanidine mutagenesis of the toxigenic corynephage beta (Uchida et al. (1971) Nature New Biology 233:8-11). The $CRM_{197}$ protein has the same molecular weight as the diphtheria toxin but differs therefrom by a single base change (guanine to adenine) in the structural gene. This single base change causes an amino acid substitution (glutamic acid for glycine) in the mature protein and eliminates the toxic properties of diphtheria toxin. The $CRM_{197}$ protein is a safe and effective T-cell dependent carrier for saccharides. Further details about $CRM_{197}$ and production thereof can be found, e.g., in U.S. Pat. No. 5,614,382.

In an embodiment, the capsular saccharides of the invention are conjugated to $CRM_{197}$ protein or the A chain of $CRM_{197}$ (see CN103495161). In an embodiment, the capsular saccharides of the invention are conjugated the A chain of $CRM_{197}$ obtained via expression by genetically recombinant *E. coli* (see CN103495161). In an embodiment, the capsular saccharides of the invention are all conjugated to $CRM_{197}$. In an embodiment, the capsular saccharides of the invention are all conjugated to the A chain of $CRM_{197}$.

Accordingly, in frequent embodiments, the glycoconjugates of the invention comprise $CRM_{197}$ as the carrier protein, wherein the capsular polysaccharide is covalently linked to $CRM_{197}$.

1.2 Capsular Saccharide of the Invention

The term "saccharide" throughout this specification may indicate polysaccharide or oligosaccharide and includes both. In frequent embodiments, the saccharide is a polysaccharide, in particular a *S. pneumoniae* capsular polysaccharide.

Capsular polysaccharides are prepared by standard techniques known to those of ordinary skill in the art.

In the present invention, capsular polysaccharides may be prepared, e.g., from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F of *S. pneumoniae*. Typically capsular polysaccharides are produced by growing each *S. pneumoniae* serotype in a medium (e.g., in a soy-based medium), the polysaccharides are then prepared from the bacteria culture. Bacterial strains of *S. pneumoniae* used to make the respective polysaccharides that are used in the glycoconjugates of the invention may be obtained from established culture collections or clinical specimens.

The population of the organism (each *S. pneumoniae* serotype) is often scaled up from a seed vial to seed bottles and passaged through one or more seed fermentors of increasing volume until production scale fermentation volumes are reached. At the end of the growth cycle the cells are lysed and the lysate broth is then harvested for downstream (purification) processing (see for example WO 2006/110381, WO 2008/118752, and U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2008/0102498 and 2008/0286838).

The individual polysaccharides are typically purified through centrifugation, precipitation, ultra-filtration, and/or column chromatography (see for example WO 2006/110352 and WO 2008/118752).

Purified polysaccharides may be activated (e.g., chemically activated) to make them capable of reacting (e.g., with the eTEC spacer) and then incorporated into glycoconjugates of the invention, as further described herein.

*S. pneumoniae* capsular polysaccharides comprise repeating oligosaccharide units which may contain up to 8 sugar residues.

In an embodiment, capsular saccharide of the invention may be one oligosaccharide unit or a shorter than native length saccharide chain of repeating oligosaccharide units.

In an embodiment, capsular saccharide of the invention is one repeating oligosaccharide unit of the relevant serotype.

In an embodiment, capsular saccharide of the invention may be oligosaccharides. Oligosaccharides have a low number of repeat units (typically 5-15 repeat units) and are typically derived synthetically or by hydrolysis of polysaccharides.

Preferably though, all of the capsular saccharides of the present invention and in the immunogenic compositions of the present invention are polysaccharides. High molecular weight capsular polysaccharides are able to induce certain antibody immune responses due to the epitopes present on the antigenic surface. The isolation and purification of high molecular weight capsular polysaccharides is preferably contemplated for use in the conjugates, compositions and methods of the present invention.

In some embodiments, the purified polysaccharides before conjugation have a molecular weight of between 10 kDa and 4,000 kDa. In other such embodiments, the polysaccharide has a molecular weight of between 50 kDa and 4,000 kDa. In further such embodiments, the polysaccharide has a molecular weight of between 50 kDa and 3,500 kDa; between 50 kDa and 3,000 kDa; between 50 kDa and 2,500 kDa; between 50 kDa and 2,000 kDa; between 50 kDa and 1,750 kDa; between 50 kDa and 1,500 kDa; between 50 kDa and 1,250 kDa; between 50 kDa and 1,000 kDa; between 50 kDa and 750 kDa; between 50 kDa and 500 kDa; between 100 kDa and 4,000 kDa; between 100 kDa and 3,500 kDa; 100 kDa and 3,000 kDa; 100 kDa and 2,500 kDa; 100 kDa and 2,000 kDa; between 100 kDa and 2,000 kDa; between 100 kDa and 1,750 kDa; between 100 kDa and 1,500 kDa; between 100 kDa and 1,250 kDa; between 100 kDa and 1,000 kDa; between 100 kDa and 750 kDa; between 100 kDa and 500 kDa; between 200 kDa and 4,000 kDa; between 200 kDa and 3,500 kDa; between 200 kDa and 3,000 kDa; between 200 kDa and 2,500 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 1,750 kDa; between 200 kDa and 1,500 kDa; between 200 kDa and 1,250 kDa; between 200 kDa and 1,000 kDa; between 200 kDa and 750 kDa; or between 200 kDa and 500 kDa. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

A polysaccharide can become slightly reduced in size during normal purification procedures. Additionally, as described herein, polysaccharide can be subjected to sizing techniques before conjugation. Mechanical or chemical sizing maybe employed. Chemical hydrolysis maybe conducted using acetic acid. Mechanical sizing maybe conducted using High Pressure Homogenization Shearing. The molecular weight ranges mentioned above refer to purified polysaccharides before conjugation (e.g., before activation).

In a preferred embodiment the purified polysaccharides, are capsular polysaccharide from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F or 33F of *S. pneumoniae*, wherein the capsular polysaccharide has a molecular weight falling within one of the molecular weight ranges as described here above.

As used herein, the term "molecular weight" of polysaccharide or of carrier protein-polysaccharide conjugate refers to molecular weight calculated by size exclusion chromatography (SEC) combined with multiangle laser light scattering detector (MALLS).

In some embodiments, the pneumococcal saccharides from serotypes 9V, 18C, 11A, 15B, 22F and/or 33F of the invention are O-acetylated. In some embodiments, the pneumococcal saccharides from serotypes 9V, 11A, 15B, 22F and/or 33F of the invention are O-acetylated.

The purified polysaccharides described herein are chemically activated to make the saccharides capable of reacting with the carrier protein. These pneumococcal conjugates are prepared by separate processes and formulated into a single dosage formulation as described below.

1.2.1 Pneumococcal Polysaccharide from *S. pneumoniae* Serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F

Capsular saccharides from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F may be prepared by standard techniques known to those of ordinary skill in the art (see for example WO 2006/110381). Capsular polysaccharides can be produced by growing each *S. pneumoniae* serotype in a medium; at the end of the growth cycle the cells are lysed and the lysate broth is then harvested for downstream (purification) processing. The individual polysaccharides are typically purified through centrifugation, precipitation, ultra-filtration, and/or column chromatography (see for example WO 2006/110352 and WO 2008/118752). Purified polysaccharides may be further processed as further described herein to prepare glycoconjugates of the invention.

In some embodiments, the purified polysaccharides from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and/or 23F before conjugation have a molecular weight of between 10 kDa and 4,000 kDa. In other such embodiments, the polysaccharide has a molecular weight of between 50 kDa and 4,000 kDa; between 50 kDa and 3,000 kDa or between 50 kDa and 2,000 kDa. In further such embodiments, the polysaccharide has a molecular weight of between 50 kDa and 3,500 kDa; between 50 kDa and 3,000 kDa; between 50 kDa and 2,500 kDa; between 50 kDa and 2,000 kDa; 50 kDa and 1,750 kDa; between 50 kDa and 1,500 kDa; between 50 kDa and 1,250 kDa; between 50 kDa and 1,000 kDa; between 50 kDa and 750 kDa; between 50 kDa and 500 kDa; between 100 kDa and 4,000 kDa; between 100 kDa and 3,500 kDa; between 100 kDa and 3,000 kDa; between 100 kDa and 2,500 kDa; between 100 kDa and 2,000 kDa; between 100 kDa and 1,750 kDa; between 100 kDa and 1,500 kDa; between 100 kDa and 1,250 kDa; between 100 kDa and 1,000 kDa; between 100 kDa and 750 kDa; between 100 kDa and 500 kDa; between

200 kDa and 4,000 kDa; between 200 kDa and 3,500 kDa; between 200 kDa and 3,000 kDa; between 200 kDa and 2,500 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 1,750 kDa; between 200 kDa and 1,500 kDa; between 200 kDa and 1,250 kDa; between 200 kDa and 1,000 kDa; between 200 kDa and 750 kDa; or between 200 kDa and 500 kDa. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

A polysaccharide can become slightly reduced in size during normal purification procedures. Additionally, as described herein, polysaccharide can be subjected to sizing techniques before conjugation. The molecular weight ranges mentioned above refer to purified polysaccharides before conjugation (e.g., before activation) after an eventual sizing step.

In some embodiments, the pneumococcal saccharides from serotypes 9V and/or 18C of the invention are O-acetylated. In some embodiments, the pneumococcal saccharide from serotype 9V of the invention is O-acetylated and the pneumococcal saccharide from serotype 18C of the invention is de-O-acetylated.

1.2.2 Pneumococcal Polysaccharide Serotype 8

The polysaccharide repeating unit of serotype 8 consists of a linear tetrasaccharide unit with one glucuronic acid (GlcpA), two glucopyranoses (Glcp) and one galactopyranose (Galp) (Jones et al. (1957) The Journal of the American Chemical Society. 79(11):2787-2793). All four monosaccharides are linked via 1,4-linkages as shown at FIG. **1**.

Serotype 8 saccharides can be obtained directly from bacteria using isolation procedures known to one of ordinary skill in the art (see for example methods disclosed in U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2007/0184071, 2007/0184072, 2007/0231340, and 2008/0102498 and WO 2008/118752). In addition, they can be produced using synthetic protocols.

Serotype 8 *S. pneumoniae* strains may be obtained from established culture collections (such as for example the Streptococcal Reference Laboratory (Centers for Disease Control and Prevention, Atlanta, Ga.)) or clinical specimens.

In some embodiments, the purified polysaccharides from *S. pneumoniae* serotype 8 before conjugation have a molecular weight of between 10 kDa and 2,000 kDa. In one embodiment, the capsular polysaccharide has a molecular weight of between 50 kDa and 1,000 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 70 kDa and 900 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 100 kDa and 800 kDa.

In further embodiments, the capsular polysaccharide has a molecular weight of 100 kDa to 600 kDa; 100 kDa to 500 kDa; 100 kDa to 400 kDa; 150 kDa to 600 kDa; 150 kDa to 500 kDa; 150 kDa to 400 kDa; 200 kDa to 600 kDa; 200 kDa to 500 kDa; 200 kDa to 400 kDa; 250 kDa to 600; 250 kDa to 500 kDa; 250 kDa to 400 kDa; 250 kDa to 350 kDa; 300 kDa to 600 kDa; 300 kDa to 500 kDa; 300 kDa to 400 kDa; 400 kDa to 600 kDa; 500 kDa to 600 kDa; and similar desired molecular weight ranges. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

A polysaccharide can become slightly reduced in size during normal purification procedures. Additionally, as described herein, polysaccharide can be subjected to sizing techniques before conjugation. The molecular weight ranges mentioned above refer to purified polysaccharides before conjugation (e.g., before activation) after an eventual sizing step.

1.2.3 Pneumococcal Polysaccharide Serotype 10A

The polysaccharide repeating unit of serotype 10A consists of a branched hexasaccharide repeat unit with two galactofuranoses ($Gal_f$), three galactopyranoses ($Gal_p$), one N-acetylgalactosamine ($Gal_pNAc$) and a backbone phosphoribitol (Jones, C. (1995) Carbohydrate Research 269(1):175-181). There are two branching monosaccharides at the β-GalpNAc moiety (a β-3-Galp and a β-6-Galf) as shown at FIG. **2**.

Serotype 10A saccharides can be obtained directly from bacteria using isolation procedures known to one of ordinary skill in the art (see for example methods disclosed in U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2007/0184071, 2007/0184072, 2007/0231340, and 2008/0102498 and WO 2008/118752). In addition, they can be produced using synthetic protocols.

Serotype 10A *S. pneumoniae* strains may be obtained from established culture collections (such as for example the Streptococcal Reference Laboratory (Centers for Disease Control and Prevention, Atlanta, Ga.)) or clinical specimens.

In some embodiments, the purified polysaccharides from *S. pneumoniae* serotype 10A before conjugation have a molecular weight of between 10 kDa and 2,000 kDa. In one embodiment, the capsular polysaccharide has a molecular weight of between 50 kDa and 1,000 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 70 kDa and 900 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 100 kDa and 800 kDa.

In further embodiments, the capsular polysaccharide has a molecular weight of 100 kDa to 600 kDa; 100 kDa to 500 kDa; 100 kDa to 400 kDa; 150 kDa to 600 kDa; 150 kDa to 500 kDa; 150 kDa to 400 kDa; 200 kDa to 600 kDa; 200 kDa to 500 kDa; 200 kDa to 400 kDa; 250 kDa to 600 kDa; 250 kDa to 500 kDa; 250 kDa to 400 kDa; 250 kDa to 350 kDa; 300 kDa to 600 kDa; 300 kDa to 500 kDa; 300 kDa to 400 kDa; 400 kDa to 600 kDa; 500 kDa to 600 kDa; and similar desired molecular weight ranges. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

A polysaccharide can become slightly reduced in size during normal purification procedures. Additionally, as described herein, polysaccharide can be subjected to sizing techniques before conjugation. The molecular weight ranges mentioned above refer to purified polysaccharides before conjugation (e.g., before activation) after an eventual sizing step.

1.2.4 Pneumococcal Polysaccharide Serotype 11A

The polysaccharide repeating unit of serotype 11A consists of a linear tetrasaccharide backbone (two galactopyranoses ($Gal_p$) and two glucopyranose ($Glc_p$) and a pendent phosphoglycerol (Richards et al. (1988) Adv. Exp. Med. Biol. 228:595-597), as shown at FIG. **3**. The polysaccharide is O-acetylated at multiple locations and, based on the reported data in the literature (Calix et al. (2011) J Bacteriol. 193(19):5271-5278), the total amount of O-acetylation in 11A polysaccharide is about 2.6 O-acetyl groups per polysaccharide repeat unit.

Serotype 11A saccharides can be obtained directly from bacteria using isolation procedures known to one of ordinary skill in the art (see for example methods disclosed in U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2007/0184071, 2007/0184072, 2007/0231340, and 2008/0102498 and WO 2008/118752). In addition, they can be produced using synthetic protocols.

Serotype 11A *S. pneumoniae* strains may be obtained from established culture collections (such as for example the

Streptococcal Reference Laboratory (Centers for Disease Control and Prevention, Atlanta, Ga.)) or clinical specimens.

The isolated serotype 11A capsular polysaccharide obtained by purification of serotype 11A polysaccharide from the *S. pneumoniae* lysate and optionally sizing of the purified polysaccharide may be characterized by different attributes including, for example, the molecular weight (MW) and the mM of acetate per mM of said serotype 11A capsular polysaccharide.

In some embodiments, the purified polysaccharides from *S. pneumoniae* serotype 11A before conjugation have a molecular weight of between 10 kDa and 2,000 kDa. In one embodiment, the capsular polysaccharide has a molecular weight of between 50 kDa and 1,000 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 70 kDa and 900 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 100 kDa and 800 kDa.

In further embodiments, the capsular polysaccharide has a molecular weight of 100 kDa to 600 kDa; 100 kDa to 500 kDa; 100 kDa to 400 kDa; 100 kDa to 300 kDa; 100 kDa to 200 kDa; 150 kDa to 600 kDa; 150 kDa to 500 kDa; 150 kDa to 400 kDa; 150 kDa to 300 kDa; 150 kDa to 200 kDa; 200 kDa to 600 kDa; 200 kDa to 500 kDa; 200 kDa to 400 kDa; 250 kDa to 600 kDa; 250 kDa to 500 kDa; 250 kDa to 400 kDa; 250 kDa to 350 kDa; 300 kDa to 600 kDa; 300 kDa to 500 kDa; 300 kDa to 400 kDa; 400 kDa to 600 kDa; 500 kDa to 600 kDa; and similar desired molecular weight ranges. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

A polysaccharide can become slightly reduced in size during normal purification procedures. Additionally, as described herein, polysaccharide can be subjected to sizing techniques before conjugation. The molecular weight ranges mentioned above refer to purified polysaccharides before conjugation (e.g., before activation) after an eventual sizing step.

In an embodiment, the size of the purified serotype 11A polysaccharide is reduced by high pressure homogenization. High pressure homogenization achieves high shear rates by pumping the process stream through a flow path with sufficiently small dimensions. The shear rate is increased by using a larger applied homogenization pressure, and exposure time can be increased by recirculating the feed stream through the homogenizer.

The high pressure homogenization process is particularly appropriate for reducing the size of the purified serotype 11A polysaccharide while preserving the structural features of the polysaccharide, such as the presence of O-acetyl groups.

The presence of O-acetyl in a purified, isolated or activated serotype 11A capsular polysaccharide or in a serotype 11A polysaccharide-carrier protein conjugate is expressed as the number of mM of acetate per mM of said polysaccharide or as the number of O-acetyl group per polysaccharide repeating unit.

In a preferred embodiment, the purified polysaccharides from *S. pneumoniae* serotype 11A has at least 0.2, 0.4, 0.6, 0.8, 1.0, 1.2, 1.4 or 1.6, μmol acetate per μmol of said serotype 11A capsular polysaccharide.

1.2.5 Pneumococcal Polysaccharide Serotype 12F

The polysaccharide repeating unit of serotype 12F consists of a linear trisaccharide backbone (one N-acetylfucosamine ($Fuc_p$NAc), one N-acetylgalactosamine ($Gal_p$-NAc) and one N-acetylmannuronic acid ($Man_p$NAcA)) with two branches: a pendant α-galactopyranose ($Gal_p$) linked at C3 of $Fuc_p$NAc and an α-$Glc_p$-(1→2)-α-$Glc_p$ disaccharide branch linked at C3 of $Man_p$NAcA (Leontein et al. (1983) Carbohydrate Research 114(2):257-266.) as shown at FIG. **4**.

Serotype 12F *Streptococcus pneumoniae* strains may be obtained from established culture collections (such as for example the Streptococcal Reference Laboratory (Centers for Disease Control and Prevention, Atlanta, Ga.)) or clinical specimens.

Capsular saccharides from *S. pneumoniae* serotype 12F are prepared by standard techniques known to those of ordinary skill in the art. Typically capsular polysaccharides are produced by growing each *S. pneumoniae* serotype in a medium (e.g., in a soy-based medium), the polysaccharides are then prepared from the bacteria culture. The population of the organism (*S. pneumoniae* serotype 12F) is often scaled up from a seed vial to seed bottles and passaged through one or more seed fermentors of increasing volume until production scale fermentation volumes are reached. At the end of the growth cycle the cells are lysed and the lysate broth is then harvested for downstream (purification) processing (see for example WO 2006/110381 and WO 2008/118752, U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2008/0102498 and US2008/0286838). The polysaccharides are typically purified through centrifugation, precipitation, ultra-filtration, and/or column chromatography (see for example WO 2006/110352 and WO 2008/118752).

Purified polysaccharides from serotype 12F may be activated (e.g., chemically activated) to make them capable of reacting and then incorporated into glycoconjugates of the invention, as further described herein.

In some embodiments, the purified polysaccharides from *S. pneumoniae* serotype 12F before conjugation have a molecular weight of between 10 kDa and 2,000 kDa. In one embodiment, the capsular polysaccharide has a molecular weight of between 50 kDa and 1,000 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 50 kDa and 300 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 70 kDa and 300 kDa. In further embodiments, the capsular polysaccharide has a molecular weight of 90 kDa to 250 kDa; 90 kDa to 150 kDa; 90 kDa to 120 kDa; 80 kDa to 120 kDa; 70 kDa to 100 kDa; 70 kDa to 110 kDa; 70 kDa to 120 kDa; 70 kDa to 130 kDa; 70 kDa to 140 kDa; 70 kDa to 150 kDa; 70 kDa to 160 kDa; 80 kDa to 110 kDa; 80 kDa to 120 kDa; 80 kDa to 130 kDa; 80 kDa to 140 kDa; 80 kDa to 150 kDa; 80 kDa to 160 kDa; 90 kDa to 110 kDa; 90 kDa to 120 kDa; 90 kDa to 130 kDa; 90 kDa to 140 kDa; 90 kDa to 150 kDa; 90 kDa to 160 kDa; 100 kDa to 120 kDa; 100 kDa to 130 kDa; 100 kDa to 140 kDa; 100 kDa to 150 kDa; 100 kDa to 160 kDa; and similar desired molecular weight ranges. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

A polysaccharide can become slightly reduced in size during normal purification procedures. Additionally, as described herein, polysaccharide can be subjected to sizing techniques before conjugation. The molecular weight ranges mentioned above refer to purified polysaccharides before conjugation (e.g., before activation) after an eventual sizing step.

1.2.6 Pneumococcal Polysaccharide Serotype 15B

As shown at FIG. **5**, the polysaccharide repeating unit of serotype 15B consists of a branched trisaccharide backbone (one N-acetylglucosamine ($Glc_p$NAc), one galactopyranose ($Gal_p$) and one glucopyranose ($Glc_p$)) with an α$Gal_p$-β$Gal_p$ disaccharide branch linked to the C4 hydroxyl group of $Glc_p$NAc. The phosphoglycerol is linked to the C3 hydroxyl

group of the $\beta Gal_p$ residue in the disaccharide branch (Jones et al. (2005) Carbohydrate Research 340(3):403-409). Capsular polysaccharide from serotype 15C serotype has the identical backbone structure as serotype 15B but lacks the O-acetylation.

Serotype 15B polysaccharides can be obtained directly from bacteria using isolation procedures known to one of ordinary skill in the art (see for example methods disclosed in U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2007/0184071, 2007/0184072, 2007/0231340, and 2008/0102498 and WO 2008/118752). They can also be produced using synthetic protocols known to the man skilled in the art.

Serotype 15B *S. pneumoniae* strains may be obtained from established culture collections (such as for example the American Type Culture Collection (ATCC, Manassas, Va. USA) (e.g., deposit strain No. ATCC10354) or the Streptococcal Reference Laboratory (Centers for Disease Control and Prevention, Atlanta, Ga. USA)) or from clinical specimens.

The bacterial cells are grown in a medium, preferably in a soy based medium. Following fermentation of bacterial cells that produce *S. pneumoniae* serotype 15B capsular polysaccharides, the bacterial cells are lysed to produce a cell lysate. The serotype 15B polysaccharide may then be isolated from the cell lysate using purification techniques known in the art, including the use of centrifugation, depth filtration, precipitation, ultra-filtration, treatment with activate carbon, diafiltration and/or column chromatography (see, for example, U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2007/0184071, 2007/0184072, 2007/0231340, and 2008/0102498 and WO 2008/118752). The purified serotype 15B capsular polysaccharide can then be used for the preparation of immunogenic conjugates.

The isolated serotype 15B capsular polysaccharide obtained by purification of serotype 15B polysaccharide from the *S. pneumoniae* lysate and optionally sizing of the purified polysaccharide can be characterized by different parameters including, for example, the molecular weight (MW), the mM of acetate per mM of said serotype 15B capsular polysaccharide and the mM of glycerol per mM of said serotype 15B capsular polysaccharide.

Preferably, in order to generate 15B conjugates with advantageous filterability characteristics and/or yields, sizing of the polysaccharide to a target molecular weight range is performed prior to the conjugation to a carrier protein. Advantageously, the size of the purified serotype 15B polysaccharide is reduced while preserving critical features of the structure of the polysaccharide such as for example the presence of O-acetyl groups. Preferably, the size of the purified serotype 15B polysaccharide is reduced by mechanical homogenization.

In a preferred embodiment, the size of the purified serotype 15B polysaccharide is reduced by high pressure homogenization. High pressure homogenization achieves high shear rates by pumping the process stream through a flow path with sufficiently small dimensions. The shear rate is increased by using a larger applied homogenization pressure, and exposure time can be increased by recirculating the feed stream through the homogenizer.

The high pressure homogenization process is particularly appropriate for reducing the size of the purified serotype 15B polysaccharide while preserving the structural features of the polysaccharide, such as the presence of O-acetyl groups.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 5 kDa and 500 kDa, between 50 kDa and 500 kDa, between 50 kDa and 450 kDa, between 100 kDa and 400 kDa, and between 100 kDa and 350 kDa. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 350 kDa. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 300 kDa. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 150 kDa and 300 kDa. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 150 kDa and 350 kDa. In further embodiments, the capsular polysaccharide has a molecular weight of 100 kDa to 500 kDa; 100 kDa to 400 kDa; 100 kDa to 300 kDa; 100 kDa to 200 kDa; 150 kDa to 500 kDa; 150 kDa to 400 kDa; 150 kDa to 300 kDa; 150 kDa to 200 kDa; 200 kDa to 500 kDa; 200 kDa to 400 kDa; 250 kDa to 500 kDa; 250 kDa to 400 kDa; 250 kDa to 350 kDa; 300 kDa to 500 kDa; 300 kDa to 400 kDa; and similar desired molecular weight ranges. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

Serotype 15B polysaccharide is O-acetylated and the total amount of O-acetylation is approximately 0.8-0.9 O-acetyl groups per polysaccharide repeating unit. The degree of O-acetylation of the polysaccharide can be determined by any method known in the art, for example, by proton NMR (see for example Lemercinier et al. (1996) Carbohydrate Research 296:83-96; Jones et al. (2002) J. Pharmaceutical and Biomedical Analysis 30:1233-1247; WO 2005/033148 and WO 00/56357). Another commonly used method is described in Hestrin, S. (1949) J. Biol. Chem. 180:249-261. Preferably, the presence of O-acetyl groups is determined by ion-HPLC analysis.

The presence of O-acetyl in a purified, isolated or activated serotype 15B capsular polysaccharide or in a serotype 15B polysaccharide-carrier protein conjugate is expressed as the number of mM of acetate per mM of said polysaccharide or as the number of O-acetyl group per polysaccharide repeating unit.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7 or 0.8 mM acetate per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide comprises at least 0.5, 0.6 or 0.7 mM acetate per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide comprises at least 0.7 mM acetate per mM of said serotype 15B capsular polysaccharide.

The presence of glycerolphosphate side chains is determined by measurement of glycerol using high performance anion exchange chromatography with pulsed amperometric detection (HPAEC-PAD) after its release by treatment of the polysaccharide with hydrofluoric acid (HF). The presence of glycerol in a purified, isolated or activated serotype 15B polysaccharide or in a serotype 15B polysaccharide-carrier protein conjugate is expressed as the number of mM of glycerol per mM of serotype 15B polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7 or 0.8 mM glycerol per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide comprises

at least 0.5, 0.6 or 0.7 mM glycerol per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide comprises at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the isolated serotype 15B capsular polysaccharide comprises at least 0.7 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 350 kDa and comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 350 kDa and comprises at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 150 kDa and 300 kDa and comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 150 kDa and 300 kDa and comprises at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 150 kDa and 350 kDa and comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 150 kDa and 350 kDa and comprises at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide and at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 350 kDa and comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide and at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 150 kDa and 300 kDa and comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide and at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the isolated serotype 15B capsular polysaccharide has a molecular weight between 150 kDa and 350 kDa and comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide and at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

1.2.7 Pneumococcal Polysaccharide Serotype 22F

As shown at FIG. **6**, the polysaccharide repeating unit of serotype 22F consists of a branched pentasaccharide backbone (one glucuronic acid ($Glc_pA$), one glucopyranose ($Glc_p$), one galactofuranose ($Gal_f$) and two rhamnopyranoses ($Rha_p$)) with a $\alpha Glc_p$ branch linked to the C3 hydroxyl group of $\beta Rha_p$ (Richards et al. (1989) Canadian Journal of Chemistry 67(6):1038-1050). Approximately 80% of the C2 hydroxyl groups of the $\beta Rha_p$ residue in the polysaccharide repeating unit are O-acetylated.

Serotype 22F polysaccharides can be obtained directly from bacteria using isolation procedures known to one of ordinary skill in the art (see for example methods disclosed in U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2007/0184071, 2007/0184072, 2007/0231340, and 2008/0102498 and WO 2008/118752). In addition, they can be produced using synthetic protocols.

Serotype 22F *S. pneumoniae* strains may be obtained from established culture collections (such as for example the Streptococcal Reference Laboratory (Centers for Disease Control and Prevention, Atlanta, Ga.)) or clinical specimens.

The isolated serotype 22F capsular polysaccharide obtained by purification of serotype 22F polysaccharide from the *S. pneumoniae* lysate and optionally sizing of the purified polysaccharide can be characterized by different parameters including, for example, the molecular weight (MW) and the mM of acetate per mM of said serotype 22F capsular polysaccharide.

Preferably, in order to generate serotype 22F conjugates with advantageous filterability characteristics and/or yields, sizing of the polysaccharide to a target molecular weight range is performed prior to the conjugation to a carrier protein. Advantageously, the size of the purified serotype 22F polysaccharide is reduced while preserving critical features of the structure of the polysaccharide such as for example the presence of O-acetyl group. Preferably, the size of the purified serotype 22F polysaccharide is reduced by mechanical homogenization.

In a preferred embodiment, the size of the purified polysaccharide is reduced by high pressure homogenization. High pressure homogenization achieves high shear rates by pumping the process stream through a flow path with sufficiently small dimensions. The shear rate is increased by using a larger applied homogenization pressure, and exposure time can be increased by recirculating the feed stream through the homogenizer.

The high pressure homogenization process is particularly appropriate for reducing the size of the purified serotype 22F polysaccharide while preserving the structural features of the polysaccharide, such as the presence of O-acetyl groups.

In some embodiments, the purified polysaccharides from *S. pneumoniae* serotype 22F before conjugation have a molecular weight of between 10 kDa and 2,000 kDa. In one embodiment, the capsular polysaccharide has a molecular weight of between 50 kDa and 1,000 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 70 kDa to 900 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 100 kDa to 800 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 200 kDa to 600 kDa. In another embodiment, the capsular polysaccharide has a molecular weight of between 400 kDa to 700 kDa.

In further embodiments, the capsular polysaccharide has a molecular weight of 100 kDa to 1,000 kDa; 100 kDa to 900 kDa; 100 kDa to 800 kDa; 100 kDa to 700 kDa; 100 kDa to 600 kDa; 100 kDa to 500 kDa; 100 kDa to 400 kDa; 100 kDa to 300 kDa; 150 kDa to 1,000 kDa; 150 kDa to 900 kDa; 150 kDa to 800 kDa; 150 kDa to 700 kDa; 150 kDa to 600 kDa; 150 kDa to 500 kDa; 150 kDa to 400 kDa; 150 kDa to 300 kDa; 200 kDa to 1,000 kDa; 200 kDa to 900 kDa; 200 kDa to 800 kDa; 200 kDa to 700 kDa; 200 kDa to 600 kDa; 200 kDa to 500 kDa; 200 kDa to 400 kDa; 200 kDa to 300 kDa; 250 kDa to 1,000 kDa; 250 kDa to 900 kDa; 250 kDa to 800 kDa; 250 kDa to 700 kDa; 250 kDa to 600 kDa; 250 kDa to

500 kDa; 250 kDa to 400 kDa; 250 kDa to 350 kDa; 300 kDa to 1,000 kDa; 300 kDa to 900 kDa; 300 kDa to 800 kDa; 300 kDa to 700 kDa; 300 kDa to 600 kDa; 300 kDa to 500 kDa; 300 kDa to 400 kDa; 400 kDa to 1,000 kDa; 400 kDa to 900 kDa; 400 kDa to 800 kDa; 400 kDa to 700 kDa; 400 kDa to 600 kDa; 500 kDa to 600 kDa; and similar desired molecular weight ranges. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

A polysaccharide can become slightly reduced in size during normal purification procedures. Additionally, as described hereabove, 22F polysaccharide can be subjected to sizing techniques before conjugation. The molecular weight ranges mentioned above refer to purified polysaccharides before conjugation (e.g., before activation) after an eventual sizing step.

The degree of O-acetylation of the polysaccharide can be determined by any method known in the art, for example, by proton NMR (Lemercinier et al. (1996) Carbohydrate Research 296:83-96; Jones et al. (2002) J. Pharmaceutical and Biomedical Analysis 30:1233-1247; WO 2005/033148 and WO 00/56357). Another commonly used method is described in Hestrin, S. (1949) J. Biol. Chem. 180:249-261. Preferably, the presence of O-acetyl groups is determined by ion-HPLC analysis.

The presence of O-acetyl in a purified, isolated or activated serotype 22F capsular polysaccharide or in a serotype 22F polysaccharide-carrier protein conjugate is expressed as the number of mM of acetate per mM of said polysaccharide or as the number of O-acetyl group per polysaccharide repeating unit.

In a preferred embodiment, the purified polysaccharides from *S. pneumoniae* serotype 22F has at least 0.2, 0.4, 0.6, 0.8, 1, 1.2, 1.4 or 1.6, μmol acetate per μmol of said serotype 22F capsular polysaccharide.

1.2.8 Pneumococcal Polysaccharide Serotype 33F

As shown at FIG. **7**, the polysaccharide repeating unit of serotype 33F consists of a branched pentasaccharide backbone (two galactopyranoses ($Gal_p$), two galactofuranoses ($Gaf_f$) and one glucopyranose ($Glc_p$) with a terminal $\alpha Gal_p$ linked to the C2 hydroxyl group of $\alpha Gal_p$ residue within the backbone (Lemercinier et al. (2006) Carbohydrate Research 341(1):68-74.). It has been reported in the literature that the C2 hydroxyl group of the backbone 3-β-$Gal_f$ residue is O-acetylated.

Serotype 33F polysaccharides can be obtained directly from bacteria using isolation procedures known to one of ordinary skill in the art (see for example methods disclosed in U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2007/0184071, 2007/0184072, 2007/0231340, and 2008/0102498 and WO 2008/118752). In addition, they can be produced using synthetic protocols.

Serotype 33F *S. pneumoniae* strains may be obtained from established culture collections (such as for example the Streptococcal Reference Laboratory (Centers for Disease Control and Prevention, Atlanta, Ga.)) or clinical specimens.

Purified polysaccharides from serotype 33F may be activated (e.g., chemically activated) to make them capable of reacting and then incorporated into glycoconjugates of the invention, as further described herein.

The isolated serotype 33F capsular polysaccharide obtained by purification of serotype 33F polysaccharide from the *S. pneumoniae* lysate and optionally sizing of the purified polysaccharide can be characterized by different parameters including, for example, the molecular weight and the mM of acetate per mM of said serotype 33F capsular polysaccharide.



In some embodiments, the purified polysaccharides from *S. pneumoniae* serotype 33F before conjugation have a molecular weight of between 10 kDa and 2,000 kDa. In other such embodiments, the saccharide has a molecular weight of between 50 kDa and 2,000 kDa. In further such embodiments, the saccharide has a molecular weight of between 50 kDa and 1,750 kDa; between 50 kDa and 1,500 kDa; between 50 kDa and 1,250 kDa; between 50 kDa and 1,000 kDa; between 50 kDa and 750 kDa; between 50 kDa and 500 kDa; between 100 kDa and 2,000 kDa; between 100 kDa and 1,750 kDa; between 100 kDa and 1,500 kDa; between 100 kDa and 1,250 kDa; between 100 kDa and 1,000 kDa; between 100 kDa and 750 kDa; between 100 kDa and 500 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 1,750 kDa; between 200 kDa and 1,500 kDa; between 200 kDa and 1,250 kDa; between 200 kDa and 1,000 kDa; between 200 kDa and 750 kDa; or between 200 kDa and 500 kDa. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

A polysaccharide can become slightly reduced in size during normal purification procedures. Additionally, as described herein, polysaccharide can be subjected to sizing techniques before conjugation. The molecular weight ranges mentioned above refer to purified polysaccharides before conjugation (e.g., before activation) after an eventual sizing step.

The presence of O-acetyl in a purified, isolated or activated serotype 33F capsular polysaccharide or in a serotype 33F polysaccharide-carrier protein conjugate is expressed as the number of mM of acetate per mM of said polysaccharide or as the number of O-acetyl group per polysaccharide repeating unit.

In a preferred embodiment, the purified polysaccharides from *S. pneumoniae* serotype 33F has at least 0.2, 0.4, 0.6, 0.8, 1.0, 1.2, 1.4 or 1.6, μmol acetate per μmol of said serotype 33F capsular polysaccharide.

1.3 Glycoconjugates of the Invention

The purified saccharides are chemically activated to make the saccharides (i.e., activated saccharides) capable of reacting with the carrier protein. Once activated, each capsular saccharide is separately conjugated to a carrier protein to form a glycoconjugate. In one embodiment, each capsular saccharide is conjugated to the same carrier protein. The chemical activation of the saccharides and subsequent conjugation to the carrier protein can be achieved by the activation and conjugation methods disclosed herein.

1.3.1 Glycoconjugates from *S. pneumoniae* Serotype 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F

Capsular polysaccharides from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F of *S. pneumoniae* are prepared by standard techniques known to those of ordinary skill in the art (see for example WO 2006/110381, WO 2008/118752, WO 2006/110352, and U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2008/0102498 and 2008/0286838).

In an embodiment, the polysaccharides are activated with 1-cyano-4-dimethylamino pyridinium tetrafluoroborate (CDAP) to form a cyanate ester. The activated polysaccharide is then coupled directly or via a spacer (linker) group to an amino group on the carrier protein (preferably $CRM_{197}$). For example, the spacer could be cystamine or cysteamine to give a thiolated polysaccharide which could be coupled to the carrier via a thioether linkage obtained after reaction with a maleimide-activated carrier protein (for example using N-[γ-maleimidobutyrloxy]succinimide ester (GMBS)) or a haloacetylated carrier protein (for example using iodo-

acetimide, N-succinimidyl bromoacetate (SBA; SIB), N-succinimidyl(4-iodoacetyl)aminobenzoate (SIAB), sulfo-succinimidyl(4-iodoacetyl)aminobenzoate (sulfo-SIAB), N-succinimidyl iodoacetate (SIA) or succinimidyl 3-[bromoacetamido]proprionate (SBAP)). Preferably, the cyanate ester (optionally made by CDAP chemistry) is coupled with hexane diamine or adipic acid dihydrazide (ADH) and the amino-derivatised saccharide is conjugated to the carrier protein (e.g., $CRM_{197}$) using carbodiimide (e.g., EDAC or EDC) chemistry via a carboxyl group on the protein carrier. Such conjugates are described for example in WO 93/15760, WO 95/08348 and WO 96/29094.

Other suitable techniques for conjugation use carbodiimides, hydrazides, active esters, norborane, p-nitrobenzoic acid, N-hydroxysuccinimide, S—NHS, EDC, TSTU. Many are described in International Patent Application Publication No. WO 98/42721. Conjugation may involve a carbonyl linker which may be formed by reaction of a free hydroxyl group of the saccharide with 1,1'-carbonyldiimidazole (CDI) (see Bethell et al. (1979) J. Biol. Chem. 254:2572-2574; Hearn et al. (1981) J. Chromatogr. 218:509-518) followed by reaction with a protein to form a carbamate linkage. This may involve reduction of the anomeric terminus to a primary hydroxyl group, optional protection/deprotection of the primary hydroxyl group, reaction of the primary hydroxyl group with CDI to form a CDI carbamate intermediate and coupling the CDI carbamate intermediate with an amino group on a protein.

In an preferred embodiment, at least one of capsular polysaccharides from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F of *S. pneumoniae* is conjugated to the carrier protein by reductive amination (such as described in U.S. Patent Appl. Pub. Nos. 2006/0228380, 2007/0231340, 2007/0184071 and 2007/0184072, WO 2006/110381, WO 2008/079653, and WO 2008/143709). In a preferred embodiment, the capsular polysaccharides from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F of *S. pneumoniae* are all conjugated to the carrier protein by reductive amination.

Reductive amination involves two steps, (1) oxidation of the polysaccharide, (2) reduction of the activated polysaccharide and a carrier protein to form a conjugate. Before oxidation, the polysaccharide is optionally hydrolyzed. Mechanical or chemical hydrolysis may be employed. Chemical hydrolysis may be conducted using acetic acid. The oxidation step may involve reaction with periodate. For the purpose of the present invention, the term "periodate" includes both periodate and periodic acid; the term also includes both metaperiodate ($IO_4^-$) and orthoperiodate ($IO_6^{5-}$) and the various salts of periodate (e.g., sodium periodate and potassium periodate).

In an embodiment the capsular polysaccharide from serotype 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F or 23F of *S. pneumoniae* is oxidized in the presence of metaperiodate, preferably in the presence of sodium periodate ($NaIO_4$). In another embodiment the capsular polysaccharides from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F of *S. pneumoniae* is oxydized in the presence of orthoperiodate, preferably in the presence of periodic acid.

Following the oxidation step of the polysaccharide, the polysaccharide is said to be activated and is referred to as "activated polysaccharide" here below. The activated polysaccharide and the carrier protein may be lyophilised (freeze-dried), either independently (discrete lyophilization) or together (co-lyophilized). In one embodiment the activated polysaccharide and the carrier protein are co-lyophilized. In another embodiment the activated polysaccharide and the carrier protein are lyophilized independently.

In one embodiment the lyophilization takes place in the presence of a non-reducing sugar, possible non-reducing sugars include sucrose, trehalose, raffinose, stachyose, melezitose, dextran, mannitol, lactitol and palatinit.

The second step of the conjugation process is the reduction of the activated polysaccharide and a carrier protein to form a conjugate (so-called reductive amination), using a reducing agent. Reducing agents which are suitable include the cyanoborohydrides, such as sodium cyanoborohydride, borane-pyridine, or borohydride exchange resin. In one embodiment the reducing agent is sodium cyanoborohydride.

In an embodiment, the reduction reaction is carried out in aqueous solvent, in another embodiment the reaction is carried out in aprotic solvent. In an embodiment, the reduction reaction is carried out in DMSO (dimethylsulfoxide) or in DMF (dimethylformamide) solvent. The DMSO or DMF solvent may be used to reconstitute the activated polysaccharide and carrier protein which has been lyophilized.

At the end of the reduction reaction, there may be unreacted aldehyde groups remaining in the conjugates, these may be capped using a suitable capping agent. In one embodiment this capping agent is sodium borohydride ($NaBH_4$). Following the conjugation (the reduction reaction and optionally the capping), the glycoconjugates may be purified. The glycoconjugates maybe purified by diafiltration and/or ion exchange chromatography and/or size exclusion chromatography. In an embodiment, the glycoconjugates are purified by diafiltration or ion exchange chromatography or size exclusion chromatography. In one embodiment the glycoconjugates are sterile filtered.

In some embodiments, the glycoconjugate from *S. pneumoniae* serotypes 9V and/or 18C comprise a saccharide which has a degree of O-acetylation of between 10% and 100%, between 20% and 100%, between 30% and 100%, between 40% and 100%, between 50% and 100%, between 60% and 100%, between 70% and 100%, between 75% and 100%, between 80% and 100%, between 90% and 100%, between 50% and 90%, between 60% and 90%, between 70% and 90% or between 80% and 90%. In other embodiments, the degree of O-acetylation is ≥10%, ≥20%, ≥30%, ≥40%, ≥50%, ≥60%, ≥70%, ≥80%, or ≥90%, or about 100%.

In some embodiments, the glycoconjugate from *S. pneumoniae* serotypes 9V and/or 18C of the invention are O-acetylated. In some embodiments, the glycoconjugate from *S. pneumoniae* serotype 9V is O-acetylated and the glycoconjugate from *S. pneumoniae* serotype 18C is de-O-acetylated.

1.3.2 Glycoconjugates from *S. pneumoniae* Serotype 22F

In an embodiment, the serotype 22F glycoconjugates are obtained by activating polysaccharide with 1-cyano-4-dimethylamino pyridinium tetrafluoroborate (CDAP) to form a cyanate ester. The activated polysaccharide may be coupled directly or via a spacer (linker) group to an amino group on the carrier protein. For example, the spacer could be cystamine or cysteamine to give a thiolated polysaccharide which could be coupled to the carrier via a thioether linkage obtained after reaction with a maleimide-activated carrier protein (for example using GMBS) or a haloacetylated carrier protein (for example using iodoacetimide, SIB, SIAB, sulfo-SIAB, SIA, or SBAP). Preferably, the cyanate ester (optionally made by CDAP chemistry) is coupled with hexane diamine or adipic acid dihydrazide (ADH) and the amino-derivatised saccharide is conjugated to the carrier

protein using carbodiimide (e.g., EDAC or EDC) chemistry via a carboxyl group on the protein carrier. Such conjugates are described for example in WO 93/15760, WO 95/08348 and WO 96/29094.

Other suitable techniques use carbodiimides, hydrazides, active esters, norborane, p-nitrobenzoic acid, N-hydroxysuccinimide, S—NHS, EDC, TSTU. Many are described in International Patent Application Publication No. WO 98/42721. Conjugation may involve a carbonyl linker which may be formed by reaction of a free hydroxyl group of the saccharide with CDI (see Bethell et al. (1979) J. Biol. Chem. 254:2572-2574; Hearn et al. (1981) J. Chromatogr. 218:509-518) followed by reaction with a protein to form a carbamate linkage. This may involve reduction of the anomeric terminus to a primary hydroxyl group, optional protection/deprotection of the primary hydroxyl group, reaction of the primary hydroxyl group with CDI to form a CDI carbamate intermediate and coupling the CDI carbamate intermediate with an amino group on a protein.

In preferred embodiments, the serotype 22F glycoconjugates of the invention are prepared using reductive amination. Reductive amination involves two steps, (1) oxidation of the polysaccharide to generate aldehyde functionalities from vicinal diols in individual hexasaccharide unit, (2) reduction of the activated polysaccharide and a carrier protein (e.g., $CRM_{197}$) to form a conjugate.

Preferably, before oxidation, sizing of the serotype 22F polysaccharide to a target molecular weight (MW) range is performed. Advantageously, the size of the purified serotype 22F polysaccharide is reduced while preserving critical features of the structure of the polysaccharide such as for example the presence of O-acetyl groups. Preferably, the size of the purified serotype 22F polysaccharide is reduced by mechanical homogenization (see section 1.2.7 above).

In an embodiment, serotype polysaccharide is activated (oxidized) by a process comprising the step of:

(a) reacting isolated serotype 22F polysaccharide with an oxidizing agent;

(b) quenching the oxidation reaction by addition of a quenching agent resulting in an activated serotype 22F polysaccharide.

In a preferred embodiment, the oxidizing agent is periodate. For the purpose of the present invention, the term "periodate" includes both periodate and periodic acid; the term also includes both metaperiodate ($IO_4^-$) and orthoperiodate ($IO_6^{5-}$) and the various salts of periodate (e.g., sodium periodate and potassium periodate). In a preferred embodiment, the oxidizing agent is sodium periodate. In a preferred embodiment, the periodate used for the oxidation of serotype 22F polysaccharide is metaperiodate. In a preferred embodiment the periodate used for the oxidation of serotype 22F polysaccharide is sodium metaperiodate.

In one embodiment, the quenching agent is selected from vicinal diols, 1,2-aminoalcohols, amino acids, glutathione, sulfite, bisulfate, dithionite, metabisulfite, thiosulfate, phosphites, hypophosphites or phosphorous acid.

In one embodiment, the quenching agent is a 1,2-aminoalcohols of formula (I):

(I)




wherein $R^1$ is selected from H, methyl, ethyl, propyl or isopropyl.

In one embodiment, the quenching agent is selected from sodium and potassium salts of sulfite, bisulfate, dithionite, metabisulfite, thiosulfate, phosphites, hypophosphites or phosphorous acid.

In one embodiment, the quenching agent is an amino acid. In such embodiments, said amino acid may be selected from serine, threonine, cysteine, cystine, methionine, proline, hydroxyproline, tryptophan, tyrosine, and histidine.

In one embodiment, the quenching agent is a sulfite such as bisulfate, dithionite, metabisulfite, thiosulfate.

In one embodiment, the quenching agent is a compound comprising two vicinal hydroxyl groups (vicinal diols), i.e., two hydroxyl groups covalently linked to two adjacent carbon atoms.

Preferably, the quenching agent is a compound of formula (II):

(II)




wherein $R^1$ and $R^2$ are each independently selected from H, methyl, ethyl, propyl or isopropyl.

In a preferred embodiment, the quenching agent is glycerol, ethylene glycol, propan-1,2-diol, butan-1,2-diol or butan-2,3-diol, or ascorbic acid. In a preferred embodiment, the quenching agent is butan-2,3-diol.

In a preferred embodiment, the isolated serotype 22F polysaccharide is activated by a process comprising the step of:

(a) reacting isolated serotype 22F polysaccharide with periodate;

(b) quenching the oxidation reaction by addition of butan-2,3-diol resulting in an activated serotype 22F polysaccharide.

Following the oxidation step of the polysaccharide, the polysaccharide is said to be activated and is referred to as "activated polysaccharide" here below.

In a preferred embodiment, the activated serotype 22F polysaccharide is purified. The activated serotype 22F polysaccharide is purified according to methods known to the man skilled in the art such as gel permeation chromatography (GPC), dialysis or ultrafiltration/diafiltration. For example, the activated 22F polysaccharide is purified by concentration and diafiltration using an ultrafiltration device.

In a preferred embodiment the degree of oxidation of the activated serotype 22F polysaccharide is between 2 and 30, between 2 and 25, between 2 and 20, between 2 and 15, between 2 and 10, between 2 and 5, between 5 and 30, between 5 and 25, between 5 and 20, between 5 and 15, between 5 and 10, between 10 and 30, between 10 and 25, between 10 and 20, between 10 and 15, between 15 and 30, between 15 and 25, between 15 and 20, between 20 to 30, or between 20 to 25. In a preferred embodiment the degree of oxidation of the activated serotype 22F polysaccharide is between 2 and 10, between 4 and 8, between 4 and 6, between 6 and 8, between 6 and 12, between 8 and 14, between 9 and 11, between 10 and 16, between 12 and 16, between 14 and 18, between 16 and 20, between 16 and 18, between 18 and 22, or between 18 and 20.

In a preferred embodiment, the activated serotype 22F polysaccharide has a molecular weight between 25 kDa and

1,000 kDa, between 100 kDa and 1,000 kDa, between 300 kDa and 800 kDa, between 300 kDa and 700 kDa, between 300 kDa and 600 kDa, between 400 kDa and 1,000 kDa, between 400 kDa and 800 kDa, between 400 kDa and 700 kDa or between 400 kDa and 600 kDa. In an embodiment, the activated serotype 22F polysaccharide has a molecular weight between 300 kDa and 800 kDa. In an embodiment, the activated serotype 22F polysaccharide has a molecular weight between 400 kDa and 600 kDa. In a preferred embodiment, the activated serotype 22F polysaccharide has a molecular weight between 400 kDa and 600 kDa and a degree of oxidation between 10 and 25, between 10 and 20, between 12 and 20 or between 14 and 18. In a preferred embodiment, the activated serotype 22F polysaccharide has a molecular weight between 400 kDa and 600 kDa and a degree of oxidation between 10 and 20.

In a preferred embodiment, the activated serotype 22F polysaccharide comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6 or 0.7 or about 0.8 mM acetate per mM serotype 22F polysaccharide. In a preferred embodiment, the activated serotype 22F polysaccharide comprises at least 0.5, 0.6 or 0.7 mM acetate per mM serotype 22F polysaccharide. In a preferred embodiment, the activated serotype 22F polysaccharide comprises at least 0.6 mM acetate per mM serotype 22F polysaccharide. In a preferred embodiment, the activated serotype 22F polysaccharide comprises at least 0.7 mM acetate per mM serotype 22F polysaccharide.

In a preferred embodiment, the activated serotype 22F polysaccharide has a molecular weight between 400 kDa and 800 kDa and comprises at least 0.6 mM acetate per mM serotype 22F polysaccharide.

In a preferred embodiment, the activated serotype 22F polysaccharide has a molecular weight between 400 kDa and 800 kDa, a degree of oxidation between 12 and 20 and comprises at least 0.6 mM acetate per mM serotype 22F polysaccharide.

The activated polysaccharide and/or the carrier protein may be lyophilised (freeze-dried), either independently (discrete lyophilization) or together (co-lyophilized).

In an embodiment, the activated serotype 22F polysaccharide is lyophilized, optionally in the presence of saccharide. In a preferred embodiment, the saccharide is selected from sucrose, trehalose, raffinose, stachyose, melezitose, dextran, mannitol, lactitol and palatinit. In a preferred embodiment, the saccharide is sucrose. In one embodiment, the lyophilized activated polysaccharide is then compounded with a solution comprising the carrier protein.

In another embodiment the activated polysaccharide and the carrier protein are co-lyophilised. In such embodiments, the activated serotype 22F polysaccharide is compounded with the carrier protein and lyophilized optionally in the presence of a saccharide. In a preferred embodiment, the saccharide is selected from sucrose, trehalose, raffinose, stachyose, melezitose, dextran, mannitol, lactitol and palatinit. In a preferred embodiment, the saccharide is sucrose. The co-lyophilized polysaccharide and carrier protein can then be resuspended in solution and reacted with a reducing agent.

The second step of the conjugation process is the reduction of the activated polysaccharide and a carrier protein to form a conjugate (reductive amination), using a reducing agent.

The activated serotype 22F polysaccharide can be conjugated to a carrier protein by a process comprising the step of:
(c) compounding the activated serotype 22F polysaccharide with a carrier protein; and
(d) reacting the compounded activated serotype 22F polysaccharide and carrier protein with a reducing agent to form a serotype 22F polysaccharide-carrier protein conjugate.

In an embodiment, the reduction reaction is carried out in aqueous solvent, in another embodiment the reaction is carried out in aprotic solvent. In an embodiment, the reduction reaction is carried out in DMSO (dimethylsulfoxide) or in DMF (dimethylformamide)) solvent. The DMSO or DMF solvent may be used to reconstitute the activated polysaccharide and carrier protein which has been lyophilised.

The conjugation of activated serotype 22F polysaccharide with a protein carrier by reductive amination in dimethylsulfoxide (DMSO) is suitable to preserve the O-acetyl content of the polysaccharide as compared, for example, to reductive amination in aqueous phase where the level of O-acetylation of the polysaccharide may be significantly reduced. Therefore in a preferred embodiment, step (c) and step (d) are carried out in DMSO.

In an embodiment, the reducing agent is sodium cyanoborohydride, sodium triacetoxyborohydride, sodium or zinc borohydride in the presence of Bronsted or Lewis acids, amine boranes such as pyridine borane, 2-Picoline Borane, 2,6-diborane-methanol, dimethylamine-borane, t-BuMe$^i$PrN—$BH_3$, benzylamine-$BH_3$ or 5-ethyl-2-methylpyridine borane (PEMB). In a preferred embodiment, the reducing agent is sodium cyanoborohydride.

At the end of the reduction reaction, there may be unreacted aldehyde groups remaining in the conjugates, these may be capped using a suitable capping agent. In one embodiment this capping agent is sodium borohydride ($NaBH_4$).

Following conjugation of serotype 22F polysaccharide to the carrier protein, the glycoconjugate can be purified (enriched with respect to the amount of polysaccharide-protein conjugate) by a variety of techniques known to the skilled person. These techniques include dialysis, concentration/diafiltration operations, tangential flow filtration precipitation/elution, column chromatography (DEAE or hydrophobic interaction chromatography), and depth filtration.

In some embodiments, the serotype 22F glycoconjugates of the present invention comprise a saccharide having a molecular weight of between 10 kDa and 2,000 kDa. In other such embodiments, the saccharide has a molecular weight of between 50 kDa and 1,000 kDa. In other such embodiments, the saccharide has a molecular weight of between 70 kDa and 900 kDa. In other such embodiments, the saccharide has a molecular weight of between 100 kDa and 800 kDa. In other such embodiments, the saccharide has a molecular weight of between 200 kDa and 600 kDa. In further such embodiments, the saccharide has a molecular weight of 100 kDa to 1,000 kDa; 100 kDa to 900 kDa; 100 kDa to 800 kDa; 100 kDa to 700 kDa; 100 kDa to 600 kDa; 100 kDa to 500 kDa; 100 kDa to 400 kDa; 100 kDa to 300 kDa; 150 kDa to 1,000 kDa; 150 kDa to 900 kDa; 150 kDa to 800 kDa; 150 kDa to 700 kDa; 150 kDa to 600 kDa; 150 kDa to 500 kDa; 150 kDa to 400 kDa; 150 kDa to 300 kDa; 200 kDa to 1,000 kDa; 200 kDa to 900 kDa; 200 kDa to 800 kDa; 200 kDa to 700 kDa; 200 kDa to 600 kDa; 200 kDa to 500 kDa; 200 kDa to 400 kDa; 200 kDa to 300 kDa; 250 kDa to 1,000 kDa; 250 kDa to 900 kDa; 250 kDa to 800 kDa; 250 kDa to 700 kDa; 250 kDa to 600 kDa; 250 kDa to 500 kDa; 250 kDa to 400 kDa; 250 kDa to 350 kDa; 300 kDa to 1000 kDa; 300 kDa to 900 kDa; 300 kDa to 800 kDa; 300 kDa to 700 kDa; 300 kDa to 600 kDa; 300 kDa to 500 kDa; 300 kDa to 400 kDa; 400 kDa to 1,000 kDa; 400 kDa to 900 kDa; 400 kDa to 800 kDa; 400 kDa to 700 kDa; 400 kDa to 600 kDa; 500 kDa to 600 kDa. Any whole number integer within any

of the above ranges is contemplated as an embodiment of the disclosure. In some such embodiments, the serotype 22F glycoconjugates are prepared using reductive amination.

In some embodiments, the serotype 22F glycoconjugate of the invention has a molecular weight of between 400 kDa and 15,000 kDa; between 500 kDa and 10,000 kDa; between 2,000 kDa and 10,000 kDa; between 3,000 kDa and 8,000 kDa; or between 3,000 kDa and 5,000 kDa. In other embodiments, the serotype 22F glycoconjugate has a molecular weight of between 500 kDa and 10,000 kDa. In other embodiments, the serotype 22F glycoconjugate has a molecular weight of between 1,000 kDa and 8,000 kDa. In still other embodiments, the serotype 22F glycoconjugate has a molecular weight of between 2,000 kDa and 8,000 kDa or between 3,000 kDa and 7,000 kDa. In further embodiments, the serotype 22F glycoconjugate of the invention has a molecular weight of between 200 kDa and 20,000 kDa; between 200 kDa and 15,000 kDa; between 200 kDa and 10,000 kDa; between 200 kDa and 7,500 kDa; between 200 kDa and 5,000 kDa; between 200 kDa and 3,000 kDa; between 200 kDa and 1,000 kDa; between 500 kDa and 20,000 kDa; between 500 kDa and 15,000 kDa; between 500 kDa and 12,500 kDa; between 500 kDa and 10,000 kDa; between 500 kDa and 7,500 kDa; between 500 kDa and 6,000 kDa; between 500 kDa and 5,000 kDa; between 500 kDa and 4,000 kDa; between 500 kDa and 3,000 kDa; between 500 kDa and 2,000 kDa; between 500 kDa and 1,500 kDa; between 500 kDa and 1,000 kDa; between 750 kDa and 20,000 kDa; between 750 kDa and 15,000 kDa; between 750 kDa and 12,500 kDa; between 750 kDa and 10,000 kDa; between 750 kDa and 7,500 kDa; between 750 kDa and 6,000 kDa; between 750 kDa and 5,000 kDa; between 750 kDa and 4,000 kDa; between 750 kDa and 3,000 kDa; between 750 kDa and 2,000 kDa; between 750 kDa and 1,500 kDa; between 1,000 kDa and 15,000 kDa; between 1,000 kDa and 12,500 kDa; between 1,000 kDa and 10,000 kDa; between 1,000 kDa and 7,500 kDa; between 1,000 kDa and 6,000 kDa; between 1,000 kDa and 5,000 kDa; between 1,000 kDa and 4,000 kDa; between 1,000 kDa and 2,500 kDa; between 2,000 kDa and 15,000 kDa; between 2,000 kDa and 12,500 kDa; between 2,000 kDa and 10,000 kDa; between 2,000 kDa and 7,500 kDa; between 2,000 kDa and 6,000 kDa; between 2,000 kDa and 5,000 kDa; between 2,000 kDa and 4,000 kDa; or between 2,000 kDa and 3,000 kDa.

In further embodiments, the serotype 22F glycoconjugate of the invention has a molecular weight of between 3,000 kDa and 20,000 kDa; between 3,000 kDa and 15,000 kDa; between 3,000 kDa and 10,000 kDa; between 3,000 kDa and 7,500 kDa; between 3,000 kDa and 5,000 kDa; between 4,000 kDa and 20,000 kDa; between 4,000 kDa and 15,000 kDa; between 4,000 kDa and 12,500 kDa; between 4,000 kDa and 10,000 kDa; between 4,000 kDa and 7,500 kDa; between 4,000 kDa and 6,000 kDa; or between 4,000 kDa and 5,000 kDa.

In further embodiments, the serotype 22F glycoconjugate of the invention has a molecular weight of between 5,000 kDa and 20,000 kDa; between 5,000 kDa and 15,000 kDa; between 5,000 kDa and 10,000 kDa; between 5,000 kDa and 7,500 kDa; between 6,000 kDa and 20,000 kDa; between 6,000 kDa and 15,000 kDa; between 6,000 kDa and 12,500 kDa; between 6,000 kDa and 10,000 kDa or between 6,000 kDa and 7,500 kDa.

The molecular weight of the glycoconjugate is measured by SEC-MALLS. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

In a preferred embodiment, the serotype 22F glycoconjugate of the invention comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6 or 0.7 or about 0.8 mM acetate per mM serotype 22F polysaccharide. In a preferred embodiment, the glycoconjugate comprises at least 0.5, 0.6 or 0.7 mM acetate per mM serotype 22F polysaccharide. In a preferred embodiment, the glycoconjugate comprises at least 0.6 mM acetate per mM serotype 22F polysaccharide. In a preferred embodiment, the glycoconjugate comprises at least 0.7 mM acetate per mM serotype 22F polysaccharide.

In a preferred embodiment, the ratio of mM acetate per mM serotype 22F polysaccharide in the glycoconjugate to mM acetate per mM serotype 22F polysaccharide in the isolated polysaccharide is at least 0.6, 0.65, 0.7, 0.75, 0.8, 0.85, 0.9, or 0.95. In a preferred embodiment, the ratio of mM acetate per mM serotype 22F polysaccharide in the glycoconjugate to mM acetate per mM serotype 22F polysaccharide in the isolated polysaccharide is at least 0.7. In a preferred embodiment, the ratio of mM acetate per mM serotype 22F polysaccharide in the glycoconjugate to mM acetate per mM serotype 22F polysaccharide in the isolated polysaccharide is at least 0.9.

In a preferred embodiment, the ratio of mM acetate per mM serotype 22F polysaccharide in the glycoconjugate to mM acetate per mM serotype 22F polysaccharide in the activated polysaccharide is at least 0.6, 0.65, 0.7, 0.75, 0.8, 0.85, 0.9, or 0.95. In a preferred embodiment, the ratio of mM acetate per mM serotype 22F polysaccharide in the glycoconjugate to mM acetate per mM serotype 22F polysaccharide in the activated polysaccharide is at least 0.7. In a preferred embodiment, the ratio of mM acetate per mM serotype 22F polysaccharide in the glycoconjugate to mM acetate per mM serotype 22F polysaccharide in the activated polysaccharide is at least 0.9.

Another way to characterize the serotype 22F glycoconjugates of the invention is by the number of lysine residues in the carrier protein (e.g., $CRM_{197}$) that become conjugated to the saccharide which can be characterized as a range of conjugated lysines (degree of conjugation). The evidence for lysine modification of the carrier protein, due to covalent linkages to the polysaccharides, can be obtained by amino acid analysis using routine methods known to those of skill in the art. Conjugation results in a reduction in the number of lysine residues recovered compared to the $CRM_{197}$ protein starting material used to generate the conjugate materials. In a preferred embodiment, the degree of conjugation of the serotype 22F glycoconjugate of the invention is between 2 and 15, between 2 and 13, between 2 and 10, between 2 and 8, between 2 and 6, between 2 and 5, between 2 and 4, between 3 and 15, between 3 and 13, between 3 and 10, between 3 and 8, between 3 and 6, between 3 and 5, between 3 and 4, between 5 and 15, between 5 and 10, between 8 and 15, between 8 and 12, between 10 and 15 or between 10 and 12. In an embodiment, the degree of conjugation of the serotype 22F glycoconjugate of the invention is about 2, about 3, about 4, about 5, about 6, about 7, about 8, about 9, about 10, about 11, about 12, about 13, about 14 or about 15. In a preferred embodiment, the degree of conjugation of the serotype 22F glycoconjugate of the invention is between 4 and 7. In some such embodiments, the carrier protein is $CRM_{197}$.

The serotype 22F glycoconjugates of the invention may also be characterized by the ratio (weight/weight) of saccharide to carrier protein. In some embodiments, the ratio of serotype 22F polysaccharide to carrier protein in the glycoconjugate (w/w) is between 0.5 and 3.0 (e.g., about 0.5, about 0.6, about 0.7, about 0.8, about 0.9, about 1.0, about

1.1, about 1.2, about 1.3, about 1.4, about 1.5, about 1.6, about 1.7, about 1.8, about 1.9, about 2.0, about 2.1, about 2.2, about 2.3, about 2.4, about 2.5, about 2.6, about 2.7, about 2.8, about 2.9, or about 3.0). In other embodiments, the saccharide to carrier protein ratio (w/w) is between 0.5 and 2.0, between 0.5 and 1.5, between 0.8 and 1.2, between 0.5 and 1.0, between 1.0 and 1.5 or between 1.0 and 2.0. In further embodiments, the saccharide to carrier protein ratio (w/w) is between 0.8 and 1.2. In a preferred embodiment, the ratio of serotype 22F capsular polysaccharide to carrier protein in the conjugate is between 0.9 and 1.1. In some such embodiments, the carrier protein is $CRM_{197}$.

The serotype 22F glycoconjugates and immunogenic compositions of the invention may contain free saccharide that is not covalently conjugated to the carrier protein, but is nevertheless present in the glycoconjugate composition. The free saccharide may be noncovalently associated with (i.e., noncovalently bound to, adsorbed to, or entrapped in or with) the glycoconjugate.

In a preferred embodiment, the serotype 22F glycoconjugate comprises less than about 50%, 45%, 40%, 35%, 30%, 25%, 20% or 15% of free serotype 22F polysaccharide compared to the total amount of serotype 22F polysaccharide. In a preferred embodiment the serotype 22F glycoconjugate comprises less than about 40% of free serotype 22F polysaccharide compared to the total amount of serotype 22F polysaccharide. In a preferred embodiment the serotype 22F glycoconjugate comprises less than about 25% of free serotype 22F polysaccharide compared to the total amount of serotype 22F polysaccharide. In a preferred embodiment the serotype 22F glycoconjugate comprises less than about 20% of free serotype 22F polysaccharide compared to the total amount of serotype 22F polysaccharide. In a preferred embodiment the serotype 22F glycoconjugate comprises less than about 15% of free serotype 22F polysaccharide compared to the total amount of serotype 22F polysaccharide.

The serotype 22F glycoconjugates may also be characterized by their molecular size distribution ($K_d$). Size exclusion chromatography media (CL-4B) can be used to determine the relative molecular size distribution of the conjugate. Size Exclusion Chromatography (SEC) is used in gravity fed columns to profile the molecular size distribution of conjugates. Large molecules excluded from the pores in the media elute more quickly than small molecules. Fraction collectors are used to collect the column eluate. The fractions are tested colorimetrically by saccharide assay. For the determination of $K_d$, columns are calibrated to establish the fraction at which molecules are fully excluded ($V_0$), ($K_d$=0), and the fraction representing the maximum retention (V), ($K_d$=1). The fraction at which a specified sample attribute is reached ($V_e$), is related to $K_d$ by the expression, $K_d=(V_e-V_0)/(V_i-V_0)$.

In a preferred embodiment, at least 30% of the serotype 22F glycoconjugate has a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 40% of the glycoconjugate has a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, or 85% of the serotype 22F glycoconjugate has a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 60% of the serotype 22F glycoconjugate has a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 50% and 80% of the serotype 22F glycoconjugate has a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 65% and 80% of the serotype 22F glycoconjugate has a $K_d$ below or equal to 0.3 in a CL-4B column.

1.3.3 Glycoconjugates from *S. pneumoniae* Serotype 33F

In an embodiment, the serotype 33F glycoconjugates are obtained by activating polysaccharide with 1-cyano-4-dimethylamino pyridinium tetrafluoroborate (CDAP) to form a cyanate ester. The activated polysaccharide may be coupled directly or via a spacer (linker) group to an amino group on the carrier protein. For example, the spacer could be cystamine or cysteamine to give a thiolated polysaccharide which could be coupled to the carrier via a thioether linkage obtained after reaction with a maleimide-activated carrier protein (for example using GMBS) or a haloacetylated carrier protein (for example using iodoacetimide, SIB, SIAB, sulfo-SIAB, SIA, or SBAP). Preferably, the cyanate ester (optionally made by CDAP chemistry) is coupled with hexane diamine or adipic acid dihydrazide (ADH) and the amino-derivatised saccharide is conjugated to the carrier protein using carbodiimide (e.g., EDAC or EDC) chemistry via a carboxyl group on the protein carrier. Such conjugates are described for example in WO 93/15760, WO 95/08348 and WO 96/29094.

Other suitable techniques use carbodiimides, hydrazides, active esters, norborane, p-nitrobenzoic acid, N-hydroxysuccinimide, S—NHS, EDC, TSTU. Many are described in International Patent Application Publication No. WO 98/42721. Conjugation may involve a carbonyl linker which may be formed by reaction of a free hydroxyl group of the saccharide with CDI (see Bethell et al. (1979) J. Biol. Chem. 254:2572-2574; Hearn et al. (1981) J. Chromatogr. 218:509-518) followed by reaction with a protein to form a carbamate linkage. This may involve reduction of the anomeric terminus to a primary hydroxyl group, optional protection/deprotection of the primary hydroxyl group, reaction of the primary hydroxyl group with CDI to form a CDI carbamate intermediate and coupling the CDI carbamate intermediate with an amino group on a protein.

In certain embodiments, the serotype 33F glycoconjugates of the invention are prepared using reductive amination. In such embodiment, the serotype 33F glycoconjugates of the invention maybe prepared using reductive amination in aqueous phase (RAC/aqueous). Reductive amination in aqueous phase has been successfully applied to produce pneumococcal conjugate vaccine (see, e.g., WO 2006/110381). Preferably though, when using reductive amination, the serotype 33F glycoconjugates are prepared via reductive amination in DMSO (RAC/DMSO). In view of the challenges associated with the preservation of O-acetyl functionality using RAC/aqueous process, reductive amination in DMSO is preferred. RAC/DMSO has been successfully applied to produce pneumococcal conjugate vaccine (see, e.g., WO 2006/110381).

In preferred embodiments, the serotype 33F glycoconjugates of the invention are prepared using eTEC conjugation (hereinafter “serotype 33F eTEC linked glycoconjugates”), such as described at Examples 1, 2 and 3 and in WO 2014/027302. Said 33F glycoconjugates comprise a saccharide covalently conjugated to a carrier protein through one or more eTEC spacers, wherein the saccharide is covalently conjugated to the eTEC spacer through a carbamate linkage, and wherein the carrier protein is covalently conjugated to the eTEC spacer through an amide linkage. The eTEC linked glycoconjugates of the invention may be represented by the general formula (III):

(III)




wherein the atoms that comprise the eTEC spacer are contained in the central box.

The eTEC spacer includes seven linear atoms (i.e., —$C(O)NH(CH_2)_2SCH_2C(O)$—) and provides stable thioether and amide bonds between the saccharide and carrier protein. Synthesis of the eTEC linked glycoconjugate involves reaction of an activated hydroxyl group of the saccharide with the amino group of a thioalkylamine reagent, e.g., cystamine or cysteinamine or a salt thereof, forming a carbamate linkage to the saccharide to provide a thiolated saccharide. Generation of one or more free sulfhydryl groups is accomplished by reaction with a reducing agent to provide an activated thiolated saccharide. Reaction of the free sulfhydryl groups of the activated thiolated saccharide with an activated carrier protein having one or more α-haloacetamide groups on amine containing residues generates a thioether bond to form the conjugate, wherein the carrier protein is attached to the eTEC spacer through an amide bond.

In serotype 33F glycoconjugates of the invention, the saccharide may be a polysaccharide or an oligosaccharide. The carrier protein may be selected from any suitable carrier as described herein or known to those of skill in the art. In frequent embodiments, the saccharide is a polysaccharide. In some such embodiments, the carrier protein is $CRM_{197}$. In some such embodiments, the eTEC linked glycoconjugate comprises a *S. pneumoniae* serotype 33F capsular polysaccharide.

In particularly preferred embodiments, the eTEC linked glycoconjugate comprises a Pn-33F capsular polysaccharide, which is covalently conjugated to $CRM_{197}$ through an eTEC spacer (serotype 33F eTEC linked glycoconjugates).

In some embodiments, the serotype 33F glycoconjugates of the present invention comprise a saccharide having a molecular weight of between 10 kDa and 2,000 kDa. In other such embodiments, the saccharide has a molecular weight of between 50 kDa and 2,000 kDa. In further such embodiments, the saccharide has a molecular weight of between 50 kDa and 1,750 kDa; between 50 kDa and 1,500 kDa; between 50 kDa and 1,250 kDa; between 50 kDa and 1,000 kDa; between 50 kDa and 750 kDa; between 50 kDa and 500 kDa; between 100 kDa and 2,000 kDa; between 100 kDa and 1,750 kDa; between 100 kDa and 1,500 kDa; between 100 kDa and 1,250 kDa; between 100 kDa and 1,000 kDa; between 100 kDa and 750 kDa; between 100 kDa and 500 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 1,750 kDa; between 200 kDa and 1,500 kDa; between 200 kDa and 1,250 kDa; between 200 kDa and 1,000 kDa; between 200 kDa and 750 kDa; or between 200 kDa and 500 kDa. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

In some embodiments, the serotype 33F glycoconjugate of the invention has a molecular weight of between 50 kDa and 20,000 kDa. In other embodiments, the serotype 33F glycoconjugate has a molecular weight of between 500 kDa and 10,000 kDa. In other embodiments, the serotype 33F glycoconjugate has a molecular weight of between 200 kDa and 10,000 kDa. In still other embodiments, the serotype 33F glycoconjugate has a molecular weight of between 1,000 kDa and 3,000 kDa.

In further embodiments, the serotype 33F glycoconjugate of the invention has a molecular weight of between 200 kDa and 20,000 kDa; between 200 kDa and 15,000 kDa; between 200 kDa and 10,000 kDa; between 200 kDa and 7,500 kDa; between 200 kDa and 5,000 kDa; between 200 kDa and 3,000 kDa; between 200 kDa and 1,000 kDa; between 500 kDa and 20,000 kDa; between 500 kDa and 15,000 kDa; between 500 kDa and 12,500 kDa; between 500 kDa and 10,000 kDa; between 500 kDa and 7,500 kDa; between 500 kDa and 6,000 kDa; between 500 kDa and 5,000 kDa; between 500 kDa and 4,000 kDa; between 500 kDa and 3,000 kDa; between 500 kDa and 2,000 kDa; between 500 kDa and 1,500 kDa; between 500 kDa and 1,000 kDa; between 750 kDa and 20,000 kDa; between 750 kDa and 15,000 kDa; between 750 kDa and 12,500 kDa; between 750 kDa and 10,000 kDa; between 750 kDa and 7,500 kDa; between 750 kDa and 6,000 kDa; between 750 kDa and 5,000 kDa; between 750 kDa and 4,000 kDa; between 750 kDa and 3,000 kDa; between 750 kDa and 2,000 kDa; between 750 kDa and 1,500 kDa; between 1,000 kDa and 15,000 kDa; between 1,000 kDa and 12,500 kDa; between 1,000 kDa and 10,000 kDa; between 1,000 kDa and 7,500 kDa; between 1,000 kDa and 6,000 kDa; between 1,000 kDa and 5,000 kDa; between 1,000 kDa and 4,000 kDa; between 1,000 kDa and 2,500 kDa; between 2,000 kDa and 15,000 kDa; between 2,000 kDa and 12,500 kDa; between 2,000 kDa and 10,000 kDa; between 2,000 kDa and 7,500 kDa; between 2,000 kDa and 6,000 kDa; between 2,000 kDa and 5,000 kDa; between 2,000 kDa and 4,000 kDa; between 2,000 kDa and 3,000 kDa; between 3,000 kDa and 20,000 kDa; between 3,000 kDa and 15,000 kDa; between 3,000 kDa and 12,500 kDa; between 3,000 kDa and 10,000 kDa; between 3,000 kDa and 9,000 kDa; between 3,000 kDa and 8,000 kDa; between 3,000 kDa and 7,000 kDa; between 3,000 kDa and 6,000 kDa; between 3,000 kDa and 5,000 kDa or between 3,000 kDa and 4,000 kDa. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

Another way to characterize the serotype 33F glycoconjugates of the invention is by the number of lysine residues in the carrier protein (e.g., $CRM_{197}$) that become conjugated to the saccharide, which can be characterized as a range of conjugated lysines (degree of conjugation).

In a preferred embodiment, the degree of conjugation of the serotype 33F glycoconjugate of the invention is between 2 and 20, between 4 and 16, between 2 and 15, between 2 and 13, between 2 and 10, between 2 and 8, between 2 and 6, between 2 and 5, between 2 and 4, between 3 and 15, between 3 and 13, between 3 and 10, between 3 and 8, between 3 and 6, between 3 and 5, between 3 and 4, between 5 and 15, between 5 and 10, between 8 and 15, between 8 and 12, between 10 and 15 or between 10 and 12. In an embodiment, the degree of conjugation of the serotype 33F glycoconjugate of the invention is about 2, about 3, about 4, about 5, about 6, about 7, about 8, about 9, about 10, about 11, about 12, about 13, about 14, about 15, about 16, about 17, about 18, about 19 or about 20. In a preferred embodiment, the degree of conjugation of the serotype 33F glycoconjugate of the invention is between 4 and 16. In some such embodiments, the carrier protein is $CRM_{197}$.

In a preferred embodiment, the carrier protein comprises $CRM_{197}$, which contains 39 lysine residues. In some such embodiments, the $CRM_{197}$ may comprise 4 to 16 lysine

residues out of 39 covalently linked to the saccharide. Another way to express this parameter is that about 10% to about 41% of $CRM_{197}$ lysines are covalently linked to the saccharide. In another such embodiment, the $CRM_{197}$ may comprise 2 to 20 lysine residues out of 39 covalently linked to the saccharide. Another way to express this parameter is that about 5% to about 50% of $CRM_{197}$ lysines are covalently linked to the saccharide. In some embodiments, the $CRM_{197}$ may comprise about 4, about 5, about 6, about 7, about 8, about 9, about 10, about 11, about 12, about 13, about 14, about 15, or about 16 lysine residues out of 39 covalently linked to the saccharide.

In frequent embodiments, the carrier protein is covalently conjugated to an eTEC spacer through an amide linkage to one or more ϵ-amino groups of lysine residues on the carrier protein. In some such embodiments, the carrier protein comprises 2 to 20 lysine residues covalently conjugated to the saccharide. In other such embodiments, the carrier protein comprises 4 to 16 lysine residues covalently conjugated to the saccharide.

The serotype 33F glycoconjugates of the invention may also be characterized by the ratio (weight/weight) of saccharide to carrier protein. In some embodiments, the saccharide to carrier protein ratio (w/w) is between 0.2 and 4.0 (e.g., about 0.2, about 0.3, about 0.4, about 0.5, about 0.6, about 0.7, about 0.8, about 0.9, about 1.0, about 1.1, about 1.2, about 1.3, about 1.4, about 1.5, about 1.6, about 1.7, about 1.8, about 1.9, about 2.0, about 2.1, about 2.2, about 2.3, about 2.4, about 2.5, about 2.6, about 2.7, about 2.8, about 2.9, about 3.0, about 3.1, about 3.2, about 3.3, about 3.4, about 3.5, about 3.6, about 3.7, about 3.8, about 3.9 or about 4.0). In other embodiments, the saccharide to carrier protein ratio (w/w) is between 1.0 and 2.5. In further embodiments, the saccharide to carrier protein ratio (w/w) is between 0.4 and 1.7. In some such embodiments, the carrier protein is $CRM_{197}$.

The frequency of attachment of the saccharide chain to a lysine on the carrier protein is another parameter for characterizing the serotype 33F glycoconjugates of the invention. For example, in some embodiments, at least one covalent linkage between the carrier protein and the polysaccharide occurs for every 4 saccharide repeat units of the polysaccharide. In another embodiment, the covalent linkage between the carrier protein and the polysaccharide occurs at least once in every 10 saccharide repeat units of the polysaccharide. In another embodiment, the covalent linkage between the carrier protein and the polysaccharide occurs at least once in every 15 saccharide repeat units of the polysaccharide. In a further embodiment, the covalent linkage between the carrier protein and the polysaccharide occurs at least once in every 25 saccharide repeat units of the polysaccharide.

In frequent embodiments, the carrier protein is $CRM_{197}$ and the covalent linkage via an eTEC spacer between the $CRM_{197}$ and the polysaccharide occurs at least once in every 4, 10, 15 or 25 saccharide repeat units of the polysaccharide.

In other embodiments, the conjugate comprises at least one covalent linkage between the carrier protein and saccharide for every 5 to 10 saccharide repeat units; every 2 to 7 saccharide repeat units; every 3 to 8 saccharide repeat units; every 4 to 9 saccharide repeat units; every 6 to 11 saccharide repeat units; every 7 to 12 saccharide repeat units; every 8 to 13 saccharide repeat units; every 9 to 14 saccharide repeat units; every 10 to 15 saccharide repeat units; every 2 to 6 saccharide repeat units, every 3 to 7 saccharide repeat units; every 4 to 8 saccharide repeat units; every 6 to 10 saccharide repeat units; every 7 to 11 saccharide repeat units; every 8 to 12 saccharide repeat units; every 9 to 13 saccharide repeat units; every 10 to 14 saccharide repeat units; every 10 to 20 saccharide repeat units; every 4 to 25 saccharide repeat units or every 2 to 25 saccharide repeat units. In frequent embodiments, the carrier protein is $CRM_{197}$.

In another embodiment, at least one linkage between carrier protein and saccharide occurs for every 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 saccharide repeat units of the polysaccharide. In an embodiment, the carrier protein is $CRM_{197}$. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

An important consideration during conjugation is the development of conditions that permit the retention of potentially sensitive non-saccharide substituent functional groups of the individual components, such as 0-Acyl, phosphate or glycerol phosphate side chains that may form part of the saccharide epitope.

In one embodiment, the serotype 33F glycoconjugates of the invention comprise a saccharide which has a degree of O-acetylation between 10% and 100%. In some such embodiments, the saccharide has a degree of O-acetylation between 50% and 100%. In other such embodiments, the saccharide has a degree of O-acetylation between 75% and 100%. In further embodiments, the saccharide has a degree of O-acetylation greater than or equal to 70% (≥70%).

In a preferred embodiment, the serotype 33F glycoconjugate of the invention comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7 or 0.8 mM acetate per mM serotype 33F capsular polysaccharide. In a preferred embodiment, the glycoconjugate comprises at least 0.5, 0.6 or 0.7 mM acetate per mM serotype 33F capsular polysaccharide. In a preferred embodiment, the glycoconjugate comprises at least 0.6 mM acetate per mM serotype 33F capsular polysaccharide. In a preferred embodiment, the glycoconjugate comprises at least 0.7 mM acetate per mM serotype 33F capsular polysaccharide. In a preferred embodiment, the presence of O-acetyl groups is determined by ion-HPLC analysis.

In a preferred embodiment, the ratio of mM acetate per mM serotype 33F polysaccharide in the glycoconjugate to mM acetate per mM serotype 33F polysaccharide in the isolated polysaccharide is at least 0.6, 0.65, 0.7, 0.75, 0.8, 0.85, 0.9, or 0.95. In a preferred embodiment, the ratio of mM acetate per mM serotype 33F polysaccharide in the glycoconjugate to mM acetate per mM serotype 33F polysaccharide in the isolated polysaccharide is at least 0.7. In a preferred embodiment, the ratio of mM acetate per mM serotype 33F polysaccharide in the glycoconjugate to mM acetate per mM serotype 33F polysaccharide in the isolated polysaccharide is at least 0.9.

In a preferred embodiment, the ratio of mM acetate per mM serotype 33F polysaccharide in the glycoconjugate to mM acetate per mM serotype 33F polysaccharide in the activated polysaccharide is at least 0.6, 0.65, 0.7, 0.75, 0.8, 0.85, 0.9, or 0.95. In a preferred embodiment, the ratio of mM acetate per mM serotype 33F polysaccharide in the glycoconjugate to mM acetate per mM serotype 33F polysaccharide in the activated polysaccharide is at least 0.7. In a preferred embodiment, the ratio of mM acetate per mM serotype 33F polysaccharide in the glycoconjugate to mM acetate per mM serotype 33F polysaccharide in the activated polysaccharide is at least 0.9.

The serotype 33F glycoconjugates and immunogenic compositions of the invention may contain free saccharide that is not covalently conjugated to the carrier protein, but is nevertheless present in the glycoconjugate composition. The

free saccharide may be noncovalently associated with (i.e., noncovalently bound to, adsorbed to, or entrapped in or with) the glycoconjugate.

In some embodiments, the serotype 33F glycoconjugates of the invention comprise less than about 50%, 45%, 40%, 35%, 30%, 25%, 20%, 15%, 10% or 5% of free serotype 33F polysaccharide compared to the total amount of serotype 33F polysaccharide. Preferably, serotype 33F the glycoconjugate comprises less than 15% free saccharide, more preferably less than 10% free saccharide, and still more preferably, less than 5% of free saccharide. In a preferred embodiment the serotype 33F glycoconjugate comprises less than about 25% of free serotype 33F polysaccharide compared to the total amount of serotype 33F polysaccharide. In a preferred embodiment the serotype 33F glycoconjugate comprises less than about 20% of free serotype 33F polysaccharide compared to the total amount of serotype 33F polysaccharide. In a preferred embodiment the serotype 33F glycoconjugate comprises less than about 15% of free serotype 33F polysaccharide compared to the total amount of serotype 33F polysaccharide.

In certain preferred embodiments, the invention provides a serotype 33F glycoconjugate having one or more of the following features alone or in combination: the polysaccharide has a molecular weight of between 50 kDa and 2,000 kDa; the glycoconjugate has a molecular weight of between 500 kDa to 10,000 KDa; the carrier protein comprises 2 to 20 lysine residues covalently linked to the saccharide; the saccharide to carrier protein ratio (w/w) is between 0.2 and 4.0; the glycoconjugate comprises at least one covalent linkage between the carrier protein and the polysaccharide for every 4, 10, 15 or 25 saccharide repeat units of the polysaccharide; the saccharide has a degree of O-acetylation between 75% and 100%; the conjugate comprises less than about 15% free polysaccharide relative to total polysaccharide; the carrier protein is $CRM_{197}$.

The serotype 33F glycoconjugates may also be characterized by their molecular size distribution ($K_d$). Size exclusion chromatography media (CL-4B) can be used to determine the relative molecular size distribution of the conjugate, as mentioned above. In an embodiment, at least 15% of the serotype 33F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In an embodiment, at least 15%, 20%, 25%, 30%, 35%, 40%, 45%, 50%, 60%, 70%, 80% or 90% of the serotype 33F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column.

In a preferred embodiment, at least 35% of the serotype 33F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In preferred embodiments, at least 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, or 85% of the serotype 33F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 60% of the serotype 33F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 70% of the serotype 33F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column.

In a preferred embodiment, between 40% and 90% of the serotype 33F glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 50% and 90% of the serotype 33F glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 65% and 80% of the serotype 33F glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column.

1.3.4 Glycoconjugates from *S. pneumoniae* Serotype 15B

In an embodiment, the serotype 15B glycoconjugates are obtained by activating polysaccharide with 1-cyano-4-dimethylamino pyridinium tetrafluoroborate (CDAP) to form a cyanate ester. The activated polysaccharide may be coupled directly or via a spacer (linker) group to an amino group on the carrier protein. For example, the spacer could be cystamine or cysteamine to give a thiolated polysaccharide which could be coupled to the carrier via a thioether linkage obtained after reaction with a maleimide-activated carrier protein (for example using GMBS) or a haloacetylated carrier protein (for example using iodoacetimide, SIB, SIAB, sulfo-SIAB, SIA, or SBAP). Preferably, the cyanate ester (optionally made by CDAP chemistry) is coupled with hexane diamine or adipic acid dihydrazide (ADH) and the amino-derivatised saccharide is conjugated to the carrier protein using carbodiimide (e.g., EDAC or EDC) chemistry via a carboxyl group on the protein carrier. Such conjugates are described for example in WO 93/15760, WO 95/08348 and WO 96/29094.

Other suitable techniques use carbodiimides, hydrazides, active esters, norborane, p-nitrobenzoic acid, N-hydroxysuccinimide, S—NHS, EDC, TSTU. Many are described in International Patent Application Publication No. WO 98/42721. Conjugation may involve a carbonyl linker which may be formed by reaction of a free hydroxyl group of the saccharide with CDI (see Bethell et al. (1979) J. Biol. Chem. 254:2572-2574; Hearn et al. (1981) J. Chromatogr. 218:509-518) followed by reaction with a protein to form a carbamate linkage. This may involve reduction of the anomeric terminus to a primary hydroxyl group, optional protection/deprotection of the primary hydroxyl group, reaction of the primary hydroxyl group with CDI to form a CDI carbamate intermediate and coupling the CDI carbamate intermediate with an amino group on a protein.

In preferred embodiments, the serotype 15B glycoconjugates of the invention are prepared using reductive amination. Reductive amination involves two steps, (1) oxidation of the polysaccharide to generate aldehyde functionalities from vicinal diols in individual hexasaccharide unit, (2) reduction of the activated polysaccharide and a carrier protein to form a conjugate.

Preferably, before oxidation, sizing of the serotype 15B polysaccharide to a target molecular weight (MW) range is performed. Advantageously, the size of the purified serotype 15B polysaccharide is reduced while preserving critical features of the structure of the polysaccharide such as for example the presence of O-acetyl groups. Preferably, the size of the purified serotype 15B polysaccharide is reduced by mechanical homogenization (see section 1.2.6 above).

The oxidation step may involve reaction with periodate. For the purpose of the present invention, the term "periodate" includes both periodate and periodic acid; the term also includes both metaperiodate ($IO_4^-$) and orthoperiodate ($IO_6^{5-}$) and the various salts of periodate (e.g., sodium periodate and potassium periodate). In a preferred embodiment the periodate used for the oxidation of serotype 15B capsular polysaccharide is metaperiodate. In a preferred embodiment the periodate used for the oxidation of serotype 15B capsular polysaccharide is sodium metaperiodate.

In a preferred embodiment, the polysaccharide is reacted with 0.01 to 10.0, 0.05 to 5.0, 0.1 to 1.0, 0.5 to 1.0, 0.7 to 0.8, 0.05 to 0.5, 0.1 to 0.3 molar equivalents of oxidizing agent. In a preferred embodiment, the polysaccharide is reacted with about 0.1, 0.15, 0.2, 0.25, 0.3, 0.35, 0.4, 0.45, 0.5, 0.55, 0.6, 0.65, 0.7, 0.75, 0.8, 0.85, 0.9, 0.95 molar equivalents of oxidizing agent. In a preferred embodiment,

the polysaccharide is reacted with about 0.15 molar equivalents of oxidizing agent. In a preferred embodiment, the polysaccharide is reacted with about 0.25 molar equivalents of oxidizing agent. In a preferred embodiment, the polysaccharide is reacted with about 0.5 molar equivalents of oxidizing agent. In a preferred embodiment, the polysaccharide is reacted with about 0.6 molar equivalents of oxidizing agent. In a preferred embodiment, the polysaccharide is reacted with about 0.7 molar equivalents of oxidizing agent.

In a preferred embodiment, the duration of the reaction is between 1 hour and 50 hours, between 10 hours and 30 hours, between 15 hours and 20 hours, between 15 hours and 17 hours or about 16 hours.

In a preferred embodiment, the temperature of the reaction is maintained between 15° C. and 45° C., between 15° C. and 30° C., between 20° C. and 25° C. In a preferred embodiment, the temperature of the reaction is maintained at about 23° C.

In a preferred embodiment, the oxidation reaction is carried out in a buffer selected from sodium phosphate, potassium phosphate, 2-(N-morpholino)ethanesulfonic acid (MES) or Bis-Tris. In a preferred embodiment, the buffer is potassium phosphate.

In a preferred embodiment, the buffer has a concentration of between 1 mM and 500 mM, between 1 mM and 300 mM, or between 50 mM and 200 mM. In a preferred embodiment the buffer has a concentration of about 100 mM.

In a preferred embodiment, the oxidation reaction is carried out at a pH between 4.0 and 8.0, between 5.0 and 7.0, or between 5.5 and 6.5. In a preferred embodiment, the pH is about 6.0.

In preferred embodiment, the activated serotype 15B capsular polysaccharide is obtained by reacting 0.5 mg/mL to 5 mg/mL of isolated serotype 15B capsular polysaccharide with 0.2 to 0.3 molar equivalents of periodate at a temperature between 20° C. and 25° C.

In a preferred embodiment, the activated serotype 15B capsular polysaccharide is purified. The activated serotype 15B capsular polysaccharide is purified according to methods known to the man skilled in the art, such as gel permeation chromatography (GPC), dialysis or ultrafiltration/diafiltration. For example, the activated capsular polysaccharide is purified by concentration and diafiltration using an ultrafiltration device.

In a preferred embodiment, the degree of oxidation of the activated serotype 15B capsular polysaccharide is between 2 and 20, between 2 and 15, between 2 and 10, between 2 and 5, between 5 and 20, between 5 and 15, between 5 and 10, between 10 and 20, between 10 and 15, or between 15 and 20. In a preferred embodiment the degree of oxidation of the activated serotype 15B capsular polysaccharide is between 2 and 10, between 4 and 8, between 4 and 6, between 6 and 8, between 6 and 12, between 8 and 12, between 9 and 11, between 10 and 16, between 12 and 16, between 14 and 18, between 16 and 20, between 16 and 18, or between 18 and 20.

In a preferred embodiment, the activated serotype 15B capsular polysaccharide has a molecular weight between 5 kDa and 500 kDa, between 50 kDa and 500 kDa, between 50 kDa and 450 kDa, between 100 kDa and 400 kDa, between 100 kDa and 350 kDa. In a preferred embodiment, the activated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 350 kDa. In a preferred embodiment, the activated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 300 kDa. In a preferred embodiment, the activated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 250 kDa.

In a preferred embodiment, the activated serotype 15B capsular polysaccharide comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7 or 0.8 mM acetate per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the activated serotype 15B capsular polysaccharide comprises at least 0.5, 0.6 or 0.7 mM acetate per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the activated serotype 15B capsular polysaccharide comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the activated serotype 15B capsular polysaccharide comprises at least 0.7 mM acetate per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the activated serotype 15B capsular polysaccharide comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7 or 0.8 mM glycerol per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the activated serotype 15B capsular polysaccharide comprises at least 0.5, 0.6 or 0.7 mM glycerol per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the activated serotype 15B capsular polysaccharide comprises at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide. In a preferred embodiment, the activated serotype 15B capsular polysaccharide comprises at least 0.7 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the activated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 250 kDa and comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the activated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 250 kDa and comprises at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the activated serotype 15B capsular polysaccharide comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide and at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In a preferred embodiment, the activated serotype 15B capsular polysaccharide has a molecular weight between 100 kDa and 250 kDa and comprises at least 0.6 mM acetate per mM of said serotype 15B capsular polysaccharide and at least 0.6 mM glycerol per mM of said serotype 15B capsular polysaccharide.

In an embodiment, the activated serotype 15B capsular polysaccharide is lyophilized, optionally in the presence of saccharide. In a preferred embodiment, the saccharide is selected from sucrose, trehalose, raffinose, stachyose, melezitose, dextran, mannitol, lactitol and palatinit. In a preferred embodiment, the saccharide is sucrose. The lyophilized activated capsular polysaccharide can then be compounded with a solution comprising the carrier protein.

In another embodiment, the activated serotype 15B capsular polysaccharide is compounded with the carrier protein and lyophilized optionally in the presence of a saccharide. In a preferred embodiment, the saccharide is selected from sucrose, trehalose, raffinose, stachyose, melezitose, dextran, mannitol, lactitol and palatinit. In a preferred embodiment, the saccharide is sucrose. The co-lyophilized polysaccharide and carrier protein can then be resuspended in solution and reacted with a reducing agent.

The activated serotype 15B capsular polysaccharide can be conjugated to a carrier protein by a process comprising the step of:

(a) compounding the activated serotype 15B capsular polysaccharide with a carrier protein, and

(b) reacting the compounded activated serotype 15B capsular polysaccharide and carrier protein with a reducing agent to form a serotype 15B capsular polysaccharide-carrier protein conjugate.

The conjugation of activated serotype 15B capsular polysaccharide with a protein carrier by reductive amination in dimethylsulfoxide (DMSO) is suitable to preserve the O-acetyl content of the polysaccharide as compared for example to reductive amination in aqueous solution where the level of O-acetylation of the polysaccharide is significantly reduced. In a preferred embodiment, step (a) and step (b) are carried out in DMSO.

In a preferred embodiment, step (a) comprises dissolving lyophilized serotype 15B capsular polysaccharide in a solution comprising a carrier protein and DMSO. In a preferred embodiment, step (a) comprises dissolving co-lyophilized serotype 15B capsular polysaccharide and carrier protein in DMSO.

When steps (a) and (b) are carried out in aqueous solution, steps (a) and (b) are carried out in a buffer, preferably selected from PBS, MES, HEPES, Bis-tris, ADA, PIPES, MOPSO, BES, MOPS, DIPSO, MOBS, HEPPSO, POPSO, TEA, EPPS, Bicine or HEPB, at a pH between 6.0 and 8.5, between 7.0 and 8.0 or between 7.0 and 7.5. In a preferred embodiment the buffer is PBS. In a preferred embodiment the pH is about 7.3. In a preferred embodiment, the concentration of activated serotype 15B capsular polysaccharide in step (b) is between 0.1 mg/mL and 10 mg/mL, between 0.5 mg/mL and 5 mg/mL, or between 0.5 mg/mL and 2 mg/mL. In a preferred embodiment, the concentration of activated serotype 15B capsular polysaccharide in step (b) is about 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1.0, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 2.0, 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.8, 2.9 or 3.0 mg/mL.

In a preferred embodiment the initial input ratio (weight by weight) of activated serotype 15B capsular polysaccharide to carrier protein is between 5:1 and 0.1:1, between 2:1 and 0.1:1, between 2:1 and 1:1, between 1.5:1 and 1:1, between 0.1:1 and 1:1, between 0.3:1 and 1:1, or between 0.6:1 and 1:1.

In a preferred embodiment the initial input ratio of activated serotype 15B capsular polysaccharide to carrier protein is about 0.6:1 to 1:1. In another preferred embodiment the initial input ratio of activated serotype 15B capsular polysaccharide to carrier protein is about 0.6:1 to 1.5:1. Such initial input ratio is particularly suitable to obtain low levels of free polysaccharide in the glycoconjugate.

In a preferred embodiment the initial input ratio of activated serotype 15B capsular polysaccharide to carrier protein is about 0.4:1, 0.5:1, 0.6:1, 0.7:1, 0.8:1, 0.9:1, 1:1, 1.1:1, 1.2:1, 1.3:1, 1.4:1, 1.5:1, 1.6:1, 1.7:1, 1.8:1, 1.9:1 or 2:1.

In an embodiment, the reducing agent is sodium cyanoborohydride, sodium triacetoxyborohydride, sodium or zinc borohydride in the presence of Bronsted or Lewis acids, amine boranes such as pyridine borane, 2-Picoline Borane, 2,6-diborane-methanol, dimethylamine-borane, t-BuMeiPrN-BH3, benzylamine-BH3 or 5-ethyl-2-methylpyridine borane (PEMB). In a preferred embodiment, the reducing agent is sodium cyanoborohydride. In a preferred embodiment, the reducing agent is sodium 2-Picoline Borane.



In a preferred embodiment, the quantity of reducing agent used in step (b) is between about 0.1 and 10.0 molar equivalents, between 0.5 and 5.0 molar equivalents, or between 1.0 and 2.0 molar equivalents. In a preferred embodiment, the quantity of reducing agent used in step (b) is about 1.0, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9 or 2.0 molar equivalents.

In a preferred embodiment, the duration of step (b) is between 1 hour and 60 hours, between 10 hours and 50 hours, between 40 hours and 50 hours, or between 42 hours and 46 hours. In a preferred embodiment, the duration of step (b) is about 44 hours.

In a preferred embodiment, the temperature of the reaction in step (b) is maintained between 10° C. and 40° C., between 15° C. and 30° C. or between 20° C. and 26° C. In a preferred embodiment, the temperature of the reaction in step (b) is maintained at about 23° C.

In a preferred embodiment, the process for the preparation of a glycoconjugate comprising *S. pneumoniae* serotype 15B capsular polysaccharide covalently linked to a carrier protein further comprises a step (step (c)) of capping unreacted aldehyde (quenching) by addition of $NaBH_4$.

In a preferred embodiment, the quantity of $NaBH_4$ used in step (c) is between 0.1 and 10 molar equivalents, between 0.5 and 5.0 molar equivalents or between 1.0 and 3.0 molar equivalents. In a preferred embodiment, the quantity of $NaBH_4$ used in step (c) is about 2 molar equivalents.

In a preferred embodiment, the duration of step (c) is between 0.1 hours and 10 hours, 0.5 hours and 5 hours, or between 2 hours and 4 hours. In a preferred embodiment, the duration of step (c) is about 3 hours.

In a preferred embodiment, the temperature of the reaction in step (c) is maintained between 15° C. and 45° C., between 15° C. and 30° C. or between 20° C. and 26° C. In a preferred embodiment, the temperature of the reaction in step (c) is maintained at about 23° C.

In a preferred embodiment the yield of the conjugation step is greater than 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85% or 90%. In a preferred embodiment the yield of the conjugation step (step b) is greater than 60%. In a preferred embodiment the yield of the conjugation step (step b) is greater than 70%. The yield is the amount of serotype 15B polysaccharide in the conjugate ×100)/amount of activated polysaccharide used in the conjugation step.

In a preferred embodiment, the process for the preparation of a glycoconjugate comprising *S. pneumoniae* serotype 15B capsular polysaccharide covalently linked to a carrier protein comprises the steps of:

(a) sizing purified serotype 15B polysaccharide by high pressure homogenization;

(b) reacting the sized serotype 15B polysaccharide with an oxidizing agent;

(c) compounding the activated serotype 15B polysaccharide with a carrier protein;

(d) reacting the compounded activated serotype 15B polysaccharide and carrier protein with a reducing agent to form a serotype 15B polysaccharide-carrier protein conjugate; and

(e) capping unreacted aldehyde (quenching) by addition of $NaBH_4$.

In a preferred embodiment the yield of the conjugation step (step d) of the above process is greater than 50%, 55%, 60%, 65%, 70%, 75%, 80%, 85% or 90%. In a preferred embodiment the yield of the conjugation step (step d) is greater than 60%. In a preferred embodiment the yield of the conjugation step (step d) is greater than 70%. The yield is the

amount of serotype 15B polysaccharide in the conjugate ×100)/amount of activated polysaccharide used in the conjugation step.

After conjugation of the serotype 15B capsular polysaccharide to the carrier protein, the polysaccharide-protein conjugate can be purified (enriched with respect to the amount of polysaccharide-protein conjugate) by a variety of techniques known to the skilled person. These techniques include dialysis, concentration/diafiltration operations, tangential flow filtration, precipitation/elution, column chromatography (DEAE or hydrophobic interaction chromatography), and depth filtration.

In an embodiment the carrier protein is as defined at section 1.1. In an embodiment the carrier protein is selected in the group consisting of: DT (Diphtheria toxin), TT (tetanus toxoid), $CRM_{197}$, other DT mutants, PD (*Haemophilus influenzae* protein D), or immunologically functional equivalents thereof. In an embodiment the carrier protein is $CRM_{197}$.

In some embodiments, the serotype 15B glycoconjugates of the present invention are conjugated to the carrier protein (e.g., $CRM_{197}$) and comprise a saccharide having a molecular weight of between 5 kDa and 1,500 kDa. In other such embodiments, the saccharide has a molecular weight of between 10 kDa and 1,500 kDa. In further such embodiments, the saccharide has a molecular weight of between 50 kDa and 1,500 kDa; between 50 kDa and 1,250 kDa; between 50 kDa and 1,000 kDa; between 50 kDa and 750 kDa; between 50 kDa and 500 kDa; between 50 kDa and 250 kDa; between 100 kDa and 1,500 kDa; between 100 kDa and 1,250 kDa; between 100 kDa and 1,000 kDa; between 100 kDa and 750 kDa; between 100 kDa and 500 kDa; between 100 kDa and 250 kDa; between 200 kDa and 1,500 kDa; between 200 kDa and 1,250 kDa; between 200 kDa and 1,000 kDa; between 200 kDa and 750 kDa; or between 200 kDa and 500 kDa; or between 200 kDa and 400 kDa. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure. In some embodiments, the serotype 15B glycoconjugate of the invention has a molecular weight of between 50 kDa and 20,000 kDa. In some embodiments, the serotype 15B glycoconjugate of the invention has a molecular weight of between 1,000 kDa and 20,000 kDa. In a preferred embodiment, the serotype 15B glycoconjugate of the invention has a molecular weight between 3,000 kDa and 20,000 kDa, between 5,000 kDa and 10,000 kDa, between 5,000 kDa and 20,000 kDa, between 8,000 kDa and 20,000 kDa, between 8,000 kDa and 16,000 kDa or between 10,000 kDa and 16,000 kDa.

In further embodiments, the serotype 15B glycoconjugate of the invention has a molecular weight of about 1,000 kDa, about 1,500 kDa, about 2,000 kDa, about 2,500 kDa, about 3,000 kDa, about 3,500 kDa, about 4,000 kDa, about 4,500 kDa, about 5,000 kDa, about 5,500 kDa, about 6,000 kDa, about 6,500 kDa, about 7,000 kDa, about 7,500 kDa, about 8,000 kDa, about 8,500 kDa, about 9,000 kDa, about 9,500 kDa about 10,000 kDa, about 10,500 kDa, about 11,000 kDa, about 11,500 kDa, about 12,000 kDa, about 12,500 kDa, about 13,000 kDa, about 13,500 kDa, about 14,000 kDa, about 14,500 kDa, about 15,000 kDa, about 15,500 kDa, about 16,000 kDa, about 16,500 kDa, about 17,000 kDa, about 17,500 kDa, about 18,000 kDa, about 18,500 kDa about 19,000 kDa, about 19,500 kDa or about 20,000 kDa.

In further embodiments, the serotype 15B glycoconjugate of the invention has a molecular weight of between 1,000 kDa and 20,000 kDa; between 1,000 kDa and 15,000 kDa;



between 1,000 kDa and 10,000 kDa; between 1,000 kDa and 7,500 kDa; between 1,000 kDa and 5,000 kDa; between 1,000 kDa and 4,000 kDa; between 1,000 kDa and 3,000 kDa; between 2,000 kDa and 20,000 kDa; between 2,000 kDa and 15,000 kDa; between 2,000 kDa and 12,500 kDa; between 2,000 kDa and 10,000 kDa; between 2,000 kDa and 7,500 kDa; between 2,000 kDa and 6,000 kDa; between 2,000 kDa and 5,000 kDa; between 2,000 kDa and 4,000 kDa; or between 2,000 kDa and 3,000 kDa.

In further embodiments, the serotype 15B glycoconjugate of the invention has a molecular weight of between 3,000 kDa and 20,000 kDa; between 3,000 kDa and 15,000 kDa; between 3,000 kDa and 10,000 kDa; between 3,000 kDa and 7,500 kDa; between 3,000 kDa and 5,000 kDa; between 3,000 kDa and 4,000 kDa; between 4,000 kDa and 20,000 kDa; between 4,000 kDa and 15,000 kDa; between 4,000 kDa and 12,500 kDa; between 4,000 kDa and 10,000 kDa; between 4,000 kDa and 7,500 kDa; between 4,000 kDa and 6,000 kDa or between 4,000 kDa and 5,000 kDa. In further embodiments, the serotype 15B glycoconjugate of the invention has a molecular weight of between 5,000 kDa and 20,000 kDa; between 5,000 kDa and 15,000 kDa; between 5,000 kDa and 10,000 kDa; between 5,000 kDa and 7,500 kDa; between 6,000 kDa and 20,000 kDa; between 6,000 kDa and 15,000 kDa; between 6,000 kDa and 12,500 kDa; between 6,000 kDa and 10,000 kDa or between 6,000 kDa and 7,500 kDa.

The molecular weight of the glycoconjugate is measured by SEC-MALLS. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure. In an embodiment, said serotype 15B glycoconjugates are prepared using reductive amination.

The serotype 15B glycoconjugates of the invention may also be characterized by the ratio (weight/weight) of saccharide to carrier protein. In a preferred embodiment, the ratio (weight by weight) of serotype 15B capsular polysaccharide to carrier protein in the conjugate is between 0.5 and 3.0 (e.g., about 0.5, about 0.6, about 0.7, about 0.8, about 0.9, about 1.0, about 1.1, about 1.2, about 1.3, about 1.4, about 1.5, about 1.6, about 1.7, about 1.8, about 1.9, about 2.0, about 2.1, about 2.2, about 2.3, about 2.4, about 2.5, about 2.6, about 2.7, about 2.8, about 2.9 or about 3.0). In a preferred embodiment, the ratio of serotype 15B capsular polysaccharide to carrier protein in the conjugate is between 0.4 and 2. In a preferred embodiment, the ratio of serotype 15B capsular polysaccharide to carrier protein in the conjugate is between 0.5 and 2.0, 0.5 and 1.5, 0.5 and 1.0, 1.0 and 1.5, 1.0 and 2.0. In a preferred embodiment, the ratio of serotype 15B capsular polysaccharide to carrier protein in the conjugate is between 0.7 and 0.9.

The serotype 15B glycoconjugates and immunogenic compositions of the invention may contain free saccharide that is not covalently conjugated to the carrier protein, but is nevertheless present in the glycoconjugate composition. The free saccharide may be noncovalently associated with (i.e., noncovalently bound to, adsorbed to, or entrapped in or with) the glycoconjugate.

In a preferred embodiment, the serotype 15B glycoconjugate of the invention comprises less than about 50%, 45%, 40%, 35%, 30%, 25%, 20% or 15% of free serotype 15B capsular polysaccharide compared to the total amount of serotype 15B capsular polysaccharide. In a preferred embodiment the serotype 15B glycoconjugate of the invention comprises less than about 25% of free serotype 15B capsular polysaccharide compared to the total amount of serotype 15B capsular polysaccharide. In a preferred embodiment the serotype 15B glycoconjugate of the inven-

tion comprises less than about 20% of free serotype 15B capsular polysaccharide compared to the total amount of serotype 15B capsular polysaccharide. In a preferred embodiment the serotype 15B glycoconjugates of the invention comprises less than about 15% of free serotype 15B capsular polysaccharide compared to the total amount of serotype 15B capsular polysaccharide.

The serotype 15B glycoconjugates may also be characterized by their molecular size distribution ($K_d$). Size exclusion chromatography media (CL-4B) can be used to determine the relative molecular size distribution of the conjugate, as mentioned above. In a preferred embodiment, at least 20% of the serotype 15B glycoconjugates of the invention have a Kd below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 30% of the immunogenic conjugate has a Kd below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 40% of the serotype 15B glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, or 85% of the serotype 15 glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 60% of the serotype 15B glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 70% of the serotype 15B glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column.

In a preferred embodiment, between 40% and 90% of the serotype 15B glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 50% and 90% of the serotype 15B glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 65% and 80% of the serotype 15B glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column.

In a preferred embodiment, the serotype 15B glycoconjugate of the invention comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7 or 0.8 mM acetate per mM serotype 15B capsular polysaccharide. In a preferred embodiment, the glycoconjugate comprises at least 0.5, 0.6 or 0.7 mM acetate per mM serotype 15B capsular polysaccharide. In a preferred embodiment, the glycoconjugate comprises at least 0.6 mM acetate per mM serotype 15B capsular polysaccharide. In a preferred embodiment, the glycoconjugate comprises at least 0.7 mM acetate per mM serotype 15B capsular polysaccharide. In a preferred embodiment, the presence of O-acetyl groups is determined by ion-HPLC analysis.

In a preferred embodiment, the ratio of mM acetate per mM serotype 15B capsular polysaccharide in the serotype 15B glycoconjugate to mM acetate per mM serotype 15B capsular polysaccharide in the isolated polysaccharide is at least 0.6, 0.65, 0.7, 0.75, 0.8, 0.85, 0.9, or 0.95. In a preferred embodiment, the ratio of mM acetate per mM serotype 15B capsular polysaccharide in the serotype 15B glycoconjugate to mM acetate per mM serotype 15B capsular polysaccharide in the isolated polysaccharide is at least 0.7. In a preferred embodiment, the ratio of mM acetate per mM serotype 15B capsular polysaccharide in the serotype 15B glycoconjugate to mM acetate per mM serotype 15B capsular polysaccharide in the isolated polysaccharide is at least 0.9. In a preferred embodiment, the presence of O-acetyl groups is determined by ion-HPLC analysis.

In a preferred embodiment, the ratio of mM acetate per mM serotype 15B capsular polysaccharide in the serotype 15B glycoconjugate to mM acetate per mM serotype 15B capsular polysaccharide in the activated polysaccharide is at least 0.6, 0.65, 0.7, 0.75, 0.8, 0.85, 0.9, or 0.95. In a preferred embodiment, the ratio of mM acetate per mM serotype 15B capsular polysaccharide in the serotype 15B glycoconjugate to mM acetate per mM serotype 15B capsular polysaccharide in the activated polysaccharide is at least 0.7. In a preferred embodiment, the ratio of mM acetate per mM serotype 15B capsular polysaccharide in the serotype 15B glycoconjugate to mM acetate per mM serotype 15B capsular polysaccharide in the activated polysaccharide is at least 0.9. In a preferred embodiment, the presence of O-acetyl groups is determined by ion-HPLC analysis.

In a preferred embodiment, the serotype 15B glycoconjugate of the invention comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7 or 0.8 mM glycerol per mM serotype 15B capsular polysaccharide. In a preferred embodiment, the serotype 15B glycoconjugate of the invention comprises at least 0.5, 0.6 or 0.7 mM glycerol per mM serotype 15B capsular polysaccharide. In a preferred embodiment, the serotype 15B glycoconjugate of the invention comprises at least 0.6 mM glycerol per mM serotype 15B capsular polysaccharide. In a preferred embodiment, the serotype 15B glycoconjugate of the invention comprises at least 0.7 mM glycerol per mM serotype 15B capsular polysaccharide.

Another way to characterize the serotype 15B glycoconjugates of the invention is by the number of lysine residues in the carrier protein (e.g., $CRM_{197}$) that become conjugated to the saccharide which can be characterized as a range of conjugated lysines (degree of conjugation). The evidence for lysine modification of the carrier protein, due to covalent linkages to the polysaccharides, can be obtained by amino acid analysis using routine methods known to those of skill in the art. Conjugation results in a reduction in the number of lysine residues recovered compared to the $CRM_{197}$ protein starting material used to generate the conjugate materials.

In a preferred embodiment, the degree of conjugation of the serotype 15B glycoconjugate of the invention is between 2 and 15, between 2 and 13, between 2 and 10, between 2 and 8, between 2 and 6, between 2 and 5, between 2 and 4, between 3 and 15, between 3 and 13, between 3 and 10, between 3 and 8, between 3 and 6, between 3 and 5, between 3 and 4, between 5 and 15, between 5 and 10, between 8 and 15, between 8 and 12, between 10 and 15 or between 10 and 12. In an embodiment, the degree of conjugation of the serotype 15B glycoconjugate of the invention is about 2, about 3, about 4, about 5, about 6, about 7, about 8, about 9, about 10, about 11, about 12, about 13, about 14 or about 15. In a preferred embodiment, the degree of conjugation of the serotype 15B glycoconjugate of the invention is between 2 and 5.

1.3.5 Glycoconjugates from *S. pneumoniae* Serotype 12F

In the glycoconjugates from *S. pneumoniae* serotype 12F of the present invention, the saccharide is selected from the group consisting of a polysaccharide and an oligosaccharide, and the carrier protein is selected from any suitable carrier as described herein or known to those of skill in the art. In some preferred embodiments, the saccharide is a polysaccharide from serotype 12F *S. pneumoniae.*

In an embodiment, glycoconjugates from *S. pneumoniae* serotype 12F are prepared using CDAP. The polysaccharides are activated with 1-cyano-4-dimethylamino pyridinium tetrafluoroborate (CDAP) to form a cyanate ester. The activated polysaccharide is then coupled directly or via a spacer (linker) group to an amino group on the carrier protein (preferably $CRM_{197}$). For example, the spacer could be cystamine or cysteamine to give a thiolated polysaccharide which could be coupled to the carrier via a thioether linkage

obtained after reaction with a maleimide-activated carrier protein (for example using GMBS) or a haloacetylated carrier protein (for example using iodoacetimide, SIB, SIAB, sulfo-SIAB, SIA, or SBAP). Preferably, the cyanate ester (optionally made by CDAP chemistry) is coupled with hexane diamine or adipic acid dihydrazide (ADH) and the amino-derivatised saccharide is conjugated to the carrier protein (e.g., $CRM_{197}$) using carbodiimide (e.g., EDAC or EDC) chemistry via a carboxyl group on the protein carrier.

Other techniques for conjugation use carbodiimides, hydrazides, active esters, norborane, p-nitrobenzoic acid, N-hydroxysuccinimide, S—NHS, EDC, TSTU. Many are described in International Patent Application Publication No. WO 98/42721. Conjugation may involve a carbonyl linker which may be formed by reaction of a free hydroxyl group of the saccharide with CDI (see Bethell et al. (1979) J. Biol. Chem. 254:2572-2574; Hearn et al. (1981) J. Chromatogr. 218:509-518) followed by reaction with a protein to form a carbamate linkage. This may involve reduction of the anomeric terminus to a primary hydroxyl group, optional protection/deprotection of the primary hydroxyl group, reaction of the primary hydroxyl group with CDI to form a CDI carbamate intermediate and coupling the CDI carbamate intermediate with an amino group on a protein.

In an embodiment, capsular polysaccharides from serotypes 12F *S. pneumoniae* are conjugated to the carrier protein by reductive amination. Reductive amination involves two steps, (1) oxidation of the polysaccharide to generate aldehyde functionalities from vicinal diols in individual hexasaccharide unit, (2) reduction of the activated polysaccharide and a carrier protein to form a conjugate.

Before oxidation, the serotype 12F polysaccharide is optionally hydrolized (sized). Mechanical or chemical hydrolysis maybe employed. Chemical hydrolysis maybe conducted using acetic acid.

In an embodiment, the oxidizing agent is periodate. The term “periodate” includes both periodate and periodic acid (see below).

In a preferred embodiment, the oxidizing agent is 2,2,6,6-tetramethyl-1-piperidinyloxy (TEMPO) free radical and N-Chlorosuccinimide (NCS) as the cooxidant. In such embodiment, the glycoconjugates from *S. pneumoniae* serotype 12F are prepared using 2,2,6,6-tetramethyl-1-piperidinyloxy (TEMPO) free radical to oxidize primary alcohols of the saccharide to aldehydes using N-Chlorosuccinimide (NCS) as the cooxidant (hereinafter “TEMPO/NCS oxidation”), such as described at Example 7 and in WO 2014/097099. Therefore in one aspect, the glycoconjugates from *S. pneumoniae* serotype 12F are obtainable by a method comprising the steps of: a) reacting a 12F saccharide with 2,2,6,6-tetramethyl-1-piperidinyloxy (TEMPO) and N-chlorosuccinimide (NCS) in an aqueous solvent to produce an activated saccharide; and b) reacting the activated saccharide with a carrier protein comprising one or more amine groups (hereinafter “TEMPO/NCS-reductive amination”). In one aspect, the glycoconjugates from *S. pneumoniae* serotype 12F are obtained by said method. In an embodiment, the degree of oxidation of the activated 12F saccharide ranges from 1 to 50, from 1 to 40, from 1 to 30, from 1 to 20, from 1 to 10, from 1 to 5, from 3 to 40, from 3 to 30, from 3 to 20, from 3 to 10, from 4 to 40, from 4 to 30, from 4 to 20, from 4 to 10, from 5 to 30, from 5 to 25, from 5 to 20, from 5 to 10, from 6 to 50, from 6 to 40, from 6 to 30, from 6 to 20, from 6 to 15, from 6 to 14, from 6 to 13, from 6 to 12, from 6 to 11, from 6 to 10, from 7 to 40, from 7 to 30, from 7 to 20, from 7 to 15, from 7 to 14, from 7 to 13, from 7 to 12, from 7 to 11, from 7 to 10, from 8 to 40, from 8 to 30, from 8 to 20, from 8 to 15, from 8 to 14, from 8 to 13, from 8 to 13, from 8 to 12, from 8 to 11, from 8 to 10, from 9 to 40, from 9 to 30, from 9 to 20, from 9 to 15, from 10 to 40, from 10 to 30, from 10 to 20, or from 10 to 15. In a further aspect, the degree of oxidation of the activated saccharide is 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, or 40. Preferably, the carrier protein is $CRM_{197}$.

In an embodiment, prior to step a), the 12F saccharide is hydrolyzed to a molecular weight ranging from 100 kDa to 400 kDa. For example, in one aspect, the molecular weight ranges from 100 kDa to 350 kDa, from 100 kDa to 300 kDa, from 100 kDa to 250 kDa, from 100 kDa to 200 kDa, from 100 kDa to 150 kDa, from 200 kDa to 400 kDa, from 200 kDa to 350 kDa, from 200 kDa to 300 kDa, from 200 kDa to 250 kDa, from 300 kDa to 400 kDa, or from 300 kDa to 350 kDa.

In a further aspect, the method further comprises the step of purifying the activated polysaccharide prior to step b). In a further aspect, the methods further comprise the step of adding a reducing agent following step b). In one aspect, the reducing agent is $NaCNBH_3$. In a further aspect, the methods further comprise the step of adding $NaBH_4$ following the addition of $NaCNBH_3$. In a further aspect, the method comprises a purification step following the addition of $NaBH_4$.

In another aspect, the present disclosure provides a glycoconjugate from *S. pneumoniae* serotype 12F produced, or obtainable by any of the methods disclosed hereabove. For example, in one aspect the present disclosure provides a glycoconguate from *S. pneumoniae* serotype 12F comprising a saccharide conjugated to a carrier protein that is produced or obtainable by the method comprising the steps of: a) reacting a saccharide with 2,2,6,6-tetramethyl-1-piperidinyloxy (TEMPO) and N-chlorosuccinimide (NCS) in an aqueous solvent to produce an activated saccharide; and b) reacting the activated saccharide with a carrier protein comprising one or more amine groups.

In one embodiment, the glycoconjugate from *S. pneumoniae* serotype 12F of the present invention has a molecular weight of between about 50 kDa and about 20,000 kDa. In another embodiment, the glycoconjugate has a molecular weight of between about 200 kDa and about 10,000 kDa. In another embodiment, the glycoconjugate from *S. pneumoniae* serotype 12F has a molecular weight of between about 500 kDa and about 5,000 kDa. In one embodiment, the glycoconjugate from *S. pneumoniae* serotype 12F has a molecular weight of between about 1,000 kDa and about 3,000 kDa. In other embodiments the glycoconjugate from *S. pneumoniae* serotype 12F has a molecular weight of between about 600 kDa and about 2,800 kDa; between about 700 kDa and about 2,700 kDa; between about 1,000 kDa and about 2,000 kDa; between about 1,800 kDa and about 2,500 kDa; between about 1,100 kDa and about 2,200 kDa; between about 1,900 kDa and about 2,700 kDa; between about 1,200 kDa and about 2,400 kDa; between about 1,700 kDa and about 2,600 kDa; between about 1,300 kDa and about 2,600 kDa; between about 1,600 kDa and about 3,000 kDa.

In further embodiments, the serotype 12F glycoconjugate of the invention has a molecular weight of between 1,000 kDa and 20,000 kDa; between 1,000 kDa and 15,000 kDa; between 1,000 kDa and 10,000 kDa; between 1,000 kDa and 7,500 kDa; between 1,000 kDa and 5,000 kDa; between 1,000 kDa and 4,000 kDa; between 1,000 kDa and 3,000 kDa; between 2,000 kDa and 20,000 kDa; between 2,000

kDa and 15,000 kDa; between 2,000 kDa and 12,500 kDa; between 2,000 kDa and 10,000 kDa; between 2,000 kDa and 7,500 kDa; between 2,000 kDa and 6,000 kDa; between 2,000 kDa and 5,000 kDa; between 2,000 kDa and 4,000 kDa; or between 2,000 kDa and 3,000 kDa. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure. In some such embodiments, the carrier protein is $CRM_{197}$. In some such embodiments, the serotype 12F glycoconjugate is conjugated to the carrier protein by TEMPO/NCS-reductive amination.

Another way to characterize the serotype 12F glycoconjugates of the invention is by the number of lysine residues in the carrier protein (e.g., $CRM_{197}$) that become conjugated to the saccharide, which can be characterized as a range of conjugated lysines (degree of conjugation).

In a preferred embodiment, the degree of conjugation of the serotype 12F glycoconjugate of the invention is between 2 and 20, between 4 and 16, between 4 and 15, between 2 and 15, between 2 and 13, between 2 and 10, between 2 and 8, between 2 and 6, between 2 and 5, between 2 and 4, between 3 and 15, between 3 and 13, between 3 and 10, between 3 and 8, between 3 and 6, between 3 and 5, between 3 and 4, between 5 and 15, between 5 and 10, between 8 and 15, between 8 and 12, between 10 and 15 or between 10 and 12. In an embodiment, the degree of conjugation of the serotype 12F glycoconjugate of the invention is about 2, about 3, about 4, about 5, about 6, about 7, about 8, about 9, about 10, about 11, about 12, about 13, about 14, about 15, about 16, about 17, about 18, about 19 or about 20.

The number of lysine residues in the carrier protein conjugated to the saccharide may also be expressed as a molar ratio. For example, in a glycoconjugate where 4 to 15 lysine residues of $CRM_{197}$ are covalently linked to the saccharide, the molar ratio of conjugated lysines to $CRM_{197}$ in the glycoconjugate is between about 10:1 to about 40:1. In an immunogenic composition where 2 to 20 lysine residues of $CRM_{197}$ are covalently linked to the saccharide, the molar ratio of conjugated lysines to $CRM_{197}$ in the glycoconjugate is between about 5:1 and about 50:1. In one embodiment, in the glycoconjugate from *S. pneumoniae* serotype 12F of the present invention the molar ratio of conjugated lysines to carrier protein is from about 10:1 to about 25:1. In some such embodiments, the carrier protein is $CRM_{197}$. In some embodiments, the $CRM_{197}$ may comprise about 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, or 16 lysine residues out of 39 covalently linked to the saccharide. In some such embodiments, the serotype 12F glycoconjugate is conjugated to the carrier protein by TEMPO/NCS-reductive amination.

In one embodiment, the saccharide to carrier protein ratio (w/w) is between 0.2 and 4 in the glycoconjugate from *S. pneumoniae* serotype 12F (e.g., about 0.2, about 0.3, about 0.4, about 0.5, about 0.6, about 0.7, about 0.8, about 0.9, about 1.0, about 1.1, about 1.2, about 1.3, about 1.4, about 1.5, about 1.6, about 1.7, about 1.8, about 1.9, about 2.0, about 2.1, about 2.2, about 2.3, about 2.4, about 2.5, about 2.6, about 2.7, about 2.8, about 2.9, about 3.0, about 3.1, about 3.2, about 3.3, about 3.4, about 3.5, about 3.6, about 3.7, about 3.8, about 3.9 or about 4.0). In another embodiment, the saccharide to carrier protein ratio (w/w) is between 1.1 and 1.7 in the glycoconjugate from *S. pneumoniae* serotype 12F. In other embodiments, the saccharide to carrier protein ratio (w/w) is between 0.8 and 1.8 (e.g., about 0.8, about 0.9, about 1.0, about 1.1, about 1.2, about 1.3, about 1.4, about 1.5, about 1.6, about 1.7 or about 1.8). In some such embodiments, the carrier protein is $CRM_{197}$. In some such embodiments, the carrier protein is $CRM_{197}$. In some such embodiments, the serotype 12F glycoconjugate is conjugated to the carrier protein by TEMPO/NCS-reductive amination.

The frequency of attachment of the saccharide chain to a lysine on the carrier protein is another parameter for characterizing the serotype 12F glycoconjugates of the disclosure. For example, in one embodiment, there is at least one covalent linkage between the carrier protein and the polysaccharide for every 100 saccharide repeat units of the polysaccharide. In one embodiment, there is at least one covalent linkage between the carrier protein and the polysaccharide for every 50 saccharide repeat units of the polysaccharide. In one embodiment, there is at least one covalent linkage between the carrier protein and the polysaccharide for every 25 saccharide repeat units of the polysaccharide. In another embodiment, the covalent linkage between the carrier protein and the polysaccharide occurs at least once in every 4 saccharide repeat units of the polysaccharide. In another embodiment, the covalent linkage between the carrier protein and the polysaccharide occurs at least once in every 10 saccharide repeat units of the polysaccharide. In a further embodiment, the covalent linkage between the carrier protein and the polysaccharide occurs at least once in every 15 saccharide repeat units of the polysaccharide. In frequent embodiments, the carrier protein is $CRM_{197}$ and the covalent linkage between the $CRM_{197}$ and the polysaccharide occurs at least once in every 4, 10, 15 or 25 saccharide repeat units of the polysaccharide.

In other embodiments, the conjugate comprises at least one covalent linkage between the carrier protein and saccharide for every 5 to 10 saccharide repeat units; every 2 to 7 saccharide repeat units; every 3 to 8 saccharide repeat units; every 4 to 9 saccharide repeat units; every 6 to 11 saccharide repeat units; every 7 to 12 saccharide repeat units; every 8 to 13 saccharide repeat units; every 9 to 14 saccharide repeat units; every 10 to 15 saccharide repeat units; every 2 to 6 saccharide repeat units, every 3 to 7 saccharide repeat units; every 4 to 8 saccharide repeat units; every 6 to 10 saccharide repeat units; every 7 to 11 saccharide repeat units; every 8 to 12 saccharide repeat units; every 9 to 13 saccharide repeat units; every 10 to 14 saccharide repeat units; every 10 to 20 saccharide repeat units; every 4 to 25 saccharide repeat units or every 2 to 25 saccharide repeat units. In frequent embodiments, the carrier protein is $CRM_{197}$.

In another embodiment, at least one linkage between $CRM_{197}$ and saccharide occurs for every 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 saccharide repeat units of the polysaccharide. In some such embodiments, the serotype 12F glycoconjugate is conjugated to the carrier protein by TEMPO/NCS-reductive amination.

In one embodiment, the glycoconjugate from *S. pneumoniae* serotype 12F of the invention comprises at least one covalent linkage between the carrier protein and the polysaccharide for every 25 saccharide repeat units of the polysaccharide. In another embodiment, the covalent linkage between the carrier protein and the polysaccharide occurs at least once in every 4 saccharide repeat units of the polysaccharide. In another embodiment, the covalent linkage between the carrier protein and the polysaccharide occurs at least once in every 10 saccharide repeat units of the polysaccharide. In a further embodiment, the covalent linkage between the carrier protein and the polysaccharide occurs at least once in every 15 saccharide repeat units of the polysaccharide. In some such embodiments, the serotype

12F glycoconjugate is conjugated to the carrier protein by TEMPO/NCS-reductive amination.

The serotype 12F glycoconjugates and immunogenic compositions of the invention may contain free saccharide that is not covalently conjugated to the carrier protein, but is nevertheless present in the glycoconjugate composition. The free saccharide may be noncovalently associated with (i.e., noncovalently bound to, adsorbed to, or entrapped in or with) the glycoconjugate.

In some embodiments, the serotype 12F glycoconjugates of the invention comprise less than about 50%, 45%, 40%, 35%, 30%, 25%, 20%, 15%, 10% or 5% of free serotype 12F polysaccharide compared to the total amount of serotype 12F polysaccharide. In one embodiment, the glycoconjugate from *S. pneumoniae* serotype 12F comprises less than about 50% of free serotype 12F polysaccharide compared to the total amount of serotype 12F polysaccharide. In one embodiment, the glycoconjugate from *S. pneumoniae* serotype 12F comprises less than about 45% of free serotype 12F polysaccharide compared to the total amount of serotype 12F polysaccharide. In another embodiment, the glycoconjugate comprises less than about 30% of free serotype 12F polysaccharide compared to the total amount of serotype 12F polysaccharide. In another embodiment, the glycoconjugate from *S. pneumoniae* serotype 12F comprises less than about 20% of free serotype 12F polysaccharide compared to the total amount of serotype 12F polysaccharide. In a further embodiment, the glycoconjugate comprises less than about 10% of free serotype 12F polysaccharide compared to the total amount of serotype 12F polysaccharide. In another embodiment, the glycoconjugate from *S. pneumoniae* serotype 12F comprises less than about 5% of free serotype 12F polysaccharide compared to the total amount of serotype 12F polysaccharide. In some such embodiments, the serotype 12F glycoconjugate is conjugated to the carrier protein by TEMPO/NCS-reductive amination.

In some embodiments, the serotype 12F glycoconjugate of the present invention comprises a saccharide having a molecular weight of between 10 kDa and 2,000 kDa. In other such embodiments, the saccharide has a molecular weight of between 50 kDa and 2,000 kDa. In further such embodiments, the saccharide has a molecular weight of between 50 kDa and 1,750 kDa; between 50 kDa and 1,500 kDa; between 50 kDa and 1,250 kDa; between 50 kDa and 1,000 kDa; between 50 kDa and 750 kDa; between 50 kDa and 500 kDa; between 100 kDa and 2,000 kDa; between 100 kDa and 1,750 kDa; between 100 kDa and 1,500 kDa; between 100 kDa and 1,250 kDa; between 100 kDa and 1,000 kDa; between 100 kDa and 750 kDa; between 100 kDa and 500 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 1,750 kDa; between 200 kDa and 1,500 kDa; between 200 kDa and 1,250 kDa; between 200 kDa and 1,000 kDa; between 200 kDa and 750 kDa; or between 200 kDa and 500 kDa; or between 200 kDa and 400 kDa. In some such embodiments, the serotype 12F glycoconjugate is conjugated to the carrier protein by TEMPO/NCS-reductive amination.

The serotype 12F glycoconjugates may also be characterized by their molecular size distribution ($K_d$). Size exclusion chromatography media (CL-4B) can be used to determine the relative molecular size distribution of the conjugate, as mentioned above.

In a preferred embodiment, at least 35% of the serotype 12F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, or 85% of the serotype 12F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 60% of the serotype 12F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 70% of the serotype 12F glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column.

In a preferred embodiment, between 40% and 90% of the serotype 12F glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 50% and 90% of the serotype 12F glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 65% and 80% of the serotype 12F glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column.

1.3.6 Glycoconjugates from *S. pneumoniae* Serotype 10A

In an embodiment, the serotype 10A glycoconjugates are obtained by activating polysaccharide with 1-cyano-4-dimethylamino pyridinium tetrafluoroborate (CDAP) to form a cyanate ester. The activated polysaccharide may be coupled directly or via a spacer (linker) group to an amino group on the carrier protein. For example, the spacer could be cystamine or cysteamine to give a thiolated polysaccharide which could be coupled to the carrier via a thioether linkage obtained after reaction with a maleimide-activated carrier protein (for example using GMBS) or a haloacetylated carrier protein (for example using iodoacetimide, SIB, SIAB, sulfo-SIAB, SIA, or SBAP). Preferably, the cyanate ester (optionally made by CDAP chemistry) is coupled with hexane diamine or adipic acid dihydrazide (ADH) and the amino-derivatised saccharide is conjugated to the carrier protein using carbodiimide (e.g., EDAC or EDC) chemistry via a carboxyl group on the protein carrier. Such conjugates are described for example in WO 93/15760, WO 95/08348 and WO 96/29094.

Other suitable techniques use carbodiimides, hydrazides, active esters, norborane, p-nitrobenzoic acid, N-hydroxysuccinimide, S—NHS, EDC, TSTU. Many are described in International Patent Application Publication No. WO 98/42721. Conjugation may involve a carbonyl linker which may be formed by reaction of a free hydroxyl group of the saccharide with CDI (See Bethell et al. (1979) J. Biol. Chem. 254:2572-2574; Hearn et al. (1981) J. Chromatogr. 218:509-518) followed by reaction with a protein to form a carbamate linkage. This may involve reduction of the anomeric terminus to a primary hydroxyl group, optional protection/deprotection of the primary hydroxyl group, reaction of the primary hydroxyl group with CDI to form a CDI carbamate intermediate and coupling the CDI carbamate intermediate with an amino group on a protein.

In preferred embodiments, the serotype 10A glycoconjugates of the invention are prepared using reductive amination. Reductive amination involves two steps, (1) oxidation of the polysaccharide to generate aldehyde functionalities from vicinal diols in individual hexasaccharide unit, (2) reduction of the activated polysaccharide and a carrier protein to form a conjugate.

Before oxidation, the serotype 10A polysaccharide is optionally hydrolized (sized). Mechanical or chemical hydrolysis maybe employed. Chemical hydrolysis maybe conducted using acetic acid.

In an embodiment, serotype polysaccharide is activated (oxidized) by a process comprising the step of:

(a) reacting isolated serotype 10A polysaccharide with an oxidizing agent;

(b) quenching the oxidation reaction by addition of a quenching agent resulting in an activated serotype 10A polysaccharide.

In a preferred embodiment, the oxidizing agent is periodate. For the purpose of the present invention, the term "periodate" includes both periodate and periodic acid, the term also includes both metaperiodate ($IO_4^-$) and orthoperiodate ($IO_6^{5-}$) and the various salts of periodate (e.g., sodium periodate and potassium periodate). In a preferred embodiment, the oxidizing agent is sodium periodate. In a preferred embodiment, the periodate used for the oxidation of serotype 10A polysaccharide is metaperiodate. In a preferred embodiment the periodate used for the oxidation of serotype 10A polysaccharide is sodium metaperiodate.

In one embodiment, the quenching agent is selected from vicinal diols, 1,2-aminoalcohols, amino acids, glutathione, sulfite, bisulfate, dithionite, metabisulfite, thiosulfate, phosphites, hypophosphites or phosphorous acid.

In one embodiment, the quenching agent is a 1,2-aminoalcohols of formula (I):

(I)



wherein $R^1$ is selected from H, methyl, ethyl, propyl or isopropyl.

In one embodiment, the quenching agent is selected from sodium and potassium salts of sulfite, bisulfate, dithionite, metabisulfite, thiosulfate, phosphites, hypophosphites or phosphorous acid.

In one embodiment, the quenching agent is an amino acid. In such embodiments, said amino acid may be selected from serine, threonine, cysteine, cystine, methionine, proline, hydroxyproline, tryptophan, tyrosine, and histidine.

In one embodiment, the quenching agent is a sulfite such as bisulfate, dithionite, metabisulfite, thiosulfate.

In one embodiment, the quenching agent is a compound comprising two vicinal hydroxyl groups (vicinal diols), i.e., two hydroxyl groups covalently linked to two adjacent carbon atoms.

Preferably, the quenching agent is a compound of formula (II):

(II)



wherein $R^1$ and $R^2$ are each independently selected from H, methyl, ethyl, propyl or isopropyl.

In a preferred embodiment, the quenching agent is glycerol, ethylene glycol, propan-1,2-diol, butan-1,2-diol or butan-2,3-diol, ascorbic acid. In a preferred embodiment, the quenching agent is butan-2,3-diol.

In preferred embodiment, the isolated serotype 10A polysaccharide is activated by a process comprising the step of:

(a) reacting isolated serotype 10A polysaccharide with periodate;

(b) quenching the oxidation reaction by addition of butan-2,3-diol resulting in an activated serotype 10A polysaccharide.

Following the oxidation step of the polysaccharide, the polysaccharide is said to be activated and is referred to an "activated polysaccharide" hereinafter.

In a preferred embodiment, the activated serotype 10A polysaccharide is purified. The activated serotype 10A polysaccharide is purified according to methods known to the man skilled in the art, such as gel permeation chromatography (GPC), dialysis or ultrafiltration/diafiltration. For example, the activated 10A polysaccharide is purified by concentration and diafiltration using an ultrafiltration device.

In a preferred embodiment the degree of oxidation of the activated serotype 10A polysaccharide is between 2 and 30, between 2 and 25, between 2 and 20, between 2 and 15, between 2 and 10, between 2 and 5, between 5 and 30, between 5 and 25, between 5 and 20, between 5 and 15, between 5 and 10, between 10 and 30, between 10 and 25, between 10 and 20, between 10 and 15, between 15 and 30, between 15 and 25, between 15 and 20, between 20 to 30, or between 20 to 25. In a preferred embodiment the degree of oxidation of the activated serotype 10A polysaccharide is between 2 and 10, between 4 and 8, between 4 and 6, between 6 and 8, between 6 and 12, between 8 and 14, between 9 and 11, between 10 and 16, between 12 and 16, between 14 and 18, between 16 and 20, between 16 and 18, between 18 and 22, or between 18 and 20.

In a preferred embodiment, the activated serotype 10A polysaccharide has a molecular weight between 50 kDa and 400 kDa, between 50 kDa and 350 kDa, between 50 kDa and 300 kDa, between 50 kDa and 250 kDa, between 50 kDa and 200 kDa, between 100 kDa and 300 kDa, between 100 kDa and 250 kDa or between 100 kDa and 200 kDa. In a preferred embodiment, the activated serotype 10A polysaccharide has a molecular weight between 50 kDa and 300 kDa. In a preferred embodiment, the activated serotype 10A polysaccharide has a molecular weight between 100 kDa and 200 kDa. In a preferred embodiment, the activated serotype 10A polysaccharide has a molecular weight between 100 kDa and 200 kDa and a degree of oxidation between 5 and 20, between 5 and 15, between 8 and 14, between 8 and 12 or between 9 and 11. In a preferred embodiment, the activated serotype 10A polysaccharide has a molecular weight between 100 kDa and 200 kDa and a degree of oxidation between 9 and 11.

The activated polysaccharide and/or the carrier protein may be lyophilised (freeze-dried), either independently (discrete lyophilization) or together (co-lyophilized).

In an embodiment, the activated serotype 10A polysaccharide is lyophilized, optionally in the presence of saccharide. In a preferred embodiment, the saccharide is selected from sucrose, trehalose, raffinose, stachyose, melezitose, dextran, mannitol, lactitol and palatinit. In a preferred embodiment, the saccharide is sucrose. In one embodiment, the lyophilized activated polysaccharide is then compounded with a solution comprising the carrier protein.

In another embodiment the activated polysaccharide and the carrier protein are co-lyophilised. In such embodiments, the activated serotype 10A polysaccharide is compounded with the carrier protein and lyophilized optionally in the presence of a saccharide. In a preferred embodiment, the saccharide is selected from sucrose, trehalose, raffinose, stachyose, melezitose, dextran, mannitol, lactitol and palatinit. In a preferred embodiment, the saccharide is sucrose. The co-lyophilized polysaccharide and carrier protein can then be resuspended in solution and reacted with a reducing agent.

The second step of the conjugation process is the reduction of the activated polysaccharide and a carrier protein to form a conjugate (reductive amination), using a reducing agent.

The activated serotype 10A polysaccharide can be conjugated to a carrier protein by a process comprising the step of:

(c) compounding the activated serotype 10A polysaccharide with a carrier protein; and

(d) reacting the compounded activated serotype 10A polysaccharide and carrier protein with a reducing agent to form a serotype 10A polysaccharide-carrier protein conjugate.

In an embodiment, the reduction reaction is carried out in aqueous solvent, in another embodiment the reaction is carried out in aprotic solvent. In an embodiment, the reduction reaction is carried out in DMSO (dimethylsulfoxide) or in DMF (dimethylformamide) solvent. The DMSO or DMF solvent may be used to reconstitute the activated polysaccharide and carrier protein which has been lyophilised.

In an embodiment, the reducing agent is sodium cyanoborohydride, sodium triacetoxyborohydride, sodium or zinc borohydride in the presence of Bronsted or Lewis acids, amine boranes such as pyridine borane, 2-Picoline Borane, 2,6-diborane-methanol, dimethylamine-borane, t-BuMeiPrN-BH3, benzylamine-BH3 or 5-ethyl-2-methylpyridine borane (PEMB). In a preferred embodiment, the reducing agent is sodium cyanoborohydride.

At the end of the reduction reaction, there may be unreacted aldehyde groups remaining in the conjugates, these may be capped using a suitable capping agent. In one embodiment this capping agent is sodium borohydride ($NaBH_4$).

Following conjugation of serotype 10A polysaccharide to the carrier protein, the glycoconjugate can be purified (enriched with respect to the amount of polysaccharide-protein conjugate) by a variety of techniques known to the skilled person. These techniques include dialysis, concentration/diafiltration operations, tangential flow filtration precipitation/elution, column chromatography (DEAE or hydrophobic interaction chromatography), and depth filtration.

In some embodiments, the serotype 10A glycoconjugates of the present invention comprise a saccharide having a molecular weight of between 10 kDa and 2,000 kDa. In other such embodiments, the saccharide has a molecular weight of between 50 kDa and 2,000 kDa. In further such embodiments, the saccharide has a molecular weight of between 50 kDa and 1,750 kDa; between 50 kDa and 1,500 kDa; between 50 kDa and 1,250 kDa; between 50 kDa and 1,000 kDa; between 50 kDa and 750 kDa; between 50 kDa and 500 kDa; between 100 kDa and 2,000 kDa; between 100 kDa and 1,750 kDa; between 100 kDa and 1,500 kDa; between 100 kDa and 1,250 kDa; between 100 kDa and 1,000 kDa; between 100 kDa and 750 kDa; between 100 kDa and 500 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 1,750 kDa; between 200 kDa and 1,500 kDa; between 200 kDa and 1,250 kDa; between 200 kDa and 1,000 kDa; between 200 kDa and 750 kDa; or between 200 kDa and 500 kDa; or between 200 kDa and 400 kDa. In some such embodiments, the serotype 10A glycoconjugates are prepared using reductive amination.

In some embodiments, the serotype 10A glycoconjugate of the invention has a molecular weight of between 50 kDa and 20,000 kDa. In other embodiments, the serotype 10A glycoconjugate has a molecular weight of between 50 kDa and 15,000 kDa. In other embodiments, the serotype 10A glycoconjugate has a molecular weight of between 500 kDa and 15,000 kDa, between 500 kDa and 10,000 kDa; between 2,000 kDa and 10,000 kDa; or between 3,000 kDa and 8,000 kDa. In other embodiments, the serotype 10A glycoconjugate has a molecular weight of between 1,000 kDa and 10,000 kDa. In other embodiments, the serotype 10A glycoconjugate has a molecular weight of between 1000 kDa and 8,000 kDa. In still other embodiments, the serotype 10A glycoconjugate has a molecular weight of between 2,000 kDa and 8,000 kDa or between 3,000 kDa and 7,000 kDa. In further embodiments, the serotype 10A glycoconjugate of the invention has a molecular weight of between 200 kDa and 20,000 kDa; between 200 kDa and 15,000 kDa; between 200 kDa and 10,000 kDa; between 200 kDa and 7,500 kDa; between 200 kDa and 5,000 kDa; between 200 kDa and 3,000 kDa; between 200 kDa and 1,000 kDa; between 500 kDa and 20,000 kDa; between 500 kDa and 15,000 kDa; between 500 kDa and 12,500 kDa; between 500 kDa and 10,000 kDa; between 500 kDa and 7,500 kDa; between 500 kDa and 6,000 kDa; between 500 kDa and 5,000 kDa; between 500 kDa and 4,000 kDa; between 500 kDa and 3,000 kDa; between 500 kDa and 2,000 kDa; between 500 kDa and 1,500 kDa; between 500 kDa and 1,000 kDa; between 750 kDa and 20,000 kDa; between 750 kDa and 15,000 kDa; between 750 kDa and 12,500 kDa; between 750 kDa and 10,000 kDa; between 750 kDa and 7,500 kDa; between 750 kDa and 6,000 kDa; between 750 kDa and 5,000 kDa; between 750 kDa and 4,000 kDa; between 750 kDa and 3,000 kDa; between 750 kDa and 2,000 kDa; between 750 kDa and 1,500 kDa; between 1,000 kDa and 15,000 kDa; between 1,000 kDa and 12,500 kDa; between 1,000 kDa and 10,000 kDa; between 1,000 kDa and 7,500 kDa; between 1,000 kDa and 6,000 kDa; between 1,000 kDa and 5,000 kDa; between 1,000 kDa and 4,000 kDa; between 1,000 kDa and 2,500 kDa; between 2,000 kDa and 15,000 kDa; between 2,000 kDa and 12,500 kDa; between 2,000 kDa and 10,000 kDa; between 2,000 kDa and 7,500 kDa; between 2,000 kDa and 6,000 kDa; between 2,000 kDa and 5,000 kDa; between 2,000 kDa and 4,000 kDa; or between 2,000 kDa and 3,000 kDa.



In further embodiments, the serotype 10A glycoconjugate of the invention has a molecular weight of between 3,000 kDa and 20,000 kDa; between 3,000 kDa and 15,000 kDa; between 3,000 kDa and 10,000 kDa; between 3,000 kDa and 7,500 kDa; between 3,000 kDa and 5,000 kDa; between 4,000 kDa and 20,000 kDa; between 4,000 kDa and 15,000 kDa; between 4,000 kDa and 12,500 kDa; between 4,000 kDa and 10,000 kDa; between 4,000 kDa and 7,500 kDa; between 4,000 kDa and 6,000 kDa; or between 4,000 kDa and 5,000 kDa. In further embodiments, the serotype 10A glycoconjugate of the invention has a molecular weight of between 5,000 kDa and 20,000 kDa; between 5,000 kDa and 15,000 kDa; between 5,000 kDa and 10,000 kDa or between 5,000 kDa and 7,500 kDa. In further embodiments, the serotype 10A glycoconjugate of the invention has a molecular weight of between 6,000 kDa and 20,000 kDa; between 6,000 kDa and 15,000 kDa; between 6,000 kDa and 10,000 kDa or between 6,000 kDa and 7,500 kDa. In further embodiments, the serotype 10A glycoconjugate of the invention has a molecular weight of between 7,000 kDa and 20,000 kDa; between 7,000 kDa and 15,000 kDa; between 7,000 kDa and 10,000 kDa or between 7,000 kDa and 8,000 kDa. In further embodiments, the serotype 10A glycoconjugate of the invention has a molecular weight of between 8,000 kDa and 20,000 kDa; between 8,000 kDa and 15,000 kDa; or between 8,000 kDa and 10,000 kDa.

Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure. The molecular weight of the glycoconjugate is measured by SEC-MALLS.

Another way to characterize the serotype 10A glycoconjugates of the invention is by the number of lysine residues in the carrier protein (e.g., $CRM_{197}$) that become conjugated to the saccharide which can be characterized as a range of conjugated lysines (degree of conjugation). The evidence for lysine modification of the carrier protein, due to covalent linkages to the polysaccharides, can be obtained by amino acid analysis using routine methods known to those of skill in the art. Conjugation results in a reduction in the number of lysine residues recovered compared to the $CRM_{197}$ protein starting material used to generate the conjugate materials.

In a preferred embodiment, the degree of conjugation of the serotype 10A glycoconjugate is between 2 and 15, between 2 and 13, between 2 and 10, between 2 and 8, between 2 and 6, between 2 and 5, between 2 and 4, between 3 and 15, between 3 and 13, between 3 and 10, between 3 and 8, between 3 and 6, between 3 and 5, between 3 and 4, between 5 and 15, between 5 and 10, between 8 and 15, between 8 and 12, between 10 and 15 or between 10 and 12. In a preferred embodiment, the degree of conjugation of the serotype 10A glycoconjugate is between 6 and 8. In a preferred embodiment, the carrier protein is $CRM_{197}$.

The serotype 10A glycoconjugates of the invention may also be characterized by the ratio (weight/weight) of saccharide to carrier protein. In some embodiments, the saccharide to carrier protein ratio (w/w) is between 0.5 and 3.0 (e.g., about 0.5, about 0.6, about 0.7, about 0.8, about 0.9, about 1.0, about 1.1, about 1.2, about 1.3, about 1.4, about 1.5, about 1.6, about 1.7, about 1.8, about 1.9, about 2.0, about 2.1, about 2.2, about 2.3, about 2.4, about 2.5, about 2.6, about 2.7, about 2.8, about 2.9 or about 3.0). In a preferred embodiment, the ratio of serotype 10A saccharide to carrier protein in the conjugate is between 0.5 and 2.0, 0.5 and 1.5, 0.5 and 1.0, 1.0 and 1.5 or 1.0 and 2.0. In a preferred embodiment, the ratio of serotype 10A polysaccharide to carrier protein in the conjugate is between 0.8 and 1.4. In a preferred embodiment, the ratio of serotype 10A capsular polysaccharide to carrier protein in the conjugate is between 0.8 and 1.2 (e.g., about 0.8, about 0.9 about 1.0, about 1.1, or about 1.2). In some such embodiments, the carrier protein is $CRM_{197}$.

The serotype 10A glycoconjugates and immunogenic compositions of the invention may contain free saccharide that is not covalently conjugated to the carrier protein, but is nevertheless present in the glycoconjugate composition. The free saccharide may be noncovalently associated with (i.e., noncovalently bound to, adsorbed to, or entrapped in or with) the glycoconjugate.

In some embodiments, the serotype 10A glycoconjugates of the invention comprise less than about 50% free saccharide, less than about 45% free saccharide, less than about 40% free saccharide, less than about 35% free saccharide, less than about 30% free saccharide, less than about 25% free saccharide, less than about 20% free saccharide, less than about 15% free saccharide, less than about 10% free saccharide, or less than about 5% free saccharide relative to the total amount of 10A saccharide. Preferably, serotype 10A the glycoconjugate comprises less than 15% free saccharide, more preferably less than 10% free saccharide, and still more preferably, less than 5% of free saccharide.

The serotype 10A glycoconjugates may also be characterized by their molecular size distribution ($K_d$). Size exclusion chromatography media (CL-4B) can be used to determine the relative molecular size distribution of the conjugate, as mentioned above.

In a preferred embodiment, at least 30% of the serotype 10A glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 40% of the serotype 10A glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, or 85% of the serotype 10A glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 60% of the serotype 10A glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 50% and 80% of the serotype 10A glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column.

1.3.7 Glycoconjugates from *S. pneumoniae* Serotype 11A

In an embodiment, the serotype 11A glycoconjugates are obtained by activating polysaccharide with 1-cyano-4-dimethylamino pyridinium tetrafluoroborate (CDAP) to form a cyanate ester. The activated polysaccharide may be coupled directly or via a spacer (linker) group to an amino group on the carrier protein. For example, the spacer could be cystamine or cysteamine to give a thiolated polysaccharide which could be coupled to the carrier via a thioether linkage obtained after reaction with a maleimide-activated carrier protein (for example using GMBS) or a haloacetylated carrier protein (for example using iodoacetimide, SIB, SIAB, sulfo-SIAB, SIA, or SBAP). Preferably, the cyanate ester (optionally made by CDAP chemistry) is coupled with hexane diamine or adipic acid dihydrazide (ADH) and the amino-derivatised saccharide is conjugated to the carrier protein using carbodiimide (e.g., EDAC or EDC) chemistry via a carboxyl group on the protein carrier. Such conjugates are described for example in WO 93/15760, WO 95/08348 and WO 96/29094.

Other suitable techniques use carbodiimides, hydrazides, active esters, norborane, p-nitrobenzoic acid, N-hydroxysuccinimide, S—NHS, EDC, TSTU. Many are described in International Patent Application Publication No. WO 98/42721. Conjugation may involve a carbonyl linker which may be formed by reaction of a free hydroxyl group of the saccharide with CDI (see Bethell et al. (1979). Biol. Chem. 254:2572-2574; Hearn et al. (1981) J. Chromatogr. 218:509-518) followed by reaction with a protein to form a carbamate linkage. This may involve reduction of the anomeric terminus to a primary hydroxyl group, optional protection/deprotection of the primary hydroxyl group, reaction of the primary hydroxyl group with CDI to form a CDI carbamate intermediate and coupling the CDI carbamate intermediate with an amino group on a protein.

In preferred embodiments, the serotype 11A glycoconjugates of the invention are prepared using reductive amination. Reductive amination involves two steps, (1) oxidation of the polysaccharide to generate aldehyde functionalities from vicinal diols in individual hexasaccharide unit, (2) reduction of the activated polysaccharide and a carrier protein to form a conjugate.

Before oxidation, the serotype 11A polysaccharide is optionally hydrolized to reduce its viscosity. Mechanical or chemical hydrolysis maybe employed. Chemical hydrolysis maybe conducted using acetic acid. Mechanical sizing maybe conducted using High Pressure Homogenization Shearing.

The oxidation step may involve reaction with periodate. For the purpose of the present invention, the term "perio-

date" includes both periodate and periodic acid; the term also includes both metaperiodate ($IO_4^-$) and orthoperiodate ($IO_6^{5-}$) and the various salts of periodate (e.g., sodium periodate and potassium periodate). In an embodiment the capsular polysaccharide from serotype 11A of *S. pneumoniae* is oxydized in the presence of metaperiodate, preferably in the presence of sodium periodate ($NaIO_4$). In another embodiment the capsular polysaccharide from serotype 11A is oxydized in the presence of orthoperiodate, preferably in the presence of periodic acid.

Following the oxidation step of the polysaccharide, the polysaccharide is said to be activated and is referred to as "activated polysaccharide" here below. The activated polysaccharide maybe purified and lyophilised (freeze-dried).

The activated polysaccharide and the carrier protein may be lyophilized (freeze-dried), either independently (discrete lyophilization) or together (co-lyophilized). In one embodiment the activated polysaccharide and the carrier protein are co-lyophilized. In another embodiment the activated polysaccharide and the carrier protein are lyophilized independently.

In one embodiment the lyophilization takes place in the presence of a non-reducing sugar, possible non-reducing sugars include sucrose, trehalose, raffinose, stachyose, melezitose, dextran, mannitol, lactitol and palatinit.

The second step of the conjugation process is the reduction of the activated polysaccharide and a carrier protein to form a conjugate (reductive amination), using a reducing agent. Reducing agents which are suitable include the cyanoborohydrides, such as sodium cyanoborohydride, borane-pyridine, or borohydride exchange resin. In one embodiment the reducing agent is sodium cyanoborohydride.

In an embodiment, the reduction reaction is carried out in aqueous solvent, in another embodiment the reaction is carried out in aprotic solvent. In an embodiment, the reduction reaction is carried out in DMSO (dimethylsulfoxide) or in DMF (dimethylformamide) solvent. The DMSO or DMF solvent may be used to reconstitute the activated polysaccharide and carrier protein which has been lyophilised.

In one embodiment between 0.1 and 3.0, between 0.15 and 2.0, between 0.2 and 2.0, or between 0.5 and 1.5 molar equivalents of sodium cyanoborohydride is used in the reduction reaction. In one embodiment about 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1.0, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 2.0, 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 2.9 or 3.0 molar equivalents of sodium cyanoborohydride is used in the reduction reaction.

In one embodiment the reducing agent is sodium triacetoxyborohydride, in a further embodiment between 1.0 and 6.0 molar equivalents, between 2.0 and 5.0 molar equivalents or about 3.0 molar equivalents of sodium triacetoxyborohydride is used in the reduction reaction.

At the end of the reduction reaction, there may be unreacted aldehyde groups remaining in the conjugates, these may be capped using a suitable capping agent. In one embodiment this capping agent is sodium borohydride ($NaBH_4$). In an embodiment capping is achieved by mixing the reduction reaction with between 0.5 and 5.0 molar equivalents of NaBH4, for example about 1, 1.5, 2, 2.5 or 3 molar equivalents of $NaBH_4$.

Following the conjugation (the reduction reaction and optionally the capping), the glycoconjugates may be purified. The glycoconjugates maybe purified by diafiltration and/or ion exchange chromatography and/or size exclusion chromatography. In an embodiment, the glycoconjugates are purified by diafiltration or ion exchange chromatography or size exclusion chromatography.

In one embodiment the glycoconjugates are sterile filtered.

In some embodiments, the serotype 11A glycoconjugates of the present invention are conjugated to the carrier protein (e.g., $CRM_{197}$) and comprise a saccharide having a molecular weight of between 10 kDa and 2,000 kDa. In other such embodiments, the saccharide has a molecular weight of between 50 kDa and 2,000 kDa. In further such embodiments, the saccharide has a molecular weight of between 50 kDa and 1,750 kDa; between 50 kDa and 1,500 kDa; between 50 kDa and 1,250 kDa; between 50 kDa and 1,000 kDa; between 50 kDa and 750 kDa; between 50 kDa and 500 kDa; between 50 kDa and 400 kDa; between 50 kDa and 300 kDa; between 50 kDa and 200 kDa; between 50 kDa and 100 kDa; between 100 kDa and 2,000 kDa; between 100 kDa and 1,750 kDa; between 100 kDa and 1,500 kDa; between 100 kDa and 1,250 kDa; between 100 kDa and 1,000 kDa; between 100 kDa and 750 kDa; between 100 kDa and 500 kDa; between 100 kDa and 400 kDa between; 100 kDa and 300 kDa; between 100 kDa and 200 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 1,750 kDa; between 200 kDa and 1,500 kDa; between 200 kDa and 1,250 kDa; between 200 kDa and 1,000 kDa; between 200 kDa and 750 kDa; or between 200 kDa and 500 kDa; between 200 kDa and 400 kDa or between 200 kDa and 300 kDa.

In some embodiments, the serotype 11A glycoconjugate of the invention has a molecular weight of between 50 kDa and 20,000 kDa. In other embodiments, the serotype 11A glycoconjugate has a molecular weight of between 50 kDa and 15,000 kDa. In other embodiments, the serotype 11A glycoconjugate has a molecular weight of between 500 kDa and 10,000 kDa. In other embodiments, the serotype 11A glycoconjugate has a molecular weight of between 200 kDa and 10,000 kDa. In still other embodiments, the serotype 11A glycoconjugate has a molecular weight of between 1,000 kDa and 8,000 kDa or between 2,000 kDa and 8,000 kDa.

In further embodiments, the serotype 11A glycoconjugate of the invention has a molecular weight of between 200 kDa and 20,000 kDa; between 200 kDa and 17,500 kDa; between 200 kDa and 15,000 kDa; between 200 kDa and 10,000 kDa; between 200 kDa and 7,500 kDa; between 200 kDa and 5,000 kDa; between 200 kDa and 3,000 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 1,000 kDa; between 500 kDa and 20,000 kDa; between 500 kDa and 17,500 kDa; between 500 kDa and 15,000 kDa; between 500 kDa and 12,500 kDa; between 500 kDa and 10,000 kDa; between 500 kDa and 7,500 kDa; between 500 kDa and 6,000 kDa; between 500 kDa and 5,000 kDa; between 500 kDa and 4,000 kDa; between 500 kDa and 3,000 kDa; between 500 kDa and 2,000 kDa; between 500 kDa and 1,500 kDa; between 500 kDa and 1,000 kDa; between 700 kDa and 20,000 kDa; between 700 kDa and 17,500 kDa; between 700 kDa and 15,000 kDa; between 700 kDa and 12,500 kDa; between 700 kDa and 10,000 kDa; between 700 kDa and 7,500 kDa; between 700 kDa and 6,000 kDa; between 700 kDa and 5,000 kDa; between 700 kDa and 4,500 kDa; between 700 kDa and 4,000 kDa; between 700 kDa and 3,500 kDa; between 700 kDa and 3,000 kDa; between 700 kDa and 2,000 kDa; between 700 kDa and 1,500 kDa; between 1,000 kDa and 20,000 kDa; between 1,000 kDa and 17,500 kDa; between 1,000 kDa and 15,000 kDa; between 1,000 kDa and 12,500 kDa; between 1,000 kDa and 10,000 kDa; between 1,000 kDa and 7,500 kDa; between 1,000 kDa and 6,000 kDa; between 1,000 kDa and 5,000 kDa; between 1,000 kDa and 4,000 kDa; between 1,000 kDa and 2,500 kDa; between 2,000 kDa and 20,000

kDa; between 2,000 kDa and 17,500 kDa; between 2,000 kDa and 15,000 kDa; between 2,000 kDa and 12,500 kDa; between 2,000 kDa and 10,000 kDa; between 2,000 kDa and 7,500 kDa; between 2,000 kDa and 6,000 kDa; between 2,000 kDa and 5,000 kDa; between 2,000 kDa and 4,000 kDa; or between 2,000 kDa and 3,000 kDa.

In further embodiments, the serotype 11A glycoconjugate of the invention has a molecular weight of between 3,000 kDa and 20,000 kDa; between 3,000 kDa and 17,500 kDa; between 3,000 kDa and 15,000 kDa; between 3,000 kDa and 10,000 kDa; between 3,000 kDa and 7,500 kDa; between 3,000 kDa and 5,000 kDa; between 4,000 kDa and 20,000 kDa; between 4,000 kDa and 17,500 kDa; between 4,000 kDa and 15,000 kDa; between 4,000 kDa and 12,500 kDa; between 4,000 kDa and 10,000 kDa; between 4,000 kDa and 7,500 kDa; between 4,000 kDa and 6,000 kDa; or between 4,000 kDa and 5,000 kDa. In further embodiments, the serotype 11A glycoconjugate of the invention has a molecular weight of between 5,000 kDa and 20,000 kDa; between 5,000 kDa and 17,500 kDa; between 5,000 kDa and 15,000 kDa; between 5,000 kDa and 10,000 kDa or between 5,000 kDa and 7,500 kDa.

In an embodiment, said serotype 11A glycoconjugates are prepared using reductive amination.

In a preferred embodiment, the serotype 11A glycoconjugate of the invention comprises at least 0.3, 0.5, 0.6, 1.0, 1.4, 1.8, 2.2, 2.6, 3.0, 3.4, 3.8, 4.2, 4.6 or 5 mM acetate per mM serotype 11A polysaccharide. In a preferred embodiment, the serotype 11A glycoconjugate comprises at least 1.8, 2.2 or 2.6 mM acetate per mM serotype 11A polysaccharide. In an embodiment, the glycoconjugate comprises at least 0.6 mM acetate per mM serotype 11A polysaccharide. In a preferred embodiment, the serotype 11A glycoconjugate of the invention comprises at least 0.6, 1, 1.4, 1.8, 2.2, 2.6, 3, 3.4, 3.8, 4.2 or 4.6 mM acetate per mM serotype 11A polysaccharide and less than about 5 mM acetate per mM serotype 11A polysaccharide. In an embodiment, the serotype 11A glycoconjugate of the invention comprises at least 0.6, 1.0, 1.4, 1.8, 2.2, 2.6, or 3.0 mM acetate per mM serotype 11A polysaccharide and less than about 3.4 mM acetate per mM serotype 11A polysaccharide. In an embodiment, the serotype 11A glycoconjugate of the invention comprises at least 0.6, 1, 1.4, 1.8, 2.2, 2.6, or about 3.0 mM acetate per mM serotype 11A polysaccharide and less than about 3.3 mM acetate per mM serotype 11A polysaccharide. Any of the above number is contemplated as an embodiment of the disclosure.

In a preferred embodiment, the ratio of mM acetate per mM serotype 11A capsular polysaccharide in the serotype 11A glycoconjugate to mM acetate per mM serotype 11A capsular polysaccharide in the isolated polysaccharide is at least 0.6, 0.65, 0.7, 0.75, 0.8, 0.85, 0.9, or 0.95. In a preferred embodiment, the ratio of mM acetate per mM serotype 11A capsular polysaccharide in the serotype 11A glycoconjugate to mM acetate per mM serotype 11A capsular polysaccharide in the isolated polysaccharide is at least 0.7. In a preferred embodiment, the ratio of mM acetate per mM serotype 11A capsular polysaccharide in the serotype 11A glycoconjugate to mM acetate per mM serotype 11A capsular polysaccharide in the isolated polysaccharide is at least 0.9. In a preferred embodiment, the presence of O-acetyl groups is determined by ion-HPLC analysis.

In a preferred embodiment, the ratio of mM acetate per mM serotype 11A capsular polysaccharide in the serotype 11A glycoconjugate to mM acetate per mM serotype 11A capsular polysaccharide in the activated polysaccharide is at least 0.6, 0.65, 0.7, 0.75, 0.8, 0.85, 0.9, or 0.95. In a preferred embodiment, the ratio of mM acetate per mM serotype 11A capsular polysaccharide in the serotype 11A glycoconjugate to mM acetate per mM serotype 11A capsular polysaccharide in the activated polysaccharide is at least 0.7. In a preferred embodiment, the ratio of mM acetate per mM serotype 11A capsular polysaccharide in the serotype 11A glycoconjugate to mM acetate per mM serotype 11A capsular polysaccharide in the activated polysaccharide is at least 0.9. In a preferred embodiment, the presence of O-acetyl groups is determined by ion-HPLC analysis.

In a preferred embodiment, the serotype 11A glycoconjugate of the invention comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9 or 1.0 mM glycerol per mM serotype 11A polysaccharide. In a preferred embodiment, the serotype 11A glycoconjugate comprises at least 0.2, 0.3 or 0.4 mM glycerol per mM serotype 11A polysaccharide. In a preferred embodiment, the serotype 11A glycoconjugate of the invention comprises at least 0.1, 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8 or 0.9 mM glycerol per mM serotype 11A polysaccharide and less than about 1.0 mM glycerol per mM serotype 11A polysaccharide. In a preferred embodiment, the serotype 11A glycoconjugate of the invention comprises at least 0.3, 0.4, 0.5, 0.6, or 0.7 mM glycerol per mM serotype 11A polysaccharide and less than about 0.8 mM glycerol per mM serotype 11A polysaccharide. Any of the above number is contemplated as an embodiment of the disclosure.

Another way to characterize the serotype 11A glycoconjugates of the invention is by the number of lysine residues in the carrier protein (e.g., $CRM_{197}$) that become conjugated to the saccharide which can be characterized as a range of conjugated lysines (degree of conjugation).

The evidence for lysine modification of the carrier protein, due to covalent linkages to the polysaccharides, can be obtained by amino acid analysis using routine methods known to those of skill in the art. Conjugation results in a reduction in the number of lysine residues recovered compared to the $CRM_{197}$ protein starting material used to generate the conjugate materials.

In a preferred embodiment, the degree of conjugation of the serotype 11A glycoconjugate of the invention is between 1 and 15, between 1 and 13, between 1 and 10, between 1 and 8, between 1 and 6, between 1 and 5, between 1 and 4, between 2 and 15, between 2 and 13, between 2 and 10, between 2 and 8, between 2 and 6, between 2 and 5, between 2 and 4, between 5 and 15, between 5 and 10, between 8 and 15, between 8 and 12, between 10 and 15 or between 10 and 12. In an embodiment, the degree of conjugation of the serotype 11A glycoconjugate of the invention is about 1, about 2, about 3, about 4, about 5, about 6, about 7, about 8, about 9, about 10, about 11, about 12, about 13, about 14 or about 15. In a preferred embodiment, the degree of conjugation of the serotype 11A glycoconjugate of the invention is between 1 and 6 or between 2 and 5. In some such embodiments, the carrier protein is $CRM_{197}$.

The serotype 11A glycoconjugates of the invention may also be characterized by the ratio (weight/weight) of saccharide to carrier protein. In some embodiments, the saccharide to carrier protein ratio (w/w) is between 0.2 and 4 (e.g., about 0.2, about 0.3, about 0.4, about 0.5, about 0.6, about 0.7, about 0.8, about 0.9, about 1.0, about 1.1, about 1.2, about 1.3, about 1.4, about 1.5, about 1.6, about 1.7, about 1.8, about 1.9, about 2.0, about 2.1, about 2.2, about 2.3, about 2.4, about 2.5, about 2.6, about 2.7, about 2.8, about 2.9, about 3.0, about 3.1, about 3.2, about 3.3, about 3.4, about 3.5, about 3.6, about 3.7, about 3.8, about 3.9 or about 4.0). In other embodiments, the saccharide to carrier

protein ratio (w/w) is between 0.7 and 2.5, between 0.8 and 2.0, between 0.7 and 2.0, between 0.8 and 1.5, between 0.7 and 1.5, 0.7 and 1.4, between 0.8 and 1.4, between 0.7 and 1.45 or between 0.8 and 1.45. In further embodiments, the saccharide to carrier protein ratio (w/w) is between 0.8 and 1.6 (e.g., about 0.8, about 0.9 about 1.0, about 1.1, about 1.2, about 1.3, about 1.4, about 1.5 or about 1.6). In some such embodiments, the carrier protein is $CRM_{197}$. In an embodiment, said serotype 11A glycoconjugates are prepared using reductive amination.

The serotype 11A glycoconjugates and immunogenic compositions of the invention may contain free saccharide that is not covalently conjugated to the carrier protein, but is nevertheless present in the glycoconjugate composition. The free saccharide may be noncovalently associated with (i.e., noncovalently bound to, adsorbed to, or entrapped in or with) the glycoconjugate.

In some embodiments, the serotype 11A glycoconjugates of the invention comprise less than about 50% of free serotype 11A capsular polysaccharide compared to the total amount of serotype 11A capsular polysaccharide, less than about 45% free saccharide, less than about 40% free saccharide, less than about 35% free saccharide, less than about 30% free saccharide, less than about 25% free saccharide, less than about 20% free saccharide, less than about 15% free saccharide, less than about 10% free saccharide, or less than about 5% of free serotype 11A capsular polysaccharide compared to the total amount of serotype 11A capsular polysaccharide. Preferably, serotype 11A the glycoconjugate comprises less than 15% free saccharide, more preferably less than 10% free saccharide, and still more preferably, less than 5% of free saccharide.

The serotype 11A glycoconjugates may also be characterized by their molecular size distribution ($K_d$). Size exclusion chromatography media (CL-4B) can be used to determine the relative molecular size distribution of the conjugate, as mentioned above.

In a preferred embodiment, at least 30% of the serotype 11A glycoconjugates of the invention has a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, or 85% of the serotype 11A glycoconjugates of the invention has a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 60% of the serotype 11A glycoconjugates of the invention has a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 65% of the serotype 11A glycoconjugates of the invention has a $K_d$ below or equal to 0.3 in a CL-4B column.

1.3.8 Glycoconjugates from *S. pneumoniae* Serotype 8

In an embodiment, the serotype 8 glycoconjugates are obtained by activating polysaccharide with 1-cyano-4-dimethylamino pyridinium tetrafluoroborate (CDAP) to form a cyanate ester. The activated polysaccharide may be coupled directly or via a spacer (linker) group to an amino group on the carrier protein. For example, the spacer could be cystamine or cysteamine to give a thiolated polysaccharide which could be coupled to the carrier via a thioether linkage obtained after reaction with a maleimide-activated carrier protein (for example using GMBS) or a haloacetylated carrier protein (for example using iodoacetimide, SIB, SIAB, sulfo-SIAB, SIA, or SBAP). Preferably, the cyanate ester (optionally made by CDAP chemistry) is coupled with hexane diamine or adipic acid dihydrazide (ADH) and the amino-derivatised saccharide is conjugated to the carrier protein using carbodiimide (e.g., EDAC or EDC) chemistry via a carboxyl group on the protein carrier. Such conjugates are described for example in WO 93/15760, WO 95/08348 and WO 96/29094.

Other suitable techniques use carbodiimides, hydrazides, active esters, norborane, p-nitrobenzoic acid, N-hydroxysuccinimide, S—NHS, EDC, TSTU. Many are described in International Patent Application Publication No. WO 98/42721. Conjugation may involve a carbonyl linker which may be formed by reaction of a free hydroxyl group of the saccharide with CDI (see Bethell et al. (1979) J. Biol. Chem. 254:2572-2574; Hearn et al. (1981) J. Chromatogr. 218:509-518) followed by reaction with a protein to form a carbamate linkage. This may involve reduction of the anomeric terminus to a primary hydroxyl group, optional protection/deprotection of the primary hydroxyl group, reaction of the primary hydroxyl group with CDI to form a CDI carbamate intermediate and coupling the CDI carbamate intermediate with an amino group on a protein.

In preferred embodiments, the serotype 8 glycoconjugates of the invention are prepared using reductive amination. Reductive amination involves two steps, (1) oxidation of the polysaccharide to generate aldehyde functionalities from vicinal diols in individual hexasaccharide unit, (2) reduction of the activated polysaccharide and a carrier protein to form a conjugate.

Before oxidation, the serotype 8 polysaccharide is optionally hydrolized to reduce its viscosity. Mechanical or chemical hydrolysis maybe employed. Chemical hydrolysis maybe conducted using acetic acid.

The oxidation step may involve reaction with periodate. For the purpose of the present invention, the term "periodate" includes both periodate and periodic acid; the term also includes both metaperiodate ($IO_4^-$) and orthoperiodate ($IO_6^{5-}$) and the various salts of periodate (e.g., sodium periodate and potassium periodate). In an embodiment the capsular polysaccharide from serotype 8 of *S. pneumoniae* is oxydized in the presence of metaperiodate, preferably in the presence of sodium periodate ($NaIO_4$). In another embodiment the capsular polysaccharide from serotype 8 is oxydized in the presence of orthoperiodate, preferably in the presence of periodic acid.

Following the oxidation step of the polysaccharide, the polysaccharide is said to be activated and is referred to as "activated polysaccharide" here below. The activated polysaccharide maybe purified and lyophilised (freeze-dried).

The activated polysaccharide and the carrier protein may be lyophilised (freeze-dried), either independently (discrete lyophilization) or together (co-lyophilized). In one embodiment the activated polysaccharide and the carrier protein are co-lyophilised. In another embodiment the activated polysaccharide and the carrier protein are lyophilised independently.

In one embodiment the lyophilisation takes place in the presence of a non-reducing sugar, possible non-reducing sugars include sucrose, trehalose, raffinose, stachyose, melezitose, dextran, mannitol, lactitol and palatinit.

The second step of the conjugation process is the reduction of the activated polysaccharide and a carrier protein to form a conjugate (reductive amination), using a reducing agent. Reducing agents which are suitable include the cyanoborohydrides, such as sodium cyanoborohydride, borane-pyridine, or borohydride exchange resin. In one embodiment the reducing agent is sodium cyanoborohydride.

In an embodiment, the reduction reaction is carried out in aqueous solvent, in another embodiment the reaction is carried out in aprotic solvent. In an embodiment, the reduction reaction is carried out in DMSO (dimethylsulfoxide) or

in DMF (dimethylformamide) solvent. The DMSO or DMF solvent may be used to reconstitute the activated polysaccharide and carrier protein which has been lyophilised.

In one embodiment between 0.1 and 3.0, between 0.15 and 2.0, between 0.2 and 1.0, or between 0.25 and 0.5 molar equivalents of sodium cyanoborohydride is used in the reduction reaction. In one embodiment about 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1.0, 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 2.0, 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 2.9 or 3.0 molar equivalents of sodium cyanoborohydride is used in the reduction reaction.

In one embodiment the reducing agent is sodium triacetoxyborohydride. In a further embodiment between 1.0 and 6.0 molar equivalents, between 2.0 and 5.0 molar equivalents or about 3.0 molar equivalents of sodium triacetoxyborohydride is used in the reduction reaction.

At the end of the reduction reaction, there may be unreacted aldehyde groups remaining in the conjugates, these may be capped using a suitable capping agent. In one embodiment this capping agent is sodium borohydride ($NaBH_4$). In an embodiment capping is achieved by mixing the reduction reaction with between 0.5 and 5.0 molar equivalents of $NaBH_4$, for example about 1.0, 1.5, 2.0, 2.5 or 3.0 molar equivalents of $NaBH_4$.

Following the conjugation (the reduction reaction and optionally the capping), the glycoconjugates may be purified. The glycoconjugates maybe purified by diafiltration and/or ion exchange chromatography and/or size exclusion chromatography. In an embodiment, the glycoconjugates are purified by diafiltration or ion exchange chromatography or size exclusion chromatography.

In one embodiment the glycoconjugates are sterile filtered.

In some embodiments, the serotype 8 glycoconjugates of the present invention are conjugated to the carrier protein (e.g., $CRM_{197}$) and comprise a saccharide having a molecular weight of between 10 kDa and 2,000 kDa. In other such embodiments, the saccharide has a molecular weight of between 50 kDa and 2,000 kDa. In further such embodiments, the saccharide has a molecular weight of between 50 kDa and 1,750 kDa; between 50 kDa and 1,500 kDa; between 50 kDa and 1,250 kDa; between 50 kDa and 1,000 kDa; between 50 kDa and 750 kDa; between 50 kDa and 500 kDa; between 100 kDa and 2,000 kDa; between 100 kDa and 1,750 kDa; between 100 kDa and 1,500 kDa; between 100 kDa and 1,250 kDa; between 100 kDa and 1,000 kDa; between 100 kDa and 750 kDa; between 100 kDa and 500 kDa; between 200 kDa and 2,000 kDa; between 200 kDa and 1,750 kDa; between 200 kDa and 1,500 kDa; between 200 kDa and 1,250 kDa; between 200 kDa and 1,000 kDa; between 200 kDa and 750 kDa; or between 200 kDa and 500 kDa; or between 200 kDa and 400 kDa. In an embodiment, said serotype 8 glycoconjugates are prepared using reductive amination.

In some embodiments, the serotype 8 glycoconjugate of the invention has a molecular weight of between 50 kDa and 20,000 kDa. In other embodiments, the serotype 8 glycoconjugate has a molecular weight of between 50 kDa and 15,000 kDa. In other embodiments, the serotype 8 glycoconjugate has a molecular weight of between 500 kDa and 10,000 kDa. In other embodiments, the serotype 8 glycoconjugate has a molecular weight of between 200 kDa and 10,000 kDa. In still other embodiments, the serotype 8 glycoconjugate has a molecular weight of between 1,000 kDa and 8,000 kDa or between 2,000 kDa and 8,000 kDa.

In further embodiments, the serotype 8 glycoconjugate of the invention has a molecular weight of between 200 kDa and 20,000 kDa; between 200 kDa and 15,000 kDa; between 200 kDa and 10,000 kDa; between 200 kDa and 7,500 kDa; between 200 kDa and 5,000 kDa; between 200 kDa and 3,000 kDa; between 200 kDa and 1,000 kDa; between 500 kDa and 20,000 kDa; between 500 kDa and 15,000 kDa; between 500 kDa and 12,500 kDa; between 500 kDa and 10,000 kDa; between 500 kDa and 7,500 kDa; between 500 kDa and 6,000 kDa; between 500 kDa and 5,000 kDa; between 500 kDa and 4,000 kDa; between 500 kDa and 3,000 kDa; between 500 kDa and 2,000 kDa; between 500 kDa and 1,500 kDa; between 500 kDa and 1,000 kDa; between 750 kDa and 20,000 kDa; between 750 kDa and 15,000 kDa; between 750 kDa and 12,500 kDa; between 750 kDa and 10,000 kDa; between 750 kDa and 7,500 kDa; between 750 kDa and 6,000 kDa; between 750 kDa and 5,000 kDa; between 750 kDa and 4,000 kDa; between 750 kDa and 3,000 kDa; between 750 kDa and 2,000 kDa; between 750 kDa and 1,500 kDa; between 1,000 kDa and 15,000 kDa; between 1,000 kDa and 12,500 kDa; between 1,000 kDa and 10,000 kDa; between 1,000 kDa and 7,500 kDa; between 1,000 kDa and 6,000 kDa; between 1,000 kDa and 5,000 kDa; between 1,000 kDa and 4,000 kDa; between 1,000 kDa and 2,500 kDa; between 2,000 kDa and 15,000 kDa; between 2,000 kDa and 12,500 kDa; between 2,000 kDa and 10,000 kDa; between 2,000 kDa and 7,500 kDa; between 2,000 kDa and 6,000 kDa; between 2,000 kDa and 5,000 kDa; between 2,000 kDa and 4,000 kDa; or between 2,000 kDa and 3,000 kDa.

In further embodiments, the serotype 8 glycoconjugate of the invention has a molecular weight of between 3,000 kDa and 20,000 kDa; between 3,000 kDa and 15,000 kDa; between 3,000 kDa and 10,000 kDa; between 3,000 kDa and 7,500 kDa; between 3,000 kDa and 5,000 kDa; between 4,000 kDa and 20,000 kDa; between 4,000 kDa and 15,000 kDa; between 4,000 kDa and 12,500 kDa; between 4,000 kDa and 10,000 kDa; between 4,000 kDa and 7,500 kDa; between 4,000 kDa and 6,000 kDa; or between 4,000 kDa and 5,000 kDa. In further embodiments, the serotype 8 glycoconjugate of the invention has a molecular weight of between 5,000 kDa and 20,000 kDa; between 5,000 kDa and 15,000 kDa; between 5,000 kDa and 10,000 kDa or between 5,000 kDa and 7,500 kDa. In further embodiments, the serotype 8 glycoconjugate of the invention has a molecular weight of between 6,000 kDa and 20,000 kDa; between 6,000 kDa and 15,000 kDa; between 6,000 kDa and 10,000 kDa or between 6,000 kDa and 7,500 kDa. In further embodiments, the serotype 8 glycoconjugate of the invention has a molecular weight of between 7,000 kDa and 20,000 kDa; between 7,000 kDa and 15,000 kDa; between 7,000 kDa and 10,000 kDa or between 7,000 kDa and 8,000 kDa. In further embodiments, the serotype 8 glycoconjugate of the invention has a molecular weight of between 8,000 kDa and 20,000 kDa; between 8,000 kDa and 15,000 kDa; or between 8,000 kDa and 10,000 kDa.

In an embodiment, said serotype 8 glycoconjugates are prepared using reductive amination.

Another way to characterize the serotype 8 glycoconjugates of the invention is by the number of lysine residues in the carrier protein (e.g., $CRM_{197}$) that become conjugated to the saccharide which can be characterized as a range of conjugated lysines (degree of conjugation).

The evidence for lysine modification of the carrier protein, due to covalent linkages to the polysaccharides, can be obtained by amino acid analysis using routine methods known to those of skill in the art. In frequent embodiments, the carrier protein is covalently conjugated to activated polysaccharide through an amine linkage to one or more

ε-amino groups of lysine residues on the carrier protein. In some such embodiments, the carrier protein comprises 2 to 20 lysine residues covalently conjugated to the saccharide. In other such embodiments, the carrier protein comprises 4 to 16 or 6 to 14 lysine residues covalently conjugated to the saccharide.

In a preferred embodiment, the degree of conjugation of the serotype 8 glycoconjugate of the invention is between 2 and 20, between 2 and 15, between 2 and 13, between 2 and 10, between 2 and 8, between 2 and 6, between 2 and 5, between 2 and 4, between 3 and 15, between 3 and 13, between 3 and 10, between 3 and 8, between 3 and 6, between 3 and 5, between 3 and 4, between 5 and 15, between 5 and 10, between 8 and 15, between 8 and 12, between 10 and 15 or between 10 and 12. In an embodiment, the degree of conjugation of the serotype 8 glycoconjugate of the invention is about 2, about 3, about 4, about 5, about 6, about 7, about 8, about 9, about 10, about 11, about 12, about 13, about 14 or about 15. In a preferred embodiment, the degree of conjugation of the serotype 8 glycoconjugate of the invention is between 4 and 16 or between 6 and 14. In some such embodiments, the carrier protein is $CRM_{197}$.

In a preferred embodiment, the carrier protein comprises $CRM_{197}$, which contains 39 lysine residues. In some such embodiments, the $CRM_{197}$ may comprise between 4 and 16 or between 6 and 14 lysine residues out of 39 covalently linked to the saccharide. Another way to express this parameter is that about 10% to about 41% or about 15% to about 36% of $CRM_{197}$ lysines are covalently linked to the saccharide. In another such embodiment, the $CRM_{197}$ may comprise 2 to 20 lysine residues out of 39 covalently linked to the saccharide. Another way to express this parameter is that about 5% to about 50% of $CRM_{197}$ lysines are covalently linked to the saccharide. In some such embodiments, the $CRM_{197}$ may comprise about 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, or 16 lysine residues out of 39 covalently linked to the saccharide.

The serotype 8 glycoconjugates of the invention may also be characterized by the ratio (weight/weight) of saccharide to carrier protein. In some embodiments, the saccharide to carrier protein ratio (w/w) is between 0.2 and 4.0 (e.g., about 0.2, about 0.3, about 0.4, about 0.5, about 0.6, about 0.7, about 0.8, about 0.9, about 1.0, about 1.1, about 1.2, about 1.3, about 1.4, about 1.5, about 1.6, about 1.7, about 1.8, about 1.9, about 2.0, about 2.1, about 2.2, about 2.3, about 2.4, about 2.5, about 2.6, about 2.7, about 2.8, about 2.9, about 3.0, about 3.1, about 3.2, about 3.3, about 3.4, about 3.5, about 3.6, about 3.7, about 3.8, about 3.9 or about 4.0). In other embodiments, the saccharide to carrier protein ratio (w/w) is between 0.7 and 2.5. In further embodiments, the saccharide to carrier protein ratio (w/w) is between 0.8 and 1.5 (e.g., about 0.8, about 0.9 about 1.0, about 1.1, about 1.2, about 1.3, about 1.4 or about 1.5). In some such embodiments, the carrier protein is $CRM_{197}$. In an embodiment, said serotype 8 glycoconjugates are prepared using reductive amination.

The serotype 8 glycoconjugates and immunogenic compositions of the invention may contain free saccharide that is not covalently conjugated to the carrier protein, but is nevertheless present in the glycoconjugate composition. The free saccharide may be noncovalently associated with (i.e., noncovalently bound to, adsorbed to, or entrapped in or with) the glycoconjugate.

In some embodiments, the serotype 8 glycoconjugates of the invention comprise less than about 50% free saccharide, less than about 45% free saccharide, less than about 40% free saccharide, less than about 35% free saccharide, less than about 30% free saccharide, less than about 25% free saccharide, less than about 20% free saccharide, less than about 15% free saccharide, less than about 10% free saccharide, or less than about 5% free saccharide relative to the total amount of serotype 8 saccharide. Preferably, serotype 8 the glycoconjugate comprises less than 15% free saccharide, more preferably less than 10% free saccharide, and still more preferably, less than 5% of free saccharide.

The serotype 8 glycoconjugates may also be characterized by their molecular size distribution ($K_d$). Size exclusion chromatography media (CL-4B) can be used to determine the relative molecular size distribution of the conjugate. Size Exclusion Chromatography (SEC) is used in gravity fed columns to profile the molecular size distribution of conjugates. Large molecules excluded from the pores in the media elute more quickly than small molecules. Fraction collectors are used to collect the column eluate. The fractions are tested colorimetrically by saccharide assay. For the determination of $K_d$, columns are calibrated to establish the fraction at which molecules are fully excluded ($V_0$), ($K_d$=0), and the fraction representing the maximum retention ($V_i$), ($K_d$=1). The fraction at which a specified sample attribute is reached ($V_e$), is related to $K_d$ by the expression, $K_d=(V_e-V_0)/(V_i-V_0)$.

In a preferred embodiment, at least 40% of the serotype 8 glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 30%, 35%, 40%, 45%, 50%, 55%, 60%, 65%, 70%, 75%, 80%, or 85% of the serotype 8 glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 60% of the serotype 8 glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, at least 70% of the serotype 8 glycoconjugates of the invention have a $K_d$ below or equal to 0.3 in a CL-4B column.

In a preferred embodiment, between 40% and 90% of the serotype 8 glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 50% and 90% of the serotype 8 glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column. In a preferred embodiment, between 65% and 80% of the serotype 8 glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column.

1.4 Combinations of Glycoconjugates of the Invention

In an embodiment the immunogenic composition of the invention comprises any of the glycoconjugates disclosed herein.

In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate selected from the group consisting of a glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), a glycoconjugate from *S. pneumoniae* serotype 22F (such as the glycoconjugates of section 1.3.2 above), a glycoconjugate from *S. pneumoniae* serotype 33F (such as the glycoconjugates of section 1.3.3 above), a glycoconjugate from *S. pneumoniae* serotype 12F (such as the glycoconjugates of section 1.3.5 above), a glycoconjugate from *S. pneumoniae* serotype 10A (such as the glycoconjugates of section 1.3.6 above), a glycoconjugate from *S. pneumoniae* serotype 11A (such as the glycoconjugates of section 1.3.7 above) and a glycoconjugate from *S. pneumoniae* serotype 8 (such as the glycoconjugates of section 1.3.8 above).

In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate from *S. pneumoniae* serotype 15B, such as the glycoconjugate of

section 1.3.4 above. In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate from *S. pneumoniae* serotype 22F, such as the ones disclosed at section 1.3.2 above. In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate from *S. pneumoniae* serotype 33F such as the ones disclosed at section 1.3.3 above. In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate from *S. pneumoniae* serotype 12F such as the ones disclosed at section 1.3.5 above. In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate from *S. pneumoniae* serotype 10A such as the ones disclosed at section 1.3.6 above. In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate from *S. pneumoniae* serotype 11A such as the ones disclosed at section 1.3.7 above. In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate from *S. pneumoniae* serotype 8 such as the ones disclosed at section 1.3.8 above.

In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate of each of the two *S. pneumoniae* serotypes selected from the group consisting of: 15B and 22F, 15B and 33F, 15B and 12F, 15B and 10A, 15B and 11A, 15B and 8, 22F and 33F, 22F and 12F, 22F and 10A, 22F and 11A, 22F and 8, 33F and 12F, 33F and 10A, 33F and 11A, 33F and 8, 12F and 10A, 12F and 11A, 12F and 8, 10A and 11A, 10A and 8, and 11A and 8.

In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate of each of the three following *S. pneumoniae* serotypes:

15B and 22F and 33F,
15B and 22F and 12F,
15B and 22F and 10A,
15B and 22F and 11A,
15B and 22F and 8,
15B and 33F and 12F,
15B and 33F and 10A,
15B and 33F and 11A,
15B and 33F and 8,
15B and 12F and 10A,
15B and 12F and 11A,
15B and 12F and 8,
15B and 10A and 11A,
15B and 10A and 8,
15B and 11A and 8,
22F and 33F and 12F,
22F and 33F and 10A,
22F and 33F and 11A,
22F and 33F and 8,
22F and 12F and 10A,
22F and 12F and 11A,
22F and 12F and 8,
22F and 10A and 11A,
22F and 10A and 8,
22F and 11A and 8,
33F and 12F and 10A,
33F and 12F and 11A,
33F and 12F and 8,
33F and 10A and 11A,
33F and 10A and 8,
33F and 11A and 8,
12F and 10A and 11A,
12F and 10A and 8,
12F and 11A and 8, or
10A and 11A and 8.

In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate of each of the four following *S. pneumoniae* serotypes:

15B and 22F and 33F and 12F,
15B and 22F and 33F and 10A,
15B and 22F and 33F and 11A,
15B and 22F and 33F and 8,
15B and 22F and 12F and 10A,
15B and 22F and 12F and 11A,
15B and 22F and 12F and 8,
15B and 22F and 10A and 11A,
15B and 22F and 10A and 8,
15B and 22F and 11A and 8,
15B and 33F and 12F and 10A,
15B and 33F and 12F and 11A,
15B and 33F and 12F and 8,
15B and 33F and 10A and 11A,
15B and 33F and 10A and 8,
15B and 33F and 11A and 8,
15B and 12F and 10A and 11A,
15B and 12F and 10A and 8,
15B and 12F and 11A and 8,
15B and 10A and 11A and 8,
22F and 33F and 12F and 10A,
22F and 33F and 12F and 11A,
22F and 33F and 12F and 8,
22F and 33F and 10A and 11A,
22F and 33F and 10A and 8,
22F and 33F and 11A and 8,
22F and 12F and 10A and 11A,
22F and 12F and 10A and 8,
22F and 12F and 11A and 8,
22F and 10A and 11A and 8,
33F and 12F and 10A and 11A,
33F and 12F and 10A and 8,
33F and 12F and 11A and 8,
33F and 10A and 11A and 8 or
12F and 10A and 11A and 8.

In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate of each of the five following *S. pneumoniae* serotypes:

15B and 22F and 33F and 12F and 10A,
15B and 22F and 33F and 12F and 11A,
15B and 22F and 33F and 12F and 8,
15B and 22F and 33F and 10A and 11A,
15B and 22F and 33F and 10A and 8,
15B and 22F and 33F and 11A and 8,
15B and 22F and 12F and 10A and 11A,
15B and 22F and 12F and 10A and 8,
15B and 22F and 12F and 11A and 8,
15B and 22F and 10A and 11A and 8,
15B and 33F and 12F and 10A and 11A,
15B and 33F and 12F and 10A and 8,
15B and 33F and 12F and 11A and 8,
15B and 33F and 10A and 11A and 8,
15B and 12F and 10A and 11A and 8,
22F and 33F and 12F and 10A and 11A,
22F and 33F and 12F and 10A and 8,
22F and 33F and 12F and 11A and 8,
22F and 33F and 10A and 11A and 8,
22F and 12F and 10A and 11A and 8 or
33F and 12F and 10A and 11A and 8.

In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate of each of the six following *S. pneumoniae* serotypes:

15B and 22F and 33F and 12F and 10A and 11A,
15B and 22F and 33F and 12F and 10A and 8,

15B and 22F and 33F and 12F and 11A and 8,
15B and 22F and 33F and 10A and 11A and 8,
15B and 22F and 12F and 10A and 11A and 8,
15B and 33F and 12F and 10A and 11A and 8 or
22F and 33F and 12F and 10A and 11A and 8.

In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate of each of the seven following *S. pneumoniae* serotypes: 15B and 22F and 33F and 12F and 10A and 11A and 8.

In an embodiment the glycoconjugates from *S. pneumoniae* serotypes 15B, 22F, 33F, 12F, 10A, 11A and/or 8 of any of the immunogenic composition defined in this section are as disclosed at sections 1.3.2 to 1.3.8 above.

In an embodiment any of the immunogenic compositions above comprise in addition glycoconjugates from *S. pneumoniae* serotypes 4, 6B, 9V, 14, 18C, 19F and 23F (such as the glycoconjugates of section 1.3.1 above).

In an embodiment any of the immunogenic compositions above comprise in addition glycoconjugates from *S. pneumoniae* serotypes 1, 5 and 7F (such as the glycoconjugates of section 1.3.1 above).

In an embodiment any of the immunogenic compositions above comprise in addition glycoconjugates from *S. pneumoniae* serotypes 6A and 19A (such as the glycoconjugates of section 1.3.1 above).

In an embodiment any of the immunogenic compositions above comprise in addition glycoconjugates from *S. pneumoniae* serotype 3 (such as the glycoconjugates of section 1.3.1 above).

Preferably, all the glycoconjugates of the above immunogenic compositions are individually conjugated to the carrier protein.

In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotype 22F is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotype 33F is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotype 15B is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotype 12F is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotype 10A is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotype 11A is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotype 8 is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotypes 4, 6B, 9V, 14, 18C, 19F and 23F are conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotypes 1, 5 and 7F are conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotypes 6A and 19A are conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotype 3 is conjugated to $CRM_{197}$.

In an embodiment, the glycoconjugates of any of the above immunogenic compositions are all individually conjugated to $CRM_{197}$.



In an embodiment, the glycoconjugates from *S. pneumoniae* serotypes 1, 4, 5, 6B, 7F, 9V, 14 and/or 23F of any of the above immunogenic compositions are individually conjugated to PD.

In an embodiment, the glycoconjugate from *S. pneumoniae* serotype 18C of any of the above immunogenic compositions is conjugated to TT.

In an embodiment, the glycoconjugate from *S. pneumoniae* serotype 19F of any of the above immunogenic compositions is conjugated to DT.

In an embodiment, the glycoconjugates from *S. pneumoniae* serotypes 1, 4, 5, 6B, 7F, 9V, 14 and/or 23F of any of the above immunogenic compositions are individually conjugated to PD, the glycoconjugate from *S. pneumoniae* serotype 18C is conjugated to TT and the glycoconjugate from *S. pneumoniae* serotype 19F is conjugated to DT.

In an embodiment the above immunogenic compositions comprise from 8 to 20 different serotypes of *S. pneumoniae*. In one embodiment the above immunogenic compositions comprise glycoconjugates from 12, 13, 14, 15, 16, 17, 18, 19 or 20 different serotypes.

In one embodiment the above immunogenic compositions comprise glycoconjugates from 16 or 20 different serotypes.

In an embodiment the above immunogenic compositions are 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 or 20-valent pneumococcal conjugate compositions. In an embodiment the above immunogenic compositions are 14, 15, 16, 17, 18 or 19-valent pneumococcal conjugate compositions. In an embodiment the above immunogenic compositions are 16-valent pneumococcal conjugate compositions. In an embodiment the above immunogenic compositions are 19-valent pneumococcal conjugate compositions.

1. In an embodiment the immunogenic composition of the invention comprises at least one glycoconjugate from *S. pneumoniae* serotype 15B, such as the glycoconjugates of section 1.3.4 above.

2. In another embodiment the immunogenic composition of the invention comprises in addition to point 1 above, at least one glycoconjugate from *S. pneumoniae* serotype 22F, such as the ones disclosed at section 1.3.2 above.

3. In another embodiment the immunogenic composition of the invention comprises in addition to point 1 or 2 above, at least one glycoconjugate from *S. pneumoniae* serotype 33F such as the ones disclosed at section 1.3.3 above.

4. In another embodiment the immunogenic composition of the invention comprises in addition to point 1, 2 or 3 above, at least one glycoconjugate from *S. pneumoniae* serotype 12F such as the ones disclosed at section 1.3.5 above.

5. In another embodiment the immunogenic composition of the invention comprises in addition to point 1, 2, 3 or 4 above, at least one glycoconjugate from *S. pneumoniae* serotype 10A such as the ones disclosed at section 1.3.6 above.

6. In another embodiment the immunogenic composition of the invention comprises in addition to point 1, 2, 3, 4 or 5 above, at least one glycoconjugate from *S. pneumoniae* serotype 11A such as the ones disclosed at section 1.3.7 above.

7. In another embodiment the immunogenic composition of the invention comprises in addition to point 1, 2, 3, 4, 5 or 6 above, at least one glycoconjugate from *S. pneumoniae* serotype 8 such as the ones disclosed at section 1.3.8 above.

8. In another embodiment the immunogenic composition of the invention comprises in addition to point 1, 2, 3, 4, 5,

6 or 7 above glycoconjugates from *S. pneumoniae* serotypes 4, 6B, 9V, 14, 18C, 19F and 23F, such as the glycoconjugates of section 1.3.1 above.

9. In another embodiment the immunogenic composition of the invention comprises in addition to point 1, 2, 3, 4, 5, 6, 7 or 8 above glycoconjugates from *S. pneumoniae* serotypes 1, 5 and 7F such as the glycoconjugates of section 1.3.1 above.

10. In another embodiment the immunogenic composition of the invention comprises in addition to point 1, 2, 3, 4, 5, 6, 7, 8 or 9 above glycoconjugates from *S. pneumoniae* serotypes 6A and 19A such as the glycoconjugates of section 1.3.1 above.

11. In another embodiment the immunogenic composition of the invention comprises in addition to point 1, 2, 3, 4, 5, 6, 7, 8, 9 or 10 above glycoconjugates from *S. pneumoniae* serotype 3 such as the glycoconjugates of section 1.3.1 above.

In an embodiment, the immunogenic composition of the invention comprises glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F.

In an embodiment, the immunogenic composition of the invention comprises glycoconjugates from *S. pneumoniae* serotypes 1, 4, 5, 6A, 6B, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F.

In an embodiment, the immunogenic composition of the invention comprises conjugated *S. pneumoniae* saccharides from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F.

In an embodiment, the immunogenic composition of the invention comprises conjugated *S. pneumoniae* saccharides from serotypes 1, 4, 5, 6A, 6B, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F.

In an embodiment, the glycoconjugates of the immunogenic composition of the invention consist of glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F. In an embodiment, the glycoconjugates of the immunogenic composition of the invention consist of glycoconjugates from serotypes 1, 4, 5, 6A, 6B, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F. In an embodiment, the glycoconjugates of the immunogenic composition of the invention consist of glycoconjugates from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F. In an embodiment, the glycoconjugates of the immunogenic composition of the invention consist of glycoconjugates from 1, 4, 5, 6A, 6B, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F.

Preferably, all the glycoconjugates of the immunogenic composition of the invention (e.g., of any of points 1 to 11 above) are individually conjugated to the carrier protein.

In an embodiment, the glycoconjugates from *S. pneumoniae* serotypes 1, 4, 5, 6B, 7F, 9V, 14 and/or 23F of any of points 8 to 11 above are individually conjugated to PD.

In an embodiment, the glycoconjugate from *S. pneumoniae* serotype 18C of any of points 8 to 11 above is conjugated to TT.

In an embodiment, the glycoconjugate from *S. pneumoniae* serotype 19F of any of points 8 to 11 above is conjugated to DT.

In an embodiment of any of points 8 to 11 above, the glycoconjugates from *S. pneumoniae* serotypes 1, 4, 5, 6B, 7F, 9V, 14 and/or 23F are individually conjugated to PD, the glycoconjugate from *S. pneumoniae* serotype 18C is conjugated to TT and the glycoconjugate from *S. pneumoniae* serotype 19F is conjugated to DT.

In an embodiment of any of points 1 to 11 above, the glycoconjugate from *S. pneumoniae* serotype 22F is conjugated to $CRM_{197}$. In an embodiment of any of points 2 to 11 above, the glycoconjugate from *S. pneumoniae* serotype 33F is conjugated to $CRM_{197}$. In an embodiment of any of points 3 to 11 above, the glycoconjugate from *S. pneumoniae* serotype 15B is conjugated to $CRM_{197}$. In an embodiment of any of points 4 to 11 above, the glycoconjugate from *S. pneumoniae* serotype 12F is conjugated to $CRM_{197}$. In an embodiment of any of points 5 to 11 above, the glycoconjugate from *S. pneumoniae* serotype 10A is conjugated to $CRM_{197}$. In an embodiment of any of points 6 to 11 above, the glycoconjugate from *S. pneumoniae* serotype 11A is conjugated to $CRM_{197}$. In an embodiment of any of points 7 to 11 above, the glycoconjugate from *S. pneumoniae* serotype 8 is conjugated to $CRM_{197}$. In an embodiment of any of points 8 to 11 above, the glycoconjugates from *S. pneumoniae* serotypes 4, 6B, 9V, 14, 18C, 19F and 23F are conjugated to $CRM_{197}$. In an embodiment of any of points 9 to 11 above, the glycoconjugates from *S. pneumoniae* serotypes 1, 5 and 7F are conjugated to $CRM_{197}$. In an embodiment of any of points 10 to 11 above, the glycoconjugates from *S. pneumoniae* serotypes 6A and 19A are conjugated to $CRM_{197}$. In an embodiment of point 11 above, the glycoconjugate from *S. pneumoniae* serotype 3 is conjugated to $CRM_{197}$.

In an embodiment, the glycoconjugates of immunogenic composition of points 1 to 11 above are individually conjugated to $CRM_{197}$.

In an embodiment the immunogenic composition of the invention comprises from 12 to 20 different serotypes of *S. pneumoniae*. In one embodiment the immunogenic composition of the invention comprises glycoconjugates from 12, 13, 14, 15, 16, 17, 18, 19 or 20 different serotypes. In one embodiment the immunogenic composition of the invention comprises glycoconjugates from 16 or 20 different serotypes.

In an embodiment the immunogenic composition of points 1 to 11 above is a 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 or 20-valent pneumococcal conjugate composition. In an embodiment the immunogenic composition of points 1 to 11 above is a 15, 16, 17, 18 or 19-valent pneumococcal conjugate composition. In an embodiment the immunogenic composition of points 1 to 11 above is a 16-valent pneumococcal conjugate composition. In an embodiment the immunogenic composition of points 1 to 11 above is a 19-valent pneumococcal conjugate composition.

After conjugation of the capsular polysaccharide to the carrier protein, the glycoconjugates are purified (enriched with respect to the amount of polysaccharide-protein conjugate) by a variety of techniques. These techniques include concentration/diafiltration operations, precipitation/elution, column chromatography, and depth filtration (see for example U.S. Patent App. Pub. No. 2007/0184072 or WO 2008/079653). After the individual glycoconjugates are purified, they are compounded to formulate the immunogenic composition of the present invention.

1.5 Further Combinations of Glycoconjugates of the Invention

In an embodiment any of the immunogenic compositions defined at section 1.4 above further comprise, at least one glycoconjugate from *S. pneumoniae* serotype 9V.

In an embodiment any of the immunogenic compositions defined at section 1.4 above further comprise, at least one glycoconjugate of each of the two *S. pneumoniae* serotypes selected from the group consisting of: 9V and 4, 9V and 6B, 9V and 14, 9V and 18C, 9V and 19F, 9V and 23F.

In an embodiment any of the immunogenic compositions defined at section 1.4 above further comprise, at least one glycoconjugate of each of the seven following *S. pneumoniae* serotypes: 9V, 4, 6B, 14, 18C, 19F and 23F.

In an embodiment any of the immunogenic compositions defined at section 1.4 above further comprise, at least one glycoconjugate of each of the eight following *S. pneumoniae* serotypes:

9V and 1 and 4 and 6B and 14 and 18C and 19F and 23F,
9V and 4 and 5 and 6B and 14 and 18C and 19F and 23F, or
9V and 4 and 6B and 7F and 14 and 18C and 19F and 23F.

In an embodiment any of the immunogenic compositions defined at section 1.4 above further comprise, at least one glycoconjugate of each of the ten following *S. pneumoniae* serotypes: 9V, 1, 5, 4, 6B, 7F, 14, 18C, 19F and 23F.

In an embodiment any of the immunogenic compositions defined at section 1.4 above further comprise, at least one glycoconjugate of each of the eleven following *S. pneumoniae* serotypes:

9V and 1 and 4 and 5 and 6A and 6B and 7F and 14 and 18C and 19F and 23F or
9V and 1 and 4 and 5 and 6B and 7F and 14 and 18C and 19A and 19F and 23F.

In an embodiment any of the immunogenic compositions defined at section 1.4 above further comprise, at least one glycoconjugate of each of the twelve following *S. pneumoniae* serotypes: 9V, 1, 4, 5, 6A, 6B, 7F, 14, 18C, 19A, 19F and 23F.

In an embodiment any of the immunogenic compositions defined at section 1.4 above further comprise, at least one glycoconjugate of each of the thirteen following *S. pneumoniae* serotypes: 9V, 1, 3, 4, 5, 6A, 6B, 7F, 14, 18C, 19A, 19F and 23F.

In an embodiment any of the immunogenic compositions defined at section 1.4 above comprise in addition at least one glycoconjugate from *S. pneumoniae* serotype 2.

In an embodiment any of the immunogenic compositions defined at section 1.4 above comprise in addition at least one glycoconjugate from *S. pneumoniae* serotype 17F.

In an embodiment any of the immunogenic compositions defined at section 1.4 above comprise in addition at least one glycoconjugate from *S. pneumoniae* serotype 20.

In an embodiment any of the immunogenic compositions defined at section 1.4 above comprise in addition at least one glycoconjugate from *S. pneumoniae* serotype 15C.

In an embodiment any of the immunogenic compositions defined at section 1.4 above comprise in addition at least one glycoconjugate from *S. pneumoniae* serotype 9N.

Preferably, all the glycoconjugates of the above immunogenic compositions are individually conjugated to the carrier protein.

In an embodiment of any of the above immunogenic compositions, the glycoconjugate from *S. pneumoniae* serotype 9V is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotypes 4, 6B, 14, 18C, 19F and 23F are conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotypes 1, 5 and 7F are conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugates from *S. pneumoniae* serotypes 6A and 19A are conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugate from *S. pneumoniae* serotype 3 is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugate from *S. pneumoniae* serotype 2 is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugate from *S. pneumoniae* serotype 17F is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugate from *S. pneumoniae* serotype 20 is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugate from *S. pneumoniae* serotype 15C is conjugated to $CRM_{197}$. In an embodiment of any of the above immunogenic compositions, the glycoconjugate from *S. pneumoniae* serotype 9N is conjugated to $CRM_{197}$.



In an embodiment, the glycoconjugates of the above immunogenic compositions are all individually conjugated to $CRM_{197}$.

In another embodiment, the glycoconjugate from *S. pneumoniae* serotype 9V of any of the above immunogenic compositions is individually conjugated to PD.

In an embodiment, the glycoconjugates from *S. pneumoniae* serotypes 1, 4, 5, 6B, 7F, 9V, 14 and/or 23F of any of the above immunogenic compositions are individually conjugated to PD.

In an embodiment, the glycoconjugate from *S. pneumoniae* serotype 18C of any of the above immunogenic compositions is conjugated to TT.

In an embodiment, the glycoconjugate from *S. pneumoniae* serotype 19F of any of the above immunogenic compositions is conjugated to DT.

In an embodiment, the glycoconjugates from *S. pneumoniae* serotypes 1, 4, 5, 6B, 7F, 9V, 14 and/or 23F of any of the above immunogenic compositions are individually conjugated to PD, the glycoconjugate from *S. pneumoniae* serotype 18C is conjugated to TT and the glycoconjugate from *S. pneumoniae* serotype 19F is conjugated to DT.

In an embodiment the above immunogenic compositions comprises from 7 to 25 different serotypes of *S. pneumoniae*. In one embodiment the above immunogenic compositions comprise glycoconjugates from 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 or 25 different serotypes. In one embodiment the above immunogenic compositions comprise glycoconjugates from 16 or 20 different serotypes. In an embodiment the above immunogenic compositions are 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 or 20-valent pneumococcal conjugate compositions. In an embodiment the above immunogenic compositions are 14, 15, 16, 17, 18 or 19-valent pneumococcal conjugate compositions. In an embodiment the above immunogenic compositions are 16-valent pneumococcal conjugate compositions. In an embodiment the above immunogenic compositions are 19-valent pneumococcal conjugate compositions. In an embodiment the above immunogenic compositions are 20-valent pneumococcal conjugate compositions.

After conjugation of the capsular polysaccharide to the carrier protein, the glycoconjugates are purified (enriched with respect to the amount of polysaccharide-protein conjugate) by a variety of techniques. These techniques include concentration/diafiltration operations, precipitation/elution, column chromatography, and depth filtration (see for example U.S. Patent App. Pub. No. 2007/0184072 or WO 2008/079653. After the individual glycoconjugates are purified, they are compounded to formulate the immunogenic composition of the present invention.

1.6 Particular Combinations of Glycoconjugates of the Invention

In an embodiment any of the immunogenic compositions defined at section 1.4 or 1.5 above do not comprise capsular saccharide from *S. pneumoniae* serotype 9N.

In an embodiment any of the immunogenic compositions defined at section 1.4 or 1.5 above do not comprise capsular saccharide from *S. pneumoniae* serotype 9A.

In an embodiment any of the immunogenic compositions defined at section 1.4 or 1.5 above do not comprise capsular saccharide from *S. pneumoniae* serotype 9L.

In an embodiment any of the immunogenic compositions defined at section 1.4 or 1.5 above do not comprise capsular saccharide from *S. pneumoniae* serotypes 9N and 9A.

In an embodiment any of the immunogenic compositions defined at section 1.4 or 1.5 above do not comprise capsular saccharide from *S. pneumoniae* serotypes 9N and 9L.

In an embodiment any of the immunogenic compositions defined at section 1.4 or 1.5 above do not comprise capsular saccharide from *S. pneumoniae* serotypes 9A and 9L.

In an embodiment any of the immunogenic compositions defined at section 1.4 or 1.5 above do not comprise capsular saccharide from *S. pneumoniae* serotypes 9N, 9A and 9L.

## 2 DOSAGE OF THE IMMUNOGENIC COMPOSITIONS

The amount of glycoconjugate(s) in each dose is selected as an amount which induces an immunoprotective response without significant, adverse side effects in typical vaccinees. Such amount will vary depending upon which specific immunogen is employed and how it is presented.

2.1 Glycoconjugate amount

The amount of a particular glycoconjugate in an immunogenic composition can be calculated based on total polysaccharide for that conjugate (conjugated and nonconjugated). For example, a glycoconjugate with 20% free polysaccharide will have about 80 μg of conjugated polysaccharide and about 20 μg of nonconjugated polysaccharide in a 100 μg polysaccharide dose. The amount of glycoconjugate can vary depending upon the pneumococcal serotype. The saccharide concentration can be determined by the uronic acid assay.

The "immunogenic amount" of the different polysaccharide components in the immunogenic composition, may diverge and each may comprise about 1 μg, about 2 μg, about 3 μg, about 4 μg, about 5 μg, about 6 μg, about 7 μg, about 8 μg, about 9 μg, about 10 μg, about 15 μg, about 20 μg, about 30 μg, about 40 μg, about 50 μg, about 60 μg, about 70 μg, about 80 μg, about 90 μg, or about 100 μg of any particular polysaccharide antigen.

Generally, each dose will comprise 0.1 μg to 100 μg of polysaccharide for a given serotype, particularly 0.5 μg to 20 μg, more particulary 1.0 μg to 10 μg, and even more particularly 2.0 μg to 5.0 μg. Any whole number integer within any of the above ranges is contemplated as an embodiment of the disclosure.

In an embodiment, each dose will comprise about 1.0 μg, about 1.2 μg, about 1.4 μg, about 1.6 μg, about 1.8 μg, about 2.0 μg, about 2.2 μg, about 2.4 μg, about 2.6 μg, about 2.8 μg, about 3.0 μg, about 3.2 μg, about 3.4 μg, about 3.6 μg, about 3.8 μg, about 4.0 μg, about 4.2 μg, about 4.4 μg, about 4.6 μg, about 4.8 μg, about 5.0 μg, about 5.2 μg, about 5.4 μg, about 5.6 μg, about 5.8 μg or about 6.0 μg of polysaccharide for each particular glycoconjugate.

In an embodiment, each dose will comprise about 1.1 μg, about 1.2 μg, about 1.3 μg, about 1.4 μg, about 1.5 μg, about 1.6 μg, about 1.7 μg, about 1.8 μg, about 1.9 μg, about 2.0 μg, about 2.1 μg, about 2.2 μg, about 2.3 μg, about 2.4 μg, about 2.5 μg, about 2.6 μg, about 2.7 μg, about 2.8 μg, about 2.9 μg, or about 3.0 μg of polysaccharide for glycoconjugates from *S. pneumoniae* serotype 1, 3, 4, 5, 6A, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and/or 33F.



In an embodiment, each dose will comprise about 1.1 μg, about 1.2 μg, about 1.3 μg, about 1.4 μg, about 1.5 μg, about 1.6 μg, about 1.7 μg, about 1.8 μg, about 1.9 μg, about 2.0 μg, about 2.1 μg, about 2.2 μg, about 2.3 μg, about 2.4 μg, about 2.5 μg, about 2.6 μg, about 2.7 μg, about 2.8 μg, about 2.9 μg, or about 3.0 μg of polysaccharide for glycoconjugates from *S. pneumoniae* serotype 1, 4, 5, 6A, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and/or 33F.

In an embodiment, each dose will comprise about 2.0 μg, about 2.2 μg, about 2.4 μg, about 2.6 μg, about 2.8 μg, about 3.0 μg, about 3.2 μg, about 3.4 μg, about 3.6 μg, about 3.8 μg, about 4.0 μg, about 4.2 μg, about 4.4 μg, about 4.6 μg, about 4.8 μg, about 5.0, about 5.2 μg, about 5.4 μg, about 5.6 μg, about 5.8 μg or about 6.0 μg of polysaccharide for glycoconjugates from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 1.5 μg to about 3.0 μg of polysaccharide for each glycoconjugate from *S. pneumoniae* serotype 1, 3, 4, 5, 6A, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 3.0 μg to about 6.0 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 2.0 μg to about 2.5 μg of polysaccharide for each glycoconjugate from *S. pneumoniae* serotype 1, 3, 4, 5, 6A, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 4.0 μg to about 4.8 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 2.2 μg of polysaccharide from each glycoconjugate from *S. pneumoniae* serotype 1, 3, 4, 5, 6A, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 4.4 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 1.5 μg to about 3.0 μg of polysaccharide for each glycoconjugate from *S. pneumoniae* serotype 1, 3, 4, 5, 6A, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 3 μg to about 6 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 2.0 μg to about 2.5 μg of polysaccharide for each glycoconjugate from *S. pneumoniae* serotype 1, 3, 4, 5, 6A, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 4.0 μg to about 4.8 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 2.2 μg of polysaccharide from each glycoconjugate from *S. pneumoniae* serotype 1, 3, 4, 5, 6A, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 4.4 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 1.5 μg to about 3.0 μg of polysaccharide for each glycoconjugate from *S. pneumoniae* serotype 1, 4, 5, 6A, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 3.0 μg to about 6.0 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 2.0 μg to about 2.5 μg of polysaccharide for each glycoconjugate from *S. pneumoniae* serotype 1, 4, 5, 6A, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 4.0 μg to about 4.8 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 2.2 μg of polysaccharide from each glycoconjugate from *S. pneumoniae* serotype 1, 4, 5, 6A, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 4.4 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 1.5 μg to about 3.0 μg of polysaccharide for each glycoconjugate from *S. pneumoniae* serotype 1, 4, 5, 6A, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 3.0 μg to about 6.0 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 2.0 μg to about 2.5 μg of polysaccharide for each glycoconjugate from *S. pneumoniae* serotype 1, 4, 5, 6A, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 4.0 μg to about 4.8 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

In an embodiment, each dose will comprise about 2.2 μg of polysaccharide from each glycoconjugate from *S. pneumoniae* serotype 1, 4, 5, 6A, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F, and about 4.4 μg of polysaccharide for glycoconjugate from *S. pneumoniae* serotype 6B.

2.2 Carrier Amount

Generally, each dose will comprise 10 μg to 150 μg of carrier protein, particularly 15 μg to 100 μg of carrier protein, more particularly 25 μg to 75 μg of carrier protein, and even more particularly 40 μg to 60 μg of carrier protein. In an embodiment, said carrier protein is $CRM_{197}$.

In an embodiment, each dose will comprise about 25 μg, about 26 μg, about 27 μg, about 28 μg, about 29 μg, about 30 μg, about 31 μg, about 32 μg, about 33 μg, about 34 μg, about 35 μg, about 36 μg, about 37 μg, about 38 μg, about 39 μg, about 40 μg, about 41 μg, about 42 μg, about 43 μg, about 44 μg, about 45 μg, about 46 μg, about 47 μg, about 48 μg, about 49 μg, about 50 μg, about 51 μg, about 52 μg, about 53 μg, about 54 μg, about 55 μg, about 56 μg, about 57 μg, about 58 μg, about 59 μg, about 60 μg, about 61 μg, about 62 μg, about 63 μg, about 64 μg, about 65 μg, about 66 μg, about 67 μg, about 68 μg, about 69 μg, about 70 μg, about 71 μg, about 72 μg, about 73 μg, about 74 μg or about 75 μg of carrier protein. In an embodiment, said carrier protein is $CRM_{197}$.

## 3 FURTHER ANTIGENS

Immunogenic compositions of the invention comprise conjugated *S. pneumoniae* saccharide antigens (glycoconjugates). They may also further include antigens from other pathogens, particularly from bacteria and/or viruses. Preferred further antigens are selected from: a diphtheria toxoid (D), a tetanus toxoid (T), a pertussis antigen (P), which is typically acellular (Pa), a hepatitis B virus (HBV) surface antigen (HBsAg), a hepatitis A virus (HAV) antigen, a conjugated *Haemophilus influenzae* type b capsular saccharide (Hib), inactivated poliovirus vaccine (IPV).

In an embodiment, the immunogenic compositions of the invention comprise D-T-Pa. In an embodiment, the immunogenic compositions of the invention comprise D-T-Pa-Hib, D-T-Pa-IPV or D-T-Pa-HBsAg. In an embodiment, the immunogenic compositions of the invention comprise D-T-Pa-HBsAg-IPV or D-T-Pa-HBsAg-Hib. In an embodiment, the immunogenic compositions of the invention comprise D-T-Pa-HBsAg-IPV-Hib.

Pertussis antigens: *Bordetella pertussis* causes whooping cough. Pertussis antigens in vaccines are either cellular (whole cell, in the form of inactivated *B. pertussis* cells) or acellular. Preparation of cellular pertussis antigens is well documented (e.g., it may be obtained by heat inactivation of phase I culture of *B. pertussis*). Preferably, however, the invention uses acellular antigens. Where acellular antigens are used, it is preferred to use one, two or (preferably) three of the following antigens: (1) detoxified pertussis toxin (pertussis toxoid, or PT); (2) filamentous hemagglutinin (FHA); (3) pertactin (also known as the 69 kiloDalton outer membrane protein). FHA and pertactin may be treated with formaldehyde prior to use according to the invention. PT is preferably detoxified by treatment with formaldehyde and/or glutaraldehyde. Acellular pertussis antigens are preferably adsorbed onto one or more aluminum salt adjuvants. As an alternative, they may be added in an unadsorbed state. Where pertactin is added then it is preferably already adsorbed onto an aluminum hydroxide adjuvant. PT and FHA may be adsorbed onto an aluminum hydroxide adjuvant or an aluminum phosphate. Adsorption of all of PT, FHA and pertactin to aluminum hydroxide is most preferred.

Inactivated poliovirus vaccine: Poliovirus causes poliomyelitis. Rather than use oral poliovirus vaccine, preferred embodiments of the invention use IPV. Prior to administration to patients, polioviruses must be inactivated, and this can be achieved by treatment with formaldehyde. Poliomyelitis can be caused by one of three types of poliovirus. The three types are similar and cause identical symptoms, but they are antigenically different and infection by one type does not protect against infection by others. It is therefore preferred to use three poliovirus antigens in the invention: poliovirus Type 1 (e.g., Mahoney strain), poliovirus Type 2 (e.g., MEF-1 strain), and poliovirus Type 3 (e.g., Saukett strain). The viruses are preferably grown, purified and inactivated individually, and are then combined to give a bulk trivalent mixture for use with the invention.

Diphtheria toxoid: *Corynebacterium diphtheriae* causes diphtheria. Diphtheria toxin can be treated (e.g., using formalin or formaldehyde) to remove toxicity while retaining the ability to induce specific anti-toxin antibodies after injection. These diphtheria toxoids are used in diphtheria vaccines. Preferred diphtheria toxoids are those prepared by formaldehyde treatment. The diphtheria toxoid can be obtained by growing *C. diphtheriae* in growth medium, followed by formaldehyde treatment, ultrafiltration and precipitation. The toxoided material may then be treated by a process comprising sterile filtration and/or dialysis. The diphtheria toxoid is preferably adsorbed onto an aluminum hydroxide adjuvant.

Tetanus toxoid: *Clostridium tetani* causes tetanus. Tetanus toxin can be treated to give a protective toxoid. The toxoids are used in tetanus vaccines. Preferred tetanus toxoids are those prepared by formaldehyde treatment. The tetanus toxoid can be obtained by growing *C. tetani* in growth medium, followed by formaldehyde treatment, ultrafiltration and precipitation. The material may then be treated by a process comprising sterile filtration and/or dialysis.

Hepatitis A virus antigens: Hepatitis A virus (HAV) is one of the known agents which causes viral hepatitis. A preferred HAV component is based on inactivated virus, and inactivation can be achieved by formalin treatment.

Hepatitis B virus (HBV) is one of the known agents which causes viral hepatitis. The major component of the capsid is a protein known as HBV surface antigen or, more commonly, HBsAg, which is typically a 226-amino acid polypeptide with a molecular weight of ~24 kDa. All existing hepatitis B vaccines contain HBsAg, and when this antigen

is administered to a normal vaccinee it stimulates the production of anti-HBsAg antibodies which protect against HBV infection.

For vaccine manufacture, HBsAg has been made in two ways: purification of the antigen in particulate form from the plasma of chronic hepatitis B carriers or expression of the protein by recombinant DNA methods (e.g., recombinant expression in yeast cells). Unlike native HBsAg (i.e., as in the plasma-purified product), yeast-expressed HBsAg is generally non-glycosylated, and this is the most preferred form of HBsAg for use with the invention.

Conjugated *Haemophilus influenzae* type b antigens: *Haemophilus influenzae* type b (Hib) causes bacterial meningitis. Hib vaccines are typically based on the capsular saccharide antigen, the preparation of which is well documented. The Hib saccharide can be conjugated to a carrier protein in order to enhance its immunogenicity, especially in children. Typical carrier proteins are tetanus toxoid, diphtheria toxoid, $CRM_{197}$, *H. influenzae* protein D, and an outer membrane protein complex from serogroup B meningococcus. The saccharide moiety of the conjugate may comprise full-length polyribosylribitol phosphate (PRP) as prepared from Hib bacteria, and/or fragments of full-length PRP. Hib conjugates may or may not be adsorbed to an aluminum salt adjuvant.

In an embodiment the immunogenic compositions of the invention further include a conjugated *N. meningitidis* serogroup Y capsular saccharide (MenY), and/or a conjugated *N. meningitidis* serogroup C capsular saccharide (MenC).

In an embodiment the immunogenic compositions of the invention further include a conjugated *N. meningitidis* serogroup A capsular saccharide (MenA), a conjugated *N. meningitidis* serogroup W135 capsular saccharide (MenW135), a conjugated *N. meningitidis* serogroup Y capsular saccharide (MenY), and/or a conjugated *N. meningitidis* serogroup C capsular saccharide (MenC).

In an embodiment the immunogenic compositions of the invention further include a conjugated *N. meningitidis* serogroup W135 capsular saccharide (MenW135), a conjugated *N. meningitidis* serogroup Y capsular saccharide (MenY), and/or a conjugated *N. meningitidis* serogroup C capsular saccharide (MenC).

## 4 ADJUVANT(S)

In some embodiments, the immunogenic compositions disclosed herein may further comprise at least one, two or three adjuvants. The term “adjuvant” refers to a compound or mixture that enhances the immune response to an antigen. Antigens may act primarily as a delivery system, primarily as an immune modulator or have strong features of both. Suitable adjuvants include those suitable for use in mammals, including humans.

Examples of known suitable delivery-system type adjuvants that can be used in humans include, but are not limited to, alum (e.g., aluminum phosphate, aluminum sulfate or aluminum hydroxide), calcium phosphate, liposomes, oil-in-water emulsions such as MF59 (4.3% w/v squalene, 0.5% w/v polysorbate 80 (Tween 80), 0.5% w/v sorbitan trioleate (Span 85)), water-in-oil emulsions such as Montanide, and poly(D,L-lactide-co-glycolide) (PLG) microparticles or nanoparticles.

In an embodiment, the immunogenic compositions disclosed herein comprise aluminum salts (alum) as adjuvant (e.g., aluminum phosphate, aluminum sulfate or aluminum hydroxide). In a preferred embodiment, the immunogenic compositions disclosed herein comprise aluminum phosphate or aluminum hydroxide as adjuvant. In an embodiment, the immunogenic compositions disclosed herein comprise from 0.1 mg/mL to 1 mg/mL or from 0.2 mg/mL to 0.3 mg/mL of elemental aluminum in the form of aluminum phosphate. In an embodiment, the immunogenic compositions disclosed herein comprise about 0.25 mg/mL of elemental aluminum in the form of aluminum phosphate. Examples of known suitable immune modulatory type adjuvants that can be used in humans include, but are not limited to, saponin extracts from the bark of the Aquilla tree (QS21, Quil A), TLR4 agonists such as MPL (Monophosphoryl Lipid A), 3DMPL (3-O-deacylated MPL) or GLA-AQ, LT/CT mutants, cytokines such as the various interleukins (e.g., IL-2, IL-12) or GM-CSF, and the like.

Examples of known suitable immune modulatory type adjuvants with both delivery and immune modulatory features that can be used in humans include, but are not limited to, ISCOMS (see, e.g., Sjölander et al. (1998) J. Leukocyte Biol. 64:713; WO 90/03184, WO 96/11711, WO 00/48630, WO 98/36772, WO 00/41720, WO 2006/134423 and WO 2007/026190) or GLA-EM which is a combination of a TLR4 agonist and an oil-in-water emulsion.

For veterinary applications including but not limited to animal experimentation, one can use Complete Freund’s Adjuvant (CFA), Freund’s Incomplete Adjuvant (IFA), Emulsigen, N-acetyl-muramyl-L-threonyl-D-isoglutamine (thr-MDP), N-acetyl-nor-muramyl-L-alanyl-D-isoglutamine (CGP 11637, referred to as nor-MDP), N-acetylmuramyl-L-alanyl-D-isoglutaminyl-L-alanine-2-(1'-2'-dipalmitoyl-sn-glycero-3-hydroxyphosphoryloxy)-ethylamine (CGP 19835A, referred to as MTP-PE), and RIBI, which contains three components extracted from bacteria, monophosphoryl lipid A, trehalose dimycolate and cell wall skeleton (MPL+TDM+CWS) in a 2% squalene/Tween 80 emulsion.

Further exemplary adjuvants to enhance effectiveness of the pneumococcal vaccines as disclosed herein include, but are not limited to: (1) oil-in-water emulsion formulations (with or without other specific immunostimulating agents such as muramyl peptides (see below) or bacterial cell wall components), such as for example (a) SAF, containing 10% Squalane, 0.4% Tween 80, 5% pluronic-blocked polymer L121, and thr-MDP either microfluidized into a submicron emulsion or vortexed to generate a larger particle size emulsion, and (b) RIBI™ adjuvant system (RAS), (Ribi Immunochem, Hamilton, Mont.) containing 2% Squalene, 0.2% Tween 80, and one or more bacterial cell wall components such as monophosphorylipid A (MPL), trehalose dimycolate (TDM), and cell wall skeleton (CWS), preferably MPL+CWS (DETOX™); (2) saponin adjuvants, such as QS21, STIMULON™ (Cambridge Bioscience, Worcester, Mass.), ABISCO® (Isconova, Sweden), or ISCOMATRIX® (Commonwealth Serum Laboratories, Australia), may be used or particles generated therefrom such as ISCOMs (immunostimulating complexes), which ISCOMS may be devoid of additional detergent (e.g., WO 00/07621); (3) Complete Freund’s Adjuvant (CFA) and Incomplete Freund’s Adjuvant (IFA); (4) cytokines, such as interleukins (e.g., IL-1, IL-2, IL-4, IL-5, IL-6, IL-7, IL-12 (e.g., WO 99/44636)), interferons (e.g., gamma interferon), macrophage colony stimulating factor (M-CSF), tumor necrosis

factor (TNF), etc.; (5) monophosphoryl lipid A (MPL) or 3-O-deacylated MPL (3dMPL) (see, e.g., GB2220211, EP0689454), optionally in the substantial absence of alum when used with pneumococcal saccharides (see, e.g., WO 00/56358); (6) combinations of 3dMPL with, for example, QS21 and/or oil-in-water emulsions (see, e.g., EP0835318, EP0735898, EP0761231); (7) a polyoxyethylene ether or a polyoxyethylene ester (see, e.g., WO 99/52549); (8) a polyoxyethylene sorbitan ester surfactant in combination with an octoxynol (e.g., WO 01/21207) or a polyoxyethylene alkyl ether or ester surfactant in combination with at least one additional non-ionic surfactant such as an octoxynol (e.g., WO 01/21152); (9) a saponin and an immunostimulatory oligonucleotide (e.g., a CpG oligonucleotide) (e.g., WO 00/62800); (10) an immunostimulant and a particle of metal salt (see, e.g., WO 00/23105); (11) a saponin and an oil-in-water emulsion (e.g., WO 99/11241); (12) a saponin (e.g., QS21)+3dMPL+IM2 (optionally+a sterol) (e.g., WO 98/57659); (13) other substances that act as immunostimulating agents to enhance the efficacy of the composition. Muramyl peptides include N-acetyl-muramyl-L-threonyl-D-isoglutamine (thr-MDP), N-25 acetyl-normuramyl-L-alanyl-D-isoglutamine (nor-MDP), N-acetylmuramyl-L-alanyl-D-isoglutarninyl-L-alanine-2-(1'-2'-dipalmitoyl-sn-glycero-3-hydroxyphosphoryloxy)-ethylamine MTP-PE), etc.

In an embodiment of the present invention, the immunogenic compositions as disclosed herein comprise a CpG Oligonucleotide as adjuvant. A CpG oligonucleotide as used herein refers to an immunostimulatory CpG oligodeoxynucleotide (CpG ODN), and accordingly these terms are used interchangeably unless otherwise indicated. Immunostimulatory CpG oligodeoxynucleotides contain one or more immunostimulatory CpG motifs that are unmethylated cytosine-guanine dinucleotides, optionally within certain preferred base contexts. The methylation status of the CpG immunostimulatory motif generally refers to the cytosine residue in the dinucleotide. An immunostimulatory oligonucleotide containing at least one unmethylated CpG dinucleotide is an oligonucleotide which contains a 5' unmethylated cytosine linked by a phosphate bond to a 3' guanine, and which activates the immune system through binding to Toll-like receptor 9 (TLR-9). In another embodiment the immunostimulatory oligonucleotide may contain one or more methylated CpG dinucleotides, which will activate the immune system through TLR9 but not as strongly as if the CpG motif(s) was/were unmethylated. CpG immunostimulatory oligonucleotides may comprise one or more palindromes that in turn may encompass the CpG dinucleotide. CpG oligonucleotides have been described in a number of issued patents, published patent applications, and other publications, including U.S. Pat. Nos. 6,194,388; 6,207,646; 6,214,806; 6,218,371; 6,239,116; and 6,339,068.

In an embodiment of the present invention, the immunogenic compositions as disclosed herein comprise any of the CpG Oligonucleotide described at page 3, line 22, to page 12, line 36, of WO 2010/125480.

Different classes of CpG immunostimulatory oligonucleotides have been identified. These are referred to as A, B, C and P class, and are described in greater detail at page 3, line 22, to page 12, line 36, of WO 2010/125480. Methods of the invention embrace the use of these different classes of CpG immunostimulatory oligonucleotides.



In an embodiment of the present invention, the immunogenic compositions as disclosed herein comprise an A class CpG oligonucleotide. Preferably, the "A class" CpG oligonucleotide of the invention has the following nucleic acid sequence: 5' GGGGACGACGTCGTGGGGGGG 3' (SEQ ID NO: 1). Some non-limiting examples of A-Class oligonucleotides include: 5' G*G*G_G_A_C_G_A_C_G_T_C_G_T_G_G*G*G*G*G*G 3' (SEQ ID NO: 2); wherein "*" refers to a phosphorothioate bond and "_" refers to a phosphodiester bond.

In an embodiment of the present invention, the immunogenic compositions as disclosed herein comprise a B class CpG Oligonucleotide. In one embodiment, the CpG oligonucleotide for use in the present invention is a B class CpG oligonucleotide represented by at least the formula:

5' $X_1X_2CGX_3X_4$ 3', wherein X1, X2, X3, and X4 are nucleotides. In one embodiment, $X_2$ is adenine, guanine, or thymine. In another embodiment, $X_3$ is cytosine, adenine, or thymine.

The B class CpG oligonucleotide sequences of the invention are those broadly described above as well as disclosed in WO 96/02555, WO 98/18810 and U.S. Pat. Nos. 6,194,388; 6,207,646; 6,214,806; 6,218,371; 6,239,116 and 6,339,068. Exemplary sequences include but are not limited to those disclosed in these latter applications and patents.

In an embodiment, the "B class" CpG oligonucleotide of the invention has the following nucleic acid sequence:

```
                                  (SEQ ID NO: 3)
5'TCGTCGTTTTTCGGTGCTTTT 3',
or

                                  (SEQ ID NO: 4)
5'TCGTCGTTTTTCGGTCGTTTT 3',
or

                                  (SEQ ID NO: 5)
5'TCGTCGTTTTGTCGTTTTGTCGTT 3',
or

                                  (SEQ ID NO: 6)
5'TCGTCGTTTCGTCGTTTTGTCGTT 3',
or

                                  (SEQ ID NO: 7)
5'TCGTCGTTTTGTCGTTTTTTTCGA 3'.
```

In any of these sequences, all of the linkages may be all phosphorothioate bonds. In another embodiment, in any of these sequences, one or more of the linkages may be phosphodiester, preferably between the "C" and the "G" of the CpG motif making a semi-soft CpG oligonucleotide. In any of these sequences, an ethyl-uridine or a halogen may substitute for the 5' T; examples of halogen substitutions include but are not limited to bromo-uridine or iodo-uridine substitutions.

Some non-limiting examples of B-Class oligonucleotides include:

```
                                           (SEQ ID NO: 8)
5'T*C*G*T*C*G*T*T*T*T*T*C*G*G*T*G*C*T*T*T*T 3',
or

                                           (SEQ ID NO: 9)
5'T*C*G*T*C*G*T*T*T*T*T*C*G*G*T*C*G*T*T*T*T 3',
or
```

-continued

(SEQ ID NO: 10)
5'T*C*G*T*C*G*T*T*T*T*G*T*C*G*T*T*T*T*G*T*C*G*T*
T 3',
or

(SEQ ID NO: 11)
5'T*C*G*T*C*G*T*T*T*C*G*T*C*G*T*T*T*T*G*T*C*G*T*
T 3',
or

(SEQ ID NO: 12)
5'T*C*G*T*C*G*T*T*T*T*G*T*C*G*T*T*T*T*T*T*T*C*G*
A 3'.

wherein "*" refers to a phosphorothioate bond.

In an embodiment of the present invention, the immunogenic compositions as disclosed herein comprise a C class CpG Oligonucleotide. In an embodiment, the "C class" CpG oligonucleotides of the invention have the following nucleic acid sequence:

(SEQ ID NO: 13)
5'TCGCGTCGTTCGGCGCGCGCCG 3',
or

(SEQ ID NO: 14)
5'TCGTCGACGTTCGGCGCGCGCCG 3',
or

(SEQ ID NO: 15)
5'TCGGACGTTCGGCGCGCGCCG 3',
or

(SEQ ID NO: 16)
5'TCGGACGTTCGGCGCGCCG 3',
or

(SEQ ID NO: 17)
5'TCGCGTCGTTCGGCGCGCCG 3',
or

(SEQ ID NO: 18)
5'TCGACGTTCGGCGCGCGCCG 3',
or

(SEQ ID NO: 19)
5'TCGACGTTCGGCGCGCCG 3',
or

(SEQ ID NO: 20)
5'TCGCGTCGTTCGGCGCCG 3',
or

(SEQ ID NO: 21)
5'TCGCGACGTTCGGCGCGCGCCG 3',
or

(SEQ ID NO: 22)
5'TCGTCGTTTTCGGCGCGCGCCG 3',
or

(SEQ ID NO: 23)
5'TCGTCGTTTTCGGCGGCCGCCG 3',
or

(SEQ ID NO: 24)
5'TCGTCGTTTTACGGCGCCGTGCCG 3',
or

(SEQ ID NO: 25)
5'TCGTCGTTTTCGGCGCGCGCCGT 3'.

In any of these sequences, all of the linkages may be all phosphorothioate bonds. In another embodiment, in any of these sequences, one or more of the linkages may be phosphodiester, preferably between the "C" and the "G" of the CpG motif making a semi-soft CpG oligonucleotide.



Some non-limiting examples of C-Class oligonucleotides include:

(SEQ ID NO: 26)
5'T*C_G*C_G*T*C_G*T*T*C_G*G*C*G*C_G*C*G*C*C*G 3',
or

(SEQ ID NO: 27)
5'T*C_G*T*C_G*A*C_G*T*T*C_G*G*C*G*C_G*C*G*C*C*
G 3',
or

(SEQ ID NO: 28)
5'T*C_G*G*A*C_G*T*T*C_G*G*C*G*C_G*C*G*C*C*G 3',
or

(SEQ ID NO: 29)
5'T*C_G*G*A*C_G*T*T*C_G*G*C*G*C*G*C*C*G 3',
or

(SEQ ID NO: 30)
5'T*C_G*C_G*T*C_G*T*T*C_G*G*C*G*C*G*C*C*G 3',
or

(SEQ ID NO: 31)
5'T*C_G*A*C_G*T*T*C_G*G*C*G*C_G*C*G*C*C*G 3',
or

(SEQ ID NO: 32)
5'T*C_G*A*C_G*T*T*C_G*G*C*G*C*G*C*C*G 3',
or

(SEQ ID NO: 33)
5'T*C_G*C_G*T*C_G*T*T*C_G*G*C*G*C*C*G 3',
or

(SEQ ID NO: 34)
5'T*C_G*C_G*A*C_G*T*T*C_G*G*C*G*C_G*C*G*C*C*G 3',
or

(SEQ ID NO: 35)
5'T*C*G*T*C*G*T*T*T*T*C*G*G*C*G*C*G*C*G*C*C*G 3',
or

(SEQ ID NO: 36)
5'T*C*G*T*C*G*T*T*T*T*C*G*G*C*G*G*C*C*G*C*C*G 3',
or

(SEQ ID NO: 37)
5'T*C*G*T*C_G*T*T*T*T*A*C_G*G*C*G*C*C_G*T*G*C*C*
G 3',
or

(SEQ ID NO: 38)
5'T*C_G*T*C*G*T*T*T*T*C*G*G*C*G*C*G*C*G*C*C*G*T 3'

wherein "*" refers to a phosphorothioate bond and "_" refers to a phosphodiester bond.

In any of these sequences, an ethyl-uridine or a halogen may substitute for the 5' T; examples of halogen substitutions include but are not limited to bromo-uridine or iodo-uridine substitutions.

In an embodiment of the present invention, the immunogenic compositions as disclosed herein comprise a P class CpG Oligonucleotide. In an embodiment, the CpG oligonucleotide for use in the present invention is a P class CpG oligonucleotide containing a 5' TLR activation domain and at least two palindromic regions, one palindromic region being a 5' palindromic region of at least 6 nucleotides in length and connected to a 3' palindromic region of at least 8 nucleotides in length either directly or through a spacer, wherein the oligonucleotide includes at least one YpR dinucleotide. In an embodiment, said oligonucleotide is not T*C_G*T*C_G*A*C_G*T*T*C_G*G*C*G*C_G*C*G*C*C*G (SEQ ID NO: 27). In one embodiment the P class CpG oligonucleotide includes at least one unmethylated

CpG dinucleotide. In another embodiment the TLR activation domain is TCG, TTCG, TTTCG, TYpR, TTYpR, TTTYpR, UCG, UUCG, UUUCG, TTT, or TTTT. In yet another embodiment the TLR activation domain is within the 5' palindromic region. In another embodiment the TLR activation domain is immediately 5' to the 5' palindromic region. In an embodiment, the "P class" CpG oligonucleotides of the invention have the following nucleic acid sequence: 5' TCGTCGACGATCGGCGCGCGCCG 3' (SEQ ID NO: 39).

In said sequences, all of the linkages may be all phosphorothioate bonds. In another embodiment, one or more of the linkages may be phosphodiester, preferably between the "C" and the "G" of the CpG motif making a semi-soft CpG oligonucleotide. In any of these sequences, an ethyl-uridine or a halogen may substitute for the 5' T; examples of halogen substitutions include but are not limited to bromo-uridine or iodo-uridine substitutions.

A non-limiting example of P-Class oligonucleotides include:

5' T*C_G*T*C_G*A*C_G*A*T*C_G*G*C*G*C_G*C*G*C*C*G 3' (SEQ ID NO: 40)

wherein "*" refers to a phosphorothioate bond and "_" refers to a phosphodiester bond. In one embodiment the oligonucleotide includes at least one phosphorothioate linkage. In another embodiment all internucleotide linkages of the oligonucleotide are phosphorothioate linkages. In another embodiment the oligonucleotide includes at least one phosphodiester-like linkage. In another embodiment the phosphodiester-like linkage is a phosphodiester linkage. In another embodiment a lipophilic group is conjugated to the oligonucleotide. In one embodiment the lipophilic group is cholesterol.

In an embodiment, all the internucleotide linkages of the CpG oligonucleotides disclosed herein are phosphodiester bonds ("soft" oligonucleotides, as described in WO 2007/026190). In another embodiment, CpG oligonucleotides of the invention are rendered resistant to degradation (e.g., are stabilized). A "stabilized oligonucleotide" refers to an oligonucleotide that is relatively resistant to in vivo degradation (e.g., via an exo- or endo-nuclease). Nucleic acid stabilization can be accomplished via backbone modifications. Oligonucleotides having phosphorothioate linkages provide maximal activity and protect the oligonucleotide from degradation by intracellular exo- and endo-nucleases.

The immunostimulatory oligonucleotides may have a chimeric backbone, which have combinations of phosphodiester and phosphorothioate linkages. For purposes of the instant invention, a chimeric backbone refers to a partially stabilized backbone, wherein at least one internucleotide linkage is phosphodiester or phosphodiester-like, and wherein at least one other internucleotide linkage is a stabilized internucleotide linkage, wherein the at least one phosphodiester or phosphodiester-like linkage and the at least one stabilized linkage are different. When the phosphodiester linkage is preferentially located within the CpG motif such molecules are called "semi-soft" as described in WO 2007/026190.

Other modified oligonucleotides include combinations of phosphodiester, phosphorothioate, methylphosphonate, methylphosphorothioate, phosphorodithioate, and/or p-ethoxy linkages.

Mixed backbone modified ODN may be synthesized as described in WO 2007/026190.

The size of the CpG oligonucleotide (i.e., the number of nucleotide residues along the length of the oligonucleotide) also may contribute to the stimulatory activity of the oligonucleotide. For facilitating uptake into cells, CpG oligonucleotide of the invention preferably have a minimum length of 6 nucleotide residues. Oligonucleotides of any size greater than 6 nucleotides (even many kb long) are capable of inducing an immune response if sufficient immunostimulatory motifs are present, because larger oligonucleotides are degraded inside cells. In certain embodiments, the CpG oligonucleotides are 6 to 100 nucleotides long, preferentially 8 to 30 nucleotides long. In important embodiments, nucleic acids and oligonucleotides of the invention are not plasmids or expression vectors.

In an embodiment, the CpG oligonucleotide disclosed herein comprise substitutions or modifications, such as in the bases and/or sugars as described at paragraphs 134 to 147 of WO 2007/026190.

In an embodiment, the CpG oligonucleotide of the present invention is chemically modified. Examples of chemical modifications are known to the skilled person and are described, for example in Uhlmann et al. (1990) Chem. Rev. 90:543; S. Agrawal, Ed., Humana Press, Totowa, USA 1993; Crooke et al. (1996) Annu. Rev. Pharmacol. Toxicol. 36:107-129; and Hunziker et al. (1995) Mod. Synth. Methods 7:331-417. An oligonucleotide according to the invention may have one or more modifications, wherein each modification is located at a particular phosphodiester internucleoside bridge and/or at a particular β-D-ribose unit and/or at a particular natural nucleoside base position in comparison to an oligonucleotide of the same sequence which is composed of natural DNA or RNA.

In some embodiments of the invention, CpG-containing nucleic acids might be simply mixed with immunogenic carriers according to methods known to those skilled in the art (see, e.g., WO 03/024480).

In a particular embodiment of the present invention, any of the immunogenic compositions disclosed herein comprise from 2 μg to 100 mg of CpG oligonucleotide, preferably from 0.1 mg to 50 mg CpG oligonucleotide, preferably from 0.2 mg to 10 mg CpG oligonucleotide, preferably from 0.3 mg to 5 mg CpG oligonucleotide, preferably from 0.3 mg to 5 mg CpG oligonucleotide, even preferably from 0.5 to 2 mg CpG oligonucleotide, even preferably from 0.75 to 1.5 mg CpG oligonucleotide. In a preferred embodiment, any of the immunogenic composition disclosed herein comprises about 1 mg CpG oligonucleotide.

## 5 FORMULATION

The immunogenic compositions of the invention may be formulated in liquid form (i.e., solutions or suspensions) or in a lyophilized form. Liquid formulations may advantageously be administered directly from their packaged form and are thus ideal for injection without the need for reconstitution in aqueous medium as otherwise required for lyophilized compositions of the invention.

Formulation of the immunogenic composition of the present invention can be accomplished using art-recognized methods. For instance, the individual pneumococcal conjugates can be formulated with a physiologically acceptable vehicle to prepare the composition. Examples of such vehicles include, but are not limited to, water, buffered saline, polyols (e.g., glycerol, propylene glycol, liquid polyethylene glycol) and dextrose solutions.

The present disclosure provides an immunogenic composition comprising any of combination of glycoconjugates disclosed herein and a pharmaceutically acceptable excipient, carrier, or diluent.

In an embodiment, the immunogenic composition of the invention is in liquid form, preferably in aqueous liquid form.

Immunogenic compositions of the disclosure may comprise one or more of a buffer, a salt, a divalent cation, a non-ionic detergent, a cryoprotectant such as a sugar, and an anti-oxidant such as a free radical scavenger or chelating agent, or any multiple combinations thereof.

In an embodiment, the immunogenic compositions of the invention comprise a buffer. In an embodiment, said buffer has a pKa of about 3.5 to about 7.5. In some embodiments, the buffer is phosphate, succinate, histidine or citrate. In certain embodiments, the buffer is succinate at a final concentration of 1 mM to 10 mM. In one particular embodiment, the final concentration of the succinate buffer is about 5 mM.

In an embodiment, the immunogenic compositions of the invention comprise a salt. In some embodiments, the salt is selected from the groups consisting of magnesium chloride, potassium chloride, sodium chloride and a combination thereof. In one particular embodiment, the salt is sodium chloride. In one particular embodiment, the immunogenic compositions of the invention comprise sodium chloride at 150 mM.

In an embodiment, the immunogenic compositions of the invention comprise a surfactant. In an embodiment, the surfactant is selected from the group consisting of polysorbate 20 (TWEEN™20), polysorbate 40 (TWEEN™40), polysorbate 60 (TWEEN™60), polysorbate 65 (TWEEN™65), polysorbate 80 (TWEEN™80), polysorbate 85 (TWEEN™85), TRITON™ N-101, TRITON™ X-100, oxtoxynol 40, nonoxynol-9, triethanolamine, triethanolamine polypeptide oleate, polyoxyethylene-660 hydroxystearate (PEG-15, Solutol H 15), polyoxyethylene-35-ricinoleate (CREMOPHOR® EL), soy lecithin and a poloxamer. In one particular embodiment, the surfactant is polysorbate 80. In some said embodiment, the final concentration of polysorbate 80 in the formulation is at least 0.0001% to 10% polysorbate 80 weight to weight (w/w). In some said embodiments, the final concentration of polysorbate 80 in the formulation is at least 0.001% to 1% polysorbate 80 weight to weight (w/w). In some said embodiments, the final concentration of polysorbate 80 in the formulation is at least 0.01% to 1% polysorbate 80 weight to weight (w/w). In other embodiments, the final concentration of polysorbate 80 in the formulation is 0.01%, 0.02%, 0.03%, 0.04%, 0.05%, 0.06%, 0.07%, 0.08%, 0.09% or 0.1% polysorbate 80 (w/w). In another embodiment, the final concentration of the polysorbate 80 in the formulation is 1% polysorbate 80 (w/w).

In certain embodiments, the immunogenic composition of the invention has a pH of 5.5 to 7.5, more preferably a pH of 5.6 to 7.0, even more preferably a pH of 5.8 to 6.0.

In one embodiment, the present invention provides a container filled with any of the immunogenic compositions disclosed herein. In one embodiment, the container is selected from the group consisting of a vial, a syringe, a flask, a fermentor, a bioreactor, a bag, a jar, an ampoule, a cartridge and a disposable pen. In certain embodiments, the container is siliconized.

In an embodiment, the container of the present invention is made of glass, metals (e.g., steel, stainless steel, aluminum, etc.) and/or polymers (e.g., thermoplastics, elastomers, thermoplastic-elastomers). In an embodiment, the container of the present invention is made of glass.

In one embodiment, the present invention provides a syringe filled with any of the immunogenic compositions disclosed herein. In certain embodiments, the syringe is siliconized and/or is made of glass.

A typical dose of the immunogenic composition of the invention for injection has a volume of 0.1 mL to 2 mL, more preferably 0.2 mL to 1 mL, even more preferably a volume of about 0.5 mL.

Therefore the container or syringe as defined above is filed with a volume of 0.1 mL to 2 mL, more preferably 0.2 mL to 1 mL, even more preferably a volume of about 0.5 mL of any of the immunogenic compositions defined herein.

## 6 USES OF THE IMMUNOGENIC COMPOSITIONS OF THE INVENTION

In an embodiment, the immunogenic compositions disclosed herein are for use as a medicament.

The immunogenic compositions described herein may be used in various therapeutic or prophylactic methods for preventing, treating or ameliorating a bacterial infection, disease or condition in a subject. In particular, immunogenic compositions described herein may be used to prevent, treat or ameliorate a *S. pneumoniae* infection, disease or condition in a subject.

Thus in one aspect, the invention provides a method of preventing, treating or ameliorating an infection, disease or condition associated with *S. pneumoniae* in a subject, comprising administering to the subject an immunologically effective amount of an immunogenic composition of the invention.

In some such embodiments, the infection, disease or condition is selected from the group consisting of pneumonia, sinusitis, otitis media, acute otitis media, meningitis, bacteremia, sepsis, pleural empyema, conjunctivitis, osteomyelitis, septic arthritis, endocarditis, peritonitis, pericarditis, mastoiditis, cellulitis, soft tissue infection and brain abscess.

In an embodiment, the invention provides a method of inducing an immune response to *S. pneumoniae* in a subject comprising administering to the subject an immunologically effective amount of an immunogenic composition of the invention.

In an embodiment, the immunogenic compositions disclosed herein are for use as a vaccine. In such embodiments the immunogenic compositions described herein may be used to prevent a *S. pneumoniae* infection in a subject. Thus in one aspect, the invention provides a method of preventing an infection by *S. pneumoniae* in a subject comprising administering to the subject an immunologically effective amount of an immunogenic composition of the invention. In some such embodiments, the infection is selected from the group consisting of pneumonia, sinusitis, otitis media, acute otitis media, meningitis, bacteremia, sepsis, pleural empyema, conjunctivitis, osteomyelitis, septic arthritis, endocarditis, peritonitis, pericarditis, mastoiditis, cellulitis, soft tissue infection and brain abscess. In one aspect, the subject to be vaccinated is a mammal, such as a human, cat, sheep, pig, horse, bovine or dog.

In one aspect, the immunogenic compositions disclosed herein are for use in a method of preventing, treating or ameliorating an infection, disease or condition associated with *S. pneumoniae* in a subject. In some such embodiments, the infection, disease or condition is selected from the group consisting of pneumonia, sinusitis, otitis media, acute otitis media, meningitis, bacteremia, sepsis, pleural empyema, conjunctivitis, osteomyelitis, septic arthritis, endocarditis, peritonitis, pericarditis, mastoiditis, cellulitis, soft tissue infection and brain abscess.

In an embodiment, the immunogenic compositions disclosed herein are for use as a vaccine. In such embodiments the immunogenic compositions described herein may be used to prevent a *S. pneumoniae* infection in a subject. Thus in one aspect, the immunogenic compositions disclosed herein are for use in a method of preventing, an infection by *S. pneumoniae* in a subject. In some such embodiments, the infection is selected from the group consisting of pneumonia, sinusitis, otitis media, acute otitis media, meningitis, bacteremia, sepsis, pleural empyema, conjunctivitis, osteomyelitis, septic arthritis, endocarditis, peritonitis, pericarditis, mastoiditis, cellulitis, soft tissue infection and brain abscess. In one aspect, the subject to be vaccinated is a mammal, such as a human, cat, sheep, pig, horse, bovine or dog.

The immunogenic compositions of the present invention can be used to protect or treat a human susceptible to pneumococcal infection, by means of administering the immunogenic compositions via a systemic or mucosal route. In an embodiment, the immunogenic compositions disclosed herein are administered by intramuscular, intraperitoneal, intradermal or subcutaneous routes. In an embodiment, the immunogenic compositions disclosed herein are administered by intramuscular, intraperitoneal, intradermal or subcutaneous injection. In an embodiment, the immunogenic compositions disclosed herein are administered by intramuscular or subcutaneous injection.

In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), when administered to a subject, are able to induce the formation of antibodies capable of binding to *S. pneumonia* serotype 15B, 15A and/or 15C as measured by a standard ELISA assay. In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), when administered to a subject, are able to induce the formation of antibodies capable of binding to *S. pneumonia* serotype 15B, and 15C as measured by a standard ELISA assay.

In the ELISA (Enzyme-linked Immunosorbent Assay) method, antibodies from the sera of vaccinated subjects are incubated with polysaccharides which have been adsorbed to a solid support. The bound antibodies are detected using enzyme-conjugated secondary detection antibodies.

In an embodiment said standard ELISA assay is the standardized (WHO) ELISA assay as defined by the WHO in the 'Training manual for Enzyme linked immunosorbent assay for the quantitation of *Streptococcus pneumoniae* serotype specific IgG (Pn PS ELISA).' (accessible at http://www.vaccine.uab.edu/ELISA%20protocol.pdf; accessed on Mar. 31, 2014).

The ELISA measures type specific IgG anti-*S. pneumoniae* capsular polysaccharide (PS) antibodies present in human serum. When dilutions of human sera are added to type-specific capsular PS-coated microtiter plates, antibodies specific for that capsular PS bind to the microtiter plates. The antibodies bound to the plates are detected using a goat anti-human IgG alkaline phosphatase-labeled antibody followed by a p-nitrophenyl phosphate substrate. The optical density of the colored end product is proportional to the amount of anticapsular PS antibody present in the serum.

In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above) is able to elicit IgG antibodies in human which are capable of binding *S. pneumoniae* serotype 15B polysaccharide at a concentration of at least 0.05, 0.1, 0.2, 0.3, 0.35, 0.4 or 0.5 μg/ml as determined by ELISA assay.

In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above) is able to elicit IgG antibodies in human which are capable of binding *S. pneumoniae* serotype 15C polysaccharide at a concentration of at least 0.05, 0.1, 0.2, 0.3, 0.35, 0.4 or 0.5 μg/ml as determined by ELISA assay.

In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above) is able to elicit IgG antibodies in human which are capable of binding *S. pneumoniae* serotypes 15B and 15C polysaccharide at a concentration of at least 0.05, 0.1, 0.2, 0.3, 0.35, 0.4 or 0.5 μg/ml as determined by ELISA assay.

In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), when administered to a subject, are able to induce the formation of antibodies capable of killing *S. pneumonia* serotype 15B in an opsonophagocytosis assay as disclosed herein (such as the OPA assay of Example 12).

In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), when tested in an OPA assay as disclosed herein (such as the OPA assay of Example 12), has an OPA titer greater than the OPA titer obtained with an unconjugated native *S. pneumonia* serotype 15B capsular polysaccharide.

In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), when administered to a subject, are able to induce the formation of antibodies capable of killing *S. pneumonia* serotype 15C in an opsonophagocytosis assay as disclosed herein (such as the OPA assay of Example 12). In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), when tested in an OPA assay as disclosed herein (such as the OPA assay of Example 12), has an OPA titer greater than the OPA titer obtained with an unconjugated native *S. pneumonia* serotype 15B capsular polysaccharide.

The pneumococcal opsonophagocytic assay (OPA), which measures killing of *S. pneumoniae* cells by phagocytic effector cells in the presence of functional antibody and complement, is considered to be an important surrogate for evaluating the effectiveness of pneumococcal vaccines.

Opsonophagocytic assay (OPA) can be conducted by incubating together a mixture of *Streptococcus pneumoniae* cells, a heat inactivated human serum to be tested, differentiated HL-60 cells (phagocytes) and an exogenous complement source (e.g. baby rabbit complement). Opsonophagocytosis proceeds during incubation and bacterial cells that are coated with antibody and complement are killed upon opsonophagocytosis. Colony forming units (cfu) of surviving bacteria that escape from opsonophagocytosis are determined by plating the assay mixture. The OPA titer is defined as the reciprocal dilution that results in a 50%

reduction in bacterial count over control wells without test serum. The OPA titer is interpolated from the two dilutions that encompass this 50% killing cut-off.

An endpoint titer of 1:8 or greater is considered a positive result in these killing type OPA.

In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), is able to elicit a titer of at least 1:8 against *S. pneumoniae* serotype 15B in at least 50% of the subjects as determined by opsonophagocytic killing assay (OPA). In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above) is able to elicit a titer of at least 1:8 against *S. pneumoniae* serotype 15B in at least 60%, 70%, 80%, 90%, or at least 93% of the subjects as determined by opsonophagocytic killing assay (OPA).

In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above) is able to elicit a titer of at least 1:8 against *S. pneumoniae* serotype 15C in at least 50% of the subjects as determined by opsonophagocytic killing assay (OPA). In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above) is able to elicit a titer of at least 1:8 against *S. pneumoniae* serotype 15C in at least 60%, 70%, 80%, 90%, or at least 95% of the subjects as determined by opsonophagocytic killing assay (OPA).

In a further aspect, the present disclosure provides a method of treating or preventing a *S. pneumoniae* infection, disease or condition associated with *S. pneumoniae* serotype 15A, 15B and/or 15C in a subject, the method comprising the step of administering a therapeutically or prophylactically effective amount of any of the immunogenic compositions of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above). In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), when administered to a subject, induces the formation of antibodies capable of binding to *S. pneumoniae* serotype 15B, 15A and/or 15C. In an embodiment, the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), when administered to a subject, induces the formation of antibodies capable of killing *S. pneumoniae* serotype 15B, 15C and/or 15A in an opsonophagocytosis assay as disclosed herein (such as the OPA assay of Example 12).

One embodiment of the disclosure provides a method of protecting a subject against an infection with *S. pneumoniae* serotype 15C, or a method of preventing infection with *S. pneumoniae* serotype 15C, or a method of reducing the severity of or delaying the onset of at least one symptom associated with an infection caused by *S. pneumoniae* serotype 15C, the methods comprising administering to a subject an immunogenic amount of any of the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above). One embodiment of the disclosure provides a method of treating or preventing a *S. pneumoniae* infection, disease or condition associated with *S. pneumoniae* serotype 15A, 15B and/or 15C (preferably 15B and/or 15C, more preferably 15B) in a subject, the method comprising the step of administering a therapeutically or prophylactically effective amount of any of the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above) to the subject. Another embodiment provides a method of treating or preventing a *S. pneumoniae* infection, disease or condition associated with a *S. pneumoniae* serotype 15A, 15B and/or 15C (preferably 15B and/or 15C, more preferably 15B) in a subject, the method comprising generating a polyclonal or monoclonal antibody preparation from any of the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above), and using said antibody preparation to confer passive immunity to the subject.

In one embodiment, the disclosure relates to the use of any of the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above) for the manufacture of a medicament for protecting a subject against an infection with *S. pneumoniae*, and/or preventing infection with *S. pneumoniae*, and/or reducing the severity of or delaying the onset of at least one symptom associated with an infection caused by *S. pneumoniae*, and/or protecting a subject against an infection with *S. pneumoniae* serotype 15A, 15B and/or 15C (preferably 15B and/or 15C, more preferably 15B) and/or preventing infection with *S. pneumoniae* serotype 15A, 15B and/or 15C (preferably 15B and/or 15C, more preferably 15B), and/or reducing the severity of or delaying the onset of at least one symptom associated with an infection caused by *S. pneumoniae* serotype 15A, 15B and/or 15C (preferably 15B and/or 15C, more preferably 15B).

In one embodiment, the disclosure relates to the use of any of the immunogenic composition of the present disclosure comprising at least one glycoconjugate from *S. pneumoniae* serotype 15B (such as the glycoconjugates of section 1.3.4 above) for protecting a subject against an infection with *S. pneumoniae*, and/or preventing infection with *S. pneumoniae*, and/or reducing the severity of or delaying the onset of at least one symptom associated with an infection caused by *S. pneumoniae*, and/or protecting a subject against an infection with *S. pneumoniae* serotype 15A, 15B and/or 15C (preferably 15B and/or 15C, more preferably 15B) and/or preventing infection with *S. pneumoniae* serotype 15A, 15B and/or 15C (preferably 15B and/or 15C, more preferably 15B), and/or reducing the severity of or delaying the onset of at least one symptom associated with an infection caused by *S. pneumoniae* serotype 15A, 15B and/or 15C (preferably 15B and/or 15C, more preferably 15B).

## 7 SUBJECT TO BE TREATED WITH THE IMMUNOGENIC COMPOSITIONS OF THE INVENTION

As disclosed herein, the immunogenic compositions described herein may be used in various therapeutic or prophylactic methods for preventing, treating or ameliorating a bacterial infection, disease or condition in a subject.

In a preferred embodiment, said subject is a human. In a most preferred embodiment, said subject is a newborn (i.e., under three months of age), an infant (i.e., from 3 months to one year of age) or a toddler (i.e., from one year to four years of age).

In an embodiment, the immunogenic compositions disclosed herein are for use as a vaccine.

In such embodiment, the subject to be vaccinated may be less than 1 year of age. For example, the subject to be vaccinated can be about 1, about 2, about 3, about 4, about 5, about 6, about 7, about 8, about 9, about 10, about 11 or about 12 months of age. In an embodiment, the subject to be vaccinated is about 2, about 4 or about 6 months of age. In another embodiment, the subject to be vaccinated is less than 2 years of age. For example the subject to be vaccinated can be about 12 to about 15 months of age. In some cases, as little as one dose of the immunogenic composition according to the invention is needed, but under some circumstances, a second, third or fourth dose may be given (see section 8 below).

In an embodiment of the present invention, the subject to be vaccinated is a human adult 50 years of age or older, more preferably a human adult 55 years of age or older. In an embodiment, the subject to be vaccinated is a human adult 65 years of age or older, 70 years of age or older, 75 years of age or older or 80 years of age or older.

In an embodiment the subject to be vaccinated is an immunocompromised individual, in particular a human. An immunocompromised individual is generally defined as a person who exhibits an attenuated or reduced ability to mount a normal humoral or cellular defense to challenge by infectious agents.

In an embodiment of the present invention, the immunocompromised subject to be vaccinated suffers from a disease or condition that impairs the immune system and results in an antibody response that is insufficient to protect against or treat pneumococcal disease.

In an embodiment, said disease is a primary immunodeficiency disorder. Preferably, said primary immunodeficiency disorder is selected from the group consisting of: combined T- and B-cell immunodeficiencies, antibody deficiencies, well-defined syndromes, immune dysregulation diseases, phagocyte disorders, innate immunity deficiencies, autoinflammatory disorders, and complement deficiencies. In an embodiment, said primary immunodeficiency disorder is selected from the one disclosed on page 24, line 11, to page 25, line 19, of WO 2010/125480.

In a particular embodiment of the present invention, the immunocompromised subject to be vaccinated suffers from a disease selected from the groups consisting of: HIV-infection, acquired immunodeficiency syndrome (AIDS), cancer, chronic heart or lung disorders, congestive heart failure, diabetes mellitus, chronic liver disease, alcoholism, cirrhosis, spinal fluid leaks, cardiomyopathy, chronic bronchitis, emphysema, chronic obstructive pulmonary disease (COPD), spleen dysfunction (such as sickle cell disease), lack of spleen function (asplenia), blood malignancy, leukemia, multiple myeloma, Hodgkin's disease, lymphoma, kidney failure, nephrotic syndrome and asthma.

In an embodiment of the present invention, the immunocompromised subject to be vaccinated suffers from malnutrition.

In a particular embodiment of the present invention, the immunocompromised subject to be vaccinated is taking a drug or treatment that lowers the body's resistance to infection. In an embodiment, said drug is selected from the one disclosed on page 26, line 33, to page 26, line 4, of WO 2010/125480.

In a particular embodiment of the present invention, the immunocompromised subject to be vaccinated is a smoker.

In a particular embodiment of the present invention, the immunocompromised subject to be vaccinated has a white blood cell count (leukocyte count) below $5\times10^9$ cells per liter, or below $4\times10^9$ cells per liter, or below $3\times10^9$ cells per liter, or below $2\times10^9$ cells per liter, or below $1\times10^9$ cells per liter, or below $0.5\times10^9$ cells per liter, or below $0.3\times10^9$ cells per liter, or below $0.1\times10^9$ cells per liter.

White blood cell count (leukocyte count): The number of white blood cells (WBC) in the blood. The WBC is usually measured as part of the CBC (complete blood count). White blood cells are the infection-fighting cells in the blood and are distinct from the red (oxygen-carrying) blood cells known as erythrocytes. There are different types of white blood cells, including neutrophils (polymorphonuclear leukocytes; PMN), band cells (slightly immature neutrophils), T-type lymphocytes (T-cells), B-type lymphocytes (B-cells), monocytes, eosinophils, and basophils. All the types of white blood cells are reflected in the white blood cell count. The normal range for the white blood cell count is usually between 4,300 and 10,800 cells per cubic millimeter of blood. This can also be referred to as the leukocyte count and can be expressed in international units as $4.3\text{-}10.8\times10^9$ cells per liter.

In a particular embodiment of the present invention, the immunocompromised subject to be vaccinated suffers from neutropenia. In a particular embodiment of the present invention, the immunocompromised subject to be vaccinated has a neutrophil count below $2\times10^9$ cells per liter, or below $1\times10^9$ cells per liter, or below $0.5\times10^9$ cells per liter, or below $0.1\times10^9$ cells per liter, or below $0.05\times10^9$ cells per liter.

A low white blood cell count or "neutropenia" is a condition characterized by abnormally low levels of neutrophils in the circulating blood. Neutrophils are a specific kind of white blood cell that help to prevent and fight infections. The most common reason that cancer patients experience neutropenia is as a side effect of chemotherapy. Chemotherapy-induced neutropenia increases a patient's risk of infection and disrupts cancer treatment.

In a particular embodiment of the present invention, the immunocompromised subject to be vaccinated has a CD4+ cell count below $500/mm^3$, or CD4+ cell count below $300/mm^3$, or CD4+ cell count below $200/mm^3$, CD4+ cell count below $100/mm^3$, CD4+ cell count below $75/mm^3$, or CD4+ cell count below $50/mm^3$.

CD4 cell tests are normally reported as the number of cells in $mm^3$. Normal CD4 counts are between 500 and 1,600, and CD8 counts are between 375 and 1,100. CD4 counts drop dramatically in people with HIV.

In an embodiment of the invention, any of the immunocompromised subjects disclosed herein is a human male or a human female.

## 8 REGIMEN

In some cases, as little as one dose of the immunogenic composition according to the invention is needed, but under some circumstances, such as conditions of greater immune deficiency, a second, third or fourth dose may be given. Following an initial vaccination, subjects can receive one or several booster immunizations adequately spaced.

In an embodiment, the schedule of vaccination of the immunogenic composition according to the invention is a single dose. In a particular embodiment, said single dose schedule is for healthy persons being at least 2 years of age.

In an embodiment, the schedule of vaccination of the immunogenic composition according to the invention is a multiple dose schedule. In a particular embodiment, said multiple dose schedule consists of a series of 2 doses

separated by an interval of about 1 month to about 2 months. In a particular embodiment, said multiple dose schedule consists of a series of 2 doses separated by an interval of about 1 month, or a series of 2 doses separated by an interval of about 2 months.

In another embodiment, said multiple dose schedule consists of a series of 3 doses separated by an interval of about 1 month to about 2 months. In another embodiment, said multiple dose schedule consists of a series of 3 doses separated by an interval of about 1 month, or a series of 3 doses separated by an interval of about 2 months.

In another embodiment, said multiple dose schedule consists of a series of 3 doses separated by an interval of about 1 month to about 2 months followed by a fourth dose about 10 months to about 13 months after the first dose. In another embodiment, said multiple dose schedule consists of a series of 3 doses separated by an interval of about 1 month followed by a fourth dose about 10 months to about 13 months after the first dose, or a series of 3 doses separated by an interval of about 2 months followed by a fourth dose about 10 months to about 13 months after the first dose.

In an embodiment, the multiple dose schedule consists of at least one dose (e.g., 1, 2 or 3 doses) in the first year of age followed by at least one toddler dose.

In an embodiment, the multiple dose schedule consists of a series of 2 or 3 doses separated by an interval of about 1 month to about 2 months (for example 28-56 days between doses), starting at 2 months of age, and followed by a toddler dose at 12-18 months of age. In an embodiment, said multiple dose schedule consists of a series of 3 doses separated by an interval of about 1 month to about 2 months (for example 28-56 days between doses), starting at 2 months of age, and followed by a toddler dose at 12-15 months of age. In another embodiment, said multiple dose schedule consists of a series of 2 doses separated by an interval of about 2 months, starting at 2 months of age, and followed by a toddler dose at 12-18 months of age.

In an embodiment, the multiple dose schedule consists of a 4-dose series of vaccine at 2, 4, 6, and 12-15 months of age.

In an embodiment, a prime dose is given at day 0 and one or more boosts are given at intervals that range from about 2 to about 24 weeks, preferably with a dosing interval of 4-8 weeks.

In an embodiment, a prime dose is given at day 0 and a boost is given about 3 months later.

As used herein, the term "about" means within a statistically meaningful range of a value, such as a stated concentration range, time frame, molecular weight, temperature or pH. Such a range can be within an order of magnitude, typically within 20%, more typically within 10%, and even more typically within 5% or within 1% of a given value or range. Sometimes, such a range can be within the experimental error typical of standard methods used for the measurement and/or determination of a given value or range. The allowable variation encompassed by the term "about" will depend upon the particular system under study, and can be readily appreciated by one of ordinary skill in the art. Whenever a range is recited within this application, every whole number integer within the range is also contemplated as an embodiment of the disclosure.

The terms "comprising", "comprise" and "comprises" herein are intended by the inventors to be optionally substitutable with the terms "consisting essentially of", "consist essentially of", "consists essentially of", "consisting of", "consist of" and "consists of", respectively, in every instance.

All references or patent applications cited within this patent specification are incorporated by reference herein.

The invention is illustrated in the accompanying examples. The examples below are carried out using standard techniques, which are well known and routine to those of skill in the art, except where otherwise described in detail. The examples are illustrative, but do not limit the invention.

## EXAMPLE

### Example 1

### General Process for Preparation of eTEC Linked Glycoconjugates

Activation of Saccharide and Thiolation with Cystamine Dihydrochloride

The saccharide is reconstituted in anhydrous dimethylsulfoxide (DMSO). Moisture content of the solution is determined by Karl Fischer (KF) analysis and adjusted to reach a moisture content of between 0.1% and 0.4%, typically 0.2%.

To initiate the activation, a solution of 1,1'-carbonyl-di-1,2,4-triazole (CDT) or 1,1'-carbonyldiimidazole (CU) is freshly prepared at a concentration of 100 mg/mL in DMSO. The saccharide is activated with various amounts of CDT/CDI (1-10 molar equivalents) and the reaction is allowed to proceed for 1 hour at 23±2° C. The activation level may be determined by HPLC. Cystamine dihydrochloride is freshly prepared in anhydrous DMSO at a concentration of 50 mg/mL. The activated saccharide is reacted with 1 molar equivalents (mol. eq.) of cystamine dihydrochloride. Alternatively, the activated saccharide is reacted with 1 mol. eq. of cysteamine hydrochloride. The thiolation reaction is allowed to proceed for 21±2 hours at 23±2° C., to produce a thiolated saccharide. The thiolation level is determined by the added amount of CDT/CDI.

Residual CDT/CDI in the activation reaction solution is quenched by the addition of 100 mM sodium tetraborate, pH 9.0 solution. Calculations are performed to determine the added amount of tetraborate and to adjust the final moisture content to be up to 1-2% of total aqueous.

Reduction and Purification of Activated Thiolated Saccharide

The thiolated saccharide reaction mixture is diluted 10-fold by addition to pre-chilled 5 mM sodium succinate in 0.9% saline, pH 6.0 and filtered through a 5 μm filter. Dialfiltration of thiolated saccharide is performed against 40-fold diavolume of WFI. To the retentate a solution of tris(2-carboxyethyl)phosphine (TCEP), 1-5 mol. eq., is added after dilution by 10% volume of 0.1M sodium phosphate buffer, pH 6.0. This reduction reaction is allowed to proceed for 20±2 hours at 5±3° C. Purification of the activated thiolated saccharide is performed preferably by ultrafiltration/dialfiltration of against pre-chilled 10 mM sodium phosphate monobasic, pH 4.3. Alternatively, the thiolated saccharide is purified by standard size exclusion chromatographic (SEC) procedures or ion exchange chromatographic methods. An aliquot of activated thiolated saccharide retentate is pulled to determine the saccharide concentration and thiol content (Ellman) assays.

Alternative Reduction and Purification of Activated Thiolated Saccharide

As an alternative to the purification procedure described above, activated thiolated saccharide was also purified as below.

To the thiolated saccharide reaction mixture a solution of tris(2-carboxyethyl)phosphine (TCEP), 5-10 mol. eq., was added and allowed to proceed for 3±1 hours at 23±2° C. The reaction mixture was then diluted 5-fold by addition to pre-chilled 5 mM sodium succinate in 0.9% saline, pH 6.0 and filtered through a 5 μm filter. Dialfiltration of thiolated saccharide was performed using 40-fold diavolume of pre-chilled 10 mM sodium phosphate monobasic, pH 4.3. An aliquot of activated thiolated saccharide retentate was pulled to determine the saccharide concentration and thiol content (Ellman) assays.

Activation and Purification of Bromoacetylated Carrier Protein

Free amino groups of the carrier protein are bromoactey-lated by reaction with a bromoacetylating agent, such as bromoacetic acid N-hydroxysuccinimide ester (BAANS), bromoacetylbromide, or another suitable reagent.

The carrier protein (in 0.1 M Sodium Phosphate, pH 8.0±0.2) is first kept at 8±3° C., at about pH 7 prior to activation. To the protein solution, the N-hydroxysuccinimide ester of bromoacetic acid (BAANS) as a stock dimethylsulfoxide (DMSO) solution (20 mg/mL) is added in a ratio of 0.25-0.5 BAANS:protein (w/w). The reaction is gently mixed at 5±3° C. for 30-60 minutes. The resulting bromo-acetylated (activated) protein is purified, e.g., by ultrafiltration/diafiltration using 10 kDa MWCO membrane using 10 mM phosphate (pH 7.0) buffer. Following purification, the protein concentration of the bromoacetylated carrier protein is estimated by Lowry protein assay.

The extent of activation is determined by total bromide assay by ion-exchange liquid chromatography coupled with suppressed conductivity detection (ion chromatography). The bound bromide on the activated bromoacetylated protein is cleaved from the protein in the assay sample preparation and quantitated along with any free bromide that may be present. Any remaining covalently bound bromine on the protein is released by conversion to ionic bromide by heating the sample in alkaline 2-mercaptoethanol.

Activation and Purification of Bromoacetylated $CRM_{197}$

$CRM_{197}$ was diluted to 5 mg/mL with 10 mM phosphate buffered 0.9% NaCl pH 7 (PBS) and then made 0.1 M $NaHCO_3$, pH 7.0, using 1 M stock solution. BAANS was added at a $CRM_{197}$:BAANS ratio 1:0.35 (w:w) using a BAANS stock solution of 20 mg/mL DMSO. The reaction mixture was incubated at between 3° C. and 11° C. for 30 mins-1 hour then purified by ultrafiltration/diafiltration using a 10K MWCO membrane and 10 mM Sodium Phosphate/0.9% NaCl, pH 7.0. The purified activated $CRM_{197}$ was assayed by the Lowry assay to determine the protein concentration and then diluted with PBS to 5 mg/mL. Sucrose was added to 5% wt/vol as a cryoprotectant and the activated protein was frozen and stored at −25° C. until needed for conjugation. Bromoacetylation of lysine residues of $CRM_{197}$ was very consistent, resulting in the activation of 15 to 25 lysines from 39 lysines available. The reaction produced high yields of activated protein.

Conjugation of Activated Thiolated Saccharide to Bromoacetylated Carrier Protein

Before starting the conjugation reaction, the reaction vessels are pre-cooled to 5° C. Bromoacetylated carrier protein and activated thiolated saccharide are subsequently added and mixed at an agitation speed of 150-200 rpm. The saccharide/protein input ratio is 0.9±0.1. The reaction pH is adjusted to 8.0±0.1 with 1 M NaOH solution. The conjugation reaction is allowed to proceed at 5° C. for 20±2 hours.

Capping of Residual Reactive Functional Groups

The unreacted bromoacetylated residues on the carrier protein are quenched by reacting with 2 mol. eq. of N-acetyl-L-cysteine as a capping reagent for 3 hours at 5° C. Residual free sulfhydryl groups are capped with 4 mol. eq. of iodo-acetamide (IAA) for 20 hours at 5° C.

Purification of eTEC-Linked Glycoconjugate

The conjugation reaction (post-IAA-capped) mixture is filtered through 0.45 μm filter. Ultrafiltration/dialfiltration of the glycoconjugate is performed against 5 mM succinate-0.9% saline, pH 6.0. The glycoconjugate retentate is then filtered through 0.2 μm filter. An aliquot of glycoconjugate is pulled for assays. The remaining glycoconjugate is stored at 5° C.

## Example 2

### Preparation of Pn-33F eTEC Conjugates

Activation Process

Activation of Pn33F Polysaccharide

Pn-33F polysaccharide was compounded with 500 mM of 1,2,4-triazole (in WFI) to obtain 10 grams of triazole per gram of polysaccharide. The mixture was shell-frozen in dry ice-ethanol bath and then lyophilized to dryness. The lyophilized 33F polysaccharide was reconstituted in anhydrous dimethylsulfoxide (DMSO). Moisture content of the lyophilized 33F/DMSO solution was determined by Karl Fischer (KF) analysis. The moisture content was adjusted by adding WFI to the 33F/DMSO solution to reach a moisture content of 0.2%.

To initiate the activation, 1,1'-carbonyl-di-1,2,4-triazole (CDT) was freshly prepared as 100 mg/mL in DMSO solution. Pn33F polysaccharide was activated with various amounts of CDT prior to the thiolation step. The CDT activation was carried out at 23±2° C. for 1 hour. The activation level was determined by HPLC (A220/A205). Sodium tetraborate, 100 mM, pH 9.0 solution was added to quench any residual CDT in the activation reaction solution. Calculations are performed to determine the added amount of tetraborate and to allow the final moisture content to be 1.2% of total aqueous. The reaction was allowed to proceed for 1 hour at 23±2° C.

Thiolation of Activated Pn-33F Polysaccharide

Cystamine-dihydrochloride was freshly prepared in anhydrous DMSO and 1 mol. eq. of cystamine dihydrochloride was added to the activated polysaccharide reaction solution. The reaction was allowed to proceed for 21±3 hours at 23±2° C. The thiolated saccharide solution was diluted 10-fold by addition to pre-chilled 5 mM sodium succinate in 0.9% saline, pH 6.0. The diluted reaction solution was filtered through a 5 μm filter. Dialfiltration of thiolated Pn-33F polysaccharide was carried out with 100K MWCO ultrafilter membrane cassettes, using Water for Injection (WFI).

Reduction and Purification of Activated Thiolated Pn-33F Polysaccharide

To the retentate a solution of tris(2-carboxyethyl)phosphine (TCEP), 5 mol. eq., was added after dilution by 10% volume of 0.1 M sodium phosphate buffer, pH 6.0. This reduction reaction was allowed to proceed for 2±1 hours at 23±2° C. Dialfiltration of thiolated 33F polysaccharide was carried out with 100K MWCO ultrafilter membrane cassettes. Diafiltration was performed against pre-chilled 10 mM sodium phosphate, pH 4.3. The thiolated 33F polysaccharide retentate was pulled for both saccharide concentration and thiol (Ellman) assays.

Alternative Reduction and Purification of Activated Thiolated Pn-33F Polysaccharide

As an alternative to the purification procedure described above, 33F activated thiolated saccharide was also purified as follows.

To the thiolated saccharide reaction mixture a solution of tris(2-carboxyethyl)phosphine (TCEP), 5 mol. eq., was added and allowed to proceed for 3±1 hours at 23±2° C. The reaction mixture was then diluted 5-fold by addition to pre-chilled 5 mM sodium succinate in 0.9% saline, pH 6.0 and filtered through a 5 μm filter. Dialfiltration of thiolated saccharide was performed using 40-fold diavolume of pre-chilled 10 mM sodium phosphate monobasic, pH 4.3 with 100K MWCO ultrafilter membrane cassettes. The thiolated 33F polysaccharide retentate was pulled for both saccharide concentration and thiol (Ellman) assays. A flow diagram of the activation process is provided in FIG. **8**(A).

Conjugation Process

Conjugation of Thiolated Pn33F Polysaccharide to Bromoacetylated $CRM_{197}$

The $CRM_{197}$ carrier protein was activated separately by bromoacetylation, as described in Example 1, and then reacted with the activated Pn-33F polysaccharide for the conjugation reaction. Before starting the conjugation reaction, the reaction vessel was pre-cooled to 5° C. Bromoacetylated $CRM_{197}$ and thiolated 33F polysaccharide were mixed together in a reaction vessel at an agitation speed of 150-200 rpm. The saccharide/protein input ratio was 0.9±0.1. The reaction pH was adjusted to 8.0-9.0. The conjugation reaction was allowed to proceed at 5° C. for 20±2 hours.

Capping of Reactive Groups on Bromoacetylated $CRM_{197}$ and Thiolated Pn33F Polysaccharide

The unreacted bromoacetylated residues on $CRM_{197}$ proteins were capped by reacting with 2 mol. eq. of N-acetyl-L-cysteine for 3 hours at 5° C., followed by capping any residual free sulfhydryl groups of the thiolated 33F-polysaccharide with 4 mol. eq. of iodoacetamide (IAA) for 20 hours at 5° C.

Purification of eTEC-Linked Pn-33F Glycoconjugate

The conjugation solution was filtered through a 0.45 μm or 5 μm filter. Dialfiltration of the 33F glycoconjugate was carried out with 300K MWCO ultrafilter membrane cassettes. Diafiltration was performed against 5 mM succinate-0.9% saline, pH 6.0. The Pn-33F glycoconjugate 300K retentate was then filtered through a 0.22 μm filter and stored at 5° C. A flow diagram of the conjugation process is provided in FIG. **8**(B).

Results

The reaction parameters and characterization data for several batches of Pn-33F eTEC glycoconjugates are shown in Table 1. The CDT activation-thiolation with cystamine dihydrochloride generated glycoconjugates having from 63% to 90% saccharide yields and <1% to 13% free saccharides.

TABLE 1

Experimental Parameters and Characterization Data of Pn33F eTEC Conjugates

| Conjugate Batch | 33F-1A | 33F-2B | 33F-3C | 33F-4D | 33F-5E | 33F-6F | 33F-7G |
|---|---|---|---|---|---|---|---|
| Activation level (mol of thiol/mol of polysaccharide) | 0.21 | 0.13 | 0.164 | 0.103 | 0.183 | 0.22 | 0.19 |
| Activation level (% Thiol) | 21 | 13 | 16.4 | 10.3 | 18.3 | 22 | 19 |
| Saccharide/Protein (Input) ratio | 0.75 | 1.0 | 0.75 | 1.0 | 1.0 | 0.75 | 0.80 |
| Saccharide yield (%) | 69% | 63% | 71% | 63% | 69% | 82% | 90% |
| Saccharide/Protein Ratio | 1.3 | 1.7 | 1.2 | 1.9 | 1.6 | 1.1 | 1.5 |
| Free Saccharide | 12.9% | 7.7% | 4.4% | 7.2% | 7.3% | <4% | <4% |
| MW by SEC-MALLS (kDa) | 2627 | 2561 | 4351 | 2981 | 3227 | 3719 | 5527 |
| CMCA/CMC | 14.4/0 | 13.4/0 | 6.8/1.9 | 2.7/0.6 | 5.9/0.6 | 8.2/0 | 11.4/0.6 |
| % $K_d$ ($\leq$0.3) | N/A | 85% | 88% | 75% | 68% | 67% | 76% |
| Acetylation level (mol of acetate/mol of polysaccharide) | 0.89 | 1.16 | 0.99 | 0.85 | 0.81 | 0.85 | 1.01 |

N/A = not available

OPA Titers of Pn-33F eTEC Glycoconjugates to $CRM_{197}$

Pn-33F OPA titers in mice were determined under standard conditions (similar to the OPA procedures described below for 10A and 22F conjugates). OPA titers (GMT with 95% CI) at four and seven weeks are shown in Table 2, demonstrating that the serotype 33F Pn glycoconjugate elicited OPA titers in a murine immunogenicity model.

TABLE 2

Pn-33F OPA Titers (GMT with 95% CI)

| | 33F Pn Conjugate | | |
|---|---|---|---|
| | 0.001 μg | 0.01 μg | 0.1 μg |
| week 4 | 4 (4, 5) | 37 (17, 82) | 414 (234, 734) |
| week 7 | 8 (5, 13) | 131 (54, 314) | 17567 (9469, 32593) |

Example 3

Preparation of Additional Pn-33F eTEC Conjugates

Additional Pn-33F eTEC Conjugates were generated using the process described in Example 2. The reaction parameters and characterization data for these additional batches of Pn-33F eTEC glycoconjugates are shown in Table 3.

TABLE 3

Experimental Parameters and Characterization Data of further Pn33F eTEC Conjugates

| Conjugate Batch | 33F-8H | 33F-9I | 33F-10J | 33F-11K | 33F-12L | 33F-13M | 33F-14N | 33F-15O | 33F-16P |
|---|---|---|---|---|---|---|---|---|---|
| Activation level (mol of thiol/mol of polysaccharide) | 0.22 | 0.11 | 0.11 | 0.13 | 0.14 | 0.13 | 0.06 | 0.13 | 0.11 |
| Saccharide/Protein (Input) ratio | 0.75 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Saccharide yield (%) | 78% | 88% | 89% | 67% | 69% | 86% | 81% | 91% | 88% |
| Saccharide/Protein Ratio | 1.0 | 2.2 | 2.1 | 1.4 | 1.4 | 1.4 | 2.2 | 1.9 | 1.9 |
| Free Saccharide | <1% | 6.8% | 5.9% | 2.3% | 3.6% | LOQ | 8.2% | 3.6% | 6.6% |
| MW by SEC-MALLS (kDa) | 4729 | 3293 | 3295 | 2246 | 2498 | 5539 | 3070 | 6009 | 3789 |
| CMCA/CMC | 6.6/LOQ | 14.2/2.1 | 15.4/2.1 | 5.5/1 | 5.4/1.1 | NA/LOQ | 1.7/1.2 | 4.1/2.2 | 2.2/1.2 |
| % Kd (≤0.3) | 69% | N/A | N/A | N/A | N/A | 88% | 87% | 87% | 85% |
| Acetylation level (mol of acetate/mol of polysaccharide) | 0.86 | 0.93 | 0.87 | 1.01 | 0.99 | 0.71 | 0.78 | 0.8 | 0.82 |

LOQ = limit of quantitation;
N/A = not available.

As shown above and in Table 3, several Pn-33F conjugates were obtained using the eTEC conjugation above. The eTEC chemistry allowed preparation of conjugates with high yield, low % free saccharide and high degree of conjugation (conjugated lysines). Additionally, it was possible to preserve more than 80% of acetyl functionality using the eTEC conjugation process.

## Example 4

### Evaluation of Pn-33F eTEC Glycoconjugates Stability: % Free Saccharide Trends

Aliquots of conjugate batch 33F-2B (see table 1) were dispensed into polypropylene tubes and stored at 4° C., 25° C., and 37° C., respectively and monitored for trends in % free saccharide. The data (% free saccharide) are shown in Table 4. As shown in this Table, there were no significant changes in the % free saccharide.

TABLE 4

% Free Saccharide Stability for Pn-33F eTEC Glycoconjugate at 4° C., 25°C., and 37° C.

| Lot # | Free Saccharide (%) Time: 0 | 1 wk | 3 wks | 1 M | 2 M | 3 M | 6 M |
|---|---|---|---|---|---|---|---|
| 33F-2B | 4° C. | | | | | | |
| | 7.7 | N/A | 8.3 | N/A | 9.7 | 11.2 | 13 |
| | 25° C. | | | | | | |
| | 7.7 | N/A | 10.8 | N/A | 11.8 | N/A | N/A |
| | 37° C. | | | | | | |
| | 7.7 | 12.1 | N/A | 13.4 | N/A | N/A | N/A |

wk = week;
M = month;
N/A = not available.

The accelerated stability of another conjugate lot (Batch 33F-3C) was also conducted at 37° C. up to 1 month. As shown in Table 5, there was no significant change to % free saccharide at 37° C., up to 1 month.

TABLE 5

% Free Saccharide Stability for Pn-33F eTEC Glycoconjugate at 37° C.

| Lot# | Free Saccharide (%) Time 37° C.: 0 | 1 day | 1 wk | 2 wks | 1 M |
|---|---|---|---|---|---|
| 33F-3C | 4.4 | 5.9 | 6.4 | 7.1 | 7.2 |

To further confirm the stability of eTEC conjugates, additional conjugate batches (33F-3C and 33F-5E (see Table 1)) stored at 4° C. were monitored up to approximately one year, for potential trends in % free saccharide. As shown in Table 6, there were no significant changes in % free saccharide levels for the conjugates stored at 4° C. for an extended period up to approximately one year.

TABLE 6

% Free Saccharide Stability Results for Pn-33F eTEC Glycoconjugates at 4° C.

| Lot# | Free Saccharide (%) Time: 0 | 3 M | 4 M | 12 M | 14 M |
|---|---|---|---|---|---|
| | 4° C. | | | | |
| 33F-3C | 4.4 | N/A | 5.3 | N/A | 7.6 |
| 33F-5E | 7.3 | 6.3 | N/A | 7.4 | N/A |

M = month;
N/A = not available

The Serotype 33F conjugates generated by 33F eTEC chemistry were demonstrated to be stable without noticeable degradation as monitored by the free saccharide trends at various temperatures (real time and accelerated).

## Example 5

### Preparation of Pn-8 Conjugates to $CRM_{197}$

Preparation of Pn-8 RAC/DMSO Glycoconjugates

Frozen polysaccharide was thawed and transferred to the reaction vessel. 2 M acetic acid and WFI (Water for Injection) was added to the polysaccharide solution to achieve a final polysaccharide concentration of about 2.5 g/L and a final acetic acid concentration of 0.2 M.

Hydrolysis of the Polysaccharide

The native polysaccharide was chemically hydrolyzed prior to activation. The diluted polysaccharide solution was heated to 70° C., and then held this temperature for 3.5 hours.

Oxidation of the Polysaccharide

Oxidation of polysaccharide was initiated by the addition of sodium periodate solution and the reaction kept to proceed for 20 hrs at 23° C.

Purification of Activated Polysaccharide

The activated polysaccharide was concentrated using ultrafiltration cassettes. Diafiltration was performed against 20-fold diavolume of WFI.

Lyophilization

The activated polysaccharide is compounded with sucrose to a ratio of 25 grams of sucrose per gram of activated polysaccharide. The bottles containing the activated saccharide and sucrose are shell frozen in ethanol baths and lyophilized.

Conjugation of Activated Polysaccharide to $CRM_{197}$ and Capping

Lyophilized activated polysaccharide was reconstituted to 2 mg/mL in DMSO. DMSO was added to lyophilized $CRM_{197}$ for reconstitution. Reconstituted $CRM_{197}$ was added to the reconstituted activated polysaccharide. Conjugation was then initiated by adding sodium cyanoborohydride to the reaction mixture and was incubated at 23° C. for 24 hrs. Termination of conjugation reaction is done by adding 2 MEq of sodium borohydride. This capping reaction proceeded for 3 hrs at 23° C.

Purification of Conjugate

The conjugate solution was then diluted into chilled 5 mM succinate-0.9% saline (pH 6.0), filtered, concentrated to 2-4 g/L using 300K cellulose membranes, and a first-stage diafiltration was performed against 5 mM succinate-0.9% saline (pH6.0). A final purification step was done by diafiltration with 5 mM succinate-0.9% saline, pH 6.0 buffer. After the diafiltration is completed, the purified conjugate was transferred to a collection tank through a 0.22 μm filter.

Dilution of the Monovalent Bulk Conjugate

The conjugate was diluted further with 5 mM succinate/0.9% saline (pH 6), to a target saccharide concentration of 0.5 mg/mL. Final 0.22 μm filtration step was completed to prepare the monovalent bulk conjugate (MBC) product for formulation.

Several conjugates were obtained using the above described process by varying different parameters (e.g., saccharide-protein input ratio, reaction concentration and Meq of sodium cyanoborohydride). Characterization for representative Pn-8 glycoconjugates to $CRM_{197}$ is provided in Table 7.

TABLE 7

Characterization of Pn8-$CRM_{197}$ Conjugates

| Sample No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| Activated Saccharide MW by MALLS (kDa) | 267 | 270 | 352 | 65 | 233 | 340 | 113 | 250 | 230 |
| Saccaride/Protein Ratio | 0.81 | 0.84 | 0.5 | 2.7 | 1.15 | 1.0 | 0.81 | 0.64 | 0.42 |
| MW by SEC-MALLS (kDa) | 12200 | 8670 | 3460 | 3379 | 4748 | 4255 | 5470 | 9924 | 6787 |

The Opsonophagocytic activity (OPA) titers for Serotype 8-$CRM_{197}$ conjugates in mice were determined in mice under standard conditions (similar to the OPA procedures described below for 10A and 22F conjugates). OPA titers



(geometric mean titer (GMT) with 95% confidence interval (CI)) at four weeks at different doses are shown in Table 8 and 9 (two separate experiments), demonstrating that the serotype 8 conjugate (Samples 1-9; also see Table 7 for characterization data of these conjugates) elicited OPA titers in a murine immunogenicity model.

As shown in Table 8, serotype 8 conjugates were shown to have significantly higher antibody titers, compared to the control unconjugated polysaccharide which had poor antibody titers.

TABLE 8

Immunogenicity of Serotype 8-$CRM_{197}$ Conjugates

| | OPA GMT (95% CI) | | |
|---|---|---|---|
| Sample No. | 0.001 μg | 0.01 μg | 0.1 μg |
| 1 | 17 (10, 30) | 88 (47, 165) | 1344 (896, 2016) |
| 2 | 7 (4, 11) | 184 (87, 387) | 1934 (1313, 2847) |
| 3 | 4 (4, 4) | 17 (9, 30) | 779 (345, 1757) |
| 4 | 5 (4, 7) | 74 (41, 136) | 558 (311, 1001) |
| Unconjugated PS | | | 13 (3, 55) |

TABLE 9

Immunogenicity of Serotype 8-$CRM_{197}$ Conjugates

| Sample | OPA GMT (95% CI) | |
|---|---|---|
| No. | 0.001 μg | 0.01 μg |
| 5 | 8 (5, 12) | 322 (208, 498) |
| 6 | 12 (8, 19) | 264 (129, 537) |
| 7 | 12 (7, 21) | 521 (366, 743) |
| 8 | 19 (10, 38) | 404 (238, 687) |
| 9 | 33 (14, 80) | 686 (380, 1237) |
| 2 | 13 (7, 23) | 177 (94, 336) |

The overall data generated from conjugates prepared by the above reductive amination process demonstrated that it allowed preparing conjugates with good conjugation yield, low % free saccharide and with good stability. Additionally, the prepared conjugates elicited good OPA titers in a murine immunogenicity model.

Example 6

Preparation of Serotype 10A Polysaccharide-$CRM_{197}$ Conjugate

Preparation of isolated *S. pneumoniae* serotype 10A polysaccharide Serotype 10A capsular polysaccharides can be obtained directly from bacteria using isolation procedures known to one of ordinary skill in the art (see for example methods disclosed in U.S. Patent App. Pub. Nos. 2006/0228380, 2006/0228381, 2007/0184071, 2007/0184072,

2007/0231340, and 2008/0102498 and WO 2008/118752). *Streptococcus pneumoniae* serotype 10A were grown in a seed bottle and then transferred to a seed fermentor. Once the targeted optical density was reached, the cells were transferred to a production fermentor. The fermentation broth was inactivated by the addition of N-lauroyl sarcosine and purified by ultrafiltration and diafiltration.

Oxidation of Isolated *Streptococcus pneumoniae* Serotype 10A Capsular Polysaccharide

A calculated volume of 0.1 M potassium phosphate buffer (pH 6.0) and water-for-injection (WFI) was added to the polysaccharide solution to achieve a final polysaccharide concentration of 2.5 g/L and a final concentration of 25 mM potassium phosphate buffer, if required pH was adjusted to 6.0, approximately. The diluted polysaccharide was then cooled to 5° C. Oxidation was initiated by the addition of 0.25 molar equivalents (MEq) of sodium periodate solution. The oxidation reaction time was approximately 4 hrs at 5° C. The oxidation reaction was quenched with 1 MEq of 2,3-butanediol under continuous stirring at 5° C. for 1-2 hrs.

After reaching the target reaction time, the activated polysaccharide was concentrated using 30K MWCO Millipore ultrafiltration cassettes. The diafiltration was then performed against 20-fold diavolume of WFI. The purified activated polysaccharide was stored at 5° C. The purified activated saccharide is characterized inter alia by (i) Molecular Weight by SEC-MALLS and (ii) Degree of Oxidation.

Conjugation of Activated *S. pneumoniae* Serotype 10A Polysaccharide with $CRM_{197}$

The conjugation process consisted of the following steps:

a. Compounding with sucrose excipient, and lyophilization;

b. Reconstitution of the lyophilized polysaccharide and $CRM_{197}$;

c. Conjugation of activated polysaccharide to $CRM_{197}$ and capping; and

d. Purification of the conjugate

a. Compounding with Sucrose

The activated polysaccharide is compounded with sucrose to a ratio of 25 g of sucrose per gram of activated polysaccharide. The bottle of compounded mixture was then lyophilized. Following lyophilization, bottles containing lyophilized activated polysaccharide were stored at −20° C.

b. Reconstitution of Lyophilized Activated Polysaccharide and $CRM_{197}$ Protein

Lyophilized activated polysaccharide was reconstituted in anhydrous dimethyl sulfoxide (DMSO). Upon complete dissolution of polysaccharide, the same amount of DMSO was added to the calculated $CRM_{197}$ for reconstitution.

c. Conjugation of Activated Polysaccharide to $CRM_{197}$ and Capping

Reconstituted $CRM_{197}$ (in DMSO) was added to the reconstituted activated polysaccharide in the conjugation reactor. The final polysaccharide concentration is 1 g/L. Conjugation was performed by adding 1.2 MEq of sodium cyanoborohydride to the reaction mixture. The reaction was incubated and at 23° C. for 24 hrs. Termination of conjugation reaction is done by adding 2 MEq of sodium borohydride. The capping reaction was incubated at 23° C. for 3 hrs.

Termination of conjugation reaction is done by adding 2 MEq of sodium borohydride. This capping reaction proceeded for 3 hrs at 23° C.

d. Purification of Conjugate

The conjugate solution was then diluted into 5× (by volume) chilled 5 mM succinate-0.9% saline (pH 6.0) and a 20× diafiltration was performed using 5 mM succinate-0.9% saline (pH6.0). After the initial diafiltration was completed, the conjugate retentate was transferred through a 0.22 μm filter. The conjugate was diluted further with 5 mM succinate/0.9% saline (pH 6), and after the final 0.22 μm filtration step it was stored at 2-8° C.

Several conjugates were obtained using the above described process by varying different parameters (e.g., saccharide-protein input ratio, reaction concentration and MEq of sodium cyanoborohydride). The above chemistry allowed to generate serotype 10A conjugates which were demonstrated to be stable without noticeable degradation as monitored by the free saccharide trends at various temperatures (real time and accelerated). Characterization for representative Pn-10A glycoconjugates to $CRM_{197}$ is provided in Table 10.

TABLE 10

Characterization of Pn-10A-$CRM_{197}$ Conjugates

| Conjugate No. | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| DO | 12.2 | 19.5 | 5.2 | 10.3 | 10.8 | 10.5 |
| Activated Saccharide MW, kDa | 191 | 240 | 80 | 170 | 170 | 170 |
| Input Ratio | 1.0 | 1.0 | 1.0 | 1.1 | 1.1 | 1.1 |
| % Yield | 56 | 28.5 | 65 | 82 | 73 | 66 |
| % Free Saccharide | 6.8 | 10.0 | 6.7 | 6.8 | 6.4 | 9.7 |
| Conjugate MW, kDa | 3838 | 5810 | 4630 | 4034 | 3463 | 5540 |
| Saccharide/Protein Ratio | 0.82 | 0.88 | 0.85 | 1.1 | 1.2 | 1.0 |
| Lys modification AAA | 7.4 | 3.7 | 13.1 | 6.9 | 6.7 | 6.1 |

The opsonophagocytic activity (OPA) titers for Serotype 10A-$CRM_{197}$ conjugates in mice were determined under standard conditions. Groups of thirty 6-7 week old female Swiss Webster mice were immunized with 0.001 μg, 0.01 μg, or 0.1 μg of test conjugates via the subcutaneous route on week 0. The mice were boosted with the same dose of conjugate on week 3 and then bled at week 4. Serotype-specific OPAs were performed on week 4 sera samples.

Opsonophagocytic activity (OPA) assays are used to measure functional antibodies in murine sera specific for *S. pneumonia* serotype 10A. Test serum is set up in assay reactions that measure the ability of capsular polysaccharide specific immunoglobulin to opsonize bacteria, trigger complement deposition, thereby facilitating phagocytosis and killing of bacteria by phagocytes. The OPA titer is defined as the reciprocal dilution that results in a 50% reduction in bacterial count over control wells without test serum. The OPA titer is interpolated from the two dilutions that encompass this 50% killing cut-off.

OPA procedures were based on methods described in Hu et al. (2005) Clin Diagn Lab Immunol 12 (2):287-295 with the following modifications. Test serum was serially diluted 2.5-fold and added to microtiter assay plates. Live serotype 10A target bacterial strains were added to the wells and the plates were shaken at 37° C. for 30 minutes.

Differentiated HL-60 cells (phagocytes) and baby rabbit serum (3- to 4-week old, PEL-FREEZ®, 12.5% final concentration) were added to the wells, and the plates were shaken at 37° C. for 60 minutes. To terminate the reaction, 80 μL of 0.9% NaCl was added to all wells, mixed, and a 10 μL aliquot were transferred to the wells of MULTISCREEN® HTS HV filter plates (MILLIPORE®) containing 200 μL of water. Liquid was filtered through the plates under vacuum, and 150 μL of HYSOY® medium was added to each well and filtered through. The filter plates were then incubated at 37° C., 5% $CO_2$ overnight and were then fixed with Destain Solution (Bio-Rad Laboratories, Inc., Hercules, Calif.). The plates were then stained with Coomassie

Blue and destained once. Colonies were imaged and enumerated on a Cellular Technology Limited (CTL) (Shaker Heights, Ohio) IMMUNOSPOT® Analyzer. Raw colony counts were used to plot kill curves and calculate OPA titers.

OPA titers (geometric mean titer (GMT) with 95% confidence interval (CI)) at four weeks at different doses are shown in Table 11, demonstrating that the serotype 10A conjugate (Samples 1-3; also see Table 10 for characterization data of these conjugates) elicited OPA titers in a murine immunogenicity model. As shown in Table 11, serotype 10A conjugates were shown to have significantly higher OPA titers, compared to the control unconjugated polysaccharide, which had a poor OPA response.

TABLE 11

Immunogenicity of Serotype 10A-$CRM_{197}$ Conjugates

| Sample No. | OPA GMT (95% CI) 0.001 μg | 0.01 μg | 0.1 μg |
|---|---|---|---|
| 1 | 858 (556, 1324) | 1015 (610, 1691) | 4461 (3065, 6494) |
| 2 | 1411 (737, 2703) | 796 (460, 1378) | 2873 (1768, 4842) |
| 3 | 322 (180, 574) | 1062 (528, 2135) | 2618 (1415, 4842) |
| Unconjugated PS | | | 602 (193, 1882) |

Example 7

Conjugation of Pn Serotype-12F Using TEMPO/NCS

In order to improve the stability of serotype 12F-$CRM_{197}$ glycoconjugates, alternate chemistries were explored using 2,2,6,6-Tetramethyl-1-piperidinyloxy free radical (TEMPO) and N-Chlorosuccinimide (NCS) as the cooxidant to oxidize primary alcohols to aldehyde groups. GC/MS analysis showed that the sites of oxidation were different from that of periodate-mediated oxidation. In the case of TEMPO-NCS oxidation, the α-D-Glcp and 2-Glcp were oxidized, whereas α-D-Galp was the major site of oxidation when periodate was used (see FIG. **4**). As described in further detail herein, TEMPO was used in catalytic amounts 0.1 molar equivalents) and the desired degree of oxidation (DO) was achieved by varying the amounts of NCS used. Subsequently several conjugates were synthesized and characterized. In general, the production of Serotype 12F glycoconjugates was carried out in several phases, as follows:

a) Hydrolysis of Serotype 12F polysaccharide to molecular weights 50 kDa to 500 kDa

b) Activation of Serotype 12F polysaccharide with TEMPO/NCS;

c) Purification of the activated polysaccharide;

d) Conjugation of activated Serotype 12F to $CRM_{197}$ protein; and

e) Purification of Serotype 12F-$CRM_{197}$ conjugates.

Hydrolysis and Oxidation of Serotype 12F

The hydrolysis of the polysaccharide was typically performed under acidic conditions with heating to obtain an average molecular weight in the desired range of 100 kDa to 350 kDa. A typical experiment is described below.

Hydrolysis

The Serotype 12F polysaccharide solution was added to a jacketed reaction vessel. To this, the required volume of 0.30 M Acetic acid and water for injection (WFI) were added to maintain ~0.1 M acetic acid concentration. The pH of the solution was adjusted to 3.2±0.3 using 1 N NaOH or Glacial Acetic acid. The temperature of the reaction mixture was increased to 70±5° C. The reaction mixture was stirred at 70±5° C. for 90-120 minutes. The reaction mixture was cooled down to 23±2° C. and neutralized (pH 7.0) by adding 1 M NaOH solution. The hydrolyzed polysaccharide was purified by ultrafiltration/diafiltration against WFI using 30K MWCO membranes. The solution was filtered through a 0.22 μm filter and stored at 2 to 8° C. until oxidation. The molecular weight of the hydrolyzed polysaccharide was analyzed by SEC-MALLS to ensure that the molecular weight met the target range of 100 kDa to 350 kDa.

Partial Oxidation

In one experiment, the serotype 12F polysaccharide was mechanically sized using pressure homogenization using a microfluidiser to reduce the molecular weight to approximately 100 kDa to 500 kDa. The sized polysaccharide was added to a reaction vessel at a concentration of 4.0 mg/mL and mixed with bicarbonate/carbonate buffer (0.5 M $NaHCO_3$/0.05 M $Na_2CO_3$ buffer, pH 8.6) at a ratio of 1:1 v/v. To the stirred mixture was added 0.1 mol equivalent of TEMPO. The reaction was started by the addition of 0.6 to 1.0 mol equivalent of NCS. The reaction mixture was stirred at room temperature for 2 hours, after which the activated polysaccharide was purified by diafiltration, with WFI using a 30K ultrafiltration membrane. The purified polysaccharide was collected and the degree of oxidation (DO) was determined by quantitative measurements of aldehyde (using a 3-methyl-2-benothiazolinone hydrazone (MBTH) assay) and polysaccharide (using an anthrone assay).

In another experiment, the serotype 12F polysaccharide was hydrolyzed to reduce the molecular weight to a molecular weight of approximately 100 kDa to 500 kDa. The serotype 12F polysaccharide was added to a reaction vessel and mixed with 0.5 M $NaHCO_3$/0.05 M $Na_2CO_3$ buffer (pH 8.6) at a ratio of 1:1 v/v. To the stirred mixture was added 0.6 to 1.0 molar equivalents of NCS dissolved in WFI. The activation was initiated by the addition of approximately 0.1 molar equivalents of TEMPO dissolved in WFI. The reaction mixture was stirred at room temperature for 2 hours, after which the activated polysaccharide was purified by diafiltration with WFI using a 30K ultrafiltration membrane. The purified activated polysaccharide was filtered through a 0.2 μm filter and stored at 4° C. before use.

The TEMPO/NCS mediated oxidations were also performed successfully in sodium phosphate buffers of pH 6.5, 7.0, 7.5 and 8.0. In some activation experiments a primary alcohol such as n-propanol was used to quench the reagents in order to avoid saccharide overoxidation. In another set of experiments the chemically hydrolysed polysaccharide was subjected to oxidation directly, without the ultrafiltration/diafiltration purification step.

Conjugation of Serotype 12F Oxidized Polysaccharide

In one experiment, the purified oxidized Serotype 12F polysaccharide was added to a reaction vessel followed by the addition of 0.5 M Sodium phosphate buffer (pH 6.5) to

a final buffer concentration of 0.1 M. To this solution, previously lyophilized $CRM_{197}$ was added and mixed thoroughly in order to obtain a homogenous solution. The pH was adjusted to 6.8 using diluted HCl or 1 N NaOH solution. This was followed by the addition of 1.5 molar equivalents of $NaCNBH_3$. The reaction mixture was stirred for 24 hours at room temperature (23° C.) and for 2.5 days at 37° C. The reaction mixture was then diluted with 1×0.9% saline and the unreacted aldehyde groups were "capped" with 2 molar equivalents of sodium borohydride. The capping reaction time was 3 hours.

In another experiment, the purified activated serotype 12F was added to a reaction vessel followed by the addition of 0.5 M sodium phosphate buffer (pH 6.5) to a final buffer concentration of 0.1 M. To this solution, previously lyophilized $CRM_{197}$ was added and mixed thoroughly to obtain a homogenous solution. The pH was adjusted to 6.8 using diluted HCl or 1 N NaOH solution. This was followed by the addition of 3 molar equivalents of $NaCNBH_3$. The reaction mixture was stirred for 24 hours at 23° C. and for 48 hrs at 37° C. The reaction mixture was then diluted with 1×0.9% saline and with stirring, the unreacted aldehyde groups were "capped" with 1 molar equivalent sodium borohydride $NaBH_4$. The capping reaction time was 3 hours.

In another experiment, the purified activated serotype 12F was added to a reaction vessel and mixed with $CRM_{197}$ solution. The mixture was lyophilized and the powder was dissolved in 0.1 M sodium phosphate buffer (pH 6.8) to a final saccharide concentration of 5 mg/mL. If needed the pH was adjusted to 6.8 using diluted HCl or 1N NaOH solution. This was followed by the addition of 3 molar equivalents $NaCNBH_3$. The reaction mixture was stirred for 24 hours at 23° C. and for 48 hrs at 37° C. The reaction mixture was then diluted with 1×0.9% saline, the unreacted aldehyde groups were "capped" with 1 molar equivalent sodium borohydride $NaBH_4$. The capping reaction time was 3 hours.

Conjugate Purification

The capped reaction mixture was filtered using a 5 μm filter and then purified using 100K MWCO ultra filtration membranes. The conjugate was first diafiltered using 10 mM succinate/0.9% saline, pH 6.0 buffer. The purified conjugate was then filtered through 0.45/0.22 μm filters to obtain the bulk conjugate.

Degree of Oxidation

Successful oxidation of primary alcohols in the serotype 12F polysaccharide was achieved using the TEMPO/NCS system. The hydrolyzed Serotype 12F polysaccharides were oxidized to varying degrees of oxidation (DO) levels by adjusting the amount of NCS cooxidant. The effect on DO by varying amounts of NCS using different polysaccharide batches and molecular weights is shown in FIG. **9**. Typically the oxidation reaction is complete in 2 hours as no significant change in DO was observed after 2 hours.

Several serotytpe 12F conjugates were generated and characterized using the TEMPO/NCS oxidized polysaccharide. The results are summarized in Table 12.

TABLE 12

Pneumococcal Serotype 12F-$CRM_{197}$ conjugates

| Conjugate Batch | 12F-84A | 12F-97B | 12F-147C | 12F-171D | 12F-177-6E | 12F-181F |
|---|---|---|---|---|---|---|
| Oxidation Time (hr) | 2 | 2 | 4 | 2 | 2 | 2 |
| Degree of Oxidation (DO) | 12.0 | 6.0 | 9.6 | 12.0 | 11.5 | 11.5 |
| % Activated Saccharide Yield | 80 | 71 | 70 | 89 | 86 | 86 |
| Activated Saccharide MW by MALLS (kDa) | 137 | 155 | 170 | 190 | 240 | 240 |
| Conjugation process | Lyo-CRM | Lyo-CRM | Lyo-CRM | Lyo-CRM | Lyo-CRM | Co-Lyo |
| Conjugate Results | | | | | | |
| Saccharide yield (%) | 51.6 | 76.8 | 53.6 | 76.3 | 65.8 | 40.7 |
| Saccharide/Protein Ratio | 1.2 | 0.9 | 1.0 | 1.1 | 1.4 | 0.9 |
| % Free Saccharide | 24 | 10 | 17 | 20 | 23 | 14 |
| MW by SEC-MALLS (kDa) | 2050 | 3000 | 3600 | 1500 | 2400 | 2100 |

Example 8

Immunogenicity of Pn-Serotype 12F-$CRM_{197}$ Conjugates Using the TEMPO/NCS Oxidation Method

The opsonophagocytic activity (OPA) titers for serotype 12F-$CRM_{197}$ conjugates in mice were determined in mice under standard conditions. OPA titers (geometric mean titer (GMT) with 95% confidence interval (CI)) at four and seven weeks are shown in Table 13, demonstrating that the serotype 12F-$CRM_{197}$ conjugate (Batch 12F-97B; also see Table 12 for characterization data of this conjugate) elicited OPA titers in a murine immunogenicity model. The conjugate generated by the TEMPO-NCS was more immunogenic than the control conjugate (171B) generated from the periodate oxidation.

TABLE 13

Immunogenicity of Serotype 12F-$CRM_{197}$ Conjugates

| | Dose | | |
|---|---|---|---|
| Conjugate Sample | 0.001 μg | 0.01 μg | 0.1 μg |
| Periodate Oxidation (171B) Control | 4 | 16 | 172 |
| TEMPO/NCS Oxidation (12F-97B) | 40 | 417 | 880 |

Example 9

Evaluation of Pn-12F Glycoconjugates Stability

Comparison of the stability (at 25° C.) of the conjugates generated by periodate oxidation vs. TEMPO/NCS oxidation (see FIG. **10**) demonstrated that the conjugate generated by the oxidation of the Pn-12F polysaccharides were relatively more stable. As shown in FIG. **10**, an increase in the free saccharide over time was observed for the glycoconjugate generated by the periodate oxidation of the Pn-12F polysaccharide at 25° C. In contrast, the glycoconjugate prepared using the TEMPO/NCS oxidation of the Pn-12F

polysaccharide showed no significant trends for the free saccharide under similar conditions.

Example 10

Preparation of Serotype 15B Polysaccharide-$CRM_{197}$ Conjugate

Preparation of isolated *Streptococcus pneumoniae* serotype 15B polysaccharide Serotype 15B capsular polysaccharides can be obtained directly from bacteria using isolation procedures known to one of ordinary skill in the art. The *S. pneumoniae* serotype 15B were grown in a seed bottle and then transferred to a seed fermentor. Once the targeted optical density was reached, the cells were transferred to a production fermentor. The fermentation was broth was inactivated by the addition of N-lauroyl sarcosine and purified by ultrafiltration and diafiltration.

The purified *S. pneumoniae* serotype 15B polysaccharide was then sized by high pressure homogenization using a PANDA 2K® homogenizer (GEA Niro Soavi, Parma, Italy) to produce the isolated *S. pneumoniae* serotype 15B polysaccharide.

Preferably, the isolated *S. pneumoniae* serotype 15B capsular polysaccharide obtained by the above process comprises at least 0.6 mM acetate per mM of serotype 15B capsular polysaccharide and has a molecular weight between 50 kDa and 500 kDa, preferably 150 kDa to 350 kDa.

Oxidation of Isolated *Streptococcus pneumoniae* Serotype 15B Capsular Polysaccharide

Polysaccharide oxidation was carried out in 100 mM potassium phosphate buffer (pH 6.0) by sequential addition of calculated amount of 500 mM potassium phosphate buffer (pH 6.0) and WFI to give final polysaccharide concentration of 2.0 g/L. If required, the reaction pH was adjusted to pH 6.0, approximately. After pH adjustment, the reaction temperature was adjusted to 23° C. Oxidation was initiated by the addition of approximately 0.25 molar equivalents of sodium periodate. The oxidation reaction was performed at 23° C. during 16 hrs, approximately.

Concentration and diafiltration of the activated polysaccharide was carried out using 10K MWCO ultrafiltration cassettes. Diafiltration was performed against 20-fold diavolumes of WFI. The purified activated polysaccharide was then stored at 5° C. The purified activated saccharide was characterized inter alia by (i) saccharide concentration by colorimetric assay; (ii) aldehyde concentration by colorimetric assay; (iii) Degree of Oxidation (iv) Molecular Weight by SEC-MALLS and (v) presence of O-acetyl and glycerol.

SEC-MALLS is used for the determination of the molecular weight of polysaccharides and polysaccharide-protein conjugates. SEC is used to separate the polysaccharides by hydrodynamic volume. Refractive index (RI) and multi-angle laser light scattering (MALLS) detectors are used for the determination of the molecular weight. When light interacts with matter, it scatters and the amount of scattered light is related to the concentration, the square of the do/dc (the specific refractive index increments), and the molar mass of the matter. The molecular weight measurement is calculated based on the readings from the scattered light signal from the MALLS detector and the concentration signal from the RI detector.

The degree of oxidation (DO=moles of sugar repeat unit/moles of aldehyde) of the activated polysaccharide was determined as follows:

The moles of sugar repeat unit is determined by various colorimetric methods, example by using Anthrone method. The polysaccharide is first broken down to monosaccharides by the action of sulfuric acid and heat. The Anthrone reagent reacts with the hexoses to form a yellow green colored complex whose absorbance is read spectrophotometrically at 625 nm. Within the range of the assay, the absorbance is directly proportional to the amount of hexose present.

The moles of aldehyde also are determined simultaneously, using MBTH colorimetric method. The MBTH assay involves the formation of an azine compound by reacting aldehyde groups (from a given sample) with a 3-methyl-2-benzothiazolone hydrazone (MBTH assay reagent). The excess 3-methyl-2-benzothiazolone hydrazone oxidizes to form a reactive cation. The reactive cation and the azine react to form a blue chromophore. The formed chromophore is then read spectroscopically at 650 nm.

Preferably, the activated *S. pneumoniae* serotype 15B capsular polysaccharide obtained by the above process comprises at least 0.6 mM acetate per mM of serotype 15B capsular polysaccharide and has a molecular weight between 50 kDa and 500 kDa, preferably 150 kDa to 350 kDa.

Conjugation of Activated *S. pneumoniae* Serotype 15B Capsular Polysaccharide with $CRM_{197}$

The conjugation process consisted in the following steps:

a) Compounding with sucrose excipient and lyophilization;

b) Reconstitution of the lyophilized activated polysaccharide and $CRM_{197}$;

c) Conjugation of activated polysaccharide to $CRM_{197}$ and capping; and

d) Purification of the conjugate

a) Compounding with Sucrose Excipient, and Lyophilization

The activated polysaccharide was compounded with sucrose to a ratio of 25 grams of sucrose per gram of activated polysaccharide. The bottle of compounded mixture was then lyophilized. Following lyophilization, bottles containing lyophilized activated polysaccharide were stored at −20° C. Calculated amount of $CRM_{197}$ protein was shell-frozen and lyophilized separately. Lyophilized $CRM_{197}$ was stored at −20° C.

b) Reconstitution of Lyophilized Activated Polysaccharide and $CRM_{197}$ Protein

Lyophilized activated polysaccharide was reconstituted in anhydrous dimethyl sulfoxide (DMSO). Upon complete dissolution of polysaccharide, an equal amount of anhydrous DMSO was added to lyophilized $CRM_{197}$ for reconstitution.

c) Conjugation and Capping

Reconstituted activated polysaccharide was combined with reconstituted $CRM_{197}$ in the reaction vessel (input ratio: 0.8:1), followed by mixing thoroughly to obtain a clear solution before initiating the conjugation with sodium cyanoborohydride. The final polysaccharide concentration in reaction solution is approximately 1 g/L. Conjugation was initiated by adding 1.0-1.5 MEq of sodium cyanoborohydride to the reaction mixture and was incubated at 23° C. for 40-48 hrs. Conjugation reaction was terminated by adding 2 MEq of sodium borohydride ($NaBH_4$) to cap unreacted aldehydes. This capping reaction continued at 23° C. for 3 hrs.

d) Purification of the Conjugate

The conjugate solution was diluted 1:10 with chilled 5 mM succinate-0.9% saline (pH 6.0) in preparation for purification by tangential flow filtration using 100-300K MWCO membranes. The diluted conjugate solution was passed through a 5 μm filter and diafiltration was performed using 5 mM succinate-0.9% saline (pH 6.0) as the medium.

After the diafiltration was completed, the conjugate retentate was transferred through a 0.22 μm filter.

The conjugate was diluted further with 5 mM succinate/0.9% saline (pH 6), to a target saccharide concentration of approximately 0.5 mg/mL. Final 0.22 μm filtration step was completed to obtain the glycoconjugate.

Preferably, the conjugate obtained by the above process comprises at least 0.6 mM acetate per mM of serotype 15B capsular polysaccharide, has a molecular weight between 3,000 kDa and 20,000 kDa and has a degree of conjugation between 2 and 6.

## Example 11

### Characterization of Glycoconjugate Comprising *S. pneumoniae* Serotype 15B Capsular Polysaccharide Covalently Linked to a $CRM_{197}$

Conjugate 1 was prepared by the process of Example 10. Conjugates 2 and 3 were prepared by a similar process using different amount of oxidizing agent. Conjugate 4 was prepared by a similar process except that the purified serotype 15B capsular polysaccharide was not sized and was activated to a lower DO (higher oxidation level) and the conjugation was performed in aqueous medium. Conjugate 5 was prepared by a similar process except that the purified serotype 15B capsular polysaccharide was sized by chemical hydrolysis and the conjugation was performed in aqueous medium. Conjugates 6 and 7 were prepared by a similar process except that the purified serotype 15B capsular polysaccharide was not sized.

The obtained conjugates were characterized and the results are summarized in Table 14.

TABLE 14

*Streptococcus pneumoniae* serotype 15B capsular polysaccharide-$CRM_{197}$ conjugates

| Conjugate<br>Polysaccharide | 1<br>Sized | 2<br>Sized | 3<br>Sized | 4<br>Native | 5<br>Hydrolyzed | 6<br>Native | 7<br>Native |
|---|---|---|---|---|---|---|---|
| O-Acetyl; activated Polysaccharide (μmol acetate/μmol poly) | 0.69 | 0.69 | 0.69 | 1.01 | 0.66 | 0.76 | N/A |
| Solvent medium | DMSO | DMSO | DMSO | Aqueous | Aqueous | DMSO | DMSO |
| Activated Polysaccharide DO | 11.4 | 5.8 | 9.7 | 4.8 | 8.8 | 5 | 12 |
| Activated Polysaccharide MW | 196 kDa | 218 kDa | 235 kDa | 435 kDa | 270 kDa | 431 kDa | 460 kDa |
| Yield (%) | 87.2 | 64 | 63.7 | 96.2 | 78.8 | 24.2 | 26.2 |
| Saccharide Protein Ratio | 0.68 | 0.65 | 0.71 | 1.22 | 1.29 | 0.9 | 1.5 |
| Free Saccharide (%) | <5 | <5 | 6.1 | 18.1 | 14.2 | 8.8 | 18 |
| Conjugate MW, SEC-MALLS (kDa) | 6190 | 7090 | 7937 | 1766 | 1029 | 6293 | 4466 |
| O-Acetylation, Conjugate (μmol acetate/μmol poly) | 0.68 | 0.7 | 0.68 | 0.61 | 0.44 | 0.85 | N/A |
| <0.3 $K_d$ (%), SEC | N/A | 73 | N/A | N/A | 62 | N/A | N/A |
| Degree of Conj (AAA); Modified Lys | 3.7 | 3.9 | 4.1 | N/A | 3.4 | N/A | N/A |
| % O-Acetyl Retained in Conjugate | 99% | 100% | 99.5% | 60% | 67% | 100% | N/A |

N/A = not available

The percentage of free polysaccharide is measured by a procedure utilizing aluminum hydroxide gel to bind protein and covalently bound saccharide for removal by centrifugation. Samples are mixed with phosphate buffered aluminum hydroxide gel and centrifuged. Bound saccharide is pelleted with the gel and free saccharide remains in the supernatant. The resulting supernatant and controls samples are quantitated by appropriate colorimetric assays to determine the percentage of free saccharide and to confirm sufficient removal of protein and recovery of saccharide.

For the amino acid analysis the polysaccharide-protein sample is first hydrolyzed into its individual components as free amino acids, using 6 N hydrochloric acid (HCl) hydrolysis under vacuum and heat (160° C. for 15 minutes). After hydrolysis, the samples are analyzed using Amino Acid Analyzer. The individual amino acids are separated through ion exchange chromatography using a step gradient of sodium citrate buffer with temperature and flow rate changes. After separation, the amount of each amino acid residual is quantitatively determined using a postcolumn ninhydrin coupling detection system. In this system, the ninhydrin is mixed with the column eluate in the postcolumn reactor system and the mixture passed into the photometer. The reaction of ninhydrin with eluated amino acids yields a purple compound that absorbs maximally at 570 nm. This absorbance is a linear response (function) of the amount of α-amino groups present and this reaction provides quantitative colorimetric assay for all organic compounds with α-amino groups. In the reaction with imino acids such as proline and hydroxylproline, which do not have free amino group, a bright yellow compound is generated and monitored at 440 nm. The peak areas for each amino acid are calculated using both 570 nm and 440 nm wavelength outputs.

The yield is calculated as follows: (amount of polysaccharide in the conjugate ×100)/amount of activated polysaccharide.

Conjugates (4 and 5) generated using an aqueous medium demonstrated significant loss in O-acetyl levels. Conjugates generated in DMSO solvent, using native polysaccharide without MW sizing (6 and 7) did not demonstrate loss in O-acetyl levels. However, the conjugate yields were very poor in addition to poor filterability characteristics. Conjugates generated in DMSO using polysaccharides that were sized by high pressure homogenization (1, 2 and 3) had high yield and better filterability characteristics with significant preservation of O-acetyl levels. These conjugates also had very low levels of free polysaccharides.

Example 12

Opsonophagocytic Activity (OPA) Assay Using Pn-Serotype 15B-$CRM_{197}$ Conjugates

The immunogenicity of the *S. pneumoniae* serotype 15B conjugates of the invention can be assessed using the OPA assay described below.

Groups of 30 6-7 week old female Swiss Webster mice were immunized with 0.001 μg, 0.01 μg, or 0.1 μg of test conjugates via the subcutaneous route on week 0. The mice were boosted with the same dose of conjugate on week 3 and then bled at week 4. Serotype-specific OPAs were performed on week 4 sera samples.

OPAs are used to measure functional antibodies in murine sera specific for *S. pneumoniae* serotype 15B. Test serum is set up in assay reactions that measure the ability of capsular polysaccharide specific immunoglobulin to opsonize bacteria, trigger complement deposition, thereby facilitating phagocytosis and killing of bacteria by phagocytes. The OPA titer is defined as the reciprocal dilution that results in a 50% reduction in bacterial count over control wells without test serum. The OPA titer is interpolated from the two dilutions that encompass this 50% killing cut-off.

OPA procedures were based on methods described in Hu et al. (2005) Clin Diagn Lab Immunol 12 (2):287-295 with the following modifications. Test serum was serially diluted 2.5-fold and added to microtiter assay plates. Live serotype 15B target bacteria were added to the wells and the plates were shaken at 37° C. for 30 minutes. Differentiated HL-60 cells (phagocytes) and baby rabbit serum (3- to 4-week old, PEL-FREEZ®, 6.25% final concentration) were added to the wells, and the plates were shaken at 37° C. for 45 minutes. To terminate the reaction, 80 μL of 0.9% NaCl was added to all wells, mixed, and a 10 μL aliquot were transferred to the wells of MULTISCREEN® HTS HV filter plates (MILLIPORE®) containing 200 μL of water. Liquid was filtered through the plates under vacuum, and 150 μL of HYSOY® medium was added to each well and filtered through. The filter plates were then incubated at 37° C., 5% $CO_2$ overnight and were then fixed with Destain Solution (Bio-Rad Laboratories, Inc., Hercules, Calif.). The plates were then stained with Coomassie Blue and destained once. Colonies were imaged and enumerated on a Cellular Technology Limited (CTL) (Shaker Heights, Ohio) IMMUNOSPOT® Analyzer. Raw colony counts were used to plot kill curves and calculate OPA titers.

The immunogenicity of conjugates 1 and 2 has been tested according to the above mentioned assay. One additional conjugate and an unconjugated native *S. pneumoniae* serotype 15B capsular polysaccharide (unconjugated PS) were also tested in the same assay:

Conjugate 9 was prepared by conjugation of native (i.e., not sized) serotype 15B capsular polysaccharide to $CRM_{197}$ by reductive amination in aqueous solution.

The results are shown at Table 15.

TABLE 15

OPA Titers of Animal Testing using Serotype 15B-$CRM_{197}$ Conjugates

| | OPA GMT (95% CI) | | |
|---|---|---|---|
| | 0.001 μg | 0.01 μg | 0.1 μg |
| Conjugate 1 | 485 (413, 569) | 804 (565, 1145) | 1563 (1048, 2330) |
| Conjugate 2 | 556 (438, 707) | 871 (609, 1247) | 1672 (1054, 2651) |
| Conjugate 9 | 395 (329, 475) | 856 (627, 1168) | 1802 (1108, 2930) |
| Unconjugated PS | — | — | 698 (466, 1045) |

As shown in the Table 15 above, conjugates 1 and 2, when administered to mice, generated antibodies capable of opsonizing *S. pneumoniae* serotype 15B, triggering complement deposition, thereby facilitating phagocytosis and killing of bacteria by phagocytes. In addition, despite their lower molecular weight, they also exhibited similar level of immunogenicity as compared to conjugate 9 which has not been sized.

Example 13

Preparation of Serotype 22F Polysaccharide-$CRM_{197}$ Conjugate

Preparation of Isolated *S. pneumoniae* Serotype 22F Polysaccharide

The *S. pneumoniae* serotype 22F were grown in a seed bottle and then transferred to a seed fermentor. Once the targeted optical density was reached, the cells were transferred to a production fermentor. The fermentation was broth was inactivated by the addition of N-lauroyl sarcosine and purified by ultrafiltration and diafiltration.

The purified *S. pneumoniae* serotype 22F polysaccharide was sized by high pressure homogenization using a PANDA 2K® homogenizer (GEA Niro Soavi, Parma, Italy) to produce the isolated *S. pneumoniae* serotype 22F polysaccharide.

Oxidation of Isolated *S. pneumoniae* Serotype 22F Capsular Polysaccharide

Oxidation of polysaccharide was carried out in 100 mM potassium phosphate buffer (pH 5.8) obtained by sequential addition of calculated amount of 500 mM potassium phosphate buffer (pH 5.8) and WFI to give final polysaccharide concentration of 2.0 g/L. If required, the reaction pH was adjusted to 5.8, approximately. After pH adjustment, the reaction temperature was lowered to 5° C. Oxidation was initiated by the addition of 0.10 molar equivalents (MEq) of sodium periodate. The target oxidation reaction time is 16 hrs at 5° C.

The oxidation reaction was quenched with 2 MEq of 2,3-butanediol under continuous stirring at 5° C. for 1-2 hrs.

Concentration and diafiltration of the activated polysaccharide was carried out using 100K MWCO ultrafiltration cassettes. Diafiltration was performed against 35-fold diavolume of WFI. The purified activated polysaccharide was stored at 5° C. The purified activated saccharide is characterized inter alia by (i) Molecular Weight by SEC-MALLS (ii) presence of O-acetyl and (iii) Degree of Oxidation.

SEC-MALLS is used for the determination of the molecular weight of polysaccharides and polysaccharide-protein conjugates. SEC is used to separate the polysaccharides by hydrodynamic volume. Refractive index (RI) and multi-angle laser light scattering (MALLS) detectors are used for the determination of the molecular weight. When light interacts with matter, it scatters and the amount of scattered

light is related to the concentration, the square of the do/dc (the specific refractive index increments), and the molar mass of the matter. The molecular weight measurement is calculated based on the readings from the scattered light signal from the MALLS detector and the concentration signal from the RI detector.

The degree of oxidation (DO=moles of sugar repeat unit/moles of aldehyde) of the activated polysaccharide was determined as follows:

The moles of sugar repeat unit is determined by various colorimetric methods, for example by using Anthrone method. The polysaccharide is first broken down to monosaccharides by the action of sulfuric acid and heat. The Anthrone reagent reacts with the hexoses to form a yellow green colored complex whose absorbance is read spectrophotometrically at 625 nm. Within the range of the assay, the absorbance is directly proportional to the amount of hexose present.

The moles of aldehyde also are determined simultaneously, using MBTH colorimetric method. The MBTH assay involves the formation of an azine compound by reacting aldehyde groups (from a given sample) with a 3-methyl-2-benzothiazolone hydrazone (MBTH assay reagent). The excess 3-methyl-2-benzothiazolone hydrazone oxidizes to form a reactive cation. The reactive cation and the azine react to form a blue chromophore. The formed chromophore is then read spectroscopically at 650 nm.

c. Conjugation of Activated Polysaccharide to $CRM_{197}$ and Capping

Reconstituted $CRM_{197}$ (in DMSO) was combined in the conjugation reaction vessel with the reconstituted activated polysaccharide. The final polysaccharide concentration in reaction solution is 1 g/L. Conjugation was initiated by adding 1.5 MEq of sodium cyanoborohydride to the reaction mixture and the reaction was incubated at 23° C. for 20 hrs. Termination of conjugation reaction is done by adding 2 MEq of sodium borohydride. The capping reaction was incubated at 23° C. for 3 hrs.

d. Purification of Conjugate

The conjugate solution was diluted 1:5 with chilled 5 mM succinate-0.9% saline (pH 6.0) in preparation for purification by tangential flow filtration using 100K MWCO membranes and a 20× diafiltration was performed using 5 mM succinate-0.9% saline (pH6.0) as the medium. After the diafiltration was completed, the conjugate retentate was further diluted, filtered through a 0.22 μm filter and stored at 2-8° C.

Several conjugates were obtained using the above described process by varying different parameters (e.g., saccharide-protein input ratio, reaction concentration and Meq of sodium cyanoborohydride). Characterization for representative Pn-22F glycoconjugates to $CRM_{197}$ is provided in Table 16

TABLE 16

Pneumococcal Serotype 22F-$CRM_{197}$ conjugates

| Batch | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Degree of Oxidation (D.O) | 12.6 | 19.5 | 17.2 | 14.0 | 12.4 | 14.9 | 11.1 | 14.6 | 14.4 | 13.7 |
| Activated Saccharide MW by MALLS (kDa) | 540 | 697 | 864 | 92 | 866 | 631 | 614 | 639 | 709 | 416 |
| Conjugate Results | | | | | | | | | | |
| Saccharide/Protein Ratio | 0.75 | 0.87 | 2 | 0.8 | 0.8 | 0.4 | 1.9 | 0.8 | 0.65 | 1.0 |
| O-Ac (%) | 105 | 100 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| % Free Saccharide | <5 | 2 | 15.5 | 35 | <5 | <5 | 33 | <5 | <5 | 8 |
| MW by SEC-MALLS (kDa) | 2787 | 1668 | 2194 | 1419 | 5039 | 10450 | 1577 | 3911 | 3734 | 4453 |

N/A = not available

Conjugation of Activated *S. pneumoniae* Serotype 22F Polysaccharide with $CRM_{197}$

The conjugation process consisted in the following steps:

a. Compounding with sucrose excipient, and lyophilization;

b. Reconstitution of the lyophilized polysaccharide and $CRM_{197}$;

c. Conjugation of activated polysaccharide to $CRM_{197}$ and capping; and d. Purification of the conjugate

a. Compounding with Sucrose and Lyophilization

The activated polysaccharide was compounded with sucrose (50% w/v in WFI) to a ratio of 25 grams of sucrose per gram of activated polysaccharide. The bottle of compounded mixture was then lyophilized. Following lyophilization, bottles containing lyophilized activated polysaccharide were stored at −20° C. Calculated amount of $CRM_{197}$ protein (target S/P input ratio=1) was shellfrozen and lyophilized separately. Lyophilized $CRM_{197}$ was stored at −20° C.

b. Reconstitution of Lyophilized Activated Polysaccharide and $CRM_{197}$ Protein

Lyophilized activated polysaccharide was reconstituted in anhydrous dimethyl sulfoxide (DMSO). Upon complete dissolution of polysaccharide, an equal amount of anhydrous DMSO was added to lyophilized $CRM_{197}$ for reconstitution.

The % O-Acetyl (preserved) level in the final conjugate was calculated from the ratio of the O-Acetyl content of the conjugate (μmol 0-Acetyl per μmol of the serotype 22F saccharide repeat unit) relative to the O-Acetyl content of the polysaccharide (μmol 0-Acetyl per μmol of the serotype 22F saccharide repeat unit).

The immunogenicity of the conjugates obtained above have been assessed using the opsonophagocytic assay (OPA) described below.

Groups of thirty 6-7 week old female Swiss Webster mice were immunized with 0.001 μg, 0.005 μg or 0.01 μg of test conjugates via the subcutaneous route on week 0. The mice were boosted with the same dose of conjugate on week 3 and then bled at week 4. Serotype-specific OPAs were performed on week 4 sera samples.

Opsonophagocytic activity (OPA) assays are used to measure functional antibodies in murine sera specific for *S. pneumonia* serotype 22F. Test serum is set up in assay reactions that measure the ability of capsular polysaccharide specific immunoglobulin to opsonize bacteria, trigger complement deposition, thereby facilitating phagocytosis and killing of bacteria by phagocytes. The OPA titer is defined as the reciprocal dilution that results in a 50% reduction in bacterial count over control wells without test

serum. The OPA titer is interpolated from the two dilutions that encompass this 50% killing cut-off.

OPA procedures were based on methods described in Hu et al. (2005) Clin Diagn Lab Immunol 12(2):287-295 with the following modifications. Test serum was serially diluted 2.5-fold and added to microtiter assay plates. Live serotype 22F target bacterial strains were added to the wells and the plates were shaken at 25° C. for 30 minutes. Differentiated HL-60 cells (phagocytes) and baby rabbit serum (3- to 4-week old, PEL-FREEZ®, 12.5% final concentration) were added to the wells, and the plates were shaken at 37° C. for 45 minutes. To terminate the reaction, 80 μL of 0.9% NaCl was added to all wells, mixed, and a 10 μL aliquot were transferred to the wells of MULTISCREEN® HTS HV filter plates (MILLIPORE®) containing 200 μL of water. Liquid was filtered through the plates under vacuum, and 150 μL of HYSOY® medium was added to each well and filtered through. The filter plates were then incubated at 37° C., 5% $CO_2$ overnight and were then fixed with Destain Solution (Bio-Rad Laboratories, Inc., Hercules, Calif.). The plates were then stained with Coomassie Blue and destained once. Colonies were imaged and enumerated on a Cellular Technology Limited (CTL) (Shaker Heights, Ohio) IMMUNOSPOT® Analyzer. Raw colony counts were used to plot kill curves and calculate OPA titers.

The Opsonophagocytic activity (OPA) titers for Serotype 22F-$CRM_{197}$ conjugates were determined as mentioned above. OPA titers (geometric mean titer (GMT) with 95% confidence interval (CI)) at four weeks at different doses are shown in Tables 17 and 18, (two separate experiments) demonstrating that the serotype 22F conjugate (Batches 1-7; also see Table 16 for characterization data of these conjugates) elicited OPA titers in a murine immunogenicity model.

TABLE 17

Immunogenicity of Serotype 22F-$CRM_{197}$ Conjugates

| Sample No. | OPA GMT (95% CI) 0.001 μg | 0.005 μg | 0.01 μg |
|---|---|---|---|
| 1 | 86 (45, 165) | 597 (285, 1252) | 2519 (1409, 4504) |
| 2 | 98 (51, 191) | 782 (410, 1492) | 2236 (1319, 3790) |
| 3 | 35 (18, 69) | 250 (122, 512) | 509 (273, 950) |

TABLE 18

Immunogenicity of Serotype 22F-$CRM_{197}$ Conjugates

| Sample No. | OPA GMT (95% CI) 0.001 μg | 0.01 μg |
|---|---|---|
| 4 | 37 (18, 76) | 3383 (1911, 5987) |
| 5 | 45 (20, 103) | 1773 (1072, 2931) |
| 6 | 235 (108, 513) | 4335 (3018, 6226) |
| 7 | 10 (7, 13) | 252 (138, 457) |

## Example 14

### Preparation of Pn-11A Conjugates to $CRM_{197}$

Preparation of Pn-11A RAC Glycoconjugates

The frozen sized polysaccharide stored in de-ionized water or 25 mM potassium phosphate buffer (pH 6.0) was thawed at 5° C.

Oxidation of Polysaccharide

Polysaccharide oxidation was carried out in 100 mM potassium phosphate buffer (pH 6.0) by addition of 500 mM potassium phosphate buffer (pH 6.0) and WFI to give final polysaccharide concentration of 2.0 g/L. Oxidation reaction was carried out at 23° C. Oxidation was initiated by the addition of sodium periodate. The agitation rate ranges from 100-140 rpm.

Purification of Activated 11A Polysaccharide

Concentration and diafiltration of the activated polysaccharide was carried out using ultrafiltration cassettes. Diafiltration was performed against 20-fold diavolume of WFI. After 0.22 μm filtration, the purified activated polysaccharide was stored at 5° C.

Conjugation Process Description

The conjugation process consisted in the following steps:

a. Shell freezing and lyophilization of $CRM_{197}$ protein;

b. Reconstitution of the activated polysaccharide and $CRM_{197}$;

c. Conjugation of activated polysaccharide to $CRM_{197}$; and

d. Purification and dilution of the conjugate

a. Shell Freezing and Lyophilization of $CRM_{197}$ Protein

$CRM_{197}$ protein was shell-frozen and lyophilized.

b. Reconstitution of Activated Polysaccharide and $CRM_{197}$ Protein

Activated polysaccharide solution (~10 g/L) was charged into reactor followed by addition of calculated amount 0.5 N sodium phosphate buffer (pH 7.2). Under stirring, lyophilized $CRM_{197}$ was added and the reaction mixture was stirred for 2-4 hours in order to reach complete dissolution of $CRM_{197}$.

c. Conjugation and Capping

Conjugation was initiated by adding cyanoborohydride. The reaction mixture was incubated at 23° C. for 72-96 hrs. Termination of conjugation reaction was done by adding 0.5×WFI followed by 2 MEq of sodium borohydride. This capping reaction was kept at 23° C. for 3-4 hrs.

d. Dilution and Initial Purification of Conjugate

The conjugate solution was diluted 1:5 (reaction volume) with 0.15 N sodium phosphate buffer (pH 8.0) in preparation for purification by tangential flow filtration (TFF). Diluted conjugate was mixed in the dilution vessel and then passed through a 5 μm filter. The filtered conjugate solution was then concentrated down to 1-2 g/L. A two-steps diafiltration process was performed. In step one, TFF was carried out using 30× (diafiltration volume) of 0.15 N sodium phosphate buffer (pH 8.0) followed by 20× of 5 mM succinate-0.9% NaCl (pH6.0). After the initial diafiltration was completed, the conjugate retentate was transferred through a 0.45 μm filter into a collection tank.

Final Diafiltration of Conjugate

The final purification step was a 20× diafiltration with 5 mM succinate-0.9% NaCl, pH 6.0 medium using regenerated cellulose membranes.

Dilution of the Monovalent Bulk Conjugate (MBC)

The conjugate was diluted further with 5 mM succinate/0.9% NaCl, pH 6, to a target saccharide concentration of 0.5 mg/mL. Final 0.22 μm filtration step was completed to prepare the monovalent bulk conjugate (MBC) product for formulation.

Several conjugates were obtained using the above described process by varying different parameters (e.g., saccharide-protein input ratio, reaction concentration and Meq of sodium cyanoborohydride). Characterization for representative Pn-11A glycoconjugates to $CRM_{197}$ is provided in Table 19 (batches 1 to 5).

Preparation of Pn-11A Glycoconjugates Using RAC/DMSO

Oxidized polysaccharide was prepared and purified as described above (see Preparation of Pn-11A RAC Glycoconjugates).

Conjugation Via Reductive Amination in DMSO (RAC/DMSO)

Conjugation of 11A through RAC/DMSO consisted of the following steps:

a. Compounding with sucrose, shell freezing and lyophilization;
b. Reconstitution of the lyophilized polysaccharide and $CRM_{197}$;
c. Conjugation of activated polysaccharide to $CRM_{197}$; and
d. Purification and dilution of the conjugate.

a. Compounding with Sucrose, Shell Freezing and Lyophilization

The activated polysaccharide prepared from sized polysaccharide was compounded with sucrose (50% w/v in WFI) to a ratio of 25 grams of sucrose per gram of activated polysaccharide. The components were mixed the shell-frozen bottle of compounded mixture was then lyophilized. $CRM_{197}$ protein was shell-frozen and lyophilized separately.

b. Reconstitution of Lyophilized Activated Polysaccharide and $CRM_{197}$ Protein

Lyophilized activated polysaccharide was reconstituted in DMSO at 2 mg/mL concentration. Upon the complete dissolution of polysaccharide, DMSO was added to lyophilized $CRM_{197}$ for reconstitution.

c. Conjugation and Capping

Reconstituted $CRM_{197}$ (in DMSO) was combined in the conjugation reaction vessel with the reconstituted activated polysaccharide. The final polysaccharide concentration in reaction solution is 1 g/L. Conjugation was initiated by adding cyanoborohydride to the reaction mixture and was incubated at 23° C. for 22 hours. Termination of conjugation reaction is done by adding 2 MEq of sodium borohydride. This capping reaction was kept at 23° C. for 3-4 hrs.

d. Purification and Dilution of the Conjugate

The conjugate solution was purified and diluted using a similar process as described above.

Several conjugates were obtained using the above described process by varying different parameters (e.g., saccharide-protein input ratio, reaction concentration and Meq of sodium cyanoborohydride). Characterization for representative Pn-11A glycoconjugates to $CRM_{197}$ obtained by the above process is provided at Table 19 (batches 6 to 8).

TABLE 19

| Pneumococcal Serotype 11A-$CRM_{197}$ conjugates | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Batch | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Activated Saccharide MW by MALLS (kDa) | 207 | 129 | 103 | 199 | 183 | 232 | 113 | 113 |
| Conjugate Results | | | | | | | | |
| Saccharide/ Protein Ratio | 1.24 | 1.09 | 1.32 | 1.47 | 1.31 | 1 | 0.78 | 0.68 |
| Acetate (mol/mol PS) | 2.72 | 2.89 | 2.72 | 3.2 | 3.13 | N/A | N/A | N/A |
| Glycerol (mol/mol PS)* | 0.62 | 0.68 | 0.75 | 0.51 | 0.41 | N/A | N/A | N/A |
| MW by SEC-MALLS (kDa) | 3224 | 837 | 623 | 827 | 994 | 12200 | 6543 | 15730 |

N/A = not available

*Glycerol was quantitated by High Performance Anion Exchange Chromatography with Pulsed Amperometric Detection (HPAEC-PAD) after its release from the polysaccharide by hydrofluoric acid (HF).

The overall data generated from conjugates prepared by the above reductive amination processes demonstrated that it allowed preparing conjugates with good conjugation yield, low % free saccharide and with good stability.

The immunogenicity of the conjugates obtained above have been assessed using the opsonophagocytic assay (OPA) described below.

Groups of thirty 6-7 week old female Swiss Webster mice were immunized with 0.001 μg, 0.005 μg, 0.01 μg, or 0.1 μg of test conjugates via the subcutaneous route on week 0. The mice were boosted with the same dose of conjugate on week 3 and then bled at week 4. Serotype-specific OPAs were performed on week 4 sera samples.

Opsonophagocytic activity (OPA) assays are used to measure functional antibodies in murine sera specific for *S. pneumonia* serotype 11A. Test serum is set up in assay reactions that measure the ability of capsular polysaccharide specific immunoglobulin to opsonize bacteria, trigger complement deposition, thereby facilitating phagocytosis and killing of bacteria by phagocytes. The OPA titer is defined as the reciprocal dilution that results in a 50% reduction in bacterial count over control wells without test serum. The OPA titer is interpolated from the two dilutions that encompass this 50% killing cut-off.

OPA procedures were based on methods described in Hu et al. (2005) Clin Diagn Lab Immunol 12 (2):287-295 with the following modifications. Test serum was serially diluted 2.5-fold and added to microtiter assay plates. Live serotype 22F target bacterial strains were added to the wells and the plates were shaken at 25° C. for 30 minutes. Differentiated HL-60 cells (phagocytes) and baby rabbit serum (3- to 4-week old, PEL-FREEZ®, 12.5% final concentration) were added to the wells, and the plates were shaken at 37° C. for 60 minutes. To terminate the reaction, 80 μL of 0.9% NaCl was added to all wells, mixed, and a 10 μL aliquot were transferred to the wells of MULTISCREEN® HTS HV filter plates (MILLIPORE®) containing 200 μL of water. Liquid was filtered through the plates under vacuum, and 150 μL of HYSOY® medium was added to each well and filtered through. The filter plates were then incubated at 37° C., 5% $CO_2$ overnight and were then fixed with Destain Solution (Bio-Rad Laboratories, Inc., Hercules, Calif.). The plates were then stained with Coomassie Blue and destained once. Colonies were imaged and enumerated on a Cellular Technology Limited (CTL) (Shaker Heights, Ohio) IMMUNOSPOT® Analyzer. Raw colony counts were used to plot kill curves and calculate OPA titers.

The Opsonophagocytic activity (OPA) titers for serotype 11A-$CRM_{197}$ conjugates in mice were determined as mentioned above. OPA titers (geometric mean titer (GMT) with 95% confidence interval (CI)) at four weeks at different doses are shown in Table 20, demonstrating that the serotype

11A conjugate (Batches 2-4 and 8; also see Table 19 for characterization data of these conjugates) elicited OPA titers in a murine immunogenicity model.

TABLE 20

Immunogenicity of Serotype 11A-$CRM_{197}$ Conjugates

| | OPA GMT (95% CI) | | |
|---|---|---|---|
| Batch No. | 0.001 μg | 0.01 μg | 0.1 μg |
| 2 | 326 (260, 408) | 1391 (794, 2437) | 4366 (3063, 6223) |
| 3 | 389 (316, 478) | 1113 (690, 1795) | 5527 (3698, 8260) |
| 4 | 192 (149, 248) | 926 (661, 1298) | 2800 (1975, 3970) |
| 8 | 303 (224, 411) | 1099 (624, 1935) | 3861 (2629, 5669) |

## Example 15

### Formulation of a 16-Valent Pneumococcal Conjugate Vaccine

A 16-valent conjugates composition comprising glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F (16vPnC) all individually conjugated to $CRM_{197}$ was formulated.

Glycoconjugates from *S. pneumoniae* from serotypes 15B, 22F and 33F were produced as disclosed above and *S. pneumoniae* glycoconjugates from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F were produced as disclosed in WO 2006/110381.

The required volumes of bulk concentrates were calculated based on the batch volume and the bulk saccharide concentrations. The formulated bulk vaccine was prepared by adding the required volume of NaCl/succinate buffer (pH 5.8) to obtain a final target buffer concentration of succinate 5.0 mM and 150 mM NaCl. Polysorbate 80 to a final concentration of 0.02% and the 16 pneumococcal conjugates were added. The preparation was filtered through a 0.2 μm Millipore PES membrane, followed by the addition of AlPO4. The formulation was mixed to allow for binding and to achieve homogeneity.

The formulation was then filled into glass syringes to deliver a dose volume of 0.5 mL.

The final dosage form consisted in 2.2 μg of each of glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 7F, 9V, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F individually conjugated to $CRM_{197}$, 4.4 μg of glycoconjugate from *S. pneumoniae* serotype 6B, 5 mM succinate buffer pH 5.8, 0.02 PS80, 150 mM NaCl and 0.25 mg/mL aluminum as $AlPO_4$ for a dose of 0.5 mL. $CRM_{197}$, content was about 38 μg for a dose of 0.5 mL.

## Example 16

### Formulation of a 20-Valent Pneumococcal Conjugate Vaccine

A 20 valent conjugates composition comprising glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F (20vPnC) all individually conjugated to $CRM_{197}$ was formulated.

Glycoconjugates from *S. pneumoniae* from serotypes 8, 10A, 11A, 12F, 15B, 22F and 33F were produced as disclosed above and *S. pneumoniae* glycoconjugates from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F were produced as disclosed in WO 2006/110381.

The required volumes of bulk concentrates were calculated based on the batch volume and the bulk saccharide concentrations. The formulated bulk vaccine was prepared by adding the required volume of NaCl/succinate buffer (pH 5.8) to obtain a final target buffer concentration of succinate 5.0 mM and 150 mM NaCl. Polysorbate 80 to a final concentration of 0.02% and the 20 pneumococcal conjugates are added. The preparation was filtered through a 0.2 μm Millipore PES membrane, followed by the addition of $AlPO_4$. The formulation was mixed well to obtain maximum binding of the conjugates to the aluminum.

The formulation is then filled into glass syringes to deliver a dose volume of 0.5 mL.

The final dosage form consisted in 2.2 μg of each of glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 7F, 8, 9V, 10A, 11A, 12F, 14, 15B, 18C, 19A, 19F, 22F, 23F and 33F individually conjugated to $CRM_{197}$, 4.4 μg of glycoconjugate from *S. pneumoniae* serotype 6B, 5 mM succinate buffer pH 5.8, 0.02 PS80, 150 mM NaCl and 0.25 mg/mL aluminum as AlPO4 for a dose of 0.5 mL. $CRM_{197}$, content was about 46 μg for a dose of 0.5 mL.

## Example 17

### Immunogenicity of a 16-Valent Immunogenic Composition

The immunogenicity of the 16-valent immunogenic composition (see Example 15) was assessed in Rabbits using multiplexed direct Luminex immunoassays (dLIAs) to measure serotype-specific IgG concentrations in sera and serotype-specific OPAs.

Groups of ten 2.5 kg to 3.5 kg female New Zealand white rabbits were immunized with the proposed human clinical dose (2.2 μg of conjugate except serotype 6B which was at 4.4 μg; plus 0.1 mg aluminum as $AlPO_4$) via the intramuscular route on week 0. The rabbits were boosted with the same dose of conjugate vaccine on week 2 and then bled at week 4. Serotype-specific dLIAs and OPAs were performed on week 0 and week 4 sera samples.

To quantify the total polysaccharide binding antibody (IgG) specific to each pneumococcal polysaccharide (PnPS), rabbit sera were evaluated in two direct Luminex immunoassays (dLIAs; 13-plex dLIA, PREVNAR 13® serotypes and 7-plex dLIA, additional serotypes). The 13-plex assay measures anti-PnPS antibodies specific to the 13 serotypes included in the 13-valent pneumococcal conjugate (PnC) vaccine (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F) and the 7-plex assay measures anti-PnPS antibodies to the additional serotypes (15B, 22F, 33F). Each assay contains a combination of 13 or 7 spectrally distinct magnetic microspheres coupled to PnPS conjugates (PnPS-PLL conjugates: PnPS conjugated to poly-L-Lysine).

Briefly, reference standard, controls and test sera were first pre-adsorbed with two Pn absorbents; CWPS1 (cell wall polysaccharide from PnA containing C-polysaccharide) and CWPS2 (CWP from acapsular *S. pneumoniae* serotype 2) to block non-specific antibodies from binding to the PnPS coating antigen. Following preadsorption, the PnPS-coupled microspheres were incubated with appropriately diluted reference standard serum, controls or rabbit test sera. After incubation, each mixture was washed and an R-Phycoerythrin-conjugated goat anti-rabbit IgG secondary antibody was added. Fluorescent signals (expressed as median fluorescence intensities (MFIs)) were measured using a Bio-Plex reader and correlated to the amount of bound PnPS-specific IgG. Values for test sera are reported as (Units/mL, U/mL).

Serotype-specific OPAs were performed as described above. The OPA titer is the reciprocal of the highest serum dilution resulting in 50% reduction in the number of bacterial colony forming units (CFUs) when compared to the control without serum (defined as the background CFU). The titer is interpolated from the two dilutions that encompass this 50% killing cut-off.

TABLE 21

16vPnC Total IgG Concentrations and OPA Titers

| | Total IgG (Pn dLIA) | | | | Opsonophagocytic Antibody (OPA) | | | |
|---|---|---|---|---|---|---|---|---|
| Serotype | Wk 0 GMC (μg/ml) | Wk 4 GMC (μg/ml) | Wk 4 95% CI (LCI-UCI) | IgG GMC Ratio Wk 4:Wk 0 | Wk 0 GMT | Wk 4 GMT | Wk 4 95% CI (LCI-UCI) | OPA GMT Ratio Wk 4:Wk 0 |
| 1 | 0.08 | 28 | 17-44 | 369 | 4 | 87 | 55-139 | 22 |
| 3 | 0.08 | 88 | 60-128 | 1062 | 4 | 214 | 151-304 | 54 |
| 4 | 0.08 | 30 | 14-67 | 402 | 4 | 934 | 551-1583 | 233 |
| 5 | 0.08 | 34 | 18-64 | 449 | 4 | 368 | 232-584 | 87 |
| 6A | 0.03 | 46 | 15-142 | 1835 | 4 | 3026 | 1607-5696 | 756 |
| 6B | 0.08 | 89 | 33-241 | 1182 | 4 | 6156 | 3043-12453 | 1539 |
| 7F | 0.01 | 50 | 31-78 | 3969 | 6 | 2917 | 2013-4227 | 528 |
| 9V | 0.03 | 24 | 15-38 | 881 | 5 | 613 | 426-883 | 112 |
| 14 | 0.08 | 28 | 20-39 | 368 | 19 | 449 | 331-610 | 24 |
| 18C | 0.05 | 79 | 45-139 | 1587 | 4 | 1847 | 1003-3401 | 462 |
| 19A | 0.08 | 120 | 71-205 | 1605 | 4 | 1410 | 851-2336 | 352 |
| 19F | 0.08 | 156 | 96-255 | 2083 | 4 | 3207 | 1783-5771 | 802 |
| 23F | 0.05 | 33 | 13-84 | 668 | 4 | 997 | 487-2042 | 249 |
| 15B | 0.05 | 54 | 40-71 | 1073 | 6 | 741 | 514-1069 | 116 |
| 22F | 0.08 | 158 | 95-262 | 2103 | 5 | 1078 | 661-1756 | 211 |
| 33F | 0.10 | 11 | 6-20 | 115 | 49 | 1337 | 829-2154 | 27 |

Abbreviations: GMC, geometric mean concentration; C, confidence interval; LCI, lower confidence interval; UCI, upper confidence interval.

Results showed a significant increase in serotype-specific IgG and functional OPA antibody responses following two immunizations with 16vPnC (Table 21). Serum IgG levels increased more than 2-logs above baseline. Similarly, a robust functional OPA antibody response was elicited with a minimum of a 22-fold increase in OPA GMT above baseline. Pre-immune sera (Wk 0) showed undetectable levels of PnPS-specific IgG and functional OPA antibody for the majority of the 16v Pn serotypes with the exception of serotypes 14 and 33F. Low level OPA titers were present for these serotypes but these baseline responses did not adversely affect the antibody response following vaccination.

## Example 18

### Immunogenicity of a 20-Valent Immunogenic Composition

The immunogenicity of the 20-valent immunogenic composition (as prepared at example 16) was assessed in rabbits using multiplexed direct Luminex immunoassays (dLIAs) to measure serotype-specific IgG concentrations in sera and serotype-specific OPAs.

Groups of ten 2.5 kg to 3.5 kg female New Zealand white rabbits were immunized with the proposed human clinical dose (2.2 μg of conjugate except serotype 6B which was at 4.4 μg; plus 0.1 mg aluminum as $AlPO_4$) via the intramuscular route on week 0. The rabbits were boosted with the same dose of conjugate vaccine on week 2 and then bled at week 4. Serotype-specific dLIAs and OPAs were performed on week 0 and week 4 sera samples.

To quantify the total polysaccharide binding antibody (IgG) specific to each pneumococcal polysaccharide (PnPS), rabbit sera were evaluated in two direct Luminex immunoassays (dLIAs; 13-plex dLIA, PREVNAR 13® serotypes and 7-plex dLIA, additional serotypes). The 13-plex assay measures anti-PnPS antibodies specific to the 13 serotypes included in the 13-valent pneumococcal conjugate (PnC) vaccine (1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F) and the 7-plex assay measures anti-PnPS antibodies to the additional serotypes (15B, 22F, 33F). Each assay contains a combination of 13 or 7 spectrally distinct magnetic microspheres coupled to PnPS conjugates (PnPS-PLL conjugates: PnPS conjugated to poly-L-Lysine).

Briefly, reference standard, controls and test sera were first pre-adsorbed with two Pn absorbents; CWPS1 (cell wall polysaccharide from PnA containing C-polysaccharide) and CWPS2 (CWP from acapsular *S. pneumoniae* serotype 2) to block non-specific antibodies from binding to the PnPS coating antigen. Following preadsorption, the PnPS-coupled microspheres were incubated with appropriately diluted reference standard serum, controls or rabbit test sera. After incubation, each mixture was washed and an R-Phycoerythrin-conjugated goat anti-rabbit IgG secondary antibody was added. Fluorescent signals (expressed as median fluorescence intensities (MFIs)) were measured using a Bio-Plex reader and correlated to the amount of bound PnPS-specific IgG. Values for test sera are reported as (Units/mL, U/mL).

Serotype-specific OPAs were performed as described above. The OPA titer is the reciprocal of the highest serum dilution resulting in 50% reduction in the number of bacterial colony forming units (CFUs) when compared to the control without serum (defined as the background CFU). The titer is interpolated from the two dilutions that encompass this 50% killing cut-off.

Rabbits immunized with the 20vPnC also demonstrated significant increases in total IgG and functional OPA antibody titers against serotypes common to the 16v and 20v formulations as well as to the additional four serotypes (8, 10A, 11A, and 12F) (Table 22). A 2-log increase in serum IgG levels across the 20 serotypes was induced following two immunizations. OPA GMTs elicited with the vaccine were at least 27-fold above baseline. Low level OPA titers in pre-immune sera for serotypes 14 and 33F were similarly observed following 20vPnC vaccination, but again did not alter the robustness of the post-vaccination antibody responses.

The 16vPnC and 20vPnC formulations elicited a robust humoral response that was both specific for Pneumococcal polysaccharides and associated with functional killing of the bacterium (see Tables 21 and 22). In conclusion, studies shown in Examples 17 and 18 demonstrated good immunogenicity of both the 16vPnC and 20vPnC formulations.

TABLE 22

20vPnC Total IgG Concentrations and OPA Titers

| | Total IgG (Pn dLIA) | | | | Opsonophagocytic Antibody (OPA) | | | |
|---|---|---|---|---|---|---|---|---|
| Serotype | Wk 0 GMC (μg/ml) | Wk 4 GMC (μg/ml) | Wk 4 95% CI (LCI-UCI) | IgG GMC Ratio Wk 4:Wk 0 | Wk 0 GMT | Wk 4 GMT | Wk 4 95% CI (LCI-UCI) | OPA GMT Ratio Wk 4:Wk 0 |
| 1 | 0.08 | 28 | 19-43 | 379 | 4 | 106 | 69-164 | 27 |
| 3 | 0.08 | 116 | 76-176 | 1542 | 4 | 286 | 193-425 | 72 |
| 4 | 0.08 | 62 | 39-97 | 821 | 4 | 1477 | 954-2287 | 369 |
| 5 | 0.08 | 49 | 33-71 | 648 | 4 | 509 | 350-742 | 127 |
| 6A | 0.03 | 30 | 14-66 | 1209 | 4 | 3682 | 2743-4944 | 849 |
| 6B | 0.08 | 58 | 36-94 | 775 | 4 | 4469 | 3002-6653 | 1117 |
| 7F | 0.02 | 62 | 39-101 | 3681 | 6 | 3226 | 2226-4675 | 500 |
| 9V | 0.05 | 30 | 19-48 | 644 | 6 | 956 | 634-1442 | 150 |
| 14 | 0.08 | 34 | 20-60 | 457 | 12 | 506 | 348-736 | 42 |
| 18C | 0.05 | 106 | 67-166 | 2115 | 4 | 1942 | 1263-2986 | 485 |
| 19A | 0.08 | 112 | 73-171 | 1493 | 4 | 1580 | 1071-2332 | 395 |
| 19F | 0.08 | 178 | 119-266 | 2372 | 4 | 3392 | 2085-5519 | 848 |
| 23F | 0.05 | 48 | 23-103 | 960 | 4 | 1514 | 889-2577 | 378 |
| 15B | 0.05 | 70 | 51-98 | 1410 | 6 | 1332 | 949-1869 | 210 |
| 22F | 0.10 | 172 | 118-250 | 1811 | 5 | 1304 | 1000-1700 | 279 |
| 33F | 0.12 | 14 | 10-20 | 120 | 54 | 1490 | 1117-1989 | 28 |
| 8 | 0.13 | 144 | 100-207 | 1149 | 4 | 1388 | 988-1949 | 333 |
| 10A | 0.13 | 54 | 31-94 | 433 | 5 | 1129 | 732-1741 | 236 |
| 11A | 0.13 | 178 | 125-254 | 1423 | 7 | 10483 | 6373-17241 | 1434 |
| 12F | 0.08 | 31 | 15-63 | 408 | 4 | 828 | 608-1127 | 191 |

Abbreviations: GMC, geometric mean concentration; CI, confidence interval; LCI, lower confidence interval; UCI, upper confidence interval.

## Example 19

### Evaluation of Cross-Reactive Opsonophagocytic Immune Responses within Serogroup 9 of *Streptococcus pneumoniae*

The pneumococcal opsonophagocytic assay (OPA), which measures killing of *S. pneumoniae* cells by phagocytic effector cells in the presence of functional antibody and complement, is considered to be an important surrogate for evaluating the effectiveness of pneumococcal vaccines.

Materials and Methods

Two randomly selected subsets of immune sera from adults vaccinated with a 13-valent pneumococcal conjugate vaccine (13v PnC) were tested in OPA assays for the serotypes 9V, 9A, 9L and 9N. The sera were collected from U.S. clinical trials 6115A1-004 (N=59, post-vaccinated) and 6115A1-3005 (N=66, matched pre- and post-vaccination), respectively.

Study 6115A1-3005 (ClinicalTrials.gov Identifier: NCT00546572) was a phase 3, randomized, active-controlled, modified double-blind trial evaluating the safety, tolerability, and immunogenicity of PREVNAR 13® compared with a 23-valent pneumococcal polysaccharide vaccine (23vPS) in ambulatory elderly individuals aged 70 years and older who received 1 dose of 23vPS at least 5 years before study enrollment (see: http://clinicaltrials.gov/ct2/show/NCT00546572; accessed on Mar. 31, 2014).

Study 6115A1-004 (ClinicalTrials.gov Identifier: NCT00427895) was a phase 3, randomized, active-controlled, modified double-blind trial evaluating the safety, tolerability, and immunogenicity of a 13-valent pneumococcal conjugate vaccine (13vPnC) compared to a 23-valent pneumococcal polysaccharide vaccine (23vPS) in adults 60 to 64 years old who are naive to 23vPS and the safety, tolerability, and immunogenicity of 13vPnC in adults 18 to 59 years old who are naïve to 23vPS (see: http://clinicaltrials.gov/show/NCT00427895; accessed on Mar. 31, 2014).

The 13-valent pneumococcal conjugate vaccine (13vPnC) tested in these studies contained conjugates from pneumococcal serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F, individually conjugated to diphtheria cross-reacting material 197 ($CRM_{197}$) carrier protein.

OPAs are used to measure functional antibodies in human sera against *S. pneumoniae* serotypes 9V, 9N, 9A and/or 9L. Test serum is set up in assay reactions that measure the ability of capsular polysaccharide specific immunoglobulin to opsonize bacteria, trigger complement deposition, thereby facilitating phagocytosis and killing of bacteria by phagocytes. The OPA titer is defined as the reciprocal dilution that results in a 50% reduction in bacterial count over control wells without test serum. The OPA titer is interpolated from the two dilutions that encompass this 50% killing cut-off.

OPA procedures were based on methods described in Hu et al. (2005) Clin Diagn Lab Immunol 122):287-295. Test heat-inactivated serum was serially diluted 2.5-fold and was added together with the target bacteria in assay plates and incubated for 30 minutes with shaking. Differentiated HL-60 cells (phagocytes) and baby rabbit serum (3- to 4-week old, PEL-FREEZ®, Arkansas, 12.5% final concentration) were then added to the wells, at an approximate effector to target ratio of 200:1, and incubated at 37° C. with shaking. To terminate the reaction, 80 μL of 0.9% NaCl was added to all wells, mixed, and a 10 μL aliquot were transferred to the wells of MULTISCREEN® HTS HV filter plates (MILLIPORE®) containing 200 μL of water. Liquid was filtered through the plates under vacuum, and 150 μL of HYSOY® medium was added to each well and filtered through. The filter plates were then incubated at 37° C., 5% $CO_2$ overnight and were then fixed with Destain Solution (Bio-Rad Labo-

ratories, Inc., Hercules, Calif.). The plates were then stained with Coomassie Blue and destained once. Colonies were imaged and enumerated on a Cellular Technology Limited (CTL) (Shaker Heights, Ohio) IMMUNOSPOT® Analyzer.

Statistical Analysis: Pearson two-tailed correlations were calculated.

Results—OPA Responses in 9V, 9A, 9L and 9N

The cross-functional response from immune sera of adults immunized with 13vPnC against serotypes 9A, 9L, and 9N, was evaluated in the respective microcolony Opsonophagocytic Assays (mcOPAs), along with the homologous functional response to serotype 9V. Two randomly selected subsets of immune sera from adults vaccinated with 13vPnC were tested. The sera were collected from U.S. clinical trials 6115A1-004 (N=59, post-vaccinated) and 6115A1-3005 (N=66, matched pre- and post-vaccination), respectively.

Subjects in study 6115A1-004 were previously naïve to any pneumococcal vaccination and received a single dose of 13vPnC as part of the study protocol. The immune sera from study 6115A1-004 shows a similar percentage of responders for all the serogroups with values of 98.3%, 98.3%, 100% and 93.2% for 9V, 9A, 9L and 9N respectively (FIG. **11**), supporting the results from 6115A1-3005 (FIG. **12**). A relative good OPA titer correlations were observed between serotypes 9V and 9A (Pearson correlation $\rho$=0.5456, p<0.0001) or 9L ($\rho$=0.7353, p<0.0001), but not with 9N ($\rho$=0.1217, p<0.3627).

Subjects in study 6115A1-3005 had previously received 1 dose of 23vPS at least 5 years before study enrollment and received a single dose of 13vPnC as part of the study protocol. Matched pre- and post-vaccination serum panel (N=66) from adults immunized with 13vPnC (study 6115A1-3005) was evaluated on OPA for the homologous response to serotype 9V and for cross-reactivity of anti-9V antibodies to serotypes 9A, 9L, and 9N. As shown in FIG. **12**, a relatively high immunity (percentage responders) to 9V (84%), 9A (66%), 9L (82%) and 9N (86%) was detected in the OPA assay likely due to their previous immunization with 23vPS, which includes unconjugated polysaccharides from serotypes 9V and 9N. However, the percentage responders increased to 95% or more for all four serotypes after vaccination with 13vPnC, which only contains serotype 9V conjugate from serogroup 9. The fold-rise in titer values are shown in Table 23 and are similar between the serotypes also suggesting cross-reactivity.

TABLE 23

OPA Titer Fold-Rise Matched Pre- and Post-Vaccination, 13vPnC

| | OPA Titers | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 9V | | 9A | | 9L | | 9N | |
| | Pre | Post | Pre | Post | Pre | Post | Pre | Post |
| GMT | 221 | 1323 | 41 | 308 | 165 | 706 | 322 | 693 |
| Fold-rise | 5.9 | | 7.5 | | 4.2 | | 2.1 | |

A more comprehensive analysis of the OPA titer distribution is shown in the reverse cumulative distribution curves (RCDC) in FIGS. **13**-**16**. The RCDCs show an increase in serotype-specific immune response post vaccination for serotypes 9V, 9A, 9L and to a lesser extent 9N. The correlation of the fold-rise of titer of individual matched/samples between 9V 9A, 9V/9L, and 9V/9N were also analyzed using Pearson's correlation. Relatively good correlations of fold-rises of titers were observed between serotypes 9V and 9A (Pearson correlation $\rho$=0.8720, p<0.0001) or 9N ($\rho$=0.5801, p<0.0001), but to a lesser extent with 9L ($\rho$=0.1804, p<0.1640).



Conclusion

Based on these data, the 13vPnC vaccine is likely to provide broader serotype coverage by providing additional protection against serotypes 9A, 9L, and 9N.

Example 20

Cross-Functional OPA Responses Between Serotype 15B and Serotype 15C

Pneumococcal serogroup 15 includes four structurally-related serotypes: 15A, 15B, 15C, and 15F. Serotypes 15B and 15C are undistinguishable by genetic typing techniques and have similar capsular polysaccharide (PS) composition, except that the 15B-PS is the O-acetylated variant of 15C-PS. To understand whether anti-capsular PS antibodies for serotype 15B are functionally cross-reacting with serotype 15C, 10 rabbits were immunized with 16vPnC (see example 15) and 20vPnC (see example 16) vaccines both containing an immunogenic conjugate comprising *S. pneumoniae* serotype 15B capsular polysaccharide covalently linked to $CRM_{197}$ as disclosed herein as part of their formulation. Sera from pre- and post-vaccination were tested in OPA assays against serotypes 15B and 15C target pneumococcal strains.

Of the 10 rabbits from each group, 100% had OPA response to serotype 15B following immunization with a serotype 15B conjugate. Of these same samples, 100% had OPA response to serotype 15C as well (Table 24 and Table 25). Low OPA titers were observed in prevaccination sera in 15C OPA. However, over 10-fold GMT OPA titer increase with post vaccination sera compared to pre vaccination demonstrated that the immunogenic conjugates of the invention induces the formation of antibodies capable of killing serotype 15B and 15C *Streptococcus pneumonia* in an OPA.

TABLE 24

OPA Titers Against serotypes 15B and 15C strains in Rabbit Sera Pre and Post vaccination with 16vPnC

| | 15B OPA | | 15C OPA | |
|---|---|---|---|---|
| Animal | wk0 | wk4 | wk0 | wk4 |
| 1 | 4 | 4129 | 50 | 2524 |
| 2 | 4 | 1645 | 182 | 472 |
| 3 | 4 | 1131 | 126 | 818 |
| 4 | 4 | 3199 | 50 | 1189 |
| 5 | 4 | 2664 | 36 | 727 |
| 6 | 4 | 4589 | 68 | 2492 |
| 7 | 11 | 3601 | 169 | 1137 |
| 8 | 4 | 1838 | 165 | 672 |
| 9 | 4 | 1334 | 98 | 528 |
| 10 | 4 | 1108 | 204 | 2425 |
| GMT | 4 | 2222 | 98 | 1075 |

TABLE 25

OPA Titers Against serotypes 15B and 15C strains in Rabbit Sera Pre and Post vaccination with 20vPnC

| | 15B OPA | | 15C OPA | |
|---|---|---|---|---|
| Animal | wk0 | wk4 | wk0 | wk4 |
| 1 | 4 | 3784 | indeterminable* | 2353 |
| 2 | 4 | 862 | 480 | 938 |
| 3 | 4 | 3056 | 69 | 1497 |
| 4 | 4 | 1948 | indeterminable* | 1316 |
| 5 | 4 | 2360 | 4 | 4665 |
| 6 | 4 | 1594 | indeterminable* | 1835 |

TABLE 25-continued

OPA Titers Against serotypes 15B and 15C strains in Rabbit Sera Pre and Post vaccination with 20vPnC

| | 15B OPA | | 15C OPA | |
|---|---|---|---|---|
| Animal | wk0 | wk4 | wk0 | wk4 |
| 7 | 4 | 4943 | 172 | 4085 |
| 8 | 4 | 2419 | 117 | 1458 |
| 9 | 4 | 1245 | indeterminable* | 527 |
| 10 | 4 | 616 | indeterminable* | 545 |
| GMT | 4 | 1917 | 77 | 1515 |

*Titer cannot be determined due to bad killing curves

All publications and patent applications mentioned in the specification are indicative of the level of those skilled in the art to which this invention pertains. All publications and patent applications are hereby incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

Although the foregoing invention has been described in some detail by way of illustration and example for purposes of clarity of understanding, certain changes and modifications may be practiced within the scope of the appended claims.

SEQUENCE LISTING

```
<160> NUMBER OF SEQ ID NOS: 40

<210> SEQ ID NO 1
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: "A class" CpG oligonucleotide

<400> SEQUENCE: 1

ggggacgacg tcgtgggggg g                                                21


<210> SEQ ID NO 2
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: "A class" CpG oligonucleotide

<400> SEQUENCE: 2

ggggacgacg tcgtgggggg g                                                21


<210> SEQ ID NO 3
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: "B class" CpG oligonucleotide

<400> SEQUENCE: 3

tcgtcgtttt tcggtgcttt t                                                21


<210> SEQ ID NO 4
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: "B class" CpG oligonucleotide

<400> SEQUENCE: 4

tcgtcgtttt tcggtcgttt t                                                21


<210> SEQ ID NO 5
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: "B class" CpG oligonucleotide

<400> SEQUENCE: 5
```

-continued

tcgtcgtttt gtcgttttgt cgtt 24

<210> SEQ ID NO 6
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: "B class" CpG oligonucleotide

<400> SEQUENCE: 6

tcgtcgtttc gtcgttttgt cgtt 24

<210> SEQ ID NO 7
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: "B class" CpG oligonucleotide

<400> SEQUENCE: 7

tcgtcgtttt gtcgtttttt tcga 24

<210> SEQ ID NO 8
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: B-Class oligonucleotide

<400> SEQUENCE: 8

tcgtcgtttt tcggtgcttt t 21

<210> SEQ ID NO 9
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: B-Class oligonucleotide

<400> SEQUENCE: 9

tcgtcgtttt tcggtcgttt t 21

<210> SEQ ID NO 10
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: B-Class oligonucleotide

<400> SEQUENCE: 10

tcgtcgtttt gtcgttttgt cgtt 24

<210> SEQ ID NO 11
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: B-Class oligonucleotide

<400> SEQUENCE: 11

tcgtcgtttc gtcgttttgt cgtt 24

<210> SEQ ID NO 12
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence

<220> FEATURE:
<223> OTHER INFORMATION: B-Class oligonucleotide

<400> SEQUENCE: 12

tcgtcgtttt gtcgtttttt tcga 24

<210> SEQ ID NO 13
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 13

tcgcgtcgtt cggcgcgcgc cg 22

<210> SEQ ID NO 14
<211> LENGTH: 23
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 14

tcgtcgacgt tcggcgcgcg ccg 23

<210> SEQ ID NO 15
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 15

tcggacgttc ggcgcgcgcc g 21

<210> SEQ ID NO 16
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 16

tcggacgttc ggcgcgccg 19

<210> SEQ ID NO 17
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 17

tcgcgtcgtt cggcgcgccg 20

<210> SEQ ID NO 18
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 18

tcgacgttcg gcgcgcgccg 20

<210> SEQ ID NO 19
<211> LENGTH: 18
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 19

tcgacgttcg gcgcgccg 18

<210> SEQ ID NO 20
<211> LENGTH: 18
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 20

tcgcgtcgtt cggcgccg 18

<210> SEQ ID NO 21
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 21

tcgcgacgtt cggcgcgcgc cg 22

<210> SEQ ID NO 22
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 22

tcgtcgtttt cggcgcgcgc cg 22

<210> SEQ ID NO 23
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 23

tcgtcgtttt cggcggccgc cg 22

<210> SEQ ID NO 24
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 24

tcgtcgtttt acggcgccgt gccg 24

<210> SEQ ID NO 25
<211> LENGTH: 23
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C class CpG Oligonucleotide

<400> SEQUENCE: 25

tcgtcgtttt cggcgcgcgc cgt 23

<210> SEQ ID NO 26
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotides

<400> SEQUENCE: 26

tcgcgtcgtt cggcgcgcgc cg 22

<210> SEQ ID NO 27
<211> LENGTH: 23
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 27

tcgtcgacgt tcggcgcgcg ccg 23

<210> SEQ ID NO 28
<211> LENGTH: 21
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 28

tcggacgttc ggcgcgcgcc g 21

<210> SEQ ID NO 29
<211> LENGTH: 19
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 29

tcggacgttc ggcgcgccg 19

<210> SEQ ID NO 30
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 30

tcgcgtcgtt cggcgcgccg 20

<210> SEQ ID NO 31
<211> LENGTH: 20
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 31

tcgacgttcg gcgcgcgccg 20

<210> SEQ ID NO 32

<211> LENGTH: 18
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 32

tcgacgttcg gcgcgccg 18

<210> SEQ ID NO 33
<211> LENGTH: 18
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 33

tcgcgtcgtt cggcgccg 18

<210> SEQ ID NO 34
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 34

tcgcgacgtt cggcgcgcgc cg 22

<210> SEQ ID NO 35
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 35

tcgtcgtttt cggcgcgcgc cg 22

<210> SEQ ID NO 36
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 36

tcgtcgtttt cggcggccgc cg 22

<210> SEQ ID NO 37
<211> LENGTH: 24
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 37

tcgtcgtttt acggcgccgt gccg 24

<210> SEQ ID NO 38
<211> LENGTH: 23
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: C-Class oligonucleotide

<400> SEQUENCE: 38

```
tcgtcgtttt cggcgcgcgc cgt                                              23


<210> SEQ ID NO 39
<211> LENGTH: 23
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: P class CpG oligonucleotide

<400> SEQUENCE: 39

tcgtcgacga tcggcgcgcg ccg                                              23


<210> SEQ ID NO 40
<211> LENGTH: 23
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: P class CpG oligonucleotide

<400> SEQUENCE: 40

tcgtcgacga tcggcgcgcg ccg                                              23
```

The invention claimed is:

1. An immunogenic composition comprising a *Streptococcus pneumoniae* serotype 22F glycoconjugate, wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and a carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.

2. The immunogenic composition of claim **1**, wherein the glycoconjugate comprises at least 0.1 mM acetate per mM polysaccharide.

3. The immunogenic composition of claim **1**, wherein the composition further comprises a *S. pneumoniae* serotype 15B glycoconjugate and a *S. pneumoniae* serotype 33F glycoconjugate.

4. The immunogenic composition of claim **3**, wherein the composition further comprises a *S. pneumoniae* serotype 12F glycoconjugate, a *S. pneumoniae* serotype 10A glycoconjugate, a *S. pneumoniae* serotype 11A glycoconjugate and a *S. pneumoniae* serotype 8 glycoconjugate.

5. The immunogenic composition of claim **1** further comprising glycoconjugates from *S. pneumoniae* serotypes 4, 6B, 9V, 14, 18C, 19F and 23F.

6. The immunogenic composition of claim **1** further comprising glycoconjugates from *S. pneumoniae* serotypes 1, 5 and 7F.

7. The immunogenic composition of claim **1** further comprising glycoconjugates from *S. pneumoniae* serotypes 6A and 19A.

8. The immunogenic composition of claim **1** further comprising at least one glycoconjugate from *S. pneumoniae* serotype 3.

9. The immunogenic composition of claim **1**, wherein the immunogenic composition is an 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 or 20-valent pneumococcal conjugate composition.

10. The immunogenic composition of claim **1**, wherein the carrier protein is selected from the group consisting of DT (Diphtheria toxin), TT (tetanus toxoid), CRM197, other DT mutants, PD (*Haemophilus influenzae* protein D), and immunologically functional equivalents thereof.

11. The immunogenic composition of claim **1**, wherein said immunogenic composition further comprises a buffer, a salt, a divalent cation, a non-ionic detergent, a cryoprotectant, an anti-oxidant, or a combination thereof.

12. The immunogenic composition of claim **11**, wherein the composition further comprises a buffer.

13. The immunogenic composition of claim **12**, wherein the buffer is phosphate, succinate, histidine or citrate.

14. A syringe filled with the immunogenic composition of claim **1**.

15. The syringe of claim **14**, wherein the syringe is siliconized or made of glass.

16. The immunogenic composition of claim **10**, wherein said carrier protein is $CRM_{197}$.

17. The immunogenic composition of claim **16**, wherein said polysaccharide is individually conjugated to $CRM_{197}$.

18. The immunogenic composition of claim **1**, wherein each dose of said immunogenic composition comprises 0.1 μg to 100 μg of the polysaccharide.

19. The immunogenic composition of claim **1**, wherein each dose of said immunogenic composition comprises 10 μg to 150 μg of the carrier protein.

20. The immunogenic composition of claim **1**, wherein said immunogenic composition further comprises an antigen from other pathogens.

21. The immunogenic composition of claim **20**, wherein said antigen is selected from the group consisting of a diphtheria toxoid (D), a tetanus toxoid (T), a pertussis antigen (P), an acellular pertussis antigen (Pa), a hepatitis B virus (HBV) surface antigen (HBsAg), a hepatitis A virus (HAV) antigen, a conjugated *Haemophilus influenzae* type b capsular saccharide (Hib), and an inactivated poliovirus vaccine (IPV) antigen.

22. The immunogenic composition of claim **1**, wherein said immunogenic composition further comprises a conjugated *N. meningitidis* serogroup A capsular saccharide (MenA), a conjugated *N. meningitidis* serogroup W135 capsular saccharide (MenW135), a conjugated *N. meningitidis* serogroup Y capsular saccharide (MenY), or a conjugated *N. meningitidis* serogroup C capsular saccharide (MenC).

**23**. The immunogenic composition of claim **1**, wherein said immunogenic composition further comprise at least one adjuvant.

**24**. The immunogenic composition of claim **23**, wherein said at least one adjuvant is selected from the group consisting of aluminum, calcium phosphate, a liposome, an oil-in-water emulsion, and poly(D,L-lactide-co-glycolide) (PLG) microparticles or nanoparticles.

**25**. The immunogenic composition of claim **24**, wherein said adjuvant is an aluminum adjuvant selected from the group consisting of aluminum phosphate, aluminum sulfate and aluminum hydroxide.

**26**. The immunogenic composition of claim **23**, wherein said at least one adjuvant is a CpG Oligonucleotide.

**27**. The immunogenic composition of claim **1**, wherein said immunogenic composition is formulated in liquid form.

**28**. The immunogenic composition of claim **1**, wherein said immunogenic composition is formulated in a lyophilized form.

**29**. A container filled with the immunogenic composition of claim **1**.

**30**. A method of preventing, treating or ameliorating an infection, disease or condition associated with *S. pneumoniae* in a subject comprising administering to the subject an effective amount of the immunogenic composition of claim **1**.

**31**. A method of preventing an infection caused by *S. pneumoniae* in a subject comprising administering to the subject an effective amount of the immunogenic composition of claim **1**.

**32**. The method of claim **30**, wherein the subject is a human being less than 2 years of age.

**33**. The method of claim **30**, wherein the subject is a human adult 50 years of age or older.

**34**. The method of claim **30**, wherein the subject is an immunocompromised human.

**35**. The method of claim **30**, wherein the immunogenic composition is administered in a single dose schedule.



**36**. The method of claim **30**, wherein the immunogenic composition is administered in a multiple dose schedule.

**37**. A method of inducing an immune response to *S. pneumoniae* serotype 22F in a subject comprising the step of administering an effective amount of the immunogenic composition of claim **1**.

**38**. The immunogenic composition of claim **1**, wherein at least 30% of the glycoconjugates have a $K_d$ below or equal to 0.3 in a CL-4B column.

**39**. The immunogenic composition of claim **1**, wherein the glycoconjugates comprise less than about 50% of free polysaccharide compared to a total amount of polysaccharide.

**40**. The immunogenic composition of claim **1**, wherein a ratio of mM acetate per mM polysaccharide in the glycoconjugate to mM acetate per mM isolated polysaccharide is at least 0.6.

**41**. The immunogenic composition of claim **1**, wherein said glycoconjugate is prepared using reductive amination.

**42**. The immunogenic composition of claim **41**, wherein said reductive amination comprises:

(a) oxidation of the polysaccharide to form an activated polysaccharide and

(b) reduction of the activated polysaccharide and a carrier protein to form the glycoconjugate.

**43**. The immunogenic composition of claim **42**, wherein the ratio of mM acetate per mM polysaccharide in the glycoconjugate to mM acetate per mM polysaccharide in the activated polysaccharide is at least 0.6.

**44**. The immunogenic composition of claim **1**, wherein the degree of conjugation of said glycoconjugate is between 2 and 15.

**45**. The immunogenic composition of claim **1**, wherein the polysaccharide has a molecular weight of between 10 kDa and 2,000 kDa.

* * * * *

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32.

_X__ The brief contains 13,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b), or

____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

_X_ The brief has been prepared in a proportionally spaced typeface using Microsoft Word in a 14 point Times New Roman font or

____ The brief has been prepared in a monospaced typeface using ________ ______in a ___ characters per inch_________ font.

Dated: July 18, 2022

/s/ John Scheibeler
John Scheibeler
*Attorney for Appellant Pfizer Inc.*