**2019-1871, 2019-1873, 2019-1875, 2019-1876 and 2019-2224**

# United States Court of Appeals for the Federal Circuit

PFIZER INC.,

*Appellant,*

– v. –

SANOFI PASTEUR INC., SK CHEMICALS CO., LTD.,

*Appellees.*

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,

*Intervenor.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2017-02131, IPR2017-02132, IPR2017-02136, IPR2017-02138, IPR2018-00187*

## BRIEF FOR APPELLEES

JOHN E. ROBERTS
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600
jroberts@proskauer.com

SIEGMUND Y. GUTMAN
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 557-2900
sgutman@proskauer.com

*Counsel for Appellees*

COUNSEL PRESS, LLC (888) 277-3259

Patent Claims at Issue

1. An immunogenic composition comprising a Streptococcus pneumoniae serotype 22F glycoconjugate, wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from S. pneumoniae serotype 22F and a carrier protein, and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.

3. The immunogenic composition of claim 1, wherein the composition further comprises a S. pneumoniae serotype 15B glycoconjugate and a S. pneumoniae serotype 33F glycoconjugate.

4. The immunogenic composition of claim 3, wherein the composition further comprises a S. pneumoniae serotype 12F glycoconjugate, a S. pneumoniae serotype 10A glycoconjugate, a S. pneumoniae serotype 11 A glycoconjugate and a S. pneumoniae serotype 8 glycoconjugate.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2019-1871, 2019-1873, 2019-1875, 2019-1876, 2019-2224

**Short Case Caption** Pfizer Inc. v. Sanofi Pasteur Inc.

**Filing Party/Entity** Sanofi Pasteur Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/13/2022

Signature: /s/Siegmund Y. Gutman

Name: Siegmund Y. Gutman

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Sanofi Pasteur Inc. | | Sanofi S.A. |
| SK Chemicals Co., Ltd. | SK Bioscience Co., Ltd. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| Gerald E. Worth<br>Proskauer Rose LLP | Christine G. Espino<br>Proskauer Rose LLP | S. James Boumil<br>Proskauer Rose LLP |
| Fangli Chen<br>Proskauer Rose LLP | Kimberly Q. Li<br>Proskauer Rose LLP | Tara R. Melillo<br>Proskauer Rose LLP |
| David M. Hanna<br>Proskauer Rose LLP | Amir A. Naini<br>Proskauer Rose LLP | Christopher J. Spadaro<br>Proskauer Rose LLP |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Merck Sharp & Dohme Corp. v. Pfizer Inc. & Wendy J. Watson, Case No. 2:19-cv-02011-JS (E.D. Pa.) | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Erin J. Short<br>Proskauer Rose LLP | Jiang Lin<br>Sanofi Pasteur Inc. | Siew Chong<br>Sanofi Pasteur Inc. |
| Patricia Callanan<br>Sanofi Pasteur Inc. | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page No.

STATEMENT OF RELATED CASES ..... v

PRELIMINARY STATEMENT ..... 1

STATEMENT OF ISSUES ..... 4

STATEMENT OF THE CASE ..... 4

A. The ’559 Patent ..... 4

B. The Prior Art ..... 5
1. GSK-711 ..... 6
2. Merck-086 ..... 7
3. Hausdorff ..... 8

C. Procedural History ..... 9
1. Merck’s IPRs ..... 9
2. Sanofi’s IPR ..... 10
a. Claim 1 ..... 10
b. Claims 3 and 4 ..... 15
c. Claims 46-52 and Pfizer’s Motion to Amend ..... 15

SUMMARY OF ARGUMENT ..... 18

ARGUMENT ..... 21

STANDARD OF REVIEW ..... 21

I. THE BOARD’S FINDING THAT CLAIM 1 IS OBVIOUS IS SUPPORTED BY SUBSTANTIAL EVIDENCE. ..... 22

A. Pfizer Does Not Challenge the Board’s Findings Concerning Motivation to Combine and Reasonable Expectation of Success. ..... 24

B. Pfizer’s “Optimization” Arguments Fail in Any Event. ..... 30

1. There Is Substantial Evidence that Conjugate Molecular Weight Is a Result-Effective Variable. ....................................32

2. The Prior Art Discloses Conjugate Molecular Weights that Overlap with the Claimed Molecular Weight Range. .......40

C. The Board Considered the ’559 Patent Claims as a Whole. ...............45

II. THE BOARD’S FINDING THAT CLAIMS 3 AND 4 ARE OBVIOUS IS SUPPORTED BY SUBSTANTIAL EVIDENCE. ................47

III. THE BOARD DID NOT ABUSE ITS DISCRETION WHEN IT DENIED PFIZER’S MOTION TO AMEND. ............................................53

A. The Board’s Finding that Claim 46 Is Obvious Is Supported by Substantial Evidence. ..........................................................................53

B. The Board’s Finding that Claims 48-49 Are Obvious Is Supported by Substantial Evidence. ....................................................61

IV. THE PROCEDURE FOR DIRECTOR REVIEW OF IPR DECISIONS IS NOT SUBJECT TO NOTICE-AND-COMMENT RULEMAKING. ........................................................................................63

CONCLUSION .........................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Almirall, LLC v. Amneal Pharms. LLC*,
28 F.4th 265 (Fed. Cir. 2022) ....................29, 41

*Am. Hosp. Ass'n v. Bowen*,
834 F.2d 1037 (D.C. Cir. 1987)....................21, 64

*Batterton v. Marshall*,
648 F.2d 694 (D.C. Cir. 1980)....................65

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018) ....................32, 33, 36, 38

*Ethicon LLC v. Intuitive Surgical, Inc.*,
No. 2021-1995, 2022 WL 1613188 (Fed. Cir. 2022)....................24

*Genentech, Inc. v. Hospira, Inc.*,
946 F.3d 1333 (Fed. Cir. 2020) ....................36

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ....................32, 36

*In re DBC*,
545 F.3d 1373 (Fed. Cir. 2008) ....................51, 62

*In re Haase*,
542 F. App'x 962 (Fed. Cir. 2013)....................32

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002) ....................22

*In re Magnum Oil Tools*,
829 F.3d 1364 (Fed. Cir. 2016) ....................31

*Inova Alexandria Hosp. v. Shalala*,
244 F.3d 342 (4th Cir. 2001) ....................21, 64

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................passim

*JEM Broad., Inc. v. FCC*,
22 F.3d 320 (D.C. Cir. 1994) ............................................................................64

*Nike, Inc. v. Adidas AG*,
No. 21-1903, 2022 WL 4002668 (Fed. Cir. 2022) ............................................52

*Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*,
24 F.4th 1406 (Fed. Cir. 2022) ..........................................................................21

*Regents of Univ. of Cal. v. Broad Institute, Inc.*,
903 F.3d 1286 (Fed. Cir. 2018) ..................................................................40, 42

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ........................................................................23

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
8 F.4th 1349 (Fed. Cir. 2021) ..........................................................................21

*United States v. Arthrex, Inc.*,
141 S. Ct. 1970 (2021)......................................................................................63

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952)...........................................................................................62

*Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*,
955 F.3d 25 (Fed. Cir. 2020) .......................................................................41, 42

*VidStream LLC v. Twitter, Inc.*,
981 F.3d 1060 (Fed. Cir. 2020) ........................................................................21

**STATUTES**

5 U.S.C. § 553(b)(3)(A)...............................................................3, 20, 63, 64

**OTHER AUTHORITIES**

87 Fed. Reg. 43,249 (Jul. 20, 2022)....................................................................65

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Petitioners-Appellees state that no other appeal from this civil action was previously before this or any other appellate court, and no case in this Court or any other court or agency will directly affect, or be directly affected by, the decision in this appeal.

## PRELIMINARY STATEMENT

In an 88-page decision replete with citations to the record, the Patent Trial and Appeal Board (the "Board") of the U.S. Patent and Trademark Office (the "PTO") found that all the claims of United States Patent No. 9,492,559 (the '559 patent) were invalid as obvious in light of the prior art. Appellant Pfizer Inc. asks this Court to overturn the Board's obviousness findings on the ground that they are supposedly not supported by substantial evidence. The Board's findings have overwhelming support in the record, however, and should be summarily affirmed. In arguing for reversal, Pfizer merely cites the same evidence and rehashes the same arguments that were presented to the Board and rejected.

Claim 1 of the '559 patent is directed toward a vaccine for pneumonia comprising a conjugate of a particular polysaccharide serotype where the conjugate's molecular weight falls within a particular range. Pfizer does not challenge the Board's finding that each limitation of Claim 1 is expressly disclosed in the prior art except for the precise range of molecular weight claimed. After considering the extensive evidence presented by both parties, the Board found that Claim 1 was obvious for two independent reasons: (i) a POSA would have been motivated to develop an immunogenic composition where the molecular weight of the claimed conjugate falls within the claimed range and would have reasonably expected to succeed at doing so; and (ii) a presumption of obviousness applied

because the claimed molecular weight is a result-effective variable and the molecular weights disclosed in the prior art overlapped with the range covered by Claim 1.

In its opening brief, Pfizer challenges only the second ground for the Board's obviousness finding. The finding of obviousness can therefore be affirmed on the first ground without any further analysis. The second ground is supported by overwhelming record evidence in any event. Pfizer complains that the Board should not have credited expert testimony showing that molecular weights disclosed in the prior art overlapped with the range covered by Claim 1. But it was the Board's prerogative to credit one side's expert over the other's. Pfizer may wish that the Board was persuaded by its expert evidence, but that does not mean that the Board's obviousness finding was not supported by substantial evidence.

Pfizer's contentions concerning the other claims found obvious by the Board follow the same pattern. In each instance, Pfizer points to evidence that it claims supports its position and argues that the Board's decision was therefore not supported by substantial evidence. But that is not how the substantial evidence standard works. As catalogued below, each of the Board's obviousness findings is amply supported by the prior art, expert testimony presented by Appellees, and even the testimony of Pfizer's own experts. The Board systematically explained

why the evidence supports its findings. There is no reason for this Court to overturn the Board's well-supported and well-reasoned decision.

Lacking any basis for challenging the Board's factual findings, Pfizer resorts to cherry-picking words from the Board's extensive decision out of context to argue for "legal error." For example, Pfizer contends that the Board misallocated the burden of proof to Pfizer. But that is simply not true. The Board explained that "Petitioner bears the burden of proving unpatentability of the challenged claims, and that burden never shifts to Patent Owner." Appx282 (citing *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015)). And the Board's analysis makes clear that Appellees at all times bore the burden of proof. Just because the Board rejected specific arguments proffered by Pfizer as "unpersuasive" does not mean that Pfizer bore the burden of proof.

Pfizer's final gambit is to argue that the PTO's procedure for Director review of Board decisions following the Supreme Court's *Arthrex* decision is invalid because it was not promulgated following notice and comment from the public. But the law is clear that rules governing agency procedure are not subject to notice-and-comment rulemaking. 5 U.S.C. § 553(b)(3)(A). The Director properly exercised discretion not to review the Board's decision in this case. The Board's well-supported decision should be affirmed.

## STATEMENT OF ISSUES

1. Was the Board's finding that Claim 1 of the '559 patent was obvious supported by substantial evidence?

2. Was the Board's finding that dependent Claims 3 and 4 of the '559 patent were obvious supported by substantial evidence?

3. Did the Board act within its discretion when it denied Pfizer's motion to amend?

4. Is the PTO Director's procedure for reviewing Board decisions subject to notice-and-comment rulemaking under the Administrative Procedure Act?

## STATEMENT OF THE CASE

### A. The '559 Patent

The '559 patent is directed toward immunogenic compositions that include *Streptococcus pneumonia* polysaccharide serotypes conjugated to a carrier protein. Appx24176-24265. Independent Claim 1 requires that this immunogenic composition include a serotype 22F glycoconjugate with a molecular weight between 1000 kDa and 12,500 kDa and a polysaccharide-to-carrier-protein ratio (w/w) between 0.4 and 2.0. Appx24264-24265.

Several dependent claims require that the immunogenic composition include conjugates of additional polysaccharide serotypes. For example, Claim 3 requires

that conjugates of serotypes 15B and 33F are also included, and Claim 4 additionally requires serotypes 8, 10A, 11A, and 12F. Appx24264.

The ’559 patent teaches that the 22F serotype can be conjugated to a specific carrier protein, $CRM_{197}$, using a technique called reductive amination. Appx24204, Appx24251. The patent further discloses that 22F conjugates can be produced using another technique, called CDAP, and using other carrier proteins, including PhtD. Appx24196, Appx24203-24204.

### B. The Prior Art

Vaccines against pneumococcal bacteria have long been available. Appx24899-24905. These vaccines use polysaccharides present on the surface of the bacteria to generate antibodies. Appx24899. Different strains of bacteria can have different polysaccharides present on their surfaces; these are referred to as serotypes. Appx24899-24900. A vaccine containing different serotypes is called a multivalent vaccine. Appx24900. For example, Pneumovax23®, a vaccine available since 1983, is a 23-valent vaccine—it includes 23 different serotypes. Appx24900.

Polysaccharides alone do not generate a strong immune response in infants and the elderly, however. Appx24900-24901. To overcome that limitation, the polysaccharide can be conjugated to a protein, referred to as a carrier protein. Appx24901. This conjugate vaccine technology has existed for decades.

Prevnar®, a 7-valent conjugate pneumococcal vaccine, was licensed over 20 years ago; it was followed in 2013 by Prevnar®13, a 13-valent vaccine. Appx24901-24902. The '559 patent claims glycoconjugate compositions that include serotypes that were previously known (*e.g.*, in Pneumovax23®) but not included in Prevnar®13. *See* Appx29941, Appx24959-24962.

### *1. GSK-711*

GSK-711 is an International Patent Publication published in June 2007. Appx25003-25097. GSK-711 is directed toward multivalent *Streptococcus pneumonia* conjugate vaccines that include a 22F serotype conjugate. Appx25003. It describes two working examples of immunogenic 22F glycoconjugates having a specific carrier protein, PhtD, and discloses that the inventors were able to create 13-valent vaccines using either of these 22F-PhtD conjugates. Appx25056.

Table 2 of GSK-711 reports certain characteristics of these two 22F conjugates and twelve other conjugates made up of different serotypes and carrier proteins. Appx25056. According to Table 2, one of the 22F conjugates has a polysaccharide-to-carrier-protein ratio of 0.46. *Id.*[1] GSK-711 explains that this ratio can range from 0.4 to 2.0 w/w. Appx25022.[2]

[1] This is reported as a carrier-protein-to-polysaccharide ratio of 2.17.

[2] This is reported as a carrier-protein-to-polysaccharide ratio ranging from 1:2 to 2.5:1.

Table 2 discloses the molecular weights for ten of the conjugates. Appx25056. Those weights range from 1303 kDa to 9572 kDa. Appx25056. GSK-711 also teaches that a single polysaccharide can weigh as much as 1600 kDa. Appx25085. Table 2 does not disclose the average molecular weight for the two 22F conjugates. Appx25056.

GSK-711 describes the conjugation conditions for both 22F conjugates. Appx25052-25054. Although the inventors used the CDAP technique to create their glycoconjugates, GSK-711 explains that other techniques, including reductive amination, can be used and that $CRM_{197}$ can be used as the carrier. Appx25008, Appx25019. GSK-711 provides that its multivalent conjugate vaccines can include the following serotypes: 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C, 19A, 19F, 20, 22F, 23F and 33F. Appx25009-25010.

***2. Merck-086***

Merck-086 is a United States Patent Application published August 11, 2011. Appx25098-25114. It is directed toward a 15-valent *Streptococcus pneumonia* vaccine that includes a serotype 22F glycoconjugate. Appx25102. The 15-valent vaccine described in Merck-086 includes conjugates of all seven serotypes originally included in Prevnar®, along with eight additional serotypes. Appx25111-25112. The 15 serotypes included are: 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F, and 33F, each conjugated to $CRM_{197}$. Appx25102. The

15-valent vaccine can be formulated to include an aluminum-based adjuvant. Appx25102. The vaccine was able to induce an immune response in animals for all fifteen serotypes, including 22F. Appx25110-25113. When the vaccine was studied in New Zealand White Rabbits, it elicited serum IgG levels "comparable" to those elicited by Prevnar® for all seven serotypes found in Prevnar®. Appx25111-25113. The test arms for the additional eight serotypes showed at least a 1-log increase above baseline in serum IgG level. Appx25111-25113. Two out of four test arms showed a greater than 2-log increase for five out of the eight serotypes, including 22F. Appx25111 (Table 4).

#### ***3. Hausdorff***

Hausdorff is a U.S. Patent Application published September 20, 2012. Appx28152-28173. It is directed to a 13-valent *Streptococcus pneumonia* vaccine that includes serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F, each conjugated to a $CRM_{197}$ carrier and formulated to include an aluminum adjuvant. Appx28156. These same thirteen serotypes are included in Prevnar®13. Appx29789-29780. Hausdorff demonstrates that this 13-valent vaccine could produce a more than 2-log increase in serum IgG levels in New Zealand White Rabbits across all serotypes following administration of two equal doses. Appx28170.

### C. Procedural History

#### *1. Merck's IPRs*

In September 2017, Merck filed four petitions for *inter partes* review of the '559 patent. Appx760-841, Appx7508-7592, Appx14392-14472, Appx19003-19084. Two of those petitions challenged Claims 1-10, 16-19, and 38-45. Appx1, Appx82. The other two challenged Claims 11-15 and 20-37. Appx161, Appx217. In support of its petitions, Merck relied on GSK-2008 and Merck-2011, which are nearly identical to GSK-711 and Merck-086.

The Board instituted review and found all of the claims invalid as obvious. Appx1-81, Appx82-160, Appx161-216, Appx217-271. With respect to Claim 1, the Board found that "[b]ased on the GSK 2008 disclosure of pneumococcal conjugates between 1,303-9,572 kDa, a POSITA would have been motivated with a reasonable expectation of success to construct the serotype 22F conjugate of Merck 2011/GSK 2008 in that approximate molecular weight range." Appx15 (citing Appx806). In reaching that finding, the Board credited testimony from Merck's expert, Dr. Kasper, that a POSA would have been motivated to seek glycoconjugates within the claimed weight range because larger conjugates are difficult to filter and can be less immunogenic. Appx17 (citing Appx1623-1624). Dr. Kasper further explained that because the structure of serotype 22F had been known since the 1980s, a POSA would have understood how to use routine

experimentation to create 22F glycoconjugates that fall within the claimed molecular weight range. Appx18 (citing Appx1625).

### *2. Sanofi's IPR*

In November 2017, Sanofi filed its own petition for *inter partes* review challenging Claims 1-45 of the '559 patent. Appx24081-24175. The Board instituted review, and on June 3, 2019, issued its Final Written Decision, finding all claims invalid as obvious and denying Pfizer's motion to amend. Appx272-360.

#### a. Claim 1

The Board first found that Claim 1 of the '559 patent was obvious over GSK-711 and Merck-086. Appx283. The Board began its analysis by summarizing Sanofi's characterization of GSK-711 and Merck-086 as supported by its expert, Dr. Lees. Appx283-289. As the Board explained, Sanofi presented evidence showing that (i) both references disclose immunogenic, multivalent vaccines comprising 22F glycoconjugates; (ii) GSK-711 disclosed a 22F conjugate with a carrier-to-protein ratio that falls within the claimed range; and (iii) a POSA would have been motivated, with a reasonable expectation of success, to make an immunogenic composition comprising a 22F conjugate with a molecular weight within the claimed range. Appx286-287 (citing Appx24097-24098, Appx24113-24117, Appx24128-24132).

According to the Board, Dr. Lees testified that Table 2 of GSK-711 disclosed the molecular weights of ten serotypes, "all of which fall within and span most of" the range described in Claim 1. Appx287 (citing Appx24946). The Board went on to summarize Dr. Lees' testimony that a POSA would have reasonably expected that—like those ten other serotypes—the molecular weights of the two 22F conjugates described in Table 2 of GSK-711 would fall within the claimed range. Appx287-288 (citing Appx24947).

As the Board explained, Dr. Lees further testified that a POSA would have expected the 22F conjugates from Table 2 of GSK-711 to have an average molecular weight of at least 1000 kDa, the lower limit of Claim 1. Appx288 (citing Appx24947-24950). Taking into account that GSK-711 discloses a 22F conjugate where the polysaccharide itself can weigh 1600 kDa (Appx25085, cl.61), the Board found that the 22F conjugates disclosed in GSK-711 would have a molecular weight greater than 1000 kDa. Appx284, Appx308.

The Board further found that a POSA would have expected those same 22F conjugates to have an average molecular weight lower than 12,500 kDa because the size-exclusion column used to purify the conjugates of Table 2, including the 22F conjugates, was designed to work best with proteins weighing less than 8,000 kDa. Appx288 (citing Appx24950-24951). According to Dr. Lees, a POSA would have been motivated to make glycoconjugates within a range of 1,000 kDa to

12,500 kDa because conjugates falling outside that range can be difficult to filter or purify and can affect immunogenicity. Appx288 (citing Appx24952-24954).

The Board also favorably cited Dr. Lees' testimony that a POSA would have had a reasonable expectation of success in making a 22F conjugate with a molecular weight within the claimed range, especially considering that Table 2 of GSK-711 already disclosed ten other conjugates with weights falling within that range. Appx288-289 (citing Appx24955-24958).

Having thus summarized Sanofi's and Dr. Lees' positions, and "having reviewed the cited evidence, and the record as a whole," the Board found that "Petitioner has accurately described the above stated teachings of GSK-711 and Merck-086." Appx289. The Board thus "adopt[ed] as [its] own" the positions advanced by Sanofi. Appx289 (citing Appx24126-24146).

The Board then spent nearly thirty pages rejecting as contrary to the record various arguments raised by Pfizer. Appx289-317. The Board first rejected Pfizer's contention that neither GSK-711 nor Merck-086 expressly disclose the molecular weight for a 22F conjugate. Appx289-290. The Board explained that the other conjugates in Table 2 of GSK-711 "exemplif[y] a range of conjugate sizes," all falling within the range of Claim 1. Appx293 (citing Appx25056). Furthermore, the Board found that both GSK-711 and Merck-806 taught an upper limit on conjugate size because each recognized that glycoconjugates should be

small enough to be filterable through a 0.2 micron filter. Appx292 (citing Appx25108), Appx294 (citing Appx25015-25016). The Board also explained that both Merck-086 and GSK-711 disclosed methods to control polysaccharide size, and GSK-711 provided a reason to do so—conjugates with larger saccharides provide a good immune response and stability. Appx292-294 (citing Appx25015-25017). As the Board observed, GSK-711 also reports that a single polysaccharide can have a pre-conjugation molecular weight exceeding 1000 kDa. Appx293 (citing Appx25016). Based on that evidence, the Board found that a POSA would prefer conjugates with molecular weights falling within a range that overlaps with the range recited in Claim 1. Appx294 (citing Appx25015-25017, Appx25056-25057).

The Board next rejected Pfizer's argument that a POSA would be unable to optimize molecular weight. *See* Appx290-291. The Board cited Pfizer's expert, Dr. Wang, who acknowledged that "chemists have all kinds of tricks" to "really control" conjugation reactions. Appx296 (citing Appx30375-30376). The Board further noted that Dr. Wang failed to provide any evidence that the inventors of the '559 patent had difficulty optimizing conjugate size. Appx296-297 (citing Appx30379-30383). The Board went on to credit Dr. Kasper's testimony that a POSA "would have required only routine experimentation to obtain a conjugate molecular weight within the desirable range," and Dr. Lees' explanation of specific

techniques a POSA would have known to use to optimize molecular weight. Appx297-298 (citing Appx24955-24966, Appx29193-29194, Appx29199, Appx28334-28336). The Board also found that an article called "Lees-2008" explained which parameters a POSA could vary to optimize molecular weight. Appx298-299 (citing Appx25122-25123).

The Board next addressed calculations by Dr. Lees showing that the smallest 22F-PhtD conjugate from GSK-711 would have an average molecular weight of at least 1000 kDa, which is above the lower limit of Claim 1. Appx301-310. After assessing the evidence, the Board credited Dr. Lees' calculations and rejected Pfizer's critiques of his method. *Id.* The Board found that Dr. Lees had "persuasively explained" his calculations, which provided "some additional evidence" that the claimed range was obvious. Appx302, Appx306 (citing Appx24948-24950, Appx30487, Appx30540-30541).

The Board also rejected Pfizer's argument that a POSA would not have expected the 22F conjugates of Table 2 in GSK-711 to have an average molecular weight lower than 12,500 kDa, as required by Claim 1, based on the columns used to purify and characterize the conjugates. Appx299 (citing Appx28989). Citing testimony from Dr. Lees, the Board explained that because these same columns were used to purify and characterize the other conjugates described in Table 2—all of which had molecular weights ranging from 1303 kDa to 9572 kDa—a POSA

would understand that conjugates falling in this range were both desirable and optimizable. Appx299-300 (citing Appx24140, Appx24938, Appx29231).

#### b. Claims 3 and 4

The Board found that Claims 3 and 4 were also obvious in view of GSK-711 and Merck-086. Appx317-319. The Board explained that GSK-711 disclosed a multivalent vaccine including glycoconjugates of serotypes 8, 10A, 11A, 12F, 15B, or 33F, and that this disclosure was immunogenic—both because GSK-711 described it as "immunogenic" and because the inventors would only have chosen to include a serotype in their vaccine if it was able to induce an immune response. Appx318 (citing Appx25007), Appx279. The Board further found that each of these serotypes was previously successfully included in the Pneumovax23® vaccine. Appx319. The Board credited Dr. Kasper's and Dr. Lees' testimony explaining why a POSA would have been motivated, with a reasonable expectation of success, to include these serotypes in glycoconjugate vaccines. Appx319 (citing Appx28545-28546, Appx28565, Appx28582-28584, Appx24959-24961).

#### c. Claims 46-52 and Pfizer's Motion to Amend

Following institution of Sanofi's IPR, Pfizer moved to amend the '559 patent, proposing to substitute new claims for Claims 1, 3, and 4. Appx28062-28094.

Claim 46, the proposed substitute for Claim 1, includes all limitations of that original claim with additional limitations that: (i) the immunogenic composition contains conjugates for serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F, in addition to a 22F conjugate; (ii) the carrier protein for all fourteen conjugates is $CRM_{197}$; and (iii) the composition comprises an aluminum salt adjuvant. Appx28091. Claim 46 further requires that "the composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses." Appx28091. That is, for each serotype, serum IgG levels must be at least 100 times higher after two doses than they were at baseline.

Claims 48 and 49 depend upon Claim 46, and would replace Claims 3 and 4, respectively. Appx28092. Claims 48 and 49 recite additional serotypes (from Claims 3 and 4) that are conjugated to $CRM_{197}$. Appx28092.

The Board found that each of the proposed substitute claims was obvious. Appx339-355. According to the Board, it would have been obvious to incorporate a 22F-$CRM_{197}$ glycoconjugate—such as those described in GSK-711 and Merck-086—into the 13-valent vaccine described in Hausdorff "with a reasonable expectation of success in obtaining a 2-log increase above baseline in serum IgG levels as required by claim 46." Appx340-348. The Board found that, taken together, GSK-711 and Merck-086 urged adding a 22F conjugate into a

pneumococcal vaccine to help "provide herd immunity and reduce disease in human populations." Appx348-349 (citing Appx25103, Appx25007).

The Board then considered whether a POSA would have had a reasonable expectation of success in attaining the 2-log increase for all fourteen serotypes. Appx349. It noted that Hausdorff had already demonstrated this 2-log increase for thirteen of the serotypes. Appx349 (citing Appx28170). Therefore, the only question was whether a POSA would have had a reasonable expectation of success in adding the 22F conjugate to the vaccine described in Hausdorff, while both attaining the 2-log increase for the 22F serotype and retaining the 2-log response for the other thirteen serotypes. Appx349. The Board concluded that the answer was "yes," crediting testimony by Sanofi's expert, Dr. Van Alphen, that Hausdorff demonstrated that a POSA could optimize the increase in serotype response by using different animals or varying the dose or amount of adjuvant. Appx350 (citing Appx29789-29792). The Board found that Merck-086 supported Dr. Van Alphen's explanation by showing that serotype-specific IgG increases could vary across different test arms. Appx350 (citing Appx25103, Appx25111).

The Board explained that a POSA would have had a reason to optimize the increase in serum IgG levels, crediting Dr. Van Alphen's explanation that serum IgG levels can indicate that a vaccine is immunogenic. Appx350-351 (citing Appx29786). The Board further found that a POSA would have understood which

parameters to vary in order to optimize the serum IgG level increase, crediting (i) testimony from Dr. Van Alphen that a 2-log increase across all serotypes can be achieved by routine optimization of test conditions and (ii) testimony from Pfizer's expert, Dr. Paradiso, that using animals that had previously been immunized or exposed to bacteria would affect the measured increase. Appx351 (citing Appx30047, Appx29792).

## SUMMARY OF ARGUMENT

**I.** The Board's finding that Claim 1 of the '559 patent is obvious is supported by substantial evidence. After considering the evidence proffered by both parties, the Board credited Sanofi's characterization of the prior art and adopted it as its own. Appx289. The Board thus found that the prior art disclosed every element of Claim 1 except a 22F conjugate with a molecular weight below 12,500 kDa. That finding was amply supported in the record. *See* pages 24-27, *infra*.

The Board then found that a POSA would have been motivated to develop a composition with a 22F conjugate with a molecular weight below 12,500 kDa and would reasonably have expected to succeed in doing so. Appx286. That finding, too, is well-supported. *See* pages 27-30, *infra*. Pfizer does not challenge the Board's finding about motivation to combine and reasonable expectation of success, which alone supports its obviousness finding.

The Board further found that the molecular weight of the claimed 22F conjugate was a routinely optimizable result-effective variable, which makes Claim 1 presumptively obvious. *See* Appx289-301. In so finding, the Board relied on prior art that "demonstrates that the artisan preferred a range of conjugated polysaccharide sizes overlapping that recited by the '559 claims" and credited expert testimony proffered by Sanofi showing that the molecular weight of the 22F conjugates disclosed in the prior art was routinely optimizable. Appx294-295, Appx302 (citing Appx24948-24950). Pfizer argues that Sanofi's expert testimony is not persuasive, but that is not a basis for overturning the Board's supported factual findings on substantial evidence review.

**II.** The Board's finding that Claims 3 and 4 of the '559 patent are obvious is supported by substantial evidence. *See* pages 47-49, *infra*. Claims 3 and 4 are dependent upon Claim 1 but require specific additional conjugates to be included in the vaccine. As the Board found, each of those additional serotype conjugates was disclosed in prior art disclosing multivalent vaccines. *See, e.g.*, Appx25010. The Board also credited Sanofi's expert testimony showing that all of the claimed serotypes "were already included in the multivalent pneumococcal vaccines on the market in 2014" and that a POSA would have readily been able to combine the serotypes into a vaccine that maintained the immunogenicity of each serotype. *E.g.*, Appx319 (quoting Appx24959-24961).

**III.** The Board did not abuse its discretion by denying Pfizer's motion to substitute new Claims 46, 48, and 49 for Claims 1, 3, and 4. The Board's finding that the proposed substitute claims were obvious is supported by substantial evidence.

The prior art included Hausdorff, which disclosed every limitation in Claim 46 except for a requirement that the composition exhibit more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits with respect to the 22F serotype following two equal doses. Appx28152-28173. But that limitation was disclosed in Merck-086, as the Board found. Appx350. The Board credited Sanofi's expert testimony explaining that a POSA would have been motivated to combine and would have reasonably expected to succeed at combining the serotype 22F conjugate disclosed in Merck-086 with Hausdorff's vaccine composition while retaining the 2-log increased immune response of the other thirteen serotypes. Appx349-353. Pfizer argues that the Board should have accepted its expert testimony concerning reasonable expectation of success instead of Sanofi's, but that is not a basis for overturning the Board's supported factual findings.

**IV.** The procedure governing Director review of Board decisions is not subject to formal notice-and-comment rulemaking because it is a rule of agency procedure. *See* 5 U.S.C. § 553(b)(3)(A). A procedural rule is one that does not

affect "the rights or interests of parties" but only "the manner in which parties present themselves or their viewpoints to the agency." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047, 1050 (D.C. Cir. 1987). The Director review procedure is a procedural rule because it does not affect any party's substantive rights or the patentability standards applied by the PTO. *See Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001) (holding that "a procedural rule for handling appeals" that does not "alter the substantive standards" applied by an agency is not subject to notice and comment).

# ARGUMENT

## STANDARD OF REVIEW

This Court reviews the Board's factual findings for substantial evidence. *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1413 (Fed. Cir. 2022). The substantial-evidence standard is highly "deferential." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1359 (Fed. Cir. 2021). "Substantial evidence supports a finding if a reasonable mind might accept the evidence to support the finding." *Quanergy*, 24 F.4th at 1413 (Fed. Cir. 2022). The substantial-evidence standard does not require "the weight of the evidence" to support the Board's findings. *VidStream LLC v. Twitter, Inc.*, 981 F.3d 1060, 1064 (Fed. Cir. 2020). "[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one

conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

The Board's denial of a motion to amend is reviewed for abuse of discretion. *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). The Board abuses its discretion only where its decision "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Id.*

## I. THE BOARD'S FINDING THAT CLAIM 1 IS OBVIOUS IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

Over thirty-five pages of analysis with ample citations to the record, the Board considered the prior art and the arguments and evidence proffered by the parties and found that Claim 1 of the '559 patent was obvious over GSK-711 and Merck-086. Appx282-317. The Board cited two independent bases for its obviousness finding. First, it found that a POSA would have been motivated to combine disclosures in the prior art to arrive at Claim 1 and would have reasonably expected to succeed at doing so. Appx286-289. Second, the Board found that the only allegedly novel aspect of Claim 1—the claimed range of molecular weights of the serotype 22F glycoconjugate—is a result-effective variable that a POSA could

arrive at using routine optimization, particularly in light of the overlap with ranges of molecular weights disclosed in the prior art. Appx289-310.

In its opening brief, Pfizer challenges only the Board's second ground for finding Claim 1 obvious, but it fails to challenge the Board's finding that a POSA would have been motivated, with reasonable expectation of success, to combine the prior art to arrive at Claim 1. *See* Appx286-289. That failure to challenge an independent basis for the Board's obviousness finding is fatal to Pfizer's appeal. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (holding that arguments not raised in the opening brief on appeal are waived); *see also* Point I.A, *infra*.

In any event, Pfizer's challenges to the Board's optimization findings are meritless. Pfizer contends that the Board erred in applying the result-effective variable doctrine because (1) "the record lacks substantial evidence that conjugate molecular weight is a results-effective variable" (Opening Br. 34-38 (capitalization omitted)); and (2) "the prior art does not disclose 22F conjugates with molecular weights overlapping the claimed range" (Opening Br. 27-34 (capitalization omitted)). In so arguing, Pfizer merely rehashes arguments that it presented to the Board and which the Board rejected based on the record. Pfizer also ignores the standard of review. Rather than address, as it must, whether substantial evidence supports the Board's judgment, Pfizer spends much of its opening brief citing

evidence that supposedly supports its positions. The question for this Court, however, is not whether there exists evidence supporting Pfizer but rather whether the Board's findings are supported by substantial evidence. As explained below, overwhelming evidence supports the Board's findings.

### A. Pfizer Does Not Challenge the Board's Findings Concerning Motivation to Combine and Reasonable Expectation of Success.

A patent claim is obvious if a POSA would have been motivated to combine aspects of the prior art to achieve the claimed invention and would reasonably have expected to succeed in that endeavor. *See Ethicon LLC v. Intuitive Surgical, Inc.*, No. 2021-1995, 2022 WL 1613188, at *1-4 (Fed. Cir. 2022) (affirming finding of obviousness where substantial evidence supported Board's findings concerning motivation to combine and reasonable expectation of success). In concluding that Claim 1 is obvious, the Board made a series of factual findings concerning what the prior art disclosed and found that a POSA would have been motivated to combine elements of the prior art to arrive at Claim 1 and would have reasonably expected to succeed at doing so. Appx283-289.

In making those findings, the Board rejected Pfizer's characterizations of the GSK-711 and Merck-086 references. Appx289. Instead, the Board credited, and adopted "as [its] own," Sanofi's characterizations of the prior art based on "the record as a whole," including the testimony of Sanofi's expert, Dr. Lees. *Id.* (citing Appx24126-24146).

By adopting Sanofi's characterization of the prior art, the Board found that GSK-711 discloses:

- An immunogenic *Streptococcus pneumoniae* vaccine comprising conjugated saccharides derived from at least ten different serotypes (Appx283; *see also* Appx25009, ll.4-26, Appx25080, cl.1, Appx25084-25085, cls.48,55,56,61);
- A conjugated 22F saccharide within a 13-valent conjugate vaccine that was shown to be immunogenic (Appx283-284, Appx25070, ll.36-37, Appx25056, tbl.2, ll.12-15);
- A 22F saccharide conjugated to a carrier protein, including $CRM_{197}$ (Appx283; *see also* Appx25011, ll.18-23, Appx25056, tbl.2, Appx25083, cl.43);
- "Preferably the ratio of carrier protein to *S. pneumoniae* saccharide [including 22F] is between 1:5 and 5:1 . . . (w/w)" (Appx284; *see also* Appx25022, ll.1-3, Appx25084, cl.48) and the conjugated 22F saccharide has a ratio of carrier-protein-to-saccharide of 2.17 (w/w) (Appx286; *see also* Appx25056, tbl.2)[3]; and

[3] "When converted to a polysaccharide-to-carrier-protein ratio, [the carrier protein-to-polysaccharide ratio of 2.17] equals 0.46, which falls within the range of claim 1." Appx286; *see also* Appx24130, Appx24927-24928, ¶85, Appx24945, ¶137.

- An immunogenic composition comprising a 22F conjugate where the average molecular weight of the 22F saccharide is above 100 kDa (Appx25084, cl.55), 50-1600 kDa (Appx25085, cl.61), and 50-800 kDa (Appx25084, cl.56).[4] *See also* Appx284.

The Board likewise adopted Sanofi's position that Merck-086 discloses "a PCV15 composition containing a 22F-$CRM_{197}$ glycoconjugate that induced 22F specific immune response in animal models"—i.e., a 22F glycoconjugate that is immunogenic. *See* Appx286, Appx24943, ¶¶ 129-131, Appx25102, ¶2, Appx25111-25112, tbls.2-6, Appx25113, cl.2.

In other words, the Board found that GSK-711 and Merck-086 expressly disclose the entire subject matter of Claim 1, except that they do not expressly disclose that the 22F conjugate falls below the 12,500 kDa upper limit of the claimed molecular weight range. The Board nevertheless found that limitation to be implicit in GSK-711. Appx287-289. Specifically, the Board credited Dr. Lee's testimony that "Table 2 discloses the conjugate sizes for ten (10) different pneumococcal glycoconjugates with different serotype and carrier protein combinations, all of which fall within and span most of the range of 'between 1000

---

[4] If the molecular weight of the 22F saccharide is above 1000 kDa ("above 100 kDa") or between 1000-1600 kDa ("50-1600 kDa"), then the 22F saccharide conjugated to a carrier protein will necessarily be greater than 1000 kDa.

kDa and 12,500 kDa' recited in claim 1." Appx287 (citing Appx24946, ¶139). With respect to the 12,500 kDa upper end of the claimed range, the Board agreed that "a POSA would have understood that the GSK inventors would have been targeting at [sic] 22F glycoconjugates with a molecular weight well below 12,500 kDa by using a Sephacryl S400HR column (exclusion limit below 8,000 kDa) to purify the conjugates . . . ." Appx288 (citing Appx24950-24951, ¶144). The Board therefore found that "one would have reasonably expected that the sizes of the two 22F conjugates disclosed in Table 2, if measured, would also fall within the range between 1,000 KDa and 12,500 KDa." Appx287-288 (citing Appx24947, ¶141).

The Board additionally found that a POSA would have been motivated, with reasonable expectation of success, to make 22F conjugates that fall within the claimed molecular weight range. With respect to motivation, the Board found that the claimed range is desirable because "[o]n one hand, if conjugates are too small (with molecular weights below 1000 kDa), they are difficult to separate from unconjugated free polysaccharides. As discussed above, unconjugated polysaccharides are less immunogenic in infants, elderly and immunocompromised patients." Appx288 (citing Appx24952-24954, ¶148). "On the other hand, large glycoconjugates (with molecular weights above 12,500 kDa) are difficult to purify and difficult to analyze. . . . Overconjugation may also result in the reduction or

elimination of T-cell epitopes required for eliciting an immune response." Appx288 (citing Appx24954, ¶149). The Board also noted that "GSK-711 teaches 'immunogenic conjugates prone to hydrolysis may be stabilised by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate . . . [and] that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease.'" Appx284 (citing Appx25015, ll.31-34, Appx25016, ll.1-3).

In concluding that there existed a reasonable expectation of success in forming a 22F conjugate within the claimed molecular weight range, the Board found that "CDAP or reductive amination chemistry naturally results in glycoconjugates with highly crosslinked lattice structures with multiple saccharide molecules linked to multiple carrier protein molecules in each lattice. . . . [T]he fact that GSK-711 discloses 10 different pneumococcal glycoconjugates with molecular weights all falling within the claimed range of 1,000 kDa and 12,500 kDa confirms a reasonable expectation of success."[5] Appx289 (citing Appx24955-

---

[5] The Board found that GSK-711 teaches that saccharide conjugates, including a 22F conjugate, may be prepared by any known coupling technique, including CDAP and reductive amination methods. Appx283, Appx25018, ll.9-10, Appx25019, ll.1-2, Appx25053-25054, tbl.1, Appx25056, tbl.2.

24956, ¶¶151-152). That is especially the case given that the Board found that GSK-711 teaches the use of a Sephacryl S400HR column (exclusion limit below 8,000 kDa) to purify the conjugates, including 22F conjugates. Appx288, Appx24950-24951, ¶144.

For all those reasons, the Board adopted Sanofi's position that "a POSA in view of the teachings in GSK-711 would (i) reasonably have expected that the 22F glycoconjugates disclosed in Table 2 [of GSK-711] would have molecular weights that also fall within the claimed range; or (ii) would have been motivated to make 22F glycoconjugates that fall within the claimed range with a reasonable expectation of success." Appx286 (citing Appx24132); *see also* Appx289 (adopting the positions taken by Sanofi on pages 30-50 of its petition).

The Board's findings concerning motivation to combine and reasonable expectation of success do not turn on the issue of optimizing the conjugate molecular weight as a result-effective variable—which is the only issue concerning Claim 1 raised in Pfizer's opening brief. The Board's findings are thus both amply supported by the record and not challenged by Pfizer. The Board's judgment that Claim 1 is obvious can therefore be affirmed without addressing Pfizer's arguments concerning optimization. *See Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 273 (Fed. Cir. 2022) (distinguishing between the Board's analysis based on "overlapping ranges" from its analysis based on motivation to combine

and reasonable expectation of success, and holding that even if presumption of obviousness based on "overlapping ranges" does not apply, the "outcome would be the same" based on motivation with a reasonable expectation of success).

### B. Pfizer's "Optimization" Arguments Fail in Any Event.

The Board found that Claim 1 is obvious for the additional reason that its sole allegedly novel feature—the claimed range of conjugate size between 1,000 and 12,500 kDa—is a result-effective variable that a POSA could arrive at using routine optimization. *See* Appx300. That finding was amply supported in the record, including by testimony from several experts and by the prior art itself. *See* Appx289-301. As the Board found, "a preponderance of the evidence of record demonstrates that conjugate size is a results effective variable associated with improved stability of conjugates and good immune response." Appx300. The Board further found that the claimed range of molecular weight for the 22F conjugate overlaps with the range of 1,303 and 9,572 kDa disclosed by GSK-711—thereby triggering a presumption of obviousness. *See* Appx300-301.

Pfizer criticizes the Board for supposedly "spontaneously" introducing the result-effective variable standard into the case. Opening Br. 25-26. But that is simply not true. Sanofi's petition for *inter partes* review not only discusses "routine optimization" (Appx24140), but it does so in a section addressing the relationship between the molecular weight of conjugates and the ability to purify

conjugates and their immunogenicity. *See* Appx24136-24140. Sanofi then repeatedly raised routine optimization and result-effective variable arguments throughout the proceedings. *See, e.g.*, Appx30481 (Sanofi's Reply), Appx31746-31747 (oral hearing), Appx31754 (same). Moreover, as found by the Board, GSK-711 and Merck-086 discuss how the molecular weight of a conjugate affects purification and immunogenicity. Appx292-294; *see also* Point I.B.2, *infra*. It is therefore no surprise that Pfizer itself addressed routine optimization in its Patent Owner Response, including responding to Sanofi's argument that the molecular weight of the conjugate was affected by how the conjugate was purified. Appx28982, Appx28987-28989.[6]

Pfizer's two challenges to the Board's application of the result-effective variable doctrine and the presumption of obviousness are misguided. Pfizer first argues that there was no overlap between the claimed range of conjugate size and the ranges disclosed in the prior art, and therefore the Board should not have invoked a presumption of obviousness. Opening Br. 27-34. It next argues that there is no evidence that molecular weight is a result-effective variable in the first

---

[6] This case is thus nothing like *In re Magnum Oil Tools*, 829 F.3d 1364 (Fed. Cir. 2016) (cited in Opening Br. 26). There, the Board attempted to "raise, address, and decide unpatentability theories never presented by the petitioner." *Id.* at 1381. Here, by contrast, Sanofi squarely argued that Claim 1 is obvious because molecular weight is a result-effective variable and the claimed ranges of molecular weight overlap with the prior art, and Pfizer had ample opportunity to respond.

place. Opening Br. 34-38. In both instances, Pfizer merely regurgitates arguments that the Board already rejected and ignores the extensive evidence in the record that supports the Board's findings.

### *1. There Is Substantial Evidence that Conjugate Molecular Weight Is a Result-Effective Variable.*

A result-effective variable is one that is "known to affect a particular desirable result." *In re Haase*, 542 F. App'x 962, 967 (Fed. Cir. 2013). "A recognition in the prior art that a property is affected by the variable is sufficient to find the variable result-effective." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1297 (Fed. Cir. 2012). That recognition can be either explicit or implicit in the prior art. *See E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1009 (Fed. Cir. 2018) (temperature was a result-effective variable even though no prior art disclosed a relationship between temperature and the desirable result because prior art references "expressly disclosed appropriate or preferred temperatures and air pressure for the reaction, indicating that persons of ordinary skill understood that the reaction was affected by temperature and pressure"). Additionally, a POSA's general knowledge can show that a variable is result-effective. *See id*; *Applied Materials*, 692 F.3d at 1296 (substantial evidence supported the Board's finding that groove depth on a polishing pad was result-effective because "one of ordinary skill in the art would certainly expect that increasing the thickness of the pad and the size of the grooves would result in a pad having a longer service life

since it would take longer for such a pad to wear down/out; this expectation is based on the basic engineering principle that a frictional element that is worn over time by friction will last longer if its thickness is increased"). If a variable is result-effective, "the discovery of an optimum value of a variable in a known process is normally obvious." *DuPont*, 904 F.3d at 1009.

The Board found that "a preponderance of the evidence of record demonstrates that conjugate size is a results effective variable associated with improved stability of conjugates and good immune response . . . ." Appx300 (citing *Applied Materials*, 692 F.3d at 1295). Pfizer argues that finding is unsupported because the prior art supposedly did not expressly disclose a relationship between the molecular weight of a 22F conjugate and its immunogenicity. Opening Br. 35. That contention is wrong for several reasons.

First, the test is not whether the prior art expressly provides that a variable is result-effective. As noted by the Board (Appx300), the relevant question is whether the "evidence of record" demonstrates that a POSA would have understood that conjugate molecular weight is a result-effective variable. *See DuPont*, 904 F.3d at 1007, 1009. Here, the record includes the following, which easily constitutes substantial evidence that a POSA would have understood that molecular weight affects immunogenicity:

- Pfizer's expert, Dr. Wang, admitted that conjugate molecular weight is a result-effective variable when, in response to a question regarding whether there is anything allegedly critical regarding the claimed molecular weight, he testified that "if [the conjugate molecular weight] is too small molecular weight, it may not generate enough strong immunogenicity. And if it's too big molecular weight for your sugar, this whole thing normally become a gel and is very hard to handle. So it's better to—to get something in the right molecular weight range." Appx30282-30283.
- Another Pfizer expert, Dr. Boon, admitted in one of the Merck IPRs (IPR2017-02131) that "it is well known in the art that molecular weight are important for immunogenicity." Appx6485.
- Dr. Lees testified that "if conjugates are too small (with molecular weights below 1000 kDa), they are difficult to separate from unconjugated free polysaccharides . . . [and] unconjugated polysaccharides are less immunogenic in infants, elderly and immunocompromised patients . . . . [I]t was known that unconjugated polysaccharides may also inhibit the immune response to conjugated polysaccharide . . . , [and] it is therefore important to minimize the level

of unconjugated polysaccharides in the purified glycoconjugates." Appx24952-24954.

- Dr. Lees further testified that: "Overconjugation may also result in the reduction or elimination of T-cell epitopes required for eliciting an immune response." Appx24954; *see also* Appx288.

In addition to that expert testimony, the prior art further supports the Board's finding that molecular weight is a result-effective variable:

- As the Board explained, "GSK-711 notes that the 'present inventors have found that saccharide conjugate vaccines retaining a larger size of saccharide can provide a good immune response against pneumococcal disease.'" Appx294 (citing Appx25016); *see also* Appx284. It is necessarily the case that if a saccharide has a larger molecular weight, then so too will its conjugate for a given polysaccharide-to-protein ratio.
- As the Board further observed, "GSK-711 also provides more specific reasons to optimize the saccharide conjugates for larger sizes by teaching 'immunogenic conjugates prone to hydrolysis may be stabilized by the use of larger saccharides for conjugation. The use of larger polysaccharides can result in more cross-linking with the conjugate carrier and may lessen the liberation of free saccharide from the conjugate.'" Appx294 (citing Appx25015).

There is thus ample record evidence supporting the Board's finding that conjugate size is a result-effective variable because a POSA would understand that immunogenicity is affected by molecular weight. What's more, the Board found, based on substantial evidence, that molecular weight also affects a host of other results besides immunogenicity, which further supports its finding that molecular weight is result-effective. *See Applied Materials*, 692 F.3d at 1292-93, 1297 (showing that the desirable result not need be a claimed property to trigger the result-effective variable doctrine); *DuPont*, 904 F.3d at 999, 1009 (same); *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1336, 1341 (Fed. Cir. 2020) (same):

- The Board found that "GSK-711 recognizes optimization for larger size saccharide-protein conjugates, limited only by a requirement to be 'filterable through a 0.2 micron filter.'" Appx294 (citing Appx25016). Thus, the conjugate's molecular weight was found to affect the ability of the conjugate to be filtered.
- The Board also favorably cited testimony by Dr. Lees that "the glycoconjugates described in Table 2 [of GSK-711], including 22F glycoconjugates, were purified using Sephacryl S400HR gel filtration, which has a size exclusion limitation under 8000 kDa.'" Appx295 (citing Appx24950-24951). Therefore, "based on the teachings of GSK-711 and

Merck-086, . . . [a] POSA can also quench the conjugation reaction at a desired time before the molecular sizes reach 12,500 kDa to facilitate purification [e.g., through S400HR gel filtration], characterization and to avoid precipitation or forming a gel." Appx295 (citing Appx25955-24956). In other words, the Board found that the molecular weight of a conjugate, including that of a 22F glycoconjugate, affects the conjugate's ability to be purified and characterized, and to avoid forming a gel.

- Dr. Lees further testified that "large glycoconjugates (with molecular weights above 12,500 kDa) are difficult to purify and difficult to analyze using the Sephacryl S400HR column and TSK5000-PWXL column disclosed in GSK-711 because both have size exclusion limits well below 12,500 kDa. Furthermore, it was known that very large glycoconjugates tend to precipitate or form a gel, which makes them difficult to purify by any column . . . or even sterile filtration. . . . I note that GSK-711 specifically teaches that conjugates should be readily filterable to ensure a desired yield can be obtained." Appx24954; *see also* Appx288.

For all these reasons, the evidence supporting the Board's finding that molecular weight is a result-effective variable is more than substantial—it is overwhelming.

Pfizer's argument that "arriving at the claimed ranges would have been unpredictable, not a matter of routine optimization" does not change the analysis. Opening Br. 36-37. Predictability is not required to demonstrate that the claimed molecular weight ranges are result-effective variables. *See DuPont*, 904 F.3d at 1008-09 (holding that Petitioner was not required to prove that the variables at issue "predictably affected" the yield of the claimed oxidation reaction; instead, Petitioner need only show that the prior art recognized, "either expressly or implicitly," that the variables affected the claimed reaction).

In all events, the Board found, based on substantial evidence, that arriving at the claimed molecular weight range *was* predictable as a matter of routine optimization. Appx289-301. In making that finding, the Board rejected as "unpersuasive" in light of the evidence in the record Pfizer's argument that optimization of molecular weight was unpredictable. Appx295-300. Specifically, the Board cited the testimony of Pfizer's expert, Dr. Wang, who "acknowledged that with regard to conjugation conditions, that 'you can really control [them].'" Appx297 (citing Appx30376). The Board also credited Dr. Lees' testimony that optimization of conjugate sizes was routine. Appx297-298 (citing Appx24955-24956, Appx29193-29194, Appx29199). And the Board relied on Merck-086, which teaches how to "optimize the size of the polysaccharides using known techniques, including the serotype 22F polysaccharide"; and GSK-711, which

teaches "methods to optimize the size of the polysaccharides as well as to couple to known conjugates such as $CRM_{197}$." Appx298. Based on that evidence, the Board agreed with Dr. Kasper that "routine conjugation techniques and conditions readily achieved those disclosed molecular weights." Appx298 (citing Appx28569-28570).

In its opening brief, Pfizer does not meaningfully address the evidence relied upon by the Board in finding that optimizing molecular weight was routine. Instead, Pfizer complains that the Board "dismissed" the evidence that Pfizer proffered in an attempt to show that optimization was *not* routine. Opening Br. 36-38. But the Board did not "dismiss" Pfizer's evidence. It considered Pfizer's evidence and arguments and concluded that it was not persuasive. Appx289-301. For example, Pfizer argues that the Board misconstrued Lees-2008, which Pfizer argues shows that optimizing molecular weight is unpredictable. Opening Br. 37-38. But the Board considered Pfizer's precise argument and, after reviewing the record, concluded that Pfizer's contention was "unpersuasive." Appx298 (citing Appx28987). In reaching that conclusion, the Board cited the text of Lees-2008 itself, which teaches both that serotype 22F pneumococcal vaccines are desirable and how to optimize the size of the glycoconjugates. Appx299 (citing Appx25119, Appx25121-25123). Pfizer may not like how the Board weighed the evidence, but that is not a basis for reversing the Board's well-supported conclusions. *See*

*Regents of Univ. of Cal. v. Broad Institute, Inc.*, 903 F.3d 1286, 1294 (Fed. Cir. 2018) ("It is not our role to ask whether substantial evidence supports fact-findings not made by the Board, but instead whether such evidence supports the findings that were in fact made.").[7]

### 2. *The Prior Art Discloses Conjugate Molecular Weights that Overlap with the Claimed Molecular Weight Range.*

The Board found that the range of molecular weights recited in Claim 1 was obvious for the additional reason that it overlaps with the range disclosed in GSK-711, thereby triggering a presumption of obviousness. *See* Appx300-301 (citing *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003); *DuPont*, 904 F.3d at 1006). Although Pfizer argues that the Board's finding of overlap with the prior art is unsupported, the Board's finding has substantial support in the record.

As an initial matter, GSK-711 expressly discloses molecular weights for a 22F serotype that fall within the range claimed by Claim 1. *See* Appx25084, cl.55 (disclosing an immunogenic composition comprising a 22F conjugate where the average molecular weight of the 22F saccharide is above 100kDa), Appx25085, cl.61 (molecular weight range of 50-1600 kDa), Appx25084, cl.56 (molecular

[7] Pfizer's evidence (Opening Br. 36) purportedly showing that different conjugates require different optimization methods and that conjugation "must be carefully controlled and optimized" is irrelevant in any event because it is not inconsistent with the Board's finding that optimization is routine.

weight range of 50-800 kDa). That express overlap with the ranges disclosed in GSK-711 alone triggers a presumption of obviousness.

Moreover, the presumption of obviousness is triggered where, as here, the prior art pertains to a "structurally and functionally similar compound[]" that "overlap[s] with a claimed range." *Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*, 955 F.3d 25, 32 (Fed. Cir. 2020); *see also Almirall*, 28 F.4th at 272-73. Here, GSK-711 discloses the molecular weights for numerous other pneumococcal saccharide conjugates whose molecular weights fall within the claimed range. Appx284, Appx287 (citing Appx24946, ¶¶138-139, Appx25056), Appx293. Each of those disclosed conjugates, including 22F, was prepared using the same conjugation chemistry (CDAP conjugation). Appx25053-25054, tbl.1, Appx25050-25053, Ex. 2, Appx24114, Appx290 (referring to Table 1 as disclosing CDAP for all serotypes). The Board found that CDAP conjugation was a routine optimizable process. Appx296-299. As the Board further found, all of the disclosed conjugates (except for 18C), including the 22F conjugates, were purified using the same size exclusion column, which had a maximum size-exclusion cutoff falling within the claimed range. Appx295, Appx299-300; *see also* Appx2053, Ex. 2. The fact that GSK-711 disclosed serotypes structurally and functionally similar to 22F whose molecular weights fall within the range recited in Claim 1 is

sufficient to trigger a presumption that Claim 1's range of molecular weight for the 22F serotype is obvious. *See Valeant*, 955 F.3d at 32.[8]

Pfizer contends that GSK-711 does not *expressly* disclose conjugate molecular weights for 22F that overlap with the claimed molecular weight range. Opening Br. 30. However, GSK-711 expressly discloses a 22F conjugate where the saccharide is above 1000 kDa. *See* pages 26, 40, *supra*. And the Board credited calculations from Dr. Lees showing that the molecular weight of the 22F conjugates disclosed in Table 2 of GSK-711 would have fallen within the range recited in Claim 1. Appx294-295, Appx302 (citing Appx24948-24950). Although Pfizer argues that Dr. Lees' calculations were wrong (Opening Br. 30-32), those arguments are misplaced for several reasons.

*First*, the question of whether to credit Dr. Lees' calculations is for the Board, not this Court, to decide. Pfizer is improperly asking this Court to reweigh the evidence to decide whether to credit Dr. Lees' testimony. *See Regents*, 903 F.3d at 1294.

[8] Pfizer argued to the Board that the serotypes of the conjugates for which GSK-711 provided molecular weights were prepared differently from those for which GSK-711 did not provide a molecular weight (such as 22F). The Board rejected that argument as "not persuasive," particularly in light of Merck-086, which teaches preparing conjugates using standard techniques and limiting the size of various serotypes (including 22F) using membrane filtration. Appx292-293.

*Second*, Dr. Lees' calculations are a sideshow. The Board's invocation of the presumption of obviousness and its finding that Claim 1 is obvious are supported by substantial evidence for the reasons already stated—regardless of the correctness of Dr. Lees' calculations. For example, the Board's obviousness finding can be affirmed based on its finding that a POSA would have been motivated, with reasonable expectation of success, to combine elements of the prior art to arrive at Claim 1. *See* pages 24-30, *supra*. Alternatively, the obviousness conclusion can be affirmed based on the Board's finding that molecular weight is a result-effective variable that a POSA would have known how to optimize. *See* pages 30-40, *supra*. Neither of those findings turns on Dr. Lees' calculations.

*Third*, Pfizer's criticism of Dr. Lees' calculations is meritless. Each argument that Pfizer raises on appeal was considered by the Board and found not to be persuasive. For example, Pfizer argues that Dr. Lees' calculations are somehow unreliable because they would result in a molecular weight of 1,745-1,986 kDa for one of the conjugates (PS1-PD) in Table 2 of GSK-711, whereas the reported molecular weight was 1,499-1,715 kDa. Opening Br. 31-32. The Board rejected that precise argument based on the evidence in the record (Appx303-306), including:

- Testimony from Dr. Lees that "[e]xcept for PS1-PD, all other conjugates in Table 2 with measured MWs are above the 'smallest' hypothetical lattice size, and therefore conform to my calculations." Appx304 (citing Appx30541-30542 ¶30).
- Table 2 of GSK-711 shows that conjugates having polysaccharide sizes smaller than that of the 22F conjugates of Table 2 have conjugate sizes within the claimed range. Appx304-305 (citing Appx25056).
- Testimony from Dr. Kasper that "the conjugates [of Table 2] had been crosslinked into high molecular weight lattice structures containing multiple polysaccharide and carrier proteins." Appx305 (citing Appx28563 ¶84).

Pfizer next argues that Dr. Lees failed to account for polysaccharide fragmentation. Opening Br. 32. That argument, too, was considered and rejected by the Board. Appx298-299. The Board's finding in that regard is supported by substantial evidence, including testimony from Dr. Lees that "a POSA would not reasonably expect [fragmentation] to occur for all serotypes in general or for 22F in particular." Appx30540-30541, ¶29.

Finally, Pfizer argues that the Board's finding that "targeting conjugate molecular weights below the 12,500 kDa upper limit in the claim based on size exclusion limits of a chromatography filter used in [GSK-711] [is] incorrect."

Opening Br. 33. That argument was also considered and rejected by the Board. Appx291-292 (restating Pfizer's argument here), Appx292 (rejecting the argument), Appx295, Appx299-300. The Board's conclusion is supported by substantial evidence, including the teachings of Merck-086 and GSK-711 that the conjugates can be "sized" using known methods (Appx292-293); testimony from Dr. Lees that the glycoconjugates described in Table 2 of GSK-711 (including 22F) were purified using a Sephacryl S400HR size exclusion column with a size exclusion limitation under 8,000 kDa (Appx295); and testimony from Dr. Kasper that the Board found "supported" Dr. Lees (Appx295).

### C. The Board Considered the '559 Patent Claims as a Whole.

Pfizer is wrong that the Board failed to consider Claim 1's molecular weight and polysaccharide-to-carrier-protein ratio limitations together as a whole. Opening Br. 38-39. *See, e.g.*, Appx316 ("Moreover, as discussed above, the GSK-711 and Merck-086 together suggest molecular weights and polysaccharide to carrier protein ratios that overlap and fall within the ranges recited in claim 1 of the '559 patent." (citing Appx25022, Appx25108-25109, Appx24916)). The record further shows that the ranges for the claimed polysaccharide-to-carrier-protein ratio and molecular weight were "typical" of known immunogenic conjugates in general. *See* Appx316, Appx295, Appx24916-24917 (explaining the optimization of polysaccharide-to-carrier-protein ratio), Appx24956-24957 (explaining that the

claimed ranges do not possess surprising immunogenicity, and that the ’559 patent relied on standard methods to make the conjugates); Appx30527 (explaining that the ’559 patent reports ten 22F-glycoconjugates that fall within the claimed molecular weight and polysaccharide-to-carrier-protein ratio ranges). Accordingly, the Board found that a POSA would have had no difficulty optimizing both the molecular weight and the polysaccharide-to-carrier protein ratios. Appx315-317 (citing Appx25103, Appx25108-25109, Appx25007, Appx25022, Appx24916, Appx25378, Appx28337-28338).

Pfizer also incorrectly asserts that the Board did not analyze the “immunogenic” limitation of Claim 1. Opening Br. 38. In fact, the Board cites GSK-711 and Merck-086 as showing that the 22F glycoconjugates disclosed in each reference are immunogenic. Appx283-284 (citing Appx25070), Appx284 (citing Appx25085), Appx285 (citing Appx25102-25103, Appx25110-25111). Moreover, the parties’ experts testified that both GSK-711 and Merck-086 disclose immunogenic compositions including an immunogenic 22F glycoconjugate. Appx30265, ll.7-15, Appx30300-30301, Appx30529, ¶11; *see also* Appx28577, ¶ 111. It is thus false that the Board ignored the immunogenic limitation or that the limitation is not rendered obvious by the prior art.

## II. THE BOARD'S FINDING THAT CLAIMS 3 AND 4 ARE OBVIOUS IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

Claim 3 of the '559 patent depends upon Claim 1 and requires specific additional serotype conjugates (15B and 33F) to be included in the vaccine. Claim 4 depends upon Claim 3 and requires additional conjugates of serotypes 8, 10A, 11A, and 12F. Against the backdrop of its finding that Claim 1 is obvious, the Board carefully analyzed Claims 3 and 4 and concluded that it would have been obvious to incorporate the additional conjugate serotypes identified in Claims 3 and 4 to the immunogenic composition of Claim 1. Appx319. The Board thus found that Sanofi had "shown by a preponderance" that Claims 3 and 4 "are unpatentable as obvious." Appx358.

In addition to the evidence supporting the Board's finding that Claim 1 was obvious (*see* Point I, *supra*), the obviousness finding for Claims 3 and 4 was supported by the following substantial evidence:

- As the Board observed, GSK-711 discloses that the multivalent pneumococcal conjugated vaccine "will be selected from the following serotypes 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15B, 17F, 18C, 19A, 19F, 20, 22F, 23F, and 33F." Appx318 (quoting Appx25010).[9]

[9] GSK-711 discloses that the serotypes are immunogenic because, as the Board found, "the disclosure of a vaccine by GSK-711 containing multiple serotypes also

- Dr. Lees' testimony—credited by the Board— states that '"[c]laims 3-8 collectively recite 20 additional serotypes. However, . . . all 20 of the recited serotypes were already included in the multivalent pneumococcal vaccines on the market in 2014' and, therefore, '[o]ne would also have reasonably expected success because, as shown in GSK-711 and Merck-086, 22F and other new serotypes were successfully included in multivalent PCV compositions while maintaining the immunogenicity to all serotypes in the compositions.'" Appx319 (quoting Appx24959-24961).
- Dr. Kasper's testimony—also credited by the Board and consistent with Dr. Lees'—states that "a POSITA would have been motivated with a reasonable expectation of success to additionally include a serotype 15B conjugate," and that the "claimed serotypes were well-known to be prevalent and had already been included in the Pneumovax®23 polysaccharide vaccine." Appx319 (quoting Appx28545-28548, Appx28582-28584).

---

requires induction of an immune response, otherwise there would be no need to include a serotype unable to induce such a response. And indeed, GSK-711 uses the same term, immunogenic, to describe the pneumococcal vaccine composition." Appx318 (citing Appx25007).

- GSK-711 discloses multivalent conjugated vaccines with at least ten pneumococcal serotypes. Appx25009, ll. 24-29.
- GSK-711 further discloses an immunogenic composition comprising multivalent pneumococcal conjugates comprising "2 or more (e.g. 7, 8, 9, 10, 11, 12, 13, 14, 15) capsular saccharide conjugates from different serotypes, wherein the composition comprises a 22F saccharide conjugate." Appx25007, ll. 12-15.
- GSK-711 discloses multivalent vaccines comprising immunogenic conjugates of various polysaccharide serotypes, including 22F. Appx25056-25057.
- Merck-086 discloses an immunogenic multivalent vaccine that includes serotypes 22F and 33F. Appx25103, ¶15, Appx25106, ¶55.

Thus, the record is teeming with evidence that demonstrates that a POSA would have been motivated, with a reasonable expectation of success, to add conjugated serotypes (including those identified in Claims 3 and 4) to the immunogenic composition of Claim 1.

In the face of that overwhelming evidence, Pfizer reargues points previously rejected by the Board. *First*, it contends that there is no evidence supporting the Board's conclusion that the compositions disclosed in GSK-711 satisfy the Board's construction of "immunogenic," which requires that each serotype in the

composition elicit an immune response. Opening Br. 40-42. But as shown above, the record contained evidence supporting the Board's conclusion, including testimony from Drs. Lees and Kasper that "new" immunogenic conjugate serotypes had been successfully added to already-existing immunogenic multivalent conjugate vaccines (Appx319 (quoting Appx24959-24961, Appx28545-28548, Appx28582-28584)), and the teachings of GSK-711 and Merck-086 that exemplified such additions. *See, e.g.*, Appx25056-25057 (Table 2 of GSK-711 stating that "immunogenic conjugates have been produced, that have since been shown to be components of a promising vaccine" and identifying multivalent conjugate vaccines that included those immunogenic conjugates), Appx25111 (Tables 3 and 4 of Merck-086 showing that each serotype conjugate of PCV-15 was immunogenic). Pfizer's argument concerning the immunogenic limitation was thus rejected by the Board for good reason. *See* Appx318-319.

*Second*, Pfizer dismisses Dr. Lees' testimony concerning the obviousness of Claims 3 and 4 as "unsupported." Opening Br. 42. But that testimony had ample support. For example, Dr. Lees cited the undisputed facts that the serotypes identified in Claims 3 and 4 had been included in prior art pneumococcal vaccines, such as Pneumovax® 23, and that GSK-711 and Merck-086 successfully made immunogenic multivalent compositions that included 22F as well as other serotypes. Appx24901-24906, Appx24959-24962. Even Pfizer acknowledged that

Dr. Lees "observ[ed] that Merck and GSK previously made multivalent conjugate compositions." Opening Br. 42.

*Third*, Pfizer argues that "[t]he prior art also failed to show conjugates of each of the serotypes recited in claims 3 and 4 (let alone immunogenic conjugates)." *Id.* But GSK-711 and Merck-086 *do* teach immunogenic compositions comprising conjugates of the serotypes recited in Claims 3 and 4. Appx25010, Appx25102, Appx24961-24962.[10]

*Fourth*, Pfizer argues that the "prior art, taken as a whole, must enable a skilled artisan to make and use the clamed invention." Opening Br. 43-44. That argument was never made to the Board and is thus waived. *See In re DBC*, 545 F.3d 1373, 1378 (Fed. Cir. 2008). It is misguided in any event because there is substantial evidence establishing that a POSA would have been enabled to make the immunogenic compositions of Claims 3 and 4, including the evidence supporting the Board's finding that there existed a reasonable expectation of success to make the immunogenic compositions of Claims 3 and 4. *See* pages 49-50, *supra.*

---

[10] Contrary to Pfizer's contention, the Board relied on the prior art and expert testimony, not just "the fact that the recited serotypes had previously been included in the free polysaccharide unconjugated vaccine, Pneumovax®." *See* Appx317-319.

*Fifth*, Pfizer quotes the Board out of context when it argues that it "improperly shifted the burden to Pfizer to prove that claims 3 and 4 are 'unobvious' over the prior art." Opening Br. 44. Contrary to Pfizer's contention, the Board repeatedly explained that Sanofi bore the burden of proof on obviousness. *See, e.g.*, Appx282 ("Petitioner bears the burden of proving unpatentability of the challenged claims, and that burden never shifts to Patent Owner. . . . To prevail, Petitioner must establish the facts supporting its challenge by a preponderance of the evidence." (citing *Dynamic Drinkware*, 800 F.3d at 1378)); *see also* Appx330 ("The Board must assess the patentability of the proposed substitute claims 'without placing the burden of persuasion on the patent owner.'" (quoting *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1328 (Fed. Cir. 2017) (en banc))). After analyzing all of the evidence in the record, the Board found that Sanofi had established obviousness "by a preponderance of the evidence." Appx358; *see also* Appx274, Appx283. Although Pfizer trumpets certain isolated words employed by the Board divorced from their context, "it is not the language employed with which [this Court is] concerned, it is the placement of the burden of persuasion that matters." *Nike, Inc. v. Adidas AG*, No. 21-1903, 2022 WL 4002668, at *6 (Fed. Cir. 2022). The fact that the Board did not find particular arguments by Pfizer to be persuasive or supported by the evidence does not mean that it placed the burden of persuasion on Pfizer.

## III. THE BOARD DID NOT ABUSE ITS DISCRETION WHEN IT DENIED PFIZER'S MOTION TO AMEND.

The Board did not abuse its discretion when it declined to allow Pfizer to substitute new claims for Claims 1, 3, and 4 after finding that the proposed substitute claims were obvious. *See* Appx330-355. That finding was amply supported by substantial evidence as shown below. In arguing to the contrary, Pfizer complains that the Board did not find its arguments and evidence to be persuasive. *See, e.g.*, Opening Br. 45. Pfizer's attempt to reargue positions rejected by the Board does not come close to meeting the high bar of demonstrating abuse of discretion. *See Intelligent Bio-Sys.*, 821 F.3d at 1367.

### A. The Board's Finding that Claim 46 Is Obvious Is Supported by Substantial Evidence.

After reviewing the evidence proffered by the parties, the Board found that Claim 46—which Pfizer proposed to substitute for Claim 1—was obvious. Appx344-355. Claim 46 is identical to Claim 1 with the following additional limitations: (i) the composition contains conjugates for thirteen additional serotypes; (ii) the carrier protein for all fourteen conjugates is $CRM_{197}$; (iii) the composition contains an aluminum salt adjuvant; and (iv) "the composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses." Appx28091. The Board found that "a

preponderance of the evidence demonstrates that it would have been obvious to incorporate a serotype 22F polysaccharide—conjugated to $CRM_{197}$, with molecular weights and saccharide to protein ratios falling in the claimed ranges as rendered obvious by Merck-086 and GSK-711—into a pneumococcal vaccine with the 13 serotypes and aluminum salt adjuvant disclosed by Hausdorff with a reasonable expectation of success in obtaining a 2-log increase above baseline in serum IgG levels as required by claim 46." Appx348.

That finding is amply supported in the record, including the evidence showing that Claim 1 is obvious. As found by the Board, Hausdorff (Appx28152-28173) discloses:

- "a multivalent immunogenic composition [comprising conjugates], wherein the capsular polysaccharides are from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F and 23F of Streptococcus pneumoniae, the carrier protein is $CRM_{197}$, and the adjuvant is an aluminum-based adjuvant." Appx340 (citing Appx28156);
- A saccharide-to-protein ratio of two-to-one. *Id.* (citing Appx28162);
- The use of "[s]ize exclusion chromatography media (CL-4B) . . . to profile the relative molecular size distribution of the conjugate." *Id.* (citing Appx28163);

- Data showing that "the ratio of week 4 to week 0 [after immunization with two doses in New Zealand white rabbits], both with and without aluminum phosphate [adjuvant], was higher than a 2-log increase of 100 for every single serotype tested." Appx341-342 (citing Appx28170).

Hausdorff thus expressly discloses all of the limitations in Claim 46 that were not present in Claim 1 except for the 2-log increase with respect to the 22F conjugate. But that limitation was disclosed in Merck-086, which the Board found showed:

- A fifteen-valent immunogenic composition composed of the serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F and 33F conjugated to a carrier protein, preferably $CRM_{197}$. Appx342 (citing Appx25102);
- "[A] vaccine formulation with a 1:1 ratio for 14 serotypes including serotype 22F." *Id.* (citing Appx25109);
- "[F]ormulations containing 15 serotypes of the pneumococcal conjugate vaccine (PCV-15) 'were evaluated in 4 studies in adult New Zealand White Rabbits (NZWRs) using a compressed immunization regimen in which rabbits received a full human dose of vaccine at day 0 and day 14.'" *Id.* (citing Appx25111);

- Table 4 summarizes "the 'fold-rise in antibody levels to the non-Prevnar® serotypes [in PCV-15] from Day 0 to Day 28 (Post-dose 2, PD-2) . . . ." Appx343 (citing Appx25111);
- "In the NZWR-3 and NZWR-4 studies in Table 4 of Merck-086, serotype 22F exhibits a greater than 2-log increase above baseline in New Zealand White Rabbits with values of 243.0 and 135.0, while in the NZWR-1 and NZWR-2 studies in Table 4, serotype 22F exhibits less than 2-log increases of 45.7 and 87.8." Appx343 (citing Appx25111).

As the Board found, "both Merck-086 and GSK-711 provide specific reasons to incorporate serotype 22F into a pneumococcal vaccine to provide robust antibody responses that will provide herd immunity and reduce disease in human populations." Appx349 (citing Appx25103, Appx25007).

The Board also found that a POSA would have had a reasonable expectation of success if she added the serotype 22F conjugate disclosed in Merck-086 to Hausdorff's vaccine composition while "retaining the 2-log increased immune response of the thirteen serotypes and also allowing a 2-log increase in serotype 22F response." Appx349-354. It based that finding on the following evidence:

- Testimony from Dr. Van Alphen that "a 2-Log IgG Increase from baseline across all the serotypes can be achieved by routine optimization." Appx350 (citing Appx29792);

- Merck-086, "which shows that PCV-15, a composition comprising all of Hausdorff's thirteen serotypes and further including serotypes 22F and 33F, resulted in a 2-log increase for serotype 22F." *Id.* (citing Appx25102, Appx25111);
- Testimony from Pfizer's expert, Dr. Paradiso, that the baseline from which the log increase is determined can be routinely optimized to achieve a 2-log increase. Appx351.

All of that evidence supports the Board's finding that a POSA would have been motivated to combine Merck-086 with Hausdorff to achieve a vaccine with all of the limitations found in Claim 46—and would have reasonably expected to succeed at doing so. Appx348. The Board's finding that Claim 46 is obvious should thus be summarily affirmed.

In its opening brief, Pfizer rehashes arguments that it unsuccessfully raised before the Board. It first contends that because Merck-086 failed to achieve a 2-log increase across all serotypes, there cannot be a reasonable expectation of success. Opening Br. 46. According to Pfizer, Merck-086 shows that there was "immune interference" that prevents the achievement of the claimed 2-log increase across serotypes. Opening Br. 47. The Board found that argument to be "unpersuasive" based on the evidence in the record. Appx349-353. That finding was well-supported.

Specifically, Pfizer's myopic focus on Merck-086 ignores all of the other evidence in the record—credited by the Board—that undercuts its immune interference theory. For example, Pfizer ignores the Board's reliance on Hausdorff, which shows that all thirteen disclosed serotypes achieved a greater than 2-log increase. *See* pages 54-55, *supra*. Pfizer also ignores the Board's reliance on Paradiso-2009, which states that "[w]ith conjugates on $CRM_{197}$ it has been possible to induce good immunity to new serotypes without negatively affecting the components already in the vaccine." Appx352 (citing Appx30442-30445). The Board found that this evidence "supports the position that inclusion of an additional serotype 22F- $CRM_{197}$ conjugate into the thirteen serotype composition of Hausdorff would not have been expected to result in immune interference." Appx353. Moreover, even if some degree of immune interference resulted from the addition of the 22F conjugate to Hausdorff, it would not necessarily result in any serotype falling below a 2-log increase. Nor would it alter a POSA's reasonable expectation of success because, as the Board found, testimony from Drs. Van Alphen and Paradiso established that "the new multivalent conjugate vaccine could still be efficacious and approved." Appx353.

Pfizer further misses the mark when it argues that the Board abused its discretion by considering data in Merck-086 establishing a greater than 1-log increase for some serotypes in some experiments. Opening Br. 49-50. As an

initial matter, the Board's reliance on the data in question is beside the point because Hausdorff and Merck-086 disclose all the elements of Claim 46, including a greater than 2-log increase for all the recited serotypes, including 22F. Moreover, the Board reasonably found that while the claimed 2-log increase was expressly disclosed in Hausdorff and Merck-086, the 1-log increase presented in Table 4 of Merck-086 demonstrated a robust immune response and, therefore, supported a reasonable expectation of success because "[o]bviousness does not require absolute predictability of success." Appx351-352; *see also* Appx285 (citing Appx25103), Appx316 (same). That finding was supported by substantial evidence presented to the Board by Sanofi. *See, e.g.*, Appx29788 (Dr. Van Alphen testifying that "[t]he 2-Log IgG Increase could be achieved by routine optimization" because "responses were at least 1-log (i.e., at least 10-fold) above the baseline in all rabbit groups"), Appx29585-29586.

Pfizer is wrong that there is no substantial evidence supporting the Board's findings that a POSA would have been motivated to pursue a 2-log increase and could achieve it by routine optimization. Opening Br. 53-54. Citing Hausdorff, Merck-086, and a report from the World Health Organization (Appx26276-26277), Dr. Van Alphen testified that "[t]here was a clear motivation to further increase the IgG levels above the baseline for all serotypes as serum IgG levels are one of the indicators of immunogenicity of vaccine" and that there existed a "motivation and

reasonable expectation-of-success to achieve the 2-Log IgG Increase by routine optimization." Appx29786, Appx29586-29587. The Board relied on that evidence to find that a POSA would have been motivated to achieve a 2-log increase and would reasonably have expected to succeed at doing so. Appx350-351.

Finally, Pfizer points to a single instance in which the Board mistakenly refers to a "2-fold increase" (as opposed to a 2-log increase) in its decision (Appx353) and argues that the Board applied the wrong threshold. Opening Br. 46. In so arguing, Pfizer seeks to parlay a typographical error into a reversal. That typographical error is irrelevant, however, because the record clearly shows that the Board understood that the issue before it related to a 2-log increase, not a 2-fold increase. *E.g.*, Appx348 ("Viewing the evidence as a whole, we determine that a preponderance of the evidence demonstrates that it would have been obvious to . . . obtain[] a 2-log increase above baseline . . . ."), Appx349 ("produced an immune response with more than a 2-log increase," "reasonable expectation of success . . . while retaining the 2-log increase[]"), Appx351 ("a 2-Log IgG Increase from baseline across all the serotypes can be achieved by routine optimization . . . ."), Appx31797 (the Board stating during trial that "[t]enfold is, of course, not 2-log. It's tenfold.").

### B. The Board's Finding that Claims 48-49 Are Obvious Is Supported by Substantial Evidence.

Below, Pfizer moved to substitute Claims 48 and 49 for Claims 3 and 4. The Board found that Claims 48 and 49 are obvious. Appx358. That finding, too, was supported by substantial evidence.

Claims 48 and 49 depend upon Claim 46 and recite additional serotypes conjugated to $CRM_{197}$. Those additional serotypes correspond to the serotypes recited in Claims 3 and 4. Accordingly, all of the evidence that supports the obviousness of Claim 46, as well as the evidence supporting the obviousness of Claims 3 and 4, also support the obviousness of Claims 48-49. That evidence includes:

- Evidence that it was known to conjugate pneumococcal polysaccharides to $CRM_{197}$ (Appx340, Appx342-343; *see also* pages 38-39, 53-55, 58, *supra*);
- Evidence that a POSA would have been motivated to pursue a 2-log increase with a reasonable expectation of success for all the serotypes in the immunogenic composition, especially in view of the fact that a 2-log increase could be achieved through routine optimization (Appx344-348; *see also* pages 53-60, *supra*);
- Evidence that it would have been obvious to add immunogenic conjugates (including those recited in Claims 3 and 4) to an already-

existing immunogenic composition. Appx317-319; *see also* pages 47-51, *supra*.

In connection with Claims 3 and 4, the Board found that incorporating additional known serotypes into the immunogenic compositions described in GSK-711 and Merck-086 would have been obvious. Appx319. The same reasoning supports the Board's finding that Claims 48 and 49 are obvious in view of the evidence showing that Claim 46 is obvious.

Pfizer complains that the Board did not provide an analysis of Claims 48 and 49 in its decision. Opening Br. 56. However, the analysis of Claims 48 and 49 tracks the analysis of Claims 3 and 4, which the Board already provided. Additionally, even though Pfizer could have raised this argument after the Board issued its decision, particularly as part of its request for director review, it failed to do so. Accordingly, Pfizer has waived any argument regarding the Board's purported failure to provide an analysis of claims 48 and 49. *See DBC*, 545 F.3d at 1376-79, 1381; *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.").

## IV. THE PROCEDURE FOR DIRECTOR REVIEW OF IPR DECISIONS IS NOT SUBJECT TO NOTICE-AND-COMMENT RULEMAKING.

In a final thrust, Pfizer contends that the procedure for the PTO Director's discretionary review of Final Written Decisions is invalid because it was not promulgated through notice-and-comment rulemaking. That is incorrect. Notice-and-comment rulemaking is not required for "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). The Director's review procedure is a procedural rule that is exempt from the notice-and-comment process.

Director review of Board decisions arose in response to *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021). There, the Supreme Court held that the statute governing IPRs violated the Appointments Clause of the U.S. Constitution because the decisions of administrative patent judges were not reviewable by a principal officer of the United States. *Id.* at 1985 (citing U.S. Const. art. II, § 2, cl. 2). To remedy the Appointments Clause violation, the Court held that the PTO Director must "have the discretion to review decisions rendered by APJs." *Id.* at 1988. The Court did not limit the Director's discretion or require formal rulemaking before the Director exercised that discretion. Here, Pfizer requested that the Director review the Final Written Decisions under appeal, and the Director declined to do so. That is all that *Arthrex* required.

Pfizer complains that the Director's exercise of discretion not to review the Final Written Decisions was invalid because the Director's review procedure was not formally promulgated following notice and comment from the public. But an agency's procedural rules are not required to go through a formal rulemaking process. 5 U.S.C. § 553(b)(3)(A). A procedural rule is one that does not affect "the rights or interests of parties" but only "the manner in which parties present themselves or their viewpoints to the agency." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047, 1050 (D.C. Cir. 1987). The procedure governing Director review of Board decisions is a classic procedural rule because it does not alter any party's substantive rights. It does not, for example, change the standards for patentability in an IPR or alter the parties' substantive burdens during an IPR. Instead, it merely dictates how a party can seek review of a Board decision, which is the essence of a procedural rule. *See Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001) (holding that "a procedural rule for handling appeals" that does not "alter the substantive standards" applied by an agency is not subject to notice and comment); *JEM Broad., Inc. v. FCC*, 22 F.3d 320, 327 (D.C. Cir. 1994) (rule denying parties the right to fix errors in their applications was procedural; "The critical fact . . . is that the 'hard look' rules did not change the *substantive standards* by which the FCC evaluates license applications.").

It is irrelevant that the PTO is currently soliciting public comments on the Director's review procedure. *See* Opening Br. 56; *see also* Request for Comments on Director Review, Precedential Opinion Panel Review, and Internal Circulation and Review of Patent Trial and Appeal Board Decisions, 87 Fed. Reg. 43,249 (Jul. 20, 2022). Even where notice-and-comment rulemaking is not required, Congress has encouraged agencies to voluntarily solicit public comment if it would be "useful to the agency or beneficial to the public." *Batterton v. Marshall*, 648 F.2d 694, 700 n.23 (D.C. Cir. 1980) (quoting H.R. Rep. No. 1980, 79th Cong., 2d Sess. 256 (1946)). Here, the PTO has determined that it would be useful to voluntarily solicit public comment on the Director's review procedures. That does not mean that notice and comment was required.

## CONCLUSION

For the foregoing reasons, the decisions of the Board should be affirmed.

Dated: December 13, 2022

Respectfully submitted,

*/s/ Siegmund Y. Gutman*

JOHN E. ROBERTS
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Tel: (617) 526-9600
jroberts@proskauer.com

SIEGMUND Y. GUTMAN
PROSKAUER ROSE LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067
Tel: (310) 557-2900
sgutman@proskauer.com

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2019-1871, 2019-1873, 2019-1875, 2019-1876, 2019-2224

**Short Case Caption:** Pfizer Inc. v. Sanofi Pasteur Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,724 words.

- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.

- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 12/13/2022

Signature: /s/ Siegmund Y. Gutman

Name: Siegmund Y. Gutman