2019-1871, -1873, -1875, -1876, -2224

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**PFIZER, INC.,**
Appellant,

**V.**
**SANOFI PASTEUR INC.,**
**SK CHEMICALS CO., LTD.,**
Appellees,

**KATHERINE K. VIDAL,**
Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,
Intervenor.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR2017-02131, IPR2017-02132, IPR2017-02136, IPR2017-02138, and IPR2018-00187

# BRIEF FOR DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

THOMAS W. KRAUSE
Solicitor

FARHEENA Y. RASHEED
Deputy Solicitor

MARY L. KELLY
DANIEL KAZHDAN
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the United States Patent and Trademark Office*

December 13, 2022

**Representative issued claim**

1. An immunogenic composition comprising
a *Streptococcus pneumoniae* serotype 22F glycoconjugate,
wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and
a carrier protein,
and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.

(Appx933.)

**Representative proposed substitute claim**

46. An immunogenic composition comprising:
a *Streptococcus pneumoniae* serotype 22F glycoconjugate,
wherein the 22F glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and
a $CRM_{197}$carrier protein,
and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2;
glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F all individually conjugated to $CRM_{197}$;
an aluminum salt adjuvant; and
wherein the composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition in the form of an initial dose and a booster dose.

(Appx12655.)

# TABLE OF CONTENTS

**Page**

I. Statement of the Issues ..... 1

II. Statement of the Case ..... 3

A. Technological background ..... 5

B. The ’559 patent and issued claims ..... 7

C. Pfizer’s proposed substitute claims ..... 8

D. The prior art ..... 9

1. Merck 2011 ..... 9

2. Pfizer 2012 ..... 11

3. Hausdorff ..... 11

4. GSK 2008 ..... 12

5. PVP ..... 13

E. The Board decision in IPR2017-02132 ..... 14

III. Summary of the Argument ..... 19

IV. Argument ..... 25

A. Standard of review ..... 25

B. Substantial evidence supports the Board’s finding that Pfizer’s issued claims are unpatentable as obvious ..... 26

1. Pfizer fails to identify any reversible error in the Board’s finding that the claimed molecular weight ranges are obvious ..... 28

a. Substantial evidence supports the Board's finding that molecular weight is a result-effective variable that was obvious to optimize ...... 29

b. A prior art range would need to anticipate to be obvious under Pfizer's interpretation of the law ...... 32

c. Under *KSR*, invocations of "unpredictability" alone do not render an invention patentable ...... 35

d. The Board did not introduce the result-effective variable theory of obviousness *sua sponte* ...... 37

e. The Board's citation to GSK 2008 did not create a new ground of rejection ...... 38

2. The Board correctly found a reasonable expectation of success for the 22F glycoconjugate of claim 1 ...... 40

3. The Board considered the obviousness of claim 1 as a whole ...... 42

4. Substantial evidence supports the Board's finding that dependent claims 3 and 4 are unpatentable as obvious ...... 44

C. The Board properly denied Pfizer's motion to add substitute claims 46-52 ...... 49

1. Pfizer mischaracterizes the Board's treatment of Skinner ...... 54

2. Substitute claims 48 and 49 are unpatentable for the same reasons as issued claims 3 and 4 and proposed substitute claim 46 ...... 57

D. Pfizer's APA challenges to the USPTO's implementation of Director review in light of *Arthrex* lack merit ...... 57

V. Conclusion ...... 63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alcon Rsch., Ltd. v. Apotex Inc.*,
687 F.3d 1362 (Fed. Cir. 2012) ....................................................................34

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2013) ....................................................................40

*Alza Corp. v. Mylan Labs., Inc.*,
464 F.3d 1286 (Fed. Cir. 2006) ....................................................................25

*Antonie, In re*,
559 F.2d 618 (CCPA 1977)......................................................................29, 32

*Applied Materials, In re*,
692 F.3d 1289 (Fed. Cir. 2012) ...........................................................15, 29, 31

*Aqua Products, Inc. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017) ...........................................................56, 57, 58

*Armstrong v. CFTC*,
12 F.3d 401 (3d Cir. 1993) ..........................................................................61

*Bachow Commc'ns Inc. v. FCC*,
237 F.3d 683 (D.C. Cir. 2001).......................................................................57

*Bayer Schering Pharma AG v. Barr Labs Inc.*,
575 F.3d 1341 (Fed. Cir. 2009) ....................................................................33

*Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*,
467 U.S. 837 (1984) ......................................................................................58

*City of Bethany v. FERC*,
727 F.2d 1131 (D.C. Cir. 1984) ....................................................................61

*City of Frankfort v. FERC*,
678 F.2d 699 (7th Cir. 1982) ........................................................................61

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ......................................................................................26

*Cooper Techs. Co. v. Dudas*,
536 F.3d 1330 (Fed. Cir. 2008) ....................................................................59

*Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Lit., In re*,
676 F.3d 1063 (Fed. Cir. 2012) ....................................................................34

*Demko v. United States*,
216 F.3d 1049 (Fed. Cir. 2000) ....................................................................26

*E.I. Dupont de Nemours & Company v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018) ..............................................................29, 32, 48

*Facebook, Inc. v. Windy City Innovations, LLC*,
973 F.3d 1290 ................................................................................... 56-57, 58

*Gartside, In re*,
203 F.3d 1305 (Fed. Cir. 2000) ...............................................................25, 26

*Genentech, Inc. v. Hospira, Inc.*,
946 F.3d 1333 (Fed. Cir. 2020)……………………………………………..28

*Google LLC v. IPA Techs. Inc.*,
34 F.4th 1081 (Fed. Cir. 2022) .............................................................. 47-48

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019) ............................................................... 33-34

*Inova Alexandria Hosp. v. Shalala*,
244 F.3d 342 (4th Cir. 2001) .......................................................................57

*JEM Broad. Co. v. FCC*,
22 F.3d 320 (D.C. Cir. 1994).......................................................................57

*Jolley, In re*,
308 F.3d 1317 (Fed. Cir. 2002) ....................................................................26

*Kotzab, In re*,
217 F.3d 1365 (Fed. Cir. 2000)……………………………………………..25

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007).............................................................................32, 33

*Kubin, In re*,
561 F.3d 1351 (Fed. Cir. 2009)..........53

*Mid Continent Nail Corp. v. United States*,
846 F.3d 1364 (Fed. Cir. 2017)..........26

*Morsa, In re*,
803 F.3d 1374 (Fed. Cir. 2015)..........39

*Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd.*,
923 F.3d 1051 (Fed. Cir. 2019)..........34

*O'Farrell, In re*,
853 F.2d 894 (Fed. Cir. 1988)..........53

*Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.*,
73 F.3d 1085 (Fed. Cir. 1995)..........25

*Peterson, In re*,
315 F.3d 1325..........16, 33

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007)..........33, 40

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006)..........44, 49, 56

*Soft Gel Techs., Inc. v. Jarrow Formulas, Inc.*,
864 F.3d 1334 (Fed. Cir. 2017)..........40

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
18 F.4th 1377 (Fed. Cir. 2021)..........33

*Thrift, In re*,
298 F.3d 1357 (Fed. Cir. 2002)..........25

*Titanium Metals Corp. v. Banner*,
778 F.2d 775 (Fed. Cir. 1985)..........33

*United States v. Arthrex*,
141 S. Ct. 1970 (2021)..........4, 24, 56

*United States v. Dunkel*,
927 F.2d 955 (7th Cir. 1991)…………………………………………………...44

*Watts, In re*,
354 F.3d 1362 (Fed. Cir. 2004) ....................................................................25

*Woodruff, In re*,
919 F.2d 1575 (Fed. Cir. 1990) ....................................................................36

*Yuk v. Ashcroft*,
355 F.3d 1222 (10th Cir. 2004) ....................................................................61

**Statutes**

5 U.S.C. § 552(a)(1)........................................................................................58

5 U.S.C. § 553 ...........................................................................................56, 59

5 U.S.C. § 553(b) ...............................................................................................59

5 U.S.C § 553 .....................................................................................................56

5 U.S.C § 553(b)(3)(A) ...............................................................................25, 57, 59

35 U.S.C. § 2(b) .......................................................................................56, 57

35 U.S.C. § 2(b)(2)(B) .........................................................................................59

35 U.S.C. § 316.....................................................................................................59

35 U.S.C. § 316(a) ....................................................................................56, 58

## STATEMENT OF RELATED CASES

Pfizer, Inc. (Pfizer), seeks relief from the final decisions of the Patent Trial and Appeal Board (Board) of the U.S. Patent and Trademark Office (USPTO) in five, separate inter partes review (IPR) proceedings challenging the claims in its patent, U.S. Patent No. 9,492,559 (the ’559patent). To the Director’s knowledge, outside this consolidated appeal, no other appeals concerning the ’559 patent have previously been before this Court. The Director is also unaware of any case pending in this or any other court that will directly affect or be directly affected by a decision in this appeal.

## I. STATEMENT OF THE ISSUES

Pfizer seeks reversal of Board decisions in five inter partes review proceedings (IPRs) holding the issued claims in the ’559 patent unpatentable as obvious and denying its motion to enter proposed substitute claims. Pfizer’s issued claims broadly cover any multivalent vaccine comprising a glycoconjugate(s) of the pneumococcal serotype 22F and any other pneumococcal serotypes within a broad molecular weight range. More specifically, issued claim 1 recites an immunogenic composition (vaccine) comprising a glycoconjugate prepared from the 22F serotype of *Streptococcus pneumoniae* and a carrier protein, wherein the glycoconjugate has a molecular weight between 1,000 - 12,500 kDa and a polysaccharide-to-carrier protein (weight/weight) ratio between 0.4 - 2.

In the Merck-initiated proceedings, the Board found each of Pfizer’s claims unpatentable as obvious over Merck 2011, Pfizer 2012 and the knowledge in the art. Merck 2011 teaches a multivalent conjugate vaccine comprising glycoconjugates prepared from fifteen pneumococcal serotypes, including the 22F serotype conjugated to the same carrier protein disclosed in the ’559 patent. While Merck 2011 discloses using standard techniques for preparing glycoconjugates at a 0.2 – 2 to 1 charge ratio and filtering the glycoconjugates to size, Merck 2011 does not expressly disclose the molecular weights of the resultant glycoconjugates. Nevertheless, the Board found that artisans would have been motivated to optimize

the glycoconjugates in Merck 2011's 15-valent pneumococcal conjugate vaccine (PVC-15) to within the claimed size range based on Pfizer 2012's teaching that the typical mass of glycoconjugates in multivalent vaccines is between 500 - 5,000 kDa. The Board also found that artisans would have had a reasonable expectation of success in doing so based on Merck 2011's teaching that all fifteen serotypes of PCV-15 produced a "robust" immune response. The same is true for dependent claims 3 and 4, which merely recite the inclusion of glycoconjugates containing additional pneumococcal serotypes.

The Board denied Pfizer's motion to add substitute claims for similar reasons. Representative substitute claim 46 contains all of the limitations of issued claim 1 but recites glycoconjugates of 13 additional serotypes and a requirement that all serotypes produce a 2-log immune response over baseline in New Zealand White Rabbits. The Board found that Pfizer's substitute claims are unpatentable as obvious in view of Hausdorff's multivalent vaccine, which comprises glycoconjugates of all of the serotypes recited in claim 46 except 22F and undisputedly exhibits a greater than 2-log immune response increase per the requirements of claim 46, taken in combination with Merck 2011's data showing

that the 22F glycoconjugate of PCV-15 induced greater than 2-log increase in New Zealand White Rabbits.

After Merck dropped out of these appeals, the Director intervened to defend the Board's decisions in the IPRs in which Sanofi was not a party. The Director also intervened to address Pfizer's Administrative Procedure Act (APA) challenges to the interim procedures governing Director review in IPRs.

Accordingly, the Director will address the following issues:

(1) Whether substantial evidence supports the Board's finding that the issued claims in the '559 patent are unpatentable as obvious;

(2) Whether substantial evidence supports the Board's finding that Pfizer's proposed substitute claims are unpatentable as obvious; and

(3) Whether the interim procedures governing Director review in IPRs violate the APA.

## II. STATEMENT OF THE CASE

This consolidated appeal arises from five, separate IPR proceedings initiated by Merck and/or Sanofi Pasteur, Inc. and SK Chemical Co., Ltd. (Sanofi) challenging the patentability of the claims in the '559 patent. The table below summarizes the parties involved in each proceeding and the challenged claims in each proceeding.

| CAFC APPEAL NO. | IPR PARTIES | IPR NO. | CLAIMS |
|---|---|---|---|
| 19-2224 | *Sanofi/SK v. Pfizer* | 2018-00187 | 1-45 |
| 19-1871 | *Merck v. Pfizer* | 2017-02131 | 1-10, 16-19, 38-45 |
| 19-1873 | *Merck v. Pfizer* | 2017-02132 | 1-10, 16-19, 39-45 |
| 19-1875 | *Merck v. Pfizer* | 2017-02136 | 11-15, 20-37 |
| 19-1876 | *Merck v. Pfizer* | 2017-02138 | 11-15, 20-37 |

The Board found each of the claims challenged in these proceedings unpatentable as obvious on the grounds set forth in Merck and Sanofi's petitions for IPR. Pfizer then appealed the Board's decisions to this Court. These appeals remained pending, however, awaiting resolution of the Appointments Clause challenge to the investiture of the Board's administrative patent judges. After the Supreme Court issued its decision in *United States v. Arthrex*, 141 S. Ct. 1970 (2021), this Court issued a limited remand for Pfizer to seek Director review. Former Commissioner Andrew Hirshfeld, who had been delegated the functions and duties of the Director during the former vacancy in that office, denied the requests for Director review. Thereafter, Pfizer filed an amended opening brief adding an APA challenge to the USPTO's interim procedures for conducting Director review of the Board's IPR decisions post-*Arthrex*.

When Merck dropped out of these appeals, the Director intervened to defend the merits of the Board's decisions in the appeals to which Sanofi is not a party, i.e., IPR2017-02131, -02132, -02136, -02138, and to respond to Pfizer's APA claim. Because Pfizer's opening brief challenges the Board's obviousness findings only as to challenged (issued) claims 1, 3, and 4 and proposed substitute claims 46-52, the Director limits her response to the only proceeding dealing with those claims to which Sanofi was not a party, i.e., IPR2017-02132.

**A. Technological background**[1]

The '559 patent concerns vaccines directed to polysaccharide-protein conjugates found on "encapsulated" bacteria, like pneumococcus. When faced with an infection caused by encapsulated bacteria, the immune system often focuses its response on the polysaccharides found on the bacteria's surface, thereby making the polysaccharides attractive molecules for vaccine development. (*See* Appx2581). Despite the successful use of bacterial polysaccharides to immunize adults and older children, polysaccharides alone are not very immunogenic (capable of triggering an immune response) in children under 2 years of age. *Id.* A robust antibody-mediated response against such polysaccharides can be achieved in very young children, however, if the polysaccharides are conjugated to a carrier

[1] Taken with permission from Merck Petition for IPR in IPR2017-02132 with light modification.

protein. (*See, e.g.*, Appx2633-2636.) Polysaccharide-protein conjugate vaccines have been commercialized for nearly four decades. (Appx2692, Appx2842.) Numerous conjugate vaccines have also been approved for use in children, including three vaccines against pneumococcus: Prevnar®, Prevnar 13®, and Synflorix®. (*See, e.g.*, Appx2699-2700, Appx2763-2764, Appx2838-2839, Appx2841-2842, Appx2846-2847, Appx2855-2857, Appx2861-2864, Appx2912.)

"Serotypes" or "serogroups" are strains of a bacteria characterized by the particular polysaccharides displayed on their surfaces. In general, antibodies are serotype-specific, recognizing the specific structure of a polysaccharide; antibodies against a polysaccharide from one serotype generally will not be cross-protective against structurally-unrelated serotypes. (*See* Appx3097.) Because of this lack of cross-protection, vaccines are frequently and increasingly multivalent, i.e., include polysaccharides from more than one serotype. *Id*. For example, Prevnar® was a 7-valent vaccine containing pneumococcal serotypes 4, 6B, 9V, 14, 18C, 19F, and 23F conjugated to the $CRM_{197}$ carrier protein, whereas the next iteration of Prevnar® was a 13-valent vaccine containing additional serotypes 1, 3, 5, 6A, 7F and 19A conjugated to $CRM_{197}$, i.e., Prevnar 13®. (Appx3115; Appx2915.) In this way, later iterations of multivalent vaccines may incorporate additional clinically prevalent and emerging serotypes.

Serotype specific glycoconjugates are commonly prepared using “reductive amination” or cyanylation using l-cyano-4dimethylaminopyridinium tetra-fluoroborate (CDAP). Either technique may be used to crosslink multiple sites on the polysaccharide to multiple sites on the carrier protein, thereby forming a high molecular weight “lattice” containing multiple polysaccharides and carrier proteins. (Appx2847, Appx2513-2516, Appx3061.) Reductive amination and CDAP have been used to construct immunogenic conjugates in the pneumococcal vaccines Prevnar® (Appx2847); Prevnar 13® (Appx2915); and Synflorix® (Appx2929). Prior to 2014, it was known that “[t]he degree of crosslinking and overall size of the network or lattice can be regulated by routine variation of the conditions of the conjugation reaction.” (Appx2409 at 4:56-59; Appx2436-2437 (“The properties that may be controlled include . . . selecting the degree of crosslinking of the construct (to obtain variations of size).”)).

**B. The ’559 patent and issued claims**

The ’559 patent is directed to multivalent vaccines that include “at least one glycoconjugate from a *S. pneumoniae* serotype not found in PREVNAR®, SYNFLORIX® and/or PREVNAR 13®.” (Appx845 at Abstract.) According to the ’559 patent, such vaccines will address an unmet need for the prevention of pneumococcal disease due to serotypes not present in these earlier vaccines “and potential serotype replacement over time”:

> [T]here is a need to address remaining unmet medical need for coverage of pneumococcal disease due to serotypes not found in PREVNAR 13® and potential for serotype replacement over time. The specific serotypes causing disease beyond the 13 in PREVNAR 13® vary by region, population, and may change over time due to acquisition of antibiotic resistance, pneumococcal vaccine introduction and secular trends of unknown origin.

(Appx863 at 2:3-10.)

Sole independent claim 1 reads as follows:

> 1. An immunogenic composition comprising
>     a *Streptococcus pneumoniae* serotype 22F glycoconjugate,
>         wherein the glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and
>     a carrier protein,
>     and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2.

(Appx933.) Dependent claim 3 recites the immunogenic composition of claim 1 further comprising glycoconjugates of pneumococcal serotypes 15B and 33F. *Id.* Dependent claim 4 recites the composition of claim 3 further comprising additional glycoconjugates of pneumococcal serotypes 8, 10A, 11A, and 12F. *Id.*

**C. Pfizer's proposed substitute claims**

Independent substitute claim 46 recites a multivalent immunogenic composition comprising the 22F glycoconjugate of original claim 1 plus glycoconjugates of thirteen additional serotypes (i.e., 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14,

18C, 19A, 19F, and 23F). (Appx12655.) As shown below, claim 46 also expressly requires that the "composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition":

> 46. An immunogenic composition comprising:
> a *Streptococcus pneumoniae* serotype 22F glycoconjugate,
> wherein the 22F glycoconjugate has a molecular weight of between 1000 kDa and 12,500 kDa and comprises an isolated capsular polysaccharide from *S. pneumoniae* serotype 22F and
> a $CRM_{197}$carrier protein,
> and wherein a ratio (w/w) of the polysaccharide to the carrier protein is between 0.4 and 2;
> glycoconjugates from *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F all individually conjugated to $CRM_{197}$;
> an aluminum salt adjuvant; and
> wherein the composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition in the form of an initial dose and a booster dose.

(Appx12655.) Dependent substitute claims 48 and 49 correspond to issued claims 3 and 4, and recite the addition of the serotype glycoconjugates recited in those claims, except with respect to the immunogenic composition of claim 46.

### D. The prior art

#### 1. Merck 2011[2]

Merck 2011 discloses a 15-valent pneumococcal conjugate vaccine (PCV-15) comprising glycoconjugates prepared from various pneumococcal serotypes, including the 22F serotype conjugated to the same carrier protein disclosed in the '559 patent. (Appx1734 at ll.7-11.) More specifically, PCV-15 includes glycoconjugates of pneumococcal serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F, and 33F and the carrier protein $CRM_{197}$. *Id.*

Merck 2011 discloses that PCV-15 induced a "high" immunogenic response "for all 15 serotypes contained in the vaccine." (Appx1756 at ll.3-4.) More specifically, Merck 2011 examined IgG levels in New Zealand White Rabbits following two doses of PCV-15 to assess the immune response to the non-Prevnar® serotypes found in PCV-15. (Appx1757 at Table 4.) Merck 2011 discloses that the 22F and 33F serotypes "provid[ed] robust antibody responses demonstrat[ing] the feasibility of expanding coverage of pneumococcal serotypes." (Appx1737 at ll.2-3).

Merck 2011 performed similar immunogenicity studies in infant rhesus monkeys and disclosed that antibody responses to PCV-15 and Prevnar® "were

---

[2] Caulfield *et al.*, WO 2011/100151 A1, published Aug. 18, 2011 (Merck 2012; Appx1732-1768).

comparable for the 7 common serotypes and that post-vaccination responses to PCV-15 were greater than 10-fold higher than baseline for the 8 added serotypes." (Appx1755 at ll.26-28, *see also* Appx1765 at Fig.1, Appx1766 at Fig.2.)

Merck discloses that the glycoconjugates used in PCV-15 were prepared by mixing activated serotype saccharide with the $CRM_{197}$ carrier protein at a "0.2 – 2 to 1 charge ratio" and then filtered using a 0.2 µm filter. (*See* Appx1739 at ll.11-23, Appx1750 ll.24-25.) Merck 2011 does not disclose the molecular weight range of the resultant glycoconjugates.

**2. Pfizer 2012**[3]

Pfizer 2012 discloses the benefits of using mass spectrometry to characterize vaccine products. (Appx1894.) With respect to glycoconjugate vaccines, Pfizer 2012 discloses that the polysaccharides used in these vaccines have a "Typical Mass (kDa)" of "50 to 200 kDa," and that the glycoconjugates in these vaccines have a typical mass between "500 to 5,000 kDa." (Appx1898.)

**3. Hausdorff**[4]

Hausdorff discloses a multivalent vaccine comprising glycoconjugates of all of the *S. pneumoniae* serotypes recited in claim 46 except the 22F serotype (i.e.,

---

[3] Brown *et al*., Characterization of Complex Prophylactic Vaccines with Protein and Glycoconjugate Components, 9th CASSS Symposium (Sept. 12, 2012) (Pfizer 2012; Appx1893-1926).

[4] Hausdorff *et al*., U.S. Patent Publication No. US2012/0237542 A1, published Sep. 20, 2012 (Hausdorff; Appx4522-4543).

the 13vPnC vaccine). (Appx28170 ¶¶ 230, 231.) Table 3 of Hausdorff presents the results of studies examining the serotype-specific immune responses in New Zealand White Rabbits following the administration of two doses of 13vPnC. (Appx28170 ¶¶ 230, 231, Table 3.) Table 3 shows that each of the thirteen tested serotypes produced an immune response with more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits after two equal doses of 13vPnC. (Appx28170 ¶¶ 230, 231, Table 3; *see also* Appx28156 ¶ 8.)

#### 4. GSK 2008[5]

GSK 2008 discloses multivalent pneumococcal vaccines comprising a glycoconjugate of serotype 22F. (Appx1769 at Abstract.) GSK 2008 discloses that these vaccines are typically 10- to 23-valent with capsular polysaccharides selected from serotypes 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, 15, 17F, 18C, 19A, 19F, 20, 22F, 23, 23F, and 33F. (*See* Appx1777 at ll.17-21, 29-31.) GSK 2008 also discloses that "one or two other serotypes could be substituted depending on the age of the recipient receiving the vaccine and the geographical location where the vaccine will be administered." (Appx1777 at ll.31-33.) For example, GSK 2008 discloses a 13-valent conjugate vaccine that includes a serotype 22F glycoconjugate. (Appx1824 at ll.2-8.)

---

[5] Biemans *et al.*, WO 2009/000825 A2, published Dec. 31, 2008 (GSK 2008; Appx1769-1892).

GSK 2008 claims and discloses both directly- and indirectly-linked immunogenic serotype 22F conjugates. (Appx1861 (claim 43) ("The immunogenic composition according to any preceding claim comprising a 22F capsular saccharide directly conjugated to the carrier protein."); *id.* (claim 44) ("The immunogenic composition of any one of claims 1-42 comprising 22F capsular saccharide conjugated to the carrier protein via a linker.").) GSK 2008 discloses that both types of glycoconjugates are immunogenic. (*See, e.g.,* Appx1876 (Fig.6), Appx1884 (Fig.14), Appx1886 (Fig.16), Appx1888 (Fig.18), Appx1890 (Fig.20), and Appx1892 (Fig.22).)

**5. PVP 2013**[6]

PVP 2013 discloses the minimum requirements for the 23-valent pneumococcal polysaccharide vaccine, Pneumovax® 23. PVP 2013 discloses that Pneumovax® 23 comprises the purified capsular polysaccharides from pneumococcal serotypes 1, 2, 3, 4, 5, 6B, 7F, 8, 9N, 9V, 10A, 11A, 12F, 14, **15B**, 17F, 18C, 19A, 19F, 20, **22F**, 23F, and 33F. (Appx1927 (emphases added).)

---

6 "Pneumococcal Vaccine Polyvalent" revision to Japan's "Minimum Requirements for Biological Products" published on the website of Japan's National Institute of Infectious Diseases (as of March 2, 2013) (PVP; Appx1927-1932).

**E. The Board decision in IPR2017-02132**

The Board found issued claims 1, 3, and 4 – the only issued claims defended in Pfizer's opening brief – obvious over Merck 2011, Pfizer 2012, and the general knowledge within the art. More specifically, the Board found that artisans would have been motivated to optimize the molecular weight ranges of the pneumococcal serotype 22F-CRM197 glycoconjugates in Merck 2011's vaccine to within the claimed molecular weight range based on the disclosures in Pfizer 2012 about the "typical" molecular weight ranges for glycoconjugate vaccines. (Appx97.) The Board based this finding, in part, on its finding that molecular weight is a results-effective variable for generating immunogenic compositions comprising *S. pneumoniae* glycoconjugates. (Appx108.)

In finding that molecular weight is a results-effective variable, the Board noted the admission of Pfizer's expert, Dr. Boons, that molecular weight was known to be an "important" – and possibly even "critical" – parameter for generating immunogenic glycoconjugate compositions. (Appx105-106 (quoting Appx6486 at ll.2-8 ("[S]omething that the person skilled in the art would know, is that multiple parameters are important and can be critical for generating an immunogenic glycoconjugate composition, including degree of oxidation, saccharide to protein ratio, and molecular weights.").) The Board also noted

Dr. Boons' admission that it was well known that parameters like molecular weight "need to be optimized." (Appx106 (citing Appx6487 at ll.21-24).)

The Board further found that artisans would have known how to optimize molecular weight to the claim range based on the disclosures in Merck 2011 and general knowledge in the art. For example, Merck 2011 teaches that "'[c]apsular polysaccharides from *Streptococcus pneumoniae* can be prepared by standard techniques . . . and may be sized to some degree by known methods (*see, e.g.*, European Patent Nos. EP497524 and EP497525) and preferably by microfluidisation.'" (Appx101-102 (quoting Appx1737 at ll.12–15). Merck 2011 further teaches that these "'[p]olysaccharides can be sized in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products,'" including polysaccharides "'prepared from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F [,] and 33F of *S. pneumoniae*.'" (Appx102 (quoting Appx1737 at ll.15-18 (emphasis added by Board)).) The Board also found that the filtration techniques disclosed in Merck 2011 exemplify the artisan's ability to optimize glycoconjugate size (i.e., molecular weight). (*See* Appx102.)

The Board found additional support for an expectation of success in Dr. Kasper's statement that artisans "'easily could have constructed a cross-linked serotype 22F $CRM_{197}$ conjugate in Pfizer 2012's molecular weight range, using the well-known reductive amination or CDAP conjugation chemistries disclosed in

Merck 2011.'" (Appx98 (quoting Appx1622-1623 ¶ 107; citing Appx1739 at l.15 to Appx1740 at l.6).) The Board noted that this comports with Dr. Paradiso's admission that the ordinary artisan would "'probably have a good idea on how to vary these parameters.'" (Appx107 (citing Appx6155 at ll.19-22).) Based on these admissions and the teachings in the prior art, the Board found that "conjugate size is a results-effective variable associated with improved stability of conjugates and good immune response, limited only by filter size, thereby rendering 'optimization within the grasp of one of ordinary skill in the art.'" (Appx108 (citing *In re Applied Materials*, 692 F.3d 1289, 1295 (Fed. Cir. 2012).) Next, the Board found issued claim 1 obvious based on the overlap between the recited claim range and the range of typical glycoconjugate weights disclosed in Pfizer 2012. (Appx108 (citing *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) ("In cases involving overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a prima facie case of obviousness.")).)

The Board was unpersuaded by Pfizer's arguments for the patentability of issued dependent claims 3 and 4 based on their further inclusion of serotype 15B and 33F glycoconjugates. Rather, the Board found that PVP 2013 taught the inclusion of serotype 15B in a pneumococcal vaccine, and that the Pneumovax® 23 polysaccharide vaccine already included serotypes 15B and 33F. (Appx127 (citing Appx1644 ¶ 142, Appx5789-5790 ¶ 60 (citing Appx26340)).) Although the PVP

2013 and Pneumovax® 23 vaccines included unconjugated 15B – and not a 15B glycoconjugate as recited in claims 3 and 4 – the Board found that they demonstrate the desirability of a vaccine targeting the 15B serotype. (Appx127.) On the foregoing, the Board found that "'[o]ne would also have reasonably expected success because . . . other new serotypes were successfully included in multivalent PCV compositions while maintaining the immunogenicity to all serotypes in the compositions.'" (Appx127-128.)

The Board also found Pfizer's argument unpersuasive that none of the prior art disclosures teach a composition wherein each of the exemplified serotype glycoconjugates is immunogenic, as required by claims 3 and 4. The Board found that, even though GSK 2008 does not expressly teach that each of the glycoconjugates in its multivalent vaccine is immunogenic, "the disclosure of a vaccine by GSK 2008 containing multiple serotypes also requires induction of an immune response to each serotype. Otherwise, there would be no need to include a serotype unable to induce such a response. And indeed, GSK 2008 uses the same term, immunogenic, to describe the pneumococcal vaccine composition." (Appx127 (citing Appx1774 at l.27).) Accordingly, the Board found that claims 3 and 4 are unpatentable as obvious over the disclosures in Merck 2011, Pfizer 2012,

GSK 2008, and the knowledge of persons of ordinary skill in the art. (Appx131-132.)

Next, the Board found proposed substitute claims 46-52 unpatentable as obvious and denied Pfizer's motion to amend. More specifically, the Board found that Hausdorff teaches a multivalent immunogenic composition comprising glycoconjugates of all of the *S. pneumoniae* serotypes recited in claim 46 except the 22F serotype (i.e., the 13vPnC vaccine). (Appx140-141 (citing Appx28170 ¶¶ 230, 231).) The Board also found that Table 3 of Hausdorff "shows that each of the thirteen tested serotypes produced an immune response with more than a 2-log increase above baseline serum IgG levels in New Zealand White Rabbits after administration of the two equal doses." (Appx141 (citing Appx28170 ¶231, Table 3); *see also* Appx140 (citing Appx28156 ¶ 8).) The Board additionally found that Table 4 in Merck 2011 similarly reports a greater than 100-fold (or 2-log) increase for the 22F serotype in New Zealand White Rabbits following the administration of two equal doses of PCV-15. (Appx143 (citing Appx1757 at Table 4).) On this basis, the Board found that artisans would have been motivated to include serotype 22F in Hausdorff's 13vPnC vaccine to achieve the immunogenic composition of claim 46, and that they would have had a reasonable

expectation that doing so would result in a 2-log increase in immune response across all serotypes. (Appx144-148.)

The Board was not persuaded by Pfizer's argument that Merck 2011's PCV-15 vaccine did not demonstrate a 2-log increase in immune response across all serotypes or for the 22F serotype in the NZWR-1 and NZWR-2 studies shown in Table 4. Rather, the Board found that artisans would not have been led away from incorporating a 22F glycoconjugate in Hausdorff's 13vPnC vaccine because Merck 2011 expressly states that "'the addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses [and] demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing pneumococcal vaccines . . . .'" (Appx148 (quoting Appx1737 at ll.1-4).) Thus, the Board found that "Merck 2011 provides specific reasons to incorporate serotype 22F into a pneumococcal vaccine to provide robust antibody responses that will provide immunity and reduce disease in human populations." *Id.*

Having found that "Merck 2011 specifically suggested incorporation of a serotype 22F conjugate linked to $CRM_{197}$ into a pneumococcal vaccine that was already composed of other known serotypes, including all of the thirteen serotypes disclosed by Hausdorff," the Board concluded that a preponderance of evidence supports the obviousness of proposed substitute claim 46. (Appx152-153.)

Because Pfizer made no meaningfully distinct argument for the patentability of substitute claims 48 and 49, the Board found those claims unpatentable for the same reasons it found unpatentable substitute claim 46 and issued claims 3 and 4. (Appx155.)

## III. SUMMARY OF THE ARGUMENT

Substantial evidence supports the Board's finding that the challenged claims in Pfizer's '559 patent are unpatentable as obvious over Merck 2011, Pfizer 2012, and the general knowledge in the art. Pfizer's issued claims broadly cover any multivalent vaccine comprising a glycoconjugate(s) of the pneumococcal serotype 22F and any other pneumococcal serotypes within a broad molecular weight range. More specifically, challenged (issued) claim 1 recites an immunogenic composition comprising a glycoconjugate prepared from the 22F serotype of *S. pneumoniae* and a carrier protein, wherein the glycoconjugate has a molecular weight between 1,000 - 12,500 kDa and a polysaccharide-to-carrier protein (w/w) ratio between 0.4 - 2.

Merck 2011 teaches every limitation of claim 1 except an express disclosure of the recited molecular weight range. In particular, Merck 2011 discloses a multivalent pneumococcal conjugate vaccine (PCV-15) comprising glycoconjugates prepared from fifteen pneumococcal serotypes, including the 22F serotype, conjugated to the same carrier protein disclosed in the '559 patent and

conforming to the claimed polysaccharide-to-carrier protein. Although Merck 2011 does not expressly disclose the molecular weights of these glycoconjugates, the Board found that artisans would have been motivated to optimize the glycoconjugates in Merck 2011's vaccine to within the claimed size range based on Pfizer 2012's teaching that the typical mass of glycoconjugates in multivalent vaccines is between 500 - 5,000 kDa. The Board also found that artisans would have had a reasonable expectation of success in doing so based on Merck 2011's express teaching that the "robust" immune response seen across all fifteen serotypes with PCV-15 demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing vaccines.

Pfizer makes the same unavailing arguments it made to the Board about the obviousness of the claimed molecular weight ranges. According to Pfizer, the Board erred in finding that molecular weight is a results-effective variable for generating immunogenic compositions comprising pneumococcal glycoconjugates. Not so. As Pfizer's own experts acknowledged, molecular weight was known to be an "important" – and possibly even "critical" – parameter for generating immunogenic glycoconjugate compositions. These experts admitted that it was well-known in the art that the degree of crosslinking and overall size of a glycoconjugate lattice can be regulated by routine variation of the conditions of the conjugation reaction. Indeed, the filtration techniques disclosed in Merck 2011

exemplify the artisan's ability to optimize glycoconjugate size (i.e., molecular weight). Based on these admissions and the teachings in the prior art, substantial evidence supports the Board's finding that molecular weight was a results-effective variable associated with improved stability of conjugates and good immune response, and that its optimization was well within the grasp of one of ordinary skill in the art.

Pfizer's argument that the molecular weight range disclosed in Pfizer 2012 does not overlap with the claimed molecular weight range lacks merit. According to Pfizer, Pfizer 2012 would not have guided a skilled artisan to generate the claimed 22F serotype glycoconjugates within the claimed molecular weight range because Pfizer 2012 does not recite the specific molecular weight range of any pneumococcal conjugate. From a mathematical standpoint, however, there can be no doubt that the range of molecular weights of the vaccine conjugates disclosed in Pfizer 2012 (i.e., 500 - 5,000 kDa) overlaps with the range of molecular weights recited in Pfizer's claims (i.e., 1,000 - 12,000 kDa). Moreover, while it is true that Pfizer 2012 does not expressly disclose vaccines containing pneumococcal conjugates or those specifically including the 22F serotype, Pfizer 2012's teachings about the typical molecular weights of glycoconjugates are still relevant. Thus, the Board reasonably found that artisans would have understood the molecular weight ranges disclosed in Pfizer 2012 to be desirable and would have had a reasonable

expectation of achieving an immunogenic serotype 22F conjugate in that range. Absent evidence from Pfizer that artisans would not have considered Pfizer 2012's general disclosures about glycoconjugates relevant to the claimed 22F pneumococcal glycoconjugates, the law requires nothing more.

To the extent that Pfizer also complains that a portion of the molecular weight range disclosed in Pfizer 2012 falls outside the claimed range (i.e., 500-4,999 kDa), this is a meaningless distinction. While anticipation requires that a prior art range be completely within the scope of a claimed range – obviousness does not. In light of the foregoing findings, Pfizer fails to demonstrate reversible error in the Board's finding that its issued claims are unpatentable as obvious.

Substantial evidence also supports the Board's finding that Pfizer's proposed substitute claims are unpatentable as obvious over Hausdorff, Merck 2011, and the general knowledge in the art. Representative substitute claim 46 contains all of the limitations of issued claim 1 but recites glycoconjugates of 13 additional serotypes and a requirement that all serotypes produce a 2-log immune response over baseline in New Zealand White Rabbits. There is no dispute that Hausdorff teaches a multivalent vaccine comprising glycoconjugates of all of the serotypes recited in claim 46 except 22F. There is also no dispute that each serotype in Hausdorff's vaccine exhibits a greater than 2-log immune response increase over baseline in New Zealand White Rabbits. The Board correctly found that artisans

would have been motivated to incorporate a 22F glycoconjugate in Hausdorff's vaccine based on Merck 2011's teaching that the addition of a 22F glycoconjugate to a multivalent vaccine provides a "robust" immune response and the feasibility of including other serotype glycoconjugates in multivalent vaccines. The Board also correctly found that artisans would have had a reasonable expectation that such a vaccine would induce immune responses according to claim 46 based on Merck 2012's data showing that a 22F glycoconjugate induced a greater than 2-log increase in immune response over baseline at least 50% of the time in New Zealand White Rabbits and similar increases in infant rhesus monkeys.

The Board correctly found Pfizer's rebuttal arguments about "immune interference" unpersuasive. According to Pfizer, artisans would not have had a reasonable expectation of success that incorporating a 22F glycoconjugate in Hausdorff's vaccine would produce an immune response according to claim 46 because Merck 2011 did not demonstrate a 2-log increase in immune response across all serotypes in all of its rabbits studies. The Board found this evidence outweighed by the lack of immune interference in Hausdorff's multivalent vaccine and Merck 2011's robust results with the 22F serotype in rabbits and monkeys.

Pfizer's argument that the Board improperly ignored relevant data in Skinner and Merck 2011 showing immune interference is similarly inapt. Pfizer argued before the Board that Skinner's *in vitro* data showing a poorer immune response

for Merck 2011's PCV-15 vaccine compared to Prevnar® would have diminished any expectation that adding a 22F glycoconjugate to Hausdorff's vaccine would achieve the 2-log IgG increase across serotypes. The Board correctly found, however, that the *in vitro* activity data shown in Skinner's Table 2 are less relevant to claim 46 than the serotype-specific immune response data from infant rhesus monkeys presented in Skinner's Figure 3 – especially when considered in light of Merck 2011's data showing a 2-log increase in immune response to 22F glycoconjugates in rabbits and monkeys. In light of the foregoing findings, Pfizer fails to demonstrate any abuse of discretion in the Board's denial of its motion to amend.

Lastly, the USPTO did not conduct Director review in a manner that violates either the APA or the Supreme Court's decision in *Arthrex*. In contrast to Pfizer's assertions, the agency has no obligation to formalize or publish the process by which the Director seeks internal advice from staff to assist in making a discretionary determination. Moreover, even if some obligation attached, notice-and-comment rulemaking would not be required because rules prescribing procedures before an agency are expressly exempt from the notice-and-comment rulemaking requirements of the APA, per 5 U.S.C. 553(b)(3)(A). As such, Pfizer's APA challenges to the agency's interim procedures lack merit.

# IV. ARGUMENT

## A. Standard of review

Pfizer has the burden of showing that the Board committed reversible error. *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004).

Obviousness "is a legal conclusion based on underlying findings of fact." *In re Thrift*, 298 F.3d 1357, 1363 (Fed. Cir. 2002) (quoting *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000)). These factual determinations include what a reference teaches (*see Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995)); whether there is a motivation to combine prior art references as claimed (*see Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006); *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000)); and whether the prior art provides a reasonable expectation of success (*Alza*, 464 F.3d at 1289). This Court reviews the Board's ultimate determination of obviousness without deference, and its underlying factual findings for substantial evidence. *Gartside*, 203 F.3d at 1316.

This Court has defined substantial evidence as that which "'a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 1312 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)). "[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome

of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

Pfizer's arguments concerning the rules governing the Director review process are matters of law, which this Court reviews *de novo*. *See Demko v. United States*, 216 F.3d 1049, 1052 (Fed. Cir. 2000); *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017).

**B. Substantial evidence supports the Board's finding that Pfizer's issued claims are unpatentable as obvious**

The Board correctly found claim 1 of the '559 patent unpatentable as obvious over Merck 2011, Pfizer 2012, and general knowledge within the art. Claim 1 broadly covers any immunogenic composition that includes a pneumococcal serotype 22F conjugate, so long as the conjugate has a molecular weight and polysaccharide-to-protein ratio within a wide range of possible values. More specifically, claim 1 broadly recites an immunogenic composition comprising a pneumococcal serotype 22F glycoconjugate wherein the glycoconjugate has a molecular weight between 1,000 – 12, 500 kDa and polysaccharide-to-carrier protein (w/w) ratio between 0.4 – 2. (*See* Appx46.) Merck 2011 teaches a 15-valent pneumococcal conjugate vaccine (PCV-15) comprising glycoconjugates prepared from various pneumococcal serotypes, including the 22F serotype, conjugated to the same carrier protein disclosed in the '559 patent, $CRM_{197}$. (Appx1734 at ll.7-11).) These glycoconjugates are prepared

by mixing activated serotype saccharide with the $CRM_{197}$ carrier protein at a "0.2 – 2 to 1 charge ratio" and then filtered using a 0.2 µm filter. (*See* Appx1739 at ll.11-23, Appx1750 at ll.24-25.)

Merck 2011 reports that glycoconjugates containing the 22F and 33F serotypes "provide[] robust antibody responses demonstrat[ing] the feasibility of expanding coverage of pneumococcal serotypes." (Appx1737 at ll.2-3.) Merck also presents data showing that PCV-15 induced a "high" immunogenic response "for all 15 serotypes contained in the vaccine." (Appx1756 at ll.3-4.) Although Merck 2011 does not expressly state the molecular weights of the resultant glycoconjugates, Pfizer 2012 discloses that glycoconjugate vaccines have a "[t]ypical [m]ass" between 500 to 5,000 kDa. (Appx1898.)

The Board found that artisans would have been motivated by Merck 2011 and Pfizer 2012 to construct a vaccine comprising a serotype 22F-$CRM_{197}$ glycoconjugate within the claimed molecular weight ranges with a reasonable expectation of success. (Appx97.) In doing so, the Board credited Dr. Kasper's statement that artisans "'easily could have constructed a cross-linked serotype 22F $CRM_{197}$ conjugate in Pfizer 2012's molecular weight range, using the well-known reductive amination or CDAP conjugation chemistries disclosed in Merck 2011.'" (Appx98 (quoting Appx1622-1623 ¶ 107; citing Appx1739 at l.15 to Appx1740 at l.6).) The Board also found that artisans would have understood that Merck 2011's

disclosure of pre-conjugation ratios between 0.2 and 2 would result in a post-conjugation "'squarely [within] the claimed range.'" (Appx97-98 (quoting Appx4799-4800), *see also* Appx1750 at ll.24-25, Appx1752 at ll.3-8.)

As explained more fully below, each of the arguments presented in Pfizer's opening brief fails to demonstrate reversible error in the Board's determination that claim 1 is unpatentable as obvious.

**1. Pfizer fails to identify any reversable error in the Board's finding that the claimed molecular weight ranges are obvious**

Pfizer's opening brief raises the same unavailing arguments it made to the Board about the obviousness of the claimed molecular weight ranges. Specifically, Pfizer argues that molecular weight is not a result-effective variable for immunogenic glycoconjugates. (*See* Br. at 35-36.) Pfizer further argues that, even if it was, obviousness under the result-effective variable doctrine mandates that the claimed and prior art ranges overlap which, according to Pfizer, they do not. (*See* Br. 27-29.) Pfizer is wrong on all counts.

**a. Substantial evidence supports the Board's finding that molecular weight is a result-effective variable that was obvious to optimize**

A variable is result-effective when it is recognized in the prior art as affecting a desired result and ordinary artisans know how to optimize the variable using standard techniques. *See E.I. Dupont de Nemours & Company v. Synvina C.V.*, 904 F.3d 996, 1006-09 (Fed. Cir. 2018) ("[I]f the prior art does recognize that

the variable affects the relevant property or result, then the variable is result-effective."); *see also In re Applied Materials, Inc.*, 692 F.3d 1289, 1297 (Fed. Cir. 2012) (citing *In re Antonie*, 559 F.2d 618, 620 (CCPA 1977) ("A recognition in the prior art that a property is affected by [a] variable is sufficient to find the variable result-effective.")).

Using this framework, the Board correctly found that molecular weight is a results-effective variable for generating immunogenic compositions comprising *S. pneumoniae* glycoconjugates. It was known in the art that "[t]he degree of crosslinking and overall size of the network or lattice can be regulated by routine variation of the conditions of the conjugation reaction." (Appx2409 at 4:56-59.) Pfizer's own experts acknowledged this fact. In particular, Dr. Boons admitted that molecular weight was known to be an "important" – and possibly even "critical" – parameter for generating immunogenic glycoconjugate compositions. (Appx6486 at ll.2-8 ("[S]omething that the person skilled in the art would know, is that multiple parameters are important and can be critical for generating an immunogenic glycoconjugate composition, including degree of oxidation, saccharide to protein ratio, and *molecular weights*." (emphasis added)); *see also* Appx105-106.) Dr. Boons also admitted that it was well known that parameters like molecular weight "need to be optimized." (Appx6487 at ll.21-24; *see also* Appx106.) Pfizer's other expert, Dr. Paradiso, likewise admitted that the ordinary

artisan would "probably have a good idea on how to vary these parameters." (Appx6155 at ll.19-22 (discussing molecular weight); *see also* Appx106.)

Moreover, the filtration techniques disclosed in Merck 2011 exemplify the artisan's ability to optimize glycoconjugate size (i.e., molecular weight). (*See* Appx102.) Merck 2011 expressly teaches that pre-conjugation "[p]olysaccharides can be sized in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products." (Appx1737 at ll.15-18.) Merck 2011 also teaches that different serotype saccharides are individually conjugated to the purified $CRM_{197}$ carrier protein using a common process flow, in which target molecular mass is achieved through pre- and post-conjugation:

> **[T]he saccharide is** dissolved, **sized to a target molecular mass**, chemically activated and **buffer-exchanged by ultrafiltration**. The purified $CRM_{197}$ is then conjugated with the activated saccharide **and the resulting conjugate is purified by ultrafiltration prior to a final 0.2 µm membrane filtration**.

(Appx1749 (emphases added); *see also* Appx102 ("Thus, rather than fabricating desired sizes, Merck 2011 specifically provides methods to constrain polysaccharide sizes within a particular size range").)

Based on these admissions and the teachings in the prior art, the Board correctly found that "conjugate size is a results-effective variable associated with improved stability of conjugates and good immune response, limited only by filter size, thereby rendering 'optimization within the grasp of one of ordinary skill in

the art.'" (Appx108 (citing *In re Applied Materials*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) ("'[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.'")).) This same evidence belies Pfizer's argument (Br. at 35-37) that "none of the cited testimony shows that 'optimization of polysaccharide conjugate size was well known,' but rather the opposite: despite known techniques, molecular weight remained unpredictable." Again, Pfizer's own experts said the opposite. Because those in the art knew to optimize molecular weight to improve immunogenicity – and regularly did so using well established methods – the Board reasonably found that artisans would have achieved the claimed range through routine optimization. (Appx108.)

**b. A prior art range would need to anticipate to be obvious under Pfizer's interpretation of the law**

Pfizer asserts that obviousness based on the optimization of a result-effective variable cannot exist absent an overlap between the claimed and prior art ranges of the variable in question. (*See* Br. at 27.) And, according to Pfizer, there is no overlap here because "Pfizer 2012 does not recite the specific [molecular weight] range of any *pneumococcal* conjugates." (Br. at 29 (emphasis added).) This argument is inapt for at least two reasons.

First, while the existence of an overlap in ranges can be an important indicator of obviousness, *see DuPont de Nemours*, 904 F.3d at 1006, the Court has

never held that such an overlap is a mandatory prerequisite to obviousness. Instead, all that is required is that the claimed variable be recognized in the prior art as affecting a recognized result and that artisans know how to optimize the variable using standard techniques. *See E.I. Dupont de Nemours,* 904 F.3d at 1006; *Antonie*, 559 F.2d at 620. For example, a prima facie case of obviousness may "exist[] when the claimed range and the prior art range do not overlap but are close enough such that one skilled in the art would have expected them to have the same properties." *See Peterson*, 315 F.3d at 1329 (citing *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 783-89 (Fed. Cir. 1985) (concluding that a claim directed to an alloy containing "0.8% nickel, 0.3% molybdenum, up to 0.1% maximum iron, balance titanium" would have been prima facie obvious in view of a reference disclosing alloys containing 0.75% nickel, 0.25% molybdenum, balance titanium and 0.94% nickel, 0.31% molybdenum, balance titanium)). Thus, Pfizer's reading of the law is overly restrictive.

Second, from a mathematical standpoint, there can be no doubt that the range of molecular weights of the vaccine conjugates disclosed in Pfizer 2012 (i.e., 500 kDa to 5,000 kDa) overlaps with the range of molecular weights recited in Pfizer's claims (i.e., 1,000 kDa to 12,000 kDa). More importantly, Pfizer's argument misconstrues the Board's basis for finding that an overlap exists. While it is true that Pfizer 2012 does not expressly disclose vaccines containing

pneumococcal conjugates or those specifically including the 22F serotype, Pfizer 2012 discloses that the typical molecular weight for the polysaccharides employed in such vaccines is 50-200 kDa, whereas the "Typical Mass (kDa)" in the glycoconjugate portion of these vaccines is "500 to 5000." (Appx1898.) Based on this disclosure, the Board reasonably found that artisans would have understood the molecular weight ranges disclosed in Pfizer 2012 "to be desirable and would have had a reasonable expectation of achieving an immunogenic serotype 22F conjugate in that range." (Appx108.) The law requires nothing more.[7]

To the extent that Pfizer also complains that a portion of the molecular weight range disclosed in Pfizer 2012 falls outside the claimed range (i.e., 500-4,999 kDa), (*see* Br. at 29), this is a meaningless distinction. While anticipation requires that a prior art range be completely within the scope of a claimed range – obviousness does not (*see In re Woodruff*, 919 F.2d 1575, 1578 (Fed. Cir. 1990)).

[7] Pfizer makes a similar argument based on the alleged failure of "Merck's secondary references" to specifically discuss the 22F serotype, and then faults the Board for "simply dismiss[ing] this evidence." (Br. at 37-38 (citing Appx27-Appx34).) This argument fails for the same reason as its argument based on Pfizer 2012: the prior art need not be identical to render a claimed invention obvious. The Board thoroughly addressed each of these references in its decision in IPR2017-02132, i.e., the relevant proceeding. (*See* Appx109-113.)

### c. Under *KSR*, invocations of "unpredictability" alone do not render an invention patentable

Throughout its brief, Pfizer repeatedly argues that its claims should be patentable because the art was purportedly unpredictable. (*See* Br.35-39, 50). Pfizer's understanding of obviousness does not comport with the Supreme Court's decision in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). In *KSR*, the Supreme Court held that "obvious to try" can render a claim obvious depending on whether the invention is "predictable." *Id*. at 421. *KSR* speaks about predictability in different ways: in some places it speaks about a "predictable result," but in others it speaks about a "predictable use" or a "predictable variation." *KSR*, 550 U.S. at 416, 417. Properly understood, *KSR* should be read to require only that it be predictable to use a variation—because if a skilled artisan would have naturally tried the variation (regardless of their confidence that the attempt would succeed), then there is no need for the extra incentive for a patent. *Cf. KSR*, 550 U.S. at 419 ("Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress. . . .").

Several cases from this Court likewise conclude that unpredictable results are not a reason to issue a patent. In *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007) (decided while *KSR* was pending before the Supreme Court), Pfizer held a patent to amlodipine besylate tablets. The active ingredient, amlodipine, was taught in the prior art, and the question before this Court was

whether it would have been obvious to use the besylate salt. The district court ruled that the salt would not have been obvious because "there was no reliable way to predict the influence of a particular salt species on the active part of the compound." *Id.* at 1364. While accepting this factual finding as true, the Court still reversed because the district court had improperly "equat[ed] unpredictability to patentability." *Id.* Likewise, in *Bayer v. Schering Pharma AG v. Barr Labs Inc.*, 575 F.3d 1341 (Fed. Cir. 2009), this Court found that a drug composition would have been obvious, even though there was uncertainty regarding whether the formulation would work, on the basis that ordinary artisans would have considered the formulation a "viable option." *Id.* at 1348.

The USPTO recognizes that there is a line of cases where this Court has upheld patent claims seemingly based on a lack of predictability as to the results in inherently unpredictable fields like the chemical or biological arts. *See Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021) (no "reasonable-expectation-of-success analysis around [the claimed] specific dosage of mifepristone"); *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 704 (Fed. Cir. 2019) ("lack of predictability in relation to the changes" from one formulation to another); *Alcon Rsch., Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1370 (Fed. Cir. 2012) ("a person of ordinary skill in the art would not have a reasonable expectation of success" in using the particular dose"); *In re*

*Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Lit*., 676 F.3d 1063, 1070 (Fed. Cir. 2012) (obvious to experiment but no reasonable expectation of success); *Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd*., 923 F.3d 1051, 1060-62 (Fed. Cir. 2019) (motivation to pursue a treatment but insufficient "expectation of success"). To the extent these cases are inconsistent with a finding of obviousness here, they are also inconsistent with *KSR*. The USPTO recognizes that this panel cannot overturn binding precedent, but raises the issue to preserve it for further appeal.

#### d. The Board did not introduce the result-effective variable theory of obviousness *sua sponte*

Pfizer incorrectly argues that the Board "spontaneously" introduced the "result-effective variable standard and applied it to the claimed molecular weight ranges." (Br. at 25-26.) According to Pfizer, "[t]his legal concept first appeared in the institution decisions, not the Petitions or opening expert declarations," and "[n]one of the five petitions refers to 'result-effective variable,' 'variable' or 'optimize.'" *Id.* Although Merck's petition in IPR2017-02132 does not use the term "result-effective variable," Merck's petition cites the same precedent on overlapping ranges and the optimization of result-effective variables as the Board:

> The disclosed molecular weight range in Pfizer 2012 largely overlaps the claimed range of 1,000-12,500 kDa, and therefore expressly teaches conjugates of 1,000-5,000 kDa that fall within the claimed range. [Appx1898]; *see, e.g.*, ***In re Peterson*, **315 F.3d 1325, 1329 (Fed. Cir. 2003) ("**In cases involving**

> **overlapping ranges, we and our predecessor court have consistently held that even a slight overlap in range establishes a prima facie case of obviousness**.”). Notably, “**it is not inventive to discover the optimum or workable ranges by routine experimentation**.” ***In re Geisler***, 116 F.3d 1465, 1470 (Fed. Cir. 1997); *see also* ***In re Applied Materials, Inc.***, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (“**Such overlap itself provides sufficient motivation to optimize the ranges**.”).

(Appx4795-4796 (emphases added); *see also* Appx107-108.) Merck’s petition also relies on the same evidence and applies the same rationale for showing the routine nature of molecular weight optimization as the Board:

> **A POSITA easily could have constructed a cross-linked serotype 22F $CRM_{197}$ conjugate in Pfizer 2012’s molecular weight range, using the well-known reductive amination or CDAP conjugation chemistries disclosed in Merck 2011**. [Appx1739 at l.15 to Appx1740 at l.6]. . . . Since the structure of serotype 22F capsular polysaccharide had been known since 1989 ([Appx2394-2406]), a POSITA would have required **only routine experimentation to obtain a conjugate molecular weight within Pfizer 2012’s desirable range**, e.g., by increasing or decreasing the amount of cross-linking in the conjugate . . . “**[t]he degree of crosslinking and overall size of the network or lattice can be regulated by routine variation of the conditions of the conjugation reaction**.”

(Appx4796-4798 (emphases added); *see also* Appx103-108.) Thus, there was nothing spontaneous or new in the Board’s finding that the claimed molecular

weights are a result-effective variable for immunogenic glycoconjugates. And Pfizer's claims of blindsiding fall flat.

**e. The Board's citation to GSK 2008 did not create a new ground of rejection**

Pfizer incorrectly argues that the Board entered a new ground of rejection by "cross-citing" to GSK 2008 in its analysis of claim 1 because Merck allegedly did not rely on GSK 2008 to support the obviousness of claim 1 in its petition for IPR in IPR2017-02132. (Br. at 30.) According to Pfizer, "the Board relied on GSK 2008 throughout the Final Written Decision to support its obviousness analysis" of claim 1. (Br. at 29-30 (citing Appx96-97, Appx103-107).) Pfizer engages in a bit of hyperbole here.

First, although the Board describes the general teachings of GSK 2008 at Appx96-97, the Board states that its purpose in doing so is to illuminate Merck's position and address Pfizer's arguments. (*See* Appx94 ("After providing a discussion of the prior art and Petitioner's position, we will address Patent Owner's arguments").) Additionally, the entirety of this general description of GSK 2008 *precedes* the Board's obviousness analysis of claim 1. (*See* Appx97 at heading "*4. Analysis*.") A description of the prior art without any application to claim 1 can hardly be a basis for a new ground of rejection.

Second, although the Board goes on to discuss GSK 2008 with reference to claim 1 at Appx103-107, this discussion follows more than five pages of analysis

explaining why Merck 2011 and Pfizer 2012 render the claimed molecular weight range obvious (*see* Appx97-103). This discussion is also preceded by the Board's express statement that, while GSK 2008 does not provide the basis for the unpatentability of claim 1, it supports the Board's findings about the state of the art:

> While GSK 2008 was not expressly relied upon in the statement of the rejection, GSK 2008 evidences typical conjugation methods, polysaccharide sizes, and conjugate sizes of which the ordinary artisan would have been aware. *See, e.g.*, [Appx7549-7550].

(Appx103.) This Court has previously held that the citation of additional evidence regarding the state of the art is not a new ground of rejection where, as here, it does not form the basis of the Board's obviousness analysis. *See In re Morsa*, 803 F.3d 1374, 1378 (Fed. Cir. 2015).

**2. The Board correctly found a reasonable expectation of success for the 22F glycoconjugate of claim 1**

Pfizer argues that optimizing the molecular weight of the 22F glycoconjugate recited in claim 1 would not have been routine due to differences in conjugation chemistry for different serotypes and different immunogenic carrier proteins. (*See* Br. at 35-37.) According to Pfizer, optimization would have been too unpredictable because each pneumococcal serotype "requires individualized design and testing," and "[t]he appropriate molecular weight range for any serotype glycoconjugate needs to be determined on a case-by-case basis." (Br. at

36 (citing Appx4130 at l.24 -4131 at l.7).) As support, Pfizer cites the ’559 patent’s disclosure of distinct conjugation chemistries for generating glycoconjugates of serotypes 33F, 8, 10A, 12F, 15B, 22F, and 11A. (Br. at 36 (citing Appx5471).)

This Court has repeatedly held that “obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there [is] a *reasonable* probability of success.” *Pfizer v. Apotex*, 480 F.3d at 1364 (emphasis added). Even in inherently unpredictable fields like the chemical or biological arts, unpredictability alone does not demonstrate the absence of a reasonable expectation of success. *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013) (holding obvious claims to a combination drug to treat glaucoma). Likewise, the need to engage in further routine confirmatory testing will not defeat the reasonable expectation of success. *See Soft Gel Techs., Inc. v. Jarrow Formulas, Inc.*, 864 F.3d 1334, 1342 (Fed. Cir. 2017) (“A supplemental study does not imply lack of awareness of the likely result; rather, studies are frequently conducted to confirm what is suspected to be true;” in fact, “[a]n incentive to conduct a confirmatory study frequently exists even when one has every reason to expect success.”). Finally, as discussed above, to the extent some of this Court’s precedent is read to require such a degree of predictability, it is wrong.

Here, record evidence shows that artisans knew how to construct glycoconjugates of pneumococcal serotypes and how to optimize their molecular weights – and regularly did so – despite some unpredictability in the art. As the Board correctly found, Merck 2011 teaches that "'[c]apsular polysaccharides from *Streptococcus pneumoniae* can be prepared by standard techniques . . . and may be sized to some degree by known methods (*see, e.g.*, European Patent Nos. EP497524 and EP497525) and preferably by microfluidisation.'" (Appx101-102 (quoting Appx1737 at ll.12–15). Merck 2011 further teaches that these "[p]olysaccharides can be sized in order to reduce viscosity in polysaccharide samples and/or to improve filterability for conjugated products," including polysaccharides "prepared from serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, **22F**, 23F and 33F of *S. pneumoniae*." (Appx1737 at ll.15-18 (emphasis added); *see also* Appx102.) Thus, Merck 2011 demonstrates that methods of isolating and sizing the 22F capsular polysaccharide from *S. pneumoniae* were well-known in the art.

The record also establishes that artisans would have had a reasonable expectation of success for isolating and sizing 22F glycoconjugates to within the claimed ranges using well-known methods. As Dr. Boons acknowledged, "[the] optimization of polysaccharide conjugate size was well known to the person of ordinary skill in the art." (Appx107 (citing Appx6490 at ll.11-18).) Thus, the

Board correctly found that artisans would have had a reasonable expectation of success for producing immunogenic 22F glycoconjugates within the claimed molecular weight ranges when applying these well-known methods and Pfizer 2012's teachings about the typical claim ranges for immunogenic glycoconjugates to Merck 2011's immunogenic 22F glycoconjugates. (Appx107-108.)

**3. The Board considered the obviousness of claim 1 as a whole**

Pfizer does not challenge the Board's finding that "Merck 2011 suggests that the polysaccharide to carrier protein ratio of a serotype 22F conjugate falls within the claimed ratio range of 0.4 to 2." (Appx117.) Nor does it challenge the Board's finding that "a preponderance of the evidence of record supports the obviousness of selecting polysaccharide to carrier protein ratio values for the serotype 22F polysaccharides within the 0.4 and 2 range recited in claim 1 . . . based on the disclosures of Merck 2011, GSK 2008, and the knowledge of the ordinary artisan, including the WHO guidelines." (Appx118-119.) Instead, Pfizer faults the Board's analysis of claim 1 for allegedly considering the optimization of the glycoconjugate molecular weight variable and the polysaccharide-to-carrier protein weight ratio ranges in isolation, rather than assessing both the variables concurrently. (*See* Br. at 38.)

To the extent that the Board made no express findings considering co-optimization of the molecular weight and polysaccharide-to-carrier protein ratio of

the 22F glycoconjugate, it was merely following Pfizer's lead. In particular, Pfizer's Patent Owner Response devoted 25 pages of text to the separate discussion of these two variables; 15 pages to the obviousness of the claimed molecular range (Appx11205-11220), and 10 pages to the obviousness of the claimed polysaccharide-to-carrier protein ratio (Appx11221-11230). In all that text, these variables are discussed together only twice. The first occurs in a list of a "variety" glycoconjugate parameters selected for in the GSK 2008:

> **GSK also selected final serotype glycoconjugates that differed from other final serotype glycoconjugates in a variety of parameters, such as protein to polysaccharide ratio**, percent free polysaccharide, percent free carrier protein, polysaccharide antigenicity, and **glycoconjugate molecular weight**.

(Appx12111-11212. (internal citations omitted; emphases added). The second occurs in a block quote of another prior art reference, Lees 2008, which Pfizer characterized as demonstrating "how numerous factors need to be considered when determining the appropriate molecular weight of any glycoconjugate." (Appx11220.) Two passing references suggesting that these variables might be interrelated are simply not enough to raise or preserve their interrelatedness as an issue. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("'A skeletal "argument," really nothing more than an assertion, does not preserve a claim. . . . Especially not when the brief presents a passel of other arguments. . . .

Judges are not like pigs, hunting for truffles buried in briefs.'"')). Thus, Pfizer has shown no reversible error in the Board's handling of the molecular weight range and saccharide-to-carrier protein ratio.

**4. Substantial evidence supports the Board's finding that dependent claims 3 and 4 are unpatentable as obvious**

Pfizer challenges the Board's obviousness determination on claims 3 and 4 on two grounds: (1) Pfizer argues that the prior art does not teach or suggest compositions containing glycoconjugates of each of the serotypes recited in claims 3 and 4, and (2) Pfizer argues that the prior art does not teach or suggest that composition of each of the serotype glycoconjugates elicits an immune response, as required by independent claim 1. (*See* Br. at 41-46.) Both arguments fail.

Claim 3 depends from claim 1 and recites an immunogenic composition further comprising glycoconjugates containing *S. pneumoniae* serotypes 15B and 33F, while claim 4 depends from claim 3 and further recites the inclusion of glycoconjugates containing serotypes *S. pneumoniae* 12F, 10A, 11A, and 8. GSK 2008 teaches a "'multivalent pneumococcal vaccine'" containing glycoconjugates selected from the "'serotypes 1, 2, 3, 4, 5, 6A, 6B, 7F, 8, 9N, 9V, **10A**, **11A**, **12F**, 14, 15, 17F, 18C, 19A, 19F, 20, **22F**, 23F and **33F**'" of *S. pneumoniae*. (Appx126 (quoting Appx1777 at ll.29-31 (emphases added)).)

Hence, GSK 2008 teaches an immunogenic composition containing glycoconjugates of all of the serotypes recited in claims 3 and 4 except 15B.

Nevertheless, the Board correctly found that immunogenic compositions comprising glycoconjugates of each of the recited serotypes would have been obvious over the disclosures in Merck 2011, GSK 2008, and the knowledge of persons of ordinary skill in the art. (Appx126.) More specifically, PVP 2013 taught the inclusion of serotype 15B in a pneumococcal vaccine, and the Pneumovax® 23 polysaccharide vaccine already included serotypes 15B and 33F. (Appx127 (citing Appx1644 ¶ 142, Appx5789-5790 ¶ 60 (citing Appx26340)).) Although the PVP 2013 and Pneumovax® 23 vaccines included unconjugated 15B – and not a 15B glycoconjugate as recited in claims 3 and 4 – they demonstrate the desirability of a vaccine targeting the 15B serotype and that further development of 15B-containing vaccines were on the ordinary artisan's radar prior to the '559 patent. (Appx127.) This finding is consistent with the evidence in Dr. Lee's declaration that each of the serotypes recited in claims 3-8 "'were already included in multivalent pneumococcal vaccines on the market in 2014'" (Appx127 (quoting Appx5400-5402 ¶¶ 158-59).) On the foregoing, the Board agreed with Dr. Lee's assessment that "'[o]ne would also have reasonably expected success because . . . 22F and other new serotypes were successfully

included in multivalent PCV compositions while maintaining the immunogenicity to all serotypes in the compositions.'" *Id.*

The Board also correctly found unpersuasive Pfizer's argument (Br. at 40-41) that none of the prior art disclosures teaches a composition wherein each of the exemplified serotype glycoconjugates is immunogenic, as required by claims 3 and 4. Even though GSK 2008 does not expressly teach that each of the glycoconjugates in its multivalent vaccine is immunogenic, the Board sensibly found that "the disclosure of a vaccine by GSK 2008 containing multiple serotypes also requires induction of an immune response to each serotype. Otherwise, there would be no need to include a serotype unable to induce such a response. And indeed, GSK 2008 uses the same term, immunogenic, to describe the pneumococcal vaccine composition." (Appx127 (citing Appx1774 at l.27).)

Pfizer's argument (Br. at 44) that "the Board improperly shifted the burden to Pfizer to prove that claims 3 and 4 are 'unobvious' over the prior art" fails is inapposite. As evidentiary support, Pfizer quotes three sentences repeated in three lengthy Board decisions in three separate IPR proceedings. (*See* Br. at 44 (quoting Appx101, Appx120, Appx126 from IPR2017-02132).) Two of the quoted sentences appear in the Board's obviousness analysis of claim 1 and the 22F glycoconjugate, and have nothing to do with the additional glycoconjugates recited in claims 3 and 4. (*See* Appx101, Appx120.) While the remaining sentence

(Appx126) concerns claims 3 and 4, it appears after the Board's description of the prior art and the parties' positions (*see* Appx125-126). When read in this context and in its entirety, the Board was not shifting the burden of persuasion to Pfizer, but merely stating that it was not persuaded by Pfizer's rebuttal arguments:

> While we agree, as noted above, that Patent Owner correctly construes the claims to require the term "immunogenic" to apply to all of the serotypes present in the composition, we are not persuaded that claims 3 and 4 are unobvious over the disclosures in Merck 2011, Pfizer 2012, GSK 2008, and the knowledge of the person of ordinary skill in the art.

(Appx126.) Thus, none of the quoted sentences provide factual support for Pfizer's claims about improper burden-shifting.

Pfizer's argument also confuses the burden of proof/persuasion with the burden of production. As this Court recently explained in *Google v. IPA Technologies*:

> The term "burden of proof" has been used to describe two distinct concepts: the burden of persuasion and the burden of production. The burden of persuasion is "the ultimate burden assigned to a party who must prove something to a specified degree of certainty." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326 (Fed. Cir. 2008). In an IPR, "the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' and that burden never shifts to the patentee." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting 35 U.S.C. § 316(e)). In contrast, the burden of production, or "going forward with evidence," is a shifting one, "the allocation of which depends on where in the process of trial the issue arises." *Id*. at 1379 (quoting *Tech. Licensing*, 545 F.3d at 1327). The burden of production may be met either by "producing additional

> evidence" or by "presenting persuasive argument based on new evidence or evidence already of record." *Tech. Licensing*, 545 F.3d at 1327.

*Google LLC v. IPA Techs. Inc.*, 34 F.4th 1081, 1085 (Fed. Cir. 2022); *see also DuPont de Nemours*, 904 F.3d at 1008 (confirming that the burden-shifting framework applies in IPR proceedings when a prior art range overlaps the claimed range for a results-effective variable).

Because the sentence quoted from Appx126 appears *after* the Board's description of the prior art and the parties' respective positions (*see* Appx125-126) at most, it acknowledged that the burden of production had shifted to Pfizer to come forward with argument or evidence supporting the nonobviousness of immunogenicity across all serotypes. Because such burden-shifting is permissible under this Court's precedent, Pfizer's claims about improper burden-shifting also fail as a matter of law. *See Am. Nat'l Mfg. Inc. v. Sleep No. Corp.*, 52 F.4th 1371, 1385 (Fed. Cir. 2022) (holding portions of Board opinion quoted by Appellant for alleged improper burden-shifting merely responsive to Appellant's arguments regarding the proposed prior art combinations, and not improperly allocating the burden of persuasion).

For the foregoing reasons, the Board properly found issued claims 1, 3, and 4 of the '559 patent unpatentable as obvious. Because Pfizer's opening brief makes no separate argument regarding the patentability of any of the issued claims

challenged in IPR2017-2132, -2136, -2138, Pfizer has forfeited any right to do so now and those claims fall with issued claims 1, 3 and 4. *See SmithKline Beecha. v. Apotex*, 439 F.3d at 1319 ("Our law is well established that arguments not raised in the opening brief are waived.").

**C. The Board properly denied Pfizer's motion to add substitute claims 46-52**

The Board correctly found proposed substitute claims 46-52 unpatentable as obvious. Independent substitute claim 46 recites a multivalent immunogenic composition comprising the 22F glycoconjugate of original claim 1 plus glycoconjugates of thirteen additional serotypes (i.e., 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, and 23F). (Appx12655.) Claim 46 also expressly requires that the "composition exhibits more than a 2-log increase above baseline in serum IgG levels in New Zealand White Rabbits across all serotypes in the composition following administration of two equal doses of the composition." *Id.*

In finding these claims obvious, the Board relied on Hausdorff and Merck 2011 for teaching the "2-log increase" limitation of claim 46. Hausdorff teaches a multivalent immunogenic composition comprising glycoconjugates of all of the *S. pneumoniae* serotypes recited in claim 46 except the 22F serotype (i.e., the 13vPnC vaccine). (Appx140-141 (citing Appx28170 ¶¶ 230, 231).) In accordance with the terms of claim 46, Hausdorff examined the serotype-specific immune responses in New Zealand White Rabbits following the administration of

two doses of 13vPnC. (Appx140-141 (citing Appx28170 ¶¶ 230, 231).) There is no dispute that Table 3 of Hausdorff "shows that each of the thirteen tested serotypes produced an immune response with more than a 2-log increase above baseline serum IgG levels in New Zealand White Rabbits after administration of the two equal doses." (Appx141 (citing Appx28170 ¶¶ 230, 231, Table 3); *see also* Appx140 (citing Appx28156 ¶ 8).)

Merck 2011 similarly examined the ability of a multivalent immunogenic composition comprising glycoconjugates of *S. pneumoniae* serotypes 1, 3, 4, 5, 6A, 6B, 7F, 9V, 14, 18C, 19A, 19F, 22F, 23F or 33F (i.e., the PCV-15 vaccine) to elicit serotype-specific immune responses in New Zealand White Rabbits following two doses of PCV-15. (*See, e.g.*, Appx142-143 (citing Appx1734 at ll.9-11).) The results of these tests are presented in Table 4, which shows "[t]he fold-rise in antibody levels to the non-Prevnar® serotypes from Day 0 to Day 28 (Post-dose 2, PD-2)."

Table 4

Fold-rise (Post-dose 2:Pre-dose 1) in IgG Responses to Non-Prevnar™ Serotypes of PCV-15 Lead Formulations Tested in NZWR

| Serotype | NZWR-1 | NZWR-2 | NZWR-3 | NZWR-4 |
|---|---|---|---|---|
| 1 | 14.9 | 30.5 | 55.1 | 59.9 |
| 3 | 33.6 | 16.2 | 61.5 | 28.5 |
| 5 | 12.8 | 70.2 | 112.0 | 134.0 |
| 6A | 21.3 | 77.8 | 143.0 | 123.0 |
| 7F | 42.0 | 83.8 | 194.0 | 108.0 |
| 19A | 40.5 | 79.1 | 450.0 | 314.0 |
| 22F | 45.7 | 87.8 | 243.0 | 135.0 |

(Appx1757, Table 4 (highlighting added).) While Table 4 does not disclose a greater than 100-fold (or 2-log) increase in immunogenicity across all non-15 Prevnar® serotypes in each of the rabbit studies, the Board correctly found that the highlighted portions of Table 4 disclose a greater than100-fold (or 2-log) increase in immunogenicity for five of the non-Prevnar®15 serotypes in the NZWR-3 and NZWR-4 studies. [8] (Appx143 (citing Appx1757 at Table 4).) Most importantly, Table 4 shows a greater than 2-log increase above baseline for serotype 22F – i.e.,

[8] In making this finding, the Board mistakenly described the molecular weight range disclosed in Pfizer 2012 as "1,000 kDa to 5,000 kDa" when the actual molecular weight range disclosed in Pfizer 2012 was "500 kDa to 5,000 kDa." (*See* Appx108, Appx1898.) In contrast to Pfizer's assertions that this was a pervasive error (*see* Br. at 29), the Board correctly described Pfizer 2012 as disclosing typical molecular weight ranges for glycoconjugates as "500 kDa to 5,000 kDa" elsewhere in its decision (*see* Appx95, Appx102, Appx143).

the only serotype not found in Hausdorff's 13vPnC vaccine. On this basis, the Board correctly found that artisans would have been motivated to include serotype 22F in Hausdorff's 13vPnC vaccine to achieve the immunogenic composition of claim 46, and that they would have had a reasonable expectation that doing so would result in a 2-log increase in immune response across all serotypes.[9] (Appx144-148.)

In contrast to Pfizer's complaints (Br. at 47), the Board did not ignore the lower immune response ratios for PCV-15 vs. Prevnar® shown in Table 3 of Merck 2011. Before the Board, Pfizer argued that the results in Merck 2011's Table 3 demonstrate "immune interference" between serotypes in PCV-15. (Appx6699-6700.) According to Pfizer, Table 3 evidences a level of immune interference that would diminish any expectation that a vaccine combining Hausdorff's 13vPnC vaccine and Merck 2011's 22F glycoconjugate would demonstrate a 2-log increase in immune response over baseline across all serotypes, as required by claim 46. *Id.* Pfizer also made, and continues to make,

---

[9] In contrast to Pfizer's assertions (Br. at 46), the Board's unintentional use of "2-fold" instead of "2-log" when describing Merck 2011's Table 4 is, at best, harmless error. There is no dispute that Merck 2011's Table 4 discloses a greater than 100-fold (or 2-log) increase in immunogenicity for serotype 22F in the NZWR-3 and NZWR-4 studies. Additionally, the Board clearly understood and described this "2-log" increase elsewhere in its decision. (See, e.g., Appx149 ("We recognize Patent Owner correctly notes that Merck 2011 only obtained a 2-log increase of serum IgG levels in serotype 22F conjugates in two of the four arms. . . . ").)

the same argument with respect to the data presented in Merck 2011's Table 4 for the NZWR-1 and NZWR-2 studies. (*See* Appx6700-6703, Br. at 48-50.)

As the Board correctly found, artisans would not have been led away from incorporating a 22F glycoconjugate in Hausdorff's 13vPnC vaccine because Merck 2011 expressly states that "'the addition of new polysaccharide-protein conjugates containing serotypes 22F and 33F provides robust antibody responses [and] demonstrates the feasibility of expanding coverage of pneumococcal serotypes not covered by existing pneumococcal vaccines.'" (Appx148 (quoting Appx1737 at ll.1-4).) Accordingly, the Board found that "Merck 2011 provides specific reasons to incorporate serotype 22F into a pneumococcal vaccine to provide robust antibody responses that will provide immunity and reduce disease in human populations." (Appx148.)

The Board also correctly found that the data in Merck 2011's Table 3 and the NZWR-1 and NZWR-2 data in Merck 2011's Table 4 do not overcome the "reasonable expectation of success in obtaining a 2-log increase" based on the showing in Hausdorff's Table 3 "that a composition with thirteen of the fourteen serotypes . . . required by claim 46, conjugated with $CRM_{197}$, produced an immune response with more than a 2-log increase above baseline serum IgG levels in New Zealand White Rabbits after administration of the two equal doses with or without the aluminum salt adjuvant." (Appx148 (citing Appx28170 ¶ 231, Table 3); *see*

*also* Appx149 .) In doing so, the Board expressly acknowledged that "Merck 2011 only obtained a 2-log increase of serum IgG levels in serotype 22F conjugates in two of the four arms," and that the data in Figures 3 and 4 in Merck 2011 "did not satisfy the 2-log increase." (Appx149.) The Board simply found that these data do not overwhelm the reasonable expectation of success provided by Hausdorff and the other teachings in Merck 2011. (*See* Appx149 (citing *In re Kubin*, 561 F.3d 1351, 1360 (Fed. Cir. 2009) (quoting *In re O'Farrell*, 853 F.2d 894, 903-04 (Fed. Cir. 1988) ("'[o]bviousness does not require absolute predictability of success . . . all that is required is a reasonable expectation of success.'").

**1. Pfizer mischaracterizes the Board's treatment of Skinner**

Pfizer argues that the Board improperly relied on the rhesus monkey data presented in Skinner's Figure 3 to the exclusion of other more relevant data in Merck 2011's Table 3 and Skinner's Table 3. (Br. at 48.) Not so.

As shown above, the Board thoroughly considered the data in Merck 2011's Table 3 – it just found those data less compelling than the data in Hausdorff and Merck 2011's Table 4. The same is true for the data Pfizer presented in support of its expectation of success arguments based on Skinner. More specifically, Pfizer argued before the Board that the *in vitro* data presented in Skinner's Table 2 show that "PCV-15 elicited a variety of poorer responses when compared to Prevnar®," and that "[b]ased on this data, a POSA would have understood that PCV-15

exhibited immune interference and would not have had a reasonable expectation that Merck's asserted combination would achieve the 2-log IgG Increase across all serotypes as required by every substitute claim." (Appx7297; *see also* Appx151 (quotingAppx7297).) The Board found, however, that the *in vitro* opsonophagocytic killing activity data shown in Skinner's Table 2 are less relevant to claim 46 – which requires a 2-log increase in IgG (antibody) production in New Zealand White Rabbits – than the serotype-specific immune response data from rhesus monkeys presented in Skinner's Figure 3. (Appx151 ("Because claim 46 recites the 2-[log] increase in IgG levels, not in opsonophagocytic killing activity, Figure 3 of Skinner 2011 is more relevant to the claim.").) Given the requirements of claim 46, Pfizer can hardly assail the Board's reasoning. Additionally, Pfizer has no room to complain because the Board thoroughly considered *all* of the information disclosed in a reference that it presented.

More importantly, Pfizer fails to identify any error in the Board's finding that the results in Skinner's Figure 3 are especially significant to the expectation of success for claim 46 because they "[do] not appear to demonstrate serotype interference as the antibody responses to the seven Prevnar® serotypes were not diminished by inclusion of additional polysaccharide." (Appx151; *see also* Appx7002 at Fig.3.) As the Board so aptly put it:

> This is not the case where the prior art teaches merely to pursue a "'general approach that seemed to be a promising field of experimentation'" or "'gave only general guidance as to the particular form of the claimed invention or how to achieve it.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007) (quoting *O'Farrell*, 853 F.2d at 903; *Medichem*, 437 F.3d [1157,] 1167 [(Fed. Cir. 2006)]). Here, Merck 2011 specifically suggested incorporation of a serotype 22F conjugate linked to $CRM_{197}$ into a pneumococcal vaccine that was already composed of other known serotypes, including all of the thirteen serotypes disclosed by Hausdorff.

(Appx152.) On the foregoing, the Board correctly found that a preponderance of the evidence supports a determination that there would have been a reasonable expectation of success in obtaining a fourteen serotype pneumococcal vaccine composition as required by claim 46 with 2-log increases in IgG responses in New Zealand White Rabbits, because Merck 2011 itself exemplifies 2-log increases in IgG responses in New Zealand White Rabbits for serotype 22F conjugates. Moreover, both Paradiso 2009 and Skinner 2011 support the position that inclusion of an additional serotype 22F-$CRM_{197}$ conjugate into the thirteen serotype composition of Hausdorff would not have been expected to result in immune interference. (Appx152-153.)

**2. Substitute claims 48 and 49 are unpatentable for the same reasons as issued claims 3 and 4 and proposed substitute claim 46**

By Pfizer's own admission (Br. at 54), substitute claims 48 and 49 correspond to issued claims 3 and 4, respectively, and incorporate all the additional limitations recited in independent substitute claim 46. Because Pfizer makes no

arguments for the patentability of claims 48 and 49 that have not already been shown to lack merit with respect to issued claims 3 and 4 and proposed substitute claim 46, they fall with those claims. Moreover, because Pfizer makes no separate argument regarding the patentability of substitute claims 47 and 50-52, they also fall with claim 46. *See SmithKline Beecham*, 439 F.3d at 1319.

### D. Pfizer's APA challenges to the USPTO's implementation of Director review in light of *Arthrex* lack merit

Pfizer asserts that the process through which the USPTO considered Pfizer's request for Director review of the Board's decisions was deficient in multiple ways. Br. at 56-59. None has merit.

Pfizer's lead argument is that the agency's post-*Arthrex I* Director-review procedures violate the APA because they are not regulations promulgated through notice-and-comment rulemaking. More specifically, Pfizer contends that the Director review procedures must be issued through notice-and-comment rulemaking. *See* Br. at 56-57. Pfizer's argument misinterprets the applicable statutes and this Court's case law.

The Director's guidance related to review does not require notice and an opportunity for public comment. The APA expressly exempts "rules of agency organization, procedure, or practice" from notice-and-comment rulemaking absent some other statutory requirement. *See* 5 U.S.C § 553(b)(3)(A) ("*Except when* notice or hearing is *required by statute, this subsection does not apply to*

interpretative rules, general statements of policy, or *rules of agency* organization, *procedure*, or practice." (emphases added)). The guidance Pfizer challenges, which explained the agency's internal processes and also detailed the procedural requirements for seeking Director review, falls squarely within that exception. *See, e.g.*, *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 349-50 (4th Cir. 2001) (explaining that "a procedural rule for handling appeals" is exempt from notice-and-comment requirements); *Bachow Commc'ns Inc. v. FCC*, 237 F.3d 683, 690 (D.C. Cir. 2001) (rules governing an application process are procedural under the Administrative Procedure Act); *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (similar).

The two provisions of the Patent Act cited by Pfizer impose no notice-and-comment requirement. The first provision grants the Director authority to establish regulations governing the conduct of proceedings in the USPTO. *See* 35 U.S.C. § 2(b). That provision specifically recognizes that such regulations should be "made in accordance with section 553 of title 5," *id.* § 2(b)(2)(B), and as just discussed, that provision excludes rules of agency organization, procedure, and practice from notice-and-comment requirements. The second provision requires the Director to set forth regulations governing thirteen specific types of IPR procedures. 35 U.S.C. § 316(a). Director review is not among the thirteen listed procedures, and in any event, the provision does not of its own force require that

any of those regulations be issued through notice and comment. The background rule of Section 553(b)(3)(A) of the APA thus applies and would exempt procedures for Director review from notice-and-comment requirements even if they were required by 35 U.S.C. § 316(a). Moreover, Pfizer's complaint is particularly ill-founded here because, in the main, the interim guidance simply extends to the new-Director review process longstanding rules already applicable to other stages of inter partes review proceedings. *Compare* 37 C.F.R. § 42.71(d) (setting a 30-day deadline to file request for rehearing), and *id.* § 42.24(a)(1)(v) (setting 15-page limit on motions), *with* Arthrex Q&As[10], at B1-B2, and *Interim Process for Director Review* §§4, 5[11] (reiterating these requirements).

Neither *Facebook, Inc. v. Windy City Innovations, LLC*, 973 F.3d 1321, 1349-50 (Fed. Cir. 2020) (additional views), nor *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1331 (Fed. Cir. 2017) (Moore, J., concurring), which Pfizer cites, supports Pfizer's position. Those opinions addressed when and under what conditions *Chevron* deference would be due to the agency's interpretation of the America Invents Act. Neither opinion suggests that 35 U.S.C. § 316(a) displaces ordinary principles of agency action set out in the APA, including the APA's

---

[10] Available at https://www.uspto.gov/patents/patent-trial-and-appeal-board/procedures/arthrex-qas.

[11] Available at https://www.uspto.gov/patents/patent-trial-and-appeal-board/interim-process-director-review.

exemption of rules of agency organization, procedure, and practice from notice-and-comment requirements.

To the extent that Pfizer complains that the USPTO's current guidance on Director review should have been published in the Federal Register rather than on the agency's website (Br. at 57-58), that distinction would not change the result here. Even assuming the guidance qualifies as a "rule" for APA purposes, the APA provides that a rule erroneously issued outside the Federal Register process still binds a party that has "actual and timely notice of the terms thereof," 5 U.S.C. § 552(a)(1), and there is no question that requirement would be met here because Pfizer availed itself of those procedures. Pfizer fails to identify any way in which it was prejudiced by any aspect of the guidance. *See* 5 U.S.C. § 706(2) (stating that in APA review "due account shall be taken of the rule of prejudicial error"). In any event, although not required to do so, the Director issued a request for comments seeking the public's views on, *inter alia*, the procedures for conducting the Director review process in July 2022. *See* USPTO Seeks Public Input through a Request for Comments on Director review, Precedential Opinion Panel Review, and Internal Circulation and Review of Patent Trial and Appeal Board decisions, 87 Fed. Reg. 43249 (July 22, 2022).

Finally, Pfizer contends that Director review was inadequate because the "single-page" decisions denying Director review "contain no substantive analysis,

and are effectively unreviewable." Br. at 58. But no additional analysis is required in this context. Here, the Board issued detailed decisions concluding that Pfizer's claims were unpatentable. Appx1, Appx82, Appx161, Appx217, Appx272. When Commissioner Hirshfeld denied Pfizer's request for Director review, Pfizer still had a detailed explanation of the grounds for the agency's decisions to cancel the patent claims, and the order denying review stated that the Board's final written decision in each instance was the "final" decision of the agency. *See* Appx82. Courts have routinely rejected the suggestion that each layer of an agency's review process must provide a separate reasoned decision to enable judicial review. *See, e.g.*, *Yuk v. Ashcroft*, 355 F.3d 1222, 1228-32 (10th Cir. 2004) (rejecting challenge to administrative affirmances without opinion in the immigration context and collecting cases); *Armstrong v. CFTC*, 12 F.3d 401, 403-04 (3d Cir. 1993) ("An administrative agency need not provide an independent statement if it specifically adopts an ALJ's opinion that sets forth adequate findings and reasoning."); *City of Bethany v. FERC*, 727 F.2d 1131, 1144 (D.C. Cir. 1984); *City of Frankfort v. FERC*, 678 F.2d 699, 708 (7th Cir. 1982).

For all these reasons, Pfizer fails to identify any APA violation in the rules governing Director review in IPRs.

## V. CONCLUSION

Because Pfizer has failed to demonstrate reversible error in the Board's final written decisions in IPR2017-02131, -02132, -02136, and -02138 – both on its issued claims and proposed substitute claims – this Court should affirm on all grounds. Because Pfizer also fails to identify any APA violation in the agency's interim procedures for Director review in IPRs, this Court should dismiss this claim.

Respectfully submitted,

*/s/ Mary L. Kelly*
THOMAS W. KRAUSE
Solicitor

FARHEENA Y. RASHEED
Deputy Solicitor

MARY L. KELLY
DANIEL KAZHDAN
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

*Attorneys for the Director of the United States Patent and Trademark Office*

December 13, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. Proc. 32(a)(7), I certify that the foregoing BRIEF FOR DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE complies with the type-volume limitation required by the Court's rule. The total number of words in the foregoing brief, excluding table of contents and table of authorities, is 13,786 words as calculated using the Microsoft Word® software program.

*_/s/ Mary L. Kelly_*
Mary L. Kelly
Associate Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450